## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION
SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III)
GRANTING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY;
(V) SCHEDULING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby file this motion (this "DIP Motion")[2] for the entry of an interim order, substantially in the form attached hereto as Exhibit 1 (the "Interim Order") and final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition secured financing in the form of (i) the Term Loan DIP Facility set forth in the Term DIP Loan Agreement, attached hereto as Exhibit B to Exhibit 1 and (ii) the ABL DIP Facility set forth in the ABL DIP Agreement, attached hereto as Exhibit A to Exhibit 1; (b) granting liens and providing super-priority claims with respect to such post-petition financing (including with respect to the CCAA Debtor Credit Support (defined below)); (c) authorizing the Debtors to use Cash Collateral; (d) approving the form of adequate protection

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

[2]  Unless otherwise noted herein, all capitalized terms used in this DIP Motion shall have the meanings ascribed to such terms below.  Capitalized terms used in this DIP Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order, the Term DIP Loan Agreement, and the ABL DIP Agreement, as applicable.

to be provided by the Debtors to the Prepetition Secured Parties; (e) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim Order; (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and (g) granting related relief.  In support of this DIP Motion, the Debtors submit the *Declaration of Kent McNeil in Support of Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration") and the *Declaration of Eric Winthrop of Houlihan Lokey in Support of DIP Financing* (the "Winthrop Declaration"), both of which were filed contemporaneously herewith. The Debtors also filed the *Debtors' Motion for Entry of an Order Authorizing the Filing Under Seal of the Fee Letters Relating to the DIP Facilities* contemporaneously with this Motion seeking to file under seal certain Fee Letters related to the DIP Facilities.  In further support of this DIP Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these Chapter 11 Cases (as defined herein) for the primary purpose of conducting an orderly and fair sale of substantially all of their assets as a going concern (the "Sale Process").[3]  Accordingly, the Debtors entered chapter 11 with a fully-negotiated stalking horse bid and asset purchase agreement (the "Stalking Horse Bid") with certain affiliates of FCF Co., Ltd. (the "Stalking Horse Bidder") for the sale of substantially all assets of the Debtors and their non-Debtor affiliates (collectively, the "Company") at a total implied enterprise value of up to $930.6 million.  The Stalking Horse Bid provides a strong foundation for the Sale Process that the Debtors believe will maximize value for parties in interest.  As noted in the First Day Declaration, the Stalking Horse APA preserves the

---

[3]  Each of Debtors' non-debtor Canadian affiliates—Connors Bros. Clover Leaf Seafoods Company, Clover Leaf Holdings Company, Connors Bros. Holding Company, K.C.R. Fisheries Ltd., and 6162410 Canada Limited (collectively, the "CCAA Debtors")—has or will soon make an application for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended, with the Ontario Superior Court of Justice (Commercial List).

Company's businesses as going-concerns, contemplates the employment of nearly all of the Company's employees, and maintains a business partner to scores of vendors and customers who have done business with the Company for decades.  *See* First Day Declaration at ¶ 11.

2.      The Debtors and their non-debtor affiliates require immediate access to additional liquidity to both fund these Chapter 11 Cases and preserve the going-concern value of the global business during the Sale Process.  In the months leading up to these Chapter 11 Cases, the Debtors engaged in extensive negotiations with their Prepetition Secured Lenders to obtain postpetition financing on the best possible terms. As described below, these terms were better than and more actionable than any other proposal the Debtors received. As a result of those efforts, the Debtors secured commitments for approximately $280 million in postpetition debtor-in-possession financing (the "DIP Financing") from their Prepetition Secured Lenders.

3.      The DIP Financing consists of two separate facilities:  (a) a new money multiple draw term loan (the "Term Loan DIP Facility") of up to $80 million provided by the Prepetition Term Loan Lenders (the "Term Loan DIP Lenders"), of which $40 million will be available upon entry of the Interim Order and the closing of the Term Loan DIP Facility; and (b) a new asset-based revolving credit facility (the "ABL DIP Facility," and together with the Term Loan DIP Facility, the "DIP Facilities") in an amount not to exceed $200 million, provided by the Prepetition ABL Lenders (the "ABL DIP Lenders" and collectively with the Term Loan DIP Lenders, the "DIP Lenders") that provides up to (i) $160 million of availability to the U.S. ABL Borrower (as defined herein), subject to a borrowing base limitation based on the U.S. ABL Borrower's eligible accounts receivable, reserves, and inventory (the "U.S. Revolver Commitment") and (ii) $40 million of availability to the Canadian ABL Borrower (as defined herein), subject to a substantially similar borrowing base with regard to the Canadian ABL Borrower' assets (the "Canadian Revolver Commitment").  The DIP Facilities allow the Debtors

to secure the DIP Facilities with priming liens and utilize Cash Collateral on a fully-consensual basis, avoiding expensive and potentially value destructive litigation.  In addition, as further described below, the inclusion of the CCAA Debtors and the Canadian Revolver Commitment in the ABL DIP Facility—which preserves an important component of the Debtor's existing Prepetition ABL Facility—provides the Debtors' approximately $26.6 million of incremental liquidity during the first 12 weeks of the Chapter 11 Cases (the "CCAA Debtor Credit Support").

4.     For all these reasons and the reasons set forth below, the Debtors submit that the DIP Financing is in the best interests of the Debtors, their estates, and all parties in interest and respectfully request that the Court grant the relief requested in this DIP Motion.

## JURISDICTION

5.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this DIP Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

6.     Pursuant to sections 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules

2002-1(b) and 4001-2, the Debtors request entry of the Interim Order and, pending the Final

Hearing, the Final Order, granting, among other things, the following relief:

a.     authorizing the Debtors to enter into the Term Loan DIP Facility, which shall include loans to be advanced and made available to the Borrower[4] in the aggregate principal amount of $80 million, of which $40 million shall be available upon entry of the Interim Order and subject to satisfaction of other conditions to borrowing, pursuant to the terms and conditions of the Term Loan DIP Agreement and all ancillary documents related thereto (collectively, the "Term Loan DIP Documents");

b.     authorizing the Debtors to enter into the ABL DIP Facility, which shall consist of revolving loans and letters of credit to be advanced and made available to the U.S. Borrower and Canadian Borrower[5] thereunder in the maximum aggregate principal amount of $200 million, all of which shall be available upon entry of the Interim Order, including to fully refinance the prepetition obligations under the Prepetition ABL Facility, and subject to satisfaction of other conditions to borrowing, pursuant to the terms and conditions of the ABL DIP Agreement and all ancillary documents related thereto (collectively, the "ABL DIP Documents" and together with the Term DIP Documents, the "DIP Documents");

c.     ordering that all obligations of the Borrower under the Term Loan DIP Facility shall be, subject to the Carve-Out and certain Permitted Prior Liens, secured: (i) pursuant to section 364(d)(1) of the Bankruptcy Code, by priming, first priority security interests in and liens on all DIP Term Loan Priority Collateral, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, by security interests in and liens on the ABL Collateral that shall be junior only to the liens securing the ABL DIP Facility, any adequate protection liens securing the Prepetition ABL Facility, and existing valid, perfected and non-avoidable liens on the Prepetition ABL Facility (collectively, the "DIP Term Loan Liens") in each case with the priority set forth in the priority waterfall attached as Exhibit C to the Interim Order (the "Priority Waterfall");

d.     ordering that, all obligations of the U.S. Borrower and Canadian Borrower under the ABL DIP Facility shall be, subject to the Carve-Out and certain Permitted Prior Liens, secured: (i) pursuant to section 364(d)(1) of the Bankruptcy Code, by priming, first priority security interests in and liens on all DIP ABL Priority Collateral; and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, by security interests in and liens on the DIP Term Loan Priority Collateral junior only to the liens securing the Term Loan

---

[4]  Debtor Bumble Bee Foods, LLC is the Borrower under the Term Loan DIP Facility.

[5]  Debtor Bumble Bee Foods, LLC is also the U.S. Borrower under the ABL DIP Facility, and non-debtor Connors Bros. Clover Leaf Seafoods Company is the Canadian Borrower thereunder.

DIP Facility, any adequate protection liens securing the Prepetition Term Facility, and existing valid, perfected and non-avoidable liens securing the Prepetition Term Facility (collectively, the "<u>DIP ABL Liens</u>" and together with the DIP Term Loan Liens, the "<u>DIP Liens</u>") in each case with the priority set forth in the Priority Waterfall;

e. granting to the ABL DIP Agent, the Term Loan DIP Agent (as defined below) and, together with the ABL DIP Agent, the "<u>DIP Agents</u>", and the DIP Lenders on account of the DIP Facilities and all obligations owed thereunder and under, or secured by, the DIP Documents, pursuant to section 364(c)(1), allowed super-priority administrative expense claim status with the priority set forth in the Priority Waterfall;

f. authorizing the Debtors to use any and all "cash collateral" as defined in section 363 of the Bankruptcy Code ("<u>Cash Collateral</u>"), which term shall include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition Secured Parties, in accordance with the terms set forth in the Interim Order;

g. ordering that, the Term Agent, for the benefit of itself and the Term Lenders, shall receive the following as adequate protection (the "<u>Term Adequate Protection</u>") to the extent of any diminution in the value of the prepetition security interests securing the Prepetition Term Facility, whether or not such diminution in value results from (i) the sale, use, or lease of the collateral securing the Term Obligations (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the Term Loan DIP Facility, or (iii) the imposition of the automatic stay:

(i) continuing, valid, binding, enforceable and perfected postpetition "replacement" liens on all DIP Collateral (the "<u>Term Loan Adequate Protection Liens</u>") with the priority set forth in the Priority Waterfall;

(ii) a super-priority administrative expense claim (the "<u>Term Loan 507(b) Claim</u>");

(iii) payment of all reasonable out-of-pocket fees, costs and expenses of the Prepetition Term Loan Agent, including, but not limited to, professional fees and expenses and financial advisory fees;

(iv) monthly cash payments of interest at the applicable non-default rate provided for in the Prepetition Term Facility;

(v) payment in kind and accrual of certain other interest provided for in the Prepetition Term Facility; and

01:25622533.1

(vi)    access to the Debtors' books and records and such financial reports as are provided to the DIP Agents.

h.    ordering that, solely to the extent the Prepetition ABL Facility remains outstanding, the ABL Agent, for the benefit of itself and the ABL Lenders, shall receive the following as adequate protection (the "ABL Adequate Protection") to the extent of any diminution in the value of the prepetition security interests securing the Prepetition ABL Facility whether or not arising as a result of (i) the sale, use, or lease of the collateral securing the obligations under the ABL Facility (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the ABL DIP Facility, or (iii) the imposition of the automatic stay:

(i)    continuing, valid, binding, enforceable and perfected postpetition "replacement" liens on all DIP Collateral (the "ABL Adequate Protection Liens"), with the priority set forth in the Priority Waterfall;

(ii)    a super-priority administrative expense claim (the "ABL 507(b) Claim" and, together with the Term Loan 507(b) Claims, the "Adequate Protection 507(b) Claims");

(iii)    payment of all reasonable out-of-pocket fees, costs and expenses of the ABL Agent, including, but not limited to, professional fees and expenses and financial advisory fees;

(iv)    monthly cash payments of interest at the applicable non-default rate provided for in the Prepetition ABL Facility; and

(v)    access to the Debtors' books and records and such financial reports as are provided to the DIP Agents;

i.    ordering that, solely to the extent a CCAA Debtor provides CCAA Debtor Credit Support to the Debtors during the Chapter 11 Cases, such CCAA Debtor shall receive a super-priority administrative expense claim (the "CCAA Debtor Credit Support 364(c)(1) Claims") in an amount equal to the applicable CCAA Debtor Credit Support provided;

j.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order or the Final Order, as applicable;

k.    scheduling the Final Hearing to consider entry of the Final Order and approving the form of notice with respect to the Final Hearing; and

l.    granting related relief.

## BACKGROUND

### I.    General.

7.    On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions (collectively, the "Chapter 11 Cases") for relief under chapter 11 of the Bankruptcy Code.

8.    The Debtors seek to continue in possession of their respective properties and to operate and maintain their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No party has requested the appointment of a trustee or examiner, and no committee has been established in these Chapter 11 Cases.

9.    Additional information regarding the Debtors' business and these Chapter 11 Cases is set forth in the First Day Declaration.

### II.    The Debtors' Organizational Structure and Business.[6]

10.    Non-debtor Clover Leaf Seafood S.à. r.l. ("CLSS"), a Luxembourg société à responsabilité limitée, is the direct or indirect parent of each of the Debtors, and is the 100% owner of non-Debtor Clover Leaf Holdings Company ("Clover Leaf" and, collectively with its direct and indirect subsidiaries, the "Canadian Affiliates").  CLSS is wholly owned by non-debtor Bumble Bee Foods S.à. r.l. ("BBFS"), a Luxembourg société à responsabilité limitée. Debtor Bumble Bee Foods, LLC (Bumble Bee LCC") and Anova Food, LLC ("Anova Food") operate the Company's shelf-stable seafood line and fresh frozen seafood line, respectively, in the United States.  Non-Debtor Connors Bros. Clover Leaf Seafoods Company, a wholly-owned subsidiary of Clover Leaf ("Connors Bros."), operates the Company's shelf-stable seafood line in Canada and internationally with assistance from other non-Debtor affiliates.

---

[6] An organizational chart of the Debtors and their affiliates is attached hereto as Exhibit 2.

11.     Accordingly, each of the Debtors and the Canadian Affiliates, together with assistance from certain other non-Debtor affiliates that comprise the Company, all share a common direct or indirect parent in CLSS and are part of the global enterprise being marketed through the Sale Process.

## III.    Prepetition Capital Structure.

12.     The Debtors' prepetition funded debt structure primarily consists of (a) the Prepetition ABL Facility and (b) the Prepetition Term Facility (collectively, the "Prepetition Secured Debt" and the lenders thereunder from time to time, the "Prepetition Secured Lenders"), each of which is defined and discussed more fully below.

13.     The Debtors, together with certain of their foreign non-Debtor affiliates, are obligors under the Prepetition Secured Debt, either as a U.S. or Canadian borrower under the relevant facility or as a guarantor (collectively, the "Prepetition Credit Parties").   The chart below lists each of the Prepetition Credit Parties (Debtors are identified in **bold**):

| | Prepetition ABL Facility | Prepetition Term Facility |
|---|---|---|
| **US Borrower** | **Bumble Bee Foods, LLC** | **Bumble Bee Holdings, Inc.** |
| **Canadian Borrower** | Connors Bros. Clover Leaf Seafoods Company | |
| **Luxembourg Holdings**[7] | Bumble Bee Foods S.à r.l. Clover Leaf Seafood S.à r.l. | |
| **US Guarantors** | **Bumble Bee Holdings, Inc.** | **Bumble Bee Foods, LLC** |
| | **Bumble Bee Parent, Inc.** **Bumble Bee Capital Corp.** **Anova Food, LLC** | |
| **Canadian Guarantors** | Clover Leaf Holdings Company K.C.R. Fisheries Ltd. 6162410 Canada Limited | |
| **Foreign Guarantors** | Coral Triangle Processors, LLC Anova Technical Services, LLC | |

---

[7]  These entities are also Guarantors under both the Prepetition ABL Facility and the Prepetition Term Loan Facility.

### A.    The Prepetition ABL Facility.

14.     Debtor Bumble Bee Foods, LLC ("Bumble Bee LLC") is the U.S. borrower (the "U.S. ABL Borrower") under that certain Amended and Restated Credit Agreement, dated as of August 18, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), among Bumble Bee Holdings, Inc. ("Bumble Bee Holdings"), Bumble Bee LLC, Connors Bros. (the "Canadian ABL Borrower" and, together with U.S. ABL Borrower, the "Prepetition ABL Borrowers"), the several financial institutions from time to time party thereto (the "Prepetition ABL Lenders"), Wells Fargo Capital Finance, LLC, as U.S. administrative agent for the ABL Lenders (in such capacity, the "Prepetition ABL Agent"), Wells Fargo Capital Finance Corporation Canada, as Canadian administrative agent for the ABL Lenders (in such capacity, the "Canadian ABL Agent"), Wells Fargo Capital Finance, LLC, as collateral agent (in such capacity, the "Collateral Agent" and together with the Prepetition ABL Lenders, the Prepetition ABL Agent, and the Canadian ABL Agent, the "Prepetition ABL Secured Parties"), Bank of America, N.A., as co-lead arranger, and MUFG Union Bank, N.A. as syndication agent.  The Prepetition ABL Credit Agreement provides for an asset-based revolving credit facility with aggregate commitments of up to $200 million; this is subject to a limitation of up to (a) $160 million to the U.S. ABL Borrower (the "U.S. Revolver Commitment"), subject to a borrowing base limitation based on the U.S. ABL Borrower's eligible accounts receivable, reserves, and inventory (such borrowing base the "U.S. Borrowing Base" and such facility the "U.S. Prepetition ABL Facility") and (b) $40 million to the Canadian ABL Borrower (the "Canadian Revolver Commitment"), subject to a borrowing base limitation on the Canadian ABL Borrower's eligible accounts receivable, reserves and inventory (such borrowing base the "Canadian Borrowing Base" and such facility

the "Canadian Prepetition ABL Facility," and together with the U.S. Prepetition ABL Facility, the "Prepetition ABL Facility").

15.     Although the Prepetition ABL Facility has separate U.S. and Canadian facilities with their respective borrowing bases, the facility allows the U.S. ABL Borrower to rely on assets in the Canadian Borrowing Base to increase the amount the U.S. ABL Borrower is able to borrow under the U.S. Prepetition ABL Facility by up to $40 million (subject to the $160 million aggregate cap) to the extent the Canadian Borrowing Base exceeds the amounts outstanding under the Canadian Prepetition ABL Facility.  Put differently, the U.S. ABL Borrower can use assets of the Canadian Prepetition Credit Parties whose assets comprise the Canadian Borrowing Base to increase the amounts the U.S. ABL Borrower (a Debtor) can borrow under the Prepetition ABL Facility (the "U.S. Borrowing Base Enhancement").[8]

16.     The Prepetition ABL Facility Borrowers are jointly and severally liable for obligations under the Prepetition ABL Facility, and the Prepetition ABL Facility is guaranteed by each of the other Prepetition Credit Parties.  In addition, the U.S. ABL Borrower has guaranteed the Canadian Prepetition ABL Facility, and the Canadian ABL Borrower has guaranteed the U.S. Prepetition ABL Facility.

17.     Loans under the Prepetition ABL Facility bear interest at variable levels depending on the type of loan and the average excess availability under the Prepetition ABL Facility and are subject to an unused line fee of 0.25% per annum applied to the unused amounts. Interest rates are indexed either to the applicable U.S. prime rate or LIBOR rate for the U.S. Prepetition ABL Facility, or the Canadian prime rate or CDOR rate for the Canadian Prepetition ABL Facility, plus an applicable margin of 0.50% to 2.00% depending on the type of loan and

---

[8]  The Prepetition ABL Facility also provides the Canadian ABL Borrower a similar right with respect to the U.S. Borrowing Base, subject to similar limitations and caps, which the Company has not historically relied upon to obtain advances under that facility.

the average excess availability.  Loans under the U.S. Prepetition ABL Facility currently bear interest at the applicable LIBOR rate plus 2.00% or at the applicable Prime rate plus 1.00%, and the Debtors have remained current on interest owing under the U.S. Prepetition ABL Facility.

18.    The Prepetition ABL Facility is secured on a first-priority basis by certain assets of Prepetition Credit Parties, such as cash, cash equivalents, accounts receivable and inventory (collectively, the "Prepetition ABL Priority Collateral") and is secured on a second-priority basis by security interests in all other assets (subject to certain excluded assets) of the Prepetition Credit Parties (together with the Prepetition ABL Priority Collateral, the "ABL Collateral").  The Prepetition ABL Facility matures on August 18, 2022.

19.    As of the date hereof, the aggregate amount of all obligations outstanding under the Prepetition ABL Facility was no less than approximately $192,420,215, with approximately $151,452,405 outstanding in connection with the U.S. Prepetition ABL Facility and $35,365,193 outstanding in connection with the Canadian Prepetition ABL Facility.

**B.    The Prepetition Term Loan Facility.**

20.    Debtor Bumble Bee Holdings is the U.S. borrower under a credit agreement, dated as of August 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement"), among Debtor Bumble Bee Holdings, non-debtor Connors Bros. in its capacity as the Canadian Borrower (the "Canadian Term Loan Borrower"), the lenders from time to time party thereto (the "Prepetition Term Loan Lenders"), and Brookfield Principal Credit, LLC, as administrative agent and collateral agent for the Term Lenders (in such capacity, the "Prepetition Term Loan Agent," together with the Term Lenders, the "Prepetition Term Loan Secured Parties," and, collectively with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), which provided term loans (the "Prepetition Term Loans") in the aggregate principal amount of $650 million (the

"Prepetition Term Loan Facility" and together with the Prepetition ABL Facility, the "Prepetition Secured Debt"), consisting of Prepetition Term Loans to (a) Bumble Bee Holdings in the amount of $506.5 million (the "U.S. Prepetition Term Loan Facility") and (b) the Canadian Term Loan Borrower in the amount of $143.5 million (the "Canadian Prepetition Term Loan Facility").  The Prepetition Term Loan Facility matures on August 15, 2023.

21.    The Prepetition Term Loan Facility is secured on a first-priority basis by substantially all of the assets of the Prepetition Credit Parties that do not constitute Prepetition ABL Priority Collateral, including the capital stock of each of the present and future subsidiaries of Bumble Bee Holdings, all owned real property, equipment and fixtures, investment property, and intellectual property, and all proceeds from such property and assets (the "Prepetition Term Loan Priority Collateral").  Obligations under the Prepetition Term Loan Facility are also secured by second-priority security interests in the Prepetition ABL Priority Collateral (together with the Prepetition Term Loan Priority Collateral, the "Term Loan Collateral" and, collectively with the ABL Collateral, the "Prepetition Collateral").  Like the Prepetition ABL Facility, Bumble Bee Holdings has guaranteed the Canadian Prepetition Term Loan Facility and the Canadian Term Loan Borrower has guaranteed the U.S. Term Loan Facility, and each of the other Prepetition Credit Parties guaranteed the entire amount of the Prepetition Term Loan Facility.

22.    Interest accrues per annum at the applicable prime rate plus 9.00%, with 7.50% paid in cash and 1.50% paid in kind.  Additional default rate interest accrues at the per annum rate of 2.00%, for an effective rate of interest at the applicable prime rate plus 11.00%. The Prepetition Term Loan Credit Agreement also requires quarterly amortization payments, currently at the rate 0.25% of the outstanding principal amounts, which was scheduled to step up to 0.625% beginning with the quarter ending December 31, 2019.  Bumble Bee Holdings is

obligated to make mandatory prepayments upon the occurrence of certain events, including, but not limited to, acceleration, additional debt issuances, certain asset sales, and excess cash flow generation.

23.     As of the date hereof, the outstanding aggregate principal amount of term loans under the Prepetition Term Loan Credit Agreement was not less than $649,233,814 ($505,902,964 in connection with the U.S. Prepetition Term Loan Facility and $143,330,850 in connection with the Canadian Prepetition Term Loan Facility) and the outstanding Prepayment Premium (as defined in the Prepetition Term Loan Credit Agreement) that was due and payable was not less than $32,461,691.

### C.     The Prepetition Intercreditor Agreement.

24.     The relative rights of the Prepetition Secured Parties with respect to the ABL Collateral and Term Loan Collateral are governed by that certain amended and restated intercreditor agreement, dated as of August 15, 2017 (the "Prepetition Intercreditor Agreement"), by and among the Debtors, the ABL Agent, and the Term Loan Agent, and acknowledged by the Debtors and their affiliates that are parties to the ABL DIP Facility and Term Loan DIP Facility.

25.     The Prepetition Intercreditor Agreement will remain in effect and govern the relative lien priorities, rights and remedies of the Prepetition Secured Parties. In addition, the Prepetition Secured Parties, the DIP Lenders, and the DIP Agents shall enter into the DIP Intercreditor Agreement in connection with Debtors' incurrence of debt under the DIP Facilities. The DIP Intercreditor Agreement shall govern the relative rights, lien priorities and remedies of the Prepetition Secured Parties, the DIP Lenders, and the DIP Agents.

### IV.     Efforts to Obtain DIP Financing and the Debtors' Liquidity Needs.

26.     The Debtors engaged in an extensive prepetition marketing process to obtain postpetition financing from potential third-party capital sources.  The marketing process

01:25622533.1

14

was designed to maximize actionable proposals given the Debtors' financial condition, timing concerns, and existing capital structure. *See* Winthrop Decl. at ¶ 12. As substantially all of the Debtors' assets secure the Prepetition Secured Debt, however, those efforts failed to generate an actionable alternative. The Debtors initially received only one proposal from a third-party lender that required the priming of the Prepetition Secured Lenders' prepetition liens. The Debtors discussed the proposal with the Prepetition Secured Lenders, including the request to consent to be primed. The Prepetition Secured Lenders declined to consent to the priming because they believed their interests in the Prepetition Collateral would not have been adequately protected. Upon learning of the Prepetition Secured Lenders' position, the prospective lender declined to further pursue the possibility of providing DIP financing to the Debtors. *See* Winthrop Decl. at ¶ 14. In any event, the third-party proposal did not offer DIP financing terms that were materially better than those offered by the DIP Lenders and did not provide enough liquidity to the Debtors to fund the Chapter 11 Cases and the Sale Process. These factors, among others, made the proposal an unfeasible alternative. *See* Winthrop Decl. at ¶ 13.

27.      The Debtors' then conducted a targeted marketing process seeking proposals to replace the Debtors' Prepetition ABL Facility. *See* Winthrop Decl. at ¶ 14. After contacting eight additional institutions, the Debtors received two proposals that were subject to certain closing conditions and due diligence requirements. *Id*. The Debtors reviewed the proposals with their advisors and determined that pursuing an alternative proposal to the ABL DIP Facility would likely delay the Sale Process, which could have jeopardized negotiations with the Stalking Horse Bidder and therefore the Debtors' ability to maximize value for stakeholders. *Id*. Accordingly, the Debtors determined to focus on negotiating the DIP Facilities with the Prepetition Secured Lenders on the best possible terms prior to commencing these Chapter 11 Cases.

01:25622533.1

28.     Absent the DIP Facilities, the Debtors will likely lack sufficient liquidity—whether unencumbered cash on hand or generated from operations—to continue to efficiently operate their businesses or pursue the Sale Process.  Access to liquidity is vital to preserving and maximizing the asset value of the Debtors' estates, and its immediate availability is critical during the pendency of these Chapter 11 Cases.  Without a swift injection of liquidity, the Debtors will likely suffer immediate and irreparable harm, and will likely lose the ability to preserve and maximize the value of their assets.  *See* Winthrop Decl. at ¶¶ 9, 19.  More still, as attested to in the First Day Declaration, the DIP Facilities provide sufficient liquidity to conduct the Sale Process and wind down the Debtors' affairs.  *See* First Day Declaration at ¶ 66.  The DIP Facilities are likely to instill confidence in parties that are critical to the ongoing Sale Process by facilitating the Debtors' efforts to preserve operations and their going concern value, purchase new inventory, and maintain customer accounts as that process unfolds.  This is because, as noted above, the Stalking Horse Bid preserves the Debtors' businesses as going concerns and contemplates the employment of nearly all of the Debtors' employees.  Approval of the DIP Facilities are hence part and parcel with the Debtors' ability to maintain the expectations and assumptions of the Stalking Horse Bidder until the conclusion of the Sale Process.

29.     The DIP Facilities are appropriately sized for the Debtors to continue the smooth operation of their businesses and maintain essential business relationships during the projected course of the Chapter 11 Cases.  *See* Winthrop Decl. at ¶¶ 9, 10.  Absent this Court's approval of the proposed DIP Facilities, the Debtors would both likely run out of funds required to operate their businesses and not be able to complete the Sale Process.  Accordingly, there is an urgent and immediate need to obtain the DIP Facilities.

01:25622533.1

## TERMS AND CONDITIONS OF THE DIP FACILITIES

**I.      Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2.**

30.      The following charts summarize the key terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[9]

### DIP Credit Parties[10]

| | ABL DIP Facility[11] | Term Loan DIP Facility[12] |
|---|---|---|
| **US Borrower** | **Bumble Bee Foods, LLC** | **Bumble Bee Foods, LLC** |
| **Canadian Borrower** | Connors Bros. Clover Leaf Seafoods Company | N/A |
| **Luxembourg Holdings[13]** | Bumble Bee Foods S.à r.l. Clover Leaf Seafood S.à r.l. | |
| **US Guarantors** | **Bumble Bee Holdings, Inc.** **Bumble Bee Parent, Inc.** **Bumble Bee Capital Corp.** **Anova Food, LLC** | |
| **Canadian Guarantors** | Clover Leaf Holdings Company Connors Bros. Seafoods Company Connors Bros. Holdings Company K.C.R. Fisheries Ltd. 6162410 Canada Limited | |
| **Foreign Guarantors** | Coral Triangle Processors, LLC Anova Technical Services, LLC | |

---

[9]   The summaries contained in this DIP Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent that anything in this DIP Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

[10]   Debtors are identified in bold.

[11]   *See* the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated November [●], 2019, by and among the various lenders party thereto from time to time, Wells Fargo Capital Finance, LLC as administrative agent, Bank of America, N.A., as co-lead arranger, MUFG Union Bank, N.A., as syndication agent, and Bumble Bee Foods S.À R.L., Connors Bros. Clover Leaf Seafoods Company, and Bumble Bee Foods, LLC, as borrowers, attached as Exhibit A to the Interim Order.

[12]   *See* the Superpriority Secured Debtor-In-Possession Term Loan Agreement, dated as of November [●], 2019, by and among the various lenders party thereto from time to time, Brookfield Principal Credit LLC, as administrative agent and collateral agent, and Bumble Bee Foods S.À R.L. and Bumble Bee Foods, LLC, as borrowers, attached as Exhibit B to the Interim Order.

[13]   These entities are also guarantors under both the ABL DIP Facility and the Term Loan DIP Facility.

**Summary of DIP Facilities**

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| DIP Lenders | DIP Term Facility | Lenders party to the Term DIP Loan Agreement from time to time.<br><br>*See* Term Loan DIP Agreement, Preamble. |
| | ABL DIP Facility | Lenders party to the DIP ABL Agreement from time to time.<br><br>*See* ABL DIP Agreement, Preamble. |
| Administrative Agent | Term Loan DIP Facility | Brookfield Principal Credit LLC (in such capacity, the "<u>Term Loan DIP Agent</u>")<br><br>*See* Term Loan DIP Agreement, Preamble. |
| | ABL DIP Facility | Wells Fargo Capital Finance, LLC (in such capacity, the "<u>ABL DIP Agent</u>")<br><br>*See* ABL DIP Agreement, Preamble. |
| Commitment | Term Loan DIP Facility | Loans to be advanced in an aggregate principal amount not to exceed $80 million, $40 million of which shall be drawn on the date of the closing of the Term Loan DIP Facility, $40 million of which shall be drawn upon entry of the Final Order and funded into a blocked collateral account with subsequent withdrawals from such account subject to certain requirements set forth in the Term Loan DIP Facilities.<br><br>*See* Term Loan DIP Agreement, §§ 1.01; 2.13. |
| | ABL DIP Facility | Revolving loans and letter of credit obligations in an aggregate principal amount not to exceed $200 million, all of which shall be available on an interim basis (subject to the terms of the ABL DIP Agreement) with up to (i) $160 million available to the U.S. ABL Borrower, subject to a borrowing base limitation based on the U.S. ABL Borrower's eligible accounts receivable, reserves, and inventory and (ii) $40 million available to the Canadian ABL Borrower, subject to a substantially similar borrowing base limitation with regard to the Canadian ABL Borrower's assets; in each case subject to certain aggregate borrowing limits set forth in the Term Loan DIP Agreement.<br><br>*See* ABL DIP Agreement, Schedule 1.1; Term Loan DIP Agreement § 8.04(n). |
| Interest Rates | Term Loan DIP Facility | <u>Interest Rate</u>: L+1050 (one month interest period), P+950<br><br><u>Default Rate</u>: 2.00%<br><br>*See* Term Loan DIP Agreement, § 1.01. |
| | ABL DIP Facility | <u>Interest Rate</u>: L+450 (one month interest period), P+350<br><br><u>Default Rate</u>: 2.00%<br><br>*See* ABL DIP Agreement, § 2.06. |
| Fees | Term Loan DIP Facility | <u>Exit Fee</u>: 2.00%<br><br>Additional fess pursuant to the Fee Letter.<br><br>*See* Term Loan DIP Agreement,  § 3.01 |

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | ABL DIP Facility | LC Fees: 12.5 bps fronting fee; LC commitment fee equal to margin.<br><br>Additional fees pursuant to the Fee Letter.<br><br>See ABL DIP Agreement, § 2.10. |
| Term | Term Loan DIP Facility | The earliest of (i) the date that is six months after the Closing Date,[14] (ii) the effective date of any plan for the reorganization of the Borrower or any other Debtor under Chapter 11 of the Bankruptcy Code, (iii) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, (iv) the date of acceleration of the Loans and the termination of any unused Commitments with respect to the DIP Term Facility and (v) the date that is thirty-five (35) days after the Petition Date, unless the Final Order has been entered on or prior to such date.<br><br>See Term Loan DIP Agreement, § 1.01. |
| | ABL DIP Facility | The earliest of (i) May [__], 2020;[15] (ii) the date of termination of Revolver Commitments during the continuance of an Event of Default, (iii) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the Loan Parties' ABL Priority Collateral, (iv) the effective date of a confirmed Chapter 11 plan for the Loan Parties and (v) the date on which all obligations are paid in full (including, without limitation, cash collateralization of Letters of Credit but excluding contingent obligations not due and owing) and the commitments under the ABL DIP agreement have been terminated<br><br>See ABL DIP Agreement, Schedule 1.1. |
| Use of DIP Facility and Cash Collateral | Term Loan DIP Facility | The proceeds will be used to (i) pay certain costs, premiums, fees and expenses (including professional fees, (ii) fund working capital needs of the Debtors and their Subsidiaries, including repayments of borrowings under the DIP ABL Credit Facility to the extent not accompanied by a corresponding commitment reduction, and (iii) to fund general corporate needs, including certain interest payments and adequate protection payments.<br><br>See Term Loan DIP Agreement, § 6.08. |
| | ABL DIP Facility | The proceeds will be used to pay transaction fees and expenses (including professional fees) and the Prepetition ABL Facility, and second, to fund general corporate needs, including interest payments on the Term DIP Facility and adequate protection interest payments on the Prepetition Term Facility, in each case, pursuant to the Budget. Further, outstanding Prepetition ABL Credit Agreement Indebtedness will be immediately rolled up into obligations under the ABL DIP Facility.<br><br>See ABL DIP Agreement, § 4.34; Interim Order, ¶ 4. |

---

[14] Under the Term Loan DIP Agreement, "Closing Date" is defined as the date (which shall be a Business Day) on which each of the conditions in Section 5.01 of the Term Loan DIP Agreement is satisfied (or waived in accordance with Section 11.11 of the Term Loan DIP Agreement) and the initial Borrowing (as defined in the Term Loan DIP Agreement) occurs.

[15] This date will be the date that is six months after the Closing Date.

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| Entities with Interests in Cash Collateral | Term Loan DIP Facility | The Prepetition Term Loan Secured Parties.<br><br>*See* Interim Order, ¶ F(d) |
| | ABL DIP Facility | The Prepetition ABL Secured Parties.<br><br>*See* Interim Order, ¶ F(d) |
| Conditions of Borrowing | Term Loan DIP Facility | Conditions include, among other things: (i) the cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; (ii) a motion seeking approval of the DIP Term Facility, shall have been filed in each of the Cases within one (1) day after the Petition Date;  (iii) all "first day" orders and all related pleadings shall have been entered by the Bankruptcy Court; (iv) the Borrower shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made pursuant to "first day" orders; and (v) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases.<br><br>*See* Term Loan DIP Agreement, § 5.01. |
| | ABL DIP Facility | Conditions include, among other things: (i) the ABL DIP Agent shall have received executed versions of the various related certificates, agreements, and other related loan documents, including the DIP Term Loan Documents, and documents related to the Luxembourg entities, (ii) the payment of certain fees and expenses owing as of the Closing Date, (iii) entry of the "first day" orders and the Interim Order; (iv) the ABL DIP Agent shall have received a copy of the Budget, (v) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases, (vi) the Restructuring Support Agreement shall be effective and binding, and (vii) the cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.<br><br>*See* ABL DIP Agreement, Schedule 3.1. |
| Budget | Term Loan DIP Facility | Delivered on or prior to the Closing Date and updated monthly, setting forth on a weekly basis for a 13-week period the projected total operating receipts and total operating expenses of the Credit Parties and their Subsidiaries during such period.<br><br>*See* Term Loan DIP Agreement, §§ 5.01, 7.01. |
| | ABL DIP Facility | Covers the 13-week period on a weekly basis (but with the first period therein commencing on the Petition Date through November 23, 2019 and weekly thereafter).<br><br>*See* ABL DIP Agreement, § 1.01. |
| Chapter 11 Milestones | Term Loan DIP Facility & ABL DIP Facility | 1.  File DIP Motion<br>  ▪  11/21/2019<br>2.  Enter into Stalking Horse APA<br>  ▪  11/21/2019<br>3.  File Bidding Procedures Motion<br>  ▪  11/21/2019<br>4.  Entry of Interim Order<br>  ▪  TBD based on Petition Date/Initial Hearing<br>5.  Entry of CCAA Initial Order<br>  ▪  TBD based on Petition Date/Initial Hearing |

01:25622533.1

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | | 6.  File CCAA Comeback Motion<br>   ▪ TBD<br>7.  Entry of CCAA A&R Initial Order<br>   ▪ TBD<br>8.  Entry of Bidding Procedures Order (US & Canada)<br>   ▪ 12/20/2019<br>9.  Entry of Final DIP Order<br>   ▪ 12/20/2019<br>10. Bid Deadline<br>   ▪ 1/8/2020<br>11. Auction Commenced<br>   ▪ 1/10/2020<br>12. Sale Hr'g/CCAA Approval & Vesting Order Hr'g Assuming Stalking Horse Bid is the Winning Bidder<br>   ▪ 1/17/2020<br>13. Entry of Sale Order & CCAA Approval & Vesting Order<br>   ▪ 1/22/2020<br>14. Outside Date for Consummation of Sale<br>   ▪ 3/31/2020<br><br>*See* Term Loan DIP Agreement, § 7.18; ABL DIP Agreement, Schedule 5.21. |
| Liens and Priorities | Term Loan DIP Facility | All obligations shall be subject to the Carve-Out (defined below), and have the priority set forth in the Priority Waterfall with respect to Term Loan Priority Collateral.<br><br>*See* Term Loan DIP Agreement, § 7.17; Interim Order, Exhibit B. |
| | ABL DIP Facility | All obligations shall be subject to the Carve-Out (defined below), and in each case with the priority set forth in the Priority Waterfall with respect to the ABL priority Collateral.<br><br>*See* ABL DIP Agreement, § 5.22; Interim Order, Exhibit A. |
| Events of Default | Term Loan DIP Facility | Events of Default are usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, judgments or foreclosure actions exceeding certain thresholds, and dismissal or conversion of the Bankruptcy Cases.<br><br>*See* Term Loan DIP Agreement, § 9. |
| | ABL DIP Facility | Same.<br><br>*See* ABL DIP Agreement, § 8. |
| Carve-Out | Term Loan DIP Facility | The "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time by the Bankruptcy Court, whether by interim order, procedural order, or otherwise, unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (the "Debtor Professionals") and the Committee (if appointed), pursuant to sections 328 or 1103 of the Bankruptcy Code |

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | | and, with respect to Committee professionals (the "<u>Committee Professionals</u>") (solely with respect to any Committee and the Committee Professionals strictly subject to the Budget and the line items applicable to such Committee and Committee Professionals set forth therein) and the Debtor Professionals (together with the Committee Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by a Creditor Representative (defined below) of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3 million incurred after the first business day following delivery by one of the Creditor Representatives (defined below) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by e-mail (or other electronic means) by the ABL DIP Agent or the Term Loan DIP Agent (each, a "<u>Creditor Representative</u>") to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in paragraph 36), stating that the Post-Carve-Out Trigger Notice Cap has been invoked and describing the alleged default that is continuing under the DIP Documents.<br><br>In addition, the Term Loan DIP Lenders have agreed to an additional carve out from the DIP Term Funding Account for certain fees and expenses of Houlihan Lokey Capital Inc. ("**Houlihan**") for any transaction, restructuring, sale, or other similar fees then due and owing or that thereafter become due and owing to Houlihan.<br><br>*See* Interim Order, ¶ 11; Term Loan DIP Agreement, § 7.17. |
| | ABL DIP Facility | Same.<br><br>*See* Interim Order, ¶ 11; ABL DIP Agreement, Schedule 1.1. |
| 506(c) Waiver | Term Loan DIP Facility | Upon the entry of a Final Order, the Debtors waive any right to surcharge against the DIP Collateral (as defined in the Interim Order) pursuant to section 506(c) of the Bankruptcy Code or otherwise.<br><br>*See* Interim Order, ¶ xv. |
| | ABL DIP Facility | Same. |
| Section 552(b) Waiver | Term Loan DIP Facility | Upon the entry of a Final Order, the Prepetition Secured Parties will not be subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ xv. |
| | ABL DIP Facility | Same. |

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| Stipulations to Prepetition Liens and Claims | Term Loan DIP Facility | The stipulations and admissions shall be binding on the Debtors and all parties in interest, including, without limitation, any Committee, unless, and solely to the extent that an adversary proceeding or other contested matter has been commenced by a party in interest against the Prepetition Secured Parties within the applicable Challenge Period (discussed below).<br><br>*See* Interim Order, ¶ 33. |
| | ABL DIP Facility | Same. |
| Challenge Period | Term Loan DIP Facility | The Challenge Period is (i) in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing other than the Committee (if any), no later than seventy-five (75) days from the date of entry of the Interim Order; or (ii) in the case of an adversary proceeding or other contested matter filed by the Committee (if any), no later than sixty (60) days after the appointment of the Committee (if any).<br><br>*See* Interim Order, ¶ 34. |
| | ABL DIP Facility | Same. |
| Adequate Protection | Term Loan DIP Facility | The Term Agent, for the benefit of itself and the Term Lenders, shall receive the following as adequate protection for the extent of any diminution in the value in any prepetition secured interests:<br><br>1. "Replacement" liens on all DIP Collateral, which liens shall be subordinate to the Carve-Out and have the priority set forth in the Priority Waterfall;<br>2. A super-priority administrative claim, which claim will be subject to the Carve-Out and have the priority set forth in the Priority Waterfall;<br>3. Payment of Prepetition Term Loan Agent fees and expenses, including professional fees and expenses and financial advisory fees;<br>4. Monthly cash payments of interest at the applicable non-default rate provided for in the Prepetition Term Facility. Payment in-kind and accrual of certain other interest provided for in the Prepetition Term Facility. Default interest may be accrued, and the Prepetition Term Facility lenders reserve the right to fully assert a claim therefor and the Debtors reserve the right to fully contest a claim therefor; and<br>5. The reporting requirements set forth in the Term DIP Loan Agreement.<br><br>As a condition to receiving the Adequate Protection Provisions, the Prepetition Term Loan Lenders, Prepetition Term Loan Agent, Term Loan DIP Lenders, and Term Loan DIP Agent shall, upon the consummation of a sale or other disposition of all or substantially all assets of the Debtors shall, subject to the applicable terms of the Interim Order and the Term DIP Documents, release certain of the Debtors' non-debtor affiliates from their respective Term Loan DIP Obligations and the obligations arising under the Prepetition Term Loan Documents as of the Sale Closing in a form and substance reasonably acceptable to the Debtors. |

01:25622533.1

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | | *See* Interim Order, ¶ 22. |
| | ABL DIP Facility | Adequate Protection shall be non-applicable to the extent a full "roll-up" occurs.<br><br>Prior to the time a full "roll-up" occurs, the ABL Agent, for the benefit of itself and the ABL Lenders, shall receive the following as adequate protection for the extent of any diminution in the value in any prepetition secured interests:<br><br>1. "Replacement" liens on all DIP Collateral which liens shall be subordinate to the ABL DIP Facility and the Carve-Out and have the priority set forth in the Priority Waterfall;<br>2. A super-priority administrative expense claim, which claim will be subject to the Carve-Out and have the priority set forth in the Priority Waterfall;<br>3. Payment of Prepetition ABL Agent fees and expenses, including professional fees and expenses and financial advisory fees;<br>4. Monthly cash payments of interest at the applicable non-default rate provided for in the Prepetition ABL Facility. Default interest may be accrued, and the Prepetition ABL Facility lenders reserve the right to fully assert a claim therefor and the Debtors reserve the right to fully contest a claim therefor; and<br>5. the reporting requirements set forth in the ABL DIP Agreement.<br><br>*See* Interim Order, ¶ 22. |
| CCAA Debtor Credit Support 364(c)(1) Claims | N/A | Each CCAA Debtor that provides CCAA Debtor Credit Support to the Debtors during the Chapter 11 Cases shall receive a super-priority administrative expense claim in an amount equal to the applicable CCAA Debtor Credit Support provided.<br><br>*See* Interim Order ¶ 47 |
| Waiver/Modification of the Automatic Stay | Term Loan DIP Facility | The automatic stay otherwise applicable to the DIP Agents and the DIP Lenders is modified to (i) declare all DIP Obligations to be due and payable, (ii) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, and/or (iii) terminate the applicable DIP Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders.<br><br>*See* Interim Order, ¶ 16 |
| | ABL DIP Facility | Same. |
| Releases | Term Loan DIP Facility | Subject to entry of the Final Order, each of the Debtors unconditionally waives, discharges, and releases (i) any right to challenge any of the Prepetition Credit Agreement Indebtedness, the priority of the Debtors' obligations, and the validity, extent, and priority of the liens securing the Prepetition Credit Agreement Indebtedness and (ii) each of the Prepetition Agents and the other Prepetition Secured Parties of any and all claims, counterclaims, causes of action, defenses or setoff rights relating to any of the Prepetition Credit Documents or the transactions contemplated under such documents.<br><br>*See* Interim Order, ¶ D, 34. |

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | ABL DIP Facility | Same. |
| Indemnification | Term Loan DIP Facility | The Borrower agrees to indemnify the Administrative Agent and each Lender from and hold each of them harmless against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of entering into and/or performance of the Term Loan DIP Agreement (including certain professional fees).<br><br>*See* Term Loan DIP Agreement, § 11.01. |
| | ABL DIP Facility | Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons and the Lender-Related Persons harmless from and against any and all losses, claims, damages or liabilities of any kind or nature and for any reasonable and documented or invoiced out of pocket fees and expenses to which any such Indemnified Person may become subject (including certain professional fees).<br><br>*See* ABL DIP Agreement, § 10.3. |
| Liens on Avoidance Actions | Term Loan DIP Facility | Subject to entry of the Final Order, authorization is given to grant liens to the DIP Agents and DIP Lenders on all of the proceeds or property recovered on account of the Debtors' claims and causes of action arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶¶ v., 12. |
| | ABL DIP Facility | Same. |
| No Priming Any Secured Lien Without the Consent of Lienor | Term Loan DIP Facility | The Prepetition Secured Parties have either consented to the DIP Facilities and the Debtors' use of the Prepetition Collateral, including Cash Collateral, or their respective interests therein are being adequately protected by, among other things, the adequate protection described by the Interim Order.<br><br>*See* Interim Order, ¶ D(e), F(h). |
| | ABL DIP Facility | Same. |
| Sale Provisions | Credit Bidding | The DIP Agents and Prepetition Secured Parties shall have the right to credit bid under section 363(k) of the Bankruptcy Code all of their respective claims (subject to the provisions of paragraph 34 of the Interim Order) in connection with a sale of the Debtor's assets under section 363 of the Bankruptcy Code or otherwise.<br><br>*See* Interim Order, ¶ 23. |
| | Consent & Use of Proceeds | Subject to paragraph 47 of the Interim Order and the Carve-Out, the right of the DIP Agents to consent to the sale of any portion it collateral are expressly preserved and not modified, waived or impaired.<br><br>Unless otherwise ordered by the Court, including, without limitation, pursuant to the Sale Order, all cash proceeds generated from the sale of any assets secured by the Prepetition Liens or DIP Liens shall be paid to the DIP Agents upon the closing of such sale in accordance |

| Description | DIP Facility | Summary of Material Terms |
|---|---|---|
| | | with and subject to the terms and conditions of the DIP Documents and Interim Order and, thereafter, against the obligations owing by the Debtors under the Prepetition Credit Documents in accordance with the terms of this Order, the DIP Intercreditor Agreement, and the Prepetition Intercreditor Agreement, until such time as all DIP Obligations and Prepetition Credit Agreement Indebtedness.<br><br>*See* Interim Order ¶ 23. |
| | Closing Escrow Accounts | Immediately prior to consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, the Debtors shall be entitled, subject to the terms and conditions of the applicable DIP Documents and the Interim DIP Order, to borrow under the ABL DIP Facility and submit a draw request under the Term DIP Facility to fund one or more Closing Escrow Accounts to pay certain related transaction expenses and other expenses provided for in the Budget, including certain professionals' fees, wind-down costs, certain taxes and estimated taxes, budgeted amounts payable under any applicable management compensation program, and payments owed to FCF Co., Ltd.<br><br>*See* Interim Order ¶ 47. |

## II.    Additional Disclosures Pursuant to Local Rule 4001-2.

31.    In accordance with Local Rule 4001-2, the following provisions of the DIP Facilities are also highlighted below.  As discussed in detail herein, the Debtors believe that these provisions are reasonable in light of the facts and circumstances of these Chapter 11 Cases and should be approved.

a.    **Provisions that Grant Cross-Collateralization Protection (Other Than Replacement Liens or Other Adequate Protection) to the Prepetition Secured Lenders (Local Rule 4001-2(a)(i)(A)).**  Not applicable;

b.    **Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B)).**  The Interim Order contains stipulations of this nature but are subject to challenge periods consistent with those required under the Local Rules.  *See* Interim Order ¶ D, 33;

c.    **Waiver of Section 506(c) Rights (Local Rule 4001-2(a)(i)(C)).**  The waiver of rights under section 506(c) is subject to entry of a Final Order. *See* Interim Order, ¶ 19;

d.    **Liens on the Debtors' Claims and Causes of Action Arising Under Chapter 5 of the Bankruptcy Code (Local Rule 4001-2(a)(i)(D)).**  *See* Interim Order, ¶ 12(b);

e.  **Roll-Over Provisions (Local Rule 400l-2(a)(i)(E)).**  The Interim Order includes an immediate roll-up of the obligations under the ABL, which is discussed in section E below. *See* Interim Order, ¶ 4;

f.  **Disparate Treatment of Professionals (Local Rule 400l-2(a)(i)(F)).**  The Carve-Out limits the amount of Allowed Profession Fees of the Committee and the Committee Professionals to the amount set forth in the Budget and the line items applicable to such Committee and Committee Professionals.  All other Allowed Professional Fees are included in the Carve-Out.  *See* Interim Order, ¶ 11;

g.  **Priming Lien (Local Rule 4001-2(a)(i)(G)).**  Not Applicable; and

h.  **Waiver of Rights under Section 552(b) (Local Rule 4001-2(a)(i)(G)).**  The waiver of rights under section 552(b) is subject to entry of the Final Order.  *See* Interim Order, ¶ 19.

### The Debtors Have an Immediate Need for Cash

32.    As noted above, the Debtors propose to use the DIP Financing and Cash Collateral to satisfy employee wages, employee benefits, and certain other operational expenses as set forth in the Budget, to fund the administration of these Chapter 11 Cases and the Sale Process.  Without access to the DIP Financing and Cash Collateral to satisfy these obligations, the Debtors cannot pay employee wages, preserve and maximize the value of their estates, and administer these Chapter 11 Cases.  Moreover, as further noted above, the Debtors entered chapter 11 with a Stalking Horse Bid that assumes the Debtors and their affiliates will benefit from the liquidity the DIP Facilities provide.  The DIP Facilities are therefore an essential component of the overall Sale Process that the Debtors believe will maximize value for stakeholders.  The Debtors will benefit from the message to the market that their business operations are, and will continue to be, adequately funded through the duration of the Sale Process.  It will also facilitate the maintenance of ongoing business relationships with customers, vendors, suppliers, and service providers throughout these Chapter 11 Cases until the closing of a sale – either under the Stalking Horse Bid or a higher or better offer obtained in the Sale Process.  Absent approval of the Interim Order, the Debtors will not have access to the DIP Financing or

01:25622533.1

the Cash Collateral necessary to fund the administration of these Chapter 11 Cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and other parties in interest. *See* Winthrop Decl. at ¶¶ 9-11.

## Alternative Sources of Financing Are Not Readily Available

33.    The Debtors do not believe that alternative sources of financing are readily available.  Additionally, the Debtors do not believe that it would be prudent, or even possible, to administer these Chapter 11 Cases on a "cash collateral" only basis.  Absent access to the DIP Facilities, the Debtors lack sufficient cash on hand, and do not expect to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these Chapter 11 Cases.

34.    In addition, substantially all of the Debtors' assets are encumbered by liens securing Prepetition Secured Debt.  As a result, the Debtors do not believe that third-party debtor-in-possession financing would be reasonably available given the Debtors' existing capital structure.  Affirming this belief, and as discussed in the Winthrop Declaration, Houlihan engaged in preliminary discussions with certain alternative financing sources and/or asset purchasers regarding potential alternative DIP financing. Those efforts resulted in the Debtors receiving one DIP proposal from a third-party who was unwilling to provide financing on a junior basis, and the Debtors' existing lenders were unwilling to consent to the priming of their liens by a new, third-party lender. As such, Houlihan determined that third-party financing was not likely to be a feasible alternative.

35.    Indeed, the Debtors believe, after consulting their advisors, that because any alternative sources of financing (outside of the Prepetition Secured Parties) would undoubtedly insist on priming or require satisfying all of the obligations of the Prepetition Secured Parties in full, such outside financing is not a feasible option.  Without the consent of

the Prepetition Secured Parties, any attempts at non-consensual priming of the Prepetition

Secured Parties' liens would likely involve costly, extended, and contested litigation and

jeopardize the ongoing Sales Process.  The Debtors also believe there is a risk that they could not

demonstrate adequate protection for the non-consensual priming of the Prepetition Secured

Parties' liens, and this risk is not an acceptable possibility.  Moreover, any such outside financing

would expose the Debtors to the execution risk associated with a new lender transaction,

including material timing and due diligence constraints, necessarily involving the payment of

additional professional fees, further exacerbating the need for DIP financing.

36.    In contrast, the proposed DIP Facilities offered by the DIP Lenders avoid

any costly and time-consuming priming fight at the outset of these Chapter 11 Cases.  Moreover,

consensual DIP financing sends a positive message to stakeholders and potential bidders that will

help maximize value through the Sales Process. The DIP Facilities are the product of extensive

good faith, arms'-length negotiations with the DIP Lenders and are an essential component of the

Sale Process. Accordingly, the Debtors believe that the DIP Facilities provide, on balance, the

only viable postpetition financing proposal.

## BASIS FOR RELIEF

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

A.    **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

37.    The Court should authorize the Debtors, as an exercise of the Debtors'

sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities,

and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor

to obtain secured or super-priority financing under certain circumstances discussed in detail

below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with

its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

38.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

39.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the debtors offered by a

proposed postpetition facility.  For example, in *In re Ion Media Networks. Inc.*, the Bankruptcy

Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including noneconomic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization.  This is particularly true in a bankruptcy setting
> where cooperation and establishing alliances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan.  That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

40.    The Debtors' determination to move forward with the DIP Facilities is an

exercise of their sound business judgment following an arms'-length process and careful

evaluation of alternatives.  Specifically, and in the face of limited available liquidity, the Debtors

and their advisors determined that the Debtors would require significant postpetition financing to

support their operational and restructuring activities.  Accordingly, the Debtors negotiated the

DIP Facilities with the DIP Lenders in good faith, at arms' length, and with the assistance of

their advisors, and the Debtors believe that they have obtained the best financing available.

**B.    The Debtors Should Be Authorized to Obtain Postpetition
Financing on a Senior Secured and Superpriority Basis.**

41.    The Debtors propose to obtain financing under the DIP Facilities by

providing security interests and liens as set forth above pursuant to section 364(c) of the

Bankruptcy Code with the priority set forth in the Priority Waterfall.  The statutory requirement

for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing,

that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the

Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

42.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

43.     As described above and in the Winthrop Declaration, prior to negotiating the DIP Facilities, the Debtors, together with their advisors, considered other sources of postpetition financing to determine whether the Debtors could obtain debtor-in-possession financing on better terms.  Based on current capital market conditions and results of the marketing process, and after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable.[16]

44.     In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]."  As described herein, the Debtors are unable to obtain unsecured credit.  Therefore, approving the DIP Superpriority

---

[16] *See* Winthrop Decl. at ¶¶ 11-13.

Claims in favor of the DIP Lenders is reasonable and appropriate.  Further, subsections 364(c)(2) and (c)(3) of the Bankruptcy Code provide that the debtor may obtain credit that is secured by a lien on property of the estate that is not otherwise subject to a lien or secured by a junior lien on property of the estate that is subject to a lien.  As the Debtors are unable to obtain the critical financing they need to administer their Chapter 11 Cases from any other source, they respectfully represent that granting DIP Liens to the DIP Lenders on unencumbered property and/or a junior lien basis is warranted under the circumstances.

**C.    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

45.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in Prepetition Collateral are adequately protected.

46.    Here, the Prepetition Secured Parties have consented to the DIP Facilities, and the Interim Order specifically carves out the Permitted Prior Liens for adequate protection purposes.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

01:25622533.1

D.     **No Comparable Alternative to the DIP Facilities Is Reasonably Available.**

47.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

48.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available. The DIP Facilities are the product of extensive good faith negotiations and the Debtors carefully reviewed their DIP financing alternatives and concluded that third-party debtor-in-possession financing was not a feasible option given the Debtors' existing capital structure. Further, the Prepetition Secured Lenders would not consent to the priming of their liens, making an alternative funding source unlikely. Thus, based on the marketing process and negotiation history of the DIP Facilities, the Debtors have determined that the DIP Facilities provide the best option forward under the circumstances to both fund these

Chapter 11 Cases and provide a clear path toward the consummation of the Sale Process. Therefore, the Debtors submit that the requirements of section 364 of the Bankruptcy Code are satisfied.

### E.    The Proposed Repayment of the Prepetition ABL Facility Should Be Approved.

49.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well-settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir.  1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

50.    The provisions providing for the replacement and refinancing (or "roll up") of the Prepetition ABL Obligations (the "Roll-Up Provisions") into the DIP Obligations upon entry of the Interim Order are necessary and appropriate components of the DIP Facilities. Indeed, repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements, and courts in this jurisdiction have approved similar DIP features on an interim basis.  *See, e.g.*, *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 5, 2019) (approving roll-up of prepetition revolving obligations in interim order); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 8, 2018) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (Bankr. D. Del. Dec. 13, 2017) (same); *In re American Apparel, Inc.,* No. 15-12055 (Bankr. D. Del. Oct. 6, 2015) (same).

51.     Here, the Roll-Up Provisions are appropriate because the Prepetition ABL Lenders are oversecured, so repaying such creditor with postpetition loans should not harm the Debtors' estates and other creditors.  The Roll-Up Provisions merely affect the timing, not the amount or certainty of the Prepetition ABL Lenders' recovery because the secured claims arising under the Prepetition ABL Facility must be satisfied in full before recoveries to junior creditors may be provided absent the consent of such secured parties, which the Debtors do not have here. In addition, the rights of parties in interest are adequately protected because the Roll-Up Provisions are subject to their right to assert a challenge.  *See* Interim Order, ¶¶ 4, 33.

52.     Finally, the Roll-Up Provisions were required by the ABL DIP Lenders as a condition to their commitment to provide postpetition financing.  The Debtors were unable to obtain debtor-in-possession financing on similar terms that did not provide for the repayment of prepetition amounts on similar terms.  As described herein, the Debtors obtain significant benefits through the fully-consensual DIP Facilities that justify the Roll-Up Provisions, particularly where, as here, parties in interest should not be prejudiced by such provisions.

F.     **The Inclusion of the CCAA Debtors in the DIP Facilities and Granting the CCAA Debtor Credit Support 364(c)(1) Claims Are in the Best Interests of the Debtors' Estates**

53.     As noted above, the Debtors are jointly and severally liable for any Advances made under the Canadian Revolver Commitment to the Canadian ABL Borrower to operate the CCAA Debtors' business.  Although the Debtors may incur these obligations on behalf of non-debtors, doing so provides material benefits to the Debtors' estates for at least five reasons.

54.     First, including the CCAA Debtors in the ABL DIP Facility allows the Debtors to maintain the U.S. Borrowing Base Enhancement, which will allow the Debtors to access up to $40 million of additional U.S. Advances under the ABL DIP Facility.  Of this

amount, the Debtors currently estimate that absent that additional liquidity, the Debtors would have been forced to negotiate for additional DIP borrowings that may not have been available or, if available, would have increased the overall financing costs to the Debtors' estates.

55.     Second, the ABL DIP Facility requires that ABL DIP Agent to maintain separate loan accounts for the Canadian Borrower and the U.S. Borrower to ensure that the respective costs of any Advances made to the respective Borrower (including any interest, fees or other Lender Group Expenses (as defined in the ABL DIP Credit Agreement)) are charged to the appropriate Borrower's account.[17]  Each Borrower also has the primary obligation to pay its own unused line fees.[18]  Thus, although the Debtors are ultimately jointly and severally liable for all obligations under the ABL DIP Facility, the Canadian Borrower will bear its own fees and expenses in the first instance under that facility.

56.     Third, as set forth in the First Day Declaration, the Debtors anticipate that inclusion of the CCAA Debtors in the ABL DIP Facility will decrease the Debtors' financing needs by approximately $26.6 million during the first 12 weeks of the Chapter 11 Cases alone.  During that time, the Debtors estimate the CCAA Debtors will pay down approximately $14.2 million of the U.S. Advances under the U.S. Revolver Commitment and allow the Debtors to access approximately $12.4 million of additional borrowing base.

57.     Fourth, ensuring the Canadian Affiliates have sufficient liquidity to operate their businesses during the Sale Process benefits the Debtors' estates.  If the Sale Process results in a sale of the entire Company, which the Stalking Horse Bid currently contemplates, preserving the value of the Canadian Affiliates' businesses is likely to also maximize value of

---

[17] *See* ABL DIP Credit Agreement at § 2.9.

[18] *See* ABL DIP Credit Agreement at § 2.10.

the Debtors' estates by preserving or potentially increasing the amount a potential purchaser is willing to pay for the Debtors' assets as part of a whole-Company sale.

58.     Finally, it is unlikely that the Prepetition ABL Lenders would have extended the ABL DIP Facility unless the Canadian Affiliates and other non-debtor affiliates party thereto guaranteed the Debtors' obligations under that facility.  Absent the ABL DIP Facility, the Debtors may have been forced to obtain additional financing on more expensive terms from an alternative financing provider.

59.     For all these reasons, the Debtors submit that including the Canadian Revolver Commitment under the ABL DIP Facility is in the best interest of the Debtors' estates and should be approved.  In addition, as noted above, section 364(c)(1) of the Bankruptcy Code provides that a debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]."  The CCAA Debtors, through their monitor, would not agree to provide the CCAA Debtor Credit Support on an unsecured basis and requested that these amounts receive super-priority status in the Chapter 11 Cases.  Accordingly, the Debtors submit that granting the CCAA Debtor Credit Support 364(c)(1) Claims is reasonable and appropriate.

**II.     The Debtors Should Be Authorized to Use the Cash Collateral.**

60.     Section 363 of the Bankruptcy Code generally governs the use of estate property.  Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

61.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See*

*In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

62.    As described more fully above and in the Interim Order, the Debtors propose to provide the Term Loan Secured Parties with the Term Adequate Protection to protect against the postpetition diminution in value of the Term Loan Secured Parties' security interests, whether resulting from the use, sale, or lease of the Term Loan Collateral by the Debtors, the priming liens, or the imposition of the automatic stay, primarily in the form of the Term Loan Adequate Protection Liens, the Term Loan 507(b) Claims, monthly cash payments of interest at the non-default rate provided for in the Prepetition Term Facility, and payment in kind and accrual of certain other interest as provided for in the Prepetition Term Facility pursuant to the Interim Order. The Term Adequate Protection also includes financial reporting and the payment of certain fees and expenses to the Term Agent. Accordingly, the proposed Term Adequate Protection provisions are sufficient to protect the Term Loan Secured Parties from any diminution in value to the Term Loan Collateral. In light of the foregoing, the Debtors submit,

and the Term Loan Secured Parties agree, that the proposed Term Adequate Protection to be provided for the benefit of the Prepetition Term Loan Lenders is appropriate.

63.    Additionally, as described more fully above, to the extent the Court approves the Roll-Up Provisions in the Interim Order, the ABL Secured Parties will not be receiving adequate protection.  If the Roll-Up Provisions are not approved in the Interim Order, the Debtors propose to provide the ABL Secured Parties with the ABL Adequate Protection in the form of the ABL Adequate Protection Liens, the ABL 507(b) Claims, monthly cash payments of interest at the non-default rate provided for in the Prepetition ABL Facility, and payment of all reasonable out-of-pocket fees, costs, and expenses of the ABL Agent. Accordingly, the proposed ABL Adequate Protection provisions are sufficient to protect the ABL Secured Parties from any diminution in value resulting from the use of the Cash Collateral. In light of the foregoing, the Debtors submit, and the ABL Secured Parties agree, that the proposed ABL Adequate Protection to be provided for the benefit of the ABL Secured Parties is appropriate.

64.    Thus, the Debtors' provision of the Term Adequate Protection and ABL Adequate Protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### III.    The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).

65.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of a debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

01:25622533.1

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

66.     Here, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing and of extended arms' length, good-faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**IV.     The Automatic Stay Should Be Modified on a Limited Basis.**

67.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors to grant the liens and security interests contemplated by the DIP Documents and Interim Order.  The Interim Order further provides that, following the occurrence of an Event of Default (as defined in the DIP Documents), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies in accordance with the DIP Documents (other than in the case of certain rights and remedies that are subject to a five (5) calendar day notice period), or applicable law.

68.     Stay modifications of this kind are ordinary and standard features of

debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See, e.g.*, *In Am. Apparel, Inc.*, Case No. 15-12055 (BLS) [Docket No. 248] (Bankr. D. Del. Nov. 2, 2015) (authorizing stay modifications in order to permit DIP lenders to exercise remedies upon an event of default); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) [Docket No. 278] (Bankr. D. Del. July 24, 2015) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Coldwater Creek, Inc.*, Case No. 14-10867 (BLS) [Docket No. 573] (Bankr. D. Del. June 12, 2014) (modifying stay to authorize exercise of remedies upon default); *In re Broadway 401 LLC*, Case No. 10-10070 (KJC) [Docket No. 55] (Bankr. D. Del. Feb. 16, 2010) (modifying the stay to the extent necessary to effectuate the order).

## V.   Failure to Obtain the Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.

69.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

70.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to use the Cash Collateral and to withdraw and borrow funds under the DIP Facilities, in accordance with the Budget.  In particular, the Debtors, through their management, financial, and restructuring advisors, developed the Budget to ensure that the Debtors had access to adequate capital and funding to ensure that their businesses can be operated in the ordinary

01:25622533.1

course so as to preserve the going-concern value of their assets.  And the borrowing proposed to be made available under the Interim Order is limited to those amounts necessary to avoid immediate and irreparable harm in the period from the Petition Date to the Final Hearing.

71.    The Debtors require access to these funds prior to the Final Hearing and entry of the Final Order to be able to continue to operate and pay their administrative expenses. This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### REQUEST FOR FINAL HEARING

72.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this DIP Motion.

### WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

73.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

74.    Notice of this DIP Motion has been or will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the Prepetition Agents; (d) counsel to the DIP Agents; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Offices of the United States Attorney for each of the District of Delaware and the Northern District of California; (h) all parties known to have asserted a lien against the Debtors' assets; (i) the Debtors' cash management banks; and (j) any other party that

has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules and the Local Rules. Notice of this DIP Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order, granting the relief requested herein and such other and further relief as the Court may

deem just and proper.

Dated:    November 21, 2019
          Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pauline K. Morgan*
Pauline K. Morgan (No. 3650)
Ryan M. Bartley (No. 4985)
Ashley E. Jacobs (No. 5635)
Elizabeth S. Justison (No. 5911)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Kelley A. Cornish
Claudia R. Tobler
Christopher Hopkins
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Proposed Co-Counsel to the Debtors and
Debtors-in-Possession*

01:25622533.1

## **EXHIBIT 1**

**Interim Order**

01:25622533.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; (V) SCHEDULING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**"), dated November 21, 2019, of Bumble Bee Parent, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002, 4001-1, 4001-2, and 9013-1 of the Local Rules for the United States Bankruptcy Court, District of Delaware (the "**Local Rules**") seeking, among other things:

      i.     authorization for the Debtors to obtain a senior secured asset-based debtor in possession credit facility with the priority set forth in the waterfall attached hereto as **Exhibit C** (the "**Priority Waterfall**") and, as to the Term Loan DIP Facility (as defined below), the priority set forth in the Priority Waterfall and in the DIP Intercreditor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

Agreement (as defined herein) (the "**ABL DIP Facility**") consisting of up to $200,000,000 in revolving credit commitments, subject to the terms, conditions, and limitations set forth herein and in the documentation regarding the ABL DIP Facility (the commitments thereunder the "**Revolving DIP Commitments**" and the loans thereunder the "**Revolving DIP Loans**"), which shall include (a) the immediate conversion (i.e. "roll up") of all outstanding Prepetition ABL Credit Agreement Indebtedness (as defined below) into obligations under the ABL DIP Facility (the "**Prepetition ABL Roll Up**") upon entry of this Interim Order, (b) funding of those certain expenditures set forth in the Approved Budget (as defined below), and (c) an amount equal to $10,000,000 of the Revolving DIP Commitments available in the form of standby letters of credit, inclusive of all outstanding letters of credit existing under the Prepetition ABL Credit Agreement (as defined herein) converting to letters of credit under the ABL DIP Facility, provided by Wells Fargo Capital Finance, LLC ("**Wells Fargo**"), as administrative agent (in such capacity, the **"ABL DIP Agent"**), and the lenders thereunder (collectively, and together with Wells Fargo, in such capacity, the "**ABL DIP Lenders**");

ii.      authorization for the Debtors to enter into the ABL DIP Facility, and approving the terms and conditions thereof, as set forth in this Interim Order and the ABL DIP Documents (as defined herein) entered into, by and among Bumble Bee Foods, LLC (the "**U.S. ABL DIP Borrower**"), Connors Bros. Clover Leaf Seafoods Company as Canadian Borrower (the "**Canadian Borrower**"), Bumble Bee Foods S.À.R.L. ("**Holdings**"), certain subsidiaries of Holdings as guarantors, the ABL DIP Agent, and the ABL DIP Lenders (substantially in the form attached hereto as **Exhibit A**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified

from time to time in accordance with the terms thereof and hereof, the "**ABL DIP Agreement**," and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**ABL DIP Documents**," including, without limitation, any fee letters executed by the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, as necessary, collectively, the "**ABL Fee Letters**");

iii.    authorization for the Debtors to execute and deliver the ABL DIP Agreement and the other ABL DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

iv.    authorization for the ABL DIP Agent to terminate the ABL DIP Agreement in accordance with the terms hereof and thereof;

v.    subject to entry of the Final Order (as defined herein), authorization to grant liens to the DIP Agents and DIP Lenders on all of the proceeds or property recovered (collectively, the "**Avoidance Proceeds**") on account of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**");

vi.    allowance of the ABL DIP Superpriority Claims (as defined herein) in favor of the ABL DIP Agent and the ABL DIP Lenders;

vii.    authorization for Bumble Bee Foods, LLC (the "**Term Loan DIP Borrower**") to obtain a senior secured term loan debtor in possession credit facility with the priority set forth in the Priority Waterfall and, as to the ABL DIP Facility, the priority set forth in the Priority Waterfall and in the DIP Intercreditor Agreement (the "**Term**

Loan DIP Facility" together with the ABL DIP Facility, the "**DIP Facilities**") consisting of up to $80 million in term loan credit commitments (the commitments thereunder, the "**Term Loan DIP Commitments**" and, together with the ABL DIP Commitments, the "**DIP Commitments**"; the loans thereunder the "**Term DIP Loans**" and, together with the ABL DIP Loans, the "**DIP Loans**"), provided by the lenders thereunder (collectively, the "**Term Loan DIP Lenders**" and, together with the ABL DIP Lenders, the "**DIP Lenders**");

    viii.    authorization for the Debtors to enter into the Term Loan DIP Facility, and approving the terms and conditions thereof, as set forth in this Interim Order and the Term Loan DIP Documents (as defined herein) entered into, by and among the Term Loan DIP Borrower, Holdings and certain subsidiaries of Holdings as guarantors, Brookfield Principal Credit LLC, as administrative agent (in such capacity, the "**Term Loan DIP Agent**") (the Term Loan DIP Agent with the ABL DIP Agent, collectively, the "**DIP Agents**"), and the Term Loan DIP Lenders (substantially in the form attached hereto as **Exhibit B**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**Term Loan DIP Agreement**" and, together with the ABL DIP Agreement, the "**DIP Agreements**") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, (collectively, the "**Term Loan DIP Documents**" and, together with the ABL DIP Documents, the "**DIP Documents**"), including, without limitation, any fee letters

executed by the Debtors, the Term Loan DIP Agent, and the Term Loan DIP Lenders, as necessary (collectively, the "**Term Loan Fee Letters**" and, together with the ABL Fee Letters, the "**Fee Letters**");

ix.    authorization for the Debtors to execute and deliver the Term Loan DIP Agreement and the other Term Loan DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

x.    approving that certain DIP Intercreditor Agreement by and between the ABL DIP Agent, the Term Loan DIP Agent, the Prepetition ABL Agent (as defined herein) and the Prepetition Term Loan Agent (as defined herein) (substantially in the form attached hereto as **Exhibit E**, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Intercreditor Agreement**");

xi.    authorization for the Term Loan DIP Agent to terminate the Term Loan DIP Agreement in accordance with the terms thereof;

xii.    allowance of the Term Loan DIP Superpriority Claims (as defined herein) in favor of the Term Loan DIP Agent and the Term Loan DIP Lenders;

xiii.    authorization, subject to the terms and provisions hereof, for the Debtors to use, among other things, Cash Collateral (as defined herein), within the meaning of section 363(a) of the Bankruptcy Code;

xiv.    the granting of adequate protection to the (a) lenders under the Prepetition ABL Credit Agreement (as defined herein), and (b) lenders under the Prepetition Term Loan Credit Agreement (as defined herein);

xv.        subject to and only effective upon the entry of a Final Order granting such relief, (a) the waiver by the Debtors of any right to surcharge against the DIP Collateral and the Prepetition Collateral (each as defined herein), including pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) providing that the Prepetition Secured Parties are not subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, and (c) providing that the Prepetition Secured Parties (as defined herein) are not subject to the equitable doctrine of "marshaling," or any other similar doctrine with respect to the DIP Collateral;

xvi.        pursuant to Bankruptcy Rule 4001(c)(2), requesting an interim hearing on the DIP Motion be held before this Court to consider entry of this interim order (the "**Interim Order**") (A) (i) authorizing the U.S. ABL DIP Borrower, on an interim basis, to borrow under the ABL DIP Facility an amount not to exceed $200 million (the "**Interim ABL Commitment Amount**"), and (ii) authorizing the Term Loan DIP Borrower, on an interim basis, to borrow under the Term Loan DIP Facility an amount not to exceed $40 million (the "**Interim Term Loan Commitment Amount**" and together with the Interim ABL Commitment Amount, the "**Interim Order Commitment Amount**"), where a portion of the Interim ABL Commitment Amount shall be accessed to effectuate the Prepetition ABL Roll Up, and the rest of the Interim Order Commitment Amount shall be accessed to meet the Debtors' working capital and other needs pending the final hearing and as set forth in the Approved Budget (as defined herein), (B) authorizing the Debtors' use of Cash Collateral, and (C) granting the adequate protection and other relief described therein;

xvii.    scheduling a final hearing (the "**Final Hearing**") to consider entry of a final

order (the "**Final Order**") approving the DIP Motion and approving the Debtors' notice

with respect thereto; and

xviii.    granting related relief.

The Court having held an interim hearing pursuant to Bankruptcy Rules 4001(b)(2) and

4001(c)(2) (the "**Interim Hearing**") to consider the relief requested in the DIP Motion; and upon

the record of the Interim Hearing and upon the Court's consideration of the DIP Motion and all

exhibits thereto; and upon the First Day Declaration and the Winthrop Declaration; and upon due

deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**[2]

A.    Petition Date:  On November 21, 2019 (the "**Petition Date**"), each of the Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  The

Debtors have continued in the management and operation of their businesses and properties as

debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in the Cases.  No official committee of unsecured creditors (upon

any appointment thereof, the "**Committee**") as provided for under section 1102 of the

Bankruptcy Code has been appointed.

B.    Jurisdiction.  This Court has core jurisdiction over these Cases, this DIP Motion,

and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334.  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the DIP

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.

C.    <u>Notice</u>.    The Debtors have represented that telephonic, facsimile notice or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (iii) counsel to the Prepetition Agents; (iv) counsel to the DIP Agents; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; (vii) the Offices of the United States Attorney for each of the District of Delaware and the Northern District of California; (viii) all parties known to have asserted a lien against the Debtors' assets; (ix) the Debtors' cash management banks and (x) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Local Rules.  Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

D.    <u>Debtors' Stipulations</u>.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 34 below), the Debtors admit, stipulate and agree that:

(a)    <u>Prepetition ABL Credit Agreement and Prepetition Term Loan Credit Agreement</u>.

(i)    The U.S. ABL DIP Borrower, the Canadian Borrower, Holdings and the other Guarantors party thereto (collectively, the "**<u>Prepetition ABL Credit Parties</u>**"), Wells Fargo Capital Finance, LLC, as administrative agent (in such capacity,

the "**Prepetition ABL Agent**"), and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**" and, together with the Prepetition ABL Agent, the "**Prepetition ABL Secured Parties**"), are party to that certain ABL Credit Agreement, dated as of August 18, 2017 (as the same has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including the Prepetition ABL Security Agreement (as defined below)), as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**Prepetition ABL Documents**").

(ii)    As of the Petition Date, the outstanding aggregate principal amount under the Prepetition ABL Credit Agreement was not less than $192,420,215 consisting of $186,817,599 in revolving loans and $5,602,616 in letters of credit (together with all other outstanding Obligations, as defined in the Prepetition ABL Credit Agreement, including interest, fees and expenses, the "**Prepetition ABL Credit Agreement Indebtedness**").

(iii)    As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Credit Parties granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, a security interest in and continuing lien on (the "**Prepetition ABL Credit Agreement Liens**") substantially all of their assets and property (with certain exceptions set out in the Prepetition ABL Documents) including (a) a first priority security interest in and continuing lien on the

ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement referred to below) (which for the avoidance of doubt, includes "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**")) *other than* (x) Term Loan Priority Accounts (as defined in the Prepetition Intercreditor Agreement) and (y) Cash Collateral (in the case of each of (x) and (y), that is proceeds of Term Loan Priority Collateral (as defined in the Prepetition Intercreditor Agreement)) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition ABL Priority Collateral"**), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in that certain Prepetition Intercreditor Agreement, defined below) and proceeds, products, and rents of any of the foregoing (collectively, the "**Prepetition Term Loan Priority Collateral**," and together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**"), subject only to Permitted Prior Liens (as defined herein) and the liens of the Prepetition Term Loan Agent on the Prepetition Term Loan Priority Collateral and excluding the Excluded Assets (as defined in the Prepetition ABL Security Agreement).

(iv)     The Term Loan DIP Borrower, Holdings and the other Guarantors (collectively, the "**Prepetition Term Loan Credit Parties**" and, together with the Prepetition ABL Credit Parties, the "**Prepetition Credit Parties**"), Brookfield Principal Credit LLC, as administrative agent thereunder (the "**Prepetition Term Loan Agent**" and, together with the Prepetition ABL Agent, the "**Prepetition Agents**"), the lenders from time to time party to the Prepetition Term Loan Agreement (the "**Prepetition Term Loan Lenders**"; the Prepetition Term Loan Agent and the Prepetition Term Loan

Lenders, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**"), are party to that certain Term Loan Credit Agreement, dated as of August 15, 2017 (as the same has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Term Loan Credit Agreement**" and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including the Prepetition Term Loan Security Agreement (as defined below)), as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**Prepetition Term Loan Documents**", and together with the Prepetition ABL Documents, the "**Prepetition Credit Documents**").

(v)     As of the Petition Date, the outstanding aggregate principal amount of term loans under the Prepetition Term Loan Credit Agreement was $649,233,814 and the outstanding Prepayment Premium (as defined in the Prepetition Term Loan Credit Agreement) that was due and payable was $32,461,691 (collectively with all other outstanding obligations including all accrued and unpaid interest, fees, costs, charges, any other premiums and expenses, the "**Prepetition Term Loan Credit Agreement Indebtedness**" and, together with the Prepetition ABL Credit Agreement Indebtedness, the "**Prepetition Credit Agreement Indebtedness**").

(vi)     As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Credit Parties granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, a security interest in and continuing liens on (the "**Prepetition Term Loan**

**Credit Agreement Liens**," and, together with the Prepetition ABL Credit Agreement Liens, the "**Prepetition Liens**") substantially all of their assets and property (with certain exceptions set out in the Prepetition Term Loan Documents), including (a) a first priority security interest and continuing lien on the Prepetition Term Loan Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to Permitted Prior Liens (as defined herein) and the liens of the Prepetition ABL Administrative Agent on the Prepetition ABL Priority Collateral and excluding the Excluded Assets (as defined in the Prepetition Term Loan Security Agreement).

(vii)    The Prepetition ABL Agent and the Prepetition Term Loan Agent entered into that certain prepetition Intercreditor Agreement dated as of August 15, 2017 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "**Prepetition Intercreditor Agreement**") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other Prepetition Credit Parties that are not Debtors.  Each of the Prepetition Credit Parties under the Prepetition Credit Documents acknowledged and agreed to the Prepetition Intercreditor Agreement.

(b)    The Prepetition ABL Credit Agreement Indebtedness constitutes the legal, valid and binding obligations of the Prepetition ABL Credit Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition ABL Credit Agreement Indebtedness is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(c)     The Debtors acknowledge and agree that as of the Petition Date: (i) the Prepetition ABL Credit Agreement Liens on the Prepetition Collateral and the Prepetition ABL Credit Agreement Indebtedness were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties; (ii) the Prepetition ABL Credit Agreement Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Loan Priority Collateral, and (2) certain liens otherwise permitted by the Prepetition ABL Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition ABL Credit Agreement Liens as of the Petition Date, the "**Prepetition ABL Permitted Prior Liens**"); (iii) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Credit Agreement Liens or Prepetition ABL Credit Agreement Indebtedness exist, and no portion of the Prepetition ABL Credit Agreement Liens, Prepetition ABL Credit Agreement Indebtedness or any amounts paid to the Prepetition ABL Secured Parties or applied to the obligations owing under the Prepetition ABL Documents prior to the Petition Date is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, subordination (equitable or otherwise), recovery, attack, offset, contest, objection, reclassification, reduction or counterclaim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (iv) the Debtors and their estates have no claims, objections, challenges, defenses, setoff rights, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and

01:25622213.1

13

employees arising out of, based upon or related to the Prepetition ABL Credit Agreement; and (v) the Prepetition ABL Credit Agreement Indebtedness constitutes an allowed, secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code.

(d)     The Prepetition Term Loan Credit Agreement Indebtedness constitutes the legal, valid and binding obligations of the Prepetition Term Loan Credit Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Term Loan Credit Agreement Indebtedness is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(e)     The Debtors acknowledge and agree that as of the Petition Date: (i) the Prepetition Term Loan Credit Agreement Liens on the Prepetition Collateral and the Prepetition Term Loan Credit Agreement Indebtedness were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Agent; (ii) the Prepetition Term Loan Credit Agreement Liens were senior in priority over any and all other liens in the Prepetition Term Loan Credit Agreement Collateral, subject only to (1) the Prepetition ABL Credit Agreement Liens on the Prepetition ABL Priority Collateral, and (2) certain liens otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date, the "**Prepetition Term Loan Permitted Prior Liens**" and, together with the Prepetition ABL Permitted Prior Liens, the "**Permitted Prior Liens**"); (iii) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Credit Agreement Liens or Prepetition Term Loan Credit Agreement Indebtedness exist, and no portion

of the Prepetition Term Loan Credit Agreement Liens or Prepetition Term Loan Credit Agreement Indebtedness or any amounts paid to the Prepetition Term Loan Agent or applied to the obligations owing under the Prepetition Term Loan Documents prior to the Petition Date is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, subordination (equitable or otherwise), recovery, attack, offset, contest, objection, reclassification, reduction or counterclaim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (iv) the Debtors and their estates have no claims, objections, challenges, defenses, setoff rights, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Term Loan Agent, Prepetition Term Loan Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Credit Agreement; and (v) the Prepetition Term Loan Credit Agreement Indebtedness constitutes an allowed, secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code.

(f)     Subject to entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns hereby unconditionally, irrevocably and fully, forever waives, discharges, and releases (i) any right to challenge any of the Prepetition Credit Agreement Indebtedness, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Credit Agreement Indebtedness and (ii) each of the Prepetition Agents and the other Prepetition Secured Parties, and each of their respective former or current officers, employees, directors, agents, representatives, owners, members, partners,

financial advisors, legal advisors, shareholders, managers, consultants, accounts, attorneys, affiliates, and predecessors in interest of any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights that exist on the date hereof relating to any of the Prepetition Credit Documents or the transactions contemplated under such documents, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, arising at law or in equity, including, without limitation, any so-called "lender liability," recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of state or federal law and any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or the claims of the Prepetition Secured Parties and Prepetition Agents.

(g)     Subject to paragraph 34 hereof, the Debtors' acknowledgements, stipulations and releases (as set forth in this paragraph) shall be binding on the Debtors and their respective representatives, successors and assigns, and on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in the Cases, whether such trustee or representative is appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

E.     <u>Prepetition Intercreditor Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Credit Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority

administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.   Until the effectiveness and full roll up of the Prepetition ABL Roll Up, the ABL DIP Facility shall be deemed a "refinancing" of the ABL Obligations as such term is used in the Prepetition Intercreditor Agreement, and upon its effectiveness the Prepetition ABL Roll Up shall constitute a Discharge of ABL Obligations (as such terms are defined in the Prepetition Intercreditor Agreement).

       F.       <u>Findings Regarding DIP Facilities and Use of Cash Collateral</u>.

       (a)       Good cause has been shown for the entry of this Interim Order.

       (b)       The Debtors have an immediate and critical need to obtain the DIP Facilities and to use Cash Collateral as well as other collateral to continue the operation of their businesses.  Without such funds, the Debtors will not be able to meet their payroll obligations or to pay operating and other expenses during this critical period.  The ability of the Debtors to finance their operations through the incurrence of new indebtedness is vital to the preservation and maintenance of the going concern value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the estates.

       (c)       The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

(d)　　The DIP Agents and the DIP Lenders are willing to provide the DIP Facilities, and the Prepetition Secured Parties are willing to consent to the use of their Cash Collateral and other Prepetition Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Interim Order, as applicable, and provided that the DIP Liens, the DIP Superpriority Claims and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facilities and the Cash Collateral use approved by this Interim Order.  The DIP Agents and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facilities approved by this Interim Order and to be further evidenced by the DIP Documents, and the Prepetition Secured Parties have acted in good faith in consenting to the Debtors' use of their Cash Collateral and other Prepetition Collateral pursuant to the terms of this Interim Order, and their reliance on the assurances referred to above is in good faith.

(e)　　Among other things, entry of this Interim Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and professional fees.  The DIP Facilities and the use of Cash Collateral as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Facilities and to the use of Cash Collateral is not obtained.  Consummation of the DIP Facilities and the use of Cash Collateral pursuant to the terms of this Interim Order therefore are in the best interests of the Debtors' estates.

(f)　　The DIP Documents and the use of Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the ABL

DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, and the Prepetition Secured Parties, among other parties, and the ABL DIP Facility, the Term Loan DIP Facility and the use of Cash Collateral reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are fair and reasonable under the circumstances, and are supported by reasonably equivalent value and fair consideration.   All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents including, without limitation, all loans, including the Prepetition ABL Roll Up, made to, guarantees issued by, and all letters of credit issued (or deemed issued) for the account of, the Debtors pursuant to the DIP Documents, and any other obligations under the DIP Documents, including bank product and hedging obligations (individually, the "**ABL DIP Obligations**" and the "**Term Loan DIP Obligations**", and collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal.

(g)    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).   The permission granted herein on an interim basis to use Cash Collateral and to enter into the DIP Documents and to borrow an amount up to the Interim Order Commitment Amount is necessary to avoid immediate and irreparable harm to the Debtors and their estates.   This Court concludes that entry of this Interim Order is in the best interests of the Debtors and their estates and creditors as its implementation

will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets, thus satisfying Bankruptcy Rules 4001(b)(2) and (c)(2).

(h)    To the extent necessary, the Prepetition Secured Parties have either consented to the DIP Facilities and the Debtors' use of the Prepetition Collateral, including Cash Collateral, or their respective interests therein are being adequately protected by, among other things, the adequate protection described by this Interim Order.  This Court concludes that the adequate protection provided to the Prepetition Secured Parties hereunder for, among other things, the Debtors' incurrence of the DIP Obligations on a priming basis, as described herein, and the Debtors' use of the Prepetition Collateral, including Cash Collateral, is consistent with and authorized by sections 361, 362, 363, and 364 of the Bankruptcy Code.

G.    Based on the foregoing findings, acknowledgements, and conclusions, and upon the record made before the Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Approval of DIP Motion</u>.  The DIP Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order and the DIP Documents; <u>provided, however</u>, that if there are any inconsistencies between the terms of this Interim Order and the DIP Documents, the terms of this Interim Order shall govern.  Any objections or responses to the relief requested in the DIP Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the Final Hearing.  This Interim Order shall become effective immediately upon its entry.

2.      <u>Authorization of DIP Facilities and DIP Documents</u>.

(a)      The ABL DIP Facility and the Term Loan DIP Facility are each hereby approved on an interim basis.  The Debtors are hereby authorized to execute, issue, deliver, enter into and adopt, as the case may be, the ABL DIP Agreement, all ABL DIP Documents, the Term Loan DIP Agreement and all Term Loan DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Approved Budget (as defined herein).  The U.S. ABL DIP Borrower is hereby authorized to borrow money under the ABL DIP Facility and the Term Loan DIP Borrower is authorized to borrow money under the Term Loan DIP Facility, on an interim basis, up to the Interim Order Commitment Amount.  The Debtors that are Guarantors are hereby authorized to guarantee such borrowings and the other DIP Obligations, all in accordance with the terms of this Interim Order, the DIP Agreements, and all other DIP Documents.

(b)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and, without further application to the Court, to pay all fees referred to in this Interim Order, the ABL DIP Agreement, the ABL DIP Documents, the Term Loan DIP Agreement and the Term Loan DIP Documents including, without limitation, the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the professionals of the DIP Agents, including Paul Hastings LLP, Blake, Cassels & Graydon LLP, Womble Bond Dickinson LLP, FTI Consulting, Weil, Gotshal & Manges LLP, Richards Layton & Finger LLP, Rothschild & Co., Goodmans LLP (subject to the same procedures, including

01:25622213.1

with respect to the ability to object, provided for in paragraph 22(e) regarding payment of the fees and expenses of the Prepetition Secured Parties).

(c)    Subject to the provisions contained in paragraph 40 hereof, the Debtors are hereby authorized to execute, deliver and perform one or more amendments or modifications to the ABL DIP Documents and/or Term Loan DIP Documents for the purpose of adding additional financial institutions as ABL DIP Lenders and/or Term Loan DIP Lenders and reallocating the commitments for the ABL DIP Facility among the ABL DIP Lenders and/or the Term Loan DIP Facility among the Term Loan DIP Lenders, in each case in such form as the Debtors, the ABL DIP Agent and the ABL DIP Lenders or the Term Loan DIP Agent and the Term Loan DIP Lenders, as applicable, may agree (it being understood that no further approval of this Court shall be required for non-material amendments to the ABL DIP Documents and/or the Term Loan DIP Documents).

3.    Binding Effect.    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

4.    ABL DIP Loans and Roll Up.

(a)    All loans made or monies advanced under the ABL DIP Facility to or for the benefit of the "Loan Parties" under and as defined in the ABL DIP Agreement (the "**ABL DIP Loan Parties**") on or after the Petition Date including, without limitation, loans made or monies

advanced or deemed advanced under or in connection with the ABL DIP Facility, shall: (i) be evidenced by the books and records of the ABL DIP Agent; (ii) bear interest payable at the rates set forth in the ABL DIP Agreement; (iii) be secured in the manner set forth in this Interim Order and in the ABL DIP Documents; (iv) be payable in accordance with the terms of the ABL DIP Documents; and (v) otherwise be governed by the terms set forth in this Interim Order and in the ABL DIP Documents.

(b)     The Advances (as defined in the Prepetition ABL Credit Agreement) outstanding as of the Petition Date under the Prepetition ABL Credit Agreement constitute a portion of the Revolving DIP Loans outstanding under the ABL DIP Facility.  For all purposes of the ABL DIP Documents, the sum of the Pre-Petition Revolving Loans and any other Revolving DIP Loans made on the Closing Date shall constitute all of the Revolving DIP Loans outstanding on the Closing Date.  Each Pre-Petition Letter of Credit (as defined in the ABL DIP Agreement) shall constitute a "Letter of Credit" for all purposes of the ABL DIP Documents and shall be deemed issued under the ABL DIP Agreement as of the Closing Date.  All Letter of Credit Outstandings (as defined in the Prepetition ABL Credit Agreement) shall constitute Letter of Credit Outstandings for all purposes of the ABL DIP Documents.

(c)     For the avoidance of doubt, the Prepetition ABL Roll Up shall be subject to paragraph 34 of this Interim Order.

5.     Use of ABL DIP Loans.  Subject to the terms and conditions of this Interim Order and the ABL DIP Documents (including, without limitation, satisfaction of the conditions precedent to borrowing set forth therein), and other restrictions set forth in the DIP Documents, an amount not to exceed $200 million of the ABL DIP Loans shall be available on or after the Closing Date and shall be used by the U.S. ABL DIP Borrower, in each case in accordance with

the Approved Budget (as defined herein) to (a) effectuate the Prepetition ABL Roll Up as set

forth in the ABL DIP Agreement and paragraph 4(b) of this Interim Order, (b) fund general

corporate needs, including, without limitation, working capital needs, (c) pay administrative

expenses of the Cases, including reasonable fees and expenses of professionals, (d) pay

Adequate Protection Provisions and (e) pay any prepetition obligations authorized to be paid

pursuant to any "first day order" entered by the Court, in each case, in accordance with the

Approved Budget (as defined herein).

6.     Term DIP Loans.  All loans made or monies advanced under the Term Loan DIP

Facility to or for the benefit of the "Credit Parties" under and as defined in the Term Loan DIP

Agreement (the "Term DIP Loan Parties" and, together with the ABL DIP Loan Parties, the

"**Loan Parties**") on or after the Petition Date including, without limitation, loans made or

monies advanced or deemed advanced under or in connection with the Term Loan DIP Facility,

shall: (a) be evidenced by the books and records of the Term Loan DIP Agent; (b) bear interest

payable at the rates set forth in the Term Loan DIP Agreement; (c) be secured in the manner set

forth in this Interim Order and in the Term Loan DIP Documents; (d) be payable in accordance

with the terms of the Term Loan DIP Documents; and (e) otherwise be governed by the terms set

forth in this Interim Order and in the Term Loan DIP Documents.

7.     Use of Term DIP Loans.  Subject to the terms and conditions of this Interim Order

and the Term Loan DIP Agreement (including, without limitation, satisfaction of the conditions

precedent to borrowing set forth therein), the proceeds of the Term DIP Loans shall be available

on or after the Closing Date and shall be used by the Term Loan DIP Borrower, in each case in

accordance with the Approved Budget (as defined herein) to (a) pay transaction fees and

expenses, administrative expenses of the cases (including the professional fees and expenses of

the Term Loan DIP Agent and/or the Term Loan DIP Lenders, to the extent the ABL DIP Facility does not provide sufficient funds to pay such needs) and to fund general corporate needs, including, without limitation, working capital needs and repayments of borrowings under the ABL DIP Facility (solely to the extent not accompanied by a corresponding reduction of commitments under such ABL DIP Facility), and (b) pay any prepetition obligations authorized to be paid pursuant to any "first day order" entered by the Court, in each case, in accordance with the Approved Budget.

8.    <u>Payment of DIP Fees and Expenses</u>.  Immediately upon entry of this Interim Order, the Debtors are authorized to pay or otherwise incur all fees, expenses, and other amounts payable under the Fee Letters and under the terms of the ABL DIP Agreement, any other ABL DIP Documents, the Term Loan DIP Agreement and any other Term Loan DIP Documents including, without limitation, the commitment fee, the unused line fee, the servicing fee, the closing/upfront fee, the exit fee, the administrative agent fee, and any letter of credit fees (collectively, the "**DIP Fees**") as well as all reasonable and documented out-of-pocket costs and expenses of the DIP Agents in accordance with the terms of the DIP Agreements (collectively, the "**Expenses**").  The DIP Fees and Expenses approved pursuant to this paragraph shall include, without limitation, the reasonable and documented prepetition and postpetition fees and expenses of counsel and financial advisors retained by the DIP Agents associated with the arrangement, preparation, execution, delivery and administration of the DIP Documents (and any amendment or waiver with respect thereto), and the Cases and, subject to the same procedures provided in paragraph 22(e) regarding payment of the fees and expenses of the Prepetition Secured Parties, none of the DIP Fees and Expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application

with this Court with respect to such fees and expenses.  In addition, the Debtors are hereby authorized to indemnify the DIP Agents, the DIP Lenders, and their respective affiliates and other parties, as provided in the DIP Agreements.  All fees and expenses approved pursuant to this paragraph shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.  The Debtors are hereby authorized to pay all DIP Fees and Expenses in accordance with the DIP Documents.

9.     ABL DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the ABL DIP Obligations shall constitute allowed claims against the Debtors (without the need to file any proofs of claim) including priority over any and all administrative expenses, diminution claims (including all Adequate Protection Provisions (as defined herein)), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code (the "**ABL DIP Superpriority Claims**"), which allowed claims, shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expense claims allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out and senior to the Adequate Protection 507(b) Claims (as defined herein).

10.     <u>Term Loan DIP Superpriority Claims</u>.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Term Loan DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proofs of claim), including priority over any and all administrative expenses, diminution claims (including all Adequate Protection Provisions (as defined herein)), and all other claims against the Debtors, now existing or hereafter arising, in these Cases or a Successor Case (as defined herein), of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code (the "**<u>Term Loan DIP Superpriority Claims</u>**" and, together with the ABL DIP Superpriority Claims, the "**<u>DIP Superpriority Claims</u>**"), which allowed claims, shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expense claims allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out; <u>provided, however</u>, that the ABL DIP Superpriority Claims and Term Loan DIP Superpriority Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities as set forth herein, and shall be subject to the Carve Out and senior to the Adequate Protection 507(b) Claims (as defined herein).

11.     <u>Carve Out</u>.

(a)     For purposes hereof, the "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000

incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time by the Bankruptcy Court, whether by interim order, procedural order, or otherwise, unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (the "Debtor Professionals") and the Committee (if appointed), pursuant to sections 328 or 1103 of the Bankruptcy Code and, with respect to Committee professionals (the "Committee Professionals") (solely with respect to any Committee and the Committee Professionals strictly subject to the Approved Budget and the line items applicable to such Committee and Committee Professionals set forth therein) and the Debtor Professionals (together with the Committee Professionals, the "Professional Persons") at any time before or on the first business day following delivery by a Creditor Representative (defined below) of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3 million incurred after the first business day following delivery by one of the Creditor Representatives (defined below) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by e-mail (or other electronic means) by the ABL DIP Agent or the Term Loan DIP Agent (each, a "Creditor Representative") to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in paragraph 36), stating that the Post-Carve Out Trigger Notice Cap has been invoked

and describing the alleged default that is continuing under the DIP Documents. In addition, without duplication of any Allowed Professional Fees, and only after the funding of the Carve Out Reserves in full, an additional amount shall be funded to the Post-Carve Out Trigger Notice Reserve from the DIP Term Funding Account up to the lesser of (x) the remaining amount in the DIP Term Funding Account and (y) $8.6 million if a Sale Order has been entered by the Bankruptcy Court approving the Stalking Horse APA substantially in the form filed on the Petition Date or $10 million if the Sale Order has not been entered by the Bankruptcy Court, which amount shall be available solely to pay any transaction, restructuring, sale or other similar fees then due and owing or that thereafter become due and owing to Houlihan Lokey Capital Inc.

(b)    _Carve Out Reserves._ On the day on which a Carve Out Trigger Notice is given by a Creditor Representative to the Debtors (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall: (i) be deemed a borrowing request and notice of borrowing by the Debtors for ABL DIP Loans under the ABL DIP Agreement, in an amount equal to (a) the maximum amount provided for in paragraph 11(a)(ii) above, plus (b) the then unpaid amounts (including the good-faith estimated Professional Fees accrued and not yet invoiced) of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans), as provided for in paragraph 11(a)(iii) above; and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account not subject to the control of the DIP Agents or any Prepetition Secured Party in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims to the fullest extent allowable under the Bankruptcy Code and applicable non-

bankruptcy law.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also

be deemed a request by the Debtors for ABL DIP Loans under the ABL DIP Agreement (on a

*pro rata* basis based on the then-outstanding ABL DIP Loans), in an amount equal to the

Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP

Loans).  The Debtors shall deposit and hold such amounts in a segregated account not subject to

the control of the DIP Agents or any Prepetition Secured Party in trust to pay such Allowed

Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out**

**Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the

"**Carve Out Reserves**") prior to any and all other claims.  On the first business day after a DIP

Agent provides notice of a Carve Out Trigger Notice to the ABL DIP Lenders, notwithstanding

anything in the ABL DIP Agreement or any other DIP Document, including Section 8.04(n) of

the DIP Term Loan Agreement, to the contrary, including with respect to the existence of a

Default (as defined in the ABL DIP Agreement) or Event of Default, the failure of the Debtors to

satisfy any or all of the conditions precedent for ABL DIP Loans under the ABL DIP Facility,

any termination of the ABL DIP Loan Commitments following an Event of Default, or the

occurrence of the Maturity Date (as defined in the ABL DIP Agreement), each ABL DIP Lender

with an outstanding ABL DIP Loan Commitment (on a *pro rata* basis based on the then-

outstanding ABL DIP Loan Commitments) shall make available to the ABL DIP Agent such

ABL DIP Lender's *pro rata* share with respect to such borrowing in accordance with the ABL

DIP Facility; provided, however, that notwithstanding anything to the contrary in this paragraph

11, no ABL DIP Lender shall be required to make ABL DIP Loans in excess of the lesser of its

ABL DIP Loan Commitment and its *pro rata* share of the Borrowing Base.   Notwithstanding

anything to the contrary set forth herein or in the DIP Documents, if the amount of all the ABL

DIP Loans available to the Debtors following delivery of the Carve Out Trigger Notice is insufficient to fund the full amount of the Carve Out Reserves, then the Carve Out Trigger Notice shall be deemed to be a withdrawal request for proceeds solely from the DIP Term Funding Account (as defined in the Term Loan DIP Agreement) in an amount necessary solely to fund any unfunded portion of the Carve Out Reserves outstanding after application of all the ABL DIP Loans, regardless of anything in the Term Loan DIP Agreement to the contrary, including under Section 2.13(a)(iii) thereunder or with respect to the existence of a Default (as defined in the Term Loan DIP Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Term DIP Loans under the Term Loan DIP Facility, any termination of the Term DIP Loan Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the Term Loan DIP Agreement) up to the full amount of any proceeds.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Pre-Carve Our Trigger Notice Reserve funded by or from the ABL DIP Lenders or the DIP ABL Priority Collateral or the Term DIP Lenders or the DIP Term Loan Collateral, respectively) to: (a) the ABL DIP Agent on behalf of the ABL DIP Lenders, and (b) the Term Loan DIP Agent on behalf of the Term DIP Lenders.

(c)      All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve

has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Pre-Carve Our Trigger Notice Reserve funded by or from the ABL DIP Lenders or the DIP ABL Priority Collateral or the Term DIP Lenders or the DIP Term Loan Collateral, respectively) to: (a) the ABL DIP Agent on behalf of the ABL DIP Lenders, and (b) the Term Loan DIP Agent on behalf of the Term DIP Lenders.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 11, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the ABL DIP Agent or the Term Loan DIP Agent, as applicable.  Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the ABL DIP Agent and the Term Loan DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid in accordance with this paragraph (c) and paragraphs (a) and (b) above.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Advances (as defined in the ABL DIP Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional

Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything

to the contrary herein or in the ABL DIP Agreement or in the Term Loan DIP Agreement, the

Carve Out shall be senior to all liens and claims securing the DIP Facilities, the DIP Liens, the

DIP Superpriority Claims, and the Adequate Protection Liens, and any and all other forms of

adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit

Agreement Indebtedness.   Notwithstanding anything herein, but subject to paragraph 35, no

proceeds of Prepetition Collateral, the DIP Loans or the Carve Out shall be used for the purpose

of: (a) investigating, objecting to, challenging, or contesting in any manner, or in raising any

defenses to, the amount, validity, extent, perfection, priority, enforceability, or avoidability of the

Prepetition Credit Agreement Indebtedness, the Prepetition Liens or any liens or security

interests with respect thereto, or any other rights or interests of any of the Prepetition Secured

Parties, whether in their capacity as such or otherwise, including with respect to the Adequate

Protection Liens, or in asserting any claims or causes of action against any of the Prepetition

Secured Parties (whether in their capacity as such or otherwise), including, without limitation,

for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the

Bankruptcy Code, applicable non-bankruptcy law or otherwise.

    (d) <u>No Direct Obligation to Pay Allowed Professional Fees; No Waiver of</u>

<u>Right to Object to Fees</u>.  The DIP Agents and the DIP Lenders shall not be responsible for the

payment or reimbursement of any fees or disbursements of any Professional Person incurred in

connection with the Cases or any Successor Case (as defined herein) under any chapter of the

Bankruptcy Code.  Nothing in this Interim Order or otherwise shall (i) be construed to obligate

the DIP Agents or the DIP Lenders, in any way, to pay compensation to, or to reimburse

expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to

pay such compensation or reimbursement or (ii) require any DIP Lender to make DIP Loans in excess of its DIP Commitment.  Notwithstanding any provision in this paragraph 11 to the contrary, no portion of the Carve-Out, any Cash Collateral, any DIP Collateral, any proceeds of the DIP Facilities or any unencumbered assets (or the proceeds thereof) that are subject to the DIP Superpriority Claims (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out) shall be utilized for the payment of professional fees and disbursements to the extent restricted under paragraph 35 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unoffical committee in these Cases or any Successor Case (as defined herein) or of any other person or entity, or shall affect the right of the DIP Agents or the DIP Lenders to object to the allowance and payment of any such fees and expenses.

(e)    Payment of Allowed Professional Fees Prior to Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)    Payment of Carve Out On or After Termination Declaration Date.  Any payment or reimbursement from the Carve-Out Reserves made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

12.    DIP Liens.  As security for the ABL DIP Obligations and Term Loan DIP Obligations, effective and perfected automatically upon the date of this Interim Order and

without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by any DIP Agent of any DIP Collateral (as defined herein), the following security interests and liens (all such liens and security interests granted to the ABL DIP Agent and Term Loan DIP Agent, for their benefit and for the benefit of the respective ABL DIP Lenders and Term Loan Lenders, pursuant to this Interim Order and the DIP Documents, (the "**DIP Liens**") are hereby granted to the ABL DIP Agent and Term Loan DIP Agent:

(a)    pursuant to section 364(d) of the Bankruptcy Code, perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness, regardless of whether any lien or any security interest securing or purporting to secure the Prepetition Credit Agreement Indebtedness is valid or invalid, perfected or unperfected, or avoidable or non-avoidable, subject and subordinate to all perfected non-avoidable senior pre-existing liens as of the Petition Date securing claims other than liens securing the Prepetition Credit Agreement Indebtedness;

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by section 546 of the Bankruptcy Code) including, and effective upon entry of a Final Order, the Avoidance Proceeds; and

(c)    pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests on other assets of the Debtors subject to permitted liens (excluding the

Prepetition Credit Agreement Liens) on the Petition Date (the assets referenced in clauses (a)-(c) of this paragraph 12 collectively, the "**DIP Collateral**").

13.     The DIP Collateral includes all tangible and intangible prepetition and postpetition property and interests in property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, including, without limitation: (a) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, intellectual property, instruments, insurance, inventory, investment property, letter-of-credit rights, money and any supporting obligations related thereto; (b) all commercial tort claims; (c) all books and records pertaining to the DIP Collateral; (d) all property of any Prepetition Credit Party held by the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, or any Prepetition Secured Party, including all property of every description, in the custody of or in transit to the DIP Agents, the DIP Lenders or any Prepetition Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such party or as to which such party may have any right or power, including, but not limited to cash; (e) all other goods (including, but not limited to, fixtures) and personal property, whether tangible or intangible and wherever located; (f) all owned real property interests, leased real property (including, for the avoidance of doubt, any ground leases) and all proceeds of all other leased property (except that the DIP Liens granted to the ABL DIP Agent shall not include the DIP Collateral described in this paragraph 13(f)); (g) any Indebtedness of Holdings or any of its Subsidiaries owing to Holdings or any of its Subsidiaries; (h) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; and (i) all proceeds of the foregoing, plus all Prepetition Collateral.  Subject to and effective only upon entry of the Final Order, the DIP Collateral shall include the Avoidance Proceeds, which includes any proceeds or property recovered,

unencumbered or that is the otherwise subject of a successful Avoidance Action, whether by judgment, settlement, or otherwise.

14.     DIP Collateral that is: (a) of a type that would be ABL Priority Collateral; and (b) of a type that would be ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, shall, in each case, constitute "**DIP ABL Priority Collateral**"; provided, however, that neither the DIP Term Funding Account (as defined in the Term Loan DIP Agreement) nor any funds held therein shall constitute the DIP ABL Priority Collateral.  DIP Collateral that is: (a) of a type that would be Term Priority Collateral; (b) of a type that would be Term Priority Collateral but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (c) the DIP Term Funding Account and all funds held therein, shall, in each case, constitute "**DIP Term Loan Priority Collateral**".  Notwithstanding anything in this paragraph 14 or paragraph 15, the priority of DIP Liens on DIP Collateral consisting of Avoidance Proceeds shall be *pari passu* as between the DIP ABL Agent and the DIP Term Loan Agent.

15.     <u>DIP Lien Priority</u>.  The DIP Liens securing the DIP ABL Obligations (the "**DIP ABL Liens**") and the DIP Liens securing the DIP Term Loan Obligations (the "**DIP Term Loan Liens**") are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens and the DIP Term Loan Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise have the priority set forth in the Priority Waterfall. Notwithstanding anything herein to the contrary, the DIP Liens shall be subordinate to the Carve Out.

01:25622213.1

37

16.  <u>Remedies</u>.  (a) Any automatic stay otherwise applicable to the DIP Agents and the DIP Lenders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Agents and the DIP Lenders to: (i) declare all DIP Obligations to be due and payable; (ii) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains; and/or (iii) terminate the applicable DIP Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations.

(b)    In addition to the rights and remedies described above, upon not less than five (5) business days' prior written notice to the Debtors (with a copy to counsel to each of the Prepetition Agents, the Committee, if any, and the U.S. Trustee) following the occurrence and continuance of an Event of Default (as defined herein), the DIP Agents are hereby granted relief from the automatic stay provisions of section 362 of the Bankruptcy Code without further notice, hearing, motion, order or together action of any kind, to foreclose on, or otherwise enforce and realize on, their DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the applicable DIP Obligations, and by occupying the Debtors' premises (subject to paragraph 16(c) below) to sell or otherwise dispose of the DIP Collateral, with the exercise of remedies as among the ABL DIP Agent and Term Loan DIP Agent being subject to the DIP Intercreditor Agreement, except as expressly provided herein, in all cases subject to the Carve Out.  During the foregoing five (5) business day period objections may be raised by the Debtors or the Committee; <u>provided, however</u>, that during such five (5) day period, the Debtors may only use Cash Collateral pursuant to paragraph 37 of this Order.

(c)    Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agents and the DIP Lenders contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon five (5) business days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Cash Collateral Termination Event has occurred and is continuing, the DIP Agents (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord, licensor, or third party owner and the DIP Agents (the terms of which shall be reasonably acceptable to the parties thereto), enter any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a lien of any third party and that are used by Debtors in their businesses, in the case of either subparagraph (i) or (ii) of this paragraph 16(b) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agents and DIP Lenders can only enter onto any leased premises after a Cash Collateral Termination Event has occurred and is continuing, in accordance with (x) a separate agreement with the landlord of the applicable leased premises; (y) upon entry of an order of this Court after the filing of a motion and appropriate notice and an opportunity for landlords to object and be heard; or (z) as permitted by applicable law; provided, further, that the DIP Agents, on behalf of the DIP Lenders, shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced

above from the DIP Agents and that accrue during the period of such occupancy or use by such DIP Agent calculated on a daily basis. Nothing herein shall require the Debtors, the DIP Agents, or the other DIP Lenders to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agents and the DIP Lenders in this paragraph 16(c).

17.    <u>Budget</u>.  For purposes of this Interim Order, the term "<u>Approved Budget</u>" means a 13-week cash flow forecast detailing cash receipts, cash disbursements, inventory levels and accrued and unpaid professional fees on a weekly basis for such weekly period on a regional and consolidated basis, in each case substantially consistent with the manner in which such information is presented in the Budget attached hereto as **<u>Exhibit D</u>**, filed with the Bankruptcy Court on or before the date of entry of this Interim Order, and shall initially refer to the Approved Budget delivered by the Debtors on the Closing Date and thereafter shall refer to the Approved Budget delivered by the Debtors pursuant to Section 7.1(h) of the ABL DIP Agreement and Section 7.1(f) of the Term Loan DIP Agreement on the second Wednesday following the end of each fiscal month of Holdings falling after the Petition Date (each such date, a "**<u>Budget Delivery Date</u>**"), in each case, in form and substance acceptable to the ABL DIP Agent and the Term Loan DIP Agent.  On each Wednesday on or before 11:59 pm Pacific Time (the "**<u>Reporting Date</u>**") starting the week after the first full calendar week following the Petition Date, delivery of the following will be made to the DIP Agents and the DIP Lenders: (a) a budget variance report covering the cumulative period commencing on the Sunday immediately following the Budget Delivery Date for the then-effective Approved Budget through the Saturday immediately preceding the Reporting Date (such period, the "**<u>Budget Testing Period</u>**") setting forth the variances (whether positive or negative) of actual total operating receipts and

total operating expenses as compared to the Approved Budget then in effect covering the applicable Budget Testing Period, together with an explanation, in reasonable detail, for any budget variances, and additional discussion and other information related to any budget variances as the ABL DIP Agent or the Term Loan DIP Agent may reasonably request; and (b) a certification that no proceeds of the ABL Revolving Loans or the Term DIP Loans have been used for purposes other than as set forth in the Approved Budget (subject to permitted variances).

18.     Budget Covenants.

(a)     Except as otherwise provided in the DIP Agreements or approved by the DIP Agents and the requisite lenders under the applicable DIP Agreement (and regardless of whether or not a Carve Out Trigger Notice has been delivered), the Debtors and their Subsidiaries shall not, directly or indirectly (i) use any cash or the proceeds of any DIP Loans in a manner or for a purpose other than those consistent with the DIP Agreements, this Interim Order, the Final Order, and the Approved Budget (and any variances permitted thereunder), (ii) permit a disbursement causing any variance other than any variances permitted thereunder without the prior written consent of the ABL DIP Agent, the Term Loan DIP Agent, and the requisite lenders under the applicable DIP Agreement or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments set forth in the Approved Budget and authorized by the Bankruptcy Court.

(b)     Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses of Professional Persons solely to the extent that such fees and expenses are authorized to be paid under sections 328, 330, 331, and 363 of the Bankruptcy Code pursuant to an order of the Court, as the same may be due

and payable.  Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice, the right of the Debtors to pay professional fees of Professional Persons outside the Carve Out shall terminate, and the Debtors shall provide immediate notice to all Professional Persons informing them that the Debtors' ability to pay such Professional Persons is subject to and limited by the Carve Out.

(c)     Following the Petition Date: (i) total operating expenses (excluding professional fees and expenses) paid by the Loan Parties and their subsidiaries shall not exceed the amounts in the then effective Approved Budget by more than (A) in the case of any Budget Testing Period with a duration of one or two week(s), 15%, and (B) in the case of any other Budget Testing Period, 12.5%, in each case, on a cumulative basis for such Budget Testing Period; and (ii) total operating receipts (excluding any borrowings or other cash receipts not constituting trade receipts) of the Loan Parties and their subsidiaries shall not be less than (A) in the case of any Budget Testing Period with a duration of one or two week(s), 85%, and (B) in the case of any other Budget Testing Period, 87.5%, in each case, on a cumulative basis for such Budget Testing Period, of the amounts in the then effective Approved Budget, and in the case of each of clause (i) and (ii),  such variances shall be tested weekly, starting the week after the first full calendar week following the Petition Date.

19.     <u>Limitation on Charging Expenses Against DIP Collateral</u>.  Subject to and effective only upon entry of the Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine

(including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents, and no consent shall be implied from any action, inaction or acquiescence by the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, or the Prepetition Secured Parties.  Subject to and effective only upon entry of the Final Order, in no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (b) the equitable doctrine of "marshaling," or any other similar doctrine with respect to the DIP Collateral.

20.    Cash Collateral.  All cash and cash equivalents of the Debtors, whenever and wherever acquired, and the proceeds of all DIP Loans and DIP Collateral constitute cash collateral as contemplated by section 363 of the Bankruptcy Code (the "Cash Collateral").  Subject to the terms of this Interim Order and the Budget, and, in the case of Cash Collateral held in the DIP Term Funding Account, subject to the Term Loan DIP Agreement, the Debtors are hereby authorized to use all Cash Collateral, solely in accordance with the Carve Out and the Budget, in which the Prepetition Agents or any other Prepetition Secured Party has, and in which the DIP Agents and DIP Lenders have, a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which any of the Prepetition Agents or DIP Agents have control.

21.    Use of Cash Collateral.  Cash Collateral may be used only: (a) to effectuate the Prepetition ABL Roll Up; (b) to pay the Adequate Protection Provisions, (c) to pay the DIP Obligations, including, without limitation, to pay principal, interest, reimbursement obligations on account of letters of credit, fees, costs and expenses under the DIP Facilities; (d) for working capital and other general corporate purposes of the Debtors in accordance with the Approved

Budget and the DIP Documents; (e) to pay the allowed administrative costs and expenses of the Cases, including the Carve Out; (f) to pay prepetition obligations authorized pursuant to "first day orders;" and with respect to (d), (e), and (f) above, solely in accordance with the Budget, the DIP Documents, and this Interim Order, or as otherwise ordered by the Court after notice and a hearing.

22.    <u>Prepetition Secured Parties' Adequate Protection</u>.  The Prepetition Secured Parties are entitled, until the indefeasible repayment in full in cash of (a) in the case of the Prepetition ABL Secured Parties, the Prepetition ABL Credit Agreement Indebtedness and (b) in the case of the Prepetition Term Loan Agent, the Prepetition Term Loan Credit Agreement Indebtedness, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in value of their respective interests in the Prepetition Collateral, including, without limitation, any diminution resulting from the sale, lease or use by the Debtors of Cash Collateral or any other Prepetition Collateral, the priming liens on the Prepetition Collateral granted to the DIP Agents and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, in each case to the extent required by the Bankruptcy Code (each, a "<u>Diminution Claim</u>").   As adequate protection for and to secure payment of an amount equal to, such Diminution Claims, the Prepetition Secured Parties are granted, *nunc pro tunc* as of the Petition Date, the following adequate protection (collectively, the "<u>Adequate Protection Provisions</u>"):

(a)    <u>Adequate Protection Liens</u>.

(i)    As adequate protection of the interests of the Prepetition ABL Agent and the Prepetition ABL Lenders in the Prepetition ABL Priority Collateral

for their Diminution Claims, the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted valid and perfected security interests in and liens on the DIP Collateral (the "**ABL Adequate Protection Liens**").

(ii)     As adequate protection of the interests of the Prepetition Term Loan Agent in the Prepetition Term Loan Credit Agreement Collateral for its Diminution Claims, the Prepetition Term Loan Agent, for itself and for the benefit of the Prepetition Term Loan Lenders, is hereby granted valid, binding, continuing, enforceable and fully-perfected security interests in, and liens on, the DIP Collateral (the "**Term Loan Adequate Protection Liens**").

(b)     Adequate Protection Lien Priority

(i)     The ABL Adequate Protection Liens and Term Loan Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise  have the priority set forth in the Priority Waterfall.

(c)     Section 507(b) Claim.

(i)     As adequate protection for, and to secure payment of an amount equal to, the Prepetition ABL Secured Parties' Diminution Claims, the Prepetition ABL Secured Parties are hereby granted to the extent provided by Bankruptcy Code Section 507(b) allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses

of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claim**").

(ii)     As adequate protection for, and to secure payment of an amount equal to, the Prepetition Term Loan Agent's Diminution Claim, the Prepetition Term Loan Secured Parties are hereby granted to the extent provided by Bankruptcy Code Section 507(b) allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Term Loan 507(b) Claim**" and, together with the Prepetition ABL 507(b) Claim, the "**Adequate Protection 507(b) Claims**").

(iii)    Except as set forth herein, the Adequate Protection 507(b) Claims shall have priority over all administrative expense claims, secured claims (except secured claims secured by Permitted Prior Liens), and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 114 of the Bankruptcy Code; provided, however, that the Adequate Protection 507(b) Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities set forth herein, and subject to the Carve Out as set forth in this Interim Order and junior to the DIP Superpriority Claims.

(d)      <u>Interest, Fees, Expenses, and Interest Accrual</u>.  Without further application

to this Court, the Debtors shall pay forthwith in cash (i) upon entry of this Interim

Order, all accrued and unpaid interest through the Petition Date owed to the

Prepetition Secured Parties under the Prepetition ABL Credit Agreement and

Prepetition Term Loan Credit Agreement (including, without limitation, payment

of all outstanding default interest); (ii) on the last business day of each month, a

payment to the Prepetition Term Loan Agent on behalf of the Prepetition Term

Loan Lenders, of the cash pay portion of interest that accrued on the loans under

the Prepetition Term Loan Credit Agreement, which, for the avoidance of doubt,

shall not include the Prepayment Premium, at the non-default rate during such

monthly period (or portion thereof) pursuant to Section 2.07(a)(ii) of the

Prepetition Term Loan Credit Agreement; (iii) on the last business day of each

month, payment in kind of all PIK Interest (as defined in the Prepetition Term

Loan Credit Agreement) that accrued on the loans under the Prepetition Term

Loan Credit Agreement, which, for the avoidance of doubt, shall not include the

Prepayment Premium, during such monthly period (or portion thereof) (which

PIK Interest shall be capitalized and added to the principal amount of the loans

under the Prepetition Term Loan Credit Agreement, including for the purposes of

the foregoing clause (ii)); (iv) upon entry of this Interim Order, all accrued and

unpaid fees and disbursements owed to the Prepetition ABL Agent and

Prepetition Term Loan Agent, respectively, including all reasonable and

documented out-of-pocket fees and expenses of counsel and other professionals of

the Prepetition ABL Agent and Prepetition Term Loan Agent, respectively, as

provided under the Prepetition ABL Credit Agreement and Prepetition Term Loan Credit Agreement, as applicable and, in each case, whether incurred before or after the Petition Date; and (v) during the pendency of the Chapter 11 Cases, (A) interest shall accrue on the Prepayment Premium at the default rate set forth in Section 2.07(b) of the Prepetition Term Loan Credit Agreement and (B) the additional interest of 2.00% shall continue to accrue on the loans under the Prepetition Term Loan Credit Agreement pursuant to Section 2.07(b) of the Prepetition Term Loan Credit Agreement; provided, that the interest payments described in this clause (v) shall not be capitalized and added to the principal amount of the loans under Prepetition Term Loan Credit Agreement for the purposes of calculating the interest payable to the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Lenders pursuant to this paragraph.

(e)     Payment of Prepetition Secured Parties' Professional Fees and Expenses. The Debtors shall pay the Prepetition Secured Parties' prepetition and postpetition Professional Fees and Expenses within ten (10) days (if no written objection is received within such ten (10) day period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses; provided, however, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoice to the DIP Agents, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the U.S. Trustee and the Committee (if appointed).  Written objections to payment of such fees and expenses, which may only be asserted by the Debtors, the DIP Agents, the U.S. Trustee and the Committee (if appointed), must contain

a specific basis for the objection.  None of the fees and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file any interim or final fee application with the Court with respect thereto; provided, however, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of such invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

(f)      Adequate Protection Condition.  As a condition to receiving the Adequate Protection Provisions of this Order, each of the Prepetition Term Loan Lenders, Prepetition Term Loan Agent, Term Loan DIP Lenders, and Term Loan DIP Agent shall, upon or substantially concurrently with the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code and of their non-debtor affiliates, whether pursuant to section 36 of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36 or otherwise (and not, for the avoidance of doubt, upon the occurrence of the Maturity Date due to any other event), so long as the proceeds of such sale or disposition shall satisfy in full in cash the Term Loan DIP Obligations and the obligations under the Prepetition Term Loan Credit Agreement (or if such obligations are otherwise satisfied and discharged or reduced pursuant to an arrangement satisfactory to the Term Loan DIP Agent in its sole discretion; it being understood and agreed that the satisfaction and discharge or reduction of the Term Loan DIP Obligations and the Prepetition

Term Loan Credit Agreement Indebtedness in connection with (1) a sale pursuant to and in accordance with the Stalking Horse APA (as defined in the Term Loan DIP Agreement), as in effect on the date hereof, without giving effect to any amendment, waiver, consent or other modification thereto that is adverse to the interests of the Term Loan DIP Lenders or the Prepetition Term Loan Lenders and not otherwise approved by the Required Lenders as defined in and under the Term Loan DIP Agreement), and (2) any sale pursuant to the Sale Order (as defined in the Term Loan DIP Agreement) pursuant to any offer that is deemed higher or better by the Bankruptcy Court shall be satisfactory to the Term Loan DIP Agent) (any such sale, a "**Qualified Sale Closing**"), shall provide a full release of each of the RMI Subs (as defined below), Holdings and Clover Leaf Seafood S.à. r.l. ("**Luxco Parent**") from their respective Term Loan DIP Obligations and the obligations arising under the Prepetition Term Loan Documents, duly executed by each of the Prepetition Term Loan Lenders, Prepetition Term Loan Agent, Term Loan DIP Lenders, and Term Loan DIP Agent then party to the DIP Term Loan Documents and the Prepetition Term Loan Documents as of the Sale Closing in a form and substance reasonably acceptable to the Debtors.

23.    Credit Bid; Application of Sale Proceeds.  (a) The DIP Agents and the Prepetition Secured Parties, respectively, shall have the right to credit bid under section 363(k) of the Bankruptcy Code all of their respective claims (subject to the provisions of paragraph 34 herein) (including, for the avoidance of doubt, all of the Prepetition Credit Agreement Indebtedness and the DIP Obligations) in connection with a sale of the Debtors' assets under section 363 of the

Bankruptcy Code or under a chapter 11 plan or otherwise, unless the Court orders otherwise. The Prepetition Term Loan Agent, the Term Loan DIP Agent, Prepetition ABL Agent and ABL DIP Agent shall each be deemed a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.  Notwithstanding anything herein and subject to paragraph 47 of this Order and the Carve Out: (i) the right of each of the DIP Agents to consent to the sale of any portion of its collateral, including, without limitation, any Assets, on terms and conditions acceptable to the DIP Agents, are hereby expressly reserved and not modified, waived or impaired and (ii) unless otherwise ordered by the Court, including without limitation pursuant to the Sale Order (as defined in the DIP Documents), all cash proceeds generated from the sale of any assets secured by Prepetition Liens or DIP Liens shall be paid to the DIP Agents upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents in accordance with the terms and conditions of the DIP Order and the DIP Documents and thereafter, against the obligations owing by the Debtors under the Prepetition Credit Documents in accordance with the terms of this Order, the DIP Intercreditor Agreement, and the Prepetition Intercreditor Agreement, until such time as all DIP Obligations and Prepetition Credit Agreement Indebtedness (including the Credit Bid Amount) has been paid in full in cash in accordance with the terms and conditions of the DIP Documents, the DIP Order and the Prepetition Credit Documents, as applicable.

(b) Upon consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 or 1129 of the Bankruptcy Code, all amounts outstanding under the ABL DIP Documents, and, to the extent not discharged prior to Closing, under the Prepetition ABL Documents, shall be repaid in full in cash (unless the Court orders otherwise or the Prepetition ABL Secured Parties and/or ABL DIP Agent and ABL DIP Lenders, as

applicable, otherwise agree). Nothing in this paragraph 23 or this Interim Order shall alter the rights and obligations of the parties to the DIP Intercreditor Agreement (as defined in the DIP ABL Credit Agreement) thereunder with respect to ABL Priority Collateral (as defined in the DIP Intercreditor Agreement) (or the proceeds thereof) or Term Priority Collateral (as defined in the DIP Intercreditor Agreement) (or the proceeds thereof).

24.    <u>Milestones</u>.    The DIP Agents and the DIP Lenders are hereby entitled to performance of the milestones set forth in section 7.18 of the Term Loan DIP Agreement and section 5.21 of the ABL DIP Agreement (collectively, the "**Milestones**"), a schedule reflecting the Milestones is attached hereto as **Exhibit F**.  For the avoidance of doubt, the failure of the Debtors to comply with any of the Milestones shall constitute an Event of Default under the DIP Agreements and this Interim Order and permit the DIP Agents, subject to paragraph 16, to exercise the rights and remedies provided for in this Interim Order and the DIP Documents.

25.    <u>Reservation of Rights of Prepetition Secured Parties</u>.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant hereto is without prejudice to the right of any of the Prepetition Secured Parties to seek modification of the grant of adequate protection so as to provide different or additional adequate protection.

26.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents, the DIP Lenders, or the Prepetition Agents choose to file such financing

statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order, but subject in all respects to the provisions of this Interim Order.

27.    <u>Secured Party Status</u>.    To the extent that any Prepetition Agent is the secured party under any account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any Prepetition Credit Document, the ABL DIP Agent, for itself and on behalf of the ABL DIP Lenders, or the Term Loan DIP Agent, for itself and on behalf of the Term Loan DIP Lenders, as applicable, is also deemed to be the secured party under such account control agreements, loss payee or additional insured under each such insurance policy, and the secured party under each such Prepetition Credit Document (in any such case with the same priority of liens and claims thereunder relative to the priority of (a) the DIP ABL Liens, (b) the DIP Term Loan Liens, and (c) the Prepetition Liens and Adequate Protection Liens, in each case, as set forth in the Priority Waterfall and this Interim Order), and shall have all rights and powers in each case attendant to that position (including rights of enforcement but subject in all respects to the terms of this Interim Order), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and the applicable DIP Documents.

28.    <u>Optional Recordation</u>.    A certified copy of this Interim Order may, in the discretion of the DIP Agents or the Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of or in addition to such financing statements,

mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

29.    <u>Delivery of Instruments and Documents</u>.  The Debtors shall execute and deliver to the DIP Agents or the Prepetition Agents, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agents or the Prepetition Agents may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

30.    <u>Preservation of Rights Granted Under the Interim Order</u>.  Except with respect to (a) the Carve Out, (b) any replacement financing that indefeasibly repays in full in cash the DIP Obligations and the Diminution Claims prior to or simultaneously with the allowance of any claims or expenses in connection with such financing, or (c) as expressly provided herein or in the DIP Agreements, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order shall be granted or allowed while any portion of the DIP Obligations or the Diminution Claims, as the case may be, remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, in each case, whether in these Cases or any Successor Case (as defined herein), without the express written consent of the DIP Agents given in accordance with the DIP Documents (which consent may be withheld in each DIP Agent's sole discretion).

31.    <u>Certain Limits on Rights of Debtors</u>.  Unless all DIP Obligations and Diminution Claims shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall

constitute an Event of Default under the DIP Agreements and a Cash Collateral Termination Event hereunder if any of the Debtors seek, or if there is entered: (a) any stay, vacatur, rescission, or modification of this Interim Order without the prior written consent of the DIP Agents and the Prepetition Secured Parties that is not reversed or vacated within five (5) days, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents or the Prepetition Secured Parties; or (b) an order converting the Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of the Cases that are not reversed or vacated within five (5) days.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered such order shall be in a form and substance reasonably acceptable to the DIP Agents.  Notwithstanding the dismissal of any of the Cases under section 1112 of the Bankruptcy Code or otherwise (x) the DIP Superpriority Claims and other administrative claims granted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and all Diminution Claims shall have been paid and satisfied in full (and such DIP Superpriority Claims, the other administrative claims granted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) to the fullest extent permitted by law or ordered by this Court, this Court shall retain exclusive jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

    32.    <u>Effect of Reversal, Etc.</u>  Upon any reversal or modification on appeal of this Interim Order, section 364(e) of the Bankruptcy Code applies to any DIP Obligations, the Adequate Protection Provisions, the DIP Liens, the Adequate Protection Liens, and the ABL DIP

Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, and the Prepetition Secured Parties and are entitled to all of the benefits and protections afforded by section 364(e).

33.    <u>Survival of Rights</u>.  Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, and all other rights and remedies of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, or the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, impaired, or discharged by: (a) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, or by any other act or omission; (b) the entry of an order confirming a plan of reorganization in any of the Cases; or (c) consummation of any chapter 11 plan(s).  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code (each, a "**<u>Successor Case</u>**"), and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the DIP Superpriority Claims, and all other administrative claims granted pursuant to this Interim Order and all other rights and remedies of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, all Diminution Claims, and all allowed claims payable in cash arising from the Adequate Protection Provisions are indefeasibly paid in full in cash.

34.    <u>Effect of Stipulations on Third Parties</u>.  The stipulations and admissions contained in paragraph D of this Interim Order shall be binding on the Debtors and all parties in interest, including, without limitation, any Committee, unless, and solely to the extent that an adversary proceeding or other contested matter has been commenced by a party in interest (other than the Debtors) with the requisite standing and authority, against the Prepetition Secured Parties in connection with any matter related to the Prepetition Credit Agreements (a "**<u>Challenge</u>**"), by (i) in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing other than the Committee (if any), no later than seventy-five (75) days from the date of entry of this Interim Order; or (ii) in the case of an adversary proceeding or other contested matter filed by the Committee (if any), no later than sixty (60) days after the appointment of the Committee (if any) (the "**<u>Challenge Deadline</u>**"); provided, however, that if the Cases convert to Chapter 7, or if a Chapter 11 trustee is appointed, in each case prior to the Challenge Deadline, the Challenge Deadline shall be extended for the Chapter 7 or Chapter 11 trustee by the longer of 10 days or the time remaining in the Challenge Period.  If the Cases convert to Chapter 7, the Chapter 7 trustee will have standing to commence a Challenge, notwithstanding any other provision in this Order to the contrary.  The Challenge Deadline may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Credit Agreement), the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Credit Agreement), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline.  If no such adversary proceeding or contested matter is timely and properly filed by the Challenge Deadline or the Court does not rule in favor of the plaintiff in any such proceeding (which ruling on standing, if appealed, shall not stay or delay the Cases or confirmation of a

chapter 11 plan), then the:  (w) stipulations, admissions and releases contained in paragraph D of this Interim Order shall become binding on all parties in interest, including, for the avoidance of doubt, any Committee appointed in the Cases; (x) Prepetition Credit Agreement Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case; (y) Prepetition Credit Agreement Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph D, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) Prepetition Credit Agreement Indebtedness and the Prepetition Credit Agreement Liens shall not be subject to any other or further challenge by the Debtors, any Committee, or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any such adversary proceeding or contested matter is timely and properly filed, the stipulations, admissions and releases contained in paragraph D of this Interim Order shall nonetheless remain binding and preclusive on the Debtors, any Committee, and any other person or entity, except as to any such stipulations and admissions that were expressly and successfully challenged in such timely and properly filed adversary proceeding or contested matter.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Credit Agreement Indebtedness or the Prepetition Credit Agreement Liens.

01:25622213.1

35.     <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything herein or in any other order by this Court to the contrary, without the prior written consent of the DIP Agents or the Prepetition Agents, none of the DIP Obligations, the Cash Collateral, DIP Collateral, or the Carve Out may be used for the following purposes: (a) to object to or contest the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documents or the Prepetition Credit Agreement; <u>provided, however</u>, that the Committee, if any, may expend up to $50,000 (the "**Investigation Budget**") for the fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions contained in paragraph D; (b) to assert or prosecute any claim or cause of action against the DIP Agents, any DIP Lender, or any Prepetition Secured Party; (c) to seek to modify any of the rights granted under the Interim Order or Final Order to the DIP Agents, any DIP Lender or any Prepetition Secured Party; (d) to make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the covenants related to the Approved Budget (as set forth herein or in the DIP Agreements) and, with respect to the payment of any prepetition claim or non-ordinary course administrative claim, separately approved by this Court; (e) to object to, contest, delay, prevent or interfere in any way with the exercise of rights and remedies by the ABL DIP Agent, the ABL DIP Lenders, Term Loan DIP Agent, or Term Loan DIP Lenders under the DIP Documents or with respect to the DIP Collateral once an Event of Default has occurred and any applicable notice period has expired (except that, prior to the expiration of such notice period, the rights of the Debtors and other parties in interest with respect to any such exercise of remedies are preserved); or (f) except as expressly provided or permitted under the DIP Agreements and the

Budget, to make any payment or distribution to any non-Debtor affiliate, equity holder, or insider of any Debtor outside of the ordinary course of business.

36.    <u>Events of Default</u>.  Except as otherwise provided in this Interim Order, unless waived by the DIP Agents in writing and in accordance with the terms of the DIP Agreements, each of the following shall constitute an event of default (each, an "**Event of Default**"): (a) failure of the Debtors to perform or comply with any of the terms, provision, conditions, covenants, or obligations under this Interim Order in any material respect; or (b) the occurrence of an Event of Default as defined in either of the DIP Agreements.

37.    <u>Termination of Cash Collateral Use</u>.  In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary except the Carve Out, and after delivery (including delivery by electronic mail or facsimile) of notice of the occurrence of a Cash Collateral Termination Event by one or more of the DIP Agents, as applicable, to the Debtors, the Committee (if appointed), the Prepetition Secured Parties and the U.S. Trustee, the Debtors shall no longer be authorized pursuant to this Interim Order to use Cash Collateral other than with respect to the Carve Out and such Cash Collateral use shall automatically terminate the date upon which any of the following events occurs (such date being referred to herein as the "**Cash Collateral Termination Date**," and each of the following events, a "**Cash Collateral Termination Event**"); <u>provided</u> that, notwithstanding anything to the contrary herein or in the DIP Documents, during the five (5) day period following the Cash Collateral Termination Event, the Debtors may, use Cash Collateral to pay regular payroll and other expenses critical to keep the business of the Debtors operating solely in accordance with the Approved Budget (subject to permitted variances) in the aggregate amount not to exceed $12 million; <u>provided</u>, <u>however</u>, Cash Collateral shall not include any amounts in the DIP Term

01:25622213.1

Funding Account that are not yet drawn or permitted to be drawn in accordance with the Term Loan DIP Agreement:

(a)     the appointment of a trustee or the appointment of an examiner with enlarged powers in any of the Cases unless such appointment is approved by the Prepetition Agents;

(b)     the delivery of a Carve Out Trigger Notice;

(c)     the occurrence of an Event of Default as defined in either of the DIP Agreements;

(d)     the entry of an order by this Court or any other Court having jurisdiction over these Cases granting other superpriority liens with priority over or *pari passu* with the DIP Liens;

(e)     the filing by the Debtors of a motion to approve postpetition financing without the prior written consent of the DIP Agents acting at the direction of the relevant required DIP Lenders, which consent shall not be unreasonably withheld if the postpetition financing provides for full payment in cash of the DIP Obligations;

(f)     the filing by the Debtors of a motion to approve any material sale of assets of the Debtors under section 363 of the Bankruptcy Code, whether pursuant to a chapter 11 plan or otherwise, in each case without the prior written consent of the DIP Agents acting at the direction of the relevant requisite DIP Lenders;

(g)     the entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtors having a value in excess of $1 million without the prior written consent of the DIP Agents, except as permitted by the DIP Agreements;

01:25622213.1

(h)    after entry of the Final Order, the filing of a motion by any Debtor (or any party in interest) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Prepetition Collateral (or from any Prepetition Secured Party directly) any costs or expenses of preserving or disposing of the Prepetition Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(i)    the termination of the commitments under the DIP Documents or acceleration of the DIP Obligations; or

(j)    any of the liens securing the Prepetition Credit Agreement Indebtedness or the Adequate Protection Liens granted to the Prepetition Secured Parties shall cease to be valid, binding, and perfected liens with the priority and to the extent provided in this Interim Order.

38.    <u>Rights of Prepetition Agents</u>.    Notwithstanding the occurrence of the Cash Collateral Termination Date, all of the rights, remedies, benefits and protections provided to the Prepetition Agents under this Interim Order as of such Cash Collateral Termination Date shall survive the Cash Collateral Termination Date.

39.    <u>Access to the Debtors</u>.    In accordance with the terms of the DIP Documents and the Prepetition Credit Agreements, the DIP Agents and the Prepetition Agents, respectively, and their respective professionals shall be afforded continued reporting as to DIP Collateral amounts and reasonable access to the DIP Collateral and the Debtors' business premises, during normal business hours and upon reasonable advance notice, for purposes of verifying the Debtors' compliance with the terms of this Interim Order.

40.    <u>Modifications of DIP Documents</u>.    The Debtors, the DIP Agents, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP

Documents, any non-material modifications of the respective DIP Documents without further order of this Court; provided, however, that notice of any material modification or amendment to the respective DIP Documents shall be provided to counsel to the Committee, if any, the Prepetition Agents, and the U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment. If the Committee, either of the Prepetition Agents, or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

41.    Binding Effect; Successors and Assigns. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors; provided, however, for the avoidance of doubt, that the Debtors' acknowledgements, stipulations, and releases set forth in paragraph D are subject to paragraph 34 hereof and shall inure to the benefit of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns, as applicable; provided, however, that the DIP Agents and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan under the DIP Agreements or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, subject to entry of the Final Order, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the

01:25622213.1

operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

42.    <u>Master Proof of Claim</u>.    Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Case to the contrary, none of the Prepetition Secured Parties will be required to file (a) proofs of claim for claims arising under the Prepetition Credit Documents; or (b) requests for payment of administrative expenses in any of the Cases or any Successor Case with respect to any Adequate Protection Obligations or Adequate Protection Payments, and the Debtors' stipulations, admissions, and acknowledgements and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties with regard to all claims arising under the Prepetition Credit Documents.    Notwithstanding the foregoing, each of the Prepetition Agents, for the benefit of itself and its respective Prepetition Secured Parties, are authorized and entitled, in their sole discretion, but are not required, to file (and amend and/or supplement, as each sees fit), for any claim or administrative expense claim described herein: (x) a master proof of claim; (y) proofs of claim; and/or (z) requests for payment of administrative expenses, in each of the Cases or any Successor Case.    The failure to file any such proof of claim or request for payment of an administrative expense shall not affect the validity or enforceability of any of the Prepetition Credit Agreement Indebtedness or this Interim Order.    The DIP Agents and the DIP Lenders shall similarly not be required to file proofs of claim to maintain their respective claims for payment of the DIP Obligations, and the evidence presented with the DIP

Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to such obligations and secured status.

43. <u>Forbearance of the Prepetition Secured Parties</u>. Prior to the occurrence of an Event of Default or a Cash Collateral Termination Event, except as expressly permitted pursuant to the terms of this Interim Order or the DIP Loan Documents, the Prepetition Secured Parties shall not (a) exercise any rights or remedies with respect to any Prepetition Liens or Prepetition Collateral, (b) enforce or pursue an event of default or other breach under any Prepetition Credit Document, or (c) assert any demand for payment of any kind whatsoever, in each case with respect to (i) Holdings, Luxco Parent, Coral Triangle Processors, LLC ("**Coral Triangle**") and Anova Technical Services, LLC ("**Anova**" and, together with Coral Triangle, the "**RMI Subs**"), on account of any Prepetition Credit Agreement Indebtedness and (ii) Connors Bros. Clover Leaf Seafoods Company, Clover Leaf Holdings Company, K.C.R. Fisheries Ltd., and 6162410 Canada Limited (collectively, with the entities listed in the foregoing clause (i), the "**Non-Debtor Credit Parties**"); <u>provided</u> that such forbearance shall terminate (x) upon the delivery of a Carve-Out Trigger Notice; (y) with respect to any Non-Debtor Credit Party, if such Non-Debtor Credit Party receives any written charge, complaint, claim, demand, suit, or notice (copy of which shall immediately be provided to the DIP Agents and the Prepetition Agents) seeking payment or remedies in excess of $100,000; and (z) solely with respect to either Holdings or the Luxco Parent, upon three (3) business days' notice that, in the reasonable discretion of the ABL DIP Agent or the Term DIP Agent, Holdings or Luxco Parent (as applicable) is in breach of its obligations under the DIP Documents or the Stalking Horse APA (as defined in the DIP Documents) and such breach or alleged breach is not cured within such three (3) business days period.

44. <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Interim Order.

45. <u>Preservation of Intercompany Claims</u>. Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, or as a result of the incurrence of the DIP Obligations, the Debtors' compliance with any of the Adequate Protection Provisions, or any repayment or satisfaction of the DIP Obligations or any Prepetition Credit Agreement Indebtedness, the rights, defenses, claims, causes of action, and other legal entitlements of each Credit Party (as defined in the Term Loan DIP Agreement) and Loan Party (as defined in the ABL DIP Agreement) (collectively, the "**DIP Credit Parties**") and each Prepetition Credit Party (collectively, the "**Credit Parties**"), including any entitlement to set-off, subrogation or contribution, against any other Credit Party arising under or related to the DIP Facilities or the Prepetition Secured Debt are expressly preserved; <u>provided</u> that any such legal entitlements with respect to the Debtors shall be subject to paragraph 47 and the Carve-Out and junior to the DIP Liens, Prepetition Liens, DIP Superpriority Claims, and Adequate Protection 507(b) Claims and, in each case, subject to the satisfaction in full of the DIP Obligations and the Prepetition Credit Agreement Indebtedness; <u>provided</u>, <u>further</u> that any such legal entitlements of the CCAA Debtors (as defined in the Term Loan DIP Agreement) arising under the ABL DIP Facility with respect to the Debtors shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed claims against the Debtors (without the need to file any proofs of claim) including priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330,

331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code, which shall be subject to paragraph 47 and the Carve-Out and junior to the DIP Liens, Prepetition Liens, DIP Superpriority Claims, and Adequate Protection 507(b) Claims and, in each case, subject to the satisfaction in full of the DIP Obligations and the Prepetition Credit Agreement Indebtedness.

46.    <u>CCAA Initial Order</u>.  Notwithstanding anything in this Interim Order, the DIP Facilities, the DIP Documents or elsewhere, no Debtor shall provide an intercompany advance to any Canadian affiliate that is not an Debtor until such time as the Ontario Superior Court of Justice (Commercial List) has issued the CCAA Initial Order (as defined in the Term Loan DIP Documents), approving, among other things, the DIP Facilities and containing a paragraph in substance substantially similar to paragraph 45 herein.

47.    <u>Closing Escrow Accounts</u>.  Notwithstanding anything to the contrary herein or in the DIP Documents and provided that no Event of Default has occurred and is continuing under any DIP Document, immediately prior to any Qualified Sale Closing (and not, for the avoidance of doubt, upon the occurrence of the Maturity Date (as defined in the ABL DIP Agreement or the Term Loan DIP Agreement, as applicable) due to any other event), the Debtors shall be entitled to submit (1) a borrowing request and notice of borrowing for ABL DIP Loans under the ABL DIP Credit Agreement and/or (2) a withdrawal request for proceeds of the DIP Term Funding Account, subject to the limitations contained in the DIP Documents, and utilize and direct the transfer of proceeds of such borrowing request and notice of borrowing and/or withdrawal request into one or more escrow accounts established by the Debtors (the "**Closing Escrow Accounts**"), in an amount equal to the lesser of (such lesser amount, the "**Permitted Funding Amount**") (x)(I) on or prior to January 31, 2020, $250,000,000 and (II) on or after February 1,

2020, $255,000,000, in each case, *less* the principal amount of (1) Advances (under and as defined in the ABL DIP Agreement and the Prepetition ABL Credit Agreement), (2) Letter of Credit Disbursements (under and as defined in the ABL DIP Agreement) not yet reimbursed, including outstanding Advances (under and as defined in the ABL DIP Agreement) made with respect to such Letter of Credit Disbursements, and (3) undrawn Letters of Credit (under and as defined in the ABL DIP Agreement) to the extent such Letters of Credit were not outstanding (or are not replacements of Letters of Credit that are outstanding on the Closing Date (as defined in the DIP Documents), in an aggregate undrawn face amount no greater than that of the Letters of Credit being replaced) on the Closing Date (as defined in the DIP Documents), in each case, on the date of the withdrawal immediately prior to giving effect to the incurrence of the Permitted Funding Amount *less* the outstanding principal amount of loans outstanding under the Term Loan DIP Agreement on the date of withdrawal immediately prior to giving effect to the incurrence of the Permitted Funding Amount and (y) the Closing Escrow Amount (as defined below).  The "**Closing Escrow Amount**" shall mean an amount equal to the sum of, without duplication, (a) the amount required to satisfy the obligations of the Debtors under the Stalking Horse APA and/or the Sale Order, in accordance with the terms of the Stalking Horse APA and/or the Sale Order, as applicable, including any amounts earned, due and payable under the line item "Utility Deposit/Other APA Schedule Items" (the "**Transaction Expense Amount**"); provided, that, to the extent that any portion of the Transaction Expense Amount is not itemized in the Approved Budget or is insufficient to satisfy the applicable liability, such portion of the Transaction Expense Amount based on a good faith estimate of the Debtors may nevertheless be withdrawn from the DIP Term Funding Account, and (b) the amount necessary to fund (i) the administration of the Cases in an amount not to exceed the Wind-Down Amount (as defined in

the Term Loan DIP Documents), (ii) all accrued and unpaid professional fees, (iii) the amounts

earned, owing, due and payable under line item "KEIP/KERP/MIP/SIP" in the Approved Budget

in an amount not to exceed the KEIP/KERP Amount (as defined in the Term Loan DIP

Documents), and (iv) any other line item amount provided in the Approved Budget, other than

under the line items (1) "Restructuring Professional Fee", (2) "KEIP/KERP/MIP/SIP", (3)

"Wind-Down Budget", and (4) "Utility Deposit/Other APA Schedule Items", that is unpaid as of

the date of such borrowing request and notice of borrowing and/or withdrawal request, up to the

aggregate amount unpaid and budgeted to be drawn upon such Qualified Sale Closing for all

such line item amounts in the Approved Budget.  The Closing Escrow Accounts and the Closing

Escrow Amounts shall not be subject to any pre- or postpetition liens or claims against the

Debtors or their assets, including any liens or claims securing the DIP Facilities or the

Prepetition Credit Agreement Indebtedness, the DIP Liens, the DIP Superpriority Claims, the

Adequate Protection Liens, or any and all other forms of adequate protection, liens, or claims

against the Debtors or the Debtors' assets arising from the DIP Facilities or the Prepetition Credit

Agreement Indebtedness; provided that the Prepetition Term Loan Credit Parties shall retain any

Adequate Protection Liens, Adequate Protection 507(b) Claims, and any liens or claims securing

any Prepetition Term Loan Credit Agreement Indebtedness in any residual amounts remaining in

the Closing Escrow Accounts after the satisfaction in full of all obligations comprising the

Closing Escrow Amounts.

48.  <u>Bank Products</u>.  Pre-Petition U.S. Bank Products (other than Hedge Agreements) under the Prepetition ABL Documents shall be deemed to constitute U.S. Bank Products under the ABL DIP Documents upon entry of this Interim Order with the same effect as if such Pre-Petition U.S. Bank Products were provided by a Bank Product Provider at the request of the U.S. Borrower on the date of entry of this Interim Order.  All Pre-Petition Canadian Bank Products (other than Hedge Agreements) under the Prepetition ABL Documents shall constitute Canadian Bank Products under the ABL DIP Documents upon entry of this Interim Order with the same effect as if such Pre-Petition Canadian Bank Products were provided by a Bank Product Provider at the request of the Canadian Borrower on the date of entry of this Interim Order.

49.  <u>Final Hearing</u>.  The Final Hearing is scheduled for _____, 2019 at _____ (ET) before this Court.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any other party that has filed a request for notices with this Court, and to the Committee, if appointed, or Committee counsel, if the same shall have been retained.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served no later than _____, 2019 at 4:00 p.m. (ET) (a) proposed counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Kelley A. Cornish (kcornish@paulweiss.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan (PMorgan@ycst.com), (b) the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware, 19801 (Attn: David L. Buchbinder, Esq.); (c) counsel to the ABL DIP Agent, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: Andrew V. Tenzer, Esq.

and Michael E. Comerford, Esq.); and (d) counsel to the Term Loan DIP Agent, Weil, Gotshal &

Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Matthew S. Barr, Esq. and

David N. Griffiths, Esq.).

Dated: _____, 2019
Wilmington, Delaware

                     UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**ABL DIP Agreement**

**SENIOR SECURED SUPER-PRIORITY**

**DEBTOR-IN-POSSESSION**

**CREDIT AGREEMENT**

by and among

**BUMBLE BEE FOODS S.À R.L.**

**as Holdings,**

**BUMBLE BEE FOODS, LLC**

as U.S. Borrower,

**CONNORS BROS. CLOVER LEAF SEAFOODS COMPANY**

as Canadian Borrower,

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

as the Lenders,

**WELLS FARGO CAPITAL FINANCE, LLC**

as administrative agent and as joint lead arranger and bookrunner,

**BANK OF AMERICA, N.A.**

as joint lead arranger and bookrunner, and

**MUFG UNION BANK, N.A.**

as syndication agent

Dated as of November [__], 2019

01:25621774.1

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| **1.** | **DEFINITIONS AND CONSTRUCTION** | | **2** |
| | 1.1 | Definitions | 2 |
| | 1.2 | Accounting Terms | 2 |
| | 1.3 | Code | 3 |
| | 1.4 | Construction | 3 |
| | 1.5 | Schedules and Exhibits | 4 |
| | 1.6 | [Intentionally Omitted] | 4 |
| | 1.7 | Rounding | 4 |
| | 1.8 | Classification of Loans and Borrowings | 4 |
| | 1.9 | Interpretation in Québec | 4 |
| | 1.10 | Divisions | 5 |
| **2.** | **LOAN AND TERMS OF PAYMENT** | | **5** |
| | 2.1 | U.S. Revolver Advances | 5 |
| | 2.2 | Canadian Revolver Advances | 6 |
| | 2.3 | Borrowing Procedures and Settlements | 7 |
| | 2.4 | Payments; Reductions of Commitments; Prepayments | 18 |
| | 2.5 | [Intentionally Omitted] | 24 |
| | 2.6 | Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations | 24 |
| | 2.7 | Crediting Payments | 27 |
| | 2.8 | Designated Account | 27 |
| | 2.9 | Maintenance of Loan Account; Statements of Obligations | 27 |
| | 2.10 | Fees | 28 |
| | 2.11 | Letters of Credit | 28 |
| | 2.12 | LIBOR Option | 45 |
| | 2.13 | Capital and Liquidity Requirements | 48 |
| | 2.14 | Certain Bankruptcy Matters | 49 |
| | 2.15 | Joint and Several Liability of Borrowers | 50 |
| **3.** | **CONDITIONS; TERM OF AGREEMENT** | | **53** |
| | 3.1 | Conditions Precedent to the Initial Extension of Credit | 54 |
| | 3.2 | Conditions Precedent to all Extensions of Credit on and after the Closing Date | 54 |
| | 3.3 | Maturity | 55 |
| | 3.4 | Effect of Maturity | 55 |
| | 3.5 | Early Termination by Borrowers | 55 |
| **4.** | **REPRESENTATIONS AND WARRANTIES** | | **55** |

4.1 Due Organization and Qualification; Subsidiaries.................................................55

4.2 Due Authorization; No Conflict.............................................................................56

4.3 Governmental Consents........................................................................................57

4.4 Binding Obligations; Perfected Liens...................................................................57

4.5 Title to Assets........................................................................................................58

4.6 Budget....................................................................................................................58

4.7 Litigation................................................................................................................58

4.8 Compliance with Laws..........................................................................................58

4.9 No Material Adverse Effect...................................................................................58

4.10 [Intentionally Omitted].........................................................................................58

4.11 Employee Benefits................................................................................................58

4.12 Environmental Condition......................................................................................62

4.13 Intellectual Property..............................................................................................62

4.14 [Intentionally Omitted].........................................................................................62

4.15 [Intentionally Omitted].........................................................................................63

4.16 Complete Disclosure.............................................................................................63

4.17 [Intentionally Omitted].........................................................................................63

4.18 Patriot Act.............................................................................................................63

4.19 [Intentionally Omitted].........................................................................................63

4.20 Payment of Taxes..................................................................................................63

4.21 Margin Stock.........................................................................................................64

4.22 Governmental Regulation.....................................................................................64

4.23 OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.......64

4.24 [Intentionally Omitted].........................................................................................64

4.25 [Intentionally Omitted].........................................................................................64

4.26 [Intentionally Omitted].........................................................................................64

4.27 Eligible Accounts..................................................................................................64

4.28 Eligible Inventory.................................................................................................64

4.29 Orders....................................................................................................................65

4.30 Inventory Records.................................................................................................65

4.31 Withholdings and Remittances.............................................................................66

4.32 [Intentionally Omitted].........................................................................................66

4.33 [Intentionally Omitted].........................................................................................66

4.34 Use of Proceeds....................................................................................................66

5.    **AFFIRMATIVE COVENANTS**.......................................................................67

| | | | |
|---|---|---|---|
| 5.1 | Financial Statements, Reports, Certificates | ........................................... | 67 |
| 5.2 | Collateral Reporting | ........................................... | 67 |
| 5.3 | Existence | ........................................... | 67 |
| 5.4 | Maintenance of Properties | ........................................... | 67 |
| 5.5 | Taxes | ........................................... | 67 |
| 5.6 | Insurance | ........................................... | 68 |
| 5.7 | Inspection | ........................................... | 68 |
| 5.8 | Compliance with Laws | ........................................... | 69 |
| 5.9 | Environmental | ........................................... | 69 |
| 5.10 | Change Name | ........................................... | 70 |
| 5.11 | Formation of Subsidiaries | ........................................... | 70 |
| 5.12 | Further Assurances | ........................................... | 70 |
| 5.13 | Additional Information and Bankruptcy-Related Obligations | ........................................... | 71 |
| 5.14 | Performance Within Budget | ........................................... | 73 |
| 5.15 | DOJ Settlement; Compliance Program; Company Compliance Program | ........................................... | 74 |
| 5.16 | Compliance with ERISA and the IRC | ........................................... | 74 |
| 5.17 | Canadian Pension and Benefit Plans | ........................................... | 74 |
| 5.18 | Use of Proceeds | ........................................... | 75 |
| 5.19 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Canadian Anti-Terrorism Laws | ........................................... | 75 |
| 5.20 | Control Agreements; Controlled Accounts | ........................................... | 75 |
| 5.21 | Milestones | ........................................... | 76 |
| 5.22 | Priority and Liens | ........................................... | 76 |
| 5.23 | Lender Meetings | ........................................... | 78 |
| 5.24 | Challenges | ........................................... | 78 |
| **6.** | **NEGATIVE COVENANTS** | ........................................... | **78** |
| 6.1 | Indebtedness | ........................................... | 79 |
| 6.2 | Liens | ........................................... | 79 |
| 6.3 | Restrictions on Fundamental Changes | ........................................... | 79 |
| 6.4 | Disposal of Assets | ........................................... | 79 |
| 6.5 | Use of Proceeds | ........................................... | 79 |
| 6.6 | [Intentionally Omitted] | ........................................... | 79 |
| 6.7 | Prepayments and Amendments | ........................................... | 79 |
| 6.8 | Chapter 11 Claims | ........................................... | 80 |
| 6.9 | Restricted Junior Payments | ........................................... | 80 |

| | | |
|---|---|---|
| 6.10 | Accounting Methods | 81 |
| 6.11 | Investments | 81 |
| 6.12 | Transactions with Affiliates | 81 |
| 6.13 | Changes in Business | 82 |
| 6.14 | Holding Companies | 83 |
| 6.15 | Compliance with Budget | 83 |
| 6.16 | Civil Antitrust Claims | 83 |
| 6.17 | Use of Collateral | 84 |
| 6.18 | Negative Pledge Clauses | 84 |
| 6.19 | Establishment or Acquisition of Canadian Defined Benefit Plans | 85 |
| 6.20 | Winding Up of a Canadian Pension Plan | 85 |
| 6.21 | Bankruptcy Negative Covenants | 86 |
| 6.22 | Formation of Subsidiaries | 87 |
| 6.23 | Litigation Spend | 87 |
| **7.** | **[INTENTIONALLY OMITTED]** | **87** |
| **8.** | **EVENTS OF DEFAULT** | **87** |
| **9.** | **RIGHTS AND REMEDIES** | **95** |
| 9.1 | Rights and Remedies | 95 |
| 9.2 | Remedies Cumulative | 96 |
| **10.** | **WAIVERS; INDEMNIFICATION** | **96** |
| 10.1 | Demand; Protest; etc | 96 |
| 10.2 | The Lender Group's Liability for Collateral | 96 |
| 10.3 | Indemnification | 96 |
| 10.4 | Waiver of Consequential Damages, Etc | 97 |
| **11.** | **NOTICES** | **97** |
| **12.** | **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION** | **99** |
| **13.** | **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS** | **101** |
| 13.1 | Assignments and Participations | 101 |
| 13.2 | Successors | 105 |
| **14.** | **AMENDMENTS; WAIVERS** | **106** |
| 14.1 | Amendments and Waivers | 106 |
| 14.2 | Replacement of Holdout Lender | 107 |
| 14.3 | No Waivers; Cumulative Remedies | 108 |
| **15.** | **AGENT; THE LENDER GROUP** | **108** |

| | 15.1 | Appointment and Authorization of Agent | 108 |
|---|---|---|---|
| | 15.2 | Delegation of Duties | 110 |
| | 15.3 | Liability of Agent | 110 |
| | 15.4 | Reliance by Agent | 110 |
| | 15.5 | Notice of Default or Event of Default | 111 |
| | 15.6 | Credit Decision | 111 |
| | 15.7 | Costs and Expenses; Indemnification | 112 |
| | 15.8 | Agent in Individual Capacity | 112 |
| | 15.9 | Successor Agent | 113 |
| | 15.10 | Lender in Individual Capacity | 113 |
| | 15.11 | Collateral Matters | 114 |
| | 15.12 | Restrictions on Actions by Lenders; Sharing of Payments | 115 |
| | 15.13 | Agency for Perfection | 116 |
| | 15.14 | Payments by Agent to the Lenders | 116 |
| | 15.15 | Concerning the Collateral and Related Loan Documents | 116 |
| | 15.16 | Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 117 |
| | 15.17 | Several Obligations; No Liability | 118 |
| | 15.18 | Parallel Debt | 118 |
| | 15.19 | Credit Bidding | 119 |
| **16.** | | **WITHHOLDING TAXES** | **119** |
| **17.** | | **GENERAL PROVISIONS** | **122** |
| | 17.1 | Effectiveness | 122 |
| | 17.2 | Section Headings | 122 |
| | 17.3 | Interpretation | 123 |
| | 17.4 | Severability of Provisions | 123 |
| | 17.5 | Bank Product Providers | 123 |
| | 17.6 | Debtor-Creditor Relationship | 124 |
| | 17.7 | Counterparts; Electronic Execution | 124 |
| | 17.8 | Revival and Reinstatement of Obligations | 124 |
| | 17.9 | Confidentiality | 124 |
| | 17.10 | Lender Group Expenses | 126 |
| | 17.11 | USA PATRIOT Act | 126 |
| | 17.12 | Applicable Currency | 126 |
| | 17.13 | Integration | 127 |

17.14    [Intentionally Omitted] ................................................................................ 127

17.15    Survival.......................................................................................................... 127

17.16    Release of Collateral and Guarantee Obligations ......................................... 127

17.17    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .................... 128

17.18    Acknowledgement Regarding Any Supported QFCs .................................... 128

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Bank Product Provider Letter Agreement |
| Exhibit C-1 | Form of Canadian Borrowing Base Certificate and Form of U.S. Borrowing Base Certificate |
| Exhibit I-1 | Form of DIP Intercreditor Agreement |
| Exhibit I-2 | Form of Interim Order |
| Exhibit I-3 | Form of CCAA Initial Order |
| Exhibit L-1 | Form of LIBOR Notice |
| | |
| Schedule A-1 | Authorized Persons of Canadian Borrower and Canadian Subsidiary Guarantors |
| Schedule A-2 | Authorized Persons of Holdings, U.S. Borrower and each other Guarantor (other than the Canadian Subsidiary Guarantors) |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule E-1 | Eligible Inventory Locations |
| Schedule E-2 | Pre-Petition Letters of Credit |
| Schedule E-3 | Certain Excluded Subsidiaries |
| Schedule P-2 | Permitted Investments |
| Schedule P-3 | Permitted Liens |
| Schedule P-5 | Permitted Indebtedness |
| Schedule U-1 | Agent's Account |
| Schedule V-1 | Existing Canadian Vessels |
| Schedule 1.1 | Definitions |
| Schedule 3.1 | Conditions Precedent |
| Schedule 3.6 | Conditions Subsequent |
| Schedule 4.1(b) | Capitalization of Holdings |
| Schedule 4.1(c) | Capitalization of Holdings' Subsidiaries |
| Schedule 4.1(d) | Subscriptions, Options, Warrants, and Calls |
| Schedule 4.7 | Litigation |
| Schedule 4.11(a) | U.S. Employee Benefits |
| Schedule 4.11(b) | Canadian Employee Benefits |
| Schedule 4.12 | Environmental Matters |
| Schedule 4.20 | Existing Tax Liabilities |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.5 | Taxes |
| Schedule 5.21 | Milestones |
| Schedule 6.12 | Affiliated Party Transactions |
| Schedule 6.18 | Existing Contractual Obligations |

# SENIOR SECURED SUPER-PRIORITY
# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "Agreement"), is entered into as of November [__], 2019, by and among the banks, financial institutions and other investors from time to time party hereto (such banks, financial institutions and other investors, each individually as a "Lender" and collectively as the "Lenders"; each as hereinafter further defined), **WELLS FARGO CAPITAL FINANCE, LLC**, a Delaware limited liability company ("WFCF"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, "Agent"), and as joint lead arranger and bookrunner, **BANK OF AMERICA, N.A.** ("BOA"), as joint lead arranger and bookrunner, **MUFG UNION BANK, N.A.** ("MUFG"), as syndication agent, **BUMBLE BEE FOODS S.À R.L.**, a *Luxembourg société à responsabilité limitée*, incorporated and existing under the laws of the Grand-Duchy of Luxembourg, having its registered office at 8, rue Lou Hemmer, L-1748 Luxembourg Findel, registered with the Luxembourg Trade and Companies' Register (*Registre de Commerce et des Sociétés*) under number B 140.339 ("Holdings"), **CONNORS BROS. CLOVER LEAF SEAFOODS COMPANY**, a Nova Scotia unlimited company ("Canadian Borrower"), and **BUMBLE BEE FOODS, LLC**, a Delaware limited liability company ("U.S. Borrower"; together with Canadian Borrower, each, individually, a "Borrower" and, collectively, jointly and severally, as "Borrowers").

## RECITALS:

**WHEREAS**, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Schedule 1.1 hereof;

**WHEREAS**, Borrowers entered into an Amended and Restated Credit Agreement, dated as of August 18, 2017 (as amended and in effect prior to the Petition Date, the "Pre-Petition Credit Agreement"), among Holdings, U.S. Borrower, Canadian Borrower, WFCF, as United States administrative agent and collateral agent for the lenders party thereto, Wells Fargo Capital Finance Corporation Canada, as Canadian administrative agent for the Canadian Lenders (as defined therein), and each lender from time to time party thereto;

**WHEREAS**, on November [__], 2019 (the "Petition Date"), U.S. Borrower and the U.S. Subsidiary Guarantors (in such capacities, the "Debtors") each filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code within the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are continuing in the possession of their assets and continuing to operate their businesses and manage their respective properties as debtors and debtors in possession under Section 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, on November [__], 2019 (the "CCAA Filing Date"), the Canadian Loan Parties (in such capacity, each a "CCAA Debtor" and collectively the "CCAA Debtors") filed an application with the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") pursuant to the CCAA (collectively, the "CCAA Cases" and each a "CCAA Case") seeking the CCAA Initial Order and have continued in the possession of their assets and in the management of their businesses pursuant to the CCAA Initial Order;

**WHEREAS**, the Debtors and the CCAA Debtors have requested that the Lenders make available to the Borrowers, from and after the later of the date of entry of the Interim Order and the CCAA Initial Order, a senior secured super-priority debtor-in-possession asset-based revolving credit facility on the terms and conditions set forth in this Agreement to, among other things, fund the working capital requirements and other financial needs of the Debtors and the CCAA Debtors during the pendency

of the Cases and the CCAA Cases, including a "roll-up" of all the existing outstanding obligations under the Pre-Petition Credit Agreement, which shall be secured by a first priority lien on all ABL Priority Collateral, and a second priority lien on all Term Loan Priority Collateral. Concurrently therewith, the Debtors and the CCAA Debtors will also obtain a new $80,000,000 senior secured debtor-in-possession term loan facility secured by a first priority lien on the Term Loan Priority Collateral and a second priority lien on the ABL Priority Collateral pursuant to the DIP Term Loan Credit Agreement.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION**

1.1    **Definitions**. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2    **Accounting Terms**.

(a)    All accounting terms not specifically defined herein shall be construed in accordance with, and all financial data (including financial ratios and other financial calculations required to be submitted pursuant to this Agreement) shall be prepared in conformity with, GAAP applied in a manner consistent with that used in preparing the Historical Financial Statements, except as otherwise specifically prescribed herein; provided, however, that if Holdings notifies the Agent that it requests an amendment to any provision (including any definitions) hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Holdings that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent, Holdings and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders, Holdings and Borrowers after such Accounting Change conform as nearly as possible to their respective positions as of the Closing Date and, until any such amendments have been agreed upon, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Holdings" is used in respect of a financial covenant or a related definition, it shall be understood to mean Holdings and its Subsidiaries (on a consolidated basis) unless the context clearly requires otherwise.

(b)    [Intentionally Omitted].

(c)    Notwithstanding anything to the contrary contained herein, in the event of any Accounting Change requiring all leases to be capitalized, any lease that would be characterized as an operating lease in accordance with GAAP on the Closing Date (as defined in the Pre-Petition Credit Agreement) (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a capital lease) for purposes of this Agreement, regardless of any change in GAAP following the Closing Date (as defined in the Pre-Petition Credit Agreement) (and without giving effect to any treatment of leases under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect)) that would otherwise require such lease to be re-characterized (on a prospective or retroactive basis or otherwise) as a capitalized lease, and all calculations and deliverables under this Agreement or any other Loan Document shall be made in accordance therewith.

1.3    **Code**. Any terms used in this Agreement and the other Loan Documents that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern. Notwithstanding the foregoing, and where the context so requires, (i) any term defined in this Agreement by reference to the "Code", the "UCC" or the "Uniform Commercial Code" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the Personal Property Security Act of each applicable province of Canada, the *Civil Code of Quebec*, the *Bills of Exchange Act* (Canada) and the *Depository Bills and Notes Act* (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Agent, (ii) all references in this Agreement to "Article 8" shall be deemed to refer also to applicable Canadian securities transfer laws (including, without limitation, the *Securities Transfer Act, 2006* (Ontario) and an *Act Respecting the Transfer of Securities and the Establishment of Security Entitlements* (Quebec)), (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, and (v) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal and provincial securities laws in Canada.

1.4    **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby", "hereunder", and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, restatements, amendment and restatements, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, restatements, amendment and restatements, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of any Obligation shall mean the repayment in full in cash or immediately available funds (or, (a) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, and (b) in the case of obligations with respect to Bank Products (other than Hedge Obligations), only to the extent required in the underlying Bank Product Agreement, providing Bank Product Collateralization) of all of the Obligations (including the payment of any termination amount then owing (or which becomes payable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (i) unasserted contingent indemnification Obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that, by the terms of the applicable Bank Product Agreement are not required to be repaid or cash collateralized as a result of the repayment of other Obligations, and (iii) any Hedge Obligations that, by the terms of the applicable Bank Product Agreement are not required to be repaid as a result of the repayment of other Obligations. References to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law. Any reference herein to any Person shall be construed to include such

Person's successors and permitted assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record. The words "month" and "monthly" refer to calendar months unless expressly stated to refer to fiscal months.

1.5 **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference. All schedules attached hereto or to any other Loan Document shall be deemed to incorporate by reference all information disclosed in the Orders, in each case as of the Petition Date and the CCAA Filing Date, in the form delivered to the Agent prior to the date hereof, which Orders shall not have been modified or amended without the consent of the Agent in its sole discretion.

1.6 **[Intentionally Omitted]**.

1.7 **Rounding**. Any financial ratios required to be maintained or complied with by Holdings pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.8 **Classification of Loans and Borrowings**. For purposes of this Agreement, Advances may be classified and referred to by Class (e.g., a "U.S. Advance") or by type (e.g., a "LIBOR Rate Loan"). Borrowings also may be classified and referred to by Class (e.g., a "U.S. Advance Borrowing") or by type (e.g., a "LIBOR Rate Borrowing").

1.9 **Interpretation in Québec**. For all purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (i) "personal property" shall include "movable property", (ii) "real property" shall include "immovable property", (iii) "tangible property" shall include "corporeal property", (iv) "intangible property" shall include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall include a "hypothec", "prior claim" and a "resolutory clause", (vi) all references to filing, registering or recording under the Code shall include publication under the Register of Personal and Movable Real Rights of Québec, (vii) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" lien or security interest as against third parties, (viii) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (ix) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall include a "mandatary", (xi) "construction liens" shall include "legal hypothecs", (xii) "joint and several" shall include solidary, (xiii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiv) "beneficial ownership" shall include "ownership on behalf of another as "mandatary", (xv) "easement" shall include "servitude", (xvi) "priority" shall include "prior claim", (xvii) "survey" shall include "certificate of location and plan", (xviii) "fee simple title" shall include "absolute ownership" and (xix) "leasehold interest" shall include "valid lease" ", (xx) "leasehold interest" shall include "valid lease", (xxi) "accounts" and "accounts receivable" shall include "claims", (xxii) "guarantee" and "guarantor" shall include "suretyship" and "surety" respectively, and (xxiii) "Deposit Account" shall include a "financial account" (as defined in the *Civil Code of Quebec*). The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only. *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y*

*compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

1.10    **Divisions**. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Stock at such time.

## 2.    LOAN AND TERMS OF PAYMENT

2.1    **U.S. Revolver Advances**.

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a U.S. Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans ("U.S. Advances") to U.S. Borrower in U.S. Dollars in an amount at any one time outstanding not to exceed *the lesser of*:

(i)    such Lender's U.S. Revolver Commitment, or

(ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of*:

(1)    the Maximum U.S. Revolver Amount *less* the sum of (1) the U.S. Letter of Credit Usage at such time, plus (2) the principal amount of U.S. Swing Loans outstanding at such time, and

(2)    the U.S. Borrowing Base at such time *less* the sum of (1) the U.S. Letter of Credit Usage at such time, *plus* (2) the principal amount of U.S. Swing Loans outstanding at such time.

(b)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the U.S. Advances, together with interest accrued thereon, shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(c)    Anything to the contrary in this Section 2.1 notwithstanding, in addition to (but with respect to the U.S. Borrowing Base, without duplication of) other reserves provided for in the definition of U.S. Borrowing Base, Agent shall have the right (but not the obligation) to establish, increase, reduce, eliminate, or otherwise adjust reserves from time to time against the U.S. Borrowing Base (and in the case of the U.S. Bank Product Reserve Amount and the Carve Out Reserve, at the election of Agent in its Permitted Discretion, also against the Maximum U.S. Revolver Amount) in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate but with respect to the U.S. Borrowing Base without duplication of any reserve otherwise provided for herein, including reserves with respect to (i) sums due and owing and that any U.S. Loan Party is required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay when due, (ii) amounts owing or alleged to be owing by a U.S. Loan Party to any Person to the extent secured by (or alleged to be secured by) a Lien on, or trust over, any of the ABL Priority Collateral (other than a Permitted Lien which is a permitted purchase money Lien or

the interest of a lessor under a Capital Lease), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for *ad valorem*, excise, sales, or other taxes where given priority under Applicable Law) in and to such item of the ABL Priority Collateral, or which may give rise to a right of offset, set-off or recoupment in favor of any Account Debtor of such U.S. Loan Party, (iii) reserves (determined from time to time by Agent in its Permitted Discretion) for (A) the estimated costs relating to unpaid freight charges, warehousing or storage charges, taxes, duties, and other similar unpaid costs associated with the acquisition of Eligible In-Transit Inventory by any U.S. Loan Party, plus (B) the estimated reclamation claims of unpaid sellers of Inventory sold to any U.S. Loan Party to the extent that the applicable U.S. Loan Party is not Solvent at such time, and (iv) any amounts from time to time that may be payable (but remain unpaid at such time) pursuant to the Orders.

(d)    Any advance rate, standard of eligibility or reserve established or modified by Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such advance rates, standards of eligibility or reserve, as reasonably determined by Agent in good faith in accordance with customary business practices for asset-based lending transactions and in its Permitted Discretion.

(e)    Notwithstanding anything herein to the contrary, Reserves shall not duplicate eligibility criteria contained in the definition of "Eligible Account", "Eligible Landed Inventory", "Eligible In-Transit Inventory" and vice versa.

(f)    Notwithstanding anything to the contrary contained in this <u>Section 2.1</u> or <u>Section 2.2</u>, the Loan Parties hereby, acknowledge, confirm and agree that (i) immediately prior to the Closing Date, the Pre-Petition Obligations under the Pre-Petition Credit Agreement were not less than $192,420,215.00, (ii) such Pre-Petition Obligations shall be re-evidenced by this Agreement as a portion of the Advances outstanding hereunder, (iii) for all purposes of this Agreement and the other Loan Documents, the sum of the Pre-Petition Obligations and any other Advances made on the Closing Date shall constitute all of the Advances outstanding on the Closing Date, and (iv) the "Revolver Commitments" (as defined under the Pre-Petition Credit Agreement) shall hereinafter be deemed to be assigned or re-allocated among the Revolver Commitments hereunder and after giving effect hereto, the Revolver Commitments as of the Closing Date shall be as set forth on <u>Schedule C-1</u>.

2.2    **Canadian Revolver Advances**.

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a Canadian Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans ("<u>Canadian Advances</u>") to Canadian Borrower in U.S. Dollars in an amount at any one time outstanding not to exceed *the lesser of*:

(i)    such Lender's Canadian Revolver Commitment, or

(ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of*:

(1)    the Maximum Canadian Revolver Amount *less* the sum of (1) the Canadian Letter of Credit Usage at such time, plus (2) the principal amount of Canadian Swing Loans outstanding at such time, and

(2)    the U.S. Dollar Equivalent of the Canadian Borrowing Base at such time *less* the sum of (1) the Canadian Letter of Credit Usage at such time, *plus* (2) the principal amount of Canadian Swing Loans outstanding at such time.

(b)    Amounts borrowed pursuant to this <u>Section 2.2</u> may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the Canadian Advances, together with interest accrued thereon, shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(c)    Anything to the contrary in this <u>Section 2.2</u> notwithstanding, in addition to (but with respect to the Canadian Borrowing Base, without duplication of) other reserves provided for in the definition of Canadian Borrowing Base, Agent shall have the right (but not the obligation) to establish, increase, reduce, eliminate, or otherwise adjust reserves from time to time against the Canadian Borrowing Base (and in the case of the Canadian Bank Product Reserve Amount, at the election of Agent in its Permitted Discretion, also against the Maximum Canadian Revolver Amount) in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate but with respect to the Canadian Borrowing Base without duplication of any reserve otherwise provided for herein, including reserves with respect to (i) sums that any Canadian Loan Party is required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, employee wages (including accrued vacation pay and severance obligations), unpaid pension plan contributions, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay when due, (ii) amounts owing or alleged to be owing by a Canadian Loan Party to any Person to the extent secured by (or alleged to be secured by) a Lien on, or trust over, any of the ABL Priority Collateral (other than a Permitted Lien which is a permitted purchase money Lien or the interest of a lessor under a Capital Lease), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for *ad valorem*, excise, sales, or other taxes where given priority under Applicable Law) in and to such item of the ABL Priority Collateral, or which may give rise to a right of offset, set-off or recoupment in favor of any Account Debtor of such Canadian Loan Party, (iii) reserves (determined from time to time by Agent in its Permitted Discretion) for (A) the estimated costs relating to unpaid freight charges, warehousing or storage charges, taxes, duties, and other similar unpaid costs associated with the acquisition of Eligible In-Transit Inventory by any Canadian Loan Party, plus (B) the estimated claims of unpaid suppliers of Inventory sold to any Canadian Loan Party (including, without limitation, claims arising under the *Bankruptcy and Insolvency Act* (Canada)), and (iv) any amounts from time to time that may be payable (but remain unpaid at such time) pursuant to the Orders.

(d)    Any advance rate, standard of eligibility or reserve established or modified by Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such advance rates, standards of eligibility or reserve, as reasonably determined by Agent in good faith in accordance with customary business practices for asset-based lending transactions and in its Permitted Discretion.

(e)    Notwithstanding anything herein to the contrary, Reserves shall not duplicate eligibility criteria contained in the definition of "Eligible Account", "Eligible Landed Inventory", "Eligible In-Transit Inventory" and vice versa.

2.3    **Borrowing Procedures and Settlements**.

   (a) **Procedure for Borrowing.** Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent (which may be delivered though Agent's electronic platform or portal) and received by Agent no later than 10:00 a.m. (California time) (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, (ii) on the Business Day that is one Business Day prior to the requested Funding Date in the case of a request for a Base Rate Loan, and (iii) on the Business Day that is three Business Days prior to the requested Funding Date in the case of all other requests, specifying (A) the amount of such Borrowing, (B) whether such Borrowing is a U.S. Advance or a Canadian Advance, and (C) the requested Funding Date, which shall be a Business Day; provided, that Agent may, in its sole discretion, elect to accept as timely requests that are received later than 10:00 a.m. (California time) on the applicable Business Day. All Borrowing requests which are not made on-line via Agent's electronic platform or portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Advance. Each Advance shall be made in U.S. Dollars.

   (b) **Making of Swing Loans**. In the case of a request for an Advance and so long as either (i) the aggregate amount of Swing Loans made since the last Settlement Date, minus the amount of Collections or payments applied to Swing Loans since the last Settlement Date, plus the amount of the requested Advance does not exceed $20,000,000 or (ii) (A) in the case of a request for a U.S. Advance, Swing Lender, in its sole discretion, shall agree to make a U.S. Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make a U.S. Advance in the amount of such Borrowing (any such U.S. Advance made solely by Swing Lender pursuant to this Section 2.3(b) being referred to as a "U.S. Swing Loan" and such U.S. Advances being referred to collectively as "U.S. Swing Loans") available to U.S. Borrower on the Funding Date applicable thereto by transferring immediately available funds in U.S. Dollars to U.S. Borrower's Designated U.S. Account, or (B) in the case of a request for a Canadian Advance, Swing Lender, in its sole discretion, shall agree to make a Canadian Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make a Canadian Advance in the amount of such Borrowing (any such Canadian Advance made solely by Swing Lender pursuant to this Section 2.3(b) being referred to as a "Canadian Swing Loan" and such Canadian Advances being referred to collectively as "Canadian Swing Loans"; and together with the U.S. Swing Loans, each a "Swing Loan" and collectively the "Swing Loans") available to Canadian Borrower on the Funding Date applicable thereto by transferring immediately available funds in U.S. Dollars, to Canadian Borrower's Designated Canadian Account. Each U.S. Swing Loan shall be deemed to be a U.S. Advance hereunder and shall be subject to all the terms and conditions applicable to other U.S. Advances, except that all payments on any U.S. Swing Loan shall be payable to Swing Lender solely for its own account. Each Canadian Swing Loan shall be deemed to be a Canadian Advance hereunder and shall be subject to all the terms and conditions applicable to other Canadian Advances, except that all payments on any Canadian Swing Loan shall be payable to Swing Lender solely for its own account. Subject to the provisions of Section 2.3(d)(ii), Swing Lender shall not make or be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, (ii) in the case of a request for a U.S. Advance, the requested U.S. Advance would exceed the U.S. Availability on such Funding Date, or (iii) in the case of a request for a Canadian Advance, the requested Canadian Advance would exceed the Canadian Availability on such Funding Date. No Swing Lender shall otherwise be required to determine whether the applicable conditions precedent set forth in Section 3.2 have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The U.S. Swing Loans shall be secured by Agent's Liens, constitute U.S. Advances and Obligations hereunder, and bear interest at the rate applicable from time to time to U.S. Advances that are Base Rate Loans. The Canadian Swing Loans shall be secured by Agent's Liens, constitute Canadian Advances and Obligations hereunder, and bear interest at the rate applicable from time to time, to Canadian Advances that are Base Rate Loans.

(c)        **Making of Loans**.

(i)        In the event that the Swing Lender is not obligated to make a Swing Loan, then promptly after receipt of a request for a Borrowing pursuant to Section 2.3(a), (A) in the case of a request for a U.S. Advance, Agent shall notify the U.S. Lenders, or (B) in the case of a request for a Canadian Advance, Agent shall notify the Canadian Lenders, in each case not later than 1:00 p.m. (California time) (x) in the case of a Base Rate Loan, at least one Business Day prior to the requested Funding Date, or (y) in the case of a LIBOR Rate Loan, at least three Business Days prior to the requested Funding Date, in each case by telecopy, telephone, or other form of electronic transmission, of the requested Borrowing. In the case of a request for a U.S. Advance, each U.S. Lender shall make the amount of such U.S. Lender's Pro Rata Share of the requested U.S. Advance available to Agent in immediately available funds in U.S. Dollars, to Agent's Account, not later than 10:00 a.m. (California time) on the Funding Date applicable thereto. In the case of a request for a Canadian Advance, each Canadian Lender shall make the amount of such Canadian Lender's Pro Rata Share of the requested Canadian Advance available to Agent in immediately available funds in U.S. Dollars to Agent's Account, not later than 10:00 a.m. (California time) on the Funding Date applicable thereto. After (X) in the case of the request for a U.S. Advance, Agent's receipt of the proceeds of such U.S. Advances, Agent shall make the proceeds thereof available to U.S. Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated U.S. Account, or (Y) in the case of the request for a Canadian Advance, Agent's receipt of the proceeds of such Canadian Advances, Agent shall make the proceeds thereof in to Canadian Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Canadian Account; provided, however, that, subject to the provisions of Section 2.3(d)(ii), Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance if (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, (2) in the case of a request for a U.S. Advance, the requested U.S. Advance would exceed the U.S. Availability on such Funding Date, or (3) in the case of a request for a Canadian Advance, the requested Canadian Advance would exceed the Canadian Availability on such Funding Date.

(ii)        Unless Agent receives notice from a Lender prior to 9:00 a.m. (California time) on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrower the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount. If any Lender shall not have made its full amount available to Agent in immediately available funds and if Agent in such circumstances has made available to the applicable Borrower such amount, that Lender shall on the Business Day following such Funding Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by the Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error. If such amount is so made available, such payment to the Agent shall constitute such Lender's Advance on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify the applicable Borrower of such failure to fund and, upon demand by Agent, such Borrower shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances composing such Borrowing. The failure of any Lender to make any Advance on any Funding Date shall not relieve any other Lender of any obligation hereunder to make such Advance on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on any Funding Date.

(d)    **Protective Advances and Optional Overadvances**.

(i)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to <u>Section 2.3(d)(iv)</u>, Agent hereby is authorized by Borrowers and the Lenders, from time to time in Agent's sole discretion, (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in <u>Section 3</u> are not satisfied, to (x) make U.S. Advances to U.S. Borrower on behalf of the U.S. Lenders, and (y) make Canadian Advances to Canadian Borrower on behalf of the Canadian Lenders, in each case that Agent, in its Permitted Discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (any of the Advances described in this <u>Section 2.3(d)(i)</u> shall be referred to as "<u>Protective Advances</u>"). Agent may elect in its discretion to designate such Protective Advance as a U.S. Advance or a Canadian Advance.

(ii)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to <u>Section 2.3(d)(iv)</u>, (A) the U.S. Lenders hereby authorize Agent or Swing Lender, as applicable, and either Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make U.S. Advances (including U.S. Swing Loans) to U.S. Borrower notwithstanding that a Overadvance Amount exists or thereby would be created, so long as (1) after giving effect to such U.S. Advances, the outstanding U.S. Revolver Usage does not exceed the U.S. Borrowing Base by more than 10% of the lesser of (x) the Maximum U.S. Revolver Amount at such time and (y) the U.S. Borrowing Base at such time, and (2) after giving effect to such U.S. Advances, the outstanding U.S. Revolver Usage (except for and excluding any portion of such U.S. Revolver Usage that is in respect of amounts charged to the Loan Account for interest, fees, or Lender Group Expenses in accordance with the provisions of the Loan Documents) does not exceed the Maximum U.S. Revolver Amount, and (B) the Canadian Lenders hereby authorize Agent or Swing Lender, as applicable, and either Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Canadian Advances (including Canadian Swing Loans) to Canadian Borrower notwithstanding that a Overadvance Amount exists or thereby would be created, so long as (1) after giving effect to such Canadian Advances, the outstanding Canadian Revolver Usage does not exceed the Canadian Borrowing Base by more than 10% of the lesser of (x) the Maximum Canadian Revolver Amount at such time and (y) the Canadian Borrowing Base at such time, and (2) after giving effect to such Canadian Advances, the outstanding Canadian Revolver Usage (except for and excluding any portion of such Revolver Usage that is in respect of amounts charged to the Loan Account for interest, fees, or Lender Group Expenses in accordance with the provisions of the Loan Documents) does not exceed the Maximum Canadian Revolver Amount. In the event (x) Agent obtains actual knowledge that the U.S. Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, or (y) Agent obtains actual knowledge that the Canadian Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, in each case regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable and prior to making any (or any additional) intentional Overadvances (except for and excluding any portion of such Revolver Usage that is in respect of amounts charged to the Loan Account for interest, fees, or Lender Group Expenses in accordance with the provisions of the Loan Documents), unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter, and the applicable Lenders thereupon shall, together with the Agent jointly determine the terms of arrangements that shall be implemented with the applicable Borrower intended to reduce, within a reasonable time, the outstanding principal amount of the Advances to such Borrower to an amount permitted by the preceding sentence. In such circumstances, if any Lender objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. In any event: (x) if any Overadvance not otherwise made or permitted pursuant to this <u>Section 2.3(d)</u> remains outstanding for

more than 60 days, unless otherwise agreed to by the Required Lenders, the applicable Borrower shall immediately repay Advances in an amount sufficient to eliminate all such Overadvances not otherwise made or permitted to this <u>Section 2.3(d)</u>, and (y) after the date all such Overadvances have been eliminated, there must be at least five consecutive days before additional Advances are made pursuant to this <u>Section 2.3(d)(ii)</u> are made. The foregoing provisions are meant for the benefit of the Lenders and the Agent and are not meant for the benefit of Borrowers, which shall continue to be bound by the provisions of <u>Sections 2.4(e)(ii)</u> and <u>2.4(e)(iii)</u>. Each U.S. Lender with a U.S. Revolver Commitment shall be obligated to settle with Agent as provided in <u>Section 2.3(e)</u> or <u>Section 2.3(g)</u>, as applicable, for the amount of such U.S. Lender's Pro Rata Share of any Overadvances not otherwise made or permitted pursuant to this <u>Section 2.3(d)</u> by Agent reported to such U.S. Lender, any Overadvances made by Agent as permitted under this <u>Section 2.3(d)</u>, and any Overadvances consisting of U.S. Advances resulting from the charging to the U.S. Borrower's Loan Account of interest, fees, or Lender Group Expenses. Each Canadian Lender with a Canadian Revolver Commitment shall be obligated to settle with Agent as provided in <u>Section 2.3(e)</u> or <u>Section 2.3(g)</u>, as applicable, for the amount of such Canadian Lender's Pro Rata Share of any Overadvances not otherwise made or permitted pursuant to this <u>Section 2.3(d)</u> by Agent reported to such Canadian Lender, any Overadvances made by Agent as permitted under this <u>Section 2.3(d)</u>, and any Overadvances consisting of Canadian Advances resulting from the charging to Canadian Borrower's Loan Account of interest, fees, or Lender Group Expenses.

(iii)    Each Protective Advance and each Overadvance by Agent shall be deemed to be a U.S. Advance or a Canadian Advance (as applicable) hereunder, except that no Protective Advance or Overadvance shall be eligible to be a LIBOR Rate Loan and, prior to U.S. Settlement or Canadian Settlement, as applicable, therefor all payments on the Protective Advances by Agent shall be payable to Agent solely for its own account. The Protective Advances and Overadvances shall be repayable on demand, secured by Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans. The ability of Agent to make Protective Advances is separate and distinct from its ability to make Overadvances and its ability to make Overadvances is separate and distinct from its ability to make Protective Advances. For the avoidance of doubt, the limitations on Agent's ability to make Protective Advances do not apply to Overadvances and the limitations on Agent's ability to make Overadvances do not apply to Protective Advances. The provisions of this <u>Section 2.3(d)</u> are for the exclusive benefit of Agent, Swing Lenders, and the Lenders and are not intended to benefit any Borrower in any way.

(iv)    Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary:  no Overadvance or Protective Advance may be made by Agent if such Advance would (A) cause the aggregate principal amount of Overadvances and Protective Advances outstanding to exceed an amount equal to ten percent (10%) of Aggregate Availability, (B) cause the aggregate U.S. Revolver Usage to exceed the Maximum U.S. Revolver Amount, or (C) cause the aggregate Canadian Revolver Usage to exceed the Maximum Canadian Revolver Amount.

(e)    **Settlement Regarding U.S. Advances**. It is agreed that each U.S. Lender's funded portion of the U.S. Advances is intended by the U.S. Lenders to equal, at all times, such U.S. Lender's Pro Rata Share of the outstanding U.S. Advances. Such agreement notwithstanding, Agent, Swing Lender, and the other U.S. Lenders agree (which agreement shall not be for the benefit of U.S. Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the U.S. Lenders as to the U.S. Advances, the U.S. Swing Loans, and the Protective Advances by Agent shall take place on a periodic basis in accordance with the following provisions:

(i)    Agent shall request settlement ("<u>U.S. Settlement</u>") with the U.S. Lenders on a weekly basis, or on a more frequent basis if so determined by Agent (1) on behalf of Swing Lender,

with respect to the outstanding U.S. Swing Loans, (2) for itself, with respect to the outstanding Protective Advances that constitute U.S. Advances, and (3) with respect to payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent in respect of U.S. Advances pursuant to the provisions of this Agreement or any other Loan Document, as to each by notifying the U.S. Lenders by written notice, telecopy, electronic mail or other similar form of transmission, of such requested U.S. Settlement, no later than 2:00 p.m. (California time) on the Business Day immediately prior to the date of such requested U.S. Settlement (the date of such requested U.S. Settlement being the "U.S. Settlement Date"). Such notice of a U.S. Settlement Date shall include a summary statement of the amount of outstanding U.S. Advances, U.S. Swing Loans, and Protective Advances that constitute U.S. Advances for the period since the prior U.S. Settlement Date. Subject to the terms and conditions contained herein (including Section 2.3(g)): (y) if the amount of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances) made by a U.S. Lender that is not a Defaulting Lender exceeds such U.S. Lender's Pro Rata Share of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances) as of a U.S. Settlement Date, then Agent shall, by no later than 12:00 p.m. (California time) on the U.S. Settlement Date, transfer in immediately available funds to a Deposit Account of such U.S. Lender (as such U.S. Lender may designate), an amount such that each such U.S. Lender shall, upon receipt of such amount, have as of the U.S. Settlement Date, its Pro Rata Share of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances), and (z) if the amount of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances) made by a U.S. Lender is less than such U.S. Lender's Pro Rata Share of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances) as of a U.S. Settlement Date, such U.S. Lender shall no later than 12:00 p.m. (California time) on the U.S. Settlement Date transfer in immediately available funds to the Agent's Account, an amount such that each such U.S. Lender shall, upon transfer of such amount, have as of the U.S. Settlement Date, its Pro Rata Share of the U.S. Advances (including U.S. Swing Loans and Protective Advances that constitute U.S. Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable U.S. Swing Loans or Protective Advances that constitute U.S. Advances and, together with the portion of such U.S. Swing Loans or Protective Advances that constitute U.S. Advances representing Swing Lender's Pro Rata Share thereof, shall constitute U.S. Advances of such U.S. Lenders. If any such amount is not made available to Agent by any U.S. Lender on the U.S. Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such U.S. Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a U.S. Lender's balance of the U.S. Advances, U.S. Swing Loans, and Protective Advances that constitute U.S. Advances is less than, equal to, or greater than such U.S. Lender's Pro Rata Share of the U.S. Advances, U.S. Swing Loans, and Protective Advances that constitute U.S. Advances as of a U.S. Settlement Date, Agent shall, as part of the relevant U.S. Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by U.S. Borrower and allocable to the U.S. Lenders hereunder, and proceeds of Collateral.

(iii)    Between U.S. Settlement Dates, Agent, to the extent Protective Advances by Agent or U.S. Swing Loans are outstanding, may pay over to Agent or Swing Lender, as applicable, any payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent pursuant to the provisions of this Agreement or any other Loan Document, that in accordance with the terms of this Agreement would be applied to the reduction of the U.S. Advances, for application to the Protective Advances that constitute U.S. Advances or U.S. Swing Loans. Between U.S. Settlement Dates, Agent, to the extent no Protective Advances that constitute U.S. Advances or U.S. Swing Loans are outstanding,

may pay over to Swing Lender any payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent pursuant to the provisions of this Agreement or any other Loan Document, that in accordance with the terms of this Agreement would be applied to the reduction of the U.S. Advances, for application to Swing Lender's Pro Rata Share of the U.S. Advances. If, as of any U.S. Settlement Date, payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent in respect of U.S. Advances pursuant to the provisions of this Agreement or any other Loan Document or payments of the Loan Parties received since the then immediately preceding U.S. Settlement Date have been applied to Swing Lender's Pro Rata Share of the U.S. Advances other than to U.S. Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Agent for the accounts of the U.S. Lenders, and Agent shall pay to the U.S. Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.3(g)), to be applied to the outstanding U.S. Advances of such U.S. Lenders, an amount such that each U.S. Lender shall, upon receipt of such amount, have, as of such U.S. Settlement Date, its Pro Rata Share of the U.S. Advances. During the period between U.S. Settlement Dates, Swing Lender with respect to U.S. Swing Loans, Agent with respect to Protective Advances that constitute U.S. Advances, and each U.S. Lender (subject to the effect of agreements between Agent and individual U.S. Lenders) with respect to the U.S. Advances other than U.S. Swing Loans and Protective Advances that constitute U.S. Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Agent, or the U.S. Lenders, as applicable.

(iv)    Anything in this Section 2.3(e) to the contrary notwithstanding, in the event that a U.S. Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(g).

(v)    Agent, as a non-fiduciary agent for U.S. Borrower, shall maintain a register showing the principal amount of the U.S. Advances, owing to each U.S. Lender, including the U.S. Swing Loans owing to Swing Lender, and Protective Advances owing to Agent, and the interests therein of each U.S. Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(f)    **Settlement Regarding Canadian Advances**. It is agreed that each Canadian Lender's funded portion of the Canadian Advances is intended by the Canadian Lenders to equal, at all times, such Canadian Lender's Pro Rata Share of the outstanding Canadian Advances. Such agreement notwithstanding, Agent, Swing Lender, and the other Canadian Lenders agree (which agreement shall not be for the benefit of Canadian Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Canadian Lenders as to the Canadian Advances, the Canadian Swing Loans, and the Protective Advances by Agent shall take place on a periodic basis in accordance with the following provisions:

(i)    Agent shall request settlement ("Canadian Settlement") with the Canadian Lenders on a weekly basis, or on a more frequent basis if so determined by Agent (1) on behalf of Swing Lender, with respect to the outstanding Canadian Swing Loans, (2) for itself, with respect to the outstanding Protective Advances that constitute Canadian Advances, and (3) with respect to payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent in respect of Canadian Advances pursuant to the provisions of this Agreement or any other Loan Document, as to each by notifying the Canadian Lenders by written notice, telecopy, electronic mail or other similar form of transmission, of such requested Canadian Settlement, no later than 2:00 p.m. (California time) on the Business Day immediately prior to the date of such requested Canadian Settlement (the date of such requested Canadian

Settlement being the "Canadian Settlement Date"). Such notice of a Canadian Settlement Date shall include a summary statement of the amount of outstanding Canadian Advances, Canadian Swing Loans, and Protective Advances that constitute Canadian Advances for the period since the prior Canadian Settlement Date. Subject to the terms and conditions contained herein (including Section 2.3(g)): (y) if the amount of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances) made by a Canadian Lender that is not a Defaulting Lender exceeds such Canadian Lender's Pro Rata Share of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances) as of a Canadian Settlement Date, then Agent shall, by no later than 12:00 p.m. (California time) on the Canadian Settlement Date, transfer in immediately available funds to a Deposit Account of such Canadian Lender (as such Canadian Lender may designate), an amount in U.S. Dollars such that each such Canadian Lender shall, upon receipt of such amount, have as of the Canadian Settlement Date, its Pro Rata Share of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances), and (z) if the amount of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances) made by a Canadian Lender is less than such Canadian Lender's Pro Rata Share of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances) as of a Canadian Settlement Date, such Canadian Lender shall no later than 12:00 p.m. (California time) on the Canadian Settlement Date transfer in immediately available funds and in the relevant Currency to the Agent's Account, an amount such that each such Canadian Lender shall, upon transfer of such amount, have as of the Canadian Settlement Date, its Pro Rata Share of the Canadian Advances (including Canadian Swing Loans and Protective Advances that constitute Canadian Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Canadian Swing Loans or Protective Advances that constitute Canadian Advances and, together with the portion of such Canadian Swing Loans or Protective Advances that constitute Canadian Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Canadian Advances of such Canadian Lenders. If any such amount is not made available to Agent by any Canadian Lender on the Canadian Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Canadian Lender together with interest thereon at the Defaulting Lender Rate.

(ii)       In determining whether a Canadian Lender's balance of the Canadian Advances, Canadian Swing Loans, and Protective Advances that constitute Canadian Advances is less than, equal to, or greater than such Canadian Lender's Pro Rata Share of the Canadian Advances, Canadian Swing Loans, and Protective Advances that constitute Canadian Advances as of a Canadian Settlement Date, Agent shall, as part of the relevant Canadian Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Canadian Borrower and allocable to the Canadian Lenders hereunder, and proceeds of Collateral.

(iii)       Between Canadian Settlement Dates, Agent, to the extent Protective Advances by Agent or Canadian Swing Loans are outstanding, may pay over to Agent or Swing Lender, as applicable, any payments received from any Loan Party, including any amounts received pursuant to Section 2.4(e) and any Collections required to be paid to Agent pursuant to the provisions of this Agreement or any other Loan Document, that in accordance with the terms of this Agreement would be applied to the reduction of the Canadian Advances, for application to the Protective Advances that constitute Canadian Advances or Canadian Swing Loans. Between Canadian Settlement Dates, Agent, to the extent no Protective Advances that constitute Canadian Advances or Canadian Swing Loans are outstanding, may pay over to Swing Lender any payments received from any Loan Party, including any amounts received pursuant to Section 2.4(e) and any Collections required to be paid to Agent pursuant to the provisions of this Agreement or any other Loan Document, that in accordance with the terms of this Agreement would be applied to the reduction of the Canadian Advances, for application to Swing

Lender's Pro Rata Share of the Canadian Advances. If, as of any Canadian Settlement Date, payments received from any Loan Party, including any amounts received pursuant to Section 2.4(d) or Section 2.4(e) and any Collections required to be paid to Agent in respect of Canadian Advances pursuant to the provisions of this Agreement or any other Loan Document or payments of the Loan Parties received since the then immediately preceding Canadian Settlement Date have been applied to Swing Lender's Pro Rata Share of the Canadian Advances other than to Canadian Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Agent for the accounts of the Canadian Lenders, and Agent shall pay to the Canadian Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.3(g)), to be applied to the outstanding Canadian Advances of such Canadian Lenders, an amount such that each Canadian Lender shall, upon receipt of such amount, have, as of such Canadian Settlement Date, its Pro Rata Share of the Canadian Advances. During the period between Canadian Settlement Dates, Swing Lender with respect to Canadian Swing Loans, Agent with respect to Protective Advances that constitute Canadian Advances, and each Canadian Lender (subject to the effect of agreements between Agent and individual Canadian Lenders) with respect to the Canadian Advances other than Canadian Swing Loans and Protective Advances that constitute Canadian Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Agent, or the Canadian Lenders, as applicable.

(iv)     Anything in this Section 2.3(f) to the contrary notwithstanding, in the event that a Canadian Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(g).

(v)     Agent, as a non-fiduciary agent for Canadian Borrower, shall maintain a register showing the principal amount of the Canadian Advances, owing to each Canadian Lender, including the Canadian Swing Loans owing to Swing Lender, and Protective Advances owing to Agent, and the interests therein of each Canadian Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)     **Defaulting Lenders**.

(i)     Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the applicable Borrower to Agent for the Defaulting Lender's benefit or any Collections or proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) first, to the Swing Lender to the extent of any Swing Loans that were made by Swing Lender and that were required to be, but were not, repaid by the Defaulting Lender, (B) second, to the Issuing Lender, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, repaid by the Defaulting Lender, (C) third, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of an Advance (or other funding obligation) was funded by such other Non-Defaulting Lender), (D) to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of Borrowers as if such Defaulting Lender had made its portion of the applicable Advances (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (14) of Section 2.4(b)(ii); provided, however, that if such payment is a payment of the principal amount of an Advance or of a Letter of Credit Disbursement, such payment shall be applied solely to pay the relevant Advances of and Letter of Credit Disbursements owed to, the relevant Non-Defaulting Lender prior to being applied in the manner set forth above. Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to the applicable Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of

such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fees payable under Section 2.10(b) and Section 2.10(c), such Defaulting Lender shall be deemed not to be a "Lender" and such fees shall cease to accrue with respect to such Lender's Commitment and such Lender's Commitment shall be deemed to be zero; provided, however, that the foregoing shall not apply to any of the matters governed by Section 14.1(a)(i) through (iii). The provisions of this Section 2.3(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which the Agent and the applicable Borrower shall have waived, in writing, the application of this Section 2.3(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder. The operation of this Section 2.3(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender. Any failure by a Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Lender of this Agreement and shall entitle the applicable Borrower, at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Lender pursuant to the terms of Section 14.2. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of the Letters of Credit); provided, however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or the applicable Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 2.3(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(g) shall control and govern.

(ii)        Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the provisions of this Section 2.3(g)(ii) shall apply for so long as such Lender is a Defaulting Lender. If any U.S. Swing Loans are outstanding or if any U.S. Letters of Credit are outstanding at the time a U.S. Lender is or becomes a Defaulting Lender then all or any part of the U.S. Swing Loan Exposure and U.S. Letter of Credit Exposure with respect thereto shall be reallocated among the U.S. Lenders that are Non-Defaulting Lenders of the U.S. Swing Loans and U.S. Letters of Credit in accordance with their respective Pro Rata Share thereof but only to the extent the sum of all such Non-Defaulting Lenders' Pro Rata Share of the U.S. Revolver Usage plus such Defaulting Lender's U.S. Swing Loan Exposure and U.S. Letter of Credit Exposure does not exceed the total of all such Non-Defaulting Lenders' U.S. Revolver Commitments. If any Canadian Swing Loans are outstanding or if any Canadian Letters of Credit are outstanding at the time a Canadian Lender is or becomes a Defaulting Lender then all or any part of the Canadian Swing Loan Exposure and Canadian Letter of Credit Exposure with respect thereto shall be reallocated among the Canadian Lenders that are Non-Defaulting Lenders of the Canadian Swing Loans and Canadian Letters of Credit in accordance with their respective Pro Rata Share thereof but only to the extent the sum of all such Non-Defaulting Lenders' Pro Rata Share of the Canadian Revolver Usage plus such Defaulting Lender's Canadian Swing Loan

Exposure and Canadian Letter of Credit Exposure does not exceed the total of all such Non-Defaulting Lenders' Canadian Revolver Commitments.

(iii)    If the reallocation described in clause (ii) above cannot, or can only partially, be effected, the applicable Borrower shall within one Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's U.S. Swing Loan Exposure or Canadian Swing Loan Exposure, as applicable, and (y) second, provide Letter of Credit Collateralization with respect to such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (ii) above) for so long as such Letter of Credit Exposure is outstanding.

(iv)    If the applicable Borrower provides Letter of Credit Collateralization with respect to any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to clause (iii) above, Borrowers shall not be required to pay any fees to such Defaulting Lender with respect to such portion of such Defaulting Lender's Letter of Credit Exposure so long as the applicable Borrower has provided Letter of Credit Collateralization with respect to such portion of such Defaulting Lender's Letter of Credit Exposure.

(v)    If any portion of such Defaulting Lender's Letter of Credit Exposure is neither subject to Letter of Credit Collateralization nor reallocated pursuant to clause (ii) above, then, without prejudice to any rights or remedies of any Issuing Lender or any Lender hereunder, then any fees provided for in Sections 2.6(d)(i) and 2.6(d)(ii) payable to such Defaulting Lender with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to the applicable Issuing Lender until such Letter of Credit Exposure is made subject to Letter of Credit Collateralization or reallocated.

(vi)    So long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to fund any Swing Loans and the Issuing Lenders shall not be required to issue, amend or increase any Letters of Credit, unless it is reasonably satisfied that 100% of the related exposure will be covered by the U.S. Revolver Commitments or Canadian Revolver Commitments, as applicable, of the Non-Defaulting Lenders or cash collateralized in accordance with Section 2.3(g)(iii), and participations in any such newly issued or increased Letter of Credit or newly made Swing Loan shall be allocated among Non-Defaulting Lenders in accordance with their respective Pro Rata Share (and Defaulting Lenders shall not participate therein).

(vii)    To the extent permitted by Applicable Law, any voluntary prepayment of Advances shall, if the applicable Borrower so directs at the time of making such voluntary prepayment, be applied to the Advances of other Lenders as if such Defaulting Lender had no Advances outstanding and the Revolver Usage of such Defaulting Lender were zero.

(viii)    In the event that Agent, Borrowers, each Issuing Lender or Swing Lender, as the case may be, each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swing Loan Exposure and Letter of Credit Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's U.S. Revolver Commitment or Canadian Revolver Commitment, as applicable, and on such date such Lender shall purchase at par such of the U.S. Advances or Canadian Advances, as applicable, of the other U.S. Lender or Canadian Lenders, as applicable, as the Agent shall determine may be necessary in order for such Lender to hold such Advances in accordance with its Pro Rata Share. The rights and remedies against a Defaulting Lender under this Section 2.3(g) are in addition to other rights and remedies that Borrowers, Agent, the Issuing Lenders, the Swing Lender and the Non-Defaulting Lenders may have against such Defaulting Lender.

(h)    **Independent Obligations**. All Advances (other than Swing Loans and Protective Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4    <u>**Payments; Reductions of Commitments; Prepayments**</u>.

(a)    **Payments by Borrowers**.

(i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 11:00 a.m. (California time) on the date specified herein. Any payment received by Agent later than 11:00 a.m. (California time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from the applicable Borrower prior to the date on which any payment is due to the Lenders that such Borrower will not make such payment in full as and when required, the Agent may assume that such Borrower has made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the applicable Borrower does not make such payment in full to the Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application**.

(i)    So long as no Application Event has occurred and is continuing, (x) subject to the provisions of <u>Section 2.4(e)</u> hereof, this <u>Section 2.4(b)(i)</u> shall not apply to any payment made by a Borrower to Agent and specified by such Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document, (y) otherwise, all payments to be made hereunder by a Borrower shall be remitted to the Agent and all (subject to <u>Section 2.4(b)(vi)</u>, and <u>Section 2.4(e)</u>) such payments, and all proceeds of Collateral received by Agent, shall be applied (A) <u>first</u>, to reduce the balance of the U.S. Advances outstanding until paid in full, and (B) <u>second</u>, to reduce the balance of the Canadian Advances outstanding until paid in full, and thereafter, to the applicable Borrower (to be wired to the applicable Designated Account) or such other Person entitled thereto under Applicable Law, and (z) except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by the Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Advances to which such payments relate held by each Lender) and all payments of fees and expenses received by the Agent (other than fees or expenses that are for Agent's separate account or for the separate account of any Issuing Lender, or Swing Lender or any other Lender) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.

(ii)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders and subject to the terms of the

DIP Intercreditor Agreement, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

(1)    <u>first</u>, to fund amounts required to be paid from the Collateral pursuant the provisions of the Orders and in accordance with the Budget in respect of the Carve Out, in an aggregate amount not to exceed the Carve Out Reserve;

(2)    <u>second</u>, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to the Agent under the Loan Documents, until paid in full,

(3)    <u>third</u>, ratably to pay any fees then due to the Agent under the Loan Documents until paid in full,

(4)    <u>fourth</u>, (i) first, ratably to pay interest due in respect of all U.S. Protective Advances made by Agent until paid in full, and (ii) second, ratably to pay interest due in respect of all Canadian Protective Advances made by Agent until paid in full,

(5)    <u>fifth</u>, (i) first, ratably to pay the principal of all U.S. Protective Advances made by Agent until paid in full, and (ii) second, ratably to pay the principal of all Canadian Protective Advances made by Agent until paid in full,

(6)    <u>sixth</u>, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(7)    <u>seventh</u>, ratably to pay any fees then due to any of the Lenders under the Loan Documents, until paid in full,

(8)    <u>eighth</u>, (i) first, ratably, to pay interest accrued in respect of the U.S. Swing Loans made by Swing Lender until paid in full, and (ii) second, ratably to pay interest accrued in respect of the Canadian Swing Loans made by Swing Lender until paid in full,

(9)    <u>ninth</u>, (i) first, with respect to any Canadian Collections, if Canadian Availability is less than $5,000,000, ratably to pay the principal of all Canadian Swing Loans made by Swing Lender until either (A) such Canadian Swing Loans are paid in full, or (B) Canadian Availability is no less than $5,000,000, (ii) second, with respect to all other amounts, ratably to pay the principal of all U.S. Swing Loans made by Swing Lender until paid in full, and (iii) third, with respect to all other amounts, ratably to pay the principal of all Canadian Swing Loans made by Swing Lender until paid in full,

(10)    <u>tenth</u>, (i) first, ratably to pay interest accrued in respect of the U.S. Advances (other than Protective Advances and other than Swing Loans) made by any Lender until paid in full, and (ii) second, ratably to pay interest accrued in respect of the Canadian Advances (other than Protective Advances and other Swing Loans) made by any Lender until paid in full,

(11)    <u>eleventh</u>, (i) first, with respect to any Canadian Collections, if Canadian Availability is less than $5,000,000, ratably (A) to pay the principal of all Canadian Advances until paid in full, and (B) to Agent, to be held by Agent, for the benefit of the Issuing Lenders (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of any Issuing Lender, a share of each Letter of Credit Disbursement in respect of a Canadian Letter of Credit),

as cash collateral in an amount up to 103% of the Canadian Letter of Credit Usage (to the extent permitted by Applicable Law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement in respect of a Canadian Letter of Credit as and when such disbursement occurs and, if a Canadian Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Canadian Letter of Credit shall, to the extent permitted by Applicable Law, be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (1) hereof), until Canadian Availability is no less than $5,000,000, (ii) second, with respect to all other amounts, ratably (A) to pay the principal of all U.S. Advances until paid in full, and (B) to Agent, to be held by Agent, for the benefit of the Issuing Lenders (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of any Issuing Lender, a share of each Letter of Credit Disbursement in respect of a U.S. Letter of Credit), as cash collateral in an amount up to 103% of the U.S. Letter of Credit Usage (to the extent permitted by Applicable Law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement in respect of a U.S. Letter of Credit as and when such disbursement occurs and, if a U.S. Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such U.S. Letter of Credit shall, to the extent permitted by Applicable Law, be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (1) hereof), and (iii) third, with respect to all other amounts, ratably (A) to pay the principal of all Canadian Advances until paid in full, and (B) to Agent, to be held by Agent, for the benefit of the Issuing Lenders (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of any Issuing Lender, a share of each Letter of Credit Disbursement in respect of a Canadian Letter of Credit), as cash collateral in an amount up to 103% of the Canadian Letter of Credit Usage (to the extent permitted by Applicable Law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement in respect of a Canadian Letter of Credit as and when such disbursement occurs and, if a Canadian Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Canadian Letter of Credit shall, to the extent permitted by Applicable Law, be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (1) hereof),

(12)    twelfth, ratably to pay any other Obligations, other than Obligations owed to Defaulting Lenders and other than Bank Product Obligations, until paid in full,

(13)    thirteenth, ratably to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations in respect of which a Bank Product Reserve Amount was established, and, only to the extent expressly required by the terms of any underlying Bank Product Agreement, to be paid to Agent, to be held by Agent, for the ratable benefit of the applicable Bank Product Providers with respect to Bank Product Obligations in respect of which a Bank Product Reserve Amount was established, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to such Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by the Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (1) hereof, in each case to the extent of the Bank Product Reserve Amount established in respect of such Bank Product Obligations),

(14)    fourteenth, ratably to the Bank Product Providers on account of all amounts then due and payable in respect of all other Bank Product Obligations, and, only to the extent expressly required by the terms of any underlying Bank Product Agreement, to be paid to Agent, to be held by Agent, for the ratable benefit of the applicable Bank Product Providers in respect of all other Bank Product Obligations, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to such Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and

at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such other Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (1) hereof),

(15)    fifteenth, ratably to pay any Obligations owed to Defaulting Lenders; and

(16)    sixteenth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under Applicable Law.

(iii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(iv)    [intentionally omitted].

(v)    For purposes of Section 2.4(b)(ii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vi)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.3(g) and this Section 2.4, then the provisions of Section 2.3(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.4 shall control and govern.

(c)    **Reduction of Commitments**. The Revolver Commitments shall terminate on the Maturity Date.

(d)    **Optional Prepayments**.

(i)    **Canadian Advances**. The Canadian Borrower may prepay the principal of any Canadian Advance at any time in whole or in part, without premium or penalty. Any amounts prepaid may be reborrowed, subject to the terms and conditions of this Agreement.

(ii)    **U.S. Advances**. The U.S. Borrower may prepay the principal of any U.S. Advance at any time in whole or in part, without premium or penalty. Any amounts prepaid may be reborrowed, subject to the terms and conditions of this Agreement.

(e)    **Mandatory Prepayments**.

(i)    On each occasion when (x) a Non-Ordinary Course Asset Disposition or Recovery Event occurs at a time when an Asset Disposition Event has occurred and is continuing or (y) any Other Asset Sale or Other Recovery Event occurs that, in each case, would otherwise require any Loan Party to make a mandatory prepayment of the DIP Term Loan Indebtedness or the Term Loan Indebtedness pursuant to Sections 4.02(c) or 4.02(f), respectively, of the DIP Term Loan Credit Agreement or the Term Loan Credit Agreement (after giving effect to any reinvestment rights set forth in

the DIP Term Loan Credit Agreement and the Term Loan Credit Agreement, as applicable), within one (1) Business Day of the date of receipt of the Net Cash Proceeds therefrom, (A) U.S. Borrower shall prepay the outstanding principal amount of Advances or cash collateralize Letters of Credit in accordance with Section 2.4(f)(i) in an amount equal to (x) in the case of a disposition of any ABL Priority Collateral or any insurance policy or condemnation awards with respect to any ABL Priority Collateral, 100% of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by U.S. Borrower or any of its Subsidiaries in connection with such sales or dispositions, or (y) in the case of (1) a disposition of all or substantially all of the Stock of any Person that has an interest in ABL Priority Collateral, 100% of the Net Cash Proceeds attributable to such ABL Priority Collateral, with the Net Cash Proceeds attributable to such ABL Priority Collateral in any such sale being equal to the sum (without duplication) of (X) 100% of the book value of any Accounts held by such Person as assessed on the date of such sale, plus (Y) 100% of book value of all Inventory held by such Person as assessed on the date of such sale plus (Z) 100% of the Fair Market Value of other ABL Priority Collateral held by such Person as assessed on the date of such sale or (2) a disposition that includes both ABL Priority Collateral and other assets, 100% of the Net Cash Proceeds attributable to such ABL Priority Collateral, with the Net Cash Proceeds attributable to such ABL Priority Collateral in any such sale being equal to the sum (without duplication) of (X) 100% of the book value of any Accounts disposed of in connection with such disposition as assessed on the date of such sale, plus (Y) 100% of book value of all Inventory held by such Person as assessed on the date of such sale plus (Z) 100% of the Fair Market Value of other ABL Priority Collateral disposed in such disposition as assessed on the date of such sale, and (B) Canadian Borrower shall prepay the outstanding principal amount of Advances or cash collateralize Letters of Credit in accordance with Section 2.4(f)(i) in an amount equal to (x) in the case of a disposition of any ABL Priority Collateral or any insurance policy or condemnation awards with respect to any ABL Priority Collateral, 100% of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by Canadian Borrower or any of its Subsidiaries in connection with such sales or dispositions, or (y) in the case of (1) a disposition of all or substantially all of the Stock of any Person that has an interest in ABL Priority Collateral, 100% of the Net Cash Proceeds attributable to such ABL Priority Collateral, with the Net Cash Proceeds attributable to such ABL Priority Collateral in any such sale being equal to the sum (without duplication) of (X) 100% of the book value of any Accounts held by such Person as assessed on the date of such sale, plus (Y) 100% of book value of all Inventory held by such Person as assessed on the date of such sale plus (Z) 100% of the Fair Market Value of other ABL Priority Collateral held by such Person as assessed on the date of such sale or (2) a disposition that includes both ABL Priority Collateral and other assets, 100% of the Net Cash Proceeds attributable to such ABL Priority Collateral, with the Net Cash Proceeds attributable to such ABL Priority Collateral in any such sale being equal to the sum (without duplication) of (X) 100% of the book value of any Accounts disposed of in connection with such disposition as assessed on the date of such sale, plus (Y) 100% of book value of all Inventory held by such Person as assessed on the date of such sale plus (Z) 100% of the Fair Market Value of other ABL Priority Collateral disposed in such disposition as assessed on the date of such sale. Nothing contained in this Section 2.4(e) shall permit any Loan Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 6.4; provided that no mandatory prepayment pursuant to this Section 2.4(e)(i) shall be required (i) with respect to an Other Asset Sale, until the aggregate amount of Net Cash Proceeds with respect to Other Asset Sales received by Holdings and its Subsidiaries shall exceed $50,000, and (ii) with respect to a Recovery Event or Other Recovery Event, until the amount of Net Cash Proceeds with respect to such Recovery Event or Other Recovery Event received by Holdings and its Subsidiaries shall exceed $50,000 or $100,000 in the aggregate for all Recovery Events and Other Recovery Events for which Holdings and its Subsidiaries have received Net Cash Proceeds.

(ii)    Unless otherwise agreed to by Agent and subject to the provisions of Sections 2.3(d)(i), 2.3(d)(ii) and 2.3(g), (A) if, at any time, the U.S. Revolver Usage on such date exceeds the lesser of the (x) the Maximum U.S. Revolver Amount and (y) the U.S. Borrowing Base (such excess

being referred to as the "U.S. Overadvance Amount"), then U.S. Borrower shall, within one (1) Business Day, prepay the U.S. Advances or cash collateralize U.S. Letters of Credit in accordance with Section 2.4(f)(i) in an aggregate amount equal to such U.S. Overadvance Amount or (B) if, at any time, the Canadian Revolver Usage on such date exceeds the lesser of (x) the Maximum Canadian Revolver Amount and (y) the U.S. Dollar Equivalent of the Canadian Borrowing Base (such excess being referred to as the "Canadian Overadvance Amount"), then Canadian Borrower shall, within one (1) Business Day, prepay the Canadian Advances or cash collateralize the Canadian Letters of Credit in accordance with Section 2.4(f)(ii)(B) in an aggregate amount equal to such Canadian Overadvance Amount.

(iii)    Unless otherwise agreed to by the Agent and subject to the provisions of Section 2.3(g), at all times on each Business Day, Agent shall apply all funds credited to the applicable Controlled Accounts as of 10:00 a.m., California time, on such Business Day in accordance with Section 2.4(f)(i).

(iv)    [Intentionally Omitted].

(v)    If at any time any Loan Party maintains cash or Cash Equivalents in any Deposit Account or Securities Account in an aggregate amount for all such Deposit Accounts and Securities Accounts in excess of $500,000 for three consecutive Business Days, Borrowers shall prepay the Obligations to the extent of such excess within one Business Day thereof.

(vi)    Each Borrower promises to pay the Obligations (including principal, interest, fees, costs, and expenses, but for the avoidance of any doubt, excluding any Bank Product Obligations except to the extent required by the underlying Bank Product Agreement) in Dollars in full on the Maturity Date or, if earlier, on the date on which the Obligations are declared due and payable pursuant to the terms of this Agreement.

(vii)    For clarity, none of the mandatory prepayments described in this Section 2.4(e) shall have the effect of reducing the Maximum U.S. Revolver Amount, the U.S. Revolver Commitments, the Maximum Canadian Revolver Amount, or the Canadian Revolver Commitments.

(f)    **Application of Payments**.

(i)    Each prepayment pursuant to Section 2.4(e)(i), Section 2.4(e)(iii), Section 2.4(e)(v) and Section 2.4(e)(vi) above shall (A) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii) and (B) so long as no Application Event shall have occurred and be continuing, be applied, first, to the outstanding principal amount of the U.S. Advances, until paid in full, second, to the outstanding principal amount of the Canadian Advances, until paid in full, third, to cash collateralize the U.S. Letters of Credit in an amount equal to 103% of then extant U.S. Letter of Credit Usage, until paid in full, and fourth, to cash collateralize the Canadian Letters of Credit in an amount equal to 103% of then extant Canadian Letter of Credit Usage, until paid in full.

(ii)    Each prepayment pursuant to (A) Section 2.4(e)(ii)(A) above shall be applied, first, to the outstanding principal amount of the U.S. Advances, until paid in full, and second, to cash collateralize the U.S. Letters of Credit in an amount equal to 103% of then extant U.S. Letter of Credit Usage, until paid in full, or (B) Section 2.4(e)(ii)(B) above shall be applied, first, to the outstanding principal amount of the Canadian Advances, until paid in full, and second, to cash collateralize the Canadian Letters of Credit in an amount equal to 103% of then extant Canadian Letter of Credit Usage, until paid in full.

(iii)    In the event that a mandatory prepayment is required to be paid pursuant to both Section 2.4(e)(ii)(A) and Section 2.4(e)(ii)(B), such mandatory prepayment will be applied as set forth above in Section 2.4(f)(i)(B) as if no Application Events had occurred and were continuing. Amounts paid pursuant to this Section 2.4(f) may be reborrowed subject to the terms and conditions of this Agreement.

2.5    **[Intentionally Omitted]**.

2.6    **Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations**.

(a)    **Interest Rates**. Except as provided in Section 2.6(c), all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows:

(i)    if the relevant Obligation is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin, and

(ii)    otherwise, at a per annum rate equal to the Base Rate plus the Base Rate Margin.

(b)    Agent, as applicable, upon determining the interest rate for any Borrowing of LIBOR Rate Loans, shall promptly notify Borrowers and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

(c)    Subject to the provisions of Section 2.7, interest on each Advance shall accrue from and including the date of any Borrowing to but excluding the date of repayment thereof.

(d)    **Letter of Credit Fee**.

(i)    U.S. Borrower shall pay to the Agent (for the ratable benefit of the Lenders with a U.S. Revolver Commitment, subject to any agreements between Agent and individual Lenders), a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 2.11(a)(vii)) in respect of the U.S. Letters of Credit which shall accrue at a per annum rate equal to the LIBOR Rate Margin times the Daily Balance of the undrawn amount of all outstanding U.S. Letters of Credit.

(ii)    Canadian Borrower shall pay to the Agent (for the ratable benefit of the Lenders with a Canadian Revolver Commitment, subject to any agreements between Agent and individual Lenders), a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 2.11(b)(vii)) in respect of the Canadian Letters of Credit which shall accrue at a per annum rate equal to the LIBOR Rate Margin times the Daily Balance of the undrawn amount of all outstanding Canadian Letters of Credit.

(e)    **Default Rate**. If all or a portion of the principal amount of any Advance, Reimbursement Undertaking, or any interest payable thereon or any fees or other amounts due hereunder or under any other Loan Document shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (including post-petition interest in any Insolvency Proceeding) at a rate per annum that is (i) in the case of overdue principal, to the extent permitted by Applicable Law, the rate that would otherwise be applicable thereto plus 2% or (ii) in the case of overdue interest, fees or other amounts due hereunder, to the extent permitted by Applicable

Law, the rate per annum described in <u>Section 2.6(a)(ii)</u> plus 2% from and including the date of such non-payment to but excluding the date on which such amount is paid in full. All such interest shall be payable on demand.

(f)    **Payment**. Except to the extent provided to the contrary in <u>Section 2.10</u> or <u>Section 2.12(a)</u>, (i) all interest and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month, (ii) all Letter of Credit fees payable hereunder, and all fronting fees and all commissions, other fees, charges and expenses provided for in <u>Section 2.11</u> shall be due and payable, in arrears, on the first Business Day of each month, and (iii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all other Lender Group Expenses shall, subject to the Orders, be due and payable on the earlier of (A) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred, or (B) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)). Payments of all other amounts hereunder or under the Loan Documents shall be due and payable on the dates and at the times specified herein or in such other Loan Document. Each Borrower hereby authorizes Agent, from time to time without prior notice to such Borrower, if (subject to the provisions of <u>Section 2.11</u>) to charge the Loan Account, (A) on the first day of each month, all interest accrued during the prior month on the Advances hereunder, (B) on the first Business Day of each month, all Letter of Credit fees accrued or chargeable hereunder during the prior month, (C) as and when incurred or accrued, all fees and costs provided for in <u>Section 2.10(a)</u> or <u>(c)</u>, (D) [intentionally omitted], (E) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (F) on the Closing Date and thereafter as and when incurred or accrued, subject to the Orders, all other Lender Group Expenses, and (G) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products). All amounts (including interest, fees, costs, expenses, or other amounts payable hereunder or under any other Loan Document or any Bank Product Agreement) relating to Canadian Advances or Canadian Letters of Credit charged to the Loan Account shall thereafter shall constitute Canadian Advances hereunder and shall accrue interest at the rate then applicable to Canadian Advances that are Base Rate Loans. All amounts (including interest, fees, costs, expenses, or other amounts payable hereunder or under any other Loan Document or any Bank Product Agreement) relating to U.S. Advances or U.S. Letters of Credit charged to the Loan Account shall thereafter shall constitute U.S. Advances hereunder and shall accrue interest at the rate then applicable to U.S. Advances that are Base Rate Loans. Agent may elect to deem any amounts charged to the Loan Account in respect of Lender Group Expenses as either a U.S. Advance or a Canadian Advance, and such amount shall accrue interest at the rate then applicable to Advances that are Base Rate Loans. As set out in <u>Section 17.12</u> in further detail, each payment in respect of any Obligation in respect of Advances shall only be made in Dollars with respect to such Obligation. Borrowers hereby acknowledge and agree that to the extent that any information about interest, fees, costs, and other Obligations hereunder is maintained and available to the Borrowers in an electronic database, (x) the Lender Group shall have no obligation to independently provide such information to Borrowers, and (y) Borrowers shall obtain information regarding interests, fees, costs, and other payments hereunder by accessing such electronic database and shall not rely on the Lender Group to otherwise deliver to Borrowers such information.

(g)    **Computation**.

(i)    All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year (or a 365-day year or 366-day year, as the case may, be for Base Rate Loans), in each case, for the actual number of days elapsed in the period during which the interest or

fees accrue. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(ii)    For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day year (or 365-day year or 366-day year, as the case may be), the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 (or 365 or 366, as the case may be) The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(iii)    Each Loan Party acknowledges and confirms that:

(A)    Clause (ii) above satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document;

(B)    Each Loan Party is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon the methodology set out in clause (ii) above.

(iv)    Each Borrower agrees not to, and to cause each Loan Party not to, plead or assert, whether by way of defence or otherwise, in any proceeding relating to the Loan Documents, that the interest payable thereunder and the calculation thereof has not been adequately disclosed to any Loan Party, whether pursuant to Section 4 of the *Interest Act* (Canada) or any other Applicable Law or legal principle.

(v)    Notwithstanding anything to the contrary contained in this Agreement, if the amount of interest payable under any Loan Document is reduced by virtue of the application of Section 4 of the *Interest Act* (Canada), then the Borrowers shall immediately and retroactively be obligated to pay to the Agent for the account of the applicable Lenders, promptly on demand by the Agent (or, if an Event of Default pursuant to Sections 8.4 and 8.5 shall have occurred and be continuing, automatically and without further action by the Agent), an amount equal to the amount of such reduction.

(h)    **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Each Borrower and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the Closing Date, each Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from a Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Advances to the extent of such excess. Without limiting the generality of the foregoing, if any provision of this Agreement would oblige any Loan Party to make any payment of interest or other amount payable to any Lender or the Agent in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Lender or the Agent of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been

adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Lender or the Agent of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary, as follows: first, by reducing the amount or rate of interest, and, thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for purposes of section 347 of the *Criminal Code* (Canada). Any provision of this Agreement that would oblige a Loan Party to pay any fine, penalty or rate of interest on any arrears of principal or interest secured by a mortgage on real property that has the effect of increasing the charge on arrears beyond the rate of interest payable on principal money not in arrears shall not apply to such Loan Party, which shall be required to pay interest on money in arrears at the same rate of interest payable on principal money not in arrears.

2.7    **Crediting Payments**. The receipt of any payment item by Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then the applicable Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 11:00 a.m. (California time). If any payment item is received into Agent's Account on a non-Business Day or after 11:00 a.m. (California time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8    **Designated Account**. Agent is authorized to make the Advances, and each Issuing Lender is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.3(d) after the occurrence and during the continuance of an Event of Default. Each Borrower agrees to establish and maintain its Designated Account with the applicable Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by such Borrower and made by the Agent or the Lenders hereunder. Unless otherwise agreed by Agent and the applicable Borrower, any Advances, or Swing Loan requested by such Borrower and made by Agent or the Lenders hereunder shall be made to the applicable Designated Account.

2.9    **Maintenance of Loan Account; Statements of Obligations**.

(a)    Agent shall maintain an account on its books in the name of Canadian Borrower (the "Canadian Loan Account") on which Canadian Borrower will be charged with all Canadian Advances (including Protective Advances that constitute Canadian Advance) made by Agent, the Swing Lender, or the Lenders to Canadian Borrower or for Canadian Borrower's account, the Canadian Letters of Credit issued or arranged by Canadian Issuing Lender for Canadian Borrower's account, and with all other payment Obligations of Canadian Borrower hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and Lender Group Expenses.    In accordance with Section 2.7, the Canadian Loan Account will be credited with all payments received by Agent from Canadian Borrower or for Canadian Borrower's account. Agent shall render statements regarding the Canadian Loan Account to Canadian Borrower, including principal, interest, fees, and expenses including an itemization of all charges and expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Canadian Borrower and the Lender Group unless, within 30 days after receipt thereof by Canadian Borrower, Canadian Borrower shall deliver to the Agent written objection thereto describing the error or errors contained in any such statements.

(b)    Agent shall maintain an account on its books in the name of U.S. Borrower (the "U.S. Loan Account") on which U.S. Borrower will be charged with all U.S. Advances (including Protective Advances that constitute U.S. Advances) made by Agent, the Swing Lender or the Lenders to U.S. Borrower or for U.S. Borrower's account, the U.S. Letters of Credit issued or arranged by U.S. Issuing Lender for U.S. Borrower's account, and with all other payment Obligations of U.S. Borrower hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and Lender Group Expenses.  In accordance with Section 2.7, the U.S. Loan Account will be credited with all payments received by Agent from U.S. Borrower or for U.S. Borrower's account. Agent shall render statements regarding the U.S. Loan Account to U.S. Borrower, including principal, interest, fees, and expenses including an itemization of all charges and expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between U.S. Borrower and the Lender Group unless, within 30 days after receipt thereof by U.S. Borrower, U.S. Borrower shall deliver to the Agent written objection thereto describing the error or errors contained in any such statements.

2.10    **Fees**.

(a)    Each Borrower shall pay to Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)    Canadian Borrower shall pay to Agent, for the ratable account of the Canadian Lenders, on the first Business Day of each fiscal quarter after the Closing Date up to the first Business Day of the fiscal quarter prior to the Payoff Date and on the Payoff Date, an unused line fee in Dollars in an amount equal to the Applicable Unused Line Fee Rate per annum times the result of (i) the Maximum Canadian Revolver Amount less (ii) the average U.S. Dollar Equivalent of the Daily Balance of the U.S. Dollar Equivalent of the Canadian Revolver Usage during the immediately preceding fiscal quarter (or portion thereof).

(c)    U.S. Borrower shall pay to Agent, for the ratable account of the U.S. Lenders, on the first Business Day of each fiscal quarter after the Closing Date up to the first Business Day of the fiscal quarter prior to the Payoff Date and on the Payoff Date, an unused line fee in Dollars in an amount equal to the Applicable Unused Line Fee Rate per annum times the result of (i) the Maximum U.S. Revolver Amount less (ii) the average Daily Balance of the U.S. Revolver Usage during the immediately preceding fiscal quarter (or portion thereof).

2.11    **Letters of Credit**.

(a)    **U.S. Letters of Credit**

(i)    Subject to the terms and conditions of this Agreement, upon the request of U.S. Borrower made in accordance herewith, the U.S. Issuing Lender agrees to issue, or to cause a U.S. Underlying Issuer (including, as U.S. Issuing Lender's agent) to issue, a requested standby U.S. Letter of Credit or a sight commercial U.S. Letter of Credit for the account of U.S. Borrower. If U.S. Issuing Lender, at its option, elects to cause a U.S. Underlying Issuer to issue a requested U.S. Letter of Credit, then U.S. Issuing Lender agrees that it will enter into arrangements relative to the reimbursement of such U.S. Underlying Issuer (which may include, among, other means, by becoming an applicant with respect to such U.S. Letter of Credit or entering into undertakings which provide for reimbursements of such U.S. Underlying Issuer with respect to such U.S. Letter of Credit; each such obligation or undertaking, irrespective of whether in writing, a "U.S. Reimbursement Undertaking") with respect to U.S. Letters of Credit issued by such U.S. Underlying Issuer. By submitting a request to U.S. Issuing Lender for the issuance of a U.S. Letter of Credit, U.S. Borrower

shall be deemed to have requested that U.S. Issuing Lender issue or that a U.S. Underlying Issuer issue the requested U.S. Letter of Credit and to have requested U.S. Issuing Lender to issue a U.S. Reimbursement Undertaking with respect to such requested U.S. Letter of Credit if it is to be issued by a U.S. Underlying Issuer (it being expressly acknowledged and agreed by U.S. Borrower that U.S. Borrower is and shall be deemed to be an applicant (within the meaning of Section 5-102(a)(2) of the Code) with respect to each U.S. Underlying Letter of Credit). Each request for the issuance of a U.S. Letter of Credit, or the amendment, renewal, or extension of any outstanding U.S. Letter of Credit, shall be made in writing by an Authorized Person and delivered to the U.S. Issuing Lender and Agent via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to the Agent and the U.S. Issuing Lender in its Permitted Discretion and shall specify (A) the amount of such U.S. Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such U.S. Letter of Credit, (C) the expiration date of such U.S. Letter of Credit, (D) the name and address of the beneficiary of the U.S. Letter of Credit, and (E) such other information (including the conditions of drawing and, in the case of an amendment, renewal, or extension, identification of the outstanding U.S. Letter of Credit to be so amended, renewed, or extended) as shall be reasonably necessary to prepare, amend, renew, or extend such U.S. Letter of Credit, and shall be accompanied by such Issuer Documents as Agent or U.S. Issuing Lender or a U.S. Underlying Issuer may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that U.S. Issuing Lender or U.S. Underlying Issuer, as applicable, generally requests for Letters of Credit in similar circumstances. U.S. Issuing Lender's and U.S. Underlying Issuer's records of the content of any such request will be conclusive. Each U.S. Letter of Credit shall be denominated in Dollars. Anything contained herein to the contrary notwithstanding, the U.S. Issuing Lender may, but shall not be obligated to issue, or cause the issuance of a U.S. Letter of Credit or to issue a U.S. Reimbursement Undertaking in respect of a U.S. Underlying Letter of Credit, in either case, that supports the obligations of a Loan Party or its Subsidiaries in respect of (1) a lease of real property, or (2) an employment contract. The U.S. Issuing Lender shall have no obligation to issue a U.S. Letter of Credit or a U.S. Reimbursement Undertaking in respect of a U.S. Underlying Letter of Credit, in either case, if any of the following would result after giving effect to the requested issuance:

> (1)    the U.S. Letter of Credit Usage would exceed the U.S. Borrowing Base *less* the outstanding amount of U.S. Advances (inclusive of U.S. Swing Loans), or

> (2)    the U.S. Letter of Credit Usage would exceed the U.S. L/C Sublimit, or

> (3)    the U.S. Letter of Credit Usage would exceed the Maximum U.S. Revolver Amount less the outstanding amount of U.S. Advances (including U.S. Swing Loans).

> (ii)    U.S. Borrower and the Lender Group hereby acknowledge and agree that all Pre-Petition U.S. Letters of Credit shall constitute U.S. Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Pre-Petition U.S. Letters of Credit were issued by U.S. Issuing Lender or a U.S. Underlying Issuer under this Agreement at the request of U.S. Borrower on the Closing Date. Any U.S. Issuing Lender or U.S. Underlying Issuer (other than Wells Fargo or any of its Affiliates) shall notify Agent in writing no later than the Business Day prior to the Business Day on which such U.S. Issuing Lender or U.S. Underlying Issuer issues any U.S. Letter of Credit. In addition, each U.S. Issuing Lender and U.S. Underlying Issuer (other than Wells Fargo or any of its Affiliates) shall, on the first Business Day of each week, submit to Agent a report detailing the daily undrawn amount of each U.S. Letter of Credit issued by such U.S. Issuing Lender and U.S. Underlying Issuer during the prior calendar week. Each U.S. Letter of Credit shall be in form and substance reasonably acceptable to the U.S. Issuing Lender, including the requirement that the amounts payable thereunder

must be payable in Dollars. If U.S. Issuing Lender makes a payment under a U.S. Letter of Credit or a U.S. Underlying Issuer makes a payment under a U.S. Underlying Letter of Credit, U.S. Borrower shall pay to Agent an amount equal to such U.S. Letter of Credit Disbursement, not later than 11:00 a.m. (California time), on the date that such U.S. Letter of Credit Disbursement is made, if U.S. Borrower shall have received written or telephonic notice of such Letter of Credit Disbursement prior to 10:00 a.m., California time, on such date, or, if such notice has not been received by U.S. Borrower prior to such time on such date, then not later than 11:00 a.m., California time, on the date of receipt, and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a U.S. Advance hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to U.S. Advances that are Base Rate Loans. If a U.S. Letter of Credit Disbursement is deemed to be a U.S. Advance hereunder, U.S. Borrower's obligation to pay the amount of such Letter of Credit Disbursement to U.S. Issuing Lender shall be automatically converted into an obligation to pay the resulting U.S. Advance. Promptly following receipt by Agent of any payment from U.S. Borrower pursuant to this paragraph, Agent shall distribute such payment to the U.S. Issuing Lender or, to the extent that U.S. Lenders have made payments pursuant to this Section 2.11(a)(ii) to reimburse the U.S. Issuing Lender, then to such U.S. Lenders and the U.S. Issuing Lender as their interests may appear.

(iii)    Each standby U.S. Letter of Credit (and corresponding U.S. Underlying Letter of Credit) shall have an expiry date no later than the date that is twelve months after the issuance or renewal of such U.S. Letter of Credit; provided, that any standby U.S. Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any U.S. Letter of Credit which extends beyond the Maturity Date, Letter of Credit Collateralization shall be provided therefor on or before the date that is five Business Days prior to the Maturity Date. Each commercial U.S. Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial U.S. Letter of Credit and (ii) five Business Days prior to the Maturity Date.

(iv)    Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(a)(i), each U.S. Lender with a U.S. Revolver Commitment agrees to fund its Pro Rata Share of any U.S. Advance deemed made pursuant to the foregoing subsection on the same terms and conditions as if U.S. Borrower had requested the amount thereof as a U.S. Advance and Agent shall promptly pay to U.S. Issuing Lender the amounts so received by it from the U.S. Lenders. By the issuance of a U.S. Letter of Credit or a U.S. Reimbursement Undertaking (or an amendment, renewal or extension of a U.S. Letter of Credit or a U.S. Reimbursement Undertaking increasing the amount thereof) and without any further action on the part of the U.S. Issuing Lender or the U.S. Lenders with U.S. Revolver Commitments, the U.S. Issuing Lender shall be deemed to have granted to each U.S. Lender with a U.S. Revolver Commitment, and each U.S. Lender with a U.S. Revolver Commitment shall be deemed to have purchased, a participation in each U.S. Letter of Credit issued by U.S. Issuing Lender and each U.S. Reimbursement Undertaking, in an amount equal to its Pro Rata Share of such U.S. Letter of Credit or a U.S. Reimbursement Undertaking, and each such U.S. Lender agrees to pay to Agent, for the account of the U.S. Issuing Lender, such U.S. Lender's Pro Rata Share of any Letter of Credit Disbursement made by the U.S. Issuing Lender or a U.S. Underlying Issuer under such U.S. Letter of Credit. In consideration and in furtherance of the foregoing, each U.S. Lender with a U.S. Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of the U.S. Issuing Lender, such U.S. Lender's Pro Rata Share of each U.S. Letter of Credit Disbursement made by the U.S. Issuing Lender or U.S. Underlying Issuer and not reimbursed by U.S. Borrower (each such amount so paid until reimbursed, a "U.S. Unpaid Drawing" and together with the Canadian Unpaid Drawings, "Unpaid Drawings") on the date due as provided in Section 2.11(a)(i), or of any reimbursement payment required to be refunded to U.S. Borrower for any reason. Each U.S. Lender with a U.S. Revolver Commitment acknowledges and agrees that its obligation to deliver to Agent, for the account of the U.S. Issuing

Lender, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(a)(iv) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3. If any such U.S. Lender fails to make available to Agent the amount of such Lender's Pro Rata Share of a U.S. Letter of Credit Disbursement as provided in this Section, such U.S. Lender shall be deemed to be a Defaulting Lender and Agent (for the account of the U.S. Issuing Lender) shall be entitled to recover such amount on demand from such U.S. Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(v)     U.S. Borrower hereby agrees that each U.S. Underlying Issuer shall be entitled to the benefits of Section 10.3. U.S. Borrower agrees to be bound by the U.S. Underlying Issuer's regulations and interpretations of any U.S. Letter of Credit or by U.S. Issuing Lender's interpretations of any U.S. Reimbursement Undertaking even though this interpretation may be different from U.S. Borrower's own, and U.S. Borrower understands and agrees that none of the U.S. Issuing Lender, the Lender Group, or any U.S. Underlying Issuer shall be liable for any error, negligence, or mistake, whether of omission or commission, in following U.S. Borrower's instructions or those contained in the U.S. Letter of Credit or any modifications, amendments, or supplements thereto. U.S. Borrower understands that the U.S. Reimbursement Undertakings may require U.S. Issuing Lender to indemnify the U.S. Underlying Issuer for certain costs or liabilities arising out of claims by U.S. Borrower against such U.S. Underlying Issuer, except to the extent that a court of competent jurisdiction in a final and non-appealable decision determines that such error, negligence or mistake resulted from the gross negligence or willful misconduct of any U.S. Issuing Lender, any other member of the Lender Group or any U.S. Underlying Issuer. U.S. Borrower hereby acknowledges and agrees that none of the U.S. Issuing Lender, any other member of the Lender Group, or any U.S. Underlying Issuer shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any U.S. Letter of Credit, except to the extent that a court of competent jurisdiction in a final and non-appealable decision determines that such error, delay, negligence or mistake resulted from the gross negligence or willful misconduct of any U.S. Issuing Lender, any other member of the Lender Group or any U.S. Underlying Issuer.

(vi)     U.S. Borrower hereby authorizes and directs any U.S. Underlying Issuer to deliver to the U.S. Issuing Lender all instruments, documents, and other writings and property received by such U.S. Underlying Issuer pursuant to such U.S. Underlying Letter of Credit and to accept and rely upon the U.S. Issuing Lender's instructions with respect to all matters arising in connection with such U.S. Underlying Letter of Credit and the related application.

(vii)     U.S. Borrower agrees to pay immediately upon demand to the U.S. Issuing Lender a fee in respect of each U.S. Letter of Credit issued hereunder by such U.S. Issuing Lender, for the period from and including the date of issuance of such Letter of Credit to but excluding the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% per annum or such other amount as is agreed in a separate writing between the applicable U.S. Issuing Lender and U.S. Borrower on the average Daily Balance of U.S. Letter of Credit Exposure attributable to Letters of Credit issued by it (excluding any portion attributable to Unpaid Drawings) during the immediately preceding month (or portion thereof). Such fee shall be due and payable on the first Business Day of each month and on the Payoff Date. In addition, U.S. Borrower agrees to pay directly to the applicable U.S. Issuing Lender as Lender Group Expenses upon each issuance of, drawing under and/or amendment, renewal or extension of a U.S. Letter of Credit issued by it such amount as such U.S. Issuing Lender and U.S. Borrower shall have agreed upon for issuances of, drawings under or amendments of, renewals or extensions of, Letters of Credit issued by it.

(viii)    If by reason of (A) any change after the Closing Date in any Applicable Law, or any change in the interpretation or application thereof by any Governmental Authority, or (B) compliance by the U.S. Issuing Lender, any Lender, or U.S. Underlying Issuer with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board made after the Closing Date:

(1)    any reserve, deposit, or similar requirement (other than reserves, deposits, or similar requirements of a *de minimis* nature) is or shall be imposed or modified in respect of any U.S. Letter of Credit issued or caused to be issued hereunder or hereby, or

(2)    there shall be imposed on the U.S. Issuing Lender, any Lender, or U.S. Underlying Issuer any other condition regarding any U.S. Letter of Credit or U.S. Reimbursement Undertaking,

and the result of the foregoing is to increase, directly or indirectly, the cost to the U.S. Issuing Lender, any Lender, or a U.S. Underlying Issuer of issuing, making, guaranteeing, or maintaining any U.S. Reimbursement Undertaking or U.S. Letter of Credit or to reduce the amount receivable in respect thereof (other than any such increase or reduction attributable to taxes which is indemnified under Section 16), then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify in writing U.S. Borrower, and U.S. Borrower shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate the U.S. Issuing Lender, any Lender, or a U.S. Underlying Issuer for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, however, that U.S. Borrower shall not be required to provide any compensation pursuant to this Section for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to U.S. Borrower; provided further that if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. The determination by Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the basis for the determination of such reimbursement and calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(ix)    U.S. Borrower is responsible for the final text of the U.S. Letters of Credit as issued by a U.S. Issuing Lender or a U.S. Underlying Issuer, irrespective of any assistance any U.S. Issuing Lender or any U.S. Underlying Issuer may provide such as drafting or recommending text or by such U.S. Issuing Lender's or such U.S. Underlying Issuer's use or refusal to use text submitted by U.S. Borrower. U.S. Borrower understands that the final form of any U.S. Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by a U.S. Issuing Lender or a U.S. Underlying Issuer, and U.S. Borrower hereby consents to such revisions and changes not materially different from the application executed in connection therewith. U.S. Borrower is solely responsible for the suitability of the U.S. Letter of Credit for U.S. Borrower's purposes. If U.S. Borrower requests U.S. Issuing Lender or a U.S. Underlying Issuer to issue a U.S. Letter of Credit for an affiliated or unaffiliated third party (a "U.S. Account Party"), (i) such U.S. Account Party shall have no rights against any U.S. Issuing Lender or any U.S. Underlying Issuer; (ii) U.S. Borrower shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective U.S. Letter of Credit shall be among U.S. Issuing Lender, the U.S. Underlying Issuer and U.S. Borrower. U.S. Borrower will examine the copy of the U.S. Letter of Credit and any other documents sent by a U.S. Issuing Lender or a U.S. Underlying Issuer in connection therewith and shall promptly notify U.S. Issuing Lender (not later than three (3) Business Days following U.S. Borrower's receipt of documents from a U.S. Issuing Lender or a U.S. Underlying Issuer) of any non-compliance

with U.S. Borrower's instructions and of any discrepancy in any document under any presentment or other irregularity. U.S. Borrower understands and agrees that any U.S. Issuing Lender and any U.S. Underlying Issuer is not required to extend the expiration date of any U.S. Letter of Credit for any reason. With respect to any U.S. Letter of Credit containing an "automatic amendment" to extend the expiration date of such U.S. Letter of Credit, U.S. Issuing Lender or U.S. Underlying Issuer, in its sole and absolute discretion, may give notice of nonrenewal of such U.S. Letter of Credit and, if U.S. Borrower does not at any time want the then current expiration date of such U.S. Letter of Credit to be extended, U.S. Borrower will so notify Agent and U.S. Issuing Lender and U.S. Underlying Issuer at least 30 calendar days before U.S. Issuing Lender or the U.S. Underlying Issuer is required to notify the beneficiary of such U.S. Letter of Credit or any advising bank of such non-extension pursuant to the terms of such U.S. Letter of Credit.

(x)    Borrowers' reimbursement and payment obligations under this <u>Section 2.11(a)</u> are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever; provided, that subject to <u>Section 2.11(a)(iv)</u> above, the foregoing shall not release any U.S. Issuing Lender or any U.S. Underlying Issuer from such liability to U.S. Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against a U.S. Issuing Lender or a U.S. Underlying Issuer following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrowers to a U.S. Issuing Lender or a U.S. Underlying Issuer arising under, or in connection with, this <u>Section 2.11(a)</u> or any U.S. Letter of Credit.

(xi)    Without limiting any other provision of this Agreement, U.S. Issuing Lender, U.S. Underlying Issuer and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrowers for, and U.S. Issuing Lender's and U.S. Underlying Issuer's rights and remedies against U.S. Borrower and the obligation of Borrowers to reimburse such U.S. Issuing Lender or such U.S. Underlying Issuer for each drawing under each U.S. Letter of Credit shall not be impaired by:

(1)    honor of a presentation under any U.S. Letter of Credit that on its face substantially complies with the terms and conditions of such U.S. Letter of Credit, even if the U.S. Letter of Credit requires strict compliance by the beneficiary;

(2)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(3)    acceptance as a draft of any written or electronic demand or request for payment under a U.S. Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the U.S. Letter of Credit;

(4)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than U.S. Issuing Lender's or Underlying Issuer's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the U.S. Letter of Credit);

(5)    acting upon any instruction or request relative to a U.S. Letter of Credit or requested U.S. Letter of Credit that U.S. Issuing Lender or a U.S. Underlying Issuer in good faith believes to have been given by a Person authorized to give such instruction or request;

(6)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to U.S. Borrower;

(7)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and U.S. Borrower or any of the parties to the underlying transaction to which the U.S. Letter of Credit relates;

(8)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(9)    payment to any presenting bank (designated or permitted by the terms of the applicable U.S. Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(10)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where U.S. Issuing Lender or U.S. Underlying Issuer has issued, confirmed, advised or negotiated such U.S. Letter of Credit, as the case may be;

(11)    honor of a presentation after the expiration date of any U.S. Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by U.S. Issuing Lender or U.S. Underlying Issuer if subsequently U.S. Issuing Lender, U.S. Underlying Issuer or any court or other finder of fact determines such presentation should have been honored;

(12)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(13)    honor of a presentation that is subsequently determined by U.S. Issuing Lender or U.S. Underlying Issuer to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(xii)    If (i) any Event of Default shall occur and be continuing, or (ii) Availability shall at any time be less than zero, then on the Business Day following the date when the Borrowers receives notice from Agent or the Required Lenders (or, if the maturity of the Obligations has been accelerated, Revolving Lenders with U.S. Letter of Credit Exposure representing greater than 50% of the total U.S. Letter Credit Exposure) demanding Letter of Credit Collateralization pursuant to this Section 2.11(a) upon such demand, Borrowers shall provide Letter of Credit Collateralization with respect to the then existing U.S. Letter of Credit Usage. If Borrowers fail to provide Letter of Credit Collateralization as required by this Section 2.11(a), the U.S. Lenders may (and, upon direction of Agent, shall) advance, as a U.S. Advance, the amount of the cash collateral required pursuant to the Letter of Credit Collateralization provision so that the then existing U.S. Letter of Credit Usage is cash collateralized in accordance with the Letter of Credit Collateralization provision, whether or not the U.S. Revolver Commitments have terminated, an Overadvance exists or the conditions in Section 3 are satisfied.

(xiii)    Unless otherwise expressly agreed by U.S. Issuing Lender, U.S. Underlying Issuer and U.S. Borrower when a U.S. Letter of Credit is issued (including any such

agreement applicable to Pre-Petition Letters of Credit), (i) the rules of the ISP shall apply to each standby U.S. Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial U.S. Letter of Credit.

(xiv)    U.S. Issuing Lender and U.S. Underlying Issuer shall be deemed to have acted with due diligence and reasonable care if U.S. Issuing Lender's or U.S. Underlying Issuer's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement

(xv)    At U.S. Borrower's costs and expense, U.S. Borrower shall execute and deliver to U.S. Issuing Lender and U.S. Underlying Issuer such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by U.S. Issuing Lender or U.S. Underlying Issuer to enable U.S. Issuing Lender or U.S. Underlying Issuer to issue any U.S. Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce U.S. Issuing Lenders' or U.S. Underlying Issuer's rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document. U.S. Borrower irrevocably appoints U.S. Issuing Lender and U.S. Underlying Issuer as its attorney-in-fact and authorizes U.S. Issuing Lender and U.S. Underlying Issuer, without notice to any Borrower, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents. The power of attorney granted by U.S. Borrower is limited solely to such actions related to the issuance, confirmation or amendment of any U.S. Letter of Credit and to ancillary documents or letters customary in the letter of credit business. This appointment is coupled with an interest.

(xvi)    U.S. Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including U.S. Issuing Lender, U.S. Underlying Issuer and their respective branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including U.S. Issuing Lender and U.S. Underlying Issuer, a "Letter of Credit Related Person") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by Section 16) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. This indemnification provision shall survive termination of this Agreement and all Letters of Credit. The liability of U.S. Issuing Lender or U.S. Underlying Issuer (or any other Letter of Credit Related Person) under, in connection with or arising out of any U.S. Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by U.S. Borrower that are caused directly by U.S. Issuing Lender's or U.S. Underlying Issuer's gross negligence or willful misconduct in (i) honoring a presentation under a U.S. Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such U.S. Letter of Credit, (ii) failing to honor a presentation under a U.S. Letter of Credit that strictly complies with the terms and conditions of such U.S. Letter of Credit, or (iii) retaining Drawing Documents presented under a U.S. Letter of Credit. U.S. Borrowers' aggregate remedies against U.S. Issuing Lender and any other Letter of Credit Related

Person for wrongfully honoring a presentation under any U.S. Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by U.S. Borrower to U.S. Issuing Lender in respect of the honored presentation in connection with such U.S. Letter of Credit under Sections 2.11(a)(ii), *plus* interest at the rate then applicable to Base Rate Loans hereunder. U.S. Borrower shall take action to avoid and mitigate the amount of any damages claimed against U.S. Issuing Lender, U.S. Underlying Issuer or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the U.S. Letters of Credit. Any claim by U.S. Borrower under or in connection with U.S. Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by U.S. Borrowers as a result of the breach or alleged wrongful conduct complained of, and (y) the amount (if any) of the loss that would have been avoided had U.S. Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing U.S. Issuing Lender or U.S. Underlying Issuer to effect a cure.

(xvii)    In the event of a direct conflict between the provisions of this Section 2.11(a) and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11(a) shall control and govern.

(xviii)    The provisions of this Section 2.11 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any U.S. Letters of Credit that remain outstanding.

(b)        **Canadian Letters of Credit**

(i)    Subject to the terms and conditions of this Agreement, upon the request of Canadian Borrower made in accordance herewith, the Canadian Issuing Lender agrees to issue, or to cause a Canadian Underlying Issuer (including, as Canadian Issuing Lender's agent) to issue, a requested standby Canadian Letter of Credit or a sight commercial Canadian Letter of Credit for the account of Canadian Borrower. If Canadian Issuing Lender, at its option, elects to cause a Canadian Underlying Issuer to issue a requested Canadian Letter of Credit, then Canadian Issuing Lender agrees that it will enter into arrangements relative to the reimbursement of such Canadian Underlying Issuer (which may include, among, other means, by becoming an applicant with respect to such Canadian Letter of Credit or entering into undertakings which provide for reimbursements of such Canadian Underlying Issuer with respect to such Canadian Letter of Credit; each such obligation or undertaking, irrespective of whether in writing, a "Canadian Reimbursement Undertaking") with respect to Canadian Letters of Credit issued by such Canadian Underlying Issuer. By submitting a request to Canadian Issuing Lender for the issuance of a Canadian Letter of Credit, Canadian Borrower shall be deemed to have requested that Canadian Issuing Lender issue or that a Canadian Underlying Issuer issue the requested Canadian Letter of Credit and to have requested Canadian Issuing Lender to issue a Canadian Reimbursement Undertaking with respect to such requested Canadian Letter of Credit if it is to be issued by a Canadian Underlying Issuer (it being expressly acknowledged and agreed by Canadian Borrower that Canadian Borrower is and shall be deemed to be an applicant (within the meaning of Section 5-102(a)(2) of the Code) with respect to each Canadian Underlying Letter of Credit). Each request for the issuance of a Canadian Letter of Credit, or the amendment, renewal, or extension of any outstanding Canadian Letter of Credit, shall be made in writing by an Authorized Person and delivered to the Canadian Issuing Lender and Agent via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to the Agent and the Canadian Issuing Lender in its Permitted Discretion and shall specify (A) the amount of such Canadian Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Canadian Letter of Credit, (C) the expiration date of such Canadian Letter of Credit,

(D) the name and address of the beneficiary of the Canadian Letter of Credit, and (E) such other information (including the conditions of drawing and, in the case of an amendment, renewal, or extension, identification of the outstanding Canadian Letter of Credit to be so amended, renewed, or extended) as shall be reasonably necessary to prepare, amend, renew, or extend such Canadian Letter of Credit, and shall be accompanied by such Issuer Documents as Agent or Canadian Issuing Lender or a Canadian Underlying Issuer may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Canadian Issuing Lender or Canadian Underlying Issuer, as applicable, generally requests for Canadian Letters of Credit in similar circumstances. Canadian Issuing Lender's and Canadian Underlying Issuer's records of the content of any such request will be conclusive. Each Canadian Letter of Credit shall be denominated in U.S. Dollars. Anything contained herein to the contrary notwithstanding, the Canadian Issuing Lender may, but shall not be obligated to issue, or cause the issuance of a Canadian Letter of Credit or to issue a Canadian Reimbursement Undertaking in respect of a Canadian Underlying Letter of Credit, in either case, that supports the obligations of a Loan Party or its Subsidiaries in respect of (1) a lease of real property, or (2) an employment contract. The Canadian Issuing Lender shall have no obligation to issue a Canadian Letter of Credit or a Canadian Reimbursement Undertaking in respect of a Canadian Underlying Letter of Credit, in either case, if any of the following would result after giving effect to the requested issuance:

(1)    the Canadian Letter of Credit Usage would exceed the U.S. Dollar Equivalent of the Canadian Borrowing Base *less* the outstanding amount of Canadian Advances (inclusive of Canadian Swing Loans), or

(2)    the Canadian Letter of Credit Usage would exceed the Canadian L/C Sublimit, or

(3)    the Canadian Letter of Credit Usage would exceed the Maximum Canadian Revolver Amount less the outstanding amount of Canadian Advances (including Canadian Swing Loans).

(ii)    Canadian Borrower and the Lender Group hereby acknowledge and agree that all Pre-Petition Canadian Letters of Credit shall constitute Canadian Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Pre-Petition Canadian Letters of Credit were issued by Canadian Issuing Lender or a Canadian Underlying Issuer under this Agreement at the request of Canadian Borrower on the Closing Date. Any Canadian Issuing Lender or Canadian Underlying Issuer (other than The Toronto Dominion Bank, Wells Fargo or any of their Affiliates) shall notify Agent in writing no later than the Business Day prior to the Business Day on which such Canadian Issuing Lender or Canadian Underlying Issuer issues any Canadian Letter of Credit. In addition, each Canadian Issuing Lender and Canadian Underlying Issuer (other than The Toronto Dominion Bank, Wells Fargo or any of their Affiliates) shall, on the first Business Day of each week, submit to Agent a report detailing the daily undrawn amount of each Canadian Letter of Credit issued by such Canadian Issuing Lender and Canadian Underlying Issuer during the prior calendar week. Each Canadian Letter of Credit shall be in form and substance reasonably acceptable to the Canadian Issuing Lender, including the requirement that the amounts payable thereunder must be payable in either Canadian Dollars or U.S. Dollars. If Canadian Issuing Lender makes a payment under a Canadian Letter of Credit or a Canadian Underlying Issuer makes a payment under a Canadian Underlying Letter of Credit, Canadian Borrower shall pay to Agent an amount equal to such Canadian Letter of Credit Disbursement, not later than 11:00 a.m. (California time), on the date that such Canadian Letter of Credit Disbursement is made, if Canadian Borrower shall have received written or telephonic notice of such Letter of Credit Disbursement prior to 10:00 a.m., California time, on such date, or, if such notice has not been received by Canadian Borrower prior to such time on such date, then not later than 11:00 a.m., California time, on the Business Day that Canadian Borrower receives such notice, if such notice is

received prior to 10:00 a.m., California time, on the date of receipt, and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Canadian Advance hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to Canadian Advances that are Base Rate Loans. If a Canadian Letter of Credit Disbursement is deemed to be a Canadian Advance hereunder, Canadian Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Canadian Issuing Lender shall be automatically converted into an obligation to pay the resulting Canadian Advance. Promptly following receipt by Agent of any payment from Canadian Borrower pursuant to this paragraph, Agent shall distribute such payment to the Canadian Issuing Lender or, to the extent that Canadian Lenders have made payments pursuant to this Section 2.11(b)(ii) to reimburse the Canadian Issuing Lender, then to such Canadian Lenders and the Canadian Issuing Lender as their interests may appear.

(iii)    Each standby Canadian Letter of Credit (and corresponding Canadian Underlying Letter of Credit) shall have an expiry date no later than the date that is twelve months after the issuance or renewal of such Canadian Letter of Credit; provided, that any standby Canadian Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any Canadian Letter of Credit which extends beyond the Maturity Date, Letter of Credit Collateralization shall be provided therefor on or before the date that is five Business Days prior to the Maturity Date. Each commercial Canadian Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial Canadian Letter of Credit and (ii) five Business Days prior to the Maturity Date.

(iv)    Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(b)(i), each Canadian Lender with a Canadian Revolver Commitment agrees to fund its Pro Rata Share of any Canadian Advance deemed made pursuant to the foregoing subsection on the same terms and conditions as if Canadian Borrower had requested the amount thereof as a Canadian Advance and Agent shall promptly pay to Canadian Issuing Lender the amounts so received by it from the Canadian Lenders. By the issuance of a Canadian Letter of Credit or a Canadian Reimbursement Undertaking (or an amendment, renewal or extension of a Canadian Letter of Credit or a Canadian Reimbursement Undertaking increasing the amount thereof) and without any further action on the part of the Canadian Issuing Lender or the Canadian Lenders with Canadian Revolver Commitments, the Canadian Issuing Lender shall be deemed to have granted to each Canadian Lender with a Canadian Revolver Commitment, and each Canadian Lender with a Canadian Revolver Commitment shall be deemed to have purchased, a participation in each Canadian Letter of Credit issued by Canadian Issuing Lender and each Canadian Reimbursement Undertaking, in an amount equal to its Pro Rata Share of such Canadian Letter of Credit or a Canadian Reimbursement Undertaking, and each such Canadian Lender agrees to pay to Agent, for the account of the Canadian Issuing Lender, such Canadian Lender's Pro Rata Share of any Letter of Credit Disbursement made by the Canadian Issuing Lender or a Canadian Underlying Issuer under such Canadian Letter of Credit. In consideration and in furtherance of the foregoing, each Canadian Lender with a Canadian Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of the Canadian Issuing Lender, such Canadian Lender's Pro Rata Share of each Canadian Letter of Credit Disbursement made by the Canadian Issuing Lender or Canadian Underlying Issuer and not reimbursed by Canadian Borrower (each such amount so paid until reimbursed, a "Canadian Unpaid Drawing") on the date due as provided in Section 2.11(b)(i), or of any reimbursement payment required to be refunded to Canadian Borrower for any reason. Each Canadian Lender with a Canadian Revolver Commitment acknowledges and agrees that its obligation to deliver to Agent, for the account of the Canadian Issuing Lender, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(b)(iv) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3. If any such Canadian Lender fails to make available to Agent the amount of such Lender's Pro Rata Share of a

Canadian Letter of Credit Disbursement as provided in this Section, such Canadian Lender shall be deemed to be a Defaulting Lender and Agent (for the account of the Canadian Issuing Lender) shall be entitled to recover such amount on demand from such Canadian Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(v)     Canadian Borrower hereby agrees that each Canadian Underlying Issuer shall be entitled to the benefits of <u>Section 10.3</u>.  Canadian Borrower agrees to be bound by the Canadian Underlying Issuer's regulations and interpretations of any Canadian Letter of Credit or by Canadian Issuing Lender's interpretations of any Canadian Reimbursement Undertaking even though this interpretation may be different from Canadian Borrower's own, and Canadian Borrower understands and agrees that none of the Canadian Issuing Lender, the Lender Group, or any Canadian Underlying Issuer shall be liable for any error, negligence, or mistake, whether of omission or commission, in following Canadian Borrower's instructions or those contained in the Canadian Letter of Credit or any modifications, amendments, or supplements thereto. Canadian Borrower understands that the Canadian Reimbursement Undertakings may require Canadian Issuing Lender to indemnify the Canadian Underlying Issuer for certain costs or liabilities arising out of claims by Canadian Borrower against such Canadian Underlying Issuer, except to the extent that a court of competent jurisdiction in a final and non-appealable decision determines that such error, negligence or mistake resulted from the gross negligence or willful misconduct of any U.S. Issuing Lender, any other member of the Lender Group, or any U.S. Underlying Issuer. Canadian Borrower hereby acknowledges and agrees that none of the Canadian Issuing Lender, any other member of the Lender Group, or any Canadian Underlying Issuer shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Canadian Letter of Credit, except to the extent that a court of competent jurisdiction in a final and non-appealable decision determines that such error, delay, negligence or mistake resulted from the gross negligence or willful misconduct of any Canadian Issuing Lender, any other member of the Lender Group, or any Canadian Underlying Issuer.

(vi)     Canadian Borrower hereby authorizes and directs any Canadian Underlying Issuer to deliver to the Canadian Issuing Lender all instruments, documents, and other writings and property received by such Canadian Underlying Issuer pursuant to such Canadian Underlying Letter of Credit and to accept and rely upon the Canadian Issuing Lender's instructions with respect to all matters arising in connection with such Canadian Underlying Letter of Credit and the related application.

(vii)     Canadian Borrower agrees to pay immediately upon demand to the Canadian Issuing Lender a fee in respect of each Canadian Letter of Credit issued hereunder by such Canadian Issuing Lender, for the period from and including the date of issuance of such Letter of Credit to but excluding the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% per annum or such other amount as is agreed in a separate writing between the applicable Canadian Issuing Lender and Canadian Borrower on the average Daily Balance of Canadian Letter of Credit Exposure attributable to Letters of Credit issued by it (excluding any portion attributable to Unpaid Drawings) during the immediately preceding month (or portion thereof). Such fee shall be due and payable on the first Business Day of each month and on the Payoff Date. In addition, Canadian Borrower agrees to pay directly to the applicable Canadian Issuing Lender as Lender Group Expenses upon each issuance of, drawing under and/or amendment, renewal or extension of a Canadian Letter of Credit issued by it such amount as such Canadian Issuing Lender and Canadian Borrower shall have agreed upon for issuances of, drawings under or amendments of, renewals or extensions of, Letters of Credit issued by it.

(viii)     If by reason of (A) any change after the Closing Date in any Applicable Law, or any change in the interpretation or application thereof by any Governmental Authority, or

(B) compliance by the Canadian Issuing Lender, any Lender, or Canadian Underlying Issuer with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board made after the Closing Date:

(1)     (A) any reserve, deposit, or similar requirement (other than reserves, deposits, or similar requirements of a de minimis nature) is or shall be imposed or modified in respect of any Canadian Letter of Credit issued or caused to be issued hereunder or hereby, or

(2)     there shall be imposed on the Canadian Issuing Lender, any Lender, or Canadian Underlying Issuer any other condition regarding any Canadian Letter of Credit or Canadian Reimbursement Undertaking,

and the result of the foregoing is to increase, directly or indirectly, the cost to the Canadian Issuing Lender, any Lender, or a Canadian Underlying Issuer of issuing, making, guaranteeing, or maintaining any Canadian Reimbursement Undertaking or Canadian Letter of Credit or to reduce the amount receivable in respect thereof (other than any such increase or reduction attributable to taxes which is indemnified under Section 16), then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify in writing Canadian Borrower, and Canadian Borrower shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate the Canadian Issuing Lender, any Lender, or a Canadian Underlying Issuer for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, however, that Canadian Borrower shall not be required to provide any compensation pursuant to this Section for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Canadian Borrower; provided further that if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. The determination by Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the basis for the determination of such reimbursement and calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(ix)     Canadian Borrower is responsible for the final text of the Canadian Letters of Credit as issued by a Canadian Issuing Lender or a Canadian Underlying Issuer, irrespective of any assistance any Canadian Issuing Lender or any Canadian Underlying Issuer may provide such as drafting or recommending text or by such Canadian Issuing Lender's or such Canadian Underlying Issuer's use or refusal to use text submitted by Canadian Borrower. Canadian Borrower understands that the final form of any Canadian Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by a Canadian Issuing Lender or a Canadian Underlying Issuer, and Canadian Borrower hereby consents to such revisions and changes not materially different from the application executed in connection therewith. Canadian Borrower is solely responsible for the suitability of the Canadian Letter of Credit for Canadian Borrower's purposes. If Canadian Borrower requests Canadian Issuing Lender or a Canadian Underlying Issuer to issue a Canadian Letter of Credit for an affiliated or unaffiliated third party (a "Canadian Account Party"), (i) such Canadian Account Party shall have no rights against any Canadian Issuing Lender or any Canadian Underlying Issuer; (ii) Canadian Borrower shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Canadian Letter of Credit shall be among Canadian Issuing Lender, the Canadian Underlying Issuer and Canadian Borrower. Canadian Borrower will examine the copy of the Canadian Letter of Credit and any other documents sent by a Canadian Issuing Lender or a Canadian Underlying Issuer in connection therewith and shall promptly notify Canadian Issuing Lender (not later than three (3) Business Days following Canadian Borrower's receipt of documents from a Canadian Issuing Lender or a Canadian Underlying

Issuer) of any non-compliance with Canadian Borrower's instructions and of any discrepancy in any document under any presentment or other irregularity. Canadian Borrower understands and agrees that any Canadian Issuing Lender and any Canadian Underlying Issuer is not required to extend the expiration date of any Canadian Letter of Credit for any reason. With respect to any Canadian Letter of Credit containing an "automatic amendment" to extend the expiration date of such Canadian Letter of Credit, Canadian Issuing Lender or Canadian Underlying Issuer, in its sole and absolute discretion, may give notice of nonrenewal of such Canadian Letter of Credit and, if Canadian Borrower does not at any time want the then current expiration date of such Canadian Letter of Credit to be extended, Canadian Borrower will so notify Agent and Canadian Issuing Lender and Canadian Underlying Issuer at least 30 calendar days before Canadian Issuing Lender or the Canadian Underlying Issuer is required to notify the beneficiary of such Canadian Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Canadian Letter of Credit.

(x)    Borrowers' reimbursement and payment obligations under this Section 2.11(b) are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever; provided, that subject to Section 2.11(b)(iv) above, the foregoing shall not release any Canadian Issuing Lender or any Canadian Underlying Issuer from such liability to Canadian Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against a Canadian Issuing Lender or a Canadian Underlying Issuer following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrowers to a Canadian Issuing Lender or a Canadian Underlying Issuer arising under, or in connection with, this Section 2.11(b) or any Canadian Letter of Credit.

(xi)    Without limiting any other provision of this Agreement, Canadian Issuing Lender, Canadian Underlying Issuer and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrowers for, and Canadian Issuing Lender's and Canadian Underlying Issuer's rights and remedies against Canadian Borrower and the obligation of Borrowers to reimburse such Canadian Issuing Lender or such Canadian Underlying Issuer for each drawing under each Canadian Letter of Credit shall not be impaired by:

(1)    honor of a presentation under any Canadian Letter of Credit that on its face substantially complies with the terms and conditions of such Canadian Letter of Credit, even if the Canadian Letter of Credit requires strict compliance by the beneficiary;

(2)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(3)    acceptance as a draft of any written or electronic demand or request for payment under a Canadian Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Canadian Letter of Credit;

(4)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Canadian Issuing Lender's or Underlying Issuer's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Canadian Letter of Credit);

(5)    acting upon any instruction or request relative to a Canadian Letter of Credit or requested Canadian Letter of Credit that Canadian Issuing Lender or a Canadian Underlying Issuer in good faith believes to have been given by a Person authorized to give such instruction or request;

(6)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Canadian Borrower;

(7)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and Canadian Borrower or any of the parties to the underlying transaction to which the Canadian Letter of Credit relates;

(8)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(9)    payment to any presenting bank (designated or permitted by the terms of the applicable Canadian Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(10)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Canadian Issuing Lender or Canadian Underlying Issuer has issued, confirmed, advised or negotiated such Canadian Letter of Credit, as the case may be;

(11)    honor of a presentation after the expiration date of any Canadian Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Canadian Issuing Lender or Canadian Underlying Issuer if subsequently Canadian Issuing Lender, Canadian Underlying Issuer or any court or other finder of fact determines such presentation should have been honored;

(12)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(13)    honor of a presentation that is subsequently determined by Canadian Issuing Lender or Canadian Underlying Issuer to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(xii)    If (i) any Event of Default shall occur and be continuing, or (ii) Availability shall at any time be less than zero, then on the Business Day following the date when the Borrowers receives notice from Agent or the Required Lenders (or, if the maturity of the Obligations has been accelerated, Revolving Lenders with Canadian Letter of Credit Exposure representing greater than 50% of the total Canadian Letter Credit Exposure) demanding Letter of Credit Collateralization pursuant to this Section 2.11(b) upon such demand, Borrowers shall provide Letter of Credit Collateralization with respect to the then existing Canadian Letter of Credit Usage. If Borrowers fail to provide Letter of Credit Collateralization as required by this Section 2.11(b), the Canadian Lenders may (and, upon direction of Agent, shall) advance, as a Canadian Advance, the amount of the cash collateral required pursuant to the Letter of Credit Collateralization provision so that the then existing Canadian Letter of Credit Usage is cash collateralized in accordance with the Letter of Credit Collateralization provision (whether or not the

Canadian Revolver Commitments have terminated, an Overadvance exists or the conditions in <u>Section 3</u> are satisfied.

(xiii)    Unless otherwise expressly agreed by Canadian Issuing Lender, Canadian Underlying Issuer and Canadian Borrower when a Canadian Letter of Credit is issued (including any such agreement applicable to Pre-Petition Letters of Credit), (i) the rules of the ISP shall apply to each standby Canadian Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Canadian Letter of Credit.

(xiv)    Canadian Issuing Lender and Canadian Underlying Issuer shall be deemed to have acted with due diligence and reasonable care if Canadian Issuing Lender's or Canadian Underlying Issuer's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement

(xv)    At Canadian Borrower's costs and expense, Canadian Borrower shall execute and deliver to Canadian Issuing Lender and Canadian Underlying Issuer such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by Canadian Issuing Lender or Canadian Underlying Issuer to enable Canadian Issuing Lender or Canadian Underlying Issuer to issue any Canadian Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce Canadian Issuing Lenders' or Canadian Underlying Issuer's rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document. Canadian Borrower irrevocably appoints Canadian Issuing Lender and Canadian Underlying Issuer as its attorney-in-fact and authorizes Canadian Issuing Lender and Canadian Underlying Issuer, without notice to any Borrower, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents. The power of attorney granted by Canadian Borrower is limited solely to such actions related to the issuance, confirmation or amendment of any Canadian Letter of Credit and to ancillary documents or letters customary in the letter of credit business. This appointment is coupled with an interest.

(xvi)    Canadian Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Canadian Issuing Lender, Canadian Underlying Issuer and their respective branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Canadian Issuing Lender and Canadian Underlying Issuer, a "<u>Letter of Credit Related Person</u>") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by <u>Section 16</u>) (the "<u>Letter of Credit Indemnified Costs</u>"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence; <u>provided</u>, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. This indemnification provision shall survive termination of this Agreement and all Letters of Credit. The liability of Canadian Issuing Lender or Canadian Underlying Issuer (or any other Letter of Credit Related

Person) under, in connection with or arising out of any Canadian Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Canadian Borrower that are caused directly by Canadian Issuing Lender's or Canadian Underlying Issuer's gross negligence or willful misconduct in (i) honoring a presentation under a Canadian Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Canadian Letter of Credit, (ii) failing to honor a presentation under a Canadian Letter of Credit that strictly complies with the terms and conditions of such Canadian Letter of Credit, or (iii) retaining Drawing Documents presented under a Canadian Letter of Credit. Canadian Borrowers' aggregate remedies against Canadian Issuing Lender and any other Letter of Credit Related Person for wrongfully honoring a presentation under any Canadian Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Canadian Borrower to Canadian Issuing Lender in respect of the honored presentation in connection with such Canadian Letter of Credit under Sections 2.11(b)(ii), *plus* interest at the rate then applicable to Base Rate Loans hereunder. Canadian Borrower shall take action to avoid and mitigate the amount of any damages claimed against Canadian Issuing Lender, Canadian Underlying Issuer or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Canadian Letters of Credit. Any claim by Canadian Borrower under or in connection with Canadian Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Canadian Borrowers as a result of the breach or alleged wrongful conduct complained of, and (y) the amount (if any) of the loss that would have been avoided had Canadian Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Canadian Issuing Lender or Canadian Underlying Issuer to effect a cure.

(xvii)    In the event of a direct conflict between the provisions of this Section 2.11(b) and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11(b) shall control and govern.

(xviii)    The provisions of this Section 2.11 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Canadian Letters of Credit that remain outstanding.

(c)    **Defaulting Lenders.** In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, no Issuing Lender shall be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.3(g), or (ii) such Issuing Lender has not otherwise entered into arrangements reasonably satisfactory to it and Borrowers to eliminate Issuing Lender's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include a Borrower cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.3(g). Additionally, an Issuing Lender shall have no obligation to issue or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Lender from issuing such Letter of Credit, or any law applicable to Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Lender shall prohibit or request that such Issuing Lender refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of such Issuing Lender applicable to letters of credit generally.

(d)    **New or Successor Letter of Credit Issuer**. Any Issuing Lender may resign as an Issuing Lender upon 30 days' prior written notice to the Agent, the Lenders and Borrowers. Subject to

the terms of the following sentence, Borrowers may add Issuing Lenders at any time upon notice to the Agent and with the consent (not to be unreasonably withheld or delayed) of the Agent. If an Issuing Lender shall resign, then Borrowers may appoint a successor issuer of Letters of Credit, or if Borrowers shall decide to add a new Issuing Lender under this Agreement, then Borrowers may appoint a new Issuing Lender, as the case may be, in either case, with the consent of the Agent (such consent not to be unreasonably withheld), whereupon such successor issuer shall succeed to the rights, powers and duties of the resigning Issuing Lender under this Agreement and the other Loan Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of a Issuing Lender hereunder, and the term "U.S. Issuing Lender" or "Canadian Issuing Lender" shall mean such successor or such new issuer of Letters of Credit effective upon such appointment. At the time such resignation shall become effective, Borrowers shall pay to the resigning Issuing Lender all accrued and unpaid fees pursuant to Sections 2.11(a)(vii) and 2.11(b)(vii), as applicable. The acceptance of any appointment as a Issuing Lender hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form satisfactory to Borrowers and the Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become a "U.S. Issuing Lender" or "Canadian Issuing Lender" hereunder. After the resignation of an Issuing Lender hereunder, the resigning Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of a Issuing Lender under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit. In connection with any resignation pursuant to this Section 2.11(d), only to the extent that a successor issuer of Letters of Credit shall have been appointed, either (i) Borrowers, the resigning Issuing Lender and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning Issuing Lender replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) Borrowers shall cause the successor issuer of Letters of Credit, if such successor issuer is reasonably satisfactory to the resigning Issuing Lender, to issue "back-stop" Letters of Credit naming the resigning Issuing Lender as beneficiary for each outstanding Letter of Credit issued by the resigning Issuing Lender, which new Letters of Credit shall have a face amount equal to the Letters of Credit being back-stopped and the sole requirement for drawing on such new Letters of Credit shall be a drawing on the corresponding back-stopped Letters of Credit. After any resigning Issuing Lender's resignation as Issuing Lender, the provisions of this Agreement relating to a Issuing Lender shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was a Issuing Lender under this Agreement or (B) at any time with respect to Letters of Credit issued by such Issuing Lender.

2.12     **LIBOR Option**.

(a)         **Interest and Interest Payment Dates**. Borrower, in lieu of having interest charged at the rate based upon the Base Rate, shall have the option, subject to Section 2.12(b) below (the "LIBOR Option") to have interest on all or a portion of its Advances be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto, (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof. On the last day of each applicable Interest Period, unless the Borrower properly has exercised the LIBOR Option with respect thereto the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans, of the same type hereunder. At any time that an Event of Default has occurred and is continuing, at the written election of Agent or the Required Lenders, no Borrower shall any longer have the option to request that Advances bear interest at a rate based upon the LIBOR Rate and the Agent shall have the right to convert

the interest rate on all outstanding LIBOR Rate Loans to the rate applicable to Base Rate Loans hereunder.

      (b)      **LIBOR Election**.

      (i)      Either Borrower may, at any time and from time to time, so long as such Borrower has not received a notice from Agent, after the occurrence and during the continuance of an Event of Default, of the election of Agent or the Required Lenders to terminate the right of Borrowers to exercise the LIBOR Option during the continuance of such Event of Default, elect to exercise the LIBOR Option by notifying the Agent prior to 11:00 a.m. (California time) at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of such Borrower's election of the LIBOR Option for a permitted portion of its Advances and an Interest Period pursuant to this Section shall be made by delivery to the Agent of a LIBOR Notice received by Agent before the LIBOR Deadline. Promptly upon its receipt of each such LIBOR Notice, the Agent shall provide a copy thereof to each of the affected Lenders.

      (ii)      Each LIBOR Notice shall be irrevocable and binding on Borrower. In connection with each LIBOR Rate Loan, the applicable Borrower shall, after receipt of a written request by a Lender (which request shall set forth in reasonable detail the basis for requesting such amount and, absent clearly demonstrable error, the amount requested shall be final and conclusive and binding upon all parties hereto), pay to the Agent for the account of such Lender within 30 days of the date of its receipt of such request any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of (A) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice, delivered pursuant hereto, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund or maintain such LIBOR Rate Loan (such losses, costs, or expenses, "Funding Losses").

      (iii)      Borrowers shall have no more than seven (7) LIBOR Rate Loans in effect at any given time in the aggregate. Borrowers only may exercise the LIBOR Option for LIBOR Rate Loans of at least $1,000,000.

      (c)      **Conversion**. Borrowers may convert LIBOR Rate Loans to Base Rate Loans at any time; provided, however, that, in each case, in the event that any LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Agent of proceeds of the Collections of the Loan Parties to the extent permitted pursuant to the terms of this Agreement, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrowers shall comply with the requirements of Section 2.12 (b)(ii) above.

      (d)      **Special Provisions Applicable to the LIBOR Rate**.

      (i)      If by reason of (X) any change after the Closing Date in any Applicable Law, or any change in the interpretation, implementation or application thereof by any Governmental Authority, or (Y) compliance by any Lender with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board made after the Closing Date:

(1)     any reserve, deposit, or similar requirement (other than reserves, deposits, or similar requirements of a *de minimis* nature and reserve requirements taken into account in determining Reserve Percentages) is or shall be imposed or modified in respect of any Lender hereunder, or

(2)     there shall be imposed on any Lender or on the London interbank market any other condition or cost or expense affecting this Agreement or LIBOR Rate Loans made by such Lender,

and the result of the foregoing is to increase, directly or indirectly, the cost to such Lender of making, converting into, continuing or maintaining LIBOR Rate Loans or to reduce the amount receivable in respect thereof (other than increases or reductions of a *de minimis* nature and other than any such increase or reduction (i) attributable to taxes indemnified under Section 16, (ii) net income taxes and franchise taxes (imposed in lieu of net income), or any U.S. or Canadian federal or capital taxes, imposed (in each case) on any Lender as a result of a present or former connection between such Lender and the jurisdiction of the Governmental Authority imposing such tax (other than any such connection arising from execution or delivery of, receipt of any payments under, performance under or enforcement of, or any other transactions occurring pursuant to, this Agreement or any other Loan Document)) then, and in any such case, the Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify in writing applicable Borrower thereof, and applicable Borrower shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate such Lender for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, however, that Borrowers shall not be required to provide any compensation pursuant to this Section for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to the applicable Borrower; provided further that if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. The determination by Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the basis for the determination of such reimbursement and calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(ii)     In the event that (A) due to any contingency occurring after the Closing Date that adversely affects the interbank LIBOR market or (B) due to any change after the Closing Date in any Applicable Law, or any change in the interpretation or application thereof by any Governmental Authority, shall in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans, or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to the Agent and Borrowers and the Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) such Lender shall not be required to provide LIBOR Rate Loans to the Borrower until such time as it determines that it would no longer be unlawful or impractical to do so.

(e)     **No Requirement of Matched Funding**. Anything to the contrary contained herein notwithstanding, none of Agent, any Lender, or of their respective Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Advance as to which interest accrues at the LIBOR Rate.

(f)     This Section 2.12 shall not apply to taxes to the extent duplicative of Section 16.

2.13    **Capital and Liquidity Requirements**.

(a)    If, after the Closing Date, any Lender determines that (i) the adoption of or change in any Applicable Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or any change in the interpretation implementation, or application thereof by any Governmental Authority charged with the administration thereof, in any such case occurring after the Closing Date, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law) or quantitative liquidity requirements, in each case made or adopted after the Closing Date, has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrowers and Agent in writing thereof. Following receipt of such notice, the applicable Borrower agrees to pay such Lender the amount as will compensate such Lender or the holding company for such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail the basis for and such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that no Borrower shall be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that such Lender notifies such Borrower of such law, rule, regulation or guideline giving rise to such reductions and of such Lender's intention to claim compensation therefor; <u>provided</u> <u>further</u> that if such claim arises by reason of the adoption of or change in any law, rule, regulation or guideline that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. For purposes of this <u>Section 2.13(a)</u>, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated under Basel III, shall in each case described in clauses (x) and (y) above, be deemed to be a change in Applicable Law, regardless of the date enacted, adopted, issued or implemented.

(b)    If any Lender, any Issuing Lender or any Underlying Issuer requests additional or increased costs pursuant to <u>Sections 2.11(a)(vi), 2.11(b)(vi), 2.12(d)(i), 16</u> or amounts under <u>Section 2.13(a)</u> or declared its ability to make LIBOR Rate Loans impractical or unlawful pursuant to <u>Section 2.12(d)(ii)</u> (any such Person, an "<u>Affected Lender</u>"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to <u>Sections 2.11(a)(viii), 2.11(b)(viii), 2.12(d)(i), 2.12(d)(ii), 2.13(a)</u> or <u>16</u>, as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Rate Loans, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. The applicable Borrower agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment.

(c)    This <u>Section 2.13</u> shall not apply to taxes to the extent duplicative of underline{Section 16}.

2.14    **Certain Bankruptcy Matters**.

(a)    Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to the Carve Out and the DIP Intercreditor Agreement, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against each Borrower or the other Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (and subject to entry of the Final Order, the Debtors' rights to charge the DIP Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or any equivalent provision of Canadian Bankruptcy and Insolvency Law and all superpriority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court or the CCAA Court, (ii) pursuant to Bankruptcy Code Section 364(c)(2) and any applicable provisions of the CCAA, be secured by a perfected first-priority security interest in the DIP Collateral, and any proceeds and products thereof in whatever form received, provided, further that the DIP Collateral shall exclude the Debtors' and the CCAA Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code and any applicable provisions of the CCAA, or other Avoidance Actions, but subject only to, and effective upon, entry of the Final Order and the CCAA Orders, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise, in each case, to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases and the CCAA Cases, (iii) pursuant to Bankruptcy Code Section 364(c)(3) and any applicable provisions of the CCAA, be secured by a perfected lien on all DIP Collateral, to the extent that such DIP Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases and the CCAA Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code and any applicable provisions of the CCAA and (iv) pursuant to Bankruptcy Code Section 364(d) and any applicable provisions of the CCAA, be secured by a perfected priming first priority lien on all DIP Collateral, to the extent that such DIP Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases and the CCAA Cases that secure the obligations of the Loan Parties under or in connection with the Pre-Petition Credit Agreement.

(b)    In the event of a conflict between, or inconsistency among, the Orders, on the one hand, and any Loan Document, on the other hand, the Orders, as applicable, shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere (except as specifically described below):

(i)    the parties hereto agree, and the Orders shall provide, that the Loan Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or opposable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders, the CCAA Orders or any other Loan Document. Subject to the limitations set forth herein, if the Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, hypothecs, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or opposable or perfect all or any portion of the Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that each of the Interim Order and the CCAA Initial Order is entered, and (B)

shall not negate or impair the validity or effectiveness of this <u>Section 2.14</u> or of the perfection or opposability of any other Liens in favor of the Agent, for the benefit of the Lenders and the other Loan Parties, on the Collateral; and

(ii)    except as otherwise agreed to by the Lenders (including, without limitation, in the DIP Intercreditor Agreement) or as otherwise permitted or contemplated by this Agreement, the Orders or the other Loan Documents, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Loan Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, opposability enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code, the CCAA or otherwise), or by dismissal or conversion of the Cases or the CCAA Cases, or by any other act or omission whatsoever.

(d)    Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve Out and the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or the CCAA Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Agent against the Borrowers in respect of any Obligations;

(ii)    other than as provided in the Orders or the Loan Documents, the Agent's Liens on the Collateral shall constitute valid, enforceable, opposable and perfected Liens, and, except with respect to the Carve Out (and as otherwise set forth in the DIP Intercreditor Agreement and in the Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)    the parties hereto agree, and the Orders shall provide, that the Agent's Liens on the Collateral shall continue to be valid, enforceable, opposable and perfected without the need for the Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect or render opposable the Agent's Liens under applicable non-bankruptcy law.

(e)    In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code or the CCAA, including Section 363 of the Bankruptcy Code and section 36 of the CCAA or as part of any plan subject to confirmation under Section 1129 of the Bankruptcy Code or any applicable provision of the CCAA, or at any sale or foreclosure conducted by the Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code or any applicable provision of the CCAA, each Borrower and each other Loan Party hereby gives the Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

2.15    **Joint and Several Liability of Borrowers**.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in

consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations until they are paid in full.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.15(d)) or any other circumstances whatsoever until the Obligations are paid in full (subject to Section 17.16).

(e)     Except as otherwise expressly provided in this Agreement and without waiver of any right that any Borrower has hereunder vis-à-vis any Secured Party with respect to the Advances and Letters of Credit that were made to such Borrower (and other interest, fees, expenses and other Obligations related thereto), each Borrower in connection with its agreement to be jointly and severally liable for the Obligations of the other Borrower only hereby waives notice of acceptance of its joint and several liability, notice of any Advances or Letters of Credit issued under or pursuant to this Agreement on behalf of the other Borrower, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement with respect to the other Borrower, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations of the other Borrower, any requirement of diligence or to mitigate damages by the Secured Parties to the other Borrower and, generally, to the extent permitted by applicable law and applicable to the enforcement of its agreement to be jointly and severally liable for the Obligations of the other Borrower, all demands, notices and other formalities of every kind in connection with this Agreement. Each Borrower in connection with its agreement to be jointly and severally liable for the Obligations of the other Borrower only hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations of the other Borrower, the acceptance of any payment of any of the Obligations of the other Borrower, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by the other Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations of the other Borrower, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations of the other Borrower or the addition, substitution or release, in whole or in part, of the other Borrower from its obligations hereunder. Without limiting the generality of the foregoing, each Borrower with respect to the Obligations of the other Borrower assents to any other action or delay in acting or failure to act on the part of Agent or Lender with respect to the failure by the other Borrower to comply with any of its Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving the other Borrower, in whole or in part from its Obligations, it being the intention of each Borrower that until the Obligations are paid in full, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the

extent of such performance. The Obligations of each Borrower under this <u>Section 2.15</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to the other Borrower or Agent or Lender. For avoidance of doubt, no provision in this <u>Section 2.15</u> shall be interpreted as a waiver of rights hereunder by a Borrower with respect to Advances and Letters of Credit that were made to such Borrower (and other and other interest, fees, expenses and other Obligations related thereto) (it being understood that such rights shall continue to exist as if such Borrower were the only Borrower under this Agreement).

(f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of the other Borrower and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations of the other Borrower. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of the other Borrower's financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations of the other Borrower.

(g)     Except as otherwise expressly provided in this Agreement and without waiver of any right a Borrower has hereunder with respect to its Advances and Letters of Credit that were made to such Borrower (and other interest, fees, expenses and other Obligations related thereto), each Borrower waives all rights and defenses arising out of an election of remedies by Agent or any Lender, other than the defense that the Obligations have been paid in full, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Agent's or such Lender's rights of subrogation and reimbursement against such Borrower by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(h)     Except as otherwise expressly provided in this Agreement and without waiver of any right a Borrower has hereunder with respect to its Advances and Letters of Credit that were made to such Borrower (and other interest, fees, expenses and other Obligations related thereto), each Borrower waives all rights and defenses that such Borrower may have because the Obligations are secured by Real Property, other than the defense that the Obligations have been paid in full. This means, among other things:

(1)     Agent and Lenders may collect from such Borrower without first foreclosing on any Collateral pledged by any other Borrower.

(2)     If Agent or any Lender forecloses on any Real Property Collateral pledged by Borrowers:

(A)     The amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)     Agent and Lenders may collect from such Borrower even if Agent or Lenders, by foreclosing on the Real Property Collateral, has destroyed any right such Borrower may have to collect from the other Borrowers.

(i)     This is an unconditional and irrevocable waiver of any rights and defenses such Borrower may have because the Obligations are secured by Real Property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

01:25621774.1

LEGAL_US_W # 100587566.15

(j)      The provisions of this Section 2.15 are made for the benefit of Agent, each member of the Lender Group, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against either Borrower as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, any Bank Product Provider, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied (subject to Section 17.16). If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(k)      Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations of the other Borrower or any collateral security therefor until such time as all of the Obligations have been paid in full. Except as permitted hereunder, any claim which a Borrower may have against the other Borrower with respect to any payments to Agent or any member of the Lender Group hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to a Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made to the other Borrower therefor. Notwithstanding anything to the contrary contained in this Section 2.15, no Borrower shall exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and shall not proceed or seek recourse against or with respect to any property or asset of, the other Borrower (the "Foreclosed Borrower"), including after payment in full of the Obligations, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Stock of such Foreclosed Borrower whether pursuant to the Security Agreement or otherwise.

(l)      Each Borrower hereby agrees that, upon the occurrence and during the continuance of any Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full of the Obligations. Each Borrower hereby agrees that upon the occurrence and during the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to the applicable Agent for application to the Obligations in accordance with Section 2.4(b); provided that upon the waiver of all existing Events of Default in accordance with this Agreement, the applicable Agent shall as soon as reasonably practicable repay to such Borrower any amount held by Agent that were not applied for application to the Obligations.

**3.      CONDITIONS; TERM OF AGREEMENT**

3.1    **Conditions Precedent to the Initial Extension of Credit**. The obligation of each Lender to make its initial extension of credit provided for hereunder, is subject to the fulfillment of the conditions precedent set forth on Schedule 3.1.

3.2    **Conditions Precedent to all Extensions of Credit on and after the Closing Date**. The obligation of the Lender Group (or any member thereof) to make any Advances hereunder (or to extend any other credit hereunder) at any time on and after the Closing Date shall be subject to the following conditions precedent:

(a)    the representations and warranties of Holdings and the other Loan Parties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date), in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date;

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)    the Interim Order and, after entry of the Final Order, the Final Order shall be in full force and effect and shall not have been (i) vacated, enjoined, reserved or stayed, or (ii) amended or modified without the consent of the Agent and the CCAA Initial Order and, after entry of the CCAA A&R Initial Order, the CCAA A&R Initial Order shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Agent;

(d)    each Borrowing shall be made in accordance in all material respects with the Budget, including Permitted Variances thereto, and shall have been approved by the CCAA Order, the Interim Order or the Final Order (as then applicable), which Order shall be in full force and effect and which shall not have been (i) vacated, enjoined, reserved, or stayed, or (ii) modified or amended without the consent of the Agent;

(e)    (i) there shall not have been (x) any order granted by the Bankruptcy Court or the CCAA Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party challenging, in either case, the validity, priority, perfection, opposability or enforceability of the Loan Documents or any Lien granted pursuant to the Loan Documents and (ii) no Lien granted pursuant to the Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court, CCAA Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases or the CCAA Cases, including, without limitation, the Committee Professionals; and

(f)    no Overadvance shall exist as a result of such Advance.

Notwithstanding the foregoing, the only condition to the obligation of the Lender Group (or any member thereof) to make any Advances hereunder in order to fund the Carve-Out Reserve shall be conditions precedent to such Borrowing set forth in Section 11(b) of the Orders, as applicable.

3.3     **Maturity**. This Agreement shall continue in full force and effect until the earlier of (i) the termination of this Agreement by the Borrowers in accordance with Section 3.5 or (ii) the Maturity Date. The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, subject to the Lender Group's obligations in accordance with Section 11(b) of the Orders, as applicable, shall have the right to terminate its obligations under this Agreement immediately and without notice to either Borrower upon the occurrence and during the continuation of an Event of Default.

3.4     **Effect of Maturity**. On the Maturity Date, all Commitments of the applicable Lenders to provide additional credit hereunder shall automatically be terminated and all of the Obligations of such Lenders immediately shall become due and payable without notice or demand and Borrowers shall be required to repay such Obligations in full on such date. No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until the Obligations have been paid in full and the Commitments have been terminated.

3.5     **Early Termination by Borrowers**. Borrowers have the option, at any time upon three (3) Business Day's prior written notice to the Agent, to terminate this Agreement and terminate the Commitments hereunder by paying to the Agent all of the Obligations in full. Any notice delivered by Borrowers pursuant to this Section 3.5 may be conditioned on the occurrence of a specified transaction or event and revoked if such transaction does not occur.

3.6     **Conditions Subsequent.** The obligation of the Lender Group (or any member thereof) to continue to make Advances (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of the conditions subsequent set forth on Schedule 3.6 (the failure by Holdings or Borrowers to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof, shall constitute an Event of Default).

4.     **REPRESENTATIONS AND WARRANTIES**

In order to induce the Lender Group to enter into this Agreement, each of Holdings and each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Advance (or other extension of credit, other than a continuation or conversion of any LIBOR Rate Loan) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date), in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date, and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1     **Due Organization and Qualification; Subsidiaries**.

(a)     Each Loan Party (i) is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent the concept of "good standing" exists in such Loan Party's jurisdiction), (ii) is qualified or licensed to do business in any jurisdiction where it is required to be qualified or licensed, except where the failure to be so qualified or licensed could not

reasonably be expected to result in a Material Adverse Effect, and (iii) subject to the entry of the CCAA Orders, the Interim Order or the Final Order, applicable has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)　　Set forth on <u>Schedule 4.1(b)</u> is a complete and accurate description of the authorized capital Stock of Holdings, by class, and a description of the number of shares of each such class that are issued and outstanding, in each case, as of the Closing Date (after giving effect to the Transactions). As of the Closing Date (after giving effect to the Transactions), other than as described in <u>Schedule 4.1(b)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of Holdings' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. As of the Closing Date (after giving effect to the Transactions), Holdings is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock.

(c)　　As of the Closing Date (after giving effect to the Transactions), <u>Schedule 4.1(c)</u> sets forth a complete and accurate list of Holdings' direct and indirect Subsidiaries, showing: (i) the number of shares of each class of common and Preferred Stock authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by Holdings. All of the outstanding capital Stock of each such Subsidiary (other than Subsidiaries that are (i) limited liability companies or limited partnerships organized or formed under the laws of a jurisdiction within the United States) has been validly issued and is fully paid and non-assessable (to the extent such concepts are relevant with respect to such capital Stock), subject only to the general assessability of shares of a Nova Scotia unlimited company.

(d)　　As of the Closing Date, except as set forth on <u>Schedule 4.1(d)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party's or any of its Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. As of the Closing Date (after giving effect to the Transactions), no Subsidiary is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or redeem any shares of its Subsidiaries' capital Stock or any security convertible into or exchangeable for any such capital Stock, except as provided in <u>Schedule 4.1(d)</u>.

4.2　　**Due Authorization; No Conflict**.

(a)　　As to each Loan Party, subject to the entry of the CCAA Orders, the Interim Order or the Final Order, as applicable, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)　　As to each Loan Party, subject to the entry of the CCAA Orders, the Interim Order or the Final Order, as applicable, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of Applicable Law applicable to any Loan Party or its Subsidiaries, the Governing Documents of any Loan Party or its Subsidiaries, or any material order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or require consent of any Person under (other than consents that have been obtained and that are still in force and effect) any material contractual obligation of any Loan Party or its Subsidiaries except to the extent that any such conflict, breach, default, or the failure to obtain such consent could not individually or in the aggregate reasonably

be expected to have a Material Adverse Effect, or (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens.

4.3    **Governmental Consents**. Subject to the entry of the CCAA Orders, the Interim Order or the Final Order, as applicable, the execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than (i) consents or approvals that have been obtained and that are still in force and effect, (ii) filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Agent for filing or recordation, and (iii) consents, approvals, notices or other action, the failure to obtain or make could not reasonably be expected to result in a Material Adverse Effect.

4.4    **Binding Obligations; Perfected Liens**.

(a)    Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, subject, solely with respect to any Canadian Guarantor, to the effects of bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, or similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding of equity or law), including the entry of the CCAA Orders, the Interim Order or the Final Order, as applicable. Specifically but without limitation, Section 2.6(g) satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document, and each Loan Party is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon the methodology set out in such Section.

(b)    The Loan Documents, taken together with the Orders and the CCAA Orders, create in favor of the Agent, for the benefit of the Agent and the other Secured Parties, legal, valid and enforceable Liens, security or mortgage interests or hypothecs in the Collateral (subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law). Except for the entry of the Orders, no filing or other action will be necessary to perfect, or render opposable, or protect such Liens, security or mortgage interests or hypothecs in Collateral owned by the Debtors or the CCAA Debtors. Agent's liens with respect to the Loan Parties which are not Debtors or CCAA Debtors are validly created, perfected (other than (i) in respect of motor vehicles that are subject to a certificate of title, (ii) money, (iii) letter-of-credit rights (other than supporting obligations), (iv) commercial tort claims (other than those that, by the terms of the U.S. Security Agreement or Canadian Security Agreement, are required to be perfected), and (v) any Deposit Accounts and Securities Accounts not subject to a Control Agreement as permitted by the Loan Documents, and subject only to the filing of financing statements and the recordation of the Copyright Security Agreement, in each case, in the appropriate filing offices), and first priority liens, subject only to Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens, or the interests of lessors under Capital Leases. Upon entry of and to the extent provided in the Orders, the Obligations of the Loan Parties that are Debtors under this Agreement will constitute allowed super-priority administrative expense claims in the Cases and the CCAA Cases and first priority liens under Section 364(c) of the Bankruptcy Code and any applicable provision of the CCAA as further described in Section 2.14, having priority over all administrative expense claims and unsecured claims against such Loan Parties that are Debtors or CCAA Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code or any equivalent sections of the CCAA and all super-priority administrative expense claims granted to any other Person (including, for the avoidance of doubt, Avoidance Actions and the proceeds

of thereof), subject only to the Carve Out and the CCAA Orders. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, Adequate Protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations granted or recognized as valid, including the Liens, security interests, hypothecs and claims (including administrative claims and DIP Superpriority Claims) granted to the Agent and the other Loan Parties.

4.5     **Title to Assets**. Each of the Loan Parties and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in Real Property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good and marketable title to (in the case of all personal property other than Intellectual Property, and in the case of Intellectual Property, good title to), all of their respective material assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby, and except to the extent (for the purposes of clauses (i) – (iii)) that the failure to have such title or interest could not reasonably be expected to result in a Material Adverse Effect. All of such assets are free and clear of Liens except for Pre-Petition Liens and DIP Term Loan Liens.

4.6     **Budget.** A true and complete copy of the initial Budget is attached as Schedule 4.6 hereto, and presents the good faith estimate and assumptions of Holdings and its Subsidiaries as of such date.

4.7     **Litigation.** Except for the Cases and the CCAA Cases and as set forth in Schedule 4.7, there are no actions, suits, grievances or proceedings (including pursuant to any Environmental Law) pending or, to the best knowledge of Holdings or either Borrower, threatened in writing against a Loan Party or any of its Subsidiaries that, either individually or in the aggregate could reasonably be expected, if determined adversely, to result in a Material Adverse Effect.

4.8     **Compliance with Laws**. Subject to the entry of the CCAA Orders, the Interim Order or the Final Order, as applicable, no Loan Party nor any of its Subsidiaries (a) is in violation of any Applicable Law (including Environmental Laws and the Packers and Stockyards Act of 1921) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that could reasonably be expected to have a Material Adverse Effect.

4.9     **No Material Adverse Effect**. Since the Petition Date, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect with respect to the Loan Parties and their Subsidiaries, taken as a whole.

4.10     **[Intentionally Omitted]**.

4.11     **Employee Benefits.**

(a)     **U.S. Employee Benefits**

(i)     No Loan Party nor any ERISA Affiliates maintains or contributes to, or has any obligation under, any Pension Plan or Multiemployer Plan as of the Closing Date, other than those identified on Schedule 4.11(a).

(ii)        Each Loan Party and each ERISA Affiliate is in material compliance with all applicable provisions of ERISA, the IRC and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in Section 401(b) of the IRC has not yet expired and except where a failure to so comply could not reasonably be expected to result in a Material Adverse Effect. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the IRC has been determined by the Internal Revenue Service (the "IRS") to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the IRC. No liability has been incurred by any Loan Party or any ERISA Affiliate which remains unsatisfied for any taxes or penalties with respect to any Employee Benefit Plan or any Multiemployer Plan except to the extent that such liability (x) individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (y) could not reasonably be expected to result in the imposition of a Lien on any assets of any Loan Party or any of their respective Subsidiaries.

(iii)        No Employee Benefit Plan (other than individual negotiated agreements) provides for post-employment welfare benefits, except as required by the Consolidated Omnibus Reconciliation Act and no Pension Plan has been terminated for which the liabilities have not been satisfied in full, nor has any Pension Plan failed to meet the minimum funding standards of the IRC, including Section 412 or 430 of the IRC (without regard to any waiver granted under Section 412 of the IRC) other than as set forth on Schedule 4.11(a) (which schedule sets forth the fair market value of the plan's assets and the present value of the plan's liabilities using the assumptions required by the Pension Protection Act), nor has any funding waiver from the Internal Revenue Service been received or requested with respect to any Pension Plan, nor has any Loan Party or any ERISA Affiliate failed to make any contributions or to pay any amounts due and owing as required by the IRC or ERISA (including Section 412 or 430 of the IRC, Section 302 of ERISA) or the terms of any Pension Plan prior to the due dates of such contributions under the IRC or ERISA (including Section 412 or 430 of the IRC or Section 302 of ERISA), or the terms of any Pension Plan, except to the extent that the failure to make such contributions or payment, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, nor has there been any event requiring any disclosure under Section 4041(c)(3)(C) or 4063(a) of ERISA with respect to any Pension Plan. No Canadian Pension Event has occurred or is reasonably expected to occur.

(iv)        No Loan Party nor any ERISA Affiliate has: (A) engaged in a nonexempt prohibited transaction described in ERISA or the IRC (including Section 406 of ERISA or Section 4975 of the IRC), except for any transactions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (B) permitted a Lien to exist in the PBGC's favor or incurred any material liability to the PBGC which remains outstanding other than the payment of premiums and there are no premium payments which are due and unpaid, (C) failed to make a required contribution or payment to a Multiemployer Plan, which such failure remains uncured for a period of at least 15 Business Days, or (D) failed to make a required installment or other required payment under the IRC (including under Section 412 or Section 430 of the IRC) of any material amounts or permitted any Liens to exist in favor of the IRC.

(v)        No Termination Event has occurred or is reasonably expected to occur with respect to any Employee Benefit Plan of any Loan Party or any ERISA Affiliates, except for such Termination Event (other than one described in clause (f) of the definition of Termination Event or that could result in the imposition of a Lien on the assets of any Loan Party or any of their respective Subsidiaries) that could not reasonably be expected to result in a material liability to a Loan Party.

(vi)        No proceeding, claim (other than a benefits claim in the ordinary course of business), lawsuit or investigation is existing or, to the best knowledge of any Loan Party after due

inquiry, threatened concerning or involving any (A) employee welfare benefit plan (as defined in Section 3(1) of ERISA) currently maintained or contributed to by any Loan Party or any ERISA Affiliate, (B) Pension Plan or (C) Multiemployer Plan, except, in any such case, individually or in the aggregate, to the extent that such actions (x) could not reasonably be expected to result in a Material Adverse Effect, and (y) could not reasonably be expected to result in the imposition of a Lien on any assets of any Loan Party or any of their respective Subsidiaries.

(vii)    Except as set forth on Schedule 4.11(a), there is (a) no unfair labor practice complaint pending or, to any Loan Party's best knowledge, threatened against any Loan Party or any Subsidiary before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any Subsidiary which arises out of or under any collective bargaining agreement except to the extent such complaint, grievance, or arbitration could not reasonably be expected to result in a Material Adverse Effect, (b) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or, to the best knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary except to the extent such strike, labor dispute, slowdown, stoppage or similar action or grievance pending could not reasonably be expected to result in a Material Adverse Effect, and (c) no union representation question existing with respect to the employees of any Loan Party or any Subsidiary and no union organizing activity taking place with respect to any of the employees of any of them except to the extent such union representation question or union organizing activity could not reasonably be expected to result in a Material Adverse Effect. Neither the Loan Parties, nor any Subsidiary, has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state or provincial law, except as could not reasonably be expected to result in a Material Adverse Effect, which remains unpaid or unsatisfied. The hours worked and payments made to employees of the Loan Parties and each Subsidiary are in material compliance with the Fair Labor Standards Act and any other applicable legal requirements, except as could not reasonably be expected to result in a Material Adverse Effect.

(b)    **Canadian Employee Benefits**.

(i)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, any overtime pay, vacation pay, premiums for unemployment insurance, health and welfare insurance premiums, accrued wages, salaries and commissions, severance pay and employee benefit plan payments have been fully paid by each Canadian Loan Party or, in the case of accrued unpaid overtime pay or accrued unpaid vacation pay for Canadian Employees, has been accurately accounted for in the books and records of each Canadian Loan Party or has been reported pursuant to the collateral reporting obligation pursuant to Section 5.2.

(ii)    Except as disclosed on Schedule 4.11(b), no Canadian Guarantor has, maintains, administers or contributes to any Canadian Defined Benefit Plan or has any liability in respect of any Canadian Defined Benefit Plan.

(iii)    Schedule 4.11(b) lists all the Canadian Pension Plans applicable to the Canadian Employees of each Canadian Loan Party in respect of employment in Canada and which are currently maintained or sponsored by each Canadian Loan Party or to which each Canadian Loan Party contributes or has an obligation to contribute.

(iv)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no improvements to any Canadian Pension Plan or any Canadian Employee Plan have been promised, except such improvements as are described in the collective bargaining agreements listed in Schedule 4.11(b), and no amendments or improvements to a

Canadian Pension Plan or Canadian Employee Plan will be made or promised by any Canadian Loan Party unless made or promised in the ordinary course of business and consistent with past practices.

(v)    Except as disclosed in Schedule 4.11(b), no Canadian Loan Party provides benefits to retired Canadian Employees or to beneficiaries or dependents of retired Canadian Employees.

(vi)    All funding obligations regarding the Canadian Pension Plans and the Canadian Employee Plans (including current service contributions and special payments, as applicable) have been satisfied, there are no outstanding defaults or violations by any party to any Canadian Pension Plan and any Canadian Employee Plan and no taxes, penalties or fees are owing or exigible under any of the Canadian Employee Plans, except which could not reasonably be expected to result in a Material Adverse Effect. To the best knowledge of each Canadian Loan Party, no fact or circumstance exists that could adversely affect the tax-exempt status of a Canadian Pension Plan or, where applicable, a Canadian Employee Plan.

(vii)    Except as disclosed in Schedule 4.11(b),

(1)    No Canadian Loan Party is a party to any collective bargaining agreement, contract or legally binding commitment to any trade union or employee organization or group in respect of or affecting Canadian Employees;

(2)    No Canadian Loan Party is a party to any application, complaint, grievance, arbitration, or other proceeding under any statute or under any collective agreement related to any Canadian Employee or the termination of any Canadian Employee and there is no complaint, inquiry or other investigation by any regulatory or other administrative authority or agency with regard to or in relation to any Canadian Employee or the termination of any Canadian Employee, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(3)    To the best knowledge of each Canadian Loan Party, no Canadian Loan Party has engaged in any unfair labor practice, is aware of any pending or threatened complaint regarding any alleged unfair labor practices, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and

(4)    To the best knowledge of each Canadian Loan Party, there is no strike, labor dispute, work slowdown or stoppage pending or threatened against any Canadian Loan Party and no Canadian Loan Party is currently the subject of any union organization effort, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(viii)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, all contributions, assessments, premiums, fees, taxes, penalties or fines in relation to the Canadian Employees have been duly paid or remitted and there is no outstanding liability of any kind in relation to the employment of the Canadian Employees or the termination of employment of any Canadian Employee.

(ix)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Canadian Loan Party is in compliance with all requirements of any Applicable Law in respect of the Canadian Pension Plans and health and safety, workers compensation, employment standards, labor relations, health insurance, employment insurance, protection of personal information, human rights laws and any Canadian federal, provincial or local

counterparts or equivalents in each case, as applicable to the Canadian Employees and as amended from time to time.

      4.12    **Environmental Condition**. Except as set forth on <u>Schedule 4.12</u>, (a) to each Borrower's knowledge, no Loan Party's or its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation of any applicable Environmental Law, except to the extent that any such violation, considered individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (b) to each Borrower's knowledge, no Loan Party's or its Subsidiaries' properties has ever been designated or identified by a Governmental Authority in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, except to the extent that any such designation or identification, considered individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (c) no Loan Party nor any of its Subsidiaries has received written notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party or its Subsidiaries that has not been resolved, except to the extent that the foregoing, considered individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (d) no Loan Party nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

      4.13    **Intellectual Property**.

      (a)    No Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by such Loan Party, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

      (b)    To each Loan Party's knowledge, (i) such Loan Party is not infringing or misappropriating in any material respects any material Intellectual Property rights of any Person, and (ii) no product manufactured, used, distributed, licensed, or sold by or service provided by such Loan Party is currently infringing or misappropriating in any material respects any material Intellectual Property rights of any Person.

      (c)    All registered Copyrights, registered Trademarks, and issued Patents that are owned by such Loan Party are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect, except, in each case, where such lack or failure thereof could not reasonably be expected to result in a Material Adverse Effect.

      (d)    Each Loan Party and its Subsidiaries own all right, title, and interest in and to, or hold licenses in, all Intellectual Property that is necessary or material to the conduct of its business as currently conducted; <u>provided</u> that with respect to third party Patents, the foregoing representation and warranty is made to the knowledge of such Loan Party and its Subsidiaries.

      (e)    Each Loan Party has taken reasonable steps to protect and/or enforce its rights in all trade secrets owned by such Loan Party, except where such failure to maintain, protect or enforce could not reasonably be expected to result in a Material Adverse Effect.

      4.14    **[Intentionally Omitted]**.

4.15    **[Intentionally Omitted]**.

4.16    **Complete Disclosure**. The factual information regarding the Loan Parties (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) (taken as a whole) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein does not contain any untrue statement of material fact or omit to state any material fact necessary to make the factual statements therein taken as a whole not materially misleading as of the time made or furnished in light of the circumstances under which such information was made or furnished after taking into account any modification or supplement to such information. On the Closing Date, the Budget represents, and as of the date on which any other Budgets are delivered to Agent, as of the date of such Budgets, such additional Budgets represent (as of the date of the initial Budget) Holdings' good faith estimate of the Loan Parties' and their Subsidiaries future performance for the periods covered thereby based upon assumptions believed by Holdings to be reasonable as of the date of such Budgets (it being understood that such projections and forecasts are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and their Subsidiaries and no assurances can be given that such projections or forecasts will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material). As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

4.17    **[Intentionally Omitted]**.

4.18    **Patriot Act**. To the extent applicable, each Loan Party and each of its Subsidiaries is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of Advances made hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.19    **[Intentionally Omitted]**.

4.20    **Payment of Taxes**. Except as otherwise permitted under <u>Section 5.5</u> and except as set forth on Schedule 4.20, all material federal, state, provincial and local tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all other material federal, state, provincial and local taxes, assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable, except to the extent failure to do so is permitted by the Bankruptcy Code or the CCAA or pursuant to the Orders, as applicable. Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all material taxes not yet due and payable. No Borrower knows of any material proposed tax assessment against a Loan Party or any of its Subsidiaries that is not being actively contested by such Loan Party or such Subsidiary diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in

conformity with GAAP shall have been made or provided therefor. As of the Closing Date, no Loan Party has engaged in any listed transactions within the meaning of the IRC.

4.21    **Margin Stock**. No Loan Party nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Advances made to any Borrower will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of said Board of Governors.

4.22    **Governmental Regulation**. No Loan Party nor any of its Subsidiaries is subject to regulation under the Investment Company Act of 1940, as amended. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

4.23    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**. No Loan Party or any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to knowledge of such Loan Party, any director, officer, employee, agent or Controlled Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws, Anti-Money Laundering Laws, or Canadian Anti-Terrorism Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Controlled Affiliate of such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws, Anti-Money Laundering Laws and Canadian Anti-Terrorism Laws. No proceeds of any Advances made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law, Anti-Money Laundering Law, or Canadian Anti-Terrorism Law by any Persons (including any Lender, Bank Product Provider, or other individual or entity participating in any transaction).

4.24    **[Intentionally Omitted]**.

4.25    **[Intentionally Omitted]**.

4.26    **[Intentionally Omitted]**.

4.27    **Eligible Accounts**. As to each Account that is identified by a Borrower as an Eligible Account in a Borrowing Base Certificate submitted to Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of Inventory to such Account Debtor in the ordinary course of such Borrower's business, (b) owed to such Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, other than (i) as is consistent with the Loan Parties' historic return, refund, credit, cancellation or exchange policies, (ii) that in each case have been disclosed in writing to Agent, or (iii) for amounts not in excess of $100,000, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Accounts.

4.28    **Eligible Inventory**. As to each item of Inventory that is identified by a Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to Agent, such Inventory is not excluded as

ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Inventory.

4.29    **Orders**.

(a)    The Debtors and the CCAA Debtors are in compliance with the terms and conditions of the Orders. Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order (from after the date of the entry of the Final Order) is in full force and effect and has not been vacated, reversed, stayed (whether statutory stay or otherwise) or rescinded or, without the prior written consent of the Agent, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the Lender Group or any member thereof.  The CCAA Initial Order (with respect to the period on and after entry of the CCAA Initial Order and prior to entry of the CCAA A&R Initial Order) or the CCAA A&R Initial Order (with respect to the period on and after entry of the CCAA A&R Initial Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Agent's consent, modified or amended. The CCAA Debtors are in compliance in all material respects with the CCAA Initial Order (with respect to the period on and after entry of the CCAA Initial Order and prior to entry of the CCAA A&R Initial Order) or the CCAA A&R Initial Order (with respect to the period on and after entry of the CCAA A&R Initial Order).

(b)    The Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled). The Debtors and the CCAA Debtors shall give, on a timely basis as specified in the CCAA Orders, the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the CCAA Orders, the Interim Order or Final Order, as applicable.  The CCAA Cases were commenced on the CCAA Filing Date in accordance with applicable Laws and proper notice thereof has or will be given for the CCAA Comeback Motion.  The CCAA Debtors shall give, on a timely basis as specified in the CCAA Initial Order, all notices required to be given pursuant to the CCAA or as otherwise may be requested by the Agent.

(c)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, Agent and Lenders shall be entitled to immediate payment of such Obligations and, subject to the Orders and Section 9, to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.  Subject to any applicable provisions of the CCAA Initial Order or the CCAA A&R Initial Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and, subject to Section 9, to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the CCAA Court.

4.30    **Inventory Records**. Each Loan Party keeps records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof that are correct and accurate in all material respects.

4.31    **Withholdings and Remittances**. Each Loan Party has remitted all Canada Pension Plan contributions, provincial pension plan contributions, workers' compensation assessments, employment insurance premiums, employer health taxes, municipal real estate taxes and other taxes payable under applicable law by them, and, furthermore, have withheld from each payment made to any of its present or former employees, officers and directors, and to all persons who are non-residents of Canada for the purposes of the *Income Tax Act* (Canada) all amounts required by law to be withheld, including without limitation all payroll deductions required to be withheld and has remitted such amounts to the proper Governmental Authority within the time required under applicable law.

4.32    **[Intentionally Omitted]**.

4.33    **[Intentionally Omitted]**.

4.34    **Use of Proceeds**. In accordance with and subject to the Budget (including the Permitted Variance provisions) and the Orders, Borrowers will use the proceeds of (a) the Canadian Advances (i) to repay and refinance, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing in respect of Canadian Pre-Petition Advances under or in connection with the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents, and (ii) to pay transaction fees, liabilities and expenses (including all fees of professionals retained in connection with the Cases and the CCAA Cases) and other administration costs incurred in connection with the Cases and the CCAA Cases and the negotiation, syndication, documentation, execution and closing of this Agreement, (b) the U.S. Advances (i) to repay and refinance, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing in respect of U.S. Pre-Petition Advances under or in connection with the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents, and (ii) to pay transaction fees, liabilities and expenses (including all fees of professionals retained in connection with the Cases and the CCAA Cases) and other administration costs incurred in connection with the Cases and the CCAA Cases and the negotiation, syndication, documentation, execution and closing of this Agreement, (c) the Canadian Advances, Canadian Letters of Credit and Canadian Swing Loans on and after the Closing Date solely (except as set forth in clause (a) above) to fund (i) the payment of interest and fees in respect of the Canadian Advances and Canadian Letters of Credit, Letter of Credit Disbursements in respect of Canadian Letters of Credit, and Lender Group Expenses, and (ii) to provide working capital for the Canadian Loan Parties and for other general corporate purposes of the Guarantors (other than the U.S. Loan Parties), and (d) the U.S. Advances, U.S. Letters of Credit and U.S. Swing Loans on and after the Closing Date solely (except as set forth in clause (b) above) to provide working capital and for other general corporate purposes of U.S. Borrower and the U.S. Guarantors. Notwithstanding the foregoing, (i) the Loan Parties may only use the proceeds of the Advances to make DOJ Payments so long as (A) no Default or Event of Default has occurred and is continuing on the date of such Advance or would result from payment of such DOJ Payment; and (B) Borrowers would have Adjusted Excess Availability, immediately after giving Pro Forma Effect to payment of such DOJ Payment, and at all times during the 30 consecutive day period immediately prior to the making of such DOJ Payment would have had Adjusted Excess Availability, in each case, in an amount equal to or greater than $10,000,000, and (ii) the Loan Parties may not use the proceeds of the Advances to make payment of any Other Payment; provided that (x) no part of the proceeds of the Advances will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, in each case, in any manner that would result in a violation of Sanctions by any Person, and (z) that no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving

of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

**5.      AFFIRMATIVE COVENANTS**

Each of Holdings and each Borrower covenants and agrees that, until the Payoff Date, each of Holdings and each Borrower shall and shall cause each of their respective Subsidiaries to comply with each of the following:

5.1      **Financial Statements, Reports, Certificates**. Deliver to Agent each of the financial statements, reports, and other items set forth on Schedule 5.1 at the times specified therein. In addition, each Borrower agrees that no Subsidiary of a Loan Party will have a fiscal year different from that of Borrowers. In addition, Holdings agrees to maintain a system of accounting that enables Holdings to produce financial statements in accordance with GAAP.

5.2      **Collateral Reporting**. Provide Agent with each of the reports set forth on Schedule 5.2 at the times specified therein. In addition, each Borrower agrees to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth above.

5.3      **Existence**. Except as otherwise permitted (x) under Section 6.3, 6.4 and 6.11:

(a)      cause each Loan Party to, and cause each of its Subsidiaries to, at all times maintain, preserve and keep in full force and effect its existence in good standing in its jurisdiction of organization, and

(b)      cause each Loan Party to, and cause each of its Subsidiaries to, at all times preserve and keep in full force and effect all existence (other than in respect of good standing in its jurisdiction of organization) and all rights and franchises, licenses and permits, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

5.4      **Maintenance of Properties**. Maintain and preserve all of its material assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted and Permitted Dispositions excepted, and except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

5.5      **Taxes**. In accordance with the Bankruptcy Code and the CCAA and except as set forth on this Section 5.5 and subject to any required approval by the Bankruptcy Court or the CCAA Court (it being understood that no Debtor or CCAA Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code and the CCAA, without an order of the Bankruptcy Court or the CCAA Court authorizing such payments), timely cause all material assessments and taxes imposed, levied, or assessed against any Loan Party or its Subsidiaries, or any of their respective assets or in respect of any of its income, businesses, or franchises to be paid in full, before delinquency or before the expiration of any extension period (taking into account all applicable provisions of the Bankruptcy Code and the CCAA), except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest and so long as, in the case of an assessment or tax that has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax. Each Borrower will and will cause each Loan Party and each of their respective Subsidiaries to make timely payment or deposit of all material withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, Canada Pension

Plan and provincial pension plans, employer health tax, Canadian employment insurance, and local, state, provincial, and federal income taxes and excise taxes, and will, upon reasonable request, furnish Agent with proof reasonably satisfactory to Agent indicating that each Loan Party and its Subsidiaries have made such payments or deposits. Each Borrower will and will cause each Loan Party and its Subsidiaries to timely file all material federal, state, provincial and local tax returns and reports required to be filed by it.

      5.6    **Insurance**.

          (a)    At Borrowers' expense, maintain insurance respecting each of the Loan Parties' and their Subsidiaries' assets wherever located, covering loss or damage by fire, theft, flood, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and which are similarly situated and located. Borrowers also shall maintain (with respect to each of the Loan Parties and their Subsidiaries) business interruption, public liability, and product liability insurance, as well as insurance against larceny. All such policies of insurance shall be with reputable insurance companies, in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located, and in any event in amount, adequacy and scope that is no less favorable to the Loan Parties than the insurance maintained by the Loan Parties on the Closing Date or such policies of insurance shall be acceptable to Agent in its Permitted Discretion. All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of the Secured Parties, as their interests may appear, in case of loss, pursuant to a standard additional loss payable endorsement with a standard non contributory "lender" or "secured party" clause. All certificates of insurance are to be delivered to Agent, with the additional loss payable and additional insured endorsement in favor of Agent and the Borrowers shall use commercially reasonable effort to cause the insurance policies to provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation. If at any time any real property constitutes Collateral, the Loan Parties shall maintain flood insurance on all real property constituting Collateral, from such providers, in amounts and on terms in accordance with the Flood Laws or as otherwise satisfactory to all Lenders.

          (b)    If Borrowers fail to maintain such insurance due to a policy lapse, then, following their receipt of notice of Agent's intent to do so (which may be delivered prior to the lapse of such insurance), Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.

          (c)    Borrowers shall give Agent reasonably prompt notice of any loss exceeding $50,000 covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

      5.7    **Inspection**.

          (a)    Permit representatives and independent contractors of the Agent and each Lender to visit and inspect any of its properties (to the extent it is within such Person's control to permit such inspection), to examine its corporate, financial, operating and other books and records, and make copies thereof or abstracts therefrom, and to discuss its affairs (including, subject to Section 5.13(l), all matters contemplated by or relating to the Bidding Procedures and the Sale Order, as provided therein),

finances and accounts with its directors, officers, other employees and independent public accountants, all at the reasonable expense of Holdings and the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Holdings and the Borrowers; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Agent on behalf of the Lenders may exercise rights of Agent and the Lenders under this Section 5.7(a); and provided, further, that, when an Event of Default exists, the Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of Holdings and the Borrowers at any time during normal business hours and upon reasonable advance notice. The Agent and the Lenders shall give Holdings and the Borrowers the opportunity to participate in any discussions with Holdings' or the Borrowers' independent public accountants.

(b)     Independently of, or in connection with, the visits and inspections provided for in Section 5.7(a), but, subject to the proviso at the end of this clause (b), not more than one time in any calendar year in respect of appraisals and not more than one time in any calendar year in respect of field examinations (provided that in each case, if an Inspection Notice Event has occurred during any calendar year, the Agent may cause additional appraisals or field examinations to be undertaken on one additional occasion (of an appraisal and a field exam) within twelve months of the occurrence of such Inspection Notice Event), upon the request of the Agent after reasonable prior notice, the Borrowers will permit the Agent or its professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Agent to conduct appraisals and commercial finance audits (including updates thereof), including, without limitation, (i) of the Borrowers' practices in the computation of the U.S. Borrowing Base and Canadian Borrowing Base and (ii) inspecting, verifying and auditing the ABL Priority Collateral. The Borrowers shall pay the fees and expenses of Agent or such professionals with respect to such audits and appraisals to the extent such evaluations and appraisals were conducted in compliance under the preceding sentence; provided, that during an Event of Default, the Agent shall have the right to require (at the Borrowers' sole expense) additional appraisals and field exams as frequently as determined by the Agent in it reasonable discretion in addition to the appraisals and field exams specified in the preceding sentence.

5.8     **Compliance with Laws**. Comply with the requirements of all Applicable Laws (including Environmental Laws and ERISA), and orders of any Governmental Authority, other than Applicable Laws, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9     **Environmental**.

(a)     Comply with Environmental Laws, other than the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and provide to Agent documentation of such compliance which Agent reasonably requests,

(b)     promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party or any of its Subsidiaries and take any Remedial Actions necessary or required to abate said release or otherwise to come into compliance with applicable Environmental Law, except to the extent that any such release, considered individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and

(c)     promptly notify Agent of any of the following: (i) written notice that a Lien arising under or related to Environmental Law or Environmental Action has been filed against any of the real or personal property, immovable or movable, of any Loan Party or any of its Subsidiaries, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be

filed against any Loan Party or any of its Subsidiaries, and (iii) notice of a violation, citation, or other administrative order, pursuant to any applicable Environmental Law, in each case of clauses (i), (ii) and (iii) above, which could reasonably be expected to result in a Material Adverse Effect.

5.10    **Change Name**.

(a)    Provide Agent with prompt written notice of any change of any Loan Party's legal name, organizational identification number or organizational identity

(b)    Provide Agent with at least 10 days prior written notice of any change of any Loan Party's jurisdiction of organization.

(c)    Each Loan Party incorporated in Luxembourg will maintain its central administration (*administration centrale*), the place of its effective management (*siège de direction effective*) and the center of its main interests (*centre des interêts principaux*) in Luxembourg.

5.11    **Formation of Subsidiaries**. Subject to the limitations set forth in this Agreement (including Section 6.23) and the other Loan Documents, at the time that any Loan Party forms, acquires or creates any direct or indirect Subsidiary other than an Excluded Subsidiary after the Closing Date, such Loan Party shall (a) within 20 days of such formation or acquisition (or such later date as may be agreed by the Agent in its Permitted Discretion) cause any such new Subsidiary to provide to Agent (1) a joinder to the Guaranty and the U.S. Security Agreement (if such new Subsidiary is not a Canadian Subsidiary), and (2) a joinder to the Canadian Security Documents (if such new Subsidiary is a Canadian Subsidiary) and the Intercompany Subordination Agreement, together with such other security documents, as well as appropriate financing statements, all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary); provided that the joinder to Guaranty, the U.S. Security Agreement, the Canadian Security Documents and such other security documents shall not be required to be provided to Agent with respect to any such new Subsidiary of Holdings if Agent and the Borrowers reasonably determine that the cost of providing such documents is excessive in relation to the benefit to the Secured Parties afforded thereby, (b) within 20 days of such formation or acquisition (or such later date as may be agreed by Agent in its Permitted Discretion) provide to Agent, to the extent not covered by the U.S. Security Agreement, a pledge agreement and appropriate certificates and powers or financing statements, hypothecating the Stock of any new Subsidiary (other than Excluded Stock) reasonably satisfactory to Agent, and (c) within 10 days of such formation or acquisition (or such later date as permitted by Agent in its Permitted Discretion) provide to Agent all other documentation, including (except with respect to joinders to the Guaranty, the U.S. Security Agreement, the Intercompany Subordination Agreement, and the Canadian Security Documents), if reasonably requested by Agent, one or more opinions of counsel reasonably satisfactory to Agent, which in its reasonable opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above in clause (b) of this Section 5.11. Any document, agreement, or instrument executed or issued pursuant to this Section 5.11 shall be a Loan Document.  Notwithstanding anything to the contrary contained herein (including this Section 5.11 and Section 5.12 hereof) or in any other Loan Document, Agent shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to Agent.

5.12    **Further Assurances**.

(a)        Subject to the limitations set forth in this Agreement and the other Loan Documents, including those set forth in the last sentence of this Section 5.12(a), at any time upon the reasonable request of Agent (or such later date as may be agreed to by Agent in its Permitted Discretion), execute or deliver to Agent any and all financing statements (or any other similar instrument including summaries or notices under Article 2949 of the Civil Code of Quebec), fixture filings, security agreements, deeds of hypothec, pledges, assignments, endorsements of certificates of title, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, or render opposable, and continue perfected or to better perfect, or render opposable, Agent's Liens in all of the assets (other than assets constituting Excluded Assets) of the Loan Parties (other than Excluded Subsidiaries) (whether now owned or hereafter arising or acquired, tangible or intangible, corporeal or incorporeal, movable or immovable), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided that the foregoing shall not apply with respect to any Loan Party that Agent and Borrowers reasonably determine that the cost of providing such Additional Documents is excessive in relation to the benefit to the Secured Parties afforded thereby. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of each Loan Party (other than Excluded Assets) and all of the outstanding Stock of the Subsidiaries of each Loan Party.  Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, (i) Holdings and its Subsidiaries shall not be required to take any action to create or perfect, or render opposable, any security interests or hypothecs in (A) any Real Property, (B) any vessel, other than vessels owned by a Canadian Loan Party on the Closing Date and other than any vessels acquired by a Loan Party after the Closing Date with a Fair Market Value (individually) in excess or $1,000,000 or (C) any Excluded Assets (as defined in the U.S. Security Agreement), and (ii) if Agent and the Borrowers reasonably determine in writing that the cost of creating, perfecting or rendering opposable any Lien on any property is excessive in relation to the benefits afforded to the Secured Parties thereby, then such property may be excluded from the Collateral for all purposes of the Loan Documents.

(b)        On or prior to the date that is thirty (30) days after the Agent requests (which request shall, automatically and without further act, be deemed to have been given simultaneously with any such request by the DIP Term Loan Agent under the DIP Term Loan Credit Agreement) that such actions be taken (or such later date as may be determined by the Agent in its sole discretion), the Loan Parties owning Stock in any entity incorporated or organized in Indonesia shall (i) execute and deliver to the Agent, an Indonesian-law governed pledge over the Stock of PT Asindo Minesagara and PT Inspection Laboratory held by such Loan Parties (such Stock, the "**Pledged Indonesian Equity Interests**"), in form and substance reasonably satisfactory to the Agent, (ii) deliver to the Agent (or to the DIP Term Loan Agent as bailee for perfection in accordance with the DIP Intercreditor Agreement, with copies there being delivered to Agent) the original share certificates of the Pledged Indonesian Equity Interests, (iii) cause PT Asindo Minesagara and PT Inspection Laboratory to notate the pledge of the Pledged Indonesian Equity Interests in favor of the Agent, for the benefit of the Secured Parties, in the shareholders' register of PT Asindo Minesagara and PT Inspection Laboratory, as applicable, and (iv) take all such other actions, and execute and deliver all other documents, in each case, as reasonably requested by the Agent to perfect and ensure the enforceability of the pledge of the Pledged Indonesian Equity Interests under Indonesian or other applicable law.

5.13    **Additional Information and Bankruptcy-Related Obligations.**

(a)        Each Borrower will deliver, as soon as practicable in advance of the filing with the Bankruptcy Court or the CCAA Court, but no later than two (2) Business Days prior to distribution, unless impracticable, in which case, as soon as reasonably practicable prior to filing, copies of all

material documents, motions and pleadings related to the Orders and this Agreement, deliver to the Agent all such documents to be filed and provide the Agent with a reasonable opportunity to review and comment on all such documents, which documents shall be reasonably satisfactory to the Agent.

(b)    Each Borrower will comply in all material respects with (i) each order entered by the Bankruptcy Court in connection with the Cases and (ii) each order issued by the CCAA Court and entered in connection with the CCAA Cases.

(c)    Each Borrower will comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, Canadian Bankruptcy and Insolvency Law, the Interim Order, the Final Order, the CCAA, the CCAA Initial Order and the CCAA A&R Initial Order, as applicable, and any other order of the Bankruptcy Court and the CCAA Court, as applicable.

(d)    Without limiting the requirements set forth in Section 5.1 or elsewhere herein, each Borrower shall promptly, but no later than two (2) Business Days prior to distribution subject to Section 5.13(l), provide the Agent with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to the sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials.

(e)    Each Borrower will deliver to the Agent promptly after the same are available, copies of all reporting and information related to any proposed asset sales or other dispositions that could reasonably be expected to materially affect the U.S. Borrowing Base or the Canadian Borrowing Base.

(f)    Each Borrower will allow the Agent access to, upon reasonable notice during normal business hours, all financial advisors and advisors engaged by the Loan Parties.

(g)    Each Borrower will deliver to the legal counsel to the Agent, at least two Business Days in advance of filing with the Bankruptcy Court or the CCAA Court, unless impracticable, in which case, as soon as reasonably practicable prior to filing, copies of all proposed orders to be entered by the Bankruptcy Court or any other court having jurisdiction over the insolvency proceeding of any Loan Party pending outside of the Bankruptcy Court in respect of first day motions and applications ("First Day Orders") and second day motions and applications ("Second Day Orders"; together with the First Day Orders, the "Initial Orders") and motions seeking approval of the Initial Orders or the CCAA Orders, which shall be in form and substance reasonably satisfactory to the Agent.

(h)    Each Borrower will provide the Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

(i)    Borrowers will deliver to counsel to the Agent (to the extent practicable) promptly as soon as available but no later than two (2) Business Days prior to distribution, unless impracticable, in which case, as soon as reasonably practicable prior to filing, copies of all proposed non-ministerial or administrative pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any Committee or unofficial committee appointed or appearing in the Cases or the CCAA Cases, the CCAA Monitor or any other party in interest, and shall consult in good faith with the Agent's advisors regarding the form and substance of any such document;

(j)        If not otherwise provided through the Bankruptcy Court's or the CCAA Court's electronic docketing system, as soon as available, deliver to the Agent (for distribution to the Lenders) and to counsel to the Agent and Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases or the CCAA Court in the CCAA Cases, or distributed by or on behalf of the Loan Parties to any Committee or unofficial committee appointed or appearing in the Cases or the CCAA Cases or the CCAA Monitor; and

(k)        Each Borrower will provide the Agent and Lenders no less than five (5) Business Days' (or such shorter notice acceptable to the Agent in its reasonable discretion) prior written notice prior to any (i) assumption or rejection of any Loan Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, or (ii) disclaimer or resiliation of any CCAA Debtor's material contracts or material non-residential real property leases pursuant to section 32 of the CCAA, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Term Loan Priority Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Term Loan Priority Collateral or the priority of any such Liens or DIP Superpriority Claims), if the Agent inform the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption, disclaimer, resiliation or rejection, as applicable.

(l)        Without limiting the requirements set forth in <u>Section 5.1</u> or elsewhere herein, each Borrower shall provide the Agent with all information required under and pursuant to the Bidding Procedures and the Bidding Procedures Order in accordance with the terms thereof; <u>provided</u> that, notwithstanding anything in this Agreement (including <u>Sections 5.7(a)</u> and <u>(c)</u>, <u>5.13(d)</u> and <u>5.23</u>) to the contrary or otherwise, Holdings and its Subsidiaries shall not be required to share any information related to the matters contemplated by or relating to the Bidding Procedures or the Bidding Procedures Order (i) that the Debtors reasonably determine must remain confidential to not advantage the Agent or any of the Lenders in connection with a bid by the Agent or any of the Lenders (if made) for any material portion of the assets of Holdings and its Subsidiaries over any other party or (ii) to the extent that the sharing of such information would be inconsistent with the Bidding Procedures or the Bidding Procedures Order.

5.14    **Performance Within Budget.**

(a)        The Loan Parties will use the proceeds of the Loans solely to make disbursements and pay expenses in accordance with <u>Section 4.34</u> and this <u>Section 5.14</u>. The Debtors and the CCAA Debtors shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)        For each Testing Period, the Borrowers shall not permit:

(i)        the actual amount of total operating expenses (excluding professional fees and expenses, to the extent set forth in the schedules delivered pursuant to <u>Schedule 5.1(i)</u>) of the Loan Parties and their Subsidiaries during such Testing Period to exceed the projected total operating expenses of the Loan Parties and their Subsidiaries (on a cumulative basis for such Testing Period) in the Budget for such Testing Period by more than (A) in the case of any Testing Period with a duration of one or two weeks, 15%, or (B) in the case of any other Testing Period, 12.5% (the "<u>Permitted Expenditures Variances</u>"); or

(ii)    the actual amount of total operating receipts of the Loan Parties and their Subsidiaries during any Testing Period to be less than (A) in the case of any Testing Period with a duration of one or two weeks, 85%, or (B) in the case of any other Testing Period, 87.5%, of the projected total operating receipts of the Loan Parties and their Subsidiaries (on a cumulative basis for such Testing Period) set forth in the Budget for such Testing Period (such variance, the "Permitted Receipts Variances" and, together with the Permitted Expenditures Variances, the **"Permitted Variances"**).

5.15    **DOJ Settlement; Compliance Program; Company Compliance Program**. The Loan Parties shall (i) comply in all respects with the DOJ Settlement other than any non-compliance that the Agent determines are de minimis in nature and which do not result in the termination by the Department of Justice of the DOJ Settlement, (ii) adopt and keep in effect, to the extent required by the terms of the DOJ Settlement or otherwise required in connection with or related to the DOJ Settlement, the Compliance Program, and comply with such Compliance Program in all respects other than any non-compliance that the Agent determines are de minimis in nature and which do not result in the termination by the Department of Justice of the DOJ Settlement, and (iii) maintain at all times the Company Compliance Program, which Company Compliance Program shall at all times be at least as stringent (taken as a whole) as the Company Compliance Program as in effect on the Closing Date.

5.16    **Compliance with ERISA and the IRC.** In addition to and without limiting the generality of Section 5.8, (a) without the prior written consent of Agent, not take any action or fail to take action the result of which action or failure could result in the imposition of a Lien in favor of the PBGC or to a Multiemployer Plan or result in a Material Adverse Effect, (b) not participate in any prohibited transaction that could result in any civil penalty under ERISA or tax under the IRC that could reasonably be expected to result in a material liability, and (c) furnish to the Agent upon the Agent's request such additional information about any Employee Benefit Plan that is a Pension Plan or a health benefit plan as may be reasonably requested by the Agent. Each applicable Loan Party shall notify Agent (i) within 30 days of the establishment of any new Pension Plan or the commencement of contributions to any Multiemployer Plan to which a Loan Party was not previously contributing, and (ii) within 30 days of any increase in a Loan Party's or ERISA Affiliates' contribution obligations to a Pension Plan or Multiemployer Plan of more than $500,000 from such entity's prior fiscal year's contribution obligations.

5.17    **Canadian Pension and Benefit Plans.**

(a)    With respect to each Canadian Pension Plan, the Canadian Borrower and Canadian Guarantors shall:

(i)    cause to be delivered to the Agent, promptly upon the Agent's reasonable written request, copies of annual information returns, actuarial valuations and any other report or form filed with the applicable Governmental Authority or the funding agent;

(ii)    ensure that each Canadian Pension Plan is administered in all material respects in accordance with its terms, any collective bargaining agreement and any Applicable Law; and

(iii)    pay all contributions and payments (including current service cost and special payments) when due in accordance with its terms, any collective bargaining agreement and any Applicable Law.

(b)    Each applicable Canadian Loan Party shall notify Agent (i) within 30 days of the establishment of any new Canadian Pension Plan, or the commencement of contributions to any such plan to which the Canadian Loan Party was not previously contributing; and (ii) within 30 days of any

increases or changes having a cost to such Canadian Loan Party in excess of C$500,000 in any fiscal year in respect of any Canadian Pension Plan or in the benefits of any Canadian Pension Plan.

5.18    **Use of Proceeds.** Borrowers will use the proceeds of the Advances and other extensions of credit hereunder solely as provided in Section 4.34.

5.19    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Canadian Anti-Terrorism Laws.** Each Loan Party will, and will cause each of its Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws, Anti-Money Laundering Laws and Canadian Anti-Terrorism Laws. Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Controlled Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

5.20    **Control Agreements; Controlled Accounts**.

(a)    **Control Agreements**. Subject to the limitations set forth in the Security Documents, on or before the Closing Date, each Loan Party shall obtain an authenticated Control Agreement, from each bank maintaining a Deposit Account or a Securities Account for such Loan Party (other than any Excluded Accounts); provided that with respect to Deposit Accounts and Securities Accounts maintained by Holdings, Clover Leaf Seafood, or any other Loan Party organized outside of the United States or Canada with a bank located outside of the United States or Canada, any such Person shall only be required to use its commercially reasonable efforts to obtain Control Agreements with respect to such Deposit Accounts and Securities Accounts (and the use of such efforts shall not require such Person to incur costs that would otherwise be excessive in relation to the benefit to the Lenders of the control arrangements to be afforded thereby). Except as permitted by Section 5.20(b)(i), the Loan Parties shall not establish any Deposit Accounts or Securities Accounts after the Closing Date unless such Loan Party, concurrently with the establishment of any such Deposit Account or Securities Account (or such later date as may be agreed by the Agent in its Permitted Discretion) shall have obtained an authenticated Control Agreement from the bank maintaining such Deposit Account or the securities intermediary maintaining such Securities Account and to have complied in full with the provisions of this Section 5.20(a) with respect to such Deposit Accounts or Securities Accounts; provided further that, with respect to any Deposit Accounts and Securities Accounts of any Loan Party acquired after the Closing Date, such Deposit Accounts and Securities Accounts of any such Loan Party shall not be required to be subject to a Control Agreement (i) until 30 days (or such later date as may be agreed by Agent in its Permitted Discretion) after such entity becomes a Loan Party, or (ii) if the security interest or hypothec of Agent in any such Deposit Account is otherwise perfected or rendered opposable by "control" (as defined in the UCC) by reason of such Deposit Account being maintained at the Agent or otherwise (including another method under foreign or domestic Applicable Law). Each Canadian Guarantor with a Controlled Account subject to a Control Agreement will instruct the applicable Controlled Account Bank each day to wire all amounts in the applicable Controlled Account to Agent's Account.

(b)    **Controlled Accounts**.

(i)    On or before the Closing Date (or such later date as may be agreed to by Agent in its Permitted Discretion), each Loan Party shall (1) establish and maintain cash management systems on terms reasonably satisfactory to Agent at one or more financial institutions (each a "Controlled Account Bank") pursuant to which such Loan Parties shall take reasonable steps to ensure that the Loan Parties' Account Debtors forward payment of the amounts owed by them directly to such Controlled Account Bank, and (2) deposit or cause to be deposited promptly, and in any event no later

than the third Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to a Loan Party) into a bank account of such Loan Party (each, a "Controlled Account") at one of the Controlled Account Banks. Each such Controlled Account shall be subject to a Control Agreement, which shall provide (among other things) that (A) the Controlled Account Bank will comply with any instructions originated by Agent directing the disposition of the funds in such Controlled Account without further consent by the applicable Loan Party, (B) the Controlled Account Bank subordinates any of its rights of setoff or recoupment or any other claim against the applicable Controlled Account other than for payment of its service fees and other charges directly related to the administration of such Controlled Account and for returned checks or other items of payment; provided, however, that Borrowers shall only be required to use commercially reasonable efforts to obtain such subordination from the Controlled Account Bank, and (C) the Controlled Account Bank will forward by daily sweep all amounts in the applicable Controlled Account to Agent's Account. Any provision of this Section 5.20 to the contrary notwithstanding, the Loan Parties may maintain (A) Excluded Accounts, and (B) Deposit Accounts, so long as all the cash and Cash Equivalents contained therein consist of (1) proceeds from the issuance or incurrence of Indebtedness (including the Designated Accounts into which the Advances are deposited) or the issuance of Stock, (2) proceeds from the sale or other Disposition of assets (other than ABL Priority Collateral) or (3) proceeds of insurance and condemnation awards (and payments in lieu thereof) relating to any assets (other than ABL Priority Collateral) that are segregated from the cash management systems of the Loan Parties and which Deposit Accounts do not contain any proceeds of ABL Priority Collateral, and such Deposit Accounts shall not be required to be subject to a Control Agreement, other than the Designated Accounts, or be considered Controlled Accounts.

(c)     Each Loan Party shall manage all cash in accordance with the provisions hereof and as provided in the Orders and/or Cash Management Order, in each case, as entered by the Bankruptcy Court or the CCAA Court, and the Borrower shall ensure that the Agent has control with respect to the Loan Parties' Deposit Accounts pursuant to the Cash Management Order or the Orders, as applicable.

(d)     Each Borrower and the Loan Parties shall not directly or indirectly own or control the use of any Deposit Account (other than Excluded Accounts) or Securities Accounts (other than Excluded Accounts) without (i) the consent of the Agent and (ii) entry into an effective account control agreement with respect to such Deposit Account (the "Post-Petition Deposit Accounts") or Securities Accounts (the "Post-Petition Securities Accounts").

5.21    **Milestones**. Each Borrower shall comply with each of the requirements set forth on Schedule 5.21 hereto.

5.22    **Priority and Liens**. At all times during the term hereof, each Borrower shall ensure each of the following and in each case subject to the Carve Out and as otherwise provided in the Orders and the CCAA Orders:

(a)     Upon the entry of each of the Orders, each Borrower's, each other Debtor's and each other CCAA Debtor's Obligations hereunder and under each of the other Loan Documents shall, at all times:

(i)     constitute an allowed DIP Superpriority Claim on a joint and several basis in the Case of such Debtor and the CCAA Case of such CCAA Debtor;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by first priority, valid, binding, continuing, enforceable and fully-perfected or opposable security interests in, and

Liens upon, all DIP Collateral that, on or as of the Petition Date, is not subject to valid, perfected, or opposable, and non-avoidable liens (excluding any Avoidance Actions (but including, following the entry of the Final Order, the proceeds therefrom));

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable and fully-perfected, or opposable, security interests in, and Liens upon, the DIP Collateral, whether existing on the Petition Date or thereafter acquired, that is subject to Liens of parties other than the Pre-Petition Parties, Liens securing the Adequate Protection Liens of the Pre-Petition Parties, the Carve Out or any Permitted Lien (as defined in the Interim Order), which security interests and liens in favor of the Agent, are junior to such valid, perfected or opposable and non-avoidable Liens; and

(iv)    pursuant to section 364(d) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully perfected, or opposable, first priority senior priming security interests and Liens upon all DIP Collateral that is subject to valid, perfected, or opposable, and non-avoidable liens presently held for the benefit of the Pre-Petition Parties (such priming liens, the "Priming Liens" and such primed liens of the Pre-Petition Parties, the "Primed Liens"). The Priming Liens shall be senior in all respects to the Primed Liens and to the interests in property of the Pre-Petition Parties (including any and all forms of adequate protection granted to the foregoing). The Primed Liens shall be primed and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate as of the Petition Date.

(b)    The Liens of the Agent described in Section 5.22(a) and the DIP Superpriority Claim shall have priority over any claims arising, upon entry of the Final Order, under sections 105 and 506(c) of the Bankruptcy Code, and shall be subject only to the Carve Out, and other Permitted Liens (as defined in the Interim Order) and as otherwise provided in the CCAA Orders. Except as set forth herein, no other claim having priority superior to or pari passu with that granted to the Secured Parties by the Order then in effect shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c)    Upon entry of the Final Order, except for the Carve Out and as otherwise provided in the CCAA Orders, no costs or expenses of administration shall be imposed against the Agent, the Lenders, or any other Secured Party or any of the Collateral or, subject to the entry of the Final Order, under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Debtors hereby waives for itself and on behalf of its estate and all rights under section 105 and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Agent, the Lenders, or any Secured Party.

(d)    Except for the Carve Out and as otherwise provided in the CCAA Orders, the DIP Superpriority Claims of the Secured Parties and the Pre-Petition Parties shall at all times be senior to the rights of such Debtor, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including any chapter 7 cases (if any of such Debtor's cases are converted to cases under chapter 7 of the Bankruptcy Code).

(e)    For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve Out shall be senior to all liens securing the Obligations as well as any Adequate Protection Liens and claims granted by any Order. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation of any professional retained by any Debtor or a Committee. Notwithstanding anything herein to the contrary, prior to an

Event of Default, the Debtors shall, in accordance with the Budget and subject to the terms of the Orders and any other relevant orders of the Bankruptcy Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of the Bankruptcy Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of such Event of Default, and such amounts paid will not reduce the Post-Carve-Out Trigger Notice Cap.

(f)        The Borrower and each CCAA Debtor hereby covenants that, upon entry of the CCAA Initial Order (and when applicable, the CCAA A&R Initial Order), and in all cases subject to the terms of the CCAA Initial Order and the CCAA A&R Initial Order, as the case may be:

(i)        the Obligations of the CCAA Debtors under the Credit Documents shall at all times be secured by the CCAA DIP Charge in favor of the Agent on behalf of and for the benefit of the Secured Parties on the Collateral of the CCAA Debtors with the priority and other terms as set forth in the CCAA Orders; and

(ii)        pursuant to the CCAA Initial Order (and, when entered, the CCAA A&R Initial Order), the Liens in favor of the Agent on behalf of and for the benefit of the Secured Parties on the Collateral of the CCAA Debtors shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, security agreement, financing statement, assignment or similar instrument.

5.23    **Lender Meetings**. No less than twice per week unless otherwise agreed by Agent, and more frequently upon the reasonable request of the Agent, Holdings will participate in a meeting or conference call with Agent to discuss the financial condition and results of operations of Holdings and its consolidated Subsidiaries, budget variances and operations of Holdings and its Subsidiaries, and, subject to Section 5.13(l), the matters contemplated by or relating to the Bidding Procedures (as provided therein), including the sale process contemplated thereby, and such other matters as may be reasonably requested by the Agent. For the avoidance of doubt, so long as no Default or an Event of Default has occurred and is continuing, such meetings and conference calls may, at Borrowers' option, be attended by the lenders under the Term Loan Indebtedness, DIP Term Loan Indebtedness or any Refinancing Indebtedness in respect thereof.

5.24    **Challenges**. Notwithstanding anything herein to the contrary, except as expressly permitted by the Orders with respect to the Pre-Petition Credit Agreement, no portion or proceeds of the Agreement or the Collateral, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) objecting, contesting or raising any defense to the validity, perfection, priority or enforceability of, or any amount due under this Agreement, the Loan Documents, the Prepetition Credit Agreement or any security interests, liens or claims granted under the Orders, the Loan Documents or the "Loan Documents" (as defined in the Prepetition Credit Agreement) to secure such amounts; (b) asserting any challenges, claims, actions or causes of action against any of the Lenders, the Agent, the lenders under the Prepetition Credit Agreement or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the Collateral; or (d) seeking to amend or modify any of the rights granted to the Agent, the Lenders, the "Secured Parties" (as defined in the Prepetition Credit Agreement) under this Agreement, the Loan Documents, the Orders or the "Loan Documents" (as defined in the Prepetition Credit Agreement), including seeking to use the cash collateral and/or Collateral on a contested basis.

## 6.    NEGATIVE COVENANTS

Each of Holdings and each Borrower covenants and agrees that, until the Payoff Date, each of Holdings and each Borrower will not and will not permit any of their Subsidiaries to do any of the following:

6.1      **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2      **Liens**. Create, incur, assume or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3      **Restrictions on Fundamental Changes**. Except as permitted by Section 6.4 or 6.11 or in connection with the consummation of a 363 Sale:

(a)      in any transaction or series of transactions, enter into any merger, amalgamation, division, or consolidation,

(b)      liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution),

(c)      in the case of Holdings and its Subsidiaries, taken as a whole, terminate a substantial portion of its business, or

(d)      convey, sell, lease, assign or otherwise Dispose of all or substantially all of the business units, assets or properties.

6.4      **Disposal of Assets**. Other than Permitted Dispositions, Permitted Investments or transactions expressly permitted by Sections 6.3 and 6.11, convey, sell, lease, license, assign (other than in connection with the granting of Permitted Liens), transfer, or otherwise dispose of (any such action, a "Disposition") any of any Loan Party's or its Subsidiaries' assets (including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division").

6.5      **Use of Proceeds**. Use the proceeds of any Advance in a manner which would result in such use of proceeds to not be in accordance with the provisions of Section 4.34 hereof.

6.6      **[Intentionally Omitted]**.

6.7      **Prepayments and Amendments**.

(a)      Optionally prepay, redeem, defease, purchase, or otherwise optionally acquire any of the principal amount of any Subject Debt (each, a "Restricted Debt Payment") (it being understood that payments of regularly scheduled interest shall be permitted), other than:

(i)      payment of secured Indebtedness that becomes due as a result of the voluntary sale or Disposition of the property or assets securing such Indebtedness (other than ABL Priority Collateral) so long as such sale or Disposition is permitted by Section 6.4 and so long as such Indebtedness is paid with the proceeds of such sale or Disposition; and

(ii)      payment due under the DIP Term Loan Credit Agreement (subject to the DIP Intercreditor Agreement), in accordance with the Orders and the Budget (subject to Permitted Variances).

Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 6.7(a) shall prohibit the repayment, prepayment, redemption, defeasance, purchase or acquisition of intercompany Indebtedness for borrowed money owed among Holdings or the Subsidiaries, unless an Event of Default has occurred and is continuing and Holdings has received a notice from Agent instructing it not to make or permit the Subsidiaries to make any such repayment, prepayment redemption, defeasance or acquisition.

(b)    Directly or indirectly, amend, modify, or change any of the terms or provisions of:

(i)    (A) any agreement entered into in connection with the 363 Sale without the consent of the Agent, if such agreement, amendment, modification or change is adverse to the interests of the Agent or any Lender, or (B) any agreement, instrument, document, indenture, or other writing evidencing or concerning the DIP Term Loan Indebtedness without the consent of the Agent if such amendment, modification or change is prohibited pursuant to the terms of the DIP Intercreditor Agreement, or

(ii)    the Governing Documents of any Loan Party or any of its Subsidiaries without the consent of the Agent.

6.8    **Chapter 11 Claims**. No Loan Party shall, until payment in full of the Obligations under this Agreement (other than (i) Obligations under Bank Product Obligations or (ii) Letters of Credit that have been cash collateralized or backstopped by a letter of credit in form and substance reasonably satisfactory to the Agent), except with respect to the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien on its property which is *pari passu* with or senior to the claims or Liens, as the case may be, of the Agent and the Lenders under the Loan Documents or under the Orders.

6.9    **Restricted Junior Payments**. Make any Restricted Junior Payment; provided, however, that, so long as it is permitted by law and in each case consistent with the Budget and any applicable order of the Bankruptcy Court or the CCAA Court:

(a)    [intentionally omitted];

(b)    to the extent constituting Restricted Junior Payments, Holdings may make Investments permitted by Section 6.11 (other than Investments described in clause (u) of the definition of "Permitted Investments");

(c)    [intentionally omitted];

(d)    Holdings may make and pay Restricted Junior Payments to its direct or indirect parent companies:

(i)    the proceeds of which will be used to allow any direct or indirect parent of Holdings to pay the tax liability to each relevant jurisdiction in respect of consolidated, combined, unitary or affiliated returns that include Holdings (or, if Holdings is a disregarded entity, the income of Holdings), but only to the extent of taxes that Holdings would have to pay if it had filed a tax return on a standalone basis for itself and its Subsidiaries; and

(ii)    the proceeds of which shall be used by any direct or indirect parent of Holdings to pay its operating expenses incurred in the ordinary course of business and other corporate

overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, in an aggregate amount not to exceed $100,000 in the aggregate;

(e)    [intentionally omitted];

(f)    Holdings may make payments described in <u>Sections 6.12</u> <u>(e)</u>, <u>(h)</u>, <u>(i)</u>, <u>(j)</u>, and <u>(n)</u> (subject to the conditions set out therein);

(g)    [intentionally omitted];

(h)    [intentionally omitted];

(i)    [intentionally omitted];

(j)    [intentionally omitted];

(k)    [intentionally omitted];

(l)    [intentionally omitted].

6.10    **Accounting Methods**. Modify or change (a) each of its, and each of the Subsidiaries', fiscal years to end on a date other than December 31 of each year and (b) each of its, and each of the Subsidiaries', fiscal quarters to end on dates that are not consistent with such fiscal year-end; <u>provided</u>, <u>however</u>, that Holdings may, upon written notice to, and consent by, the Agent, change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Agent, in which case Holdings and the Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

6.11    **Investments**. Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

6.12    **Transactions with Affiliates**. Directly or indirectly enter into, make any payment to, or sell, lease, transfer or otherwise Dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of related transactions, contract, agreement, loan, advance or guarantee with, or for the benefit of, any Affiliate of any Loan Party or any of its Subsidiaries or permit to exist any transaction with any Affiliate of any Loan Party or any of its Subsidiaries, in each case, involving consideration in excess of $250,000, except for:

(a)    such transactions in the ordinary course of business upon fair and reasonable terms fully disclosed to the Agent and on terms no less favorable to Holdings or such Subsidiary as would be obtainable by Holdings or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(b)    if such transaction is between or among Holdings or its Subsidiaries and permitted by the Budget (to the extent otherwise permitted hereunder),

(c)    [intentionally omitted],

(d)        [intentionally omitted],

(e)        any transaction in accordance with the Orders,

(f)        Stock issuances, repurchases, retirements or other acquisitions or retirements of Stock by Holdings (or a parent company thereof) permitted under Section 6.9,

(g)        to the extent permitted by the Budget, loans and guarantees by Holdings (or any of its direct or indirect parent thereof) and the Subsidiaries to the extent permitted by Section 6.1,

(h)        to the extent permitted by the Budget, employment and severance arrangements and health, disability and similar insurance or benefit plans between Holdings (or any of its direct or indirect parent thereof) and the Subsidiaries and their respective directors, officers, employees (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Stock pursuant to put/call rights or similar rights with current or former employees, officers or directors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the Board of Directors of Holdings (or any direct or indirect parent thereof),

(i)        to the extent permitted by the Budget, the payment of customary fees and reasonable and documented out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of Holdings (or any direct or indirect parent thereof) and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Holdings and the Subsidiaries,

(j)        transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 6.12;

(k)        Restricted Debt Payments permitted under Section 6.7, Restricted Junior Payments permitted pursuant to Section 6.9 and Permitted Investments permitted under Section 6.11,

(l)        any issuance of Stock or other payments, awards or grants in cash, securities, Stock or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of Holdings (or any of its direct or indirect parent thereof),

(m)        any purchase by Holdings of the Stock of a Subsidiary thereof; provided that, to the extent required by Section 5.11 or Section 5.12, any Stock so purchased shall be pledged to Agent for the benefit of the Secured Parties pursuant to the applicable Security Agreement, and

(n)        payments by Holdings (or any of its direct or indirect parent companies) and its Subsidiaries pursuant to tax sharing agreements among Holdings (or such parent) and its Subsidiaries on customary terms to the extent permitted by Section 6.9(d)(i).

Notwithstanding the foregoing, neither Holdings nor any of its Subsidiaries shall be permitted to pay any management, monitoring, consulting, transaction, advisory or similar fees to the Equity Sponsor or any of its Affiliates.

6.13    **Changes in Business**. Fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by Holdings and its Subsidiaries, taken as a

whole, on the Closing Date and other business activities incidental, complementary or related to any of the foregoing.

6.14 **Holding Companies**. Permit Holdings, Canadian Holdco, BB Parent, BB Holdings, Clover Leaf Seafood, or any other Holding Company to conduct, transact or otherwise engage in any business or operations other than (i) after giving effect to the Transactions, the ownership or acquisition of the Stock of any Holding Company, Canadian Borrower, U.S. Borrower and any other Person the Stock of which constitute a Permitted Investment, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries, (iv) the performance of its obligations under and in connection with the Loan Documents, the DIP Term Loan Document and the other agreements contemplated hereby and thereby, (v) in the case of Holdings, any public offering of its common Stock or any other issuance or registration of its Stock for sale or resale not prohibited by Section 6, including the costs, fees and expenses related thereto, (vi) any transactions that any such Person is permitted to enter into or consummate pursuant to the terms and conditions of Section 6 of the Agreement, including making any Permitted Investment or Restricted Junior Payments permitted by Sections 6.9 or 6.11 or making other dividends or distributions or holding any cash or Cash Equivalents received in connection any such dividends or distributions, in each case, in accordance with the Budget, (vii) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, in each case, in accordance with the Budget, (viii) providing indemnification to employees, officers and directors and as otherwise permitted in Section 6, (ix) activities incidental to the consummation of the Transactions and (x) activities incidental to the businesses or activities described in clauses (i) to (ix) of this Section 6.14. It being understood that in no event shall Holdings, Canadian Holdco, BB Parent, BB Holdings, Clover Leaf Seafood, or any other Holding Company own and operate any operating assets.

6.15 **Compliance with Budget.**

(a) No Loan Party shall, except as otherwise provided herein or approved by the Agent, directly or indirectly (i) use any cash or the proceeds of any Advances in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget, (ii) permit a disbursement causing any variance other than a Permitted Variance without the prior written consent of the Agent, or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments consistent with the Budget and authorized by the Bankruptcy Court or the CCAA Court.

(b) Prior to the occurrence of an Event of Default, the Borrowers shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are consistent with the Budget or any Permitted Variance and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court or under any applicable provisions of the CCAA pursuant to an order of the CCAA Court. Upon the occurrence of an Event of Default and delivery of a Carve-Out Trigger Notice, the right of the Borrowers to pay professional fees of Professional Persons in excess of the Carve Out shall terminate, and the Borrowers shall provide immediate notice to all Professional Persons informing them that the Borrowers' ability to pay such Professional Persons is subject to and limited by the Carve Out.

6.16 **Civil Antitrust Claims**. Enter into any settlement or similar agreement in connection with the Civil Antitrust Claims (or request the Bankruptcy Court or CCAA Court to approve) without the prior written consent of the Agent (such consent not to be unreasonably withheld).

6.17    **Use of Collateral**. Other than as expressly permitted by the Orders, no Loan Party shall use or permit the use of Collateral, proceeds of Advances, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee Professionals, if any, or any trustee, interim receiver, receiver, receiver-manager or other estate representative appointed in the Cases or the CCAA Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) to:

(a)    seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will discharge the Obligations in "full" in cash (other than (i) Obligations under Bank Product Obligations or (ii) Letters of Credit that have been cash collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Agent); or

(b)    except as expressly permitted by the Orders, investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agent, the Lenders, the other Loan Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims; the Liens granted under the Loan Documents, the Pre-Petition Loan Documents, the liabilities under the Pre-Petition Credit Agreement or the Liens under the Pre-Petition Credit Agreement; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders). Notwithstanding anything to the contrary herein, the Committee Professionals may use up to $50,000 in the aggregate amount of the Carve Out, any cash-collateral, or proceeds of the Avoidance Actions to investigate the Pre-Petition Parties (the "Committee Investigation Budget"); *provided* that the Debtors' and the CCAA Debtors' stipulations as to validity, priority and security of the liabilities under the Pre-Petition Credit Agreement shall be binding upon each other party in interest, including the Committee Professionals unless such party in interest commences a challenge by (x) with respect to the Committee Professionals, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Order or the CCAA Initial Order.

6.18    **Negative Pledge Clauses**. Enter into or permit to exist any contractual obligation (other than this Agreement or any other Loan Document, any DIP Term Loan Document or any documentation governing any Refinancing Indebtedness thereof, including the DIP Intercreditor Agreement), that limits the ability of (a) any Borrower or any Guarantor to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Loan Documents, or (b) any Subsidiary of either Borrower that is not a Guarantor to make distributions or pay dividends to Borrowers; provided that the foregoing shall not apply to contractual obligations that (i)(x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 6.18) are listed on Schedule 6.18 hereto and (y) to the extent contractual obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing

any Refinancing Indebtedness incurred to refinance such Indebtedness or obligation so long as such Refinancing Indebtedness is permitted and does not expand the scope of such contractual obligation in any material respect (as conclusively determined by Holdings and evidenced by a certificate of an Authorized Person of Holdings), (ii) are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary of Holdings, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Subsidiary of Holdings, (iii) represent Indebtedness of a Subsidiary of Holdings that is not a Borrower or a Guarantor to the extent such Indebtedness is permitted by Section 6.1, (iv) arise pursuant to agreements entered into with respect to any disposition permitted by Section 6.4 and applicable solely to assets under such disposition, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by Section 6.11 and applicable solely to such joint venture entered into in the ordinary course of business, (vi) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 6.2, but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness, (vii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (viii) comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 6.1 to the extent that such restrictions apply only to the property or assets securing such Indebtedness, (ix) are customary provisions restricting subletting or assignment of any lease or license governing a leasehold interest or licensed interest of Holdings or any Subsidiary, (x) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (xi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (xii) are imposed by Applicable Law, (xiii) exist under the DIP Term Loan Documents or any documentation governing any Refinancing Indebtedness incurred and permitted to refinance such Indebtedness, (xiv) are customary net worth provisions contained in real or immovable property leases entered into by Subsidiaries of Holdings, so long as Holdings has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of Holdings and its Subsidiaries to meet their ongoing obligation, (xv) are customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business, (xvi) are restrictions on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the equity interests or assets of such Subsidiary pending the closing of such sale or disposition, (xvii) are restrictions imposed by any agreement relating to Indebtedness incurred in accordance with Section 6.1, to the extent such restrictions are not more restrictive than the restrictions contained in the DIP Term Loan Documents, (xviii) customary restrictions and conditions contained in the document relating to any Lien, so long as (x) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (y) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.18, or (xix) are any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (xviii) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of Holdings, not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

6.19    **Establishment or Acquisition of Canadian Defined Benefit Plans**. Establish or commence contributing to any Canadian Defined Benefit Plan not in existence as of the Closing Date.

6.20    **Winding Up of a Canadian Pension Plan.** Terminate any Canadian Pension Plan in whole or in part, or take any action which could reasonably be expected to allow a Governmental

Authority to order the termination or wind-up of any other Canadian Pension Plan in whole or in part, if such termination or wind-up could reasonably be expected to have a Material Adverse Effect.

6.21 **Bankruptcy Negative Covenants**. Seek, consent to, or permit to exist any of the following:

(a) any modification or amendment to the Orders to which the Agent has not consented in writing, or any appeal, stay, reversal, or vacatur of any of the Orders;

(b) (i) Except to the extent provided in the Orders or the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all the Debtors' rights to surcharge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived upon the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations or (ii) any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, in each case except with respect to the Carve Out and otherwise to the extent permitted under the Orders;

(c) Except as provided for in the Budget, without the prior written consent of the Agent and pursuant to an order of the Bankruptcy Court or the CCAA Court (including any Order) after notice and a hearing, any claim or expense with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to an automatic stay provision of the Bankruptcy Code or the CCAA whether by way of "adequate protection" under the Bankruptcy Code, the CCAA or otherwise;

(d) Except as agreed to by the Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code or any equivalent provision of the CCAA;

(e) File a plan of reorganization, including, without limitation, any plan that provides for treatment of the Obligations other than repayment in full in cash on the effective date thereof (other than (i) Obligations under Bank Product Obligations or (ii) Letters of Credit that have been cash collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Agent);

(f) The Bankruptcy Court or the CCAA Court enters a final, non-appealable order granting a party relief with respect to reclamation claims with respect to Inventory in an aggregate amount in excess of $100,000;

(g) Any order which authorizes the payment of any Indebtedness (other than the Indebtedness reflected in the Budget, and other Indebtedness approved by the Agent) incurred prior to the Petition Date, and payment of any Indebtedness owed to the Affiliates of the CCAA Debtors or the Affiliates of the Debtors (but not the CCAA Debtors or the Debtors) or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget); or

(h) Any order which authorizes a Loan Party to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents unless in connection therewith the Obligations will be paid in full in cash (other than (i) contingent

indemnification obligations as to which no claim has been asserted, (ii) Obligations under Bank Product Obligations or (iii) Letters of Credit that have been cash collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Agent).

6.22    **Formation of Subsidiaries.** Form, acquire, create or allow to form, acquire or create any direct or indirect Subsidiary without the prior written consent of Agent (which will be provided in Agent's sole discretion).

6.23    **Litigation Spend**. After the Petition Date, any fees, costs and expenses paid, reimbursed or owing, directly or indirectly, by Holdings or any of its Subsidiaries (including any such fees, costs and expenses that have accrued prior to the date hereof, but have not yet been paid as of the date hereof) to any Person in connection with the Civil Antitrust Claim and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Antitrust Claim, including, without limitation, to (I) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (II) Keker, Van Nest & Peters LLP and/or any other legal counsel representing Christopher Lischewski, (III) Compass Lexecon and/or any other experts in connection with the Civil Antitrust Claim and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Cases and/or (IV) any other legal counsel representing Walter Scott Cameron and/or Kenneth Worsham and/or any other individual and/or Holdings and/or any of its Subsidiaries in connection with the Civil Antitrust Claim and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Antitrust Claim shall not exceed an aggregate amount of $450,000.

## 7.    [INTENTIONALLY OMITTED].

## 8.    EVENTS OF DEFAULT

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1    If any Borrower fails to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations owing hereunder or under the Loan Documents (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) and such failure continues for a period of three (3) Business Days, or (b) all or any portion of the principal of the Obligations owing hereunder or under the Loan Documents; provided, however, that if any payment of any fee or interest would otherwise be due and payable on a date that is not a Business Day, such failure to pay on such date shall not constitute an Event of Default until the third Business Day after the date when such payment, reimbursement, or other amount is otherwise due;

8.2    If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.6, 5.3 (with respect to Holdings or any Borrower), 5.6(b) (solely to the extent that such breach is related to the failure to maintain insurance that is in effect), 5.7, 5.10(b), 5.13, 5.14, 5.15, 5.18, 5.20, 5.21, or 5.22 of this Agreement, or (ii) Sections 6.1 through 6.23 of this Agreement;

(b)    fails to perform or observe any covenant or agreement contained in Section 5.2 of this Agreement, and such failure continues for a period of two (2) Business Days after the earlier of (i)

the date on which such failure shall first become known to any officer of any Loan Party and (ii) the date on which written notice thereof is given to any Loan Party by Agent;

(c)      fails to perform or observe any covenant or agreement contained in any of Sections 5.1, 5.11 or 5.12 of this Agreement, and such failure continues for a period of 10 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party and (ii) the date on which written notice thereof is given to any Loan Party by Agent;

(d)      fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party or (ii) the date on which written notice thereof is given to any Loan Party by Agent;

8.3      If one or more judgments, orders, or awards (or any settlement of any claim that, if breached, could result in a judgment, order, or award) for the payment of money is entered against a Loan Party or any of its Subsidiaries after the Petition Date, or with respect to any of their respective assets, or any Loan Party or any of its Subsidiaries shall agree to the settlement of any one or more pending or threatened claims, actions, suits, or proceedings, (x) relating to any litigation arising from any Civil Antitrust Claim, (y) relating to any pending criminal indictment or conviction in any way arising from or related to, directly or indirectly, the facts, circumstances, acts, or omissions involved in or related to the allegations underlying or related to the DOJ Settlement, including any judgment, order or award issued, granted, or entered on account of a breach or violation or other noncompliance with the DOJ Settlement, or any other criminal antitrust claim against any Loan Party, or (z) relating to any other matter (excluding matters described above in clauses (x) or (y) if the aggregate amount for such judgments, orders, awards, or settlements described in the foregoing clauses exceeds $1,000,000 (in each case in excess of any applicable insurance with respect to which the insurer has not denied liability)), and with respect to any such judgments, orders, award or settlements either (A) at any time after the entry of any such judgment, order, award or settlements during which a stay of enforcement thereof is not in effect, or (B) such judgment, order, award or settlement is paid;

8.4      Other than the Debtors and the CCAA Debtors or in respect of the Cases or the CCAA Cases, if an Insolvency Proceeding is commenced by Holdings, any Borrower, or any of their respective Subsidiaries;

8.5      Other than the Debtors and the CCAA Debtors or in respect of the Cases or the CCAA Cases, if an Insolvency Proceeding is commenced against Holdings, a Borrower, or any of their respective Subsidiaries and any of the following events (or analogous events under other applicable laws) occur: (a) Holdings, a Borrower, or any such Subsidiary consents to the institution of such Insolvency Proceeding against it without the consent of the Agent and the Required Lenders, (b) the petition, application or other originating process commencing the Insolvency Proceeding is not timely controverted, (c) the petition, application or other originating process commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (d) an interim trustee, interim receiver or analogous official is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its material Subsidiary, or (e) an order for relief shall have been issued or entered therein;

8.6      (a) Any DOJ Payment, if after giving effect to the payment of such DOJ Payment, Borrowers' Adjusted Excess Availability is, immediately after giving Pro Forma Effect to the payment of such DOJ Payment, or at any time during the 30 consecutive day period immediately prior to the making

of payment of such DOJ Payment would have been, in each case, less than $10,000,000 or (b) any Other Payment, except any Other Payment pursuant to any settlement agreements entered into prior to the Petition Date relating to the Civil Antitrust Claims to the extent such settlement agreements have been approved under the Pre-Petition Credit Agreement prior to the Petition Date.

8.7     Except as a result of commencement of the Cases and the CCAA Cases or unless the payment, acceleration and/or exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or the CCAA Court (a) if there is (i) default in any payment with respect to any Indebtedness (other than any Indebtedness described in <u>Section 8.1</u>) involving an aggregate amount in excess of $1,000,000, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than (A) with respect to Indebtedness consisting of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements and (B) secured Indebtedness that becomes due as a result of a Disposition (including as a result of a Recovery Event) of the property or assets securing such Indebtedness permitted under this Agreement), the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, irrespective of whether exercised, any such Indebtedness to become due prior to its stated maturity; <u>provided</u> that, in the case of this <u>clause (ii)</u>, any Event of Default pursuant to this <u>Section 8.7(a)(ii)</u> that results from an Event of Default (as defined in the DIP Term Loan Credit Agreement) shall be deemed to be waived concurrently with the waiver of all such Events of Default under the DIP Term Loan Documents or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and (A) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements and (B) secured Indebtedness that becomes due as a result of a disposition (including as a result of a Recovery Event) of the property or assets securing such Indebtedness permitted under this Agreement), prior to the stated maturity thereof;

8.8     If any warranty or representation made herein or in any other Loan Document or certificate (including any Borrowing Base Certificate or any Budget Variance Report) or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect as of the date of issuance or making or deemed making thereof;

8.9     The Guaranty or any material provision thereof shall cease to be in full force and effect or any Guarantor thereunder or any Loan Party shall deny or disaffirm in writing any Guarantor's obligations under the Guaranty;

8.10     If the U.S. Security Agreement, any Canadian Security Document, or any other Loan Document that purports to create a Lien or the Orders, shall, for any reason, fail or cease to create a valid and perfected, or opposable, and, except to the extent permitted by the terms hereof or thereof, first priority Lien on the Collateral covered thereby (subject to Permitted Liens), except (a) as a result of a Disposition of the applicable Collateral in a transaction permitted under this Agreement, or (b) with respect to Collateral the aggregate value of which, for all such Collateral, does not exceed at any time $500,000;

8.11     A Change of Control shall occur other than with respect to the 363 Sale;

8.12     Any material provision of any Loan Document shall at any time for any reason, other than as permitted hereunder or thereunder, or as a result of acts or omissions by the Agent, or the payment

in full of the Obligations, be declared to be null and void, or the validity or enforceability thereof shall be contested by a Loan Party or its Subsidiaries, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document (other than as a result of a payment in full of the Obligations);

8.13

(a)    The occurrence of any of the following events with respect to any Loan Party or any of its ERISA Affiliates: (i) any Loan Party or any ERISA Affiliate fails to make full payment when due of all amounts which, under the provisions of any Pension Plan, Multiemployer Plan, or Section 412 or 430 of the IRC, any Loan Party or any ERISA Affiliate is required to pay as contributions thereto, and such failure (x) could reasonably be expected to result in a Material Adverse Effect, either individually or in the aggregate, or (y) could reasonably be expected to result in the imposition of a Lien on any of the assets of any Loan Party or any of their respective Subsidiaries, (ii) a failure to satisfy "minimum funding standards" (as defined in Section 431 of the IRC) or a "funding shortfall" (as defined in Section 430 of the IRC) occurs or exists, whether or not waived, with respect to any Pension Plan, except, in any such case, individually or in the aggregate, to the extent that such failure or shortfall (x) could not reasonably be expected to result in a Material Adverse Effect, either individually or in the aggregate, and (y) could not reasonably be expected to result in the imposition of a Lien on any of the assets of any Loan Party or any of their respective Subsidiaries, (iii) a Termination Event which (x) could reasonably be expected to result in a Material Adverse Effect, either individually or in the aggregate, or (y) could reasonably be expected to result in the imposition of a Lien on any of the assets of any Loan Party or any of their respective Subsidiaries, or (iv) any Loan Party or any ERISA Affiliate as employers under one or more Multiemployer Plans makes a complete or partial withdrawal from any such Multiemployer Plan and incurs a withdrawal liability except to the extent that such liability (x) could not reasonably be expected to result in a Material Adverse Effect, either individually or in the aggregate, and (y) could not reasonably be expected to result in the imposition of a Lien on any of the assets of any Loan Party or any of their respective Subsidiaries; or

(b)    The occurrence of any of the following events: (i) any Canadian Loan Party or any of its Subsidiaries fails to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any Canadian Loan Party or any of its Subsidiaries is required to pay as contributions thereto, and such failure (x) could reasonably be expected to result in a Material Adverse Effect, either individually or in the aggregate, or (y) could reasonably be expected to result in the imposition of a Lien (other than a Permitted Lien) on any of the assets of any Loan Party or any of their respective Subsidiaries; or (ii) a Canadian Pension Event.

8.14    If any director or senior officer of any Loan Party is (a) convicted of a felony, unless such director or senior officer resigns or is terminated from his or her position within 10 days following such conviction (or, in the case of any Other DOJ Individual on account of any Other DOJ Matter, placed on leave at all times thereafter (or terminated) and relieved of his/her position and responsibilities), or (b) is convicted by a Governmental Authority under any Applicable Law that, with respect to this clause (b), could reasonably be expected to lead to a forfeiture of any material portion of the Collateral;

8.15    If any director or senior officer of any Loan Party (a) is indicted of a felony (other than an indictment or other charge by a Governmental Authority of one or more of the Other DOJ Individuals (including Christopher Lischewski) solely with respect to the Other DOJ Matters), unless such director or senior officer resigns or is terminated from his or her position within 10 days following such indictment, or (b) is indicted or otherwise charged by a Governmental Authority under any Applicable Law that, with

respect to this clause (b), could reasonably be expected to lead to forfeiture of any material portion of the Collateral;

8.16    If any Loan Party or any Subsidiary of any Loan Party is (a) criminally indicted or convicted of a felony, in each case other than as a result of the DOJ Settlement, or (b) charged by a Governmental Authority under any Applicable Law that would reasonably be expected to, in the case of this clause (b), lead to forfeiture of any material portion of the Collateral;

8.17    If (a) the Restructuring Support Agreement (such Restructuring Support Agreement, together with the Term Sheet defined therein and attached thereto, collectively, the "RSA") entered into by and among, *inter alia*, the Borrowers, certain of the other Loan Parties, the Lenders, and certain other creditors, is terminated by any party thereto, or (b) any Loan Party repudiates or asserts a defense to any obligation or liability under the Credit Agreement, any other Loan Document or the RSA;

8.18    Except as otherwise permitted herein, the dissolution of any Loan Party;

8.19    The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Agent or the Lenders in each case relating to this Agreements; or

8.20    Any of the following shall occur in any Case or CCAA Case:

(a)    the filing by any Loan Party of a reorganization plan that does not provide for payment in full in cash of all Obligations upon the effectiveness thereof, or if any Loan Party applies for, consent to, or acquiesces in such relief;

(b)    (A) any Order or provision thereof or any order entered in connection with the Bidding Procedures Motion or the 363 Sale is reversed, vacated, stayed, or otherwise ceases to be in full force and effect, (B) entry of an order without the prior consent of the Agent or the Required Lenders amending, supplementing or otherwise modifying any Order or any order entered in connection with the Bidding Procedures Motion or the 363 Sale (other than immaterial modifications to correct grammatical or typographical errors) or (C) failure by the Loan Parties to perform under any Order in a material respect;

(c)    The filing of a motion by any Loan Party seeking entry of, or the entry of any order without the prior consent of the Agent or the Required Lenders that authorizes any of the following:

(i)    except as provided in the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, except with respect to the Carve Out or as otherwise provided by the CCAA Orders, the DIP Term Loan Indebtedness or as may be approved by the Bankruptcy Court or the CCAA Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to the Agent;

(ii)     except as provided in the DIP Intercreditor Agreement or pursuant to the Orders, any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except with respect to the Carve Out;

(iii)     the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code or section 36 of the CCAA, through a confirmed plan of reorganization in the Cases or the CCAA Cases or otherwise that does not result in payment in full of all of the Obligations in immediately available funds at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Bank Product Obligations or (iii) Letter of Credit Obligations that have been cash collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Agent);

(iv)     except as consented to by the Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code;

(v)     authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code or requiring the marshaling of assets or any other similar remedy against or with respect to any of the Collateral or from the Agent or any of Lenders, to the extent not dismissed or denied within 45 days after the filing of such motion;

(vi)     granting of (I) relief from the automatic stay in the Cases or the CCAA Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of any Borrower or (II) any relief that would impair the material rights and interests of the Agent, and the Lenders in their capacities as such (regardless of whether such relief was sought by the Debtors, the CCAA Debtors or a third party); and/or

(vii)     payment of or granting adequate protection with respect to Pre-Petition Indebtedness, other than as expressly set forth in the Orders and the Budget.

(d)     the payment of any Indebtedness or other payables or liabilities, including any prepayments of amounts under the DOJ Settlement except as otherwise provided in the Budget and as permitted by the Orders; and/or

(e)     the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the dismissal or otherwise termination of any of the CCAA Cases, or the filing of any motion to so dismiss or convert brought by any Loan Party;

(f)     appointment of a Chapter 11 trustee or an examiner or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party;

(g)     any of the Loan Parties shall fail to comply in any material respect with the CCAA Initial Order (prior to the CCAA A&R Initial Order Date) or the CCAA A&R Initial Order (on and after the CCAA A&R Initial Order Date);

(h)     any of the Liens or the DIP Superpriority Claims granted under the Loan Documents cease to be valid, perfected and enforceable in any respect;

(i)    the use of cash collateral by the Debtors or the CCAA Debtors is terminated and the Debtors or the CCAA Debtors, as applicable, fail to regain the use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to Agent;

(j)    [intentionally omitted];

(k)    [intentionally omitted];

(l)    any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries, with any Loan Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Agent or any of the Lenders relating to the Agreement or (B) the administrative agent or any lender relating to the Prepetition Credit Agreement;

(m)    any Loan Party, or any person on behalf of any Loan Party, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (e) through (k) above or the granting of any other relief that if granted would give rise to an Event of Default;

(n)    (i) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order, the Bidding Procedures Order, the Final Order, or the Sale Order without the prior written consent of the Agent or (ii) an order of the CCAA Court shall be granted reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the CCAA Initial Order or the CCAA A&R Initial Order without the prior written consent of the Agent, or (iii) a Debtor or a CCAA Debtor shall apply for the authority to do any of the foregoing;

(o)    any of (i) the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) or (ii) the CCAA Initial Order (prior to the CCAA A&R Initial Order Date) or the CCAA A&R Initial Order (on and after the CCAA A&R Initial Order Date) shall cease to create a valid and perfected Lien on the Collateral of any Debtor or CCAA Debtor, as the case may be, or shall cease to be in full force and effect, or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Agent;

(p)    an order shall have been entered by the Bankruptcy Court or the CCAA Court, as applicable, avoiding or requiring disgorgement by the Agent or any of the Lenders of any amounts received in respect of the Obligations or by any of the lenders under the Prepetition Credit Agreement of any amounts received in respect thereof;

(q)    an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Agent;

(r)    any of the Loan Parties shall fail to comply in any material respect with the Interim Order (prior to the Final Order Entry Date), the Final Order (on and after the Final Order Entry Date), the CCAA Initial Order (prior to the CCAA A&R Initial Order Date) or the CCAA A&R Initial Order (on and after the CCAA A&R Initial Order Date);

(s)    an order shall have been entered by the Bankruptcy Court or the CCAA Court providing for a change in venue with respect to the Cases or the CCAA Cases, as applicable, without the approval of the Agent and such order shall not be reversed or vacated within 10 days;

(t)        any order shall be entered which dismisses any of the Cases of the Debtors or any of the CCAA Cases of the CCAA Debtors and which order does not provide for payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Debtors, the CCAA Debtors and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(u)        any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 8.20 or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(v)        any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the DIP Superpriority Claims, the priority of the CCAA DIP Charge or the Liens granted to secure the Obligations or any other rights granted to the Agent and the Lenders in the Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code or analogous relief under the CCAA with respect to any Collateral of any Debtor or CCAA Debtor;

(w)        any Loan Party shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Obligations or any lender under the Prepetition Credit Agreement with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default;

(x)        without the consent of the Agent, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(y)        without the Agent's consent, the entry of any order by the Bankruptcy Court or the CCAA Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court or the CCAA Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Agent's consent or to obtain any financing under section 364 of the Bankruptcy Code or the CCAA other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(z)        any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral having a value in excess of $500,000 outside the ordinary course of business and not otherwise permitted hereunder;

(aa)       if any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Loan Parties shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or the CCAA Court or another court to address any such court order;

(bb)       any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or

payables other than payments in respect of the repayment of the Indebtedness under the Prepetition Credit Agreement or as otherwise permitted under this Agreement, in each case, to the extent authorized by one or more "first day" or "second day" orders, the Interim Order, the Final Order or the CCAA Orders and consistent with the Budget;

(cc)    without the Agent's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court or CCAA Court, as applicable, seeking (i) to grant or impose, under section 364 of the Bankruptcy Code, any applicable provision of the CCAA or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Agent's liens and security interests; (ii) to use, or seek to use, Cash Collateral; or (iii) to modify or affect any of the rights of the Agent or the Lenders under the Orders or the Loan Documents, by any order entered in the Cases or the CCAA Cases; or

(dd)    any order shall be entered which dismisses or otherwise terminates any of the Cases of the Debtors or the CCAA Cases of the CCAA Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnity obligations not yet due), or any of the Debtors or the CCAA Debtors shall seek confirmation of any such plan or entry of any such order.

## 9.    RIGHTS AND REMEDIES

9.1    **Rights and Remedies**. Notwithstanding anything in Section 362 of the Bankruptcy Code or any equivalent section of the CCAA but subject to the Orders and the Carve Out, upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case under clauses (a) or (b) by written notice to Borrowers) and in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by Applicable Law, do any one or more of the following:

(a)    declare the Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents, immediately due and payable, whereupon the same shall become and be immediately due and payable, and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower;

(b)    declare the Revolver Commitments terminated, whereupon the Revolver Commitments shall immediately be terminated together with (i) any obligation of any Lender hereunder to make Advances, (ii) the obligation of any Swing Lender to make any Swing Loans, and (iii) the obligation of each Issuing Lender to issue Letters of Credit; and

(c)    exercise all other rights and remedies available to the Agent or the Lenders under the Loan Documents or Applicable Law.

The foregoing to the contrary notwithstanding, with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (c), the Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the action contemplated thereby.

The Loan Parties shall not have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Agent and the Lenders in their exercise of rights and remedies,

whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, or under any applicable section of the CCAA, to the extent such relief would restrict or impair the rights and remedies of the Agent and the Lenders set forth in the Orders and in the Loan Documents.

9.2    **Remedies Cumulative**. The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

## 10.    WAIVERS; INDEMNIFICATION

10.1    **Demand; Protest; etc**. Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which such Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**. Each Borrower hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code or other applicable law, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3    **Indemnification**. Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons and the Lender-Related Persons, each Issuing Lender and each Underlying Issuer (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all losses, claims, damages or liabilities of any kind or nature and for any reasonable and documented or invoiced out of pocket fees and expenses to which any such Indemnified Person may become subject (including the reasonable fees, disbursements and other charges of (i) one firm of primary outside counsel for all Indemnified Persons, taken as a whole, and if necessary, one firm of local/foreign counsel in each applicable jurisdiction (which may include one firm of special counsel acting in multiple jurisdictions) for all Indemnified Persons, taken as a whole (and in the case of an actual or perceived conflict of interest of another firm of counsel for such affected Indemnified Person)) and (ii) consultants and experts for all Indemnified Persons, taken as a whole, to the extent arising out of or relating to any claim, litigation, investigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and whether or not such proceedings are brought by such Indemnified Person, either Borrower, its equity holders, its Affiliates, creditors, or any third person), brought in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them, in connection with, or as a result of, or related to the execution and delivery (provided that neither Borrower shall not be liable for costs and expenses (including attorney's fees) of any Indemnified Person incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto) (including the Advances made hereunder, the Reimbursement Undertakings and Letters of Credit issued hereunder and each other extension of credit made hereunder or under any Loan Document),

or any act, omission, event, or circumstance in any manner related thereto, including any of the foregoing related to any presence or release of, or Remedial Actions concerning, Hazardous Materials related to any Loan Party or any of its Subsidiaries at, on, under, to or from any assets or properties owned, leased or operated by any Loan Party or any of its Subsidiaries or any Environmental Actions related in any way to any such assets or properties of any Loan Party or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, Borrowers (x) shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction determines in a final and non-appealable decision to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or any of its Affiliates or any of the officers, directors, employees, advisors, controlling persons, agents or other representatives of such Indemnified Person or its Affiliates or any of their respective successors (any such person, a "Related Party"), (y) a breach of any Loan Document by any Indemnified Person or one of its Affiliates or (z) any dispute solely between and among Indemnified Persons not arising from any act or omission by Borrowers, the Guarantors or any of their Subsidiaries; provided that Agent, the co-lead arrangers or the joint bookrunners (and their respective related affiliates, officers, directors, employees, agents, controlling persons, advisors and other representatives), to the extent acting in their capacity as such, shall remain indemnified in respect of such disputes to the extent otherwise entitled to be so indemnified. All amounts payable under this Section 10.3 shall be paid with 10 days after receipt by Holdings or the Borrowers of an invoice relating thereto setting forth such expense in reasonable detail. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto.

10.4    **Waiver of Consequential Damages, Etc.** To the fullest extent permitted by Applicable Law, no Loan Party nor any Indemnified Person shall assert, and each Loan Party hereby waives, any claim against any Indemnified Person, and no Indemnified Person shall assert, and each Indemnified Person hereby waives, any claim against any Loan Party, in each case, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance or Letter of Credit or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Person or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable decision).

## 11.    NOTICES

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to U.S. Borrower, Canadian Borrower, or Agent, as the case may be, they shall be sent to the respective address set forth below:

If to either Borrower:            **BUMBLE BEE FOODS, LLC**

280 10th Avenue
San Diego, CA 92101
Attn: Kent McNeil
Email: Kent.mcneil@bumblebee.com

with copies to:    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Attn: Kelley Cornish
Email: kcornish@paulweiss.com
Fax No.: 212-492-0493

If to Agent:    **WELLS FARGO CAPITAL FINANCE, LLC**
2450 Colorado Avenue, Suite 3000 West
Santa Monica, CA 90404
Attn: Business Finance Manager
Fax No.: (310) 453-7413

in each case with copies    **PAUL HASTINGS LLP**
to:

515 S. Flower Street
Twenty-Fifth Floor
Los Angeles, California 90071
Attn: Peter Burke, Esq.
Fax No.: (213) 683-3338

**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10081
Attn: Andrew Tenzer, Esq. and Michael Comerford, Esq.
Fax No.: (212) 230-7699

**WOMBLE BOND DICKINSON**
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Attn: Matthew P. Ward, Esq.
Fax No.: (302) 661-7711

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

**12.      CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION**

(a)      THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE, AS APPLICABLE.

(b)      THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT, AND TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. HOLDINGS, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 11(b). NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE A LENDER'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.

(c)      TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, HOLDINGS, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. HOLDINGS, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)      THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN

DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)    IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, AND THE WAIVER SET FORTH IN CLAUSE (c) ABOVE IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:

(i)    WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBCLAUSE (ii) BELOW, ANY CLAIM SHALL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1. THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE. VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF LOS ANGELES, CALIFORNIA.

(ii)    THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) NON-JUDICIAL FORECLOSURE OR ENFORCEMENT OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), (C) APPOINTMENT OF A RECEIVER, INTERIM RECEIVER OR SIMILAR OFFICIAL, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS). THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) - (D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT WITH RESPECT TO ANY OTHER MATTER.

(iii)    UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE. IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN 10 DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B). THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW. PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE

PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(v)     THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES. THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.

(vi)     THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW. THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.

(vii)     THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS SECTION 12(e) SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

13.     **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS**

13.1     **Assignments and Participations**.

(a)     (1) With the prior written consent of (A) in the case of an assignment by a Canadian Lender, Canadian Borrower, or (B) in the case of an assignment by a U.S. Lender, U.S. Borrower, which consent of Canadian Borrower or U.S. Borrower, as applicable, shall not be

unreasonably withheld, delayed or conditioned, and shall not be required if an Event of Default has occurred and is continuing, (2) with the prior written consent of the Swing Lender and the Issuing Lenders, which consent of the Swing Lender and the Issuing Lenders shall not be unreasonably withheld, delayed or conditioned, and shall not be required in connection with an assignment to a Person that is a Lender or an Affiliate (other than individuals) of a Lender, and (3) with the prior written consent of Agent, which consent of Agent shall not be unreasonably withheld, delayed or conditioned, and shall not be required in connection with an assignment to a Person that is a Lender or an Affiliate (other than individuals) of a Lender, any Lender may assign and delegate to one or more assignees (each an "Assignee"; provided, however, that no Loan Party, Affiliate of a Loan Party, Equity Sponsor, or Affiliate of Equity Sponsor shall be permitted to become an Assignee) all or any portion of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount (unless waived by Agent and the applicable Borrower or in connection with an assignment of all of such Lender's Commitments and portion of the outstanding Advances) of $5,000,000 (except such minimum amount shall not apply to (x) an assignment or delegation by any Lender to any other Lender or an Affiliate of any Lender or (y) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000); provided, however, that each Borrower and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) in the case of an assignment by a Canadian Lender, (A) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Canadian Borrower and Agent by such Canadian Lender and the Assignee, (B) such Canadian Lender and its Assignee have delivered to Canadian Borrower and Agent an Assignment and Acceptance and Agent has notified the assigning Lender of its receipt thereof in accordance with Section 13.1(b), and (C) unless waived by Agent, the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500, or (ii) in the case of an assignment by a U.S. Lender, (A) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to U.S. Borrower and Agent by such U.S. Lender and the Assignee, (B) such U.S. Lender and its Assignee have delivered to U.S. Borrower and Agent an Assignment and Acceptance and Agent has notified the assigning Lender of its receipt thereof in accordance with Section 13.1(b), and (C) unless waived by Agent, the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500. Notwithstanding the foregoing, no assignments or participations shall be made to any Disqualified Competitors or, prior to the occurrence of any Event of Default, any Disqualified Institutions.

(b)    From and after the date that Agent notifies the assigning Lender (with a copy to the applicable Borrower) that it has received an executed Assignment and Acceptance and, if applicable, payment of the required processing fee, the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3 hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation among the applicable Borrower, the assigning Lender, and the Assignee; provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a) of this Agreement.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning

Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon the Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant"; provided, however, that no Loan Party, Affiliate of a Loan Party, Equity Sponsor, or Affiliate of Equity Sponsor shall be permitted to become a Participant) participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would require the consent of all Lenders or all Lenders directly affected thereby pursuant to Section 14.1, and (v) all amounts payable by any Borrower hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Borrowers, Agent, the Collections of the Loan Parties and their respective Subsidiaries, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among

themselves or to receive any greater payment under this Agreement or the other Loan Documents than the Originating Lender would have been entitled to receive with respect to the participation sold to such Participant. In the case of assignment, transfer of novation by a Lender to an Assignee of all or any party of its rights and obligations under the Loan Documents, the Lender and the Assignee shall agree that, for the purposes of Article 1278 of the Luxembourg Civil Code (to the extent applicable), any Lien created under the Loan Documents securing the rights assigned, transferred or novated thereby, will be preserved for the benefit of the Assignee. Notwithstanding the foregoing, no assignments or participations shall be made to any Disqualified Competitors or, prior to the occurrence of any Event of Default, any Disqualified Institutions.

(f)     In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and information which it now or hereafter may have relating to the Loan Parties and their respective Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of (i) any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, or (ii) any other central bank, and such Federal Reserve Bank or such other central bank may enforce such pledge or security interest in any manner permitted under applicable law.

(h)     Agent (as a non-fiduciary agent on behalf of U.S. Borrower) shall maintain, or cause to be maintained, a register (the "U.S. Register") on which it enters the name and address of each U.S. Lender as the registered owner of the U.S. Advances (and the principal amount thereof and stated interest thereon) held by such U.S. Lender (each, a "U.S. Registered Loan"). Other than in connection with an assignment by a U.S. Lender of all or any portion of its portion of the U.S. Advances to an Affiliate of such U.S. Lender or a Related Fund of such U.S. Lender (i) a U.S. Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the U.S. Register (and each registered note shall expressly so provide) and (ii) any assignment or sale of all or part of such U.S. Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the U.S. Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any U.S. Registered Loan (and the registered note, if any evidencing the same), U.S. Borrower shall treat the Person in whose name such U.S. Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary. In the case of any assignment by a U.S. Lender of all or any portion of the U.S. Advances to an Affiliate of such U.S. Lender or a Related Fund of such U.S. Lender, and which assignment is not recorded in the U.S. Register, the assigning U.S. Lender, on behalf of U.S. Borrower, shall maintain a register comparable to the U.S. Register.

(i)     Agent (as a non-fiduciary agent on behalf of Canadian Borrower) shall maintain, or cause to be maintained, a register (the "Canadian Register") on which it enters the name and address of each Canadian Lender as the registered owner of the Canadian Advances (and the principal amount thereof and stated interest thereon) held by such Canadian Lender (each, a "Canadian Registered Loan"). Other than in connection with an assignment by a Canadian Lender of all or any portion of its

portion of the Canadian Advances to an Affiliate of such Canadian Lender or a Related Fund of such Canadian Lender (i) a Canadian Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Canadian Register (and each registered note shall expressly so provide) and (ii) any assignment or sale of all or part of such Canadian Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Canadian Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Canadian Registered Loan (and the registered note, if any evidencing the same), Canadian Borrower shall treat the Person in whose name such Canadian Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary. In the case of any assignment by a Canadian Lender of all or any portion of the Canadian Advances to an Affiliate of such Canadian Lender or a Related Fund of such Canadian Lender, and which assignment is not recorded in the Canadian Register, the assigning Canadian Lender, on behalf of Canadian Borrower, shall maintain a register comparable to the Canadian Register.

(j)　　In the event that a U.S. Lender sells participations in the U.S. Registered Loan, such U.S. Lender, as a non-fiduciary agent on behalf of U.S. Borrower, shall maintain a register on which it enters the name of all participants in the U.S. Registered Loans held by it (the "U.S. Participant Register"). A U.S. Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the U.S. Participant Register (and each registered note shall expressly so provide). Any participation of such U.S. Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the U.S. Participant Register.

(k)　　In the event that a Canadian Lender sells participations in the Canadian Registered Loan, such Canadian Lender, as a non-fiduciary agent on behalf of Canadian Borrower, shall maintain a register on which it enters the name of all participants in the Canadian Registered Loans held by it (the "Canadian Participant Register"). A Canadian Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Canadian Participant Register (and each registered note shall expressly so provide). Any participation of such Canadian Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Canadian Participant Register.

(l)　　Agent shall make a copy of the U.S. Register available for review by U.S. Borrower or any Lender from time to time as U.S. Borrower or any U.S. Lender may reasonably request. Agent shall make a copy of the Canadian Register available for review by Canadian Borrower or any Canadian Lender from time to time as Canadian Borrower or any Canadian Lender may reasonably request.

13.2　　**Successors**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that, except as set forth in Section 6.3, no Borrower may assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by the Lenders shall release any Borrower from its Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to

Section 13.1 hereof and, except as expressly required pursuant to Section 13.1, no consent or approval by any party is required in connection with any such assignment.

## 14.    AMENDMENTS; WAIVERS

14.1    **Amendments and Waivers**.

(a)    Except as expressly set forth in this Agreement, no amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than the Fee Letter), and no consent with respect to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and Borrowers and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by each Lender directly and adversely affected thereby and Borrowers, do any of the following:

(i)    increase the amount of or extend the expiration date of any Commitment of any Lender (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment shall not constitute an extension or increase of any Commitment),

(ii)    postpone or delay the Maturity Date applicable to any class of Obligations or any other date fixed by this Agreement or any other Loan Document for any payment of principal, interest or fees due hereunder or under any other Loan Document (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment shall not constitute an extension of any such date),

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except (x) that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment shall not constitute a reduction in principal, (y) in connection with the waiver of applicability of Section 2.6(e) (which waiver shall be effective with the written consent of the Required Lenders), and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (iii)),

(iv)    amend, modify, or eliminate this Section or any other provision of this Agreement providing for the consent of all or all affected Lenders,

(v)    except as permitted by Section 6.3, consent to the transfer or assignment by, or the release of, Holdings or any Borrower of any of its rights or obligations under any Loan Document to which it is a party,

(vi)    amend, modify, or eliminate the definition of "Required Lenders", "Supermajority Lenders" or "Pro Rata Share" or amend, modify or eliminate the last sentence of Section 2.4(c) or any other provision of the Loan Documents with respect to any provision relating to the pro rata sharing of payments among the Lenders,

(vii)    other than in connection with a transaction expressly permitted by the terms hereof or the other Loan Documents, release any Borrower or all or substantially all of the

Guarantors from their obligations under the Guaranty or, subject to the DIP Intercreditor Agreement, release all or substantially all of the Collateral under the Security Documents,

(viii)    amend, modify, or eliminate any of the provisions of Section 2.4(b)(i) or Section 2.4(b)(ii),

(ix)    [intentionally omitted],

(x)    modify any advance rate specified in the Loan Documents in a manner that is intended to increase Availability, or

(xi)    amend, modify, or eliminate the definition of U.S. Maximum Revolver Amount or Canadian Maximum Revolver Amount, or amend, modify, or eliminate the definition of U.S. Borrowing Base or Canadian Borrowing Base or any of the defined terms (including the definitions of Eligible Accounts, Eligible Inventory, Eligible In-Transit Inventory and Eligible Landed Inventory) that are used in such definition in a manner that is intended to increase Availability (other than with respect to reserves implemented by Agent), or amend, modify, or eliminate Section 2.1(c) or Section 2.2(c), without the written consent of the Supermajority Lenders.

(b)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive (i) the definition of, or any of the terms or provisions of, the Fee Letter, without the written consent of Agent and each Borrower (and shall not require the written consent of any of the Lenders) or (ii) any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders.

(c)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Lender, or any other rights or duties of any Issuing Lender under this Agreement or the other Loan Documents, without the written consent of any Issuing Lender, Agent, either Borrower, and the Required Lenders.

(d)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Swing Lenders, any other rights or duties of Swing Lenders under this Agreement or the other Loan Documents, without the written consent of Swing Lender, Borrowers, Agent, and the Required Lenders.

(e)    If at any time any real property constitutes Collateral, no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents to add, increase, renew or extend any loan, commitment or credit line hereunder until the completion of flood due diligence, documentation and coverage as required by the Flood Laws or as otherwise satisfactory to all Lenders.

14.2    **Replacement of Holdout Lender**.

(a)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders or all Lenders affected thereby or the Supermajority Lenders and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders, all Lenders affected thereby or (in the case of Section 14.1(a)(x) above), the Supermajority Lenders, or (ii) any Lender makes a claim for compensation under Section 2.11(a)(viii), 2.11(b)(viii), 2.12(d)(i), 2.12(d)(ii), 2.13(a), or 16, then Borrowers, upon at least

three (3) Business Days prior irrevocable notice, may permanently replace any Lender that failed to give its consent, authorization, or agreement (a "Holdout Lender") or any Lender that made a claim for compensation pursuant to Section 2.11(a)(viii), 2.11(b)(viii), 2.12(d)(i), 2.13(a), or 16 or has declared its ability to make LIBOR Rate Loans impractical or unlawful pursuant to Section 2.12(d)(ii) (an "Increased Cost Lender") with one or more replacement lenders (each, a "Replacement Lender"), and the Holdout Lender, an Increased Cost Lender or any Defaulting Lender, as applicable, shall have no right to refuse to be replaced hereunder. If any Lender is a Defaulting Lender, then either Borrower or Agent may replace such Defaulting Lender with one or more Replacement Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender, an Increased Cost Lender, or any Defaulting Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)     Prior to the effective date of such replacement, the Holdout Lender or Increased Cost Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender or Increased Cost Lender, as applicable being repaid in full its share of the outstanding Obligations without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due and payable in respect thereof, and (ii) an assumption of its Pro Rata Share of the Letters of Credit. If the Holdout Lender or Increased Cost Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name of and on behalf of the Holdout Lender or Increased Cost Lender, as applicable, and irrespective of whether Agent execute and deliver such Assignment and Acceptance, the Holdout Lender or Increased Cost Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender or Increased Cost Lender, as applicable, shall be made in accordance with the terms of Section 13.1. Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender or Increased Cost Lender, as applicable, hereunder and under the other Loan Documents, the Holdout Lender or Increased Cost Lender, as applicable, shall remain obligated to make the Holdout Lender's or Increased Cost Lender's, as applicable Pro Rata Share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of such Letters of Credit.

14.3   **No Waivers; Cumulative Remedies**. No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's or any Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

## 15.   AGENT; THE LENDER GROUP

15.1   **Appointment and Authorization of Agent**. Each Lender hereby designates and appoints WFCF as its Agent under this Agreement and the other Loan Documents, and, subject to the terms of Section 14.1, each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as agent

for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Section 15. The provisions of this Section 15 (other than Sections 15.9, 15.11, 15.12(a), 15.16 and 15.18) are solely for the benefit of Agent and the Lenders, and the Loan Parties and their respective Subsidiaries shall have no rights as a third party beneficiary of any of the provisions contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that (a) Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (i) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Loan Parties and their respective Subsidiaries, and related matters, (ii) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (iii) receive, apply, and distribute the Collections of Loan Parties and their respective Subsidiaries as provided in the Loan Documents, (iv) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of the Loan Parties and their respective Subsidiaries, (v) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to the Loan Parties or their respective Subsidiaries, the Obligations, the Collateral, the Collections of Loan Parties and their respective Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (vi) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents, (b) [intentionally omitted], and (c) Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (i) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Loan Parties and their respective Subsidiaries, and related matters, (ii) make Advances, for itself or on behalf of Lenders, as provided in the Loan Documents, (iii) exclusively receive, apply, and distribute the Collections of Loan Parties and their respective Subsidiaries as provided in the Loan Documents, (iv) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to the Loan Parties or their respective Subsidiaries, the Obligations, the Collateral, the Collections of Loan Parties and their respective Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (v) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

For greater certainty, for the purposes of holding any security granted under the laws of the Province of Quebec by any Loan Party, the Agent is hereby irrevocably authorized and appointed by each Borrower and each Lender, Issuing Lender, Swing Lender and Bank Product Provider hereto to act as hypothecary

representative (within the meaning of Article 2692 of the Civil Code of Quebec) for all present and future Secured Parties (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec, pledge or hypothec agreement, this Agreement or the Applicable Laws (with the power to delegate any such rights or duties). The execution prior to the date hereof by the Agent in its capacity as the Hypothecary Representative of any deed of hypothec, pledge or hypothec agreement, or other security documents made pursuant to the laws of the Province of Quebec, is hereby ratified and confirmed. Any Person who becomes a Secured Party, or a successor Agent shall be deemed to have consented to and ratified the foregoing appointment of the Agent as the Hypothecary Representative. The execution, prior to the date of this Agreement, by the Agent in its capacity as hypothecary representative of any deed of hypothec or any other security documents made pursuant to the laws of the Province of Quebec is hereby ratified and confirmed. For greater certainty, the Agent, acting as the Hypothecary Representative, shall have, in addition to the rights, power, immunities, indemnities and exclusion from liability provided for by applicable law or the security document to which it is a party, the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Agent in this Agreement, which shall apply mutatis mutandis. In the event of the resignation or replacement of the Agent (which shall include its resignation or replacement as Hypothecary Representative) and appointment of a successor Agent, such successor Agent shall also act as Hypothecary Representative, as contemplated above. Without limitation, the provisions of Section 15.9 of this Agreement shall apply mutatis mutandis to the resignation, replacement, and appointment of a successor to the Agent, acting as Hypothecary Representative. Without prejudice to Section 12 hereof, the provisions of this paragraph shall be also governed by the laws of the Province of Quebec.

15.2    **Delegation of Duties**. Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Without limiting the generality of the foregoing, Agent shall have the right to appoint any other Agent, and any Lender as its sub-agent to execute all or any portion of its rights and duties under this Agreement, including without limitation all or any portion of its rights and duties in respect of the Collateral. No Agent shall be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3    **Liability of Agent**. None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by any Loan Party or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Loan Party or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party or its Subsidiaries.

15.4    **Reliance by Agent**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or

conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Borrower or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and the Bank Product Providers).

15.5    **Notice of Default or Event of Default**. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the applicable Lenders and, except with respect to Defaults or Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default". Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to <u>Section 15.4</u>, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with <u>Section 8</u>; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6    **Credit Decision**. Each Lender (and Bank Product Provider) acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of the Loan Parties and their respective Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender (or Bank Product Provider). Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of any Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the applicable Borrower. Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall have no duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender

acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Agent has no duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to any Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

15.7    **Costs and Expenses; Indemnification**. Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, reasonable and documented attorney's fees (for one primary outside counsel, one local/foreign counsel in each applicable jurisdiction (which may include one special counsel acting in multiple jurisdictions), and any other counsel retained with Borrowers' consent (which consent shall not be unreasonably withheld, conditioned or delayed), but excluding allocated costs of internal counsel) and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not any Borrower is obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. In the event Agent is not reimbursed for such costs and expenses by the Loan Parties and their respective Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so), from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8    **Agent in Individual Capacity**. WFCF and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Loan Parties and their respective Subsidiaries and Affiliates and any other Person party to any Loan Document as though WFCF were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, WFCF or its respective Affiliates may receive information regarding the Loan Parties, their respective Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of the Loan Parties or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such

confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include WFCF in its individual capacity.

15.9    **Successor Agent**. Agent may resign as Agent upon 30 days prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrowers (unless such notice is waived by Borrowers) and without any notice to the Bank Product Providers. If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the approval of Borrowers (such approval not to be unreasonably withheld, delayed, or conditioned), appoint (x) a successor Agent for the Lenders (and the Bank Product Providers), or (y) a successor Agent for the Secured Parties. If, at the time that Agent's resignation is effective, it is acting as an Issuing Lender or a Swing Lender, such resignation shall also operate to effectuate its resignation as such Issuing Lender or such Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, to cause the Underlying Issuer to issue Letters of Credit, or to make Swing Loans. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrowers, a successor Agent or Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned). In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this <u>Section 15</u> and <u>Section 16</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above. The parties hereto acknowledge and agree that for the purpose of the security documents governed by Dutch law, any resignation by Agent is not effective until its contractual relationship under the Parallel Debt, including all of its rights and obligations thereunder, is transferred to a successor Agent. Agent will reasonably cooperate in assigning its rights and obligations under the Parallel Debt to the successor Agent and will reasonably cooperate in transferring all rights under the security documents governed by Dutch law to the successor Agent. The Agent that is resigning, successor Agent, and each relevant Loan Party shall execute all documents necessary to ensure that the successor Agent obtains valid Dutch law security similar to the previously existing Dutch security.

15.10    **Lender in Individual Capacity; Joint Lead Arrangers and Bookrunners and Syndication Agent**.

(a)    Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Loan Parties and their respective Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the Bank Product Providers). The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding any Borrower or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of any Borrower or such other Person

and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

(b)     WFCF and BOA, in their respective capacities as "joint lead arrangers and bookrunners", and MUFG in its capacity as "syndication agent" shall not have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to them in their capacities as Lenders or (i) in the case of WFCF, in its capacities as Agent, Swing Lender, or an Issuing Lender, or (ii) in the case of any other Lender, in its capacity as an Issuing Lender to the extent appointed as an Issuing Lender pursuant to this Agreement.  Without limiting the foregoing, WFCF and BOA, in their respective capacities as "joint lead arrangers and bookrunners" and MUFG in its capacity as "syndication agent" shall not have or be deemed to have any fiduciary relationship with any Borrower or with any Lender.  Each Lender acknowledges that it has not relied upon, and will not rely upon, WFCF, BOA or MUFG in deciding to enter into this Agreement or in taking or not taking action hereunder.

15.11    **Collateral Matters**.

(a)     The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, at its option and in its sole discretion, to release any Lien on any Collateral upon any of the events described in <u>Section 17.16</u>. The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, based upon the instruction of the Required Lenders, to (i) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, the CCAA, the BIA or pursuant to an order of any court of competent jurisdiction supervising an Insolvency Proceeding, (ii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (iii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid or purchase, the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Stock of the acquisition vehicle or vehicles that are used to consummate such purchase). Except as provided above or in <u>Section 17.16</u>, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers). Upon request by Agent or any Borrower at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this <u>Section 15.11</u>; <u>provided</u>, <u>however</u>, that

(1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of any Borrower in respect of) all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral. The Lenders further hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, at its option and in its sole discretion, to subordinate any Lien granted to or held by Agent under any Loan Document to the holder of any Permitted Lien on such property if such Permitted Lien secures Permitted Purchase Money Indebtedness.

(b)    Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) to assure that the Collateral exists or is owned by the Loan Parties and their respective Subsidiaries or is cared for, protected, or insured or has been encumbered, or that Agent's Liens have been properly or sufficiently or lawfully created, perfected, rendered opposable, protected, or enforced or are entitled to any particular priority, that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, or whether to impose, maintain, reduce, or eliminate any particular reserve hereunder or whether the amount of any such reserve is appropriate or not, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise provided herein.

(c)    Notwithstanding anything contained in any of the Loan Documents to the contrary, the Loan Parties, the Agent and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under any Security Document or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies under the Collateral Documents and the Guaranty may be exercised solely by the Agent acting as agent for and representative of Lenders in accordance with the terms thereof, and (2) in the event of a foreclosure by the Agent on any of the Collateral pursuant to a public or private sale or a sale under Section 363 of the Bankruptcy Code or section 36 of the CCAA, the Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (at the direction of the Required Lenders), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent at such sale.

(d)    No real property shall be taken as Collateral unless Lenders receive forty-five (45) days' advance notice and each Lender confirms to the Agent that it has completed all flood due diligence, received copies of all flood insurance documentation and confirmed flood insurance compliance as required by the Flood Laws or as otherwise satisfactory to such Lender.

15.12    **Restrictions on Actions by Lenders; Sharing of Payments**.

(a)    Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent,

set off against the Obligations that are due and owing, upon the occurrence and during the continuance of an Event of Default, any amounts due and owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest or hypothec in, any of the Collateral. In no event shall any Secured Party be permitted to take any of the foregoing actions against the Borrower or any Loan Party, including the giving of any instruction to do so, unless an Event of Default has occurred and is continuing.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment; provided, further, that the provisions of this paragraph shall not be construed to apply to (A) any payment made by Holdings, Borrowers or any other Loan Party pursuant to and in accordance with the express terms of this Agreement and the other Loan Documents, (B) any payment obtained by a Lender as consideration for the assignment or sale of a participation in any of its Advances, Commitments or other Obligations to any assignee or participant or (C) any disproportionate payment obtained by a Lender of any class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Advances or Commitments of that class or any increase in the interest rate in respect of Advances or Commitments of Lenders that have consented to any such extension.

15.13   **Agency for Perfection**. Agent hereby appoints each other Lender (and each Bank Product Provider) as its agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting or rendering opposable Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected or rendered opposable by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14   **Payments by Agent to the Lenders**. All payments to be made by Agent to the Lenders (or the Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15   **Concerning the Collateral and Related Loan Documents**. Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents. Each

member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

15.16  **Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information.** By becoming a party to this Agreement, each Lender:

(a)  is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report respecting the Loan Parties and their respective Subsidiaries (each a "<u>Report</u>" and collectively, "<u>Reports</u>") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)  expressly agrees and acknowledges that Agent (i) does not make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)  expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding the Loan Parties and their respective Subsidiaries and will rely significantly upon the Loan Parties' and their respective Subsidiaries' books and records, as well as on representations of each Borrower's personnel,

(d)  agrees to keep all Reports and other non-public information regarding the Loan Parties and their respective Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with <u>Section 17.9</u>, and

(e)  without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to any Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of any Borrower, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the, claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorney's fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing: (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by any Loan Party or any of its Subsidiaries to Agent that has not been contemporaneously provided by such Loan Party or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from the Loan Parties and their respective Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Borrowers, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to any

Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17  **Several Obligations; No Liability**. Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in <u>Section 15.7</u>, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein.

15.18  **Parallel Debt.** For the purposes of creating security rights governed by Dutch law,

(a)    Holdings irrevocably and unconditionally undertakes to pay to Agent an amount equal to the aggregate of the Principal Obligations. The payment undertaking of Holdings under this <u>Section 15.18(a)</u> is referred to as its "Parallel Debt" (the "<u>Parallel Debt</u>");

(b)    the Parallel Debt of Holdings constitutes obligations and liabilities of Holdings which are separate and independent from, and without prejudice to, the Principal Obligations and the Parallel Debt represents Agent's own independent right to receive payment of the Parallel Debt from Holdings;

(c)    the Parallel Debt of Holdings will be payable in the currency or currencies of the corresponding Principal Obligations and will become due and payable as and when and to the extent one or more of the Principal Obligations become due and payable;

(d)    Agent hereby confirms and accepts that to the extent Agent receives any amount in payment of the Parallel Debt of Holdings, Agent shall distribute that amount among the parties that are the creditors of the relevant Principal Obligations in accordance with the provisions of this Agreement and the DIP Intercreditor Agreement as if received by it in payment of the relevant Principal Obligations. Upon receipt by Agent of any amount in payment of the Parallel Debt of Holdings (a "<u>Received Amount</u>"), the corresponding Principal Obligations shall be reduced by amounts totaling an amount (a "<u>Deductible Amount</u>") equal to the Received Amount in the manner and as if the Deductible Amount were received by Agent and distributed in accordance with this Agreement and the DIP Intercreditor Agreement to the relevant creditor as a payment of the relevant Principal Obligations owed to it or them on the date of receipt by Agent of the Received Amount; and

(e)    the parties acknowledge and confirm that pursuant to the provisions contained in this <u>Section 15.18</u> the amount which may become due and payable by Holdings as its Parallel Debt shall never exceed the total of the amounts which are payable in connection with the Principal Obligations.

15.19   **Credit Bidding**. The Secured Parties hereby irrevocably authorize the Agent, based upon the instruction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, section 36 of the CCAA, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Agent on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) immediately prior to the consummation of the closing of the sale, each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, prior to the distribution of such equity interests to the Lenders including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 14.1 of this Agreement), (iv) the Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

## 16.    WITHHOLDING TAXES

(a)    All payments made by any Loan Party hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future

Taxes, and in the event any deduction or withholding of Taxes is required, each Loan Party shall comply with the next sentence of this <u>Section 16(a)</u>. If any Taxes are so levied or imposed, each Loan Party agrees to deduct and withhold and to timely pay and remit the full amount of such Taxes to the applicable Governmental Authority in accordance with applicable laws, and to pay such additional amounts to an applicable payee as may be necessary so that every payment of all amounts due under this Agreement, any note issued pursuant to this Agreement, or Loan Document, including any amount paid pursuant to this <u>Section 16(a)</u> after withholding or deduction for or on account of any Taxes, will not be less than the amount such payee would have received if such Taxes (including Taxes on any amount paid pursuant to this <u>Section 16(a)</u>) had not been deducted or withheld. Borrowers will furnish to Agent as promptly as possible after the date the payment of any Tax is due pursuant to applicable law, certified copies of tax receipts or other evidence of such payment reasonably acceptable to the Agent evidencing such payment by the applicable Borrower.

(b)       Each Loan Party agrees to pay in accordance with applicable law any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies (hereinafter, "<u>Other Taxes</u>") that arise from any payment made hereunder or under any of the Loan Documents, or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document. Each Loan Party shall indemnify and hold harmless each Lender (including for purposes of this section any Participant) and Agent (and, in the case of any Lender or Agent that is a partnership or other "flow-through" entity for tax purposes, each beneficial owner thereof (each, a "<u>Beneficial Owner</u>")) for the full amount of Taxes and Other Taxes imposed on or paid by such Person and any liability (including penalties, interest, additions to and expenses) arising from or with respect to such Taxes, whether or not they were correctly or legally asserted. Payment under this indemnification shall be made within 30 days from the date Agent or the relevant Lender makes written demand for it. A certificate containing reasonable detail as to the amount of such Taxes or Other Taxes submitted to a Loan Party by Agent or the relevant Lender shall be conclusive evidence, absent manifest error, of the amount due from such Loan Party to Agent or such Lender (or their Beneficial Owners). The provisions of this <u>Section 16</u> shall survive the termination of this Agreement and the repayment of all Obligations.

(c)       If a Lender or Participant is entitled to claim an exemption or reduction from United States withholding tax (including backup withholding tax), such Lender or Participant agrees with and in favor of Agent, to deliver to Borrowers and Agent (or, in the case of a Participant, to the Lender granting the participation only) one of the following before receiving its first payment under this Agreement:

(i)       if such Lender or Participant is entitled to claim an exemption from United States withholding tax pursuant to its portfolio interest exception, (A) a statement of the Lender and Participant, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN or Form W-8IMY (with proper attachments);

(ii)       if such Lender or Participant is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN;

(iii)       if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a

United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender or Participant serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

(v)    a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

Each Lender or Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and shall promptly notify the Borrowers and Agent (or, in the case of a Participant, the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    If a Lender or Participant claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender or such Participant agrees with and in favor of Agent, to deliver to Borrowers and the Agent (or, in the case of a Participant, to the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant is legally able to deliver such forms, provided, however, that nothing in this Section 16(d) shall require a Lender or Participant to disclose any information that it deems to be confidential (including without limitation, its tax returns). Each Lender and each Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and shall promptly notify Borrowers and the Agent (or, in the case of a Participant, to the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(e)    If a Lender or Participant claims exemption from, or reduction of, withholding tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender or Participant, such Lender or Participant agrees to notify Borrowers and Agent (or, in the case of a sale of a participation interest, to the Lender granting the participation only) of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender or Participant. To the extent of such percentage amount, Agent will treat such Lender's or such Participant's documentation provided pursuant to Section 16(c) or 16(d) as no longer valid. With respect to such percentage amount, such Participant or Assignee may provide new documentation, pursuant to Section 16(c) or 16(d), if applicable. Each Borrower agrees that each Participant shall be entitled to the benefits of this Section 16 with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this Section 16 with respect thereto; provided, that, no Participant shall be entitled to receive greater amounts under this Section 16 then the Lender granting the Participant its participation would have been entitled to receive had such participation not been granted unless such participation was made with Borrowers' prior written consent.

(f)    If a Lender or a Participant is entitled to a reduction in the applicable withholding tax, the applicable Borrower and Agent (or, in the case of a Participant, the Lender granting the participation) may withhold from any interest payment to such Lender or such Participant an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by subsection (c) or (d) of this Section 16 are not delivered to the

applicable Borrower and the Agent (or, in the case of a Participant, to the Lender granting the participation), then such Borrower or Agent (or, in the case of a Participant, to the Lender granting the participation) may withhold from any interest payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(g)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that a Borrower or Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify such Borrower or Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold such Borrower or Agent harmless (or, in the case of a Participant, such Participant shall indemnify and hold the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by such Borrower or Agent (or, in the case of a Participant, to the Lender granting the participation), as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to such Borrower or Agent (or, in the case of a Participant, to the Lender granting the participation only) under this Section 16, together with all costs and expenses (including attorney's fees and expenses). The obligation of the Lenders and the Participants under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

(h)    If Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by Borrowers or with respect to which any Borrower has paid additional amounts pursuant to this Section 16, so long as no Default or Event of Default has occurred and is continuing, it shall pay over the amount of such refund to the applicable Borrower (but only to the extent of payments made, or additional amounts paid, by such Borrower under this Section 16 with respect to Taxes giving rise to such a refund), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such a refund); provided, that such Borrower, upon the request of Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges, imposed by the relevant Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct or gross negligence of Agent hereunder) to Agent or such Lender in the event Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything in this Agreement to the contrary, this Section 16 shall not be construed to require Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to any Borrower or any other Person or to arrange its affairs in whatever manner it thinks fit and, in particular, no Agent nor any Lender shall be under any obligation to claim relief for tax purposes or to claim such relief in priority to other claims, credits or deductions.

## 17.    GENERAL PROVISIONS

17.1    **Effectiveness**. This Agreement shall be binding and deemed effective when executed by Holdings, each Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2    **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3 **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5 **Bank Product Providers**.

(a)    U.S. Borrower and the Lender Group hereby acknowledge and agree that all Pre-Petition U.S. Bank Products and the related Bank Product Letter Agreements shall constitute U.S. Bank Products and Bank Product Letter Agreements, respectively, for purposes of this Agreement on and after the Closing Date with the same effect as if such Pre-Petition U.S. Bank Products and related Bank Product Letter Agreements were provided by a Bank Product Provider at the request of U.S. Borrower on the Closing Date.  Canadian Borrower and the Lender Group hereby acknowledge and agree that all Pre-Petition Canadian Bank Products and the related Bank Product Letter Agreements shall constitute Canadian Bank Products and Bank Product Letter Agreements, respectively, for purposes of this Agreement on and after the Closing Date with the same effect as if such Pre-Petition Canadian Bank Products and Bank Product Letter Agreements were provided by a Bank Product Provider at the request of Canadian Borrower on the Closing Date.

(b)    Each Bank Product Provider shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting. Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents; it being understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Agent to determine or insure whether the amount of any such reserve is appropriate or not. In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution. Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the relevant Bank Product Provider. In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the relevant Bank Product Provider is the amount last certified to Agent by such Bank Product Provider as being due and payable (less any distributions made to such Bank Product Provider on account thereof). Any Borrower may obtain Bank Products from any Bank Product Provider, although no Borrower is required to do so. Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

17.6     **Debtor-Creditor Relationship.** The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7     **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.8     **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by any Borrower or any Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be asserted, or declared, to be void or voidable under applicable law relating to creditors' rights, including provisions of applicable law relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorney's fees of the Lender Group related thereto, the liability of such Borrower or such Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

17.9     **Confidentiality**.

(a)     Agent, Issuing Lenders and Lenders each individually (and not jointly or jointly and severally) agree that all non-public information regarding the Loan Parties and their respective Subsidiaries, their operations, assets, and existing and contemplated business plans ("<u>Confidential Information</u>") shall be treated by Agent, Issuing Lenders and the Lenders in a confidential manner, and shall not be disclosed by Agent, Issuing Lenders and the Lenders to Persons who are not parties to this Agreement, except: (i) on a confidential basis, to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and who are informed of the confidential nature of such information and are or have been advised of their obligation

to keep information of this type confidential, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers) on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby; provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9 (it being acknowledged and agreed by the parties hereby that Borrowers shall be deemed to be third party beneficiaries of such agreements), (iii) upon the request or demand of any regulatory authority having jurisdiction over any member of the Lender Group or any of their respective Affiliates (in which case such member of the Lender Group agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, to inform Borrowers prior thereof prior to disclosure), (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent, Issuing Lenders or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation or pledge (including any prospective assignment, participation or pledge) of any Lender's interest under this Agreement, provided that any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information hereunder subject to the terms of this Section and agrees only to use such information for evaluating its investment hereunder, and (ix) to the extent that Agent determines in good faith that it is necessary or advisable in connection with the exercise of any remedies hereunder or under any other Loan Document or the enforcement or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; provided, however, that in no event shall the provisions of this clause (ix) permit Agent or any Lender to divulge, reveal or otherwise disclose any Confidential Information that consists of proprietary technology, proprietary processes, proprietary Intellectual Property, or other related Confidential Information, including, any information relating to the technologies and processes of Borrowers and their Subsidiaries designed or intended to maximize yields in the canning, packing and cleaning process of Borrowers' and their Subsidiaries' business, in each case with respect to the Loan Parties and their respective Subsidiaries and Affiliates; provided, further, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof. Agent and each Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to clause (iii) or clause (iv) hereof, it will make reasonable efforts to keep the Loan Parties informed of such request or identification; provided that each Loan Party acknowledges that Agent and each Lender may make disclosure as required or requested by any Governmental Authority or representative thereof and that Agent and each Lender may be subject to review by regulatory agencies and may be required to provide to, or otherwise make available for review by, the representatives of such parties or agencies any such non-public information.

(b)     Anything in this Agreement to the contrary notwithstanding, any joint bookrunner may, in consultation with you, place customary advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of customary information on the Internet or worldwide web as it may choose, and circulate similar promotional materials, in each case, after the Closing Date, in the form of "tombstone" or otherwise describing the names of Borrowers and the amount, type and closing date of the Transactions, all at the expense of such joint bookrunner.

17.10    **Lender Group Expenses**. From and after the Closing Date, each Borrower agrees to pay any and all Lender Group Expenses no later than the 10th day after receipt of an invoice setting forth the amount and nature of the Lender Group Expenses for which reimbursement is demanded by Agent. Each Borrower agrees that its obligations contained in this Section 17.10 shall survive payment or satisfaction in full of all other Obligations; provided, however, that if an Event of Default has occurred and is continuing, the Lender Group Expenses shall be due and payable upon demand.

17.11    **USA PATRIOT Act**. Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrowers that pursuant to the requirements of the Patriot Act and certain Anti-Money Laundering Laws and Canadian Anti-Terrorism Laws, it is required to obtain, verify and record information that identifies Borrowers, which information includes the name and address of Borrowers and other information that will allow such Lender to identify Borrowers in accordance with the Patriot Act and certain Anti-Money Laundering Laws and Canadian Anti-Terrorism Laws. In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct upon reasonable advance written notice, during normal business hours, (a) Patriot Act searches, OFAC searches, and customary individual background checks for the Loan Parties and (b) OFAC searches and customary individual background checks for the Loan Parties' senior management, key principals, directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Loan Parties, and Borrowers agree to cooperate in respect of the conduct of such searches and to promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or Agent or any prospective assign or participant of a Lender or Agent in order to comply with the Patriot Act, Anti-Money Laundering Laws or Canadian Anti-Terrorism Laws and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

17.12    **Applicable Currency**. Each payment in respect of any Obligation shall be made in Dollars with respect to such Obligation. The specification under this Agreement of Dollars is of the essence in each case. Each Loan Party's obligations hereunder and under the other Loan Documents to make payments in Dollars shall not be discharged or satisfied by any tender or recovery in any other currency (including any tender pursuant to any judgment expressed in or converted into any currency other than such applicable currency), except to the extent that such tender or recovery results in the effective receipt by the Agent and Lenders of the full amount of Dollars expressed to be payable to the Agent and the Lenders under this Agreement or the other Loan Documents. If for any reason it is necessary to convert into or from any currency other than Dollars (such other currency being hereinafter referred to as the "Tendered Currency"), the rate of exchange used shall be the Exchange Rate on the Business Day preceding that on which such other currency is tendered to Agent. The obligation of each Loan Party in respect of any such sum due from it to Agent or any Lender hereunder shall, notwithstanding any tender or any judgment in such Tendered Currency, be discharged only to the extent that Agent, in accordance with its customary or other reasonable procedures, purchases Dollars with the Tendered Currency so received. If the amount of Dollars so purchased is less than the sum originally due to Agent or such Lender, as applicable, in Dollars, each Loan Party agrees, as a separate obligation and notwithstanding any judgment, to indemnify the Agent and the Lenders against such loss, and if the

Dollars so purchased exceed the sum originally due to any Lender in Dollars, Agent or such Lender, as applicable, agrees to remit to such Loan Party such excess.

17.13    **Integration**. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof. The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

17.14    **[Intentionally Omitted]**

17.15    **Survival**. All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, the Issuing Lender, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.

17.16    **Release of Collateral and Guarantee Obligations**.

(a)    The Lenders hereby irrevocably agree that the Liens granted to Agent by the Loan Parties on any Collateral shall be released (i) in full, as set forth in clause (b) below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than a Loan Party, to the extent such Disposition is made in compliance with the terms of this Agreement (and Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Sections 14.1 and 15.11), (v) to the extent the property constituting such Collateral is owned by any Loan Party, upon the release of such Loan Party from its obligations hereunder and/or under the Guaranty (in accordance with the second succeeding sentence and Section 10 of the Guaranty), (vi) as required by Agent to effect any Disposition of Collateral in connection with any exercise of remedies pursuant to the Loan Documents, (vii) with respect to any Collateral that is Stock, upon the dissolution or liquidation of the issuer of such Stock that is not prohibited by the Loan Documents, and (viii) with respect to any Term Loan Priority Collateral, upon release of any such Collateral from the DIP Term Loan Liens to the extent required by the provisions of the DIP Intercreditor Agreement. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. The Lenders hereby authorize Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Loan Party or Collateral pursuant to the foregoing provisions of this paragraph, all without the

further consent or joinder of any Lender. Any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Loan Party shall no longer be deemed to be repeated.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full and the Commitments have been terminated (such date, the "Payoff Date"), upon request of Borrowers, Agent shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its Liens in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any (i) unasserted contingent indemnification Obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that by the terms of the applicable Bank Product Agreement are not required to be repaid or cash collateralized as a result of a repayment of other Obligations, and (iii) any Hedge Obligations that by the terms of the applicable Bank Product Agreement are not required to be repaid as a result of a repayment of other Obligations. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon any Insolvency Proceeding of any Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

17.17    **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

17.18    **Acknowledgement Regarding Any Supported QFCs**. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support") and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit

Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

[Signature pages to follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BUMBLE BEE FOODS S.À R.L.,**
a société à responsabilité limitée incorporated and existing under the laws of the Grand-Duchy of Luxembourg

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____

**BUMBLE BEE FOODS, LLC,**
a Delaware limited liability company,
as U.S. Borrower


By: _____
Name: _____
Title: _____

01:25621774.1

*[Signature Page to ABL Credit Agreement]*

**CONNORS BROS. CLOVER LEAF SEAFOODS
COMPANY**, a Nova Scotia unlimited company,
as Canadian Borrower


By: _____
Name: _____
Title: _____

01:25621774.1

**WELLS FARGO CAPITAL FINANCE, LLC,**
a Delaware limited liability company, as Agent, as a Lender, as
co-lead arranger, and as joint bookrunner


By: _____
Name: _____
Title: _____

*[Signature Page to ABL Credit Agreement]*

**[OTHER LENDERS],**
as a [_____]


By: _____
Name: _____
Title: _____

01:25621774.1

## Schedule 1.1

### Definitions

As used in the Agreement, the following terms shall have the following definitions:

"363 Sale" means the sale of substantially all of the assets of the Loan Parties to the Stalking Horse Bidder, or such other purchase as the Bankruptcy Court or the CCAA Court may approve pursuant to the Bidding Procedures Motion, pursuant to Section 363 of the Bankruptcy Code or section 36 of the CCAA.

"ABL Priority Collateral" has the meaning specified therefor in the DIP Intercreditor Agreement.

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Account Party" has the meaning specified therefor in Section 2.11 of this Agreement.

"Accounting Changes" means changes in accounting principles or in the application thereof required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) or, if applicable, the SEC.

"ACH Transactions" means any cash management or related services (including the Automated Clearing House processing of electronic fund transfers through the direct Federal Reserve Fedline system) provided by a Bank Product Provider for the account of Holdings or any of its Subsidiaries.

"Acquired Entity or Business" means any Person, property, business or asset acquired, including pursuant to the Transactions or pursuant to a transaction consummated prior to the Closing Date, and not subsequently so disposed of.

"Actual Cash Receipts" means the sum of all cash collections received by the Loan Parties from operations (excluding any borrowings or other cash receipts not constituting trade receipts) during the relevant period of determination, as determined in a manner consistent with the Budget.

"Actual Disbursements" means the sum of all operating disbursements, expenses, and payments made by the Loan Parties (other than transaction-related payments of Lender Group Expenses) during the relevant period of determination, as determined in a manner consistent with the Budget.

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Adequate Protection Liens" means the "ABL Adequate Protection Liens" as defined in the Orders, as applicable.

"Adjusted Excess Availability" means, as of any date of determination, the result of (a) Borrowers' Excess Availability as of such date minus (b) (i) prior to payment in full of the maximum

amount of the fines or other amounts required to be paid at any time (whether or not then due and payable) under the terms of the DOJ Settlement, an amount equal to the result of (y) the maximum amount of the fines or other amounts required to be paid at any time (whether or not then due and payable) under the terms of the DOJ Settlement which remains unpaid at such time (excluding the $81,500,000 fine payable solely by Big Catch Cayman L.P. under the terms of the DOJ Settlement if certain conditions are met), minus (z) the amount of any DOJ Reserve then in effect, and (ii) at all times from and after the payment in full of the maximum amount of the fines or other amounts required to be paid at any time (whether or not then due and payable) under the terms of the DOJ Settlement from and after the date of entry of the DOJ Settlement, zero.

"<u>Adjusted Total Revolver Commitment</u>" means, at any time, the Total Revolver Commitment <u>less</u> the aggregate Revolver Commitments of all Defaulting Lenders.

"<u>Advances</u>" means U.S. Advances or Canadian Advances, as applicable.

"<u>Affected Lender</u>" has the meaning specified therefor in <u>Section 2.13(b)</u> of the Agreement.

"<u>Affiliate</u>" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; <u>provided</u>, <u>however</u>, that, for purposes of the definition of Eligible Accounts and <u>Section 6.12</u> of the Agreement: (a) any Person which owns directly or indirectly 25% or more of the total voting power of the Voting Stock of such other Person shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership or joint venture in which a Person is a general partner or joint venturer shall be deemed an Affiliate of such Person.

"<u>Agent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Agent's Account</u>" means the Deposit Account of Agent identified on <u>Schedule U-1</u> to the Agreement.

"<u>Agent's Liens</u>" means the Liens granted by the Loan Parties to Agent under the Loan Documents.

"<u>Agent-Related Persons</u>" means Agent, together with its Affiliates, officers, directors, employees, attorneys, advisors, agents, controlling persons and other representatives and their respective successors.

"<u>Aggregate Availability</u>" means, at any time, an amount equal to the sum of (a) the lesser of (i) the U.S. Total Revolver Commitment in effect at such time and (ii) the U.S. Borrowing Base at such time, and (b) the lesser of (i) the Canadian Total Revolver Commitment in effect at such time and (ii) the U.S. Dollar Equivalent of the Canadian Borrowing Base at such time.

"<u>Agreement</u>" means the Credit Agreement to which this <u>Schedule 1.1</u> is attached.

"<u>Allowed Professional Fees</u>" means all fees and expenses, to the extent allowed at any time, whether by interim order, procedural order or otherwise, incurred by the Debtor Professionals and the Committee Professionals.

"<u>Anti-Corruption Laws</u>" means the FCPA, the U.K. Bribery Act of 2010, the Corruption of Foreign Public Officials Act (Canada), as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Controlled Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Controlled Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"<u>Applicable Laws</u>" means, as to any Person, any law (including common law), statute, regulation, ordinance, rule, guideline, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"<u>Applicable Unused Line Fee Rate</u>" means 0.25%.

"<u>Application Event</u>" means (a) the occurrence of a failure by Borrowers to repay the applicable Obligations on the Maturity Date, or (b) the occurrence and continuation of an Event of Default and, subject to the Orders, the election by Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to <u>Section 2.4(b)(ii)</u> of the Agreement.

"<u>Approved Jurisdiction</u>" shall mean each of the United States (and any state thereof), Canada (and any province thereof) or Luxembourg.

"<u>Asset Disposition Event</u>" means any time when (a) an Event of Default has occurred and is continuing, or (b) Adjusted Excess Availability is less than 25% of the Aggregate Availability.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 13.1(a)</u> of the Agreement.

"<u>Assignment and Acceptance</u>" means an Assignment and Acceptance Agreement substantially in the form of <u>Exhibit A-1</u>.

"<u>Auction</u>" shall mean the auction to be held pursuant to the Bidding Procedures Order.

"<u>Authorized Person</u>" means (a) in the case of Canadian Borrower and each Canadian Subsidiary Guarantor, any one of the individuals identified on <u>Schedule A-1</u> and such other officers of Canadian Borrower and each Canadian Subsidiary Guarantor designated from time to time upon advance written notice to the Agent, from and after the date that Agent has completed OFAC searches, and individual background checks for such other officers, the results of which shall be reasonably satisfactory to Agent, and (b) in the case of Holdings, the U.S. Borrower, and each other Guarantor (other than the Canadian Subsidiary Guarantors), any one of the individuals identified on <u>Schedule A-2</u> and such other officers or authorized signatory of Holdings, the U.S. Borrower, and each other Guarantor (other than the Canadian Subsidiary Guarantors) designated from time to time upon advance written notice to Agent, from and after the date that Agent has completed OFAC searches, and individual background checks for such other officers, the results of which shall be reasonably satisfactory to Agent. Any document delivered hereunder that is signed by an Authorized Person shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership or other action on the part of Holdings, the Borrowers or any other Loan Party and such Authorized Person shall be conclusively presumed to have acted on behalf of such Person.

"Availability" means the sum of Canadian Availability and U.S. Availability.

"Avoidance Action" means any cause of action under chapter 5 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product" means any one or more of the following financial products or accommodations extended to any Loan Party or its Subsidiaries by a Bank Product Provider (other than pursuant to the Agreement) including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) stored value cards, (e) purchase cards (including so-called "procurement cards" or "P-cards"), (f) Cash Management Services, or (g) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by any Loan Party or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) to be held by Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount reasonably determined by Agent as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Products (other than Hedge Obligations).

"Bank Product Obligations" means U.S. Bank Product Obligations or Canadian Bank Product Obligations, as the context requires; provided that, for the avoidance of doubt, in no instance will "Bank Product Obligations" include any Indebtedness or other obligations owing in connection with any Bank Product Agreement (as such term is defined in the Term Loan Credit Agreement).

"Bank Product Provider" means Wells Fargo, Agent, any Lender, or any of their respective Affiliates; provided, however, that no such Person (other than Wells Fargo or its Affiliates) shall constitute a Bank Product Provider with respect to a Bank Product unless and until Agent shall have received a Bank Product Provider Letter Agreement from such Person and with respect to the applicable Bank Product.

"Bank Product Provider Letter Agreement" means a letter agreement in substantially the form attached to the Agreement as Exhibit B-1, in form and substance reasonably satisfactory to Agent, as applicable, duly executed by the applicable Bank Product Provider, the applicable Borrower, and Agent.

"Bank Product Reserve Amount" means the U.S. Bank Product Reserve Amount or the Canadian Bank Product Reserve Amount, as the context requires.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning specified in the recitals to the Agreement.

"Base LIBOR Rate" means, for any day, the rate per annum as published by ICE Benchmark Administration Limited (or any other commercially available source as the Agent may designate from time to time) as the LIBOR Rate as of 11:00 a.m., London time as the LIBOR Rate, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by any Borrower in accordance with this Agreement (and, if any such published rate is below zero, then the rate determined pursuant to this clause (b) shall be deemed to be zero). Each determination of the Base LIBOR Rate shall be made by Agent and shall be conclusive in the absence of manifest error.

"Base Rate" means for any day, the rate per annum equal to the greatest of (a) the Federal Funds Rate plus ½%, (b) the Base LIBOR Rate, plus 1.00 percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate" for commercial loans, with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero; provided that, for the avoidance of doubt, for purposes of calculating the Base LIBOR Rate pursuant to clause (b) above, the Base LIBOR Rate for any day shall be based on the rate per annum appearing as of 11:00 a.m. (London time) on such day as published by ICE Benchmark Administration Limited (or any other commercially available source as the Agent may designated from time to time), for a period equal to one-month. If Agent is unable to ascertain the Federal Funds Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrowers, the Base Rate shall be determined without regard to clause (a) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the "prime rate", the Federal Funds Rate or the Base LIBOR Rate for an Interest Period of one month shall be effective as of the opening of business on the effective day of such change in the "prime rate", the Federal Funds Rate or such Base LIBOR Rate, respectively.

"Base Rate Loan" means the portion of the Advances that bears interest at a rate determined by reference to the Base Rate.

"Base Rate Margin" means 3.50%.

"Basel III" means, collectively, those certain agreements on capital requirements, leverage ratios and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III: International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time), and as implemented by a Lender's primary U.S. federal banking regulatory authority or primary non-U.S. financial regulatory authority, as applicable.

"BB Holdings" means Bumble Bee Holdings, Inc., a Georgia corporation and direct parent of the U.S. Borrower.

"BB Parent" means Bumble Bee Parent, Inc., a Delaware corporation, and the direct parent of BB Holdings.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BIA" mean the *Bankruptcy and Insolvency Act* (Canada) in effect from time to time.

"Bidding Procedures" means the bidding procedures in substantially the form attached as Exhibits A-1 and A-2 to the Stalking Horse APA, as applicable, or otherwise in form and substance satisfactory to each of the Agent and the DIP Term Loan Agent.

"Bidding Procedures Motion" means the motions filed with the Bankruptcy Court and the CCAA Court seeking approval of the Bidding Procedures, which motions shall be in form and substance satisfactory to the Agent and the DIP Term Loan Agent (together with all exhibits thereto), (i) seeking approval of (A) the Stalking Horse Transaction and the Stalking Horse APA and (B) the Bidding Procedures and the scheduling of certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief.

"Bidding Procedures Order" means the orders of the Bankruptcy Court and the CCAA Court approving the Bidding Procedures and the Bidding Procedures Motion, in substantially the form attached as Exhibits A-1 and A-2 to the Stalking Horse APA, as applicable, or otherwise, which orders shall be in form and substance satisfactory to each of the Agent and the DIP Term Loan Agent.

"BHC Act Affiliate" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor thereto).

"Board of Directors" means (a) in the case of a Person that is a limited partnership, the board of directors (or comparable managers) of the general partner of such Person, or (b) otherwise, the board of directors (or comparable managers) of a Person or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Borrower" or "Borrowers" means the Canadian Borrower or the U.S. Borrower, as the context requires.

"Borrowing" means a borrowing under the Agreement consisting of (a) one type of Advances on a given date by the applicable Lenders (or the Agent on behalf thereof) (or resulting from conversions of Advances on a given date) having, in the case of LIBOR Rate Loans, the same Interest Period (provided that Base Rate Loans incurred pursuant to Section 2.12(d)(ii) shall be considered part of any related Borrowing of LIBOR Rate Loans), (b) Swing Loans from the Swing Lender on a given date and (c) any Protective Advances from Agent on a given date.

"Borrowing Base Certificate" means a Canadian Borrowing Base Certificate or a U.S. Borrowing Base Certificate, as the context requires.

"Borrowing Base Participant" has the meaning set forth in Schedule 5.2.

"Budget" means the financial projections for the Loan Parties setting forth on a weekly basis for (a) the applicable 13 week period or (b) the period until the projected closing of the 363 Sale,

whichever is shorter (but with the first period therein commencing on the Petition Date through November 30, 2019 and weekly thereafter), including among other things, the projected total operating receipts and total operating expenses of, and the projected professional fees to be paid by, the Loan Parties and their respective Subsidiaries during such period, substantially in the form of the initial Budget annexed to the Agreement as <u>Schedule 4.6</u>. Such Budget may be amended, modified or otherwise updated from time to time by the Borrower, including pursuant to the requirements of <u>Section 5.1</u>, as approved by the Agent (with the consent of the Required Lenders) and DIP Term Loan Agent in their sole and absolute discretion. For the avoidance of doubt, no Budget shall be deemed effective until each of the Agent (with the consent of the Required Lenders) and the DIP Term Loan Agent have approved such Budget (which approval may be by e-mail).

"<u>Budget Delivery Date</u>" has the meaning specified therefor in <u>Schedule 5.1</u> of the Agreement.

"<u>Budget Variance Report</u>" shall mean a variance report in form satisfactory to the Agent setting forth in each case for the Testing Period most recently ended prior to the delivery thereof (i) any variances (whether positive or negative) of actual total operating receipts or total operating expenses of the Loan Parties and their Subsidiaries from the Budget for such Testing Period and (ii) an explanation, in reasonable detail, for any variances (other than Permitted Variances) certified by an Authorized Person of Holdings.

"<u>Budgeted Cash Receipts</u>" means, for any period, the amount of cash collections projected in the Budget to be received by the Loan Parties from operations (excluding any borrowings or other cash receipts not constituting trade receipts) during such period.

"<u>Budgeted Disbursements</u>" means, for any period, the amount of operating disbursements, expenses, and payments (other than transaction-related payments of Lender Group Expenses and Allowed Professional Fees) projected in the Budget to be made by the Loan Parties during such period.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required by Applicable Law or other governmental actions to close (x) in the case of Canadian Advances, in Toronto, or (y) otherwise, in the state of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"<u>Canadian Advances</u>" has the meaning specified therefor in <u>Section 2.2(a)</u> of the Agreement.

"<u>Canadian Anti-Terrorism Laws</u>" means the *Criminal Code* (Canada), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), the *United Nations Suppression of Terrorism Regulations and the Anti-terrorism Act* (Canada) and all regulations and orders made thereunder.

"<u>Canadian Availability</u>" means, as of any date of determination, the amount that Canadian Borrower is entitled to borrow as Canadian Advances under <u>Section 2.1</u> of the Agreement (after giving effect to all then outstanding Canadian Advances and the U.S. Dollar Equivalent of Canadian Letters of Credit Outstanding).

"Canadian Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by Canadian Borrower's or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and (b) all Canadian Hedge Obligations; provided that, for the avoidance of doubt, in no instance will "Canadian Bank Product Obligations" include any Indebtedness or other obligations owing in connection with any Bank Product Agreement (as such term is defined in the Term Loan Credit Agreement).

"Canadian Bank Product Reserve Amount" means, as of any date of determination, the Dollar amount of the reserves established by Agent in respect of Canadian Bank Products Obligations, which Dollar amount may be determined by Agent in its Permitted Discretion (but in no event shall any Canadian Bank Product Reserve Amount with respect to any Canadian Hedge Obligations exceed the mark-to-market value, to the extent applicable, of such Canadian Hedge Obligations).

"Canadian Bankruptcy and Insolvency Law" shall mean any federal or provincial Canadian law from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors, including the BIA, the CCAA, the *Winding up and Restructuring Act* (Canada), the *Canada Business Corporations Act*, the *Companies Act* (Nova Scotia), the *Business Corporations Act* (New Brunswick) and any other applicable corporations legislation.

"Canadian Borrower" has the meaning specified therefor in the preamble to the Agreement.

"Canadian Borrowing Base" means, as of any date of determination, an amount equal to the result of (without duplication):

(a)    85% of the book value of the Canadian Borrowing Base Participants' Eligible Accounts at such date, *less* the amount, if any, of the Canadian Dilution Reserve at such date established by Agent as calculated by Agent in its Permitted Discretion, *plus*

(b)    the lower of

(i)    the sum of (A) 75% of the value (calculated at the lower of cost and market value on a basis consistent with Canadian Borrower's historical accounting practices) of the Canadian Borrowing Base Participants' Eligible Landed Inventory at such date, *plus* (B) the lesser of (1) $2,500,000 minus the amount of the U.S. Revolver Usage that is based on U.S. Availability generated under clause (b)(i)(B) of the U.S. Borrowing Base, and (2) 50% of the value (calculated at the lower of cost and market value on a basis consistent with Canadian Borrower's historical accounting practices) of the Canadian Borrowing Base Participants' Eligible Blocked Landed Inventory at such date, *plus* (C) the lesser of (1) $30,000,000 *minus* the amount of the U.S. Revolver Usage that is based upon U.S. Availability generated under clause (b)(i)(C) of the U.S. Borrowing Base, and (2) 65% of the value (calculated at the lower of cost and market value on a basis consistent with Canadian Borrower's historical accounting practices) of the Canadian Borrowing Base Participants' Eligible In-Transit Inventory, and

(ii)    85% *times* the most recently determined Net Liquidation Percentage *times* the book value of the Canadian Borrowing Base Participants' Eligible Landed Inventory and Eligible In-Transit Inventory at such date, *minus*

(c)      the sum at such date, without duplication, of (i) the Canadian Priority Payables Reserves established by Agent in its Permitted Discretion *plus* (ii) the aggregate amount of all Canadian Rent Reserves established by Agent in its Permitted Discretion, *plus* (iii) the Canadian Bank Product Reserve Amount, if any, established in connection with Canadian Bank Product Obligations, *plus* (iv) the aggregate amount of other reserves, if any, established by Agent under Section 2.2(c) of the Agreement in its Permitted Discretion, *plus* (v) the amount at such time that is included in the U.S. Borrowing Base pursuant to clause (c) of the definition thereof.

The Canadian Borrowing Base at any time shall be determined by reference to the most recent Canadian Borrowing Base Certificate theretofore delivered to Agent with such adjustments as Agent deems appropriate in its Permitted Discretion to assure that the Canadian Borrowing Base is calculated in accordance with the terms of the Agreement.

Any provision of this definition or any other provision of the Agreement (including this Schedule 1.1) to the contrary notwithstanding, in the event that any Canadian Subsidiary Guarantor is (or its assets are) acquired by a Loan Party after the Closing Date (a "Canadian Borrowing Base Event"), in no event shall any Accounts or Inventory of such Person or entity be included in the Canadian Borrowing Base prior to the time, after the occurrence of such Canadian Borrowing Base Event, when Agent has completed its field audits and appraisals with respect to such Canadian Subsidiary Guarantor.

"Canadian Borrowing Base Certificate" means a certificate, executed by an Authorized Person of Canadian Borrower, substantially in the form of (or in such other form as may be mutually agreed upon by Canadian Borrower and Agent), and containing the information prescribed by, Exhibit C-1, delivered to Agent and setting forth the calculation of the Canadian Borrowing Base in accordance with Section 5.2 of the Agreement.

"Canadian Borrowing Base Participants" has the meaning set forth in Schedule 5.2.

"Canadian Collections" means any Collections of any Canadian Loan Party.

"Canadian Defined Benefit Plan" means any Canadian Pension Plan which contains a "defined benefit provision", as defined in Section 147.1(1) of the Income Tax Act (Canada).

"Canadian Dilution" means, as of any date of determination, without duplication for any amounts deducted or not included in determining Eligible Accounts of the Canadian Loan Parties, a percentage, based upon the actual results of the immediately prior 360 consecutive days, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Canadian Borrower's and Canadian Subsidiary Guarantor's Accounts during such period, by (b) Canadian Borrower's and Canadian Subsidiary Guarantor's billings with respect to Accounts during such period.

"Canadian Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Canadian Borrower's and Canadian Subsidiary Guarantor's Eligible Accounts by 1 percentage point for each percentage point by which Canadian Dilution is in excess of 5%.

"Canadian Dollars" or "C$" means Canadian dollars.

"Canadian Employee" means any employee or former employee of a Canadian Loan Party.

"<u>Canadian Employee Plan</u>" means any employee benefit, health, welfare, supplemental unemployment benefit, bonus, pension, supplemental pension, profit sharing, retiring allowance, severance, deferred compensation, stock compensation, stock purchase, unit purchase, retirement, life, hospitalization insurance, medical, dental, disability or other employee group or similar benefit or employment plans or supplemental arrangements applicable to the Canadian Employees, but excluding any Canadian Pension Plan and any statutory benefit plans in which a Canadian Loan Party is required to participate or with which a Canadian Loan Party is required to comply.

"<u>Canadian Guarantors</u>" means any Guarantor that is organized under the laws of Canada or a province of Canada.

"<u>Canadian Hedge Obligations</u>" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of Canadian Borrower's or its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Bank Product Providers.

"<u>Canadian Holdco</u>" means either (i) Clover Leaf Holdings Company, a Nova Scotia unlimited company and the direct parent company of Canadian Borrower or (ii) any other Holding Company that may be the direct parent company of Canadian Borrower from time to time.

"<u>Canadian Issuing Lender</u>" means The Toronto Dominion Bank or any other Lender that, at the request of Canadian Borrower and with the consent of Agent, agrees, in such Lender's sole discretion, to become a Canadian Issuing Lender in accordance with <u>Section 2.11</u> of the Agreement for the purpose of issuing Canadian Letters of Credit or Canadian Reimbursement Undertakings pursuant to <u>Section 2.11</u> of the Agreement. In the event that there is more than one Canadian Issuing Lender at any time, references in the Agreement and in the other Loan Documents to the Canadian Issuing Lender shall be deemed to refer to the Issuing Lender in respect of the applicable Canadian Letter of Credit or to all Canadian Issuing Lenders, as the context requires.

"<u>Canadian L/C Sublimit</u>" means $5,000,000.

"<u>Canadian Lender</u>" means a Lender with a Canadian Revolver Commitment or holding at such a time a Canadian Advance (or Canadian Letter of Credit Exposure) made to Canadian Borrower; sometimes being referred to collectively as "Canadian Lenders".

"<u>Canadian Letter of Credit</u>" means a letter of credit issued by a Canadian Issuing Lender or a letter of credit issued by a Canadian Underlying Issuer, as the context requires.

"<u>Canadian Letter of Credit Exposure</u>" means, with respect to any Canadian Lender, at any time, the sum of (without duplication) (a) such Canadian Lender's Pro Rata Share of the Canadian Letter of Credit Usage at such time plus (b) such Canadian Lender's Pro Rata Share of any Canadian Unpaid Drawings at such time.

"<u>Canadian Letter of Credit Usage</u>" means, as of any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding Canadian Letters of Credit, <u>plus</u> (b) the aggregate amount of outstanding reimbursement obligations with respect to Canadian Letters of Credit which remain unreimbursed or which have not been paid through a Canadian Advance.

"<u>Canadian Letters of Credit Outstanding</u>" mean, at any time, the sum of, without duplication, (a) the aggregate undrawn amount of all outstanding Canadian Letters of Credit at such time

and (b) the aggregate amount of all Canadian Unpaid Drawings in respect of all Canadian Letters of Credit at such time.

"Canadian Loan Account" has the meaning specified therefor in Section 2.9(a) of the Agreement.

"Canadian Loan Parties" include Canadian Borrower and each Canadian Guarantor; each sometimes being referred to individually as a "Canadian Loan Party".

"Canadian Overadvance Amount" has the meaning specified therefor in Section 2.4(e)(ii) of the Agreement.

"Canadian Participant Register" has the meaning specified therefor in Section 13.1(k) of the Agreement.

"Canadian Pension Event" shall mean any event which would entitle a Person (with or without the consent of the applicable Canadian Loan Party or any of its Subsidiaries) to trigger or order a wind-up or termination, in full or in part, of such a Canadian Pension Plan, or the institution of any procedure or other steps by any Person to trigger the termination of or obtain an order to terminate or wind-up, in full or in part, any such plan, or the receipt by the applicable Canadian Loan Party or any of its Subsidiaries of an order from a Governmental Authority proposing to order a partial or full termination or wind-up of any such plan, in each case, that could reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate.

"Canadian Pension Plan" means any pension plan required to be registered under the Income Tax Act (Canada) or any Canadian federal or provincial law and or contributed to by Canadian Borrower for its Canadian Employees or former Canadian Employees, including any pension benefit plan within the meaning of the *Pension Benefits Act* (New Brunswick) or the *Pension Benefits Act* (Ontario) but does not include the Canada Pension Plan maintained by the Government of Canada.

"Canadian Pre-Petition Advances" means the "Canadian Advances" as defined in the Pre-Petition Credit Agreement.

"Canadian Priority Payables Reserves" means reserves (determined from time to time by Agent in its Permitted Discretion) for: (a) the amount past due and owing by Canadian Borrower or any Canadian Subsidiary Guarantor, or the accrued amount for which such Canadian Loan Party has an obligation to remit, to a Governmental Authority or other Person pursuant to any Applicable Law, in respect of (i) goods and services taxes, sales taxes, employee income taxes, municipal taxes and other taxes payable or to be remitted or withheld; (ii) workers' compensation or unpaid pension plan contributions (including current service contributions and special payment, as applicable); (iii) vacation or holiday pay; (iv) amounts payable to a solvency administrator or in respect of government royalties, and (v) other like charges and demands, in the case of any of clauses (i) through (v), only to the extent that any Governmental Authority or other Person may claim a lien, security interest, hypothec, trust or other claim on the ABL Priority Collateral ranking or capable of ranking in priority to or pari passu with one or more of the Liens granted in the Loan Documents under the Applicable Laws of Canada and such lien, security interest, hypothec, trust or other claim has been or may be imposed; and (b) the aggregate amount of any other liabilities of Canadian Borrower or any Canadian Subsidiary Guarantor (i) in respect of which a trust has been or may be imposed on any ABL Priority Collateral to provide for payment, or (ii) which are secured by a lien, security interest, hypothec, pledge, charge, right or claim on any ABL Priority Collateral, or as to which the claimant has a right to repossess any ABL Priority Collateral; in each case, pursuant to any Applicable Law; in each case of clause (a) and (b), pursuant to any Applicable

Law and which such lien, trust, security interest, hypothec, pledge, charge, right or claim ranks or, in the judgment of the Agent, is capable of ranking in priority to or pari passu with one or more of the Liens granted pursuant to the Security Documents under the Applicable Laws of Canada (such as liens, trusts, security interests, hypothecs, pledges, charges, rights or claims in favor of employees, customs brokers, carriers, mechanics, materialmen, labourers, or suppliers, or liens, trusts, security interests, hypothecs, pledges, charges, rights or claims for ad valorem, excise, sales, or other taxes where given priority under applicable law) and has been or may be imposed; in each case net of the aggregate amount of all restricted cash held or set aside for the payment of such obligations.

"Canadian Protective Advance" is a Protective Advance which has been deemed a "Canadian Protective Advance" by Agent.

"Canadian Register" has the meaning set forth in Section 13.1(i) of the Agreement.

"Canadian Registered Loan" has the meaning set forth in Section 13.1(i) of the Agreement.

"Canadian Reimbursement Undertaking" has the meaning specified therefor in Section 2.11(b)(i) of the Agreement.

"Canadian Rent Reserve" means, in the event the Canadian Loan Parties are unable to obtain a Collateral Access Agreement with respect to any location listed on Schedule E-1 or any other leased location in Canada where Canadian Borrower's or any Canadian Subsidiary's Inventory is located, a reserve against the Canadian Borrowing Base that Agent may, in its Permitted Discretion, impose in an amount of up to (in its Permitted Discretion) 3 months' rent at such location; provided, however, that so long as a Collateral Access Agreement is in effect for any location, such reserve shall no longer apply with respect to such location and no such reserve shall be imposed on any such location in respect of which such Eligible Inventory in the aggregate has a value of less than $500,000 or the Canadian Dollar Equivalent thereof.

"Canadian Revolver Commitment" means, with respect to each Canadian Lender, its Canadian Revolver Commitment, and, with respect to all Canadian Lenders, their Canadian Revolver Commitments, in each case as such Dollar amounts are set forth beside such Canadian Lender's name under the applicable heading on Schedule C-2 or in the Assignment and Acceptance pursuant to which such Canadian Lender became a Canadian Lender hereunder or in the case of any Lender that increases its Canadian Revolver Commitment or becomes a Post-Increase Canadian Revolver Lender, in each case pursuant to Section 2.15 of the Agreement, the amount specified in the applicable Increase Joinder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Canadian Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Canadian Advances, plus (b) the U.S. Dollar Equivalent of the amount of the Canadian Letter of Credit Usage.

"Canadian Security Agreement" means the security agreement, dated as of the Closing Date, charging all assets and interests in assets and proceeds thereof now owned or hereafter acquired by the Canadian Loan Parties in favor of Agent, as further amended, restated, supplemented or otherwise modified from time to time.

"Canadian Security Documents" means (a) the Canadian Security Agreement, (b) one or more Trademark, Patent and Copyright security agreements including any joinders thereto with respect to

all Intellectual Property and proceeds thereof now owned or hereafter acquired by the Canadian Loan Parties, (c) one or more hypothecs charging all movable property and proceeds thereof now owned or hereafter acquired by the Canadian Loan Parties, (d) one or more pledge agreements charging all investment property now owned or hereafter acquired by Canadian Holdco and each other applicable Canadian Loan Party, (e) the Quebec Security Documents, (f) [intentionally omitted], (g) the Canadian Ship Mortgages, and (h) a pledge agreement charging all investment property now owned or hereafter acquired by Clover Leaf Seafood pursuant to the provisions of clause (j) of <u>Schedule 3.6</u> of the Agreement, in the Stock of Canadian Holdco, which in each case are governed by the laws of Canada and which are otherwise in form and substance reasonably satisfactory to Agent.

"<u>Canadian Settlement</u>" has the meaning specified therefor in <u>Section 2.3(f)(i)</u> of the Agreement.

"<u>Canadian Settlement Date</u>" has the meaning specified therefor in <u>Section 2.3(f)(i)</u> of the Agreement.

"<u>Canadian Ship Mortgages</u>" means mortgages of vessels (a) owned as of the Closing Date by any Canadian Loan Party and described on <u>Schedule V-1</u>, and (b) owned or acquired after the Closing Date by any Canadian Loan Party to the extent that the Fair Market Value of any such vessel exceeds $2,500,000.

"<u>Canadian Subsidiary</u>" means any Subsidiary that is organized under the laws of Canada or one of the provinces of Canada.

"<u>Canadian Subsidiary Guarantor</u>" means any Canadian Subsidiary that is a Guarantor.

"<u>Canadian Swing Loan</u>" has the meaning specified therefor in <u>Section 2.3(b)</u> of the Agreement.

"<u>Canadian Swing Loan Exposure</u>" means, with respect to any Canadian Lender, at any time, such Canadian Lender's Pro Rata Share of the Canadian Swing Loans outstanding at such time.

"<u>Canadian Total Revolver Commitment</u>" means the sum of the Canadian Revolver Commitments of all Canadian Lenders.

"<u>Canadian Underlying Issuer</u>" means a third Person which is the beneficiary of a Canadian Reimbursement Undertaking and which has issued a letter of credit at the request of the Canadian Issuing Lender for the benefit of Canadian Borrower or one of its Subsidiaries.

"<u>Canadian Underlying Letter of Credit</u>" means a letter of credit that has been issued by a Canadian Underlying Issuer.

"<u>Canadian Unpaid Drawing</u>" has the meaning specified therefor in <u>Section 2.11(b)(iv)</u> of the Agreement.

"<u>Capital Lease</u>" means, as applied to any Person, a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP (as in effect on the Closing Date (as defined in the Pre-Petition Credit Agreement), notwithstanding any modification or interpretative change thereto after the Closing Date (including without giving effect to any treatment of leases under Accounting Standards Codification 842 or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect)).

"Capital Lease Obligation" means, as applied to any Person, that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP (as in effect on the Closing Date (as defined in the Pre-Petition Credit Agreement), notwithstanding any modification or interpretative change thereto after the Closing Date (including without giving effect to any treatment of leases under Accounting Standards Codification 842 or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect)).

"Carve Out" has the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"Carve Out Reserve" means, as of any date, a reserve established by the Agent in an amount equal to the sum of (i) Post-Carve Out Trigger Notice Cap (as such term is defined in the Interim Order and the Final Order) plus (ii) an amount equal to all fees and expenses of Professional Persons, and all fees payable (or projected to be payable) to the Clerk of the Bankruptcy Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code, in each case in this subclause (ii) for the two-week period commencing on such date as estimated by the Agent in good faith for such period.

"Carve-Out Trigger Notice" means a written notice delivered by the Agent to the Debtors and their lead restructuring counsel, the U.S. Trustee, the Pre-Petition Agent, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuance of an Event of Default and acceleration of the Obligations under this Agreement stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

"Cases" has the meaning specified in the recitals to the Agreement.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or Canada or issued by any agency thereof and backed by the full faith and credit of the United States or Canada, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state, or any province of Canada, or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank, or any bank listed on Schedule I of the *Bank Act* (Canada), having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof, or the federal laws of Canada, so long as the amount maintained with any such other bank is less than or equal to $250,000 and is insured by the Federal Deposit Insurance Corporation or the Canadian Deposit Insurance Corporation, as the case may be, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than 30 days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above and (i) shares of investment

companies that are registered under the Investment Company Act of 1940 and substantially all of the investments which are one or more of the types of assets described in clauses (a) through (g) above.

"Cash Management Order" means an order of the Bankruptcy Court or CCAA Court, in form and substance satisfactory to the Agent, among other things, (i) approving and authorizing the Debtors or the CCAA Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code or any applicable section of the CCAA and (v) authorizing the Debtors or the CCAA Debtors to use existing bank accounts and existing business forms.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, ACH Transactions and other cash management arrangements.

"CCAA" means the *Companies' Creditors Arrangement Act* (Canada), in effect from time to time.

"CCAA A&R Initial Order" shall mean the CCAA Initial Order as amended and restated by the CCAA Court at the hearing of the CCAA Comeback Motion to: (i) approve service and/or substitute service on all secured creditors of the CCAA Debtors likely to be affected by the CCAA DIP Charge; and (ii) provide for the full priming of the CCAA DIP Charge on all of the Collateral of the CCAA Debtors on the terms contemplated thereby.

"CCAA A&R Initial Order Entry Date" shall mean the date on which the CCAA A&R Initial Order is entered with the CCAA Court.

"CCAA Approval and Vesting Order" shall mean a final non-appealable order of the CCAA Court, in form and substance reasonably acceptable to each of the Agent and the DIP Term Loan Agent approving (i) the Stalking Horse Transaction on the terms set forth in the Stalking Horse APA or (ii) another sale pursuant to the Bidding Procedures Order of substantially all of the assets of the Debtors and the CCAA Debtors.

"CCAA Case" and "CCAA Cases" shall have the meaning provided in the recitals to this Agreement.

"CCAA Comeback Motion" shall mean the motion seeking the CCAA A&R Initial Order to be heard by the CCAA Court not later than ten (10) days following the entry of the CCAA Initial Order, which motion shall be served by the CCAA Debtors on the service list established in the CCAA Cases, all secured creditors of the CCAA Debtors and any other Person as may be requested by the Agent.

"CCAA Court" shall have the meaning provided in the recitals to this Agreement.

"CCAA Debtor" and "CCAA Debtors" shall have the meaning provided in the recitals to this Agreement.

"CCAA DIP Charge" shall mean a super-priority priming charge granted by the CCAA Court on all of the Collateral of the CCAA Debtors.

"CCAA Filing Date" shall have the meaning provided in the recitals to this Agreement.

"CCAA Initial Order" shall mean an order of the CCAA Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance satisfactory to the Agent, which order shall, among other things, authorize the Loan Documents and the DIP Term Loan Credit Documents to which any CCAA Debtor is a party and the Transactions contemplated by this Agreement and grant the CCAA DIP Charge, with only such modifications as are satisfactory to the Agent, in its sole discretion.

"CCAA Initial Order Date" means the date on which the CCAA Initial Order is entered with the CCAA Court.

"CCAA Monitor" means the monitor appointed by the CCAA Court pursuant to the CCAA Initial Order.

"CCAA Orders" means the CCAA Initial Order and the CCAA A&R Initial Order, as applicable.

"Change of Control" means that (a) Permitted Holders fail to own and control, directly or indirectly, more than 50%, of the Stock of Holdings having the right to vote for the election of members of its Board of Directors, (b) Holdings ceases to own, directly or indirectly, 100% of the Stock of (i) U.S. Borrower and (ii) Canadian Borrower, or (c) a "Change of Control" (or any comparable term or provision) under or with respect to the DIP Term Loan Credit Agreement (or any Refinancing Indebtedness in respect thereof) has occurred. Notwithstanding the preceding or any provision of Rule 13d-3 of the Exchange Act (or any successor provision), a Person or group shall not be deemed to beneficially own securities subject to an equity or asset purchase agreement, merger agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the transactions contemplated by such agreement.

"Civil Antitrust Claim" means any and all cases or other claims that are currently pending or that may be brought in the future against any Loan Party or any of their respective Affiliates in any and all courts within the United States, or any other country, with respect to price-fixing or any other alleged violation of any antitrust laws, including any claim arising out of or related to, but not limited to, the allegations in the following complaints: In re Packaged Sea Food Antitrust Litigation, Case No. 3:15-md-02670 (JLS)(MDD); The Kroger Co., et al v. Bumble Bee Foods LLC, et al, Case No. 16-cv-0051 (JSS)(MDD); Wegmans Food Markets, Inc. v. Bumble Bee Foods LLC, et al, Case No. 3:16cv0264 (JLS)(MDD); Wal-Mart Stores, Inc. v. Bumble Bee Foods LLC, et al, Case No. 16-CV-2821 (JLS)(MDD); Affiliated Foods, Inc.; Affiliated Foods Midwest Cooperative, Inc.; Alex Lee, Inc.; Associated Food Stores, Inc.; Associated Grocers of New England, Inc.; Associated Grocers, Inc.; Big Y Foods, Inc.; Brookshire Brothers, Inc.; Brookshire Grocery Company; Certco, Inc.; Dollar Tree Distribution, Inc.; Greenbrier International, Inc.; Family Dollar Stores, Inc.; Family Dollar Services, LLC; Fareway Stores, Inc.; The Golub Corporation; Giant Eagle Inc.; Kmart Corporation; KVA-T Food Stores, Inc.; McLane Company, Inc.; Meadowbrook Meat Company, Inc.; Merchants Distributors, LLC; Schnuck Markets, Inc.; Unified Grocers, Inc.; URM Stores Inc.; Western Family Foods, Inc.; and Woodman's Food Market, Inc. v. Tri-Union Seafoods, LLC, d/b/a Chicken of the Sea International; Thai Union Group Public Company, LTD.; Bumble Bee Foods, LLC, f/k/a Bumble Bee Seafoods, LLC, Starkist Co.; Del Monte Corporation; and Dongwon Industries Co., Ltd., Case No. 15-cv-2670(JLS)(MDD); Target Corporation v. Bumble Bee Foods, LLC, Starkist Company, Dongwon Industries Co. LTD, Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Group PLC, Case No.17-cv-02024.

"Class", when used in reference to any Advance, shall refer to whether such Advances are U.S. Advances, Canadian Advances, or Swing Loans or Protective Advances and, when used in

reference to any Commitment, refers to whether such Commitment is a U.S. Revolver Commitment, or Canadian Revolver Commitment.

"Closing Date" means the first date on which all of the conditions precedent in Section 3.1 are satisfied or waived in accordance with the terms herein, which date is November [__], 2019.

"Clover Leaf Seafood" means Clover Leaf Seafood S.à r.l., a *Luxembourg société à responsabilité limitée*, incorporated and existing under the laws of the Grand-Duchy of Luxembourg, having its registered office at 4, rue Lou Hemmer, L-1748 Luxembourg Findel, registered with the Luxembourg Trade and Companies' Register (*Registre de Commerce et des Sociétés*) under number B 159871.

"Code" means the New York Uniform Commercial Code, as in effect from time to time, provided that, where the context so requires, any term defined by reference to the "Code" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the *Personal Property Security Act* of each applicable province of Canada, the *Civil Code of Quebec*, the *Bills of Exchange Act* (Canada) and the *Depository Bills and Notes Act* (Canada)), in all cases for the extension, preservation or betterment of the security and rights of Agent and the Secured Parties.

"Collateral" means substantially all assets and interests in assets and proceeds thereof now owned or hereafter acquired by a Loan Party in or upon which a Lien is granted by such Person in favor of Agent for the benefit of the Secured Parties under any of the Security Documents, or the "DIP Collateral" referred to in any Orders and all "Property" (or equivalent term) as defined in the CCAA Initial Order (and, when entered, the CCAA A&R Initial Order), it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Access Agreement" means a collateral access agreement, landlord waiver, bailee agreement, or acknowledgement agreement of any lessor, warehouseman, bailee, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in a Loan Party's books and records, Equipment, or Inventory, in each case, in form and substance reasonably satisfactory to Agent.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds, and tax refunds).

"Commitment" means, with respect to each Lender, its U.S. Revolver Commitment or its Canadian Revolver Commitment, and, with respect to all Lenders, their U.S. Revolver Commitments or their Canadian Revolver Commitments.

"Committee" means an official committee of unsecured creditors appointed in the Cases.

"Committee Professionals" means the persons or firms retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1et seq.), as amended from time to time, and any successor statute.

"Company Compliance Program" means the corporate and regulatory compliance program maintained by the U.S. Borrower as of the Closing Date.

"Compliance Program" means any compliance program required by the DOJ Settlement or the United States or any other Governmental Authority in connection with or related to the DOJ Settlement.

"Consolidated Total Assets" means, as of any date of determination, the total amount of all assets of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with GAAP as of such date.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Loan Party, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account). For certainty, for any Canadian bank account, such term shall also refer to a "blocked account" agreement with respect to such bank account, notwithstanding that the execution and delivery of such agreement may not be a perfection requirement.

"Controlled Account" has the meaning specified therefor in Section 5.20(b)(i) of the Agreement.

"Controlled Account Bank" has the meaning specified therefor in Section 5.20(b)(i) of the Agreement.

"Controlled Affiliate" means any Affiliate that (i) is controlled by any Loan Party, or (ii) Controls any Loan Party. "Control" means the means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise; provided, that any Person which owns directly or indirectly 25% or more of the total voting power of the Voting Stock of such other Person shall be deemed a Controlled Affiliate of such Person. For the avoidance of doubt, none of FCF International Limited, FCF Fishery Co. Ltd. or any of their respective Affiliates shall be deemed to be a Controlled Affiliate of any Loan Party, so long as (x) in the aggregate, FCF International Limited, FCF Fishery Co. Ltd. and their respective Affiliates do not hold 25% or more of the total voting power of the Voting Stock of any Loan Party or any of its Controlled Affiliates, and (y) no more than one member of the Board of Directors of any Loan Party or any of their respective Controlled Affiliates was appointed at the direction of or request of FCF International Limited, FCF Fishery Co. Ltd. or any of their respective Affiliates.

"Copyright Security Agreement" has the meaning specified therefor in the U.S. Security Agreement.

"Copyrights" has the meaning specified therefor in the U.S. Security Agreement.

"Covered Party" has the meaning specified therefor in Section 17.18 of this Agreement.

"Currency" means Dollars or Canadian Dollars.

"Daily Balance" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"Debtor Professionals" means the persons or firms retained by the Debtors or the CCAA Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code or any applicable sections of the CCAA.

"Debtors" has the meaning specified in the recitals to the Agreement.

"Deductible Amount" has the meaning specified therefor in Section 15.18(d) of the Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement on the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement) and such failure continues for a period of two (2) Business Days, (b) notified the applicable Borrower, the Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within two (2) Business Days after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it under the Agreement on the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, liquidator, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, liquidator, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) becomes or has a direct or indirect parent company that becomes the subject of a Bail-In Action.

"Defaulting Lender Rate" means (a) for the first 2 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Advances that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Designated Canadian Account or the Designated U.S. Account, as the context requires.

"Designated Account Bank" means the Designated U.S. Account Bank or the Designated Canadian Account Bank, as the context requires.

"Designated Canadian Account" means the Deposit Account of Canadian Borrower identified on Schedule D-1 or such other account as may be identified by Canadian Borrower to Agent from time to time.

"Designated Canadian Account Bank" has the meaning specified therefor in Schedule D-1 or such other bank as may be identified by Canadian Borrower to Agent from time to time.

"<u>Designated U.S. Account</u>" means the Deposit Account of U.S. Borrower identified on <u>Schedule D-2</u> or such other account as may be identified by the U.S. Borrower to the Agent from time to time.

"<u>DIP Collateral</u>" means the "DIP Collateral" as defined in the Orders, as applicable.

"<u>DIP Facilities</u>" means the DIP Term Loan Documents and the Loan Documents.

"<u>DIP Intercreditor Agreement</u>" means that certain DIP Intercreditor Agreement dated as of November [\_\_], 2019 by and among Agent, DIP Term Loan Agent, WFCF, as agent under the Prepetition Credit Agreement and Brookfield Principal Credit LLC, as administrative agent under the Term Loan Credit Agreement.

"<u>DIP Superpriority Claim</u>" means the allowed superpriority administrative expense claim granted to the Loan Parties in the Cases or the CCAA Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code or any applicable provision of the CCAA, as applicable, for all of the Obligations with priority over any and all Cases, CCAA Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, any other provision of the Bankruptcy Code, and any applicable provisions of the CCAA, which shall at all times be senior to the rights of the Debtors and the CCAA Debtors and their estates, and any successor trustee or other estate representatives; <u>provided</u> that the DIP Superpriority Claim shall not have recourse to any Avoidance Actions or the proceeds thereof subject to entry of the Final Order and the CCAA Orders; <u>provided</u> <u>further</u> that the DIP Superpriority Claim shall be subject to the Carve Out and Liens created pursuant to the CCAA Orders.

"<u>DIP Term Loan Agent</u>" has the meaning specified therefor in the DIP Intercreditor Agreement.

"<u>DIP Term Loan Credit Agreement</u>" means that certain Superpriority Debtor-in-Possession Term Loan Agreement dated as of November [\_\_], 2019 among the Borrower, the lenders party thereto, Brookfield Principal Credit LLC, as administrative agent and collateral agent, and the other parties thereto, as amended and in effect from time to time in accordance with the terms of the DIP Intercreditor Agreement or any Order and any refinancing or replacement thereof in whole or in part (in accordance with the terms of the DIP Intercreditor Agreement and the Orders).

"<u>DIP Term Loan Documents</u>" means the DIP Term Loan Credit Agreement and the agreements, documents and instruments executed in connection therewith as each such document may be amended, restated, supplemented or otherwise modified, replaced or refinanced from time to time in accordance with the requirements thereof.

"<u>DIP Term Loan Indebtedness</u>" means the Indebtedness incurred by the Loan Parties under the DIP Term Loan Documents.

"<u>DIP Term Loan Liens</u>" means Liens securing the DIP Term Loan Obligations (as defined in the DIP Intercreditor Agreement).

"<u>Disposition</u>" has the meaning specified therefor in <u>Section 6.4</u> of the Agreement, the terms "Disposed" and "Dispose" shall have corresponding meanings.

"Disqualified Competitor" means any Person that is a competitor of Holdings or any of its Subsidiaries (or an Affiliate of such competitor) designated by Holdings as a "Disqualified Competitor" by written notice delivered to the Agent from time to time; provided that "Disqualified Competitor" shall exclude any Person that Holdings has designated as no longer being a "Disqualified Competitor" by written notice delivered to the Agent from time to time; provided, further that, no Affiliate of a competitor shall include any Affiliate of such competitor that is a bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans or bonds and/or similar extensions of credit in the ordinary course of business. The list of Disqualified Competitors shall be made available to any Lender upon written request to the Agent. In no event shall a supplement to the list of Disqualified Competitor apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest in the Obligations that was otherwise permitted prior to such permitted supplementation.

"Disqualified Institution" shall means any Person designated by Holdings as a "Disqualified Institution" by written notice delivered to the Agent on or prior to the Closing Date and any of such Person's Affiliates that are readily identifiable as such by their name; provided that "Disqualified Institutions" shall exclude any Person that Holdings has designated as no longer a "Disqualified Institution" by written notice delivered to the Agent from time to time. The list of Disqualified Institutions shall be made available to any Lender upon written request to the Agent.

"DOJ Payment" means any payment by Holdings or any of its Subsidiaries (or that Holdings or any of its Subsidiaries is obligated to pay or reimburse to any other person whether by applicable law, contract, or otherwise) that is due or otherwise required to be made (whether or not then due and payable) under the DOJ Settlement.

"DOJ Reserve" means a reserve equal to 100% of the amount of the fine or other amounts evidenced by the DOJ Settlement which remains unpaid at such time.

"DOJ Settlement" means the Amended Plea Agreement between the United States and U.S. Borrower, signed by representatives of the United States Department of Justice on July 31, 2017, pursuant to which U.S. Borrower agreed to plead guilty to criminal charges that prior to the date thereof it has participated in a combination or conspiracy to suppress and eliminate competition in the pricing (or by fixing prices) of packaged seafood sold in the United States in violation of the Sherman Antitrust Act, 15 U.S. C. § 1, and to pay a criminal fine of up to $25,000,000, as amended or otherwise modified from time to time, of which $17,000,000 is outstanding on the Petition Date.

"Dollar Equivalent" or "U.S. Dollar Equivalent" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Foreign Currency, the equivalent in Dollars of such amount, determined by the Agent using the applicable Exchange Rate.

"Dollars" or "$" or "U.S. Dollars" means United States dollars.

"Domestic Subsidiary" means, with respect to any Person, any Subsidiary of such Person that is organized under the laws of one of the United States, any state or territory thereof, or the District of Columbia.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts" means those Accounts created by a Borrower or a Subsidiary Guarantor in the ordinary course of its business, that arise out of such Person's sale of goods, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any audit performed by Agent from time to time after the Closing Date. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and unapplied cash. Eligible Accounts shall not include the following:

(a)     Accounts that the Account Debtor has failed to pay within 90 days of original invoice date or Accounts 60 days past due,

(b)     Accounts owed by an Account Debtor and each of its Affiliates where 50% or more of the U.S. Dollar Equivalent of all Accounts owed by that Account Debtor or any of its Affiliates are deemed ineligible under clause (a) above,

(c)     Unless otherwise agreed to by Agent, Accounts with respect to which the Account Debtor is an Affiliate or an employee of a Borrower or a Subsidiary Guarantor,

(d)     Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)     Accounts that are not payable in Dollars or Canadian Dollars,

(f)     Accounts with respect to which the Account Debtor either (i) does not either maintain its chief executive office or registered office, as applicable, in the United States, Puerto Rico, or Canada or have substantial assets and operations in the United States, Puerto Rico, or Canada, or (ii) is not organized under the laws of the United States, any state thereof, or the District of Columbia, under the laws of Puerto Rico, or under the laws of Canada or any province thereof, or (iii) is the government of any country or sovereign state other than the United States, or of any state, province, municipality, or other political subdivision thereof, or of any Governmental Authority thereof, unless (y) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by Agent, or (z) the Account is covered by credit insurance (including foreign accounts receivable insurance issued by a Governmental Authority) in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent,

(g)     Accounts with respect to which the Account Debtor is either (i) the United States or Canada or any department, agency, or instrumentality of the United States or Canada (exclusive, however, of Accounts with respect to which Borrower or a Subsidiary Guarantor has complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 USC §3727), the *Financial Administration Act* (Canada) or with any applicable state, provincial, county or municipal law or similar purpose and effect, as applicable, or (ii) any state of the United States or any province of Canada,

(h)     Accounts with respect to which the Account Debtor is a creditor of the applicable Borrower or Subsidiary Guarantor, has or has asserted a right of setoff, off-set or recoupment (irrespective of whether the liability alleged to be owing by the applicable Borrower or Subsidiary Guarantor to such Account Debtor is contingent or liquidated at such time), or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of setoff, off-set, recoupment, or dispute, as determined by Agent in its Permitted Discretion, unless (i) Agent, in its Permitted Discretion, has established an appropriate reserve, which may be adjusted by Agent from time to time in its Permitted Discretion, and determines to include such Account as an Eligible Account or (ii) such Account Debtor has entered into an agreement reasonably acceptable to Agent to waive such rights of setoff, off-set and recoupment;

(i)     Accounts with respect to an Account Debtor whose total obligations owing to the applicable Borrower or Subsidiary Guarantor exceed 10% of all Eligible Accounts, (but the portion of the Accounts owing by such Account Debtor not in excess of such percentage that otherwise satisfy the criteria herein will be deemed Eligible Accounts and it being understood that such percentage limitation shall apply to all Eligible Accounts of Borrowers and all Subsidiary Guarantors, collectively); provided, however, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit; provided further, however, that the foregoing percentage shall be increased (1) to 15% in respect of C&S Wholesale Grocers, Inc., (2) to 20% in respect of Costco Wholesale Corporation, (3) 30% in respect of Loblaws, (4) 25% in respect of Wal-Mart Canada, (5) 25% in respect of Wal-Mart Stores, Inc. and Sam's Club, and (6) 20% in respect of Metro CAD,

(j)     Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not paying its debts as they become due, has gone out of business, or as to which the applicable Borrower or Subsidiary Guarantor has received written notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(k)     from and after the delivery of written notice thereof by the Agent to the applicable Borrower, Accounts created after the date of such written notice, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful by reason of the Account Debtor's financial condition,

(l)     Accounts that are not subject to a valid and perfected or opposable first priority Agent's Lien,

(m)     Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(n)     Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(o)     Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower or Subsidiary Guarantor of the subject contract.

"Eligible Blocked Landed Inventory" means those items of Eligible Landed Inventory that do not qualify as Eligible Landed Inventory solely because they are held back from sale in the ordinary course of business due to issues not impacting their merchantability, but (without otherwise limiting the generality of the other eligibility criteria in the definition of Eligible Landed Inventory) as to which (a) such Inventory is expected to be sold by the applicable Borrower in the ordinary course of business, and (b) such Inventory consists of goods that are not spoiled or contaminated goods, defective goods, damaged goods, or goods that are not of good and merchantable quality.

"Eligible In-Transit Inventory" means those items of Inventory that do not qualify as Eligible Landed Inventory solely because they are not in a location set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement or in transit among such locations and because it is the subject of a bill of lading or other document of title, but as to which (a) such Inventory currently is in transit (whether by vessel, air, or land) to a location set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement, (b) title to such Inventory has passed to a Borrower or a Subsidiary Guarantor, (c) such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, reasonably satisfactory to Agent in its Permitted Discretion, (d) such Inventory either (1) is the subject of a negotiable bill of lading (x) that is consigned to Agent or one of its agents (either directly or by means of endorsements), (y) that was issued by the carrier respecting the subject Inventory, and (z) that is in the possession of Agent or a customs broker that has executed in favor of Agent a customs broker agreement that is reasonably satisfactory to Agent (in each case in the State or province where the customs broker is located), or (2) is the subject of a negotiable cargo receipt and is not the subject of a bill of lading (other than a negotiable bill of lading consigned to, and in the possession of, a consolidator or Agent, or their respective agents) and such negotiable cargo receipt is (x) consigned to Agent or one of its agents (either directly or by means of endorsements), (y) that was issued by a consolidator respecting the subject Inventory, and (z) that is in the possession of Agent or a customs broker that has executed in favor of Agent a customs broker agreement that is reasonably satisfactory to Agent (in each case in the State or province where the customs broker is located), and (e) the applicable Borrower has provided a certificate to the Agent that certifies that, to the best knowledge of such Borrower, such Inventory meets all of such Borrower's representations and warranties contained in the Loan Documents concerning Eligible Landed Inventory, other than because such Inventory is not in a location set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement or in transit among such locations and because it is the subject of a bill of lading or other document of title, that such Borrower knows of no reason why such Inventory would not be accepted by such Borrower when it arrives in the State or province where the customs broker is located, and that the shipment as evidenced by the documents conforms to the related order documents.

"Eligible Inventory" means Eligible Landed Inventory or Eligible In-Transit Inventory.

"Eligible Landed Inventory" means Inventory consisting of first quality finished goods, raw materials or work in progress held for sale in the ordinary course of business of a Borrower or a Subsidiary Guarantor and that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of the one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by the Agent in Agent's Permitted Discretion to address the results of any audit or appraisal performed by Agent from time to time after the Closing Date. In determining the amount to be

so included, Inventory shall be valued at the lower of cost or market on a basis consistent with such Borrower's historical accounting practices. An item of Inventory shall not be included in Eligible Landed Inventory if:

(a)        the applicable Borrower or Subsidiary Guarantor does not have good, valid, and marketable title thereto,

(b)        the applicable Borrower or Subsidiary Guarantor does not have actual and exclusive possession thereof (either directly or through a bailee or agent of such Borrower or such Subsidiary Guarantor),

(c)        it is not located at one of the locations set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement (or in transit from one such location to another such location),

(d)        it is in-transit to or from a location of a Borrower or a Subsidiary Guarantor (other than in-transit from one location set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement to another location set forth on Schedule E-1 or any other location where any Inventory is located and as to which location a Borrower has notified Agent under Section 5.2 of the Agreement),

(e)        it is located on real or immovable property leased by a Borrower or a Subsidiary Guarantor or in a contract warehouse or other Real Property owned by a third Person, in each case, unless (i) it is either (A) subject to a Collateral Access Agreement executed by the lessor or warehouseman or bailee, as the case may be, or (B) a Rent Reserve is in place with respect to such location or (C) is located at a site where the aggregate book value of Inventory at such location is less than $100,000 or the Canadian Dollar Equivalent thereof; and (ii) it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(f)        it is not subject to a valid and perfected or opposable first priority Agent's Lien,

(g)        it consists of goods that are obsolete or slow moving, spoiled or contaminated goods, or goods that constitute packaging and shipping materials, supplies used or consumed in the applicable Borrower's or the applicable Subsidiary Guarantor's business, bill and hold goods, defective goods, "seconds", that are not good and merchantable quality, or Inventory acquired on consignment or consigned to another Person,

(h)        it is the subject of a bill of lading or other document of title,

(i)        it consists of goods returned or rejected by customers of a Borrower or a Subsidiary Guarantor, or

(j)        the sale of or Disposition of such Inventory by the applicable Borrower would result in an infringement of a third party's rights in respect of any Intellectual Property.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (a) that is maintained for employees of any Loan Party or any ERISA Affiliate, (b) that has at any time within the preceding six (6) years been maintained for the employees of any Loan Party or any current or former ERISA Affiliate, (c) to which any Loan Party or any ERISA Affiliate makes contributions or is required to make contributions, (d) to which any Loan Party or any ERISA Affiliate has made or has been required to make contributions at any time within the preceding six (6)

years or (e) to which any Loan Party to any ERISA Affiliate has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, suit, lien, investigation, judicial, regulatory or administrative proceeding, judgment, letter, or other written communication from or to any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials from or onto (a) any assets, properties, or businesses of any Loan Party, any Subsidiary of a Loan Party, or any of their predecessors in interest, (b) adjoining properties or businesses, or (c) any facilities which received Hazardous Materials generated by any Loan Party, any Subsidiary of a Loan Party, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Loan Party or any of its Subsidiaries, relating to the protection of the environment or the protection of employee health to the extent related to exposure to Hazardous Materials.

"Equipment" means equipment (as that term is defined in the Code).

"Equity Sponsor" means Lion Capital LLP and any funds, partnerships or other investment vehicles managed or directly or indirectly controlled by it, but not including, however, any portfolio companies of any of the forgoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person whose employees are treated as employed by the same employer as the employees of a Loan Party or its Subsidiaries under IRC Section 414(b), (b) any trade or business whose employees are treated as employed by the same employer as the employees of a Loan Party or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Sections 412 or 430 of the IRC, any organization that is a member of an affiliated service group of which a Loan Party or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Sections 412 and 430 of the IRC, any Person that is a party to an arrangement with a Loan Party or any of its Subsidiaries and whose employees are aggregated with the employees of a Loan Party or its Subsidiaries under IRC Section 414(o).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Excess Availability" means, as of any date of determination, the amount equal to the Borrowers' Availability on such date.

"Exchange Act" means the Securities Exchange Act of 1934, as amended and as in effect from time to time and the rules and regulations promulgated thereunder.

"Exchange Rate" means, on any day with respect to any currency, the rate at which such currency may be exchanged into any other currency (including Dollars), as published in *The Wall Street Journal (Eastern Edition)* on such day for such currency. In the event that such rate does not appear on *The Wall Street Journal (Eastern Edition)*, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed by the Agent and the Borrowers, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of Wells Fargo in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m., local time, on such date for the purchase of the relevant currency for delivery two (2) Business Days later.

"Excluded Accounts" means (a) any Deposit Account or Securities Account that is used exclusively for trust, fiduciary or escrow payments, tax payments, payroll, payroll taxes or other employee wage and benefit payments to or for the employees of the Loan Parties, (b) zero balance accounts, or (c) accounts with a balance not to exceed $25,000 at any one time.

"Excluded Assets" has the meaning specified therefor in the U.S. Security Agreement.

"Excluded Stock" means (a) Stock to the extent the pledge thereof would be prohibited or limited by any Applicable Law existing on the Closing Date, the date such Stock is acquired by a Borrower or any Guarantor, or the date the issuer of such Stock is created, and (b) Stock of a Person (other than a wholly-owned Subsidiary) the pledge of which would violate a contractual obligation to the owners of the other Stock of such Person (other than any such owners that are Affiliates of Holdings) that is binding on or relating to such Stock.

"Excluded Subsidiary" means

(a)     any Subsidiary that is not a wholly owned Subsidiary on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of Section 5.11 (for so long as such Subsidiary remains a non-wholly owned Subsidiary) other than a Subsidiary that is a non-wholly owned Subsidiary if such non-wholly owned Subsidiary guarantees or issues other capital markets debt securities of any Borrower or any Guarantor,

(b)     any Subsidiary of Holdings that is prohibited by any applicable law, rule or regulation or contractual obligation existing at the time such Subsidiary becomes a Subsidiary of Holdings from guaranteeing the Obligations (and for so long as such restrictions are in effect) or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guaranty unless such consent, approval, license or authorization has been received (or is received after commercially reasonable efforts to obtain such consent, approval, license or authorization, which efforts may be requested by the Agent), and

(c)     the Subsidiaries listed on Schedule E-3.

"Excluded Swap Obligation" means, with respect to any Guarantor, (a) any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Guarantor of, or the grant by such Guarantor of a Lien to secure, as applicable, such Swap Obligation (or any guaranty thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of (or the grant of such security interest by, as applicable) such Guarantor becomes or would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible

contract participant" at such time, or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Guarantor as specified in any agreement between the relevant Loan Parties and Hedge Provider applicable to such Swap Obligations. If a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guaranty or security interest is or becomes excluded in accordance with the first sentence of this definition.

"<u>Fair Market Value</u>" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"<u>Fee Letter</u>" means that certain fee letter, dated as of November [__], 2019, between Borrowers and Agent.

"<u>Final Order</u>" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Agent, which order shall have been entered on such prior notice to such parties as may be satisfactory to the Agent, which order shall not have been (i) vacated, reversed, enjoined or stayed or (ii) modified or amended without the consent of the Agent in its sole discretion.

"<u>Final Order Entry Date</u>" means the date on which the Final Order is entered by the Bankruptcy Court.

"<u>First Day Orders</u>" has the meaning specified in <u>Section 5.13(g)</u>.

"<u>Flood Laws</u>" means the National Flood Insurance Act of 1968, Flood Disaster Protection Act of 1973, and related laws, rules and regulations, including any amendments or successor provisions.

"<u>Foreclosed Borrower</u>" has the meaning specified therefor in <u>Section 2.15(k)</u> of the Agreement.

"<u>Foreign Currency</u>" means any currency other than the Dollar.

"<u>Foreign Subsidiary</u>" means each Subsidiary of Holdings that is not a Domestic Subsidiary.

"<u>Funding Date</u>" means the date on which a Borrowing occurs.

"<u>Funding Losses</u>" has the meaning specified therefor in <u>Section 2.12(b)(ii)</u> of the Agreement.

"<u>GAAP</u>" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"<u>Governing Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation, and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement, (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and (d) with respect to an unlimited company, the memorandum of association and articles of association, and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Governmental Authority</u>" means any federal, state, provincial, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court (including the Bankruptcy Court and the CCAA Court), tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"<u>Guarantors</u>" means (a) Holdings, (b) BB Parent, (c) BB Holdings, (d) Canadian Holdco, (e) Clover Leaf Seafood, (f) each other Subsidiary of Holdings (other than the Borrower and Excluded Subsidiaries) on the Closing Date, and (g) each other Person that becomes a guarantor after the Closing Date pursuant to <u>Section 5.11</u> of the Agreement, and "<u>Guarantor</u>" means any one of them.

"<u>Guaranty</u>" means the Guaranty, dated as of the date hereof, executed and delivered by each Guarantor in favor of Agent, for the benefit of the Secured Parties, as amended, restated, supplemented, or otherwise modified from time to time.

"<u>Hazardous Materials</u>" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations relating to the protection of the environment as "hazardous substances", "hazardous materials", "hazardous wastes", "toxic substances", or words of similar import, (b) oil, petroleum, or petroleum derived substances, (c) any flammable substances or explosives or any radioactive materials and (d) asbestos and polychlorinated biphenyls.

"<u>Hedge Agreement</u>" means a "swap agreement" as the term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"<u>Hedge Obligations</u>" means U.S. Hedge Obligations or Canadian Hedge Obligations, as the context requires.

"<u>Hedge Provider</u>" means Wells Fargo, any Lender, or any of their respective Affiliates; <u>provided, however</u>, that no such Person (other than Wells Fargo or its Affiliates) shall constitute a Hedge Provider unless and until Agent shall have received a Bank Product Provider Letter Agreement from such Person and with respect to the applicable Hedge Agreement.

"Historical Financial Statement" means (a) the audited consolidated balance sheets and statements of operations, partnership (or unitholders) equity and cash flows, in each case, including notes thereto, of Holdings and its Subsidiaries (including Borrowers), for the fiscal year ending December 31, 2018, and (b) the unaudited consolidated balance sheets and statements of operations, partnership (or unitholders) equity and cash flows, in each case, including notes thereto, of Holdings and its Subsidiaries (including Borrowers), for the fiscal quarter ending June 29, 2019.

"Holding Company" means Holdings, Canadian Holdco, BB Parent, BB Holdings, Clover Leaf Seafood, and each other Subsidiary of Holdings that is a holding company and which (i) does not own or operate any operating assets and (ii) is a parent of Canadian Borrower or the U.S. Borrower.

"Holdings" has the meaning specified therefor in the preamble to the Agreement.

"Holdout Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Hypothecary Representative" has the meaning specified therefor in Section 15.1 of the Agreement.

"Increased Cost Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other similar financial products issued or created by or for the account of such Person, (c) all Capital Lease Obligations of such Person, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business but including any earn-out obligation upon such obligation becoming a liability on the balance sheet of such Person in accordance with GAAP), (f) all obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) Prohibited Preferred Stock issued by any Loan Party to a Person that is not a Loan Party, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation still outstanding and the Fair Market Value of the assets securing such obligation; provided that Indebtedness shall not include (i) customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under the Agreement, (ii) prepaid or deferred revenue arising in the ordinary course of business, (iii) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warrants or other unperformed obligations of the seller of such asset (iv) all intercompany Indebtedness of Holdings and its Subsidiaries having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business consistent with past practice and (v) liabilities in respect of operating leases under Accounting Standard Codification 842.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Initial Orders" has the meaning specified in Section 5.13(g).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code, the BIA, the CCAA, the Winding-Up and Restructuring Act (Canada), or under any other state, provincial or federal bankruptcy or insolvency law, each as now and hereafter in effect, any successors to such statutes, and any similar laws in any jurisdiction including, without limitation, any laws relating to bankruptcy (*faillite*), insolvency, liquidation, assignments for the benefit of creditors, formal or informal moratoria, reprieve from payment (*sursis de paiement*), controlled management (*gestation contrôlée*), compositions, extensions generally with creditors, receivership proceedings (whether court or privately appointed), interim receivership proceedings, or proceedings seeking reorganization, liquidation, winding-up, arrangement or other similar relief, including any proceeding for the compromise or arrangement of creditor claims pursuant to the arrangement or reorganization provisions of any corporate statutes, and any law permitting a debtor to obtain a stay or a compromise of the claims of its creditors or affecting the rights of creditors generally.

"Inspection Notice Event" means at any time when Adjusted Excess Availability is less than 20% of the Aggregate Availability.

"Intellectual Property" means (a) Intellectual Property and Intellectual Property Licenses, as each such term is defined in the U.S. Security Agreement, and (b) Intellectual Property and Intellectual Property Licenses, as each such term is defined in the Canadian Security Agreement.

"Intercompany Subordination Agreement" means the Intercompany Subordination Agreement, dated as of the Closing Date.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 30 days thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a month (or on a day for which there is no numerically corresponding day in the month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the month that is 30 days after the date on which the Interest Period began, as applicable, and (e) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of Exhibit I-2 and otherwise acceptable to the Agent approving, inter alia, this Agreement and the other Loan Documents and (a) authorizing the incurrence by the Borrowers of interim secured indebtedness in accordance with this Agreement, (b) providing for the lifting of the automatic stay (to the extent applicable) arising under

section 362 of the Bankruptcy Code to enable the Agent or any Lender to effectuate, among other things, their respective rights and remedies under Section 9 and the other Loan Documents, and (c) subject to the terms thereof, approving the payment by the Borrowers of the fees and other amounts contemplated by this Agreement, which order shall not have been (i) vacated, reversed, enjoined or stayed or (ii) modified or amended without the consent of the Agent in its sole discretion.

"Interim Order Period" means the period from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"International Export Business" means the assets held with respect to the international sales division of Canadian Borrower doing business as Bumble Bee Seafoods International.

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business consistent with past practice), or acquisitions of Indebtedness, Stock, or assets of such other Person (or of any division or business line of such other Person), and for purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investments.

"IRC" means the Internal Revenue Code of 1986, as amended and as in effect from time to time.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any version or revision thereof accepted by the applicable Issuing Lender for use.

"Issuing Lender" means the U.S. Issuing Lender or the Canadian Issuing Lender.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by Borrower in favor of Issuing Lender or Underlying Issuer and relating to such Letter of Credit.

"Lender" and "Lenders" have the respective meanings set forth in the preamble to the Agreement, and shall include any other Person made a party to the Agreement in accordance with the provisions of Section 13.1 of the Agreement.

"Lender Group" means, individually and collectively, each of the Lenders (including each Issuing Lender and each Swing Lender) and each of the Agent.

"Lender Group Expenses" means (a) the Agent's reasonable and documented or invoiced out of pocket (except as described in clause (6) below) costs and expenses (including (i) the expenses with respect to due diligence investigation, (ii) consultants' fees (including the fees of financial advisors to the Agent), (iii) syndication expenses, (iv) travel expenses, (v) reasonable and documented out of pocket expenses (except as described in clause (6) below) related to commercial finance field audit examinations and inventory appraisals of the Collateral (limited to the extent set forth in Section 5.7 and as described in clause (6) below) and (vi) reasonable fees, disbursements and other charges of one single

firm of outside counsel to all Agent and of single firm of local counsel to all Agent in each applicable jurisdiction (which may include one special counsel acting in multiple jurisdictions), and any other counsel retained with Borrowers' consent (which consent shall not be unreasonably withheld, conditioned or delayed)) incurred in connection with the preparation, negotiation, execution, delivery, administration, amendment, modification, waiver. and enforcement of the Loan Documents and any security arrangements in connection therewith and subsequent amendments, modifications or waivers thereto, and (b) the Lenders (including any Issuing Lender's) reasonable and documented or invoiced out of pocket costs and expenses (including the reasonable fees, disbursements and other charges of a single firm of outside counsel for all Lenders and a single firm of local counsel for all Lenders in each applicable jurisdiction (which may include one special counsel acting in multiple jurisdictions), and any other counsel retained with Borrowers' consent (which consent shall not be unreasonably withheld, conditioned or delayed)) incurred in connection with the enforcement of the Loan Documents and any security arrangements in connection therewith. Out of pocket costs and expenses may include reasonable and documented out of pocket (1) fees or charges for photocopying, notarization, couriers and messengers, public record searches (including tax lien, litigation, and UCC searches and including searches with the United States Patent and Trademark Office or the United States Copyright Office, and all similar searches and inquiries conducted in Canada), filing, recording, publication, real estate surveys, real estate title policies and endorsements and environmental audits, (2) after the occurrence and during the continuance of an Event of Default, costs or expenses in respect of taxes, and insurance premiums required to be paid by a Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Agent, (3) costs and expenses incurred by Agent in the disbursement of funds to Borrowers or other members of the Lender Group (by wire transfer or otherwise), (4) charges paid or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (5) costs and expenses paid or incurred by the Agent to correct any Default or Event of Default or enforce any provision of the Loan Documents after any Event of Default, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated and (6) a fee of $1,000 per day, per auditor, for each financial audit of Borrowers performed by personnel employed by the Agent.

"Lender Group Representatives" has the meaning specified therefor in Section 17.9 of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, advisors, agents, controlling persons and other representatives and their respective successors.

"Letter of Credit" means a U.S. Letter of Credit or a Canadian Letter of Credit, as applicable.

"Letter of Credit Collateralization" means (a) with respect to U.S. Letters of Credit, either (i) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that the U.S. Letter of Credit fee set forth in the Agreement will continue to accrue while the U.S. Letters of Credit are outstanding) to be held by Agent for the benefit of those Lenders with a U.S. Revolver Commitment in an amount equal to 103% of the then existing U.S. Letter of Credit Usage, (ii) causing the U.S. Underlying Letters of Credit to be returned to the U.S. Issuing Lender, or (iii) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank reasonably acceptable to Agent (in its sole discretion) in an equal to 103% of the then existing U.S. Letter of Credit Usage (it being understood that the U.S. Letter of Credit fee set forth in the Agreement will continue to accrue while the U.S. Letters of Credit are outstanding and that any such fee that accrues must be an amount that can be drawn under any such standby letter of credit), and (b)

with respect to Canadian Letters of Credit, either (i) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that the Canadian Letter of Credit fee set forth in the Agreement will continue to accrue while the Canadian Letters of Credit are outstanding) to be held by Agent for the benefit of those Lenders with a Canadian Revolver Commitment in an amount equal to 103% of the then existing Canadian Letter of Credit Usage, (ii) causing the Canadian Underlying Letters of Credit to be returned to the Canadian Issuing Lender, or (iii) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank reasonably acceptable to the Agent (in its sole discretion) in an equal to 103% of the then existing Canadian Letter of Credit Usage (it being understood that the Canadian Letter of Credit fee set forth in the Agreement will continue to accrue while the Canadian Letters of Credit are outstanding and that any such fee that accrues must be an amount that can be drawn under any such standby letter of credit).

"Letter of Credit Disbursement" means a payment made by an Issuing Lender pursuant to a Letter of Credit.

"Letter of Credit Exposure" means, with respect to any Lender, at any time, the sum of (without duplication) (a) such Lender's Pro Rata Share of the U.S. Letter of Credit Exposure or the Canadian Letter of Credit Exposure, as the context requires.

"Letter of Credit Indemnified Costs" has the meaning specified therefor in Section 2.11 of this Agreement.

"Letter of Credit" means a U.S. Letter of Credit or a Canadian Letter of Credit, as the context requires.

"Letter of Credit Related Person" has the meaning specified therefor in Section 2.11(j) of this Agreement.

"Letter of Credit Usage" means the sum of (a) U.S. Letter of Credit Usage plus (b) Canadian Letter of Credit Usage.

"Letters of Credit Outstanding" means the sum of the U.S. Letters of Credit Outstanding and the Canadian Letters of Credit Outstanding.

"LIBOR Deadline" has the meaning specified therefor in Section 2.12(b)(i) of the Agreement.

"LIBOR Notice" means a written notice substantially in the form of Exhibit L-1 or such other form as shall be reasonably acceptable to the Agent.

"LIBOR Option" has the meaning specified therefor in Section 2.12(a) of the Agreement.

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the rate per annum determined by Agent by *dividing* (a) the Base LIBOR Rate for such Interest Period, by (b) 100% *minus* the Reserve Percentage (if any).

"LIBOR Rate Loan" means each portion of an Advance that bears interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Rate Margin" means 4.50%.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, hypothec, assignment (which is intended as security), deposit arrangement (which is intended as security), charge, security interest, preference, priority, encumbrance or right of setoff, off-set or recoupment of any kind in respect of such asset, whether or not filed, recorded, registered, published or otherwise perfected or rendered opposable under Applicable Law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest or hypothec and any filing of or agreement to give any financing statement under the Code; provided that in no event shall an operating lease be deemed to constitute a Lien.

"Loan Account" means the Canadian Loan Account or the U.S. Loan Account, as the context requires.

"Loan Documents" means the Agreement, any Borrowing Base Certificate, the Canadian Security Documents, the Control Agreements, the Copyright Security Agreement, the Fee Letter, the Guaranty, the Intercompany Subordination Agreement, the DIP Intercreditor Agreement, the Letters of Credit, the Patent Security Agreement, the U.S. Security Agreement, the Trademark Security Agreement, the Luxembourg Security Documents, any other Security Document, any other pledge agreements executed in connection with the Agreement, any note or notes executed by a Borrower in connection with the Agreement and payable to any member of the Lender Group, any letter of credit application entered into by any Borrower in connection with the Agreement, and any other agreement entered into, now or in the future, by a Loan Party and any member of the Lender Group in connection with the Agreement, to the extent that such agreement provides that it shall constitute a Loan Document under the Agreement.

"Loan Parties" means Canadian Borrower, U.S. Borrower and each Guarantor, and "Loan Party" means any one of them.

"Luxembourg Security Documents" means such pledge agreements and other security documents, including but not limited to *hypothèque, nantissement, gage, privilège, sûreté réelle, droit de rétention* and any type of real security (*sûreté réelle*) or agreement or arrangement having a similar effect and any transfer of title by way of security, required to be delivered pursuant to the Agreement, which in each case are governed by the laws of Luxembourg and which are otherwise in form and substance reasonably satisfactory to Agent.

"Margin Stock" as defined in Regulation U of the Board as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, taken as a whole, in each case, except as a result of the entrance of the DOJ Settlement (but, for the avoidance of doubt, not any civil claims that may be associated therewith) or the commencement of the Cases or the CCAA Cases, or (b) a material impairment of the ability of the Loan Parties, taken as a whole, to perform the payment obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral.

"Maturity Date" means, with respect to the Revolver Commitments, the earliest of (a) May [__], 2020; (b) the date of termination of Revolver Commitments during the continuance of an Event of Default, (c) the closing date of a sale pursuant to Section 363 or 1129 of the Bankruptcy Code or section 36 of the CCAA of all or substantially all of the Loan Parties' ABL Priority Collateral, (d) the effective date of a confirmed Chapter 11 plan for the Loan Parties or any plan of compromise or arrangement of any CCAA Debtor under the CCAA or any other Canadian Bankruptcy and Insolvency Law, (e) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed by the Required Lenders), unless both the Final Order Entry Date and the CCAA A&R Initial Order Date

has occurred on or prior to such date and (f) the date on which all obligations outstanding under this Agreement are paid in full (including, without limitation, cash collateralization of Letters of Credit but excluding contingent obligations not due and owing) and the commitments under this Agreement have terminated.

"Maximum Canadian Revolver Amount" means $40,000,000 decreased by the amount of reductions in the Canadian Total Revolver Commitment made in accordance with Section 2.4(c) of this Agreement.

"Maximum U.S. Revolver Amount" means $160,000,000, decreased by the amount of reductions in the U.S. Total Revolver Commitment made in accordance with Section 2.4(c) of this Agreement.

"Minority Investment" means any Person (other than a Subsidiary) in which Holdings or any Subsidiary owns Stock.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate is making, or is accruing an obligation to make, or has made, or has accrued an obligation to make, contributions within the preceding six (6) years or has any liability, contingent or otherwise.

"Net Cash Proceeds" means, with respect to any sale, transfer or other Disposition of assets, any Recovery Event, any incurrence or issuance of Indebtedness or any issuance of Stock (each, a "Proceeds Event"), (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of a Loan Party or any of its Subsidiaries in respect of such Proceeds Event, less (b) the sum of:

(i)     the amount, if any, of all taxes paid or estimated to be payable by Holdings, or any of the Subsidiaries in connection with such Proceeds Event (including withholding taxes imposed on the repatriation of any such proceeds),

(ii)     the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Proceeds Event and (y) retained by Holdings or any of the Subsidiaries including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Proceeds Event occurring on the date of such reduction,

(iii)     in the case of any Proceeds Event constituting a sale, transfer or Disposition of assets or a Recovery Event by any non-wholly owned Subsidiary, the pro rata portion of the net cash proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of Holdings or a wholly owned Subsidiary as a result thereof,

(iv)     the amount of any Indebtedness secured by any Permitted Lien on such asset (other than (A) Indebtedness owing to Agent or any Lender under the Agreement or the other Loan Documents, (B) Indebtedness assumed by the purchaser of such asset and (C) DIP Term Loan

Indebtedness and Term Loan Indebtedness) which is required to be, and is, repaid in connection with such Proceeds Event, and

(v)    reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees, in each case, to the extent paid in cash), issuance costs, discounts and other costs paid by Holdings or any of the Subsidiaries, as applicable, in connection with such Proceeds Event (other than those payable to Holdings or any Subsidiary), in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above.

"Net Income" means, with respect to any Person, the net income (loss) attributable to such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Liquidation Percentage" means the percentage of the book value of a Borrower's Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be as determined from time to time by an appraisal company selected by Agent.

"Non-Defaulting Lender" means each Lender that is not a Defaulting Lender.

"Non-Ordinary Course Asset Disposition" mean any sale, transfer or other Disposition outside the ordinary course of business by one or more Loan Parties of ABL Priority Collateral (including, without limitation, the 363 Sale).

"Obligations" means (a) all loans, Advances (inclusive of Protective Advances and Swing Loans), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to Reimbursement Undertakings or with respect to Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to a Loan Account to the extent permitted pursuant to the Agreement), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, covenants, and duties of any kind and description owing by any Loan Party pursuant to or evidenced by the Agreement or any other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Borrower is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, (b) all debts, liabilities, or obligations (including reimbursement obligations, irrespective of whether contingent) owing by any Borrower or any other Loan Party to an Underlying Issuer now or hereafter arising from or in respect of any Underlying Letters of Credit, and (c) all Bank Product Obligations. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, increases, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding. Notwithstanding the foregoing, (i) the obligations of a Loan Party or any Subsidiary thereof under any Bank Product Agreement shall be secured and guaranteed pursuant to the Security Documents and the Guaranty only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in the manner

permitted by the Agreement and the other Loan Documents shall not require the consent of the holders of the Bank Product Obligations.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Orders" means, collectively, the CCAA Orders, the Interim Order and the Final Order.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Other Asset Sale" means any Asset Sale (as such term is defined in the DIP Term Loan Credit Agreement as in effect on the Closing Date).

"Other DOJ Individuals" means those individual directors, officers, or employees of U.S. Borrower identified in a letter from U.S. Borrower to Agent dated March 7, 2017.

"Other DOJ Matter" means any criminal charge against any of the Other DOJ Individuals alleging that prior to the DOJ Settlement Date such Other DOJ Individual participated in a combination or conspiracy to suppress and eliminate competition in the pricing of packaged seafood sold in the United States in violation of the Sherman Antitrust Act, 15 U.S. C. § 1.

"Other Payment" means payments that are due or otherwise required to be made (whether or not then due and payable) by Holdings or any of its Subsidiaries (or that Holdings or any of its Subsidiaries is obligated to pay or reimburse any other person for whether by applicable law, contract, or otherwise) under any other judgment, settlement, or order (other than the DOJ Settlement) in each case, in any way arising from or related to, directly or indirectly, the facts, circumstances, acts, or omissions involved in or related to the allegations underlying or related to the Civil Antitrust Claims.

"Other Recovery Event" means any Recovery Event (as such term is defined in the DIP Term Loan Credit Agreement in effect on the Closing Date).

"Overadvance" means any Advance if, after giving effect to such Advance, the aggregate Revolver Usage is greater than the limitations set forth in Section 2.1, Section 2.2 or Section 2.11, as applicable.

"Overadvance Amount" means the U.S. Overadvance Amount or the Canadian Overadvance amount, as the context requires.

"Parallel Debt" has the meaning specified therefor in Section 15.18(a) of the Agreement.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Patent Security Agreement" has the meaning specified therefor in the U.S. Security Agreement.

"Patents" has the meaning specified therefor in the U.S. Security Agreement.

"Patriot Act" has the meaning specified therefor in Section 4.18 of the Agreement.

"Payoff Date" has the meaning specified therefor in Section 17.16(b) of the Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV of ERISA or Section 412 or 430 of the Code (a) that is maintained for employees of any Loan Party or any ERISA Affiliate, (b) that has at any time within the preceding six (6) years been maintained for the employees of any Loan Party or any current or former ERISA Affiliate, (c) to which any Loan Party or any ERISA Affiliate makes contributions or is required to make contributions, (d) to which any Loan Party or any ERISA Affiliate has made or has been required to make contributions at any time within the preceding six (6) years or (e) to which any Loan Party to any ERISA Affiliate has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise.

"Perfection Certificate" means a certificate of the Borrowers and Guarantors in the form reasonably acceptable to the Agent.

"Permitted Discretion" means a determination made by the Agent in the exercise of reasonable (from the perspective of an asset-based lender) business judgment in good faith in accordance with customary business practices for asset-based lending transactions.

"Permitted Dispositions" means:

(a)    sales, abandonment, or other dispositions of assets that are obsolete, worn, damaged, used or surplus in the ordinary course of business,

(b)    sales of Inventory and other Dispositions of immaterial assets (including abandoning any registrations or applications of any Intellectual Property), in either case in the ordinary course of business,

(c)    the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents,

(d)    non-exclusive licenses, sublicenses or cross-licenses to Intellectual Property, or exclusive, territorial, sublicenses or cross-licenses to Intellectual Property, in each case, granted in the ordinary course of business or that are not material to the business,

(e)    the granting of Permitted Liens,

(f)    the sale or discount, in each case without recourse, of Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof; provided, however, that this clause (f) shall not permit the factoring or securitization of Accounts,

(g)    any involuntary loss, damage or destruction of property, including any Recovery Event,

(h)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property, including any Recovery Event,

(i)    the leasing, subleasing, licensing or sublicensing of assets (other than Intellectual Property) of a Loan Party or its Subsidiaries in the ordinary course of business,

(j)        [intentionally omitted],

(k)        Dispositions to a Loan Party or to a Subsidiary thereof; provided that if the transferor of such property is a Loan Party (i) the transferee thereof must either be a Loan Party or (ii) such transaction is permitted under Section 6.11 of the Agreement,

(l)        a 363 Sale,

(m)        so long as (i) no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) the aggregate consideration therefor does not exceed $500,000 in the aggregate, Dispositions of assets not otherwise permitted by this definition for the Fair Market Value thereof and 100% cash consideration,

(n)        Transactions permitted by Sections 6.3, 6.7 or 6.9 of the Agreement,

(o)        [intentionally omitted],

(p)        the unwinding of any Hedge Agreement,

(q)        Dispositions of any asset between or among the Loan Parties or its Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (p) above.

"Permitted Expenditures Variances" has the meaning set forth in Section 5.14(b(i).

"Permitted Holders" means the Equity Sponsor and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which the foregoing is a member; provided, that, in the case of such group and without giving effect to the existence of such group or any other group, such Equity Sponsor has beneficial ownership of more than 50% of the total voting power of the Voting Stock of Holdings or any direct or indirect parent thereof.

"Permitted Indebtedness" means, without duplication:

(a)        Indebtedness evidenced by the Agreement and the other Loan Documents, or the Pre-Petition Credit Agreement or other Loan Document (as defined in the Pre-Petition Credit Agreement), together with Indebtedness owed to Underlying Issuers with respect to Underlying Letters of Credit as well as the Indebtedness owed to Bank Product Providers in respect of Bank Products,

(b)        Indebtedness incurred prior to the Petition Date as set forth on Schedule P-5,

(c)        Permitted Purchase Money Indebtedness and any Refinancing Indebtedness in respect of such Indebtedness,

(d)        endorsement of instruments or other payment items for deposit,

(e)        Indebtedness consisting of (i) guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, performance and completion guarantees and similar obligations; (ii) guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions; (iii) guarantees with respect to Indebtedness of a Loan Party or one of its Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness; (iv) guarantees

incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees and (v) bankers' acceptances, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance),

(f)    Indebtedness incurred in accordance with the Orders,

(g)    DIP Term Loan Indebtedness and Term Loan Indebtedness in an aggregate outstanding principal amount not exceeding the amount permitted under the DIP Intercreditor Agreement,

(h)    Indebtedness incurred in the ordinary course of business under surety and performance bonds, bid bonds, appeal bonds, performance and completion guarantees and similar obligations and not in connection with the borrowing of money,

(i)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to a Loan Party or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year,

(j)    to the extent incurred prior to the Petition Date and outstanding as of the Closing Date or thereafter, the incurrence by a Loan Party or its Subsidiaries of Indebtedness under Hedge Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity or foreign currency risk associated with a Loan Party's or its Subsidiaries' operations and not for speculative purposes,

(k)    Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards"), or Cash Management Services, in each case, incurred in the ordinary course of business,

(l)    Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(m)    to the extent incurred prior to the Petition Date and outstanding as of the Closing Date or thereafter, Indebtedness of a Loan Party owing to current or former employees, officers, managers or directors (or any spouses, ex-spouses, successors, executors, administrators, heirs, legatees, distributees or estates of any of the foregoing) incurred in connection with the purchase or repurchase by a Loan Party of the Stock of such Loan Party (or any direct or indirect parent thereof) that has been issued to such Persons,

(n)    Indebtedness of (i) a Loan Party owing to a Loan Party or any Subsidiary; provided that (x) no such Indebtedness owing by Borrower or a U.S. Guarantor to any other Loan Party shall constitute Permitted Indebtedness pursuant to this clause (n), and (y) any such Indebtedness shall be subject to the Intercompany Subordination Agreement, (ii) any Subsidiary that is not a Loan Party owing to any other Subsidiary that is not a Loan Party and (iii) to the extent permitted by Section 6.11 of the Agreement, any Subsidiary that is not a Loan Party owing to a Loan Party,

(o)       Indebtedness composing Permitted Investments,

(p)       (i) Indebtedness in respect of obligations of the Loan Parties or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Loan Parties or any Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money,

(q)       to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, (i) unsecured Indebtedness representing deferred compensation to employees, consultants or independent contractors of Holdings (or any direct or indirect parent thereof) and the Subsidiaries incurred in the ordinary course of business and (ii) Indebtedness consisting of obligations of Holdings (or any direct or indirect parent thereof), or the Subsidiaries under deferred compensation to their employees, consultants or independent contractors or other similar arrangements incurred by such Persons in connection with the Transactions,

(r)       Indebtedness arising from agreements of Holdings or any Subsidiary providing for indemnification, adjustment of purchase price, or similar obligations, in each case entered into in connection with the Disposition of any business, assets or Stock permitted hereunder; provided that (i) such Indebtedness is not reflected on the balance sheet of Holdings or any Subsidiary (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (i)) and (ii) the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds, including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by Holdings and the Subsidiaries in connection with such disposition

(s)       [intentionally omitted],

(t)       [intentionally omitted],

(u)       [intentionally omitted],

(v)       Indebtedness not otherwise permitted in clauses (a) through (u) above that is incurred by Holdings or any of its Subsidiaries in an aggregate principal amount not to exceed $500,000; provided, however, that such Indebtedness is not secured by a Lien that encumbers all or any portion of the ABL Priority Collateral, and

(w)       all customary premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in each of the clauses (a) through (v).

"Permitted Investments" means, without duplication, in each case, to the extent permitted by the Budget:

(a)       extensions of trade credit, asset purchases (including purchases of inventory, supplies and materials), the lease of any asset and the licensing or contribution of Intellectual Property

pursuant to joint marketing arrangements with other Persons, in each case in the ordinary course of business,

(b)     to the extent provided for in the Budget, loans and advances to officers, managers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock of Holdings (or any direct or indirect parent thereof) to the extent that the amount of such loans and advances are contributed to any Loan Party in cash and (iii) for purposes not described in the foregoing clauses (i) and (ii); provided that the aggregate principal amount outstanding under clauses (i), (ii) and (iii) shall not exceed $250,000 at any time,

(c)     Investments in any Loan Party by another Loan Party; provided that (i) no such Investments by a Canadian Guarantor to Borrower or a U.S. Guarantor shall constitute a Permitted Investment pursuant to this clause (c) and (ii) Investments made pursuant to this clause (c) shall only be made between Loan Parties organized in Approved Jurisdictions,

(d)     to the extent permitted by Section 6.9 and provided for in the Budget, distributions constituting loans and advances to any direct or indirect parent of any Loan Party; provided, however, that all such amounts shall constitute distributions under Section 6.9,

(e)     [intentionally omitted],

(f)     guarantee obligations of any Loan Party or Subsidiary of leases or of other obligations, in each case entered into in the ordinary course of business, so long as the underlying Indebtedness is permitted under the Agreement,

(g)     Investments in cash and constituting Cash Equivalents at the time such Investments are made,

(h)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(i)     advances made in connection with purchases of goods or services in the ordinary course of business,

(j)     Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries,

(k)     Investments owned or committed to be made by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on Schedule P-2,

(l)     guarantees permitted under the definition of Permitted Indebtedness,

(m)     [intentionally omitted],

(n)     to the extent provided for in the Budget, advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business,

(o)    [intentionally omitted],

(p)    [intentionally omitted],

(q)    Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(r)    deposits of cash made in the ordinary course of business to secure performance of operating leases,

(s)    Investments constituting non-cash proceeds of Permitted Dispositions,

(t)    Investments in Subsidiaries that are not Guarantors in an aggregate amount not to exceed $250,000; provided, that each such Investment in the form of an intercompany loan shall be subject to the subordination provisions contained in the Intercompany Subordination Agreement,

(u)    any additional Investments, as valued at the Fair Market Value of such Investment at the time each such Investment is made, that do not exceed $500,000 in the aggregate; provided further than on the date of any such Investment and after giving effect thereto, no Default or Event of Default shall exist or shall have occurred and be continuing,

(v)    Investments consisting of Permitted Indebtedness, fundamental changes permitted by Section 6.3 of the Agreement, Permitted Dispositions and Restricted Junior Payments permitted under Section 6.9 of the Agreement,

(w)    Investments of a Loan Party to form a wholly owned Subsidiary so long as (i) such new Subsidiary becomes a Loan Party and a wholly owned, direct Subsidiary of a Loan Party, and (ii) the applicable Loan Party shall have complied with Section 5.11 and Section 5.12 of the Agreement, in each case after giving effect to such Investment, and (iii) such new Subsidiary does not make any other Investments that do not otherwise constitute Permitted Investments,

(x)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled Account Debtors and other credits to suppliers in the ordinary course of business, and

(y)    Investments in Hedge Agreements permitted by Section 6.1 of the Agreement.

"Permitted Liens" means the following:

(a)    Liens granted to, or for the benefit of, Agent to secure the Obligations and the other Indebtedness described in clause (a) of the definition of Permitted Indebtedness, whether pursuant to the Loan Documents or the Orders,

(b)    [intentionally omitted],

(c)    Liens on the Collateral (or any other assets with respect to which the Agent has declined to be granted a Lien by the Loan Parties) held by DIP Term Loan Agent to secure the DIP Term

Loan Indebtedness or the Term Loan Indebtedness, so long as such Liens on the Collateral are subject to the DIP Intercreditor Agreement,

(d) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) as to which the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests,

(e) judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.3 of the Agreement,

(f) Liens on property and assets listed in any title insurance policy obtained in respect of any Real Property Collateral (as such term is defined in the DIP Term Loan Credit Agreement) or existing with respect to any Real Property on the Closing Date (including those listed on Schedule P-3); provided that (i) such Lien does not extend to any other property or asset of Holdings or any Subsidiary, other than after acquired property that is (A) affixed or incorporated into the property covered by such Lien or financed by Permitted Indebtedness and (B) proceeds and products thereof and (ii) to the extent applicable, such Lien shall secure only those obligations that it secures on the date of such title insurance report or the Closing Date and any Refinancing Indebtedness in respect thereof,

(g) leases, subleases, licenses or sublicenses (other than those in respect of Intellectual Property) which do not materially interfere with the ordinary conduct of the business of Holdings or any of the Subsidiaries and do not secure any Indebtedness,

(h) in respect of any interest as lessee, sublessee, licensee or sublicensee, any interest or title of a lessor, sublessor, licensor or sublicensor or secured by, or otherwise encumbering, a lessor's, sublessor's, licensor's or sublicensor's interest relating to any lease, sublease, license or sublicense (including any subordination of the interest of the lessee, sublessee or licensee under such lease, sublease, license or sublicense to any Liens in respect of the interest of the lessor, sublessor, licensor or sublicensor),

(i) Liens arising from precautionary Uniform Commercial Code (or equivalent statute, including the Personal Property Security Act) financing statement or similar filings made in respect of operating leases entered into by any Loan Party or any of its Subsidiaries,

(j) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness (including Capital Lease Obligations) and so long as (i) such Lien attaches only to the asset acquired, repaired, replaced, constructed, expanded, improved or leased, accessions to such property and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire, repair, replace, construct, expand, improve or lease such assets or any Refinancing Indebtedness in respect thereof; provided, however, that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by the same lender,

(k) Liens imposed by Applicable Law (i) in favor of landlords', carriers', warehousemen's and mechanics', materialmen's and repairmen's, contractors', supplier of materials, architects', in each case for sums not yet overdue for a period of more than 30 days or that are the subject of a Permitted Protest or (ii) with respect to Canadian Pension Plans, so long as the aggregate amount of the obligations secured thereby does not exceed $500,000,

(l) pledges, deposits or security by such Person under workmen's compensation laws, unemployment insurance, employers' health tax, and other social security laws or similar

legislation or other insurance related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety, stay, customs or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of any such bonds or to support the issuance thereof and including those to secure health, safety and environmental obligations), in each case incurred in the ordinary course of business,

(m)    Liens in favor of the issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds or with respect to other regulatory requirements or letters of credit or bankers' acceptances and completion guarantees, in each case issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(n)    survey exceptions, encumbrances, ground leases, easements or reservations of, rights of others, licenses, rights-of-way, servitudes, including in respect of drains, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building code or other restrictions (including defects and irregularities in title and similar encumbrances) as to the use of real or immovable properties or Liens which were not incurred in connection with Indebtedness and which do not in the aggregate materially impair their use in the operation of the business of the Loan Parties taken as a whole,

(o)    any agreements with any Governmental Authority, utility or third party that do not, in the aggregate, adversely effect in any material respect the use of any Real Property in the operation of the business of the Loan Parties taken as a whole,

(p)    Liens on vehicles and equipment of Holdings or any Subsidiary granted in the ordinary course of business,

(q)    deposits made or other security provided in the ordinary course of business to secure liability to insurance carriers,

(r)    non-exclusive licenses, sublicenses or cross-licenses to Intellectual Property, or exclusive, territorial, sublicenses or cross-licenses to Intellectual Property, in each case, granted in the ordinary course of business or that are not material to the business,

(s)    [intentionally omitted],

(t)    rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business,

(u)    Liens (i) of a collection bank arising under Section 4-210 of the Code on items in the course of collection (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right to set off) and which are within the general parameters customary in the banking industry,

(v)       Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness,

(w)       Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

(x)       Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes,

(y)       Liens that are contractual rights of set-off or rights of pledge (a) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts of the Loan Parties or any of the Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties and the Subsidiaries or (c) relating to purchase orders and other agreements entered into with customers of the Loan Parties or any of the Subsidiaries in the ordinary course of business,

(z)       [intentionally omitted],

(aa)      [intentionally omitted],

(bb)      additional Liens of any Subsidiary of Holdings arising after the Closing Date and not otherwise permitted by this definition that do not secure obligations in excess of $500,000 in the aggregate for all such Liens at any time,

(cc)      Liens on specific items of Inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or trade letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods,

(dd)      any encumbrance or restriction (including put and call arrangements) with respect to Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement,

(ee)      Liens on the Collateral granted pursuant to the Interim Order or the CCAA Initial Order (and when entered, the Final Order or the CCAA A&R Order),

(ff)      Liens arising out of conditional sale, title retention, consignment or similar arrangements with vendors for the sale or purchase of goods entered into by Holdings or any Subsidiary in the ordinary course of business,

(gg)      ground leases or subleases, licenses or sublicenses in respect of real or immovable property on which facilities owned or leased by Holdings or any of its Subsidiaries are located,

(hh)      the reservations, limitations, provisos and conditions expressed in any original grants of real or immovable property which does not materially impair the use of the affected land for the purpose used by the Loan Parties,

(ii)    all rights of expropriation, access or use or other similar rights conferred by or reserved by any Governmental Authority,

(jj)    any zoning or similar law or right reserved to, or vested in, any Governmental Authority to control or regulate the use of any real or immovable property that does not materially interfere with the ordinary course of conduct of the business of Holdings and its Subsidiaries as currently conducted, taken as a whole,

(kk)    all rights reserved to or vested in any Governmental Authority by the terms of any lease, license, franchise, grant or permit held by the applicable Loan Party or a Subsidiary of a Loan Party or affecting the relevant Real Property and that does not materially interfere with the ordinary course of conduct of the Loan Parties and their Subsidiaries (taken as a whole) or by any statutory provision to terminate any such lease, license, franchise, grant or permit or to require annual or periodic payments as a condition of the continuance thereof or to distrain against or to obtain a Lien on any property or assets of the applicable Loan Party or Subsidiary of a Loan Party in the event of failure to make such annual or other periodic payments, so long as in each event such annual or other periodic payments are being made,

(ll)    the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business,

(mm)    Liens consisting of an agreement to sell, transfer, lease or otherwise Dispose of any property in Permitted Disposition solely to the extent such sale, Disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien, and

(nn)    Liens constituting Permitted Dispositions.

"Permitted Protest" means the right of a Loan Party or any of its Subsidiaries to protest any Lien or any obligations secured thereby (other than any Lien that secures the Obligations) or any other liabilities (including taxes), provided that (a) a reserve with respect to such obligation or liability is established on such Loan Party's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by a Loan Party or its Subsidiary, as applicable, in good faith, and (c) to the extent that any Lien is imposed as a result of any such obligation or liability, unless bonded in accordance with Applicable Law, such Liens subject to such protest would have a priority that is junior to Agent's Lien on the Collateral while such protest is pending.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Purchase Money Indebtedness in an aggregate principal amount outstanding at any one time not in excess of $500,000.

"Permitted Receipts Variances" has the meaning set forth in Section 5.14(b)(ii).

"Permitted Variances" has the meaning set forth in Section 5.14(b)(ii).

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, Governmental Authorities and political subdivisions thereof.

"Petition Date" has the meaning specified in the recitals to the Agreement.

"<u>Post-Carve-Out Trigger Notice Cap</u>" means Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first Business Day following delivery by the Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise.

"<u>Post-Petition Deposit Account</u>" has the meaning specified in <u>Section 5.20(d)</u>.

"<u>Post-Petition Securities Account</u>" has the meaning specified in <u>Section 5.20(d)</u>.

"<u>Pre-Petition</u>" means the time period ending immediately prior to the filing of the Cases and the CCAA Cases.

"<u>Pre-Petition Canadian Bank Products</u>" means each Bank Product (as such term is defined in the Pre-Petition Credit Agreement) that is evidenced by a Bank Product Agreement (as such term is defined in the Pre-Petition Credit Agreement) to which Canadian Borrower or its Subsidiaries is party as of the Petition Date (before giving effect to the filing of any petition for relief); <u>provided</u> that, for the avoidance of doubt, in no instance will "Pre-Petition Canadian Bank Products" include any Indebtedness or other obligations owing in connection with any Bank Product Agreement (as such term is defined in the Term Loan Credit Agreement).

"<u>Pre-Petition Canadian Letter of Credit</u>" means those letters of credit so identified on <u>Schedule E-2</u> to the Agreement.

"<u>Pre-Petition Credit Agreement</u>" has the meaning specified in the recitals to the Agreement.

"<u>Pre-Petition Lender Group</u>" means the "Lender Group" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Letter of Credit</u>" means any Pre-Petition Canadian Letter of Credit or Pre-Petition U.S. Letter of Credit.

"<u>Pre-Petition Loan Documents</u>" means the "Loan Documents" as set forth in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Obligations</u>" means all of the "Obligations" as set forth in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Parties</u>" means the Loan Parties (as defined under the Pre-Petition Loan Documents) and the agent, lenders and other secured parties under the Pre-Petition Credit Agreement and related credit documentation.

"<u>Pre-Petition U.S. Bank Products</u>" means each Bank Product (as such term is defined in the Pre-Petition Credit Agreement) that is evidenced by a Bank Product Agreement (as such term is defined in the Pre-Petition Credit Agreement) to which BB Holdings, U.S. Borrower or its Subsidiaries is party as of the Petition Date (before giving effect to the filing of any petition for relief); <u>provided</u> that, for the avoidance of doubt, in no instance will "Pre-Petition U.S. Bank Products" include any Indebtedness or other obligations owing in connection with any Bank Product Agreement (as such term is defined in the Term Loan Credit Agreement).

"Pre-Petition U.S. Letter of Credit" means those letters of credit identified on Schedule E-2 to the Agreement.

"Preferred Stock" means, as applied to the Stock of any Person, the Stock of any class or classes (however designated) that is preferred with respect to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Stock of any other class of such Person.

"Principal Obligations" means the Obligations other than the Parallel Debt.

"Pro Forma Basis" and "Pro Forma Effect" means, with respect to compliance with any test hereunder, that the applicable transaction shall be deemed to have occurred as of the first day of the applicable period of measurement in such test.

"Pro Rata Share" means, as of any date of determination:

(a)     with respect to a Lender's obligation to make Advances and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the outstanding principal amount of such Lender's Advances by (z) the outstanding principal amount of all Advances,

(b)     with respect to a Lender's obligation to participate in any Letter of Credit and Reimbursement Undertakings, to reimburse the Issuing Lender, and right to receive payments of fees with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the outstanding principal amount of such Lender's Advances by (z) the outstanding principal amount of all Advances; provided, however, that if all of the Advances have been repaid in full and Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined based upon subclause (i) of this clause as if the Revolver Commitments had not been terminated or reduced to zero and based upon the Revolver Commitments as they existed immediately prior to their termination or reduction to zero,

(c)     with respect to all other matters as to a particular Lender (including indemnification obligations arising under Section 15.7 of the Agreement), (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate amount of Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the outstanding principal amount of such Lender's Advances, by (z) the outstanding principal amount of all Advances; provided, however, that if all of the Advances have been repaid in full and Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined based upon subclause (i) of this clause as if the Revolver Commitments had not been terminated or reduced to zero and based upon the Revolver Commitments as they existed immediately prior to their termination or reduction to zero.

"Professional Persons" means the Debtor Professionals and the Committee Professionals.

"Prohibited Preferred Stock" means that, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is putable or exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Stock that is not otherwise Prohibited Preferred Stock) pursuant to a sinking fund obligation or otherwise, other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Advances and all other Obligations (other than Bank Product Obligations) or (b) is redeemable or exchangeable at the option of the holder thereof (other than solely for Stock that is not otherwise Prohibited Preferred Stock), other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Advances and all other Obligations (other than Bank Product Obligations), in whole or in part or (c) provides for the scheduled payment of dividends in cash, in each case prior to the date that is one year after the Maturity Date (determined at the time of the issuance of such Stock); provided that if such Stock is issued pursuant to any plan for the benefit of employees of Holdings (or any direct or indirect parent thereof) or any of its Subsidiaries or by any such plan to such employees, such Stock shall not constitute Prohibited Preferred Stock solely because it may be required to be repurchased by Holdings (or any direct or indirect parent company thereof) or any of its respective Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capital Lease Obligations), incurred at the time of, or within 120 days after, the acquisition, construction, repair, replacement, expansion or improvement of any capital asset or fixed asset for the purpose of financing all or any part of the cost thereof.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified therefor in Section 17.18 of this Agreement.

"Quebec Security Documents" means a Deed of Hypothec governed by the laws of the Province of Quebec dated on or about the date hereof, granted by Canadian Borrower in favor of Agent, as Hypothecary Representative for the Lenders and any other secured creditor under Article 2692 of the *Civil Code of Quebec*, executed before a notary of the Province of Quebec Agent.

"Real Property" means any fee simple or leasehold estates or interests in real or immovable property now owned or hereafter acquired by a Loan Party or its Subsidiaries and the improvements thereto.

"Received Amount" has the meaning specified therefor in Section 15.18(d) of the Agreement.

"Record" means information that is inscribed on a tangible or corporeal medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Recovery Event" means (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking under the power

of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"Refinancing Indebtedness" means exchanges, refinancings, renewals, modifications, replacements, refundings or extensions of Indebtedness (other than DIP Term Loan Indebtedness and Term Loan Indebtedness) so long as:

(a)      such exchanges, refinancings, renewals, modifications, replacements, refundings or extensions do not result in an increase in the principal amount of the Indebtedness so exchanged, refinanced, renewed, modified, replaced, refunded, or extended except by an amount equal to the unpaid accrued interest and premium thereon (including interest paid in kind) plus all other reasonable amounts paid and fees and expenses incurred in connection with such exchange, refinancing, renewal, modification, replacement, refund or extension plus an amount equal to any existing unutilized commitment and letters of credit undrawn thereunder,

(b)      such exchanges, refinancings, renewals, modifications, replacements, refundings or extensions do not result in a maturity date that is earlier than the maturity date of the Indebtedness so exchanged, refinanced, renewed, modified, replaced, refunded or extended,

(c)      if the Indebtedness that is exchanged, refinanced, renewed, modified, replaced, refunded or extended was subordinated in right of payment to the Obligations (or any portion thereof), then the terms and conditions of the exchanged, refinancing, renewal, modifications, replacements, refundings or extension must include subordination terms and conditions that are at least as favorable, taken as a whole, to the Lender Group as those that were applicable to the refinanced, renewed, modified, replaced, refunded or extended Indebtedness,

(d)      if the Indebtedness that is exchanged, refinanced, renewed, modified, replaced, refunded or extended is Indebtedness permitted under clause (a), (b), (g), (t), or (u) (except in the case of clause (u) only to the extent that no Loan Party is obligated in respect of such Indebtedness) of the definition of Permitted Indebtedness, the direct or contingent obligors with respect to such Indebtedness are not changed, and

(e)      if the Indebtedness being exchanged, refinanced, renewed, modified, replaced, refunded or extended is Indebtedness permitted by clauses (a), (b), (g), (t), or (u) (except in the case of clause (u) only to the extent that no Loan Party is obligated in respect of such Indebtedness) of the definition of Permitted Indebtedness, the terms and conditions of any such exchange, refinancing, renewal, modification, replacement, refunding or extension, taken as a whole, are not materially less favorable to the Lenders than the terms and conditions of the Indebtedness being exchanged, refinanced, renewed, modified, replaced, refunded or extended (including, if applicable, as to collateral priority and subordination, but excluding as to interest rates, fees, funding discounts and redemption or prepayment premiums, which shall be determined by Holdings in good faith to be market rates, fees, discounts and premiums at the time of incurrence); provided that a certificate of an Authorized Person of Holdings delivered to the Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that Holdings has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Agent notify Holdings within such 5 Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

"Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"Regulation D" means Regulation D of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation H" means Regulation H of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation T" means Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation U" means Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" means Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Undertaking" means a U.S. Reimbursement Undertaking or a Canadian Reimbursement Undertaking, as the context requires.

"Related Fund" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address any release of Hazardous Materials into the indoor or outdoor environment and (b) restore or reclaim natural resources or the environment.

"Rent Reserve" means a Canadian Rent Reserve or a U.S. Rent Reserve, as applicable.

"Replacement Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Report" has the meaning specified therefor in Section 15.16(a) of the Agreement.

"Reporting Date" has the meaning specified therefor in Schedule 5.1 of the Agreement.

"Required Lenders" means, at any date, Non-Defaulting Lenders having or holding the majority of the Adjusted Total Revolver Commitment at such time or, if the Total Revolver Commitment has been terminated at such time, the majority of the outstanding principal amount of the Advances and Letter of Credit Exposure (excluding the Letter of Credit Exposure of Defaulting Lenders) at such date; provided, however, that at any time there are 2 or more Lenders, "Required Lenders" must include at least 2 Lenders.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of such Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Restricted Debt Payments" has the meaning specified therefor in Section 6.7(a) of the Agreement.

"<u>Restricted Junior Payment</u>" means (a) any payment of dividends (other than dividends payable solely in the Stock of Holdings) or return of any capital to Holdings' equity holders or any other distribution, payment or delivery of property or cash to Holdings' equity holders as such, or any redemption, retirement, purchase or other acquisition, directly or indirectly, for consideration, of any shares of any class of Holdings' Stock (or the Stock of any direct or indirect parent thereof) now or hereafter outstanding, or any setting aside of any funds for any of the foregoing purposes, (b) any purchase or other acquisition for consideration (other than in connection with a Permitted Investment) by Holdings or any Subsidiary of any shares of any class of the Stock of Holdings (or any direct or indirect parent thereof), now or hereafter outstanding or (c) any distribution by a Borrower to a parent thereof of any Accounts or Inventory.

"<u>Revolver Commitments</u>" means the Canadian Revolver Commitments or the U.S. Revolver Commitments, as the context requires.

"<u>Revolver Usage</u>" means the Canadian Revolver Usage or the U.S. Revolver Usage or the sum of the Canadian Revolver Usage and U.S. Revolver Usage, as the context requires.

"<u>RSA</u>" has the meaning specified therefor in <u>Section 8.17(a)</u> of the Agreement.

"<u>Sale Order</u>" means a final non-appealable order in form and substance acceptable to each of the Agent and the DIP Term Loan Agent approving (i) the Stalking Horse Transaction on the terms set forth in the Stalking Horse APA or (ii) another sale pursuant to the Bidding Procedures Order of substantially all the assets of the Debtors and the CCAA Debtors.

"<u>Sanctioned Entity</u>" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d), that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"<u>Sanctioned Person</u>" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non SDN list or any other Sanctions related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"<u>Sanctions</u>" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes, anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Controlled Affiliates.

"<u>SEC</u>" means the United States Securities and Exchange Commission and any successor thereto.

"Second Day Orders" has the meaning specified therefor in Section 5.13(g) of the Agreement.

"Secured Parties" mean (a) the Lenders, (b) the Issuing Lenders, (c) the Swing Lenders, (d) the Agent, (e) each Bank Product Provider, (f) the beneficiaries of each indemnification obligation undertaken by any Loan Party under the Loan Documents and (g) any successors, endorsees, transferees and assigns of each of the foregoing.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Security Agreements" means each of the Canadian Security Agreement, the Luxembourg Security Agreement and the U.S. Security Agreement.

"Security Documents" means, collectively, the Security Agreements, the Canadian Security Documents, the DIP Intercreditor Agreement and any Control Agreement, Copyright Security Agreement, Patent Security Agreement, Trademark Security Agreement and each other security agreement or other instrument or document executed and delivered pursuant to Section 5.11 or 5.12 or pursuant to any of the Security Documents to secure or perfect, or render opposable, the Liens securing any or all of the Obligations, including the Orders.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"Stalking Horse APA" means that certain Asset Purchase Agreement, dated as of the Petition Date, among the Stalking Horse Bidder, as buyer, and the Debtors and the CCAA Debtors, as sellers.

"Stalking Horse Bidder" means, collectively, Tonos US LLC, a Delaware limited liability company, Tonos 1 Operating Corp., a British Columbia corporation, and Melissi 4 Inc., a Cayman Islands corporation.

"Stalking Horse Transaction" means the sale of substantially all of the assets of the Debtors and the CCAA Debtors pursuant to the Stalking Horse APA.

"Standard Letter of Credit Practice" means, for Issuing Lender or an Underlying Issuer, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Lender or an Underlying Issuer issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"<u>Subject Debt</u>" means the DIP Term Loan Indebtedness and any Refinancing Indebtedness in respect thereof, any Subordinated Indebtedness and any unsecured Indebtedness for borrowed money.

"<u>Subordinated Indebtedness</u>" means any Indebtedness for borrowed money of any Loan Party or any Subsidiary of any Loan Party that is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls an aggregate of more than 50% of the voting power of the Voting Stock of such corporation, partnership, limited liability company, or other entity. Unless otherwise expressly provided, all references herein to a "<u>Subsidiary</u>" means a Subsidiary of Holdings.

"<u>Subsidiary Guarantor</u>" means each U.S. Guarantor or Canadian Guarantor that is a Subsidiary of a Borrower.

"<u>Successor Cases</u>" means any case under Chapter 7 of the Bankruptcy Code commenced upon the conversion of any Cases.

"<u>Supermajority Lenders</u>" means, at any time, Non-Defaulting Lenders having in excess of 66 2/3% of the Adjusted Total Revolver Commitment at such time or, if the Total Revolver Commitment has been terminated at such time, a majority of the outstanding principal amount of the Advances and Letter of Credit Exposure (excluding the Letter of Credit Exposure of Defaulting Lenders) at such date.

"<u>Supported QFC</u>" has the meaning specified therefor in <u>Section 17.18</u> of this Agreement.

"<u>Swap</u>" means, any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"<u>Swap Obligation</u>" means, with respect to any Person, any obligation to pay or perform under any Swap.

"<u>Swing Lender</u>" means WFCF or any other Lender that, at the request of Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the Swing Lender under <u>Section 2.3(b)</u> of the Agreement.

"<u>Swing Line Exposure</u>" means U.S. Swing Line Exposure or Canadian Swing Line Exposure, as the context requires.

"<u>Swing Loan</u>" has the meaning specified therefor in <u>Section 2.3(b)</u> of the Agreement.

"<u>Taxes</u>" means, any taxes, levies, imposts, duties, fees, assessments, withholdings or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to any payment made pursuant to the Loan Documents and all interest, penalties, additions to or similar liabilities with respect thereto; <u>provided</u> that Taxes shall exclude (i) any tax imposed on the net income or net profits of Agent, any Lender or any Participant (including any branch profits taxes), in each case imposed (A) by the jurisdiction (or by any political subdivision or taxing authority thereof) in which Agent, such Lender or such Participant is resident, (B) the jurisdiction (or by any political subdivision or taxing authority thereof) in which Agent

such Lender, or such Participant is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (C) the jurisdiction (or by any political subdivision or taxing authority thereof) as a result of a present or former connection between Agent, such Lender or such Participant and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from Agent, such Lender or such Participant having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under the Agreement or any other Loan Document); (ii) any taxes resulting from (A) a Lender's or a Participant's failure to comply with the requirements of Section 16(c) or (d) of the Agreement, or (B) any non-foreign Lender's failure to provide a fully completed W-9 establishing an exemption from backup withholding, (iii) any United States withholding taxes, in respect of U.S. Borrower, or any Canadian withholding taxes, in respect of Canadian Borrower, that would be imposed on amounts payable to a Lender based upon the applicable withholding rate in effect at the time such Lender becomes a party to the Agreement (or designates a new lending office), except that Taxes shall include (A) any amount that such Lender (or its assignor, if any) was previously entitled to receive pursuant to Section 16(a) of the Agreement, if any, with respect to such withholding tax at the time such Lender becomes a party to the Agreement (or designates a new lending office), and (B) additional United States withholding taxes, in respect of U.S. Borrower, or additional Canadian withholding taxes, in respect of Canadian Borrower, that may be imposed after the time such Lender becomes a party to the Agreement (or designates a new lending office), as a result of a change in law, rule, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority, or (iv) with respect to any U.S. Borrower, any US federal withholding tax unpaid pursuant to Sections 1471-1474 of the IRC as amended or any successor statute that is substantively comparable and any regulated or official interpretation thereof.

"Tendered Currency" has the meaning specified therefor in Section 17.12 of the Agreement.

"Term Loan Credit Agreement" means the Term Loan Agreement, dated as of August 15, 2017, by and among Holdings, Canadian Borrower, Bumble Bee Holdings, Inc., the lenders from time to time a party thereto, and Brookfield Principal Credit LLC, as administrative agent for such lenders, as such agreement may be amended, restated, supplemented or otherwise modified, replaced or refinanced from time to time in accordance with the requirements thereof.

"Term Loan Documents" means the Term Loan Credit Agreement and the agreements, documents and instruments executed in connection therewith as each such document may be amended, restated, supplemented or otherwise modified, replaced or refinanced from time to time in accordance with the requirements thereof.

"Term Loan Indebtedness" means the Indebtedness incurred by the Loan Parties under the Term Loan Documents.

"Term Loan Priority Collateral" has the meaning specified therefor in the DIP Intercreditor Agreement.

"Termination Event" means (a) a "Reportable Event" described in Section 4043 of ERISA for which the notice requirement has not been waived by the PBGC, (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC, (e) any other event or condition which would constitute grounds under Section

4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC (including Section 412 or 430 of the IRC) or ERISA (including Section 302 or 4068 of ERISA), (g) the partial or complete withdrawal of any Loan Party or any ERISA Affiliate from a Multiemployer Plan (other than any complete withdrawal that would not constitute an Event of Default under Section 8.12), (h) any event or condition which results in the reorganization or insolvency of a Multiemployer Plan under Sections 4241 or 4245 of ERISA, (i) any event or condition which results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan (including under Section 4042 of ERISA), (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) any Multiemployer Plan being in "endangered status" or "critical status" within the meaning of IRC Section 432(b), (l) with respect to any Pension Plan, any Loan Party or any ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e); or (m) any event that causes any Loan Party or any of their ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the IRC.

"Testing Period" shall mean, for any Reporting Date, the cumulative period commencing on the Sunday immediately following the Budget Delivery Date for the then-effective Budget through the Saturday immediately preceding such Reporting Date.

"Total Revolver Commitment" means the sum of the Revolver Commitment of all Lenders.

"Trademark Security Agreement" has the meaning specified therefor in the U.S. Security Agreement.

"Trademarks" has the meaning specified therefor in the U.S. Security Agreement.

"Transaction Expenses" means any fees or expenses incurred or paid by Equity Sponsor, Holdings, Borrowers, any of their respective Subsidiaries (including Clover Leaf Seafood and its Subsidiaries) or any of their respective Affiliates in connection with the Transactions and the transactions contemplated hereby and thereby.

"Transactions" means, collectively, (a) the funding of the Advances on the Closing Date, (b) the consummation of any other transactions in connection with the foregoing, including the funding of DIP Term Loan Indebtedness under the DIP Term Loan Credit Agreement and the prepayment of any Pre-Petition Obligations outstanding under the Pre-Petition Credit Agreement, and, (c) the payment of Transaction Expenses.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any version or revision thereof accepted by Issuing Lender or an Underlying Issuer for use.

"Underlying Issuer" means any U.S. Underlying Issuer or any Canadian Underlying Issuer, as the context requires.

"Underlying Letter of Credit" means a U.S. Underlying Letter of Credit or a Canadian Underlying Letter of Credit, as the context requires.

"United States" or "U.S." means the United States of America.

"<u>Unpaid Drawings</u>" has the meaning specified therefor in <u>Section 2.11(a)(iv)</u>.

"<u>U.S. Advances</u>" has the meaning specified therefor in <u>Section 2.1(a)</u> of the Agreement.

"<u>U.S. Availability</u>" means, as of any date of determination, the amount that U.S. Borrower is entitled to borrow as U.S. Advances under <u>Section 2.1</u> of the Agreement (after giving effect to all then outstanding U.S. Advances and U.S. Letters of Credit Outstanding).

"<u>U.S. Bank Product Obligations</u>" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by BB Holdings, U.S. Borrower or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and (b) all U.S. Hedge Obligations; <u>provided</u> that, for the avoidance of doubt, in no instance will "U.S. Bank Product Obligations" include any Indebtedness or other obligations owing in connection with any Bank Product Agreement (as such term is defined in the Term Loan Credit Agreement).

"<u>U.S. Bank Product Reserve Amount</u>" means, as of any date of determination, the Dollar amount of the reserves established by Agent in respect of U.S. Bank Products Obligations, which Dollar amount may be determined by Agent in its Permitted Discretion (but in no event shall any U.S. Bank Product Reserve Amount with respect to any U.S. Hedge Obligations exceed the mark-to-market value, to the extent applicable, of such U.S. Hedge Obligations).

"<u>U.S. Borrower</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>U.S. Borrowing Base</u>" means, as of any date of determination, an amount equal to the result of (without duplication):

(a)      85% of the book value of the U.S. Borrowing Base Participants' Eligible Accounts at such date, *less* the amount, if any, of the U.S. Dilution Reserve at such date established by Agent in its Permitted Discretion, *plus*

(b)      the lower of

(i)      the sum of (A) 75% of the value (calculated at the lower of cost and market value on a basis consistent with U.S. Borrower's historical accounting practices) of the U.S. Borrowing Base Participants' Eligible Landed Inventory at such date, *plus* (B) the lesser of (1) $2,500,000 minus the amount of the Canadian Revolver Usage that is based on Canadian Availability generated under clause (b)(i)(B) of the Canadian Borrowing Base, and (2) 50% of the value (calculated at the lower of cost and market value on a basis consistent with U.S. Borrower's historical accounting practices) of the U.S. Borrowing Base Participants' Eligible Blocked Landed Inventory at such date, *plus* (C) the lesser of (1) $30,000,000 *minus* the amount of the Canadian Revolver Usage that is based upon Canadian Availability generated under clause (b)(i)(C) of the Canadian Borrowing Base, and (2) 65% of the value (calculated at the lower of cost and market value on a basis consistent with U.S. Borrower's historical accounting practices) of the U.S. Borrowing Base Participants' Eligible In-Transit Inventory, and

(ii)      85% *times* the most recently determined Net Liquidation Percentage *times* the book value of the U.S. Borrowing Base Participants' Eligible Landed Inventory and Eligible In-Transit Inventory at such date, *plus*

(c)       at the option of U.S. Borrower, an amount not to exceed the lesser of (i) the excess of the Canadian Borrowing Base at such date (exclusive of any portion of the Canadian Borrowing Base thereof (if any) which is not subject to a first priority perfected security interest to secure all of the Obligations of U.S. Borrowers) over the Canadian Revolver Usage, and (ii) $40,000,000, *minus*

(d)       the sum at such date, without duplication, of (i) the aggregate amount of all U.S. Rent Reserves, if any, established by Agent in its Permitted Discretion, *plus* (ii) the Carve Out Reserve, (iii) the aggregate amount of the DOJ Reserve, if any, established by Agent (it being understood that the amount of such DOJ Reserves may, in Agent's Permitted Discretion, be less than, but shall in no event be greater than, the amount set forth in the definition of "DOJ Reserve"), *plus* (iv) the U.S. Bank Product Reserve Amount, if any, established in connection with U.S. Bank Product Obligations, *plus* (v) the aggregate amount of other reserves, if any, established by Agent under Section 2.1(c) of the Agreement against the U.S. Borrowing Base in its Permitted Discretion.

The U.S. Borrowing Base at any time shall be determined by reference to the most recent U.S. Borrowing Base Certificate theretofore delivered to Agent with such adjustments as Agent deems appropriate in its Permitted Discretion to assure that the U.S. Borrowing Base is calculated in accordance with the terms of the Agreement.

Any provision of this definition or any other provision of the Agreement (including this Schedule 1.1) to the contrary notwithstanding, in the event that any U.S. Subsidiary Guarantor is (or its assets are) acquired by a Loan Party after the Closing Date (each, a "U.S. Borrowing Base Event"), in no event shall any Accounts or Inventory of such Person or entity be included in the U.S. Borrowing Base prior to the time, after the occurrence of such U.S. Borrowing Base Event, when Agent has completed its field audits and appraisals with respect to such U.S. Subsidiary Guarantor.

"U.S. Borrowing Base Certificate" means a certificate in the form, executed by an Authorized Person of the U.S. Borrower, substantially in the form of (or in such other form as may be mutually agreed upon by the U.S. Borrower and the Agent), and containing the information prescribed by, Exhibit C-1, delivered to the Agent and setting forth the calculation of the U.S. Borrowing Base in accordance with Section 5.2 of the Agreement.

"U.S. Borrowing Base Participants" has the meaning set forth in Schedule 5.2.

"U.S. Dilution" means, as of any date of determination, a percentage, based upon the actual results of the immediately prior 360 consecutive days, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to U.S. Borrower's and U.S. Subsidiary Guarantors' Accounts during such period, by (b) U.S. Borrower's and U.S. Subsidiary Guarantors' billings with respect to Accounts during such period.

"U.S. Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against U.S. Borrower's Eligible Accounts by 1 percentage point for each percentage point by which U.S. Dilution is in excess of 5%.

"U.S. Dollar Equivalent" means, at any time, (a) as to any amount denominated in Dollars, the amount thereof at such time, and (b) as to any amount denominated in any other currency, the equivalent amount in Dollars based on the Exchange Rate in effect on the Business Day of determination.

"U.S. Guarantors" means any Guarantor that is organized under the laws of any state of the United States or the District of Columbia.

"<u>U.S. Hedge Obligations</u>" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of BB Holdings, U.S. Borrower or its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Bank Product Providers.

"<u>U.S. Issuing Lender</u>" means Wells Fargo or any other Lender that, at the request of U.S. Borrower and with the consent of Agent, agrees, in such Lender's sole discretion, to become a U.S. Issuing Lender in accordance with <u>Section 2.11</u> of the Agreement for the purpose of issuing U.S. Letters of Credit or U.S. Reimbursement Undertakings pursuant to <u>Section 2.11</u> of the Agreement. In the event that there is more than one Issuing Lender at any time, references in the Agreement and in the other Loan Documents to the Issuing Lender shall be deemed to refer to the Issuing Lender in respect of the applicable Letter of Credit or to all Issuing Lenders, as the context requires.

"<u>U.S. L/C Sublimit</u>" means $10,000,000.

"<u>U.S. Lender</u>" means a Lender with a U.S. Revolver Commitment or holding at such a time a U.S. Advance (or U.S. Letter of Credit Exposure) made to U.S. Borrower; sometimes being referred to collectively as "U.S. Lenders".

"<u>U.S. Letter of Credit</u>" means a letter of credit issued by a U.S. Issuing Lender or a letter of credit issued by a U.S. Underlying Issuer, as the context requires, for the benefit of a Loan Party.

"<u>U.S. Letter of Credit Exposure</u>" means, with respect to any U.S. Lender, at any time, the sum of (without duplication) (a) such U.S. Lender's Pro Rata Share of the U.S. Letter of Credit Usage at such time plus (b) such U.S. Lender's Pro Rata Share of any U.S. Unpaid Drawings at such time.

"<u>U.S. Letter of Credit Usage</u>" means, as of any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding U.S. Letters of Credit, <u>plus</u> (b) the aggregate amount of outstanding reimbursement obligations with respect to U.S. Letters of Credit which remain unreimbursed or which have not been paid through an U.S. Advance.

"<u>U.S. Letters of Credit Outstanding</u>" mean, at any time, the sum of, without duplication, (a) the aggregate undrawn amount of all outstanding U.S. Letters of Credit at such time and (b) the aggregate amount of all U.S. Unpaid Drawings in respect of all U.S. Letters of Credit at such time.

"<u>U.S. Loan Account</u>" has the meaning specified therefor in <u>Section 2.9(b)</u> of the Agreement.

"<u>U.S. Loan Parties</u>" include the U.S. Borrower and each U.S. Guarantor; each sometimes being returned to individuals as a "U.S. Loan Party."

"<u>U.S. Overadvance Amount</u>" has the meaning specified therefor in <u>Section 2.4(e)(ii)</u> of the Agreement.

"<u>U.S. Participant Register</u>" has the meaning specified therefor in <u>Section 13.1(j)</u> of the Agreement.

"<u>U.S. Pre-Petition Advances</u>" means "U.S. Advances" as defined in the Pre-Petition Credit Agreement.

"U.S. Protective Advance" means a Protective Advance which has been deemed a "U.S. Protective Advance" by Agent.

"U.S. Register" has the meaning set forth in Section 13.1(h) of the Agreement.

"U.S. Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"U.S. Reimbursement Undertaking" has the meaning specified therefor in Section 2.11(a)(i) of the Agreement.

"U.S. Rent Reserve" means, in the event the U.S. Loan Parties are unable to obtain a Collateral Access Agreement with respect to any location listed on Schedule E-1 or any other leased location in the United States where U.S. Borrower's and U.S. Subsidiary Guarantors' Inventory is located, a reserve against the U.S. Borrowing Base that Agent may, in its Permitted Discretion, impose in an amount that is of up to (in its Permitted Discretion) 3 months' rent at such location; provided, however, that so long as a Collateral Access Agreement is in effect for any location, such reserve shall no longer apply with respect to such location and no such reserve shall be imposed on any such location in respect on which Eligible Inventory in the aggregate has a value of less than $500,000.

"U.S. Revolver Commitment" means, with respect to each U.S. Lender, its U.S. Revolver Commitment, and, with respect to all U.S. Lenders, their U.S. Revolver Commitments, in each case as such Dollar amounts are set forth beside such U.S. Lender's name under the applicable heading on Schedule C-2 or in the Assignment and Acceptance pursuant to which such U.S. Lender became a U.S. Lender hereunder or in the case of any Lender that increases its U.S. Revolver Commitment

"U.S. Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding U.S. Advances, plus (b) the amount of the U.S. Letter of Credit Usage.

"U.S. Security Agreement" means the U.S. Security Agreement, dated as of the Closing Date, entered into by Holdings, U.S. Borrower, the other U.S. Loan Parties and Agent for the benefit of the Secured Parties, as amended, restated, supplemented, or otherwise modified from time to time.

"U.S. Settlement" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"U.S. Settlement Date" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"U.S. Special Resolution Regimes" has the meaning specified therefor in Section 17.18 of this Agreement.

"U.S. Subsidiary" means a Subsidiary of U.S. Borrower or a U.S. Guarantor that is a Domestic Subsidiary and which is a U.S. Loan Party.

"U.S. Subsidiary Guarantor" means any U.S. Guarantor that is a Subsidiary of U.S. Borrower.

"U.S. Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"<u>U.S. Swing Loan Exposure</u>" means, with respect to any U.S. Lender, at any time, such U.S. Lender's Pro Rata Share of the U.S. Swing Loans outstanding at such time.

"<u>U.S. Total Revolver Commitment</u>" means the sum of the U.S. Revolver Commitment of all U.S. Lenders.

"<u>U.S. Trustee</u>" means the United States Trustee applicable in the Cases.

"<u>U.S. Underlying Issuer</u>" means a third Person which is the beneficiary of a U.S. Reimbursement Undertaking and which has issued a letter of credit at the request of the U.S. Issuing Lender for the benefit of U.S. Borrower or one of the U.S. Subsidiaries.

"<u>U.S. Underlying Letter of Credit</u>" means a letter of credit that has been issued by a U.S. Underlying Issuer.

"<u>U.S. Unpaid Drawings</u>" has the meaning specified therefor in <u>Section 2.11(a)(iv)</u>.

"<u>Variance Report</u>" has the meaning set forth on <u>Schedule 5.1</u>.

"<u>Voidable Transfer</u>" has the meaning specified therefor in <u>Section 17.8</u> of the Agreement.

"<u>Voting Stock</u>" of any Person as of any date means the Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"<u>Wells Fargo</u>" means Wells Fargo Bank, National Association, a national banking association.

"<u>WFCF</u>" means Wells Fargo Capital Finance, LLC, a Delaware limited liability company.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**<u>Exhibit B</u>**

**Term Loan DIP Agreement**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
TERM LOAN AGREEMENT

among

BUMBLE BEE FOODS S.À R.L.,

as Holdings

BUMBLE BEE FOODS, LLC,

as the Borrower

VARIOUS LENDERS,

and

BROOKFIELD PRINCIPAL CREDIT LLC,

as Administrative Agent

_____

DATED AS OF NOVEMBER [●], 2019

# TABLE OF CONTENTS

<div align="right">**Page**</div>

| | | |
|---|---|---|
| Section 1 | Definitions; Accounting Terms; Construction. | 2 |
| 1.01. | Defined Terms. | 2 |
| 1.02. | Accounting Terms. | 35 |
| 1.03. | Construction | 36 |
| 1.04. | Time References. | 36 |
| 1.05. | Schedules and Exhibits. | 37 |
| 1.06. | Quebec Interpretation Clause. | 37 |
| 1.07. | Luxembourg terms. | 37 |
| 1.08. | Divisions. | 38 |
| Section 2 | Amount and Terms of Credit. | 38 |
| 2.01. | The Commitments. | 39 |
| 2.02. | Notice of Borrowing. | 39 |
| 2.03. | Disbursement of Funds.. | 39 |
| 2.04. | Notes. | 40 |
| 2.05. | Pro Rata Borrowings. | 41 |
| 2.06. | Conversions and Continuations. | 41 |
| 2.07. | Interest. | 41 |
| 2.08. | Interest Periods. | 43 |
| 2.09. | Increased Costs, Illegality, etc | 44 |
| 2.10. | Compensation. | 46 |
| 2.11. | Change of Lending Office. | 46 |
| 2.12. | [Reserved]. | 46 |
| 2.13. | Withdrawal of Funds from the DIP Term Funding Account. | 47 |
| Section 3 | Fees; Reductions of Commitment. | 49 |
| 3.01. | Fees. | 49 |
| 3.02. | [Reserved.] | 50 |
| 3.03. | Mandatory Termination of Commitments. | 50 |
| Section 4 | Prepayments; Payments; Taxes. | 50 |
| 4.01. | Voluntary Prepayments. | 50 |
| 4.02. | Mandatory Repayments.. | 50 |
| 4.03. | Method and Place of Payment.. | 52 |
| 4.04. | Net Payments. | 52 |
| Section 5 | Conditions Precedent. | 56 |
| 5.01. | Closing Date. | 56 |
| 5.02. | Delayed Draw Borrowing. | 62 |

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| Section 6 | Representations, Warranties and Agreements. | | 64 |
| 6.01. | Company Status. | | 64 |
| 6.02. | Power and Authority. | | 64 |
| 6.03. | No Violation. | | 65 |
| 6.04. | Approvals | | 65 |
| 6.05. | Financial Statements; Financial Condition; Undisclosed Liabilities; DIP Budget. | | 65 |
| 6.06. | Litigation. | | 66 |
| 6.07. | True and Complete Disclosure. | | 66 |
| 6.08. | Use of Proceeds; Margin Regulations. | | 66 |
| 6.09. | Tax Returns and Payments. | | 67 |
| 6.10. | Employee Matter Compliance. | | 67 |
| 6.11. | Security. | | 69 |
| 6.12. | Properties. | | 70 |
| 6.13. | Capitalization of Holdings. | | 70 |
| 6.14. | Subsidiaries. | | 70 |
| 6.15. | Compliance with Laws, etc. | | 71 |
| 6.16. | Investment Company Act. | | 71 |
| 6.17. | Insurance. | | 71 |
| 6.18. | Environmental Matters. | | 71 |
| 6.19. | Employment and Labor Relations. | | 72 |
| 6.20. | Intellectual Property. | | 72 |
| 6.21. | Material Agreements. | | 73 |
| 6.22. | Necessary Authorizations.. | | 73 |
| 6.23. | Anti-Money Laundering and Economic Sanctions Laws. | | 73 |
| 6.24. | Anti-Corruption Laws. | | 73 |
| 6.25. | Food Safety. | | 74 |
| 6.26. | Centre of Main Interests and Central Administration. | | 75 |
| 6.27. | Domiciliation. | | 75 |
| 6.28. | No Defaults. | | 75 |
| 6.29. | Cases and CCAA Cases; Orders and CCAA Orders. | | 75 |
| Section 7 | Affirmative Covenants. | | 76 |
| 7.01. | Information Covenants. | | 77 |
| 7.02. | Books, Records and Inspections; Weekly Lender Calls. | | 81 |
| 7.03. | Maintenance of Property; Insurance. | | 81 |
| 7.04. | Existence; Franchises. | | 83 |
| 7.05. | Compliance with Laws, etc. | | 83 |
| 7.06. | Compliance with Environmental Laws. | | 83 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 7.07. | ERISA. | 84 |
| 7.08. | End of Fiscal Years; Fiscal Quarters. | 85 |
| 7.09. | [Reserved]. | 85 |
| 7.10. | Payment of Taxes. | 85 |
| 7.11. | Use of Proceeds. | 85 |
| 7.12. | Additional Security; Further Assurances; etc. | 85 |
| 7.13. | Plea Agreement; Compliance Program; Company Compliance Program. | 87 |
| 7.14. | [Reserved]. | 87 |
| 7.15. | [Reserved]. | 87 |
| 7.16. | [Reserved]. | 87 |
| 7.17. | Priority of Liens. | 88 |
| 7.18. | Milestones. | 88 |
| 7.19. | Bankruptcy Related Matters | 90 |
| 7.20. | Budget Compliance and Variances. | 91 |
| 7.21. | Adequate Protection Payments. | 92 |
| 7.22. | DIP ABL Credit Facility. | 92 |
| 7.23. | Challenges. | 92 |
| 7.24. | Post-Closing Matters. | 92 |
| Section 8 | Negative Covenants. | 93 |
| 8.01. | Liens. | 93 |
| 8.02. | Consolidation, Merger, Amalgamation, Arrangement, Purchase or Sale of Assets, etc. | 98 |
| 8.03. | Restricted Payments. | 100 |
| 8.04. | Indebtedness. | 101 |
| 8.05. | Advances, Investments and Loans. | 103 |
| 8.06. | Transactions with Affiliates. | 105 |
| 8.07. | [Reserved]. | 106 |
| 8.08. | [Reserved]. | 106 |
| 8.09. | [Reserved]. | 106 |
| 8.10. | Sale and Lease-Back Transactions. | 106 |
| 8.11. | Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements. | 106 |
| 8.12. | Limitation on Certain Restrictions on Subsidiaries. | 107 |
| 8.13. | Business; etc. | 108 |
| 8.14. | Limitation on Creation of Subsidiaries. | 108 |
| 8.15. | Certain Deposit Accounts. | 109 |
| 8.16. | Anti-Terrorism and Anti-Corruption Laws. | 109 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 8.17. | Civil Cases. | 110 |
| 8.18. | Canadian Pension Plans.. | 110 |
| 8.19. | Litigation Spend. | 110 |
| Section 9 | Events of Default. | 110 |
| 9.01. | Payments. | 110 |
| 9.02. | Representations, etc. | 110 |
| 9.03. | Covenants. | 110 |
| 9.04. | Default Under Other Agreements. | 111 |
| 9.05. | Bankruptcy, etc. | 111 |
| 9.06. | ERISA. | 112 |
| 9.07. | Credit Documents. | 113 |
| 9.08. | Guaranties. | 113 |
| 9.09. | Judgments. | 113 |
| 9.10. | Subordination. | 113 |
| 9.11. | Plea Agreement. | 114 |
| 9.12. | [Reserved] | 114 |
| 9.13. | The Cases and CCAA Cases; Bankruptcy Matters. | 114 |
| 9.14. | Change of Control. | 118 |
| Section 10 | The Administrative Agent. | 119 |
| 10.01. | Appointment. | 119 |
| 10.02. | Nature of Duties. | 119 |
| 10.03. | Lack of Reliance on the Administrative Agent. | 119 |
| 10.04. | Certain Rights of the Administrative Agent.. | 121 |
| 10.05. | Reliance. | 121 |
| 10.06. | Indemnification. | 122 |
| 10.07. | The Administrative Agent in its Individual Capacity. | 122 |
| 10.08. | Holders. | 122 |
| 10.09. | Resignation by the Administrative Agent. | 122 |
| 10.10. | Collateral Matters. | 123 |
| 10.11. | Delivery of Information. | 124 |
| 10.12. | Delegation of Duties. | 124 |
| 10.13. | No Reliance on the Administrative Agent's Customer Identification Program; Certifications From Banks and Participants; the PATRIOT Act. | 124 |
| 10.14. | Certain ERISA Matters. | 125 |
| Section 11 | Miscellaneous. | 126 |
| 11.01. | Payment of Expenses, etc. | 126 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 11.02. | Right of Setoff. | 128 |
| 11.03. | Notices. | 129 |
| 11.04. | Benefit of Agreement; Assignments; Participations. | 129 |
| 11.05. | No Waiver; Remedies Cumulative. | 132 |
| 11.06. | Payments Pro Rata. | 133 |
| 11.07. | Currency Indemnity. | 133 |
| 11.08. | GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. | 134 |
| 11.09. | Counterparts. | 135 |
| 11.10. | Headings Descriptive. | 135 |
| 11.11. | Amendment or Waiver; etc. | 135 |
| 11.12. | Survival. | 136 |
| 11.13. | Domicile of Term Loans. | 136 |
| 11.14. | Register. | 137 |
| 11.15. | Confidentiality. | 137 |
| 11.16. | Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Canada or Pledges over Assets Not Located in the United States or Canada. | 138 |
| 11.17. | PATRIOT Act and Canadian Anti-Money Laundering & Anti-Terrorism Compliance. | 139 |
| 11.18. | [Reserved]. | 140 |
| 11.19. | Interest Rate Limitation. | 140 |
| 11.20. | Entire Agreement. | 140 |
| 11.21. | Release. | 140 |
| 11.22. | [Reserved]. | 141 |
| 11.23. | Limitations Act (Ontario). | 141 |
| 11.24. | Quebec Security. | 141 |
| 11.25. | Termination Prior to Closing Date. | 141 |
| Section 12 | [Reserved]. | 141 |
| Section 13 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions. | 141 |
| Section 14 | Intercreditor Agreement. | 142 |

# TABLE OF CONTENTS
## (continued)

Schedule 1.01 ...................................... Commitments
Schedule 1.01B ................................... Excluded Subsidiaries
Schedule 6.06 ...................................... Litigation
Schedule 6.09 ...................................... Tax Returns and Payments
Schedule 6.12(b) ................................. Real Property
Schedule 6.12(c) ................................. Vessels
Schedule 6.13 ...................................... Capitalization of Holdings
Schedule 6.14 ...................................... Subsidiaries
Schedule 6.17 ...................................... Insurance
Schedule 7.10 ...................................... [Reserved]
Schedule 8.01 ...................................... Existing Liens
Schedule 8.04 ...................................... Existing Indebtedness
Schedule 8.05 ...................................... Existing Investments
Schedule 8.06 ...................................... Transactions with Affiliates
Schedule 8.12 ...................................... Limitation on Certain Restrictions on
                                                    Subsidiaries

Exhibit A ............................................ Form of Notice of Borrowing
Exhibit B ............................................ Form of Notice of Conversion/Continuation
Exhibit C ............................................ Form of Term Note
Exhibit D ............................................ Form of Tax Form Certificate
Exhibit E ............................................ Form of Guaranty
Exhibit F-1 ......................................... Form of U.S. Security Agreement
Exhibit F-2 ......................................... Form of Canadian Security Agreement
Exhibit G-1......................................... [Reserved]
Exhibit G-2......................................... [Reserved]
Exhibit H............................................ Form of Compliance Certificate
Exhibit I ............................................. Form of Assignment and Assumption
                                                    Agreement
Exhibit J ............................................ Form of Intercompany Subordination
                                                    Agreement
Exhibit K ............................................ [Reserved]
Exhibit L ............................................ Form of Interim Order
Exhibit M ........................................... Form of DIP Term Funding Withdrawal
                                                    Notice

01:25621776.1

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT, dated as of November [●], 2019 among BUMBLE BEE FOODS S.À R.L., a Luxembourg private limited liability company (*société à responsabilité limitée*) ("**Holdings**"), BUMBLE BEE FOODS, LLC, a Delaware limited liability company (the "**Borrower**"), the Lenders party hereto from time to time, and BROOKFIELD PRINCIPAL CREDIT LLC, as administrative agent and the collateral agent for the Lenders (in such capacities and together with its successors and assigns, the "**Administrative Agent**". All capitalized terms used herein and defined in <u>Section 1.01</u> are used herein as therein defined.

<div align="center">W I T N E S S E T H:</div>

WHEREAS, on November [●], 2019 (the "**Petition Date**"), the Domestic Credit Parties (in such capacity, each a "**Debtor**" and collectively the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on November [●], 2019 (the "**CCAA Filing Date**"), the Canadian Credit Parties (in such capacity, each a "**CCAA Debtor**" and collectively the "**CCAA Debtors**") filed an application with the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") pursuant to the CCAA (collectively, the "**CCAA Cases**" and each a "**CCAA Case**") seeking the CCAA Initial Order and have continued in the possession of their assets and in the management of their businesses pursuant to the CCAA Initial Order;

WHEREAS, the Borrower has requested that (x) the Lenders provide a debtor-in-possession term loan facility in an aggregate principal amount of $80,000,000 pursuant to this Agreement (the "**DIP Term Facility**") and (y) certain other lenders provide a debtor-in-possession asset-based revolving credit facility in an aggregate principal amount of $200,000,000 (the "**DIP ABL Credit Facility**" and, together with the DIP Term Facility, the "**DIP Facilities**") pursuant to the DIP ABL Credit Agreement (as defined below), with all of the Borrower's obligations under the DIP Facilities to be guaranteed by each applicable Guarantor;

WHEREAS, the priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order, the Final Order, the CCAA Initial Order and the CCAA A&R Initial Order, as applicable, in each case upon entry thereof by the Bankruptcy Court or the CCAA Court, as applicable, and in the Intercreditor Agreement;

WHEREAS, the Borrower, each other Guarantor and their respective Subsidiaries are engaged in related businesses, and each of them will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement; and

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IT IS AGREED:

Section 1        Definitions; Accounting Terms; Construction.

        1.01.    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**ABL Priority Collateral**" shall have the meaning provided in the Intercreditor Agreement.

"**Accounting Change**" shall have the meaning provided in Section 1.02(a).

"**Additional Documents**" shall have the meaning provided in Section 7.12(a).

"**Adequate Protection Payments**" shall have the meaning provided in Section 7.21.

"**Administrative Agent**" shall have the meaning provided in the preamble to this Agreement.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including all directors and officers of such Person), controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (a) to vote 25% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (b) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof.

"**Agreement**" shall mean this Superpriority Secured Debtor-in-Possession Term Loan Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"**Anti-Money Laundering Laws**" shall mean any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties applicable to a Credit Party and its Subsidiaries, related to terrorism financing or money laundering, including any applicable Canadian Anti-Money Laundering & Anti-Terrorism Legislation or any provision of Title III of the PATRIOT ACT and The Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act**", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"**Applicable Margin**" shall mean, as of any date of determination (i) in the case of Base Rate Loans, a percentage per annum equal to 9.50%, and (ii) in the case of Eurodollar Rate Loans, a percentage per annum equal to 10.50%.

"**Approval Date**" shall have the meaning provided in Section 9.11.

"**Approved Budget**" means (x) the Initial DIP Budget or (y) the then most current DIP Budget prepared by Holdings and consented to by the Administrative Agent pursuant to Section 7.01(f)(i), as applicable.

"**Approved Jurisdiction**" shall mean each of the United States (and any state thereof), Canada (and any province thereof) or Luxembourg.

"**Asset Sale**" shall mean any sale, transfer or other disposition by Holdings or any of its Subsidiaries to any Person (including by way of redemption by such Person or by way of a Sale and Lease-Back Transaction) of any assets pursuant to Section 8.02(c) (other than pursuant to Section 8.02(c)(i), (ii), (iv), (v), (vi), (xii), (xiii) or (xiv)).

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I or such other form as may be reasonably acceptable to the Administrative Agent.

"**Attributable Indebtedness**" shall mean, on any date of determination, in respect of any Sale and Lease-Back Transaction, the present value of the total obligations of the lessee for net rental payments during the remaining term of the lease included in such Sale and Lease-Back Transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended.

"**Auction**" shall mean the auction to be held pursuant to the Bidding Procedures Order.

"**Authorized Officer**" shall mean, with respect to (a) delivering Notices of Borrowing and similar notices, any person or persons that has or have been authorized by the Board of Directors (or comparable managers) of Holdings or the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent, (b) delivering financial information and officer's certificates pursuant to this Agreement, any person or persons that has or have been authorized by the board of managers of Holdings or the chief financial officer (or other officer with equivalent duties), the treasurer or the principal accounting officer of Holdings or the Borrower, and (c) any other matter in connection with this Agreement or any other Credit Document, any person or persons that has or have been authorized by the Board of Directors of Holdings or any officer (or a person or persons so designated by any two officers) of Holdings or the applicable Credit Party. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership or other applicable action on the part of Holdings or such Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country which has implemented, or at any time implements, Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the relevant implementing law for such

EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" shall have the meaning provided in Section 9.05.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any appellate court having jurisdiction over the Cases from time to time.

"**Base Rate**" shall mean, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "**Prime Rate**" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "**bank prime loan**" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent in good faith) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent in good faith), (b) the sum of 0.50% per annum and the Federal Funds Rate, and (c) the sum of (x) to the extent the Eurodollar Rate is ascertainable, the Eurodollar Rate calculated for each such day based on an Interest Period of one month (but, for the avoidance of doubt, not less than 1.00% per annum), plus (y) 1.00%, in each instance, as of such day; provided, that the Base Rate with respect to Base Rate Loans that bear interest at a rate based on this definition will be deemed not to be less than 2.00% per annum.  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "**bank prime loan**" rate, the Federal Funds Rate or the Eurodollar Rate for an Interest Period of one month.

"**Base Rate Loan**" shall mean a Term Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Benefit Plan**" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada), as amended.

"**Bidding Procedures**" shall mean the bidding procedures in substantially the form attached as Exhibit A-1 to the Stalking Horse APA or otherwise in form and substance satisfactory to each of the Administrative Agent and the DIP ABL Agent.

"**Bidding Procedures Order**" shall mean the orders of the Bankruptcy Court and  the CCAA Court approving the Bidding Procedures and the Bidding Procedures Motion, in substantially the form attached as Exhibit A-1 to the Stalking Horse APA or otherwise in form and substance satisfactory to each of the Administrative Agent and the DIP ABL Agent.

"**Bidding Procedures Motion**" shall mean the motions filed with the Bankruptcy Court and the CCAA Court seeking approval of the Bidding Procedures, which motions shall be in form and substance satisfactory to the Administrative Agent and the DIP ABL Agent (together with all exhibits thereto), (i) seeking approval of (A) the Stalking Horse Transaction and the Stalking Horse APA and (B) the Bidding Procedures and the scheduling of certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief.

"**Board of Directors**" shall mean (a) in the case of a Person that is a limited partnership, the board of directors (or comparable managers) of the general partner of such Person, or (b) otherwise, the board of directors (or comparable managers) of a Person or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"**Borrower**" shall have the meaning provided in the preamble of this Agreement.

"**Borrowing**" shall mean the borrowing of one type of Term Loans from all the Lenders having Commitments in respect of such Term Loans on a given date (or resulting from a conversion or conversions on such date) having, in the case of Eurodollar Rate Loans, the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 2.09(b) shall be considered part of the related Borrowing of Eurodollar Rate Loans.

"**Brookfield**" shall mean Brookfield Principal Credit LLC, a Delaware limited liability company.

"**Budget Delivery Date**" shall have the meaning provided in Section 7.01(f)(i).

"**Budget Variance Report**" shall mean a variance report in form reasonably satisfactory to the Administrative Agent setting forth in each case for the Testing Period most recently ended prior to the delivery thereof (i) any variances (whether positive or negative) of actual total operating receipts or total operating expenses of the Credit Parties and their Subsidiaries from the Approved Budget for such Testing Period and (ii) an explanation, in reasonable detail, for any variances (other than Permitted Variances) certified by an Authorized Officer of Holdings.

"**Business Day**" shall mean (a) for all purposes other than as covered by clause (b) below, any day except Saturday, Sunday and any day which shall be in New York, New York a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Term Loans, any day which is a Business Day described in clause (a) above and which is also a day for trading by and between banks in U.S. dollar deposits in the interbank Eurodollar market.

"**Canadian Anti-Money Laundering & Anti-Terrorism Legislation**" shall mean the Criminal Code, R.S.C. 1985, c. C-46, The Proceeds of Crime (Money Laundering) and Terrorist Financing Act, S.C. 2000, c. 17 and the United Nations Act, R.S.C. 1985, c. U-2 or any similar Canadian legislation applicable to a Credit Party and its Subsidiaries, together with all rules, regulations and interpretations thereunder or related thereto including the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations promulgated under the United Nations Act.

"**Canadian Bankruptcy and Insolvency Law**" shall mean any federal or provincial Canadian law from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors, including the BIA, the CCAA, the *Winding up and Restructuring Act* (Canada), the *Canada Business Corporations Act*, the *Companies Act* (Nova Scotia) and any other applicable corporations legislation.

"**Canadian Credit Parties**" shall mean, collectively, each Canadian Guarantor; each sometimes being referred to individually as a "**Canadian Credit Party**".

"**Canadian Defined Benefit Pension Plan**" shall mean any Canadian Pension Plan which contains a "**defined benefit provision**", as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"**Canadian Employee**" shall mean any employee or former employee of a Canadian Credit Party.

"**Canadian Employee Benefits Legislation**" shall mean, in respect of any Canadian Employee Plan or any Canadian Pension Plan, all applicable Laws applicable to or binding on such Canadian Employee Plan or Canadian Pension Plan, as applicable, or any of its property or assets or to which such Canadian Employee Plan or Canadian Pension Plan, as applicable, or any of its property or assets is subject, including for greater certainty, the Income Tax Act (Canada), the Pension Benefits Act (New Brunswick), and the Pension Benefits Act (Ontario), in each case, as applicable and as amended from time to time.

"**Canadian Employee Plan**" shall mean any employee benefit, health, welfare, supplemental unemployment benefit, bonus, pension, supplemental pension, profit sharing, retiring allowance, severance, deferred compensation, stock compensation, stock purchase, unit purchase, retirement, life, hospitalization insurance, medical, dental, disability or other employee group or similar benefit or employment plans or supplemental arrangements applicable to the Canadian Employees, but excluding any Canadian Pension Plan and any statutory benefit plans in which a Canadian Credit Party is required to participate or with which a Canadian Credit Party is required to comply.

"**Canadian Guarantors**" shall mean, collectively, each Guarantor that is organized under the laws of Canada or a province of Canada; each sometimes being referred to individually as a "**Canadian Guarantor**".

"**Canadian Pension Event**" shall mean the occurrence of any one or more of the following events:

(a)     failure to satisfy any funding obligations to the pension fund of any Canadian Pension Plan from a Canadian Credit Party;

(b)     prohibited withdrawal or application of the assets of the Canadian Pension Plans by any Canadian Credit Party;

(c)    the occurrence of any event which could reasonably be expected to give rise to a partial or full termination of any Canadian Defined Benefit Pension Plan;

(d)    the occurrence of any event which triggers immediate or accelerated funding in respect of any Canadian Defined Benefit Pension Plan;

(e)    the Board of Directors of any Credit Party passes a resolution to terminate or windup in whole or in part any Canadian Defined Benefit Pension Plan or any Credit Party otherwise initiates any action or filing to voluntarily terminate or wind-up in whole or in part any Canadian Defined Benefit Pension Plan;

(f)    the institution of proceedings by any Governmental Authority to terminate in whole or in part any Canadian Defined Benefit Pension Plan, including notice being given by the Ontario Superintendent of Financial Services, the New Brunswick Superintendent of Pensions or another Governmental Authority that it intends to proceed to wind-up in whole or in part a Canadian Defined Benefit Pension Plan;

(g)    the receipt by any Credit Party or correspondence from any Governmental Authority related to the likely wind-up or termination (in whole or in part) of any Canadian Defined Benefit Pension Plan;

(h)    the wind-up or partial wind-up of a Canadian Defined Benefit Pension Plan; or

(i)    a Lien arises in connection with a Canadian Pension Plan (other than for contribution amounts not yet due).

"**Canadian Pension Plan**" shall mean any pension plan required to be registered under the *Income Tax Act* (Canada) or any Canadian federal or provincial law and or contributed to by a Canadian Credit Party for its Canadian Employees or former Canadian Employees, including any pension benefit plan within the meaning of the *Pension Benefits Act* (New Brunswick) or the *Pension Benefits Act* (Ontario) but does not include the Canada Pension Plan maintained by the Government of Canada.

"**Canadian Security Agreement**" shall have the meaning provided in Section 5.01(g).

"**Canadian Subsidiary**" shall mean any Subsidiary organized under the federal laws of Canada (or any province or territory thereof) and any Subsidiary thereof.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.  Notwithstanding the foregoing, as provided in Section 1.02(b) for purposes of this Agreement the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP (as in effect on the Prepetition Closing Date).

"**Cash Collateral**" shall have the meaning provided in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or Canada or issued by any agency thereof and backed by the full faith and credit of the United States or Canada, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state, or any province of Canada, or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating from either S&P or Moody's, (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank, or any bank listed on Schedule I of the Bank Act (Canada), having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof, or the federal laws of Canada, so long as the amount maintained with any such other bank is less than or equal to $250,000 and is insured by the Federal Deposit Insurance Corporation or the Canadian Deposit Insurance Corporation, as the case may be, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than 30 days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above and (i) shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all of the investments which are one or more of the types of assets described in clauses (a) through (g) above.

"**Carve-Out**" shall have the meaning provided in the Interim Order or the Final Order, as applicable.

"**Case**" and "**Cases**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA**" shall mean the *Companies' Creditors Arrangement Act* (Canada), R.S.C 1985, c. C-36.

"**CCAA A&R Initial Order**" shall mean the CCAA Initial Order as amended and restated by the CCAA Court at the hearing of the CCAA Comeback Motion to: (i) approve service and/or substitute service on all secured creditors of the CCAA Debtors likely to be affected by the CCAA DIP Charge; and (ii) provide for the full priming of the CCAA DIP Charge on all of the Collateral of the CCAA Debtors on the terms contemplated thereby.

"**CCAA A&R Initial Order Entry Date**" shall mean the date on which the CCAA A&R Initial Order is entered with the CCAA Court.

"**CCAA Approval and Vesting Order**" shall mean a final non-appealable order of the CCAA Court, in form and substance reasonably acceptable to each of the Administrative Agent and the DIP ABL Agent approving (i) the Stalking Horse Transaction on the terms set forth in the Stalking Horse APA or (ii) another sale pursuant to the Bidding Procedures Order of substantially all of the assets of the Debtors and the CCAA Debtors.

"**CCAA Case**" and "**CCAA Cases**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA Court**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA Debtor**" and "**CCAA Debtors**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA DIP Charge**" shall mean a super-priority priming charge granted by the CCAA Court on all of the Collateral of the CCAA Debtors.

"**CCAA Filing Date**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA Comeback Motion**" shall mean the motion seeking the CCAA A&R Initial Order to be heard by the CCAA Court not later than ten (10) days following the entry of the CCAA Initial Order, which motion shall be served by the CCAA Debtors on the service list established in the CCAA Cases, all secured creditors of the CCAA Debtors and any other Person as may be requested by the Administrative Agent.

"**CCAA Initial Order**" shall mean an order of the CCAA Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance satisfactory to the Administrative Agent, which order shall, among other things, authorize the Credit Documents and the DIP ABL Credit Documents to which any CCAA Debtor is a party and the Transactions contemplated by this Agreement and grant the CCAA DIP Charge, with only such modifications as are satisfactory to the Administrative Agent, in its sole discretion.

"**CCAA Initial Order Date**" means the date on which the CCAA Initial Order is entered with the CCAA Court.

"**CCAA Orders**" means the CCAA Initial Order and the CCAA A&R Initial Order, as applicable.

"**CCAA Monitor**" means the monitor appointed by the CCAA Court pursuant to the CCAA Initial Order.

"**Change in Law**" shall have the meaning given to it in <u>Section 9.06</u>.

"**Change of Control**" shall mean that (a) at any time, Permitted Holders fail to own and control, directly or indirectly, more than 50%, on a fully diluted basis, of the Equity Interests of Holdings having the right to vote for the election of members of its Board of Directors, (b) Holdings ceases to own, directly or indirectly, 100% of the Equity Interests of the Borrower or

(c) a "Change of Control" (or any comparable term or provision) under or with respect to the DIP ABL Credit Agreement, the Prepetition Term Loan Agreement, any Restricted Debt Document or any Preferred Equity that is not Qualified Preferred Equity shall have occurred.

"**CIP Regulations**" shall have the meaning given to it in Section 10.13(a).

"**Civil Cases**" shall mean any and all cases that are currently pending and/or that will be brought in the future against Bumble Bee Foods, LLC and/or its Affiliates in any and all courts within the United States, or any other country, with respect to price-fixing or otherwise arising out of or related, but not limited, to the allegations in the following complaints: In re Packaged Sea Food Antitrust Litigation, Case No. 3:15-md-02670 (JLS)(MDD); The Kroger Co., et al v. Bumble Bee Foods, LLC, et al, Case No. 16-cv-0051 (JSS)(MDD); Wegmans Food Markets, Inc. v. Bumble Bee Foods, LLC, et al, Case No. 3:16cv0264 (JLS)(MDD); Wal-Mart Stores, Inc. v. Bumble Bee Foods, LLC, et al, Case No. 16-CV-2821 (JLS)(MDD); Affiliated Foods, Inc.; Affiliated Foods Midwest Cooperative, Inc.; Alex Lee, Inc.; Associated Food Stores, Inc.; Associated Grocers of New England, Inc.; Associated Grocers, Inc.; Big Y Foods, Inc.; Brookshire Brothers, Inc.; Brookshire Grocery Company; Certco, Inc.; Dollar Tree Distribution, Inc.; Greenbrier International, Inc.; Family Dollar Stores, Inc.; Family Dollar Services, LLC; Fareway Stores, Inc.; The Golub Corporation; Giant Eagle Inc.; Kmart Corporation; KVA-T Food Stores, Inc.; McLane Company, Inc.; Meadowbrook Meat Company, Inc.; Merchants Distributors, LLC; Schnuck Markets, Inc.; Unified Grocers, Inc.; URM Stores Inc.; Western Family Foods, Inc.; and Woodman's Food Market, Inc. v. Tri-Union Seafoods, LLC, d/b/a Chicken of the Sea International; Thai Union Group Public Company, LTD.; Bumble Bee Foods, LLC, f/k/a Bumble Bee Seafoods, LLC, Starkist Co.; Del Monte Corporation; and Dongwon Industries Co., Ltd., Case No. 15-cv-2670(JLS)(MDD); Target Corporation v. Bumble Bee Foods, LLC, Starkist Company, Dongwon Industries Co. LTD, Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Group PLC, Case No.17-cv-02024; CVS Pharmacy, Inc. v. Bumble Bee Foods LLC, et al., 3:17-cv-02145 (JLS)(MDD); Associated Wholesale Grocers, Inc. v. Bumble Bee Foods LLC, et al., 3:18-cv-01014 (JLS)(MDD); Bashas' Inc., et al. v. Tri-Union Seafoods, LLC, et al., 3:17-cv-02487; Dollar General Corporation, et al. v. Bumble Bee Foods LLC et al., 3:17-cv-1744 (JLS)(MDD); Krasdale Foods, Inc. v. Bumble Bee Foods LLC, et al., Case No. 3:17-cv-1748 (JLS)(MDD); Meijer, Inc. and Meijer Distribution, Inc. v. Bumble Bee Foods, et al., 13:6-cv-0398(JLS)(MDD); Moran Foods, LLC v. Bumble Bee Foods LLC, et al., Case 3:17-cv-1745-(JLS)(MDD); Publix Super Markets, Inc. et al. v. Bumble Bee Foods LLC, et al., 3:16-cv-00247 (JLS)(MDD); Super Store Industries v. Bumble Bee Foods LLC et al., 3:17-cv-0950 (JLS)(MDD); SuperValu Inc., et al. v. Bumble Bee Foods LLC, et al., 3:17-cv-0951 (JLS)(MDD); W. Lee Flowers & Co., Inc. v. Bumble Bee Foods, LLC; et al, 3:16-cv-01226 (JLS); Winn-Dixie Stores, Inc. v. Bumble Bee Foods LLC, et al., 3:16-cv-00017(JLS)(MDD); and Vanessa Lilleyman v. Bumble Bee Foods, LLC et al (Ontario, Canada), Case No. CV-17-58510800CP.

"**Closing Date**" shall mean the date (which shall be a Business Day) on which each of the conditions in Section 5.01 is satisfied (or waived in accordance with Section 11.11) and the initial Borrowing occurs.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time. Section references to the Code are to the Code, as in effect at the date of this Agreement and any

subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Collateral**" shall mean all "DIP Collateral" (or equivalent term) as defined in the Interim Order (and, when entered, the Final Order), all "Property" (or equivalent term) as defined in the CCAA Initial Order (and, when entered, the CCAA A&R Initial Order) and all "Collateral" (or equivalent term) as defined in any Security Document and shall include the DIP Term Funding Account and any and all amounts held in such account and all proceeds thereof; provided that Collateral shall not include Excluded Assets.

"**Commitment**" shall mean, individually or collectively, as the context may require, the Initial Commitment or the Delayed Draw Commitment. The aggregate amount of the Commitments as of the Closing Date is $80,000,000, as set forth on Schedule 1.01.

"**Committee**" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1et seq.), as amended from time to time, and any successor statute.

"**Company**" shall mean any company, corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"**Company Compliance Program**" shall mean the corporate and regulatory compliance program maintained by Bumble Bee Foods, LLC as of the Closing Date.

"**Company Product**" shall have the meaning given to it in Section 6.25(a).

"**Compliance Program**" shall mean any compliance program required by the Plea Agreement or the United States or any other Governmental Authority in connection with or related to the Plea Agreement.

"**Connection Income Taxes**" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of

such primary obligation or (d) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Controlled Investment Affiliate**" shall mean, as to any Person, any other Person which (i) directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and is organized by such Person (or any Person Controlling such Person) primarily for making equity or debt investments in Holdings or other portfolio companies or (ii) is obligated pursuant to a commitment agreement to invest its capital as directed by such Person.

"**Court**" shall mean the U.S. District Court for the Northern District of California.

"**Credit Documents**" shall mean this Agreement, the Orders, the Term Notes, if any, the Security Documents, the Intercreditor Agreement, and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Credit Party for the benefit of the Administrative Agent or any Lender in connection herewith on or after the date hereof, including all letters for the payments of fees, guaranties and collateral documents.

"**Credit Event**" shall mean the making of the Term Loans or any other extensions of credit hereunder.

"**Credit Party**" shall mean each of Holdings, the Borrower and each other Guarantor.

"**Currency Due**" shall have the meaning provided for in Section 11.07.

"**Debtor**" and "**Debtors**" shall have the meaning provided in the recitals to this Agreement.

"**Default**" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"**Delayed Draw Borrowing Date**" shall mean the date on which the Delayed Draw Term Loan is made, which shall be no earlier than the later of (i) the Final Order Entry Date and (ii) the CCAA A&R Initial Order Date.

"**Delayed Draw Commitment**" means, with respect to each Lender, the commitment of such Lender to make the Delayed Draw Term Loan to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 1.01, as

applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of the Lenders' Delayed Draw Commitments on the Closing Date is $40,000,000.

"**Delayed Draw Term Loan**" shall have the meaning provided for in Section 2.01.

"**Deposit Account**" shall mean any deposit account (as that term is defined in the UCC).

"**DIP ABL Agent**" shall mean Wells Fargo Capital Finance, LLC or any successor thereto under the DIP ABL Credit Agreement.

"**DIP ABL Credit Agreement**" shall mean that certain debtor-in-possession credit agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time), by and among Bumble Bee Foods, LLC, as the borrower, the DIP ABL Agent, the lenders and other parties from time to time party thereto.

"**DIP ABL Credit Documents**" shall mean Loan Documents (as defined in the DIP ABL Credit Agreement).

"**DIP ABL Credit Facility**" shall have the meaning provided in the recitals of this Agreement.

"**DIP Budget**" means a budget delivered on or prior to the Closing Date and updated from time to time as set forth in Section 7.01(f), setting forth on a weekly basis for (x) the applicable 13-week period or (y) the period until the projected closing of the 363 Sale, whichever is shorter, among other things, the projected total operating receipts and total operating expenses of, and the projected professional fees to be paid by, the Credit Parties and their Subsidiaries during such period.

"**DIP Facilities**" shall have the meaning provided in the recitals of this Agreement.

"**DIP Superpriority Claim**" shall have the meaning assigned to such term in the Interim Order (or the Final Order, when applicable).

"**DIP Term Facility**" shall have the meaning provided in the recitals of this Agreement.

"**DIP Term Funding Account**" shall mean the segregated Deposit Account to be established in the name of the Borrower at a financial institution satisfactory to the Administrative Agent and subject to an account control agreement providing for "day 1" control in favor of the Administrative Agent in form and substance reasonably satisfactory to the Administrative Agent into which the proceeds of the Delayed Draw Term Loans are to be deposited; it being acknowledged and agreed that the funds in such account shall only be made available to the Borrower in accordance with the terms and conditions set forth in Section 2.13.

"**DIP Term Funding Withdrawal Notice**" shall have the meaning provided in Section 2.13.

"**Disclosure Statement**" shall have the meaning provided in Section 7.18(g).

"**Disqualified Lender**" shall mean any Person that is a competitor of Holdings or any of its Subsidiaries (or an Affiliate of such competitor) designated by Holdings as a "Disqualified Lender" by written notice delivered to the Administrative Agent prior to the date hereof; provided that "Disqualified Lender" shall exclude any Person that Holdings has designated as no longer being a "Disqualified Lender" by written notice delivered to the Administrative Agent from time to time; provided, further that, no Affiliate of a competitor shall include any Affiliate of such competitor that is a bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans or bonds and/or similar extensions of credit in the ordinary course of business. The list of Disqualified Lenders shall be made available to any Lender upon written request to the Administrative Agent. In no event shall a supplement to the list of Disqualified Lenders apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest in the Term Loans that was otherwise permitted prior to such permitted supplementation.

"**Dividend**" shall mean, with respect to any Person, the payment of a dividend, distribution or return on any equity capital to its stockholders, shareholders, partners or members or the making of any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, partners or members in their capacity as such, or the redemption, retirement, purchase or other acquisition, directly or indirectly, for consideration (other than common Equity Interests of such Person) of any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests of such Person) or the purchase or other acquisition for consideration (other than common Equity Interests of such Person) of any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" and the sign "**$**" shall each mean freely transferable lawful money of the United States.

"**Domestic Credit Party**" shall mean any Credit Party incorporated or organized in the United States or any State or territory thereof or the District of Columbia.

"**Domestic Subsidiary**" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State or territory thereof or the District of Columbia.

"**EEA Financial Institution**" shall mean (a) any bank, investment firm or other financial institution or affiliate or a bank, investment firm or other financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which

is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Transferee**" shall mean and include a commercial bank, pension fund, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding (a) Holdings and its Subsidiaries and any of their respective Affiliates, and (b) any Disqualified Lenders.

"**Embargoed Person**" shall mean (a) any country or territory that is the target of a comprehensive sanctions program administered by the U.S. Government, including the Treasury Department's Office of Foreign Assets Control ("**OFAC**"); the United Nations Security Council; the European Union, including any Member State of the European Union; Her Majesty's Treasury; or the Government of Canada (collectively, "**Sanctions Authorities**") (for the avoidance of doubt, such countries or territories as of the date of this Agreement include Cuba, Iran, North Korea, Syria, Sudan, and the Crimea Region of Ukraine) or (b) any Person that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC or is otherwise currently the target of any sanctions maintained by any Sanctions Authority or (ii) resides, is organized or chartered in a country or territory that is the target of a comprehensive sanctions program administered by any Sanctions Authority.

"**Environmental Claims**" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, written notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any Environmental Permit issued, or any approval given, under any such Environmental Law, including (a) any and all claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"**Environmental Law**" shall mean, to the extent applicable to Holdings or any Subsidiary, any laws, common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders and enforceable policies, guidelines or similar requirements of all Governmental Authorities, now or hereafter in effect, and any legally binding judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment and relating to the protection of the environment, natural resources, sustainability or human health and safety as it relates to exposure to Hazardous

Materials or hazardous environmental conditions but excluding for the avoidance of doubt any Food Safety Laws.

"**Environmental Permit**" shall mean any approval, authorization, consent, license, permit or certificate of a Governmental Authority required under Environmental Law.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each member of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with Holdings, or a Subsidiary of Holdings, would be deemed to be a "single employer" within the meaning of Section 414 of the Code.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurodollar Rate**" shall mean, for any Interest Period with respect to a Term Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal to such Interest Period commencing on the first day of such Interest Period as published by Bloomberg (or, in the event such rate is not published by Bloomberg, from another commercially available source providing quotations of LIBOR as designated by the Administrative Agent from time to time), in each case, the "**Screen Rate**") as of 11:00 A.M., London, England time, two (2) Business Days prior to the first day of such Interest Period; provided, that if the Screen Rate shall not be available for such Interest Period (an "**Impacted Interest Period**"), then the Eurodollar Rate shall be the Interpolated Rate at such time; provided, further, that if the Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement; provided, further, that the Eurodollar Rate with respect to Eurodollar Rate Loans that bear interest at a rate based on this definition will not be deemed to be less than 1.00% per annum. "**Interpolated Rate**" shall mean, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available in Dollars) that exceeds the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate shall be less than zero, such rate shall be deemed to be zero

for purposes of this Agreement.  Additionally, the Eurodollar Rate shall be subject to any reserve percentage prescribed by any Governmental Authority.

"**Eurodollar Rate Loan**" shall mean a Term Loan that bears interest based on the Eurodollar Rate.

"**Event of Default**" shall have the meaning provided in <u>Section 9</u>.

"**Exchange Rate**" shall mean, on any day with respect to any currency, the rate at which such currency may be exchanged into any other currency (including Dollars), as published in *The Wall Street Journal (Eastern Edition)* on such day for such currency.  In the event that such rate does not appear on *The Wall Street Journal (Eastern Edition)*, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m., local time, on such date for the purchase of the relevant currency for delivery two (2) Business Days later.

"**Excluded Accounts**" shall mean (a) any Deposit Account or Securities Account that is used exclusively for trust, fiduciary or escrow payments, tax payments, payroll, payroll taxes or other employee wage and benefit payments to or for the employees of the Credit Parties, (b) zero balance accounts, or (c) accounts with a balance not to exceed $25,000 at any one time.

"**Excluded Assets**" shall have the meaning specified therefor in the Security Agreements, as applicable.

"**Excluded Stock**" shall mean (a) Equity Interests to the extent the pledge thereof would be prohibited or limited by any applicable Law existing on the Closing Date, the date such Equity Interests are acquired by the Borrower or any other Guarantor, or the date the issuer of such Equity Interests is created (excluding any prohibition or limitation that is ineffective under the UCC) and (b) Equity Interests of a Person (other than a Wholly-Owned Subsidiary) the pledge of which would violate a contractual obligation to the owners of the other Equity Interests of such Person (other than any such owners that are Affiliates of Holdings) that is binding on or relating to such Equity Interests.  For the avoidance of doubt, the Equity Interests of the Borrower shall not be considered as "**Excluded Stock**".

"**Excluded Subsidiary**" shall mean:

(a)    any Subsidiary that is not a Wholly-Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of <u>Section 8.14</u> (for so long as such Subsidiary remains a Non-Wholly Owned Subsidiary) other than a Subsidiary that is a Non-Wholly Owned Subsidiary if such Non-Wholly Owned Subsidiary guarantees or issues other capital markets debt securities of the Borrower or any other Guarantor;

(b)    any Subsidiary of Holdings that is prohibited by any applicable law, rule or regulation or contractual obligation existing at the time such Subsidiary becomes a Subsidiary of Holdings from guaranteeing the Obligations (and for so long as such restrictions are in effect) or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guaranty unless such consent, approval, license or authorization has been received (or is received after commercially reasonable efforts to obtain such consent, approval, license or authorization, which efforts may be requested by the Administrative Agent); and

(c)    the Subsidiaries set forth on Schedule 1.01B.

"**Excluded Taxes**" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes or any Canadian withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or Commitment or in this Agreement or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 4.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 4.04(c) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exit Fee**" shall have the meaning provided in Section 3.01(b).

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller, would agree to purchase and sell such asset, having regard to the nature and characteristics of such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer of Holdings, or the Subsidiary of Holdings that owns such asset.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing and any law or regulation adopted pursuant to or implementing any such intergovernmental agreement.

01:25621776.1

18

"**FCF Supply Agreement**" shall mean that certain Tuna Supply Agreement, dated as of June 17, 2003 (as amended, restated, amended and restated, supplemented, extended, replaced, or otherwise modified from time to time), by and between FCF Fishery Co. Ltd., a Taiwanese company, and Bumble Bee Foods, LLC, a Delaware limited liability company (f.k.a. Bumble Bee Seafoods, LLC).

"**FCPA**" shall mean the U.S. Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-1, et seq.

"**Federal Funds Rate**" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent; provided, that the Federal Funds Rate, if negative, shall be deemed to be 0.00%.

"**Federal Reserve Board**" shall mean the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**Fee Letter**" shall mean that certain Fee Letter, dated as of November [●], 2019, by and between the Borrower and the Administrative Agent.

"**Final Order**" shall mean an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Credit Documents, the DIP ABL Credit Documents to which any Debtor is a party and the Transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are reasonably satisfactory to the Administrative Agent) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Administrative Agent, in its sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Flood Laws**" shall mean all applicable laws and regulations relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other applicable laws related thereto.

"**Food Safety Laws**" shall mean, collectively, to the extent applicable to Holdings or any Subsidiary, (i) the Federal Food, Drug and Cosmetic Act, as amended, 21 U.S.C. §301 et seq., (ii) Laws, regulations and guidances promulgated and enforced by the U.S. Food and Drug Administration, the U.S. Department of Agriculture; the Canadian Food Inspection Agency, the Minister of Health (Canada) and the Minister of Agriculture and Agri-Food (Canada), (iii) the United States Tuna Foundation/National Marine Fisheries Service Test Lot Protocol; (iv) the

United States Department of Commerce Seafood Inspection Program applicable procedures for canned/pouch tuna inspection and certification; (v) the Fish Inspection Act (Canada), (vi) all other federal, national, state, provincial, territorial and foreign Laws governing the growing, harvesting, manufacturing, testing, processing, storing, shipping, packaging, labeling, marketing, selling, holding and/or distribution of food products.

"**Foreign Credit Party**" shall mean any Credit Party that is not a Domestic Credit Party.

"**Foreign Subsidiary**" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes hereof, including defined terms as used herein, are subject (to the extent provided therein) to Section 1.02.

"**Government Official**" shall mean any officer or employee of a Governmental Authority or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Authority or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof.

"**Governmental Authority**" shall mean the government of the United States of America, Canada, Luxembourg, or any other nation or any political subdivision of any of the foregoing, whether state, provincial, territorial or local, and any agency, authority, instrumentality, regulatory body, court (including the Bankruptcy Court and the CCAA Court), central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantor**" shall mean Holdings, each Subsidiary Guarantor (other than, for the avoidance of doubt, any Excluded Subsidiary) and, other than with respect to its own obligations, the Borrower.

"**Guaranty**" shall have the meaning provided in Section 5.01(f).

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials, wastes or substances defined or characterized as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations.

"**Hedge Agreement**" shall mean a "**swap agreement**" as the term is defined in Section 101(53B)(A) of the Bankruptcy Code between the Borrower and its Subsidiaries and any other Person.

"**Holdings**" shall have the meaning provided in the preamble of this Agreement.

"**Holdings Equity Interests**" shall have the meaning provided in <u>Section 6.13</u>.

"**Impacted Interest Period**" shall have the meaning provided in the definition of "**Eurodollar Rate**".

"**Indebtedness**" shall mean, as to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) the maximum amount available to be drawn or paid (to the extent not cash collateralized) under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (c) all indebtedness of the types described in <u>clauses (a)</u>, <u>(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(i)</u> of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (<u>provided</u> that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of the aggregate amount of the obligations so secured and the Fair Market Value of the property to which such Lien relates), (d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person to pay a specified purchase price for goods, services, or assets, whether or not delivered, accepted or consummated (i.e., take-or-pay and similar obligations), (f) all Contingent Obligations of such Person, (g) all obligations under any Hedge Agreement or under any similar type of agreement (which amount shall be calculated based on the amount that would be payable by such Person if such agreement were terminated on the date of determination), (h) contingent cash purchase price, earn-out and other similar obligations of such Person to the extent any such amounts are required to be classified as a liability in accordance with GAAP, and (i) all Attributable Indebtedness of such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include (i) trade payables, accrued expenses and deferred tax and other credits incurred by any Person made in the ordinary course of business of such Person, (ii) [reserved], (iii) prepaid or deferred revenue arising in the ordinary course of business, (iv) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warrants or other unperformed obligations of the seller of such asset and (v) lease liabilities in respect of operating leases under Accounting Standard Codification 842. In addition, for purposes of this definition the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing person may be liable pursuant to the terms of the instrument embodying such Indebtedness.

"**Indemnified Person**" shall have the meaning provided in <u>Section 11.01(a)</u>.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Initial Commitment**" means, with respect to each Lender, the commitment of such Lender to make the Initial Term Loan to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on <u>Schedule 1.01</u>. The aggregate amount of the Lenders' Initial Commitments on the Closing Date is $40,000,000.

"**Initial DIP Budget**" shall mean the DIP Budget delivered on or prior to the Closing Date.

"**Initial Term Loan**" shall have the meaning provided in <u>Section 2.01</u>.

"**Insolvency Regulation**" shall mean Regulation (EU) No 2015/848 of the European Parliament and of the Council of 20 May 2015 on insolvency proceedings (recast), as amended.

"**Intellectual Property**" shall have the meaning provided in <u>Section 6.20</u>.

"**Intercompany Debt**" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by Holdings or any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings.

"**Intercompany Loans**" shall have the meaning provided in <u>Section 8.05(h)</u>.

"**Intercompany Subordination Agreement**" shall mean the intercompany subordination agreement substantially in the form of <u>Exhibit J</u> (or such other form as shall be reasonably satisfactory to the Administrative Agent).

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement, dated as of November [●], 2019, among the Administrative Agent, the DIP ABL Agent, the Prepetition Term Agent, the Prepetition ABL Agent and the Credit Parties, as may be amended, restated, modified or replaced in accordance with its terms.

"**Interest Determination Date**" shall mean the second Business Day prior to the commencement of any Interest Period.

"**Interest Payment Date**" shall have the meaning provided in <u>Section 2.07(c)</u>.

"**Interest Period**" shall have the meaning provided in <u>Section 2.08</u>.

"**Interim Order**" means an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in the form set forth in <u>Exhibit L</u>, authorizing on an interim basis, among other things, the Credit Documents and the DIP ABL Credit Documents to which any Debtor is a party and

the Transactions contemplated by this Agreement, with only such modifications as are satisfactory to the Administrative Agent, in its sole discretion.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Interpolated Rate**" shall have the meaning provided in the definition of "**Eurodollar Rate**".

"**Investment**" shall mean, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivables arising in the ordinary course of business consistent with past practice), or acquisitions of Indebtedness, Equity Interests, or assets of such other Person (or of any division or business line of such other Person).  For purposes of covenant compliance, the amount of any Investment shall be equal to the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investments, minus any subsequent Dividend, distribution, interest payment, return of capital, repayment or other amount received in respect of such Investment by the Person making such Investment.

"**Judgment Currency**" shall have the meaning provided in Section 11.07.

"**KEIP/KERP Amount**" shall mean, as of any date of determination, the total amount set forth under the line item for "KEIP/KERP/MIP/SIP" in the then-applicable Approved Budget.

"**Law**" shall mean laws (including the Bankruptcy Code and any rules, regulations or orders relating thereto), common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders, rulings, decisions and enforceable policies, guidelines or similar requirements of all Governmental Authorities.

"**Leaseholds**" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"**Lender**" shall mean each institution listed on the Register maintained by the Administrative Agent pursuant to Section 11.14 as well as any Person that becomes a "Lender" hereunder pursuant to Section 11.04(b), as evidenced in such Register.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC, the PPSA, or any other similar recording or notice statute and any lease having substantially the same effect as any of the foregoing.

"**Litigation Spend**" shall have the meaning provided in Section 8.19.

"**Loan**" shall mean any Term Loan.

"**Luxembourg**" shall mean the Grand Duchy of Luxembourg.

"**Luxembourg Share Pledge**" shall have the meaning given to it in <u>Section 5.01(e)</u>.

"**Margin Stock**" shall have the meaning provided in Regulation U.

"**Market Disruption Event**" shall have the meaning given to it in <u>Section 2.09(a)(iii)</u>.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, operations, assets, liabilities or condition (financial or otherwise) of the Borrower, Holdings and its Subsidiaries (taken as a whole), in each case except as a result of the commencement of the Cases or the CCAA Cases, or (b) a material adverse effect on (i) the legality, validity or enforceability of the Credit Documents, (ii) the ability of the Credit Parties (taken as a whole) to perform their payment obligations under the Credit Documents or (iii) the rights and remedies (taken as a whole) of the Administrative Agent and Lenders under the applicable Credit Documents.

"**Material Agreement**" shall mean (i) the FCF Supply Agreement and any other agreement or series of related agreements with a supplier under which, either individually or in the aggregate, in excess of 5.0% of the expenditures of Holdings and its Subsidiaries on a consolidated basis, as of the most recently ended consecutive four fiscal quarter period for which financial statements have been delivered pursuant to <u>Section 7.01(b)</u> or <u>(c)</u>, are procured and (ii) the Stalking Horse APA.

"**Material Indebtedness**" shall mean (x) any Indebtedness under the DIP ABL Credit Agreement or (y) any other Indebtedness, in the case of this <u>clause (y)</u>, having an aggregate principal amount in excess of $1,000,000.

"**Material Real Property**" shall mean any fee-owned Real Property (including any combination of tracts of land comprising the same operating facilities) with a fair market value in excess of $1,000,000 and the other Real Property designated by the Administrative Agent on the date hereof and identified on <u>Schedule 6.12(b)</u>.

"**Maturity Date**" shall mean the earliest of (a) the date that is six months after the Closing Date (or, if such date is not a Business Day, the immediately preceding Business Day), (b) the effective date of any plan for the reorganization of the Borrower or any other Debtor under Chapter 11 of the Bankruptcy Code, or any plan of compromise or arrangement of any CCAA Debtor under the CCAA or any other Canadian Bankruptcy and Insolvency Law, (c) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, or of all or substantially all of the assets of the CCAA Debtors pursuant to section 36 of the CCAA, (d) the date of acceleration of the Loans and the termination of any unused Commitments with respect to the DIP Term Facility in accordance with the terms of this Agreement upon and during the continuance of an Event of Default and (e) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed by the Required Lenders), unless both the Final Order Entry Date and the CCAA A&R Initial Order Date has occurred on or prior to such date.

"**Maximum Rate**" shall have the meaning provided in <u>Section 11.19</u>.

"**Milestones**" shall have the meaning provided in <u>Section 7.18</u>.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument.

"**Mortgage Policy**" shall mean a Lender's title insurance policy (Form 2006) or the equivalent title policy in any other applicable jurisdiction.

"**Mortgage Related Documents**" shall mean (a) Mortgage Policies in amounts reasonably satisfactory to the Administrative Agent assuring the Administrative Agent that the Mortgages on such Real Property Collateral are valid and enforceable first priority mortgage Liens on such Real Property Collateral free and clear of all defects and encumbrances except Permitted Liens, and the Mortgage Policies otherwise shall be in form and substance reasonably satisfactory to the Administrative Agent, together with endorsements (but excluding any creditor's rights endorsement or any other endorsement not available at commercially reasonable rates), coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent available in the applicable jurisdiction, (b) if any Real Property Collateral is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, evidence of such flood insurance as may be required under Applicable Law, including Regulation H, (c) land surveys, legal opinions of local counsel in the jurisdiction where such Real Property Collateral is located, and other documents that the Administrative Agent may reasonably request with respect to the Mortgages, in each case which are in form and substance reasonably satisfactory to the Administrative Agent; provided, that surveys shall not be required when title insurance provides survey coverage and legal opinions shall not be required in respect of title, and (d) as to all Material Real Property, flood determinations as required by Flood Laws, executed as required by Flood Laws.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**NAIC**" shall mean the National Association of Insurance Commissioners.

"**Narrative Report**" shall mean, collectively, in respect of any fiscal month, fiscal quarter or fiscal year of Holdings, (i) a narrative report of the material operational and financial developments as determined in good faith by management of the Borrower during such fiscal quarter or fiscal year, (ii) to the extent not prohibited by any contract with the provider of such data, IRI market share and pricing data, (iii) albacore and skipjack cost trends data, (iv) "EBITDA bridges" and (v) a working capital summary, including variance from the prior period, in each case, for such fiscal month, fiscal quarter or fiscal year.

"**Necessary Authorizations**" shall mean all material authorizations, consents, permits, approvals, waivers, licenses, and exemptions from, and all filings and registrations with, and all reports to, any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations, whether federal, provincial, territorial, state, local, and all agencies thereof, which are required for the transactions contemplated by the Credit Documents

and necessary to the conduct of the businesses and the ownership (or lease) of the properties and assets of the Credit Parties.

"**Net Cash Proceeds**" shall mean for any event requiring a repayment of Term Loans pursuant to Section 4.02 (other than Section 4.02(c) or (d)), as the case may be, the gross cash proceeds and Cash Equivalents (including any cash and Cash Equivalents received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received by a Person from such event, net of (i) reasonable transaction costs (including any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith) payable to third parties pursuant to such event, (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to such event (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Credit Party), (iii) taxes paid or reasonably estimated by Holdings and its Subsidiaries to be payable as a result thereof (after taking into account any available tax credits or deductions and any withholding taxes imposed on the repatriation of such proceeds) and (iv) in the case of a Recovery Event, amounts required to be applied to the repayment of any Indebtedness (including with respect to any Recovery Event in respect of any ABL Priority Collateral, only those cash proceeds required to be used to repay borrowings under the DIP ABL Credit Agreement) secured by a Lien that has priority over the Lien of the Administrative Agent on the asset subject to such Recovery Event (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or any other Credit Document and (B) Indebtedness assumed by the purchase of such asset).

"**Net Sale Proceeds**" shall mean for any sale, transfer or other disposition of assets, the gross cash proceeds and Cash Equivalents (including any cash and Cash Equivalents received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received by a Person from such sale, transfer or other disposition of assets, net of (a) reasonable transaction costs (including any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and payable to third parties and sales, VAT and transfer taxes arising therefrom), (b) the amount of such gross cash proceeds required to be used to repay any Indebtedness including with respect to any Asset Sale of any ABL Priority Collateral, or any Asset Sale of the Equity Interests of any Credit Party that owns any ABL Priority Collateral, those cash proceeds required to be used to repay the borrowings under Section 2.4(e)(i) of the DIP ABL Credit Agreement, but excluding Indebtedness of the Administrative Agent and the Lenders pursuant to this Agreement) which is secured by a Lien that has priority over the Lien of the Administrative Agent on the respective assets which were sold or otherwise disposed of and (c) taxes paid or reasonably estimated by Holdings and its Subsidiaries to be payable as a result thereof (after taking into account any available tax credits or deductions) and any withholding taxes imposed on the repatriation of such proceeds; provided, however, that such gross proceeds shall not include any portion of such gross cash proceeds  that are held in escrow and reserved for customary post-closing adjustments, but only to the extent Holdings determines in good faith that any such amounts held in escrow are not reasonably likely to be released to Holdings or any Subsidiary within 90 days of the date of determination (to the extent Holdings delivers to the Lenders a certificate signed by an Authorized Officer as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than six months

following the date of the respective asset sale) the amount of Net Sale Proceeds shall be adjusted (if required) to reflect the actual amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the actual post-closing adjustments payable by Holdings or any of its Subsidiaries.

"**Non-Wholly Owned Subsidiary**" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"**Notice of Borrowing**" shall have the meaning provided in <u>Section 2.02(a)</u>.

"**Notice of Conversion/Continuation**" shall have the meaning provided in <u>Section 2.06</u>.

"**Notice Office**" shall mean the office of the Administrative Agent located at 250 Vesey Street, 15th Floor, New York, NY 10281, Attention: Andrew Schmidt or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" shall mean advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Term Loans, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses and premiums (including any Exit Fee) that accrue after the commencement by or against any Credit Party of any proceeding under the Bankruptcy Code, Canadian Bankruptcy and Insolvency Law or any similar laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees and expenses are allowed claims in such proceeding.

"**OFAC**" shall have meaning set forth in the definition of "**Embargoed Person.**"

"**Orders**" means the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**Other Connection Taxes**" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Term Loan or Credit Document).

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Parent**" shall mean Bumble Bee Holdco S.C.A.

"**Participant Register**" shall have the meaning assigned to such term in <u>Section 11.04(e)</u>.

"**PATRIOT Act**" shall have the meaning provided in Section 5.01(m).

"**Payment Office**" shall mean the office of the Administrative Agent located at 250 Vesey Street, 15th Floor, New York, NY 10281 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Perfection Certificate**" shall have the meaning assigned to such term in the U.S. Security Agreement.

"**Permitted Encumbrance**" shall mean, with respect to any Material Real Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto all of which must be acceptable to the Administrative Agent in its reasonable discretion.

"**Permitted Expenditures Variances**" shall have the meaning provided in Section 7.20(b)(i).

"**Permitted Holders**" shall mean (a) the Sponsor, and (b) all Controlled Investment Affiliates of the Sponsor.

"**Permitted Liens**" shall have the meaning provided in Section 8.01.

"**Permitted Receipts Variances**" shall have the meaning provided in Section 7.20(b)(ii).

"**Permitted Variances**" shall have the meaning provided in Section 7.20(b).

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning provided in the recitals of this Agreement.

"**Plan**" shall mean any pension plan (other than a Multiemployer Plan) as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) Holdings, a Subsidiary of Holdings or an ERISA Affiliate.

"**Plea Agreement**" shall mean that certain Amended Plea Agreement, dated as of and in effect on August 2, 2017, between Bumble Bee Foods, LLC and the United States Department of Justice, together with any other amendments thereto, in each case, in form and substance satisfactory to the Administrative Agent.

"**PPSA**" shall mean the *Personal Property Security Act* (Ontario) or the *Personal Property Security Act* of any province to which relevant property is subject, or any other applicable federal or provincial statute (including the Civil Code of Quebec) pertaining to the granting, perfecting, priority or ranking of security interests, liens, hypothecs or personal property, and any successor statutes, together with any regulations thereunder, in each case as in

01:25621776.1

effect from time to time.  References to sections of the PPSA shall be construed to also refer to any successor sections.

"**Preferred Equity**", as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common Equity Interests of such Person) of any class or classes (however designed) that ranks prior, as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to shares of Equity Interests of any other class of such Person, and shall include any Qualified Preferred Equity.

"**Prepetition ABL Agent**" shall mean Wells Fargo Capital Finance, LLC or any successor thereto under that certain credit agreement, dated as of August 18, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**"), by and among the Borrower, the other borrowers party thereto, Wells Fargo Capital Finance, LLC, as administrative agent, the lenders and other parties from time to time party thereto.

"**Prepetition Term Agent**" shall mean Brookfield Principal Credit LLC, in its capacity as administrative agent or any successor thereto under the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Agreement**" shall mean that certain Term Loan Agreement, dated as of August 15, 2017 (as amended by that certain Amendment No. 1 and Limited Waiver Agreement, dated as of April 26, 2019, that certain Amendment No. 2 and Limited Waiver Agreement, dated as of July 10, 2019, that certain Limited Waiver and Waiver and Extension Agreement, dated as of August 21, 2019, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, *inter alios*, the Bumble Bee Holdings, Inc., Holdings, the Prepetition Term Agent and the lenders from time to time party thereto.

"**Prepetition Closing Date**" shall mean August 15, 2017.

"**primary obligations**" shall have the meaning provided in the definition of "**Contingent Obligations**".

"**primary obligor**" shall have the meaning provided in the definition of "**Contingent Obligations**".

"**Prime Rate**" shall have the meaning provided in the definition of "**Base Rate**".

"**Proceeding**" shall have the meaning given to it in Section 11.01(a).

"**Professional Fees Amount**" shall mean, as of any date of determination, (i) the total amount set forth under the line item for "Restructuring Professional Fee" in the then-applicable Approved Budget, as adjusted from time to time (but no less frequently than once a month, concurrently with the delivery of the DIP Budget pursuant to Section 7.01(f)) based on the applicable professionals' good faith estimates, subject to the cap on the professional fees incurred by the unsecured creditors' committee in the Interim Order or the Final Order, as applicable, *less* (ii) the aggregate amount of such fees that have already been paid or otherwise

discharged; provided that, at any time the aggregate principal amount of outstanding (1) Advances (under and as defined in the DIP ABL Credit Agreement and the Prepetition ABL Credit Agreement), (2) Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, and (3) undrawn Letters of Credit (under and as defined in the DIP ABL Credit Agreement) to the extent not covered under clause (II) of Section 8.04(n), exceeds (x) at any time on or prior to January 31, 2020, $170,000,000 and (y) at any time on or after February 1, 2020, $175,000,000, then the aggregate amount of professional fees paid by the incurrence of Advances under the DIP ABL Credit Agreement shall not reduce the Professional Fees Amount pursuant to this clause (ii), unless a corresponding amount is withdrawn from the DIP Term Funding Account in accordance with Section 2.13 and applied to repay the outstanding amounts under the DIP ABL Credit Agreement, *less* (iii) the aggregate amount deposited into the Carve-Out Reserve (as defined in the Interim Order or the Final Order, as applicable).

"**Projected Available Liquidity**" means, on any date, the amount of projected (a) Excess Availability (as defined in the DIP ABL Credit Agreement), subject to the limitations set forth in Section 8.04(n), and (b) unrestricted cash and Cash Equivalents of the Credit Parties and their Subsidiaries with respect to the applicable period as of such date, as set forth in the liquidity forecast delivered pursuant to Section 2.13.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Qualified Preferred Equity**" shall mean any Preferred Equity of Holdings so long as the terms of any such Preferred Equity (a) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision (other than in exchange for Qualified Preferred Equity and except as a result of a change of control or asset sale so long as any rights of holders thereof upon the occurrence of a change of control or asset sale shall be subject to the prior repayment in full of the Obligations) prior to the date that is six months following the Maturity Date, (b) do not require the cash payment of dividends or distributions that would otherwise be prohibited by the terms of this Agreement or any other Credit Document, (c) do not contain any covenants that are materially more restrictive than the terms of this Agreement, (d) do not grant the holders thereof any voting rights except for (i) voting rights required to be granted to such holders under applicable law and (ii) limited customary voting rights on fundamental matters such as mergers, amalgamations, arrangements, consolidations, sales of all or substantially all of the assets of Holdings, or liquidations involving Holdings, and (e) are otherwise reasonably satisfactory to the Administrative Agent.

"**Qualified Sale**" shall have the meaning provided in Section 2.13(g).

"**Quarterly Payment Date**" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"**RCS Law**" shall have the meaning provided in Section 5.01(c).

"**Real Property**" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"**Real Property Collateral**" shall mean the Material Real Property identified on Schedule 6.12(b) and any Material Real Property hereafter acquired by a Credit Party and required to be made subject to a Mortgage pursuant to the requirements of Section 7.12 or 8.14.

"**Recipient**" shall mean the Administrative Agent, any Lender or any other recipient of any payment by any Credit Party to be made by or on account of any obligation of any Credit Party hereunder.

"**Recovery Event**" shall mean the receipt by Holdings or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (a) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of Holdings or any of its Subsidiaries and (b) under any policy of insurance required to be maintained under Section 7.03.

"**Register**" shall have the meaning provided in Section 11.14.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Remedies Notice Period**" shall have the meaning provided in Section 9.

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30 day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"**Reporting Date**" shall have the meaning provided in Section 7.01(f).

"**Required Lenders**" shall mean, at any time, the Lenders the sum of whose outstanding Term Loans at such time represents at least a majority of the sum of all outstanding Term Loans of Lenders; provided that at any time there is more than one Lender (other than any Affiliate of such Lender), Required Lenders shall include at least two Lenders that are not Affiliates of each other.

"**Restricted Debt**" shall mean (i) any unsecured Indebtedness for borrowed money of Holdings and any of its Subsidiaries and (ii) any other Indebtedness for borrowed money of Holdings and any of its Subsidiaries incurred from time to time that is subordinated in right of payment to the Obligations.

"**Restricted Debt Documents**" shall mean all documents, agreements or instruments executed and delivered with respect to any Restricted Debt.

"**Restricted Payments**" shall have the meaning given to it in Section 8.03.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement dated as of July 10, 2019, executed and delivered by certain Credit Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.[1]

"**Returns**" shall have the meaning provided in Section 6.09.

"**RSA Termination Event**" shall have the meaning provided in Section 5.01(r).

"**S&P**" shall mean S&P Global Ratings.

"**Sale Order**" means a final non-appealable order, in form and substance acceptable to each of the Administrative Agent and the DIP ABL Agent approving (i) the Stalking Horse Transaction on the terms set forth in the Stalking Horse APA or (ii) another sale pursuant to the Bidding Procedures Order of substantially all of the assets of the Debtors and the CCAA Debtors.

"**Sale and Lease-Back Transaction**" shall mean any arrangement providing for the leasing by Holdings or any of its Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred for value by such Person to a third party who is not an Affiliate of the Borrower in contemplation of such leasing.

"**Sanctions Authorities**" shall have the meaning provided in the definition of "**Embargoed Person**".

"**Screen Rate**" shall have the meaning provided in the definition of "**Eurodollar Rate**".

"**SEC**" shall have the meaning provided in Section 7.01(i).

"**Secured Creditors**" shall have the meaning provided in the respective Security Documents.

"**Securities Account**" shall mean a securities account (as that term is defined in the UCC).

"**Securities Act**" shall mean the Securities Act of 1933.

---

[1] Note to Draft: To be updated upon entry into A&R Restructuring Support Agreement.

"**Security Agreement Collateral**" shall mean all "**Collateral**" as defined in the relevant Security Agreements.

"**Security Agreements**" shall have the meaning provided in Section 5.01(g).

"**Security Document**" shall mean all instruments, documents and agreements delivered by or on behalf of any Credit Party pursuant to any Order, CCAA Order, this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Administrative Agent, for the benefit of Secured Creditors, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations, including the Orders, the CCAA Orders, each of the Security Agreements, the Luxembourg Share Pledge, each Mortgage, each Vessel Mortgage and, after the execution and delivery thereof, each Additional Document.

"**Sponsor**" shall mean Lion Capital LLP and any fund that is an Affiliate of Lion Capital LLP.

"**Subordinated Provisions**" shall have the meaning provided in Section 9.10(a).

"**Stalking Horse APA**" shall mean that certain Asset Purchase Agreement, dated as of the Petition Date, among the Stalking Horse Purchaser, as Buyer, and the Debtors and the CCAA Debtors, as Sellers.

"**Stalking Horse Purchaser**" shall mean FCF Co., LTD.

"**Stalking Horse Transaction**" shall mean the sale of substantially all of the assets of the Debtors and the CCAA Debtors pursuant to the Stalking Horse APA.

"**Subsidiary**" shall mean, as to any Person, (a) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (b) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time. Unless otherwise qualified, all references to a "**Subsidiary**" or to "**Subsidiaries**" in this Agreement shall refer to a Subsidiary or Subsidiaries of Holdings and any predecessors of such Subsidiary or Subsidiaries.

"**Subsidiary Guarantor**" shall mean each Subsidiary of Holdings (other than the Borrower and any Excluded Subsidiary) (in each case, whether existing on the Closing Date or established, created or acquired after the Closing Date), unless and until such time as such respective Person is released from all of its obligations under the Guaranty in accordance with the terms and provisions thereof.

"**Tax Form Certificate**" shall have the meaning provided in Section 4.04(c)(ii)(2).

"**Taxes**" (or "**Tax**" as the context may require) shall mean any taxes, charges, fees, levies, penalties or other assessments imposed by any Taxing Authority, including, income,

premium, excise, property, sales, use, value added, goods and services, transfer, franchise, payroll, withholding, social security or other similar taxes, including any interest, penalties or additions to tax attributable thereto.

"**Taxing Authority**" shall mean any Governmental Authority with the authority to impose Tax.

"**Term Loan**" shall mean (i) an Initial Term Loan made by a Lender to the Borrower pursuant to <u>Section 2.01(a)</u> and (ii) a Delayed Draw Term Loan made by a Lender to the Borrower pursuant to <u>Section 2.01(a)</u>.

"**Term Loan Priority Collateral**" shall mean all Collateral that does not constitute ABL Priority Collateral.

"**Term Note**" shall have the meaning provided in <u>Section 2.04(a)</u>.

"**Testing Period**" shall mean, for any Reporting Date, the cumulative period commencing on the Sunday immediately following the Budget Delivery Date for the then-effective Approved Budget through the Saturday immediately preceding such Reporting Date.

"**Transactions**" means the (i) execution, delivery and performance by the Credit Parties of this Agreement and the other Credit Documents, the borrowing of the Loans hereunder, (ii) execution, delivery and performance by the Credit Parties of DIP ABL Credit Documents, the borrowings and other extensions of credit under the DIP ABL Credit Facility and (iii) the use of the proceeds of the foregoing and the payment of fees, premiums and expenses related to the foregoing.

"**Type**" shall mean the type of Term Loan determined with regard to the interest option applicable thereto, <u>i.e.</u>, whether a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated benefit obligations under each Plan (based on the assumptions used for purposes of FASB Accounting Standard Codification Topic 715) exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"**United States**" and "**U.S.**" shall each mean the United States of America.

"**U.S. Security Agreement**" shall have the meaning provided in <u>Section 5.01(e)</u>.

"**U.S. Trustee**" means the United States Trustee for Region 3.

"**Vessel Mortgage**" shall mean each vessel mortgage entered into by any Credit Party, in form and substance reasonably satisfactory to the Administrative Agent.

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (a) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (b) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of Holdings with respect to the preceding <u>clauses (a)</u> and <u>(b)</u>, director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than Holdings and its Subsidiaries under applicable law).

"**Wind-Down Amount**" shall mean, as of any date of determination, the total amount set forth in the line item for "Wind-Down Budget" in the then-applicable Approved Budget.

"**Withdrawal Date**" shall have the meaning provided in <u>Section 2.13(b)</u>.

"**Write-Down and Conversion Powers**" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.02.   <u>Accounting Terms</u>.   (a)   Accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP subject to the following sentence; <u>provided</u>, in the event of any change in GAAP (any such change, for the purpose of this <u>Section 1.02</u>, an "**Accounting Change**") that occurs after the date of this Agreement, then, in each case, the Credit Parties and the Administrative Agent, on behalf of the Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect any such Accounting Change with the desired result that the criteria for evaluating the financial condition of Holdings and its Subsidiaries shall be the same after such Accounting Change, as applicable, as if such Accounting Change, as applicable, had not been made, and until such time as such amendment shall have been executed and delivered by the Credit Parties and Required Lenders, (i) all financial covenants, standards and terms in this Agreement shall be calculated and/or construed as if such Accounting Change had not been made, and (ii) Holdings shall prepare footnotes to each certificate and supplements to the financial statements, or schedules and footnotes to the financial statements, in each case, required to be delivered pursuant to <u>Sections 7.01(a)</u>, <u>(b)</u> and <u>(c)</u> hereunder that show the differences between the financial statements delivered (which reflect such Accounting Change) and the basis for calculating financial covenant compliance (without reflecting such Accounting Change).

(b)   In the event of an Accounting Change requiring all leases to be capitalized, any lease that would be characterized as an operating lease in accordance with GAAP on the Prepetition Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a capital lease) for purposes of this Agreement, regardless of any change in GAAP following the Prepetition Closing Date that would otherwise require such lease to be re-characterized (on a prospective or retroactive basis or otherwise) as a capitalized lease, and all calculations and deliverables under this Agreement or any other Credit Document shall be made in accordance therewith (<u>provided</u>

that, along with all financial statements delivered to the Administrative Agent in accordance with the terms of this Agreement after the date of such accounting change, the Borrower shall deliver a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting change).

(c)     The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved; provided that, notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained herein or in any other Credit Document shall be calculated, in each case, without giving effect to any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

(d)     All computations of interest and other fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable, except that interest computed by reference to the Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

1.03.   Construction.   Unless the context of this Agreement or any other Credit Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and  "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."   The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Credit Document refer to this Agreement or such other Credit Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Credit Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.   The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.   Any reference in this Agreement or in any other Credit Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law and any rules and regulations promulgated in connection therewith.   Each reference to any Governmental Authority shall include any successor or supplementary agency that performs a similar or complementary role.

1.04.   Time References.   Unless the context of this Agreement or any other Credit Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York, New York on such day.

For purposes of the computation of a period of time from a specified date to a later specified date, except as otherwise expressly provided herein, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to the Administrative Agent, or any Lender, such period shall in any event consist of at least one full day.

1.05.   Schedules and Exhibits.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.06.   Quebec Interpretation Clause.  For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall be deemed to include a "hypothec", "prior claim", "reservation of ownership" and a "resolutory clause", (vi) all references to filing, registering or recording under the UCC or PPSA shall be deemed to include publication under the Civil Code of Québec, (vii) all references to "perfection" of or "perfected" liens or security interest shall be deemed to include a reference to an "opposable" or "set up" hypothec as against third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall be deemed to include a "mandatary", (xi) "construction liens" shall be deemed to include "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable"; (xii) "joint and several" shall be deemed to include "solidary"; (xiii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault"; (xiv) "beneficial ownership" shall be deemed to include "ownership"; (xv) "legal title" shall be deemed to include "holding title on behalf of an owner as mandatary or prête-nom"; (xvi) "easement" shall be deemed to include "servitude"; (xvii) "priority" shall be deemed to include "rank" or "prior claim", as applicable; (xviii) "survey" shall be deemed to include "certificate of location and plan"; (xix) "state" shall be deemed to include "province"; (xx) "fee simple title" shall be deemed to include "ownership" (including ownership under a right of superficies); (xxi) "ground lease" shall be deemed to include "emphyteusis" or a "lease with a right of superficies", as applicable; (xii) "leasehold interest" shall be deemed to include "a valid lease"; and (xiii) "lease" shall be deemed to include a "contract of leasing (crédit-bail)".

1.07.   Luxembourg terms.   Words in the English language used in this Agreement to describe Luxembourg law concepts only intend to describe such concepts and the consequences of the use of those words in New York law or any other foreign law are to be disregarded.  In each Credit Document, where it relates to a person incorporated or having its Centre of Main Interests in Luxembourg, a reference to:

(a)   "**entity**" means any company (société), partnership (limited or general), joint venture, trust, association, economic interest group (groupement d'intérêt économique) or

other organization, enterprise or entity (whether or not vested with all the attributes of a legal entity (*personalité morale*));

(b)    a "**winding up**", "**administration**" or "**dissolution**" includes, without limitation, any procedure or proceeding in relation to an entity becoming bankrupt (*faillite*), insolvency, voluntary or judicial liquidation, composition with creditors (*concordat préventif de la faillite*), moratorium or reprieve from payment (*sursis de paiement*), controlled management (*gestion contrôlée*), court ordered liquidation or reorganization or the appointment of a temporary administrator (*administrateur provisoire*), general settlement with creditors, reorganisation or any other similar proceedings affecting the rights of creditors generally under Luxembourg law, and shall be construed so as to include any equivalent or analogous liquidation or reorganisation proceedings;

(c)    a "**director**" "**officer**" or "**manager**" includes a *gérant or an administrateur* and a "**board of directors**" or "**board of managers**" includes a *conseil d'administration* or *conseil de gérance*;

(d)    an "**agent**" includes, without limitation, a "*mandataire*";

(e)    a "**receiver**", "**administrative receiver**", "**administrator**" or the like includes, without limitation*, a juge délégué, commissaire, juge-commissaire, liquidateur* or *curateur* or any other person performing the same function of each of the foregoing;

(f)    a "**matured obligation**" includes, without limitation, any *exigible*, *certaine* and *liquide* obligation;

(g)    "**constitutional documents**" includes its up-to-date (restated) articles of association (*statuts coordonnés*);

(h)    "**Security**" or a "**security interest**" includes, without limitation, any hypothèque, nantissement, gage, privilège, accord de transfert de propriété à titre de garantie, gage sur fonds de commerce, droit de rétention or sûreté réelle whatsoever whether granted or arising by operation of law; and

(i)    a person being "**unable to pay its debts**" includes, without limitation, that person being in a state of cessation of payments (*cessation de paiements*).

1.08.    Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 2        Amount and Terms of Credit.

2.01.   <u>The Commitments</u>.  Subject to the terms and conditions hereof and in the Orders and the CCAA Orders, each Lender agrees to (i) following the Interim Order Entry Date and the CCAA Initial Order Date and the satisfaction of the conditions to Borrowing set forth in <u>Section 5.01</u>, to make a term loan to the Borrower in a single Borrowing on the Closing Date in an aggregate principal amount not to exceed such Lender's Initial Commitment (the "**Initial Term Loan**") and (ii) following the Final Order Entry Date and the CCAA A&R Initial Order Entry Date and the satisfaction of the conditions to Borrowing set forth in <u>Section 5.02</u>, to make an additional delayed draw term loan to the Borrower in a single Borrowing on the Delayed Draw Borrowing Date (the "**Delayed Draw Term Loan**") in an aggregate principal amount not to exceed such Lender's Delayed Draw Commitment. Once funded, each Initial Term Loan and each Delayed Draw Term Loan shall be a "Loan" and a "Term Loan" for all purposes under this Agreement and the other Credit Documents. Once repaid, Term Loans incurred hereunder may not be reborrowed.

2.02.   <u>Notice of Borrowing</u>.  (a)   The Borrower shall give the Administrative Agent at the Notice Office (x) at least one Business Day's prior notice of any Base Rate Loan to be incurred hereunder and (y) at least three (3) Business Days' prior notice of any Eurodollar Rate Loan to be incurred hereunder, <u>provided</u> that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 1:00 P.M. (New York City time) on such day.   Such notice (the "**Notice of Borrowing**"), except as otherwise expressly provided in <u>Section 2.09</u>, shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, substantially in the form of <u>Exhibit A</u>, and specifying: (i) the aggregate principal amount of the Term Loans to be incurred pursuant to the Borrowing, (ii) the date of the Borrowing (which shall be a Business Day) and (iii) whether the Term Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Eurodollar Rate Loans, and if Eurodollar Rate Loans, the initial Interest Period to be applicable thereto.   The Administrative Agent shall promptly give each Lender notice of the applicable Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)   At no time shall there be outstanding more than four Borrowings of Eurodollar Rate Loans in the aggregate.

(c)   Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Term Loans, the Administrative Agent may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower, prior to receipt of written confirmation. In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such Borrowing or prepayment of Term Loans, as the case may be, absent manifest error.

2.03.   <u>Disbursement of Funds</u>.  No later than 12:00 noon (New York City time) on the date specified in the Notice of Borrowing, each Lender will make available its pro rata portion (determined in accordance with <u>Section 2.05</u>) of the Borrowing requested to be made on such date.  All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower

the aggregate of the amounts so made available by the Lenders; <u>provided</u> that, the Delayed Draw Term Loans funded on the Delayed Draw Borrowing Date shall be made available to the Borrower by depositing the proceeds thereof into the DIP Term Funding Account.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of the Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of the Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower (including by remitting such amount to the DIP Term Funding Account) a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three (3) days and at the interest rate otherwise applicable to such Term Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to <u>Section 2.07</u>.  Nothing in this <u>Section 2.03</u> shall be deemed to relieve any Lender from its obligation to make Term Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Term Loans hereunder.

2.04.   <u>Notes</u>.  (a)  The Borrower's obligation to pay the principal of, and interest on, the applicable Term Loans made by each applicable Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 11.14</u> and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of <u>Exhibit C</u> (each, a "**Term Note**" and, collectively, the "**Term Notes**").

(b)      Each Lender will note on its internal records the amount of the Term Loans made by it and each payment in respect thereof and prior to any transfer of any of its Term Notes will endorse on the reverse side thereof the outstanding principal amount of the Term Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Term Loans.

(c)      Notwithstanding anything to the contrary contained above in this <u>Section 2.04</u> or elsewhere in this Agreement, Term Notes shall only be delivered to Lenders that at any time specifically request the delivery of such Term Notes.  No failure of any Lender to request or obtain a Term Note evidencing its Term Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay such Term Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties

therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Term Note evidencing its outstanding Term Loans shall in no event be required to make the notations otherwise described in preceding <u>clause (b)</u>.  At any time when any Lender requests the delivery of a Term Note to evidence any of its Term Notes, the Borrower shall promptly execute and deliver to the respective Lenders the requested Term Note in the appropriate amount or amounts to evidence such Term Loans.

2.05.   <u>Pro Rata Borrowings</u>.  All Borrowings of the applicable Term Loans under this Agreement shall be incurred from the Lenders <u>pro rata</u> on the basis of their respective Initial Commitments or their respective Delayed Draw Commitments, as the case may be.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make a Term Loan hereunder and that each Lender shall be obligated to make the Term Loan provided to be made by it hereunder, regardless of the failure of any other Lender to make its Term Loan hereunder.

2.06.   <u>Conversions and Continuations</u>.  The Borrower shall have the option to (i) convert, on any Business Day, all or a portion of the outstanding principal amount of Term Loans made pursuant to one or more Borrowings of one or more Types of Term Loans into a Borrowing of another Type of Term Loan and (ii) continue, on any Business Day, the outstanding principal amount of any Eurodollar Rate Loans as Eurodollar Rate Loans for an additional interest period, <u>provided</u> that, (A) except as otherwise provided in <u>Section 2.09(b)</u>, Eurodollar Rate Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Term Loans being converted, (B) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into Eurodollar Rate Loans if no Event of Default is in existence on the date of the conversion, (C) unless the Required Lenders otherwise agree, Eurodollar Rate Loans may only be continued as Eurodollar Rate Loans for an additional Interest Period if no Event of Default is in existence on the date of the proposed continuation and (D) no conversion pursuant to this <u>Section 2.06</u> shall result in a greater number of Borrowings of Eurodollar Rate Loans than is permitted under <u>Section 2.02(b)</u>.  Each such continuation or conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 1:00 P.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans into Eurodollar Rate Loans or continuation of Eurodollar Rate Loans, three (3) Business Days' prior notice and (y) in the case of conversions of Eurodollar Rate Loans into Base Rate Loans, one Business Day's prior notice (which may be telephonic if promptly followed by written confirmation) (each, a "**Notice of Conversion/Continuation**"), in each case substantially in the form of <u>Exhibit B</u>, specifying the Term Loans to be so converted or continued, the Borrowing or Borrowings pursuant to which such Term Loans were incurred and, if to be continued as or converted into Eurodollar Rate Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the relevant Borrower shall be deemed to have selected an Interest Period of one month's duration).  The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Term Loans.

2.07.   <u>Interest</u>.  (a)  The Borrower agrees to pay interest in respect of the unpaid principal amount of (i) each applicable Eurodollar Rate Loan from the date of Borrowing thereof until the earlier of (A) the payment in full of such principal amount (whether by acceleration or otherwise) and (B) the conversion of such Eurodollar Rate Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>2.08</u> or <u>2.09</u>, as applicable, at a rate per annum which shall, during each Interest

Period applicable thereto, be equal to the sum of Eurodollar Rate for the Interest Period in effect for such Borrowing plus the relevant Applicable Margin and (ii) each applicable Base Rate Loan from the date of Borrowing thereof until the earlier of (A) the payment in full of such principal amount (whether by acceleration or otherwise) and (B) the conversion of such Base Rate Loan to a Eurodollar Rate Loan pursuant to Section 2.06, 2.08 or 2.09, as applicable, at a rate per annum which shall be equal to the sum of the Base Rate plus the relevant Applicable Margin.

(b)     Upon the occurrence and during the continuance of any Event of Default, (i) the principal and, to the extent permitted by law, overdue interest in respect of each Term Loan shall, in each case, bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate otherwise applicable to the Term Loans from time to time and (ii) any other amounts not otherwise paid when due hereunder and under any other Credit Document shall bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate then applicable to the Term Loans that are maintained as Base Rate Loans from time to time.  Payment or acceptance of the increased rates of interest provided for in this Section 2.07(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender. Interest that accrues under this Section 2.07(b) shall be payable on demand.

(c)     Accrued (and theretofore unpaid) interest shall be payable in arrears, (A)(x) in respect of a Eurodollar Rate Loan, (i) on the last Business Day of each Interest Period and (ii) in the event of any conversion of a Eurodollar Rate Loan prior to the end of the Interest Period then applicable thereto, on the effective date of such conversion, (y) in respect of a Base Rate Loan, (i) on the applicable Quarterly Payment Date (it being understood and agreed that such amount shall be calculated through the end of such calendar quarter even if such Quarterly Payment Date is prior to the end of such calendar quarter) and (ii) in the event of any conversion of a Base Rate Loan prior to any Quarterly Payment Date, on the effective date of such conversion (each such date specified in clauses (x) and (y), an "**Interest Payment Date**"), and (B) on the date of any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(d)     Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Term Loans and shall promptly notify the Borrower and the Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

(e)     [Reserved].

(f)     The parties acknowledge and agree that all calculations of interest under this Agreement are to be made on the basis of the nominal interest rate described herein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest.  The parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

2.08.   <u>Interest Periods</u>.   The interest period (each, an "**Interest Period**") applicable to any Eurodollar Rate Loan shall be the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter; <u>provided</u> that, if any Interest Period begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month; <u>provided</u>, <u>further</u>, that:

(a)      at no time shall there be more than four Eurodollar Rate Loans with different Interest Periods outstanding under this Agreement;

(b)      the initial Interest Period for each Eurodollar Rate Loan shall commence on the date of such Eurodollar Rate Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Rate Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(c)      for the purposes of this Agreement, whenever interest is calculated on the basis of a period which is less than the actual number of days in a calendar year, each rate of interest determined pursuant to such calculation is, for the purposes of the *Interest Act* (Canada), equivalent to such rate multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and divided by the number of days used as the basis of such calculation;

(d)      if any Interest Period for a Eurodollar Rate Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; <u>provided</u>, <u>however</u>, that if any Interest Period for a Eurodollar Rate Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)      no Interest Period in respect of any Borrowing of any Eurodollar Rate Loan shall be selected which extends beyond the Maturity Date;

(f)      unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when an Event of Default is then in existence; and

(g)      in no event shall "interest" (as such term is defined in Section 347 of the *Criminal Code* of Canada) on the "credit advanced" (as defined therein) hereunder be payable by any Canadian Subsidiary in excess of sixty percent (60%) per annum and if any of such parties does pay an amount of interest in excess of sixty percent (60%) in any particular year, the amount of such excess shall be repaid by the Administrative Agent or the applicable Lender to such party.

If the Borrower is not permitted to elect a new Interest Period due to the existence of an Event of Default or otherwise, it shall be deemed to have elected to convert such Eurodollar Rate Loan into Base Rate Loans effective as of the expiration date of the then-current Interest Period.

2.09.   Increased Costs, Illegality, etc.  (a)  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Eurodollar Rate";

(ii)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Term Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in law which subjects any Lender to any Taxes (other than (1) Indemnified Taxes, (2) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (3) Connection Income Taxes) in respect of payments of the principal of or interest on the Term Loans or the Term Notes or any other amounts payable hereunder or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Closing Date affecting such Lender, the interbank Eurodollar market or the position of such Lender in such market (including that the Eurodollar Rate with respect to such Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lender of funding such Eurodollar Rate Loan); or

(iii)   at any time, that the making or continuance of any Eurodollar Rate Loan or the purchase or sale or taking of any deposit in Dollars has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market (each of clauses (i), (ii) and (iii), a "**Market Disruption Event**");

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, all Eurodollar Rate Loans shall automatically convert into Eurodollar Rate Loans that accrue interest at the Base Rate plus the relevant Applicable Margin and Eurodollar Rate Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice

of Conversion/Continuation given by the Borrower with respect to Eurodollar Rate Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower, (y) in the case of <u>clause (ii)</u> above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of <u>clause (iii)</u> above, the Borrower shall take one of the actions specified in <u>Section 2.09(b)</u> as promptly as possible and, in any event, within the time period required by law.  During any period in which a Market Disruption Event is in effect, the Borrower may request that the Administrative Agent or a Lender, as applicable, confirm that the circumstances giving rise to the Market Disruption Event continue to be in effect; <u>provided</u> that (A) the Borrower shall not be permitted to submit any such request more than once in any 30-day period and (B) nothing contained in this <u>Section 2.09</u> or the failure to provide confirmation of the continued effectiveness of such Market Disruption Event shall in any way affect the Administrative Agent's or such Lender's right to provide any additional notices of a Market Disruption Event as provided in this <u>Section 2.09</u>.  Such Lender or the Administrative Agent, as applicable, shall promptly notify the Borrower upon the end of such Market Disruption Event.

(b)    At any time that any Eurodollar Rate Loan is affected by the circumstances described in <u>Section 2.09(a)(ii)</u>, the Borrower may, and in the case of a Eurodollar Rate Loan affected by the circumstances described in <u>Section 2.09(a)(iii)</u>, the Borrower shall, either (x) if the affected Eurodollar Rate Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to <u>Section 2.09(a)(ii)</u> or <u>(iii)</u> or (y) if the affected Eurodollar Rate Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Rate Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this <u>Section 2.09(b)</u>.

(c)    If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, <u>provided</u>, that such Lender's determination of

compensation owing under this Section 2.09(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.09(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish the Borrower's obligation to pay additional amounts pursuant to this Section 2.09(c) upon the subsequent receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.09 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the circumstances giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the change in applicable law or governmental rule, regulation, order, guideline or request giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

2.10.   Compensation. The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Rate Loans but excluding loss of anticipated profits) which such Lender may sustain: (a) if for any reason (other than a default by such Lender or the Administrative Agent) the Borrowing of, or a conversion from or into, Eurodollar Rate Loans, does not occur on the date specified therein in the Notice of Borrowing or a Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.09(a)); (b) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 4.01, Section 4.02 or as a result of an acceleration of such Term Loans pursuant to Section 9) or conversion of any of its Eurodollar Rate Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (c) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (d) as a consequence of (i) any other default by the Borrower to repay such Eurodollar Rate Loans when required by the terms of this Agreement or (ii) any election made pursuant to Section 2.09(b).

2.11.   Change of Lending Office. Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.09(a)(ii) or (iii), Section 2.09(c) or Section 4.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Term Loans affected by such event, provided, that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.11 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender provided in Sections 2.09 and 4.04.

2.12.   [Reserved].

2.13.   <u>Withdrawal of Funds from the DIP Term Funding Account</u>.   (a) The Borrower shall have the right to withdraw the funds on deposit in the DIP Term Funding Account from time to time at any time on or after the Delayed Draw Borrowing Date (but not more frequently than one time in any two-week period) by delivering a written notice to the Administrative Agent and the Lenders in the form attached as <u>Exhibit M</u> hereto (each such notice, a "**DIP Term Funding Withdrawal Notice**"); <u>provided</u> that (i) the Borrower shall concurrently provide a liquidity forecast, in a form substantially consistent with the Approved Budget, certified by the chief financial officer of the Borrower, demonstrating, to the satisfaction of the Administrative Agent, that the lowest Projected Available Liquidity of the Credit Parties and their Subsidiaries on any day during the two-week period after such withdrawal (and after giving effect thereto) will not exceed $20,000,000, (ii) at the time of and immediately after giving effect to such withdrawal, no Event of Default shall have occurred and be continuing or would result therefrom and (iii) the remaining funds on deposit in the DIP Term Funding Account after giving effect to such withdrawal shall not be less than the sum of the Professional Fees Amount (for the avoidance of doubt, if the intended use of proceeds of such withdrawal as set forth pursuant to <u>clause (a)(iii)</u> below is to repay the ABL Facility in respect of professional fees in the circumstances described in the proviso in <u>clause (ii)</u> of the definition of "Professional Fees Amount", the Professional Fees Amount after giving effect to such withdrawal shall be decreased by the amount of such withdrawal used to so repay the ABL Facility in respect of professional fees), the Wind-Down Amount and the KEIP/KERP Amount at such time; <u>provided further</u> that the requirements in the preceding proviso and the requirement that withdrawals not occur more frequently than one time in any two-week period shall not apply to withdrawals described in <u>clauses (f)</u>, <u>(g)</u> or <u>(h)</u> of this <u>Section 2.13</u>. Each DIP Term Funding Withdrawal Notice shall specify the following information:

> (i)        the amount of such withdrawal;

> (ii)       the date of such proposed withdrawal (which shall be on the second Business Day following the delivery of a DIP Term Funding Withdrawal Notice) (the "**Withdrawal Date**");

> (iii)      the intended use of proceeds of such withdrawal in reasonable detail, which shall be in accordance with the then-applicable Approved Budget;

> (iv)      that as of the date of such withdrawal, the conditions set forth in this <u>Section 2.13</u> are satisfied; and

> (v)       the wiring instructions of the account of the Borrower to which the proceeds of such withdrawal are to be disbursed.

(b)       On the Withdrawal Date specified in the DIP Term Funding Withdrawal Notice, subject to the satisfaction of all conditions precedent to a withdrawal and disbursement from the DIP Term Funding Account set forth in this <u>Section 2.13</u>, the Administrative Agent shall direct the applicable depository bank to disburse funds from the DIP Term Funding Account in an aggregate principal amount equal to the amount specified in such DIP Term Funding Withdrawal Notice to the account of the Borrower or, if applicable, the specified escrow account,  specified in such DIP Term Funding Withdrawal Notice.

(c)    [Reserved].

(d)    With respect to any disbursement, withdrawal, transfer, or application of funds from the DIP Term Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, any DIP Term Funding Withdrawal Notice submitted by the Borrower as evidence that all conditions precedent to a withdrawal and disbursement from the DIP Term Funding Account to the Borrower have been satisfied. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to direct the applicable depository bank to disburse any amount from the DIP Term Funding Account in excess of the amounts then held in the DIP Term Funding Account. The Administrative Agent shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the DIP Term Funding Account has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received notice thereof from the Borrower or the Required Lenders.

(e)    For the avoidance of doubt, all amounts held in the DIP Term Funding Account shall constitute proceeds of funded Term Loans for all purposes hereunder and, notwithstanding that the proceeds of such Term Loans are held in the DIP Term Funding Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Credit Documents to the same extent as all other Term Loans.

(f)    Notwithstanding the foregoing or anything to the contrary herein, immediately prior to the occurrence of the Maturity Date (other than due to the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors and the CCAA Debtors under section 363 of the Bankruptcy Code or section 36 of the CCAA, as applicable), the Borrower shall have the right, after submitting a DIP Term Funding Withdrawal Notice, to withdraw amounts from the DIP Term Funding Account or direct the transfer of an amount to one or more escrow accounts established by the Borrower or any other Credit Party not to exceed the lesser of (x) any and all remaining amounts in the DIP Term Funding Account and (y) an amount equal to the sum of (i) all accrued and unpaid professional fees and (ii) other than in the case of the occurrence of the Maturity Date due to an event described in clause (d) or (e) of the definition thereof, the Wind-Down Amount, with such amounts to be used for the administration of the Cases and the CCAA Cases, the payment of professional fees and the wind-down of the Debtors and the CCAA Debtors.

(g)    Notwithstanding the foregoing or anything to the contrary herein, immediately prior to the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors and the CCAA Debtors under section 363 of the Bankruptcy Code or section 36 of the CCAA, as applicable (and not, for the avoidance of doubt, upon the occurrence of the Maturity Date due to any other event), so long as the proceeds of such sale or disposition shall satisfy in full in cash the Obligations and the obligations under the Prepetition Term Loan Agreement (or the Obligations and the obligations under the Prepetition Term Loan Agreement are otherwise satisfied and discharged or reduced pursuant to an arrangement satisfactory to the Administrative Agent in its sole discretion; it being understood and agreed that the satisfaction and discharge or reduction of the Obligations and the obligations under the Prepetition Term Loan Agreement in connection with (1) a sale pursuant to and in accordance with the Stalking

Horse APA, as in effect on the date hereof, without giving effect to any amendment, waiver, consent or other modification thereto that is adverse to the interests of the Lenders and not otherwise approved by the Required Lenders, and (2) any sale pursuant to the Sale Order and the CCAA Approval and Vesting Order pursuant to any offer that is deemed higher or better by the Bankruptcy Court and the CCAA Court shall be satisfactory to the Administrative Agent) (such sale, a "**Qualified Sale**"), the Borrower shall utilize and direct the transfer of an amount equal to the Permitted Funding Amount (as defined in the Orders) to one or more escrow accounts established by the Borrower or any other Credit Party; provided that, in order to fund the Permitted Funding Amount, the Borrower shall have the right, if at the time of and immediately after giving effect to such withdrawal, no Event of Default shall have occurred and be continuing, after submitting a DIP Term Funding Withdrawal Notice, to withdraw from the DIP Term Funding Account an amount up to the lesser of (x) any amounts remaining in the DIP Term Funding Account and (y) the Permitted Funding Amount *less* any amounts drawn under the ABL DIP Agreement to fund the Permitted Funding Amount; provided, further, that any amounts remaining in the DIP Term Funding Account after the withdrawal described in this clause (g) shall be applied to repay the Term Loans upon the Maturity Date.

(h)    Moreover, notwithstanding the foregoing or anything to the contrary herein, including with respect to a Default or Event of Default that has occurred or is continuing or the occurrence of the Maturity Date, after delivery of the Carve Out Trigger Notice (as defined in the Orders), if the amount of the loans available under the DIP ABL Credit Facility is insufficient to fund the full amount of the Carve Out Reserves (as defined in the Orders), then, the Borrower shall have the right, after submitting a DIP Term Funding Withdrawal Notice, to withdraw amounts from the DIP Term Funding Account in an amount not to exceed the lesser of (i) the amount necessary to fund any unfunded portion of the Carve Out Reserves and (ii) the amount remaining in the DIP Term Funding Account. Furthermore, the Administrative Agent shall not withdraw, sweep, transfer, foreclose, or otherwise affect any amounts in the DIP Term Funding Account after the occurrence of the Maturity Date or any Event of Default until the Carve Out Reserves are fully funded; provided, it is understood and agreed that if any withdrawal is made pursuant to this clause (h), no amounts may be withdrawn pursuant to clauses (f) and (g) above.

Section 3        Fees; Reductions of Commitment.

3.01.    Fees.

(a)    The Borrower agrees to pay the fees set forth in the Fee Letter, in the amounts and at the times specified therein or as so otherwise agreed upon by the Borrower and the Administrative Agent in writing.

(b)    The Borrower agrees to pay to the Administrative Agent for the account of each Lender, an exit fee (the "**Exit Fee**") in an aggregate amount equal to (1) with respect to any Term Loan outstanding under this Agreement on the Maturity Date, 2.00% of the aggregate principal amount of such outstanding Term Loans, which Exit Fee shall be payable in cash on the Maturity Date and (2) with respect to any Term Loans that are paid, repaid or prepaid prior to the Maturity Date pursuant to Section 4.01 or 4.02, 2.00% of the aggregate principal amount of Term Loans so paid, repaid or prepaid, which Exit Fee shall be payable in cash on the date of

such prepayment. The Exit Fee shall be fully earned and paid on the dates due, in immediately available funds, to the Administrative Agent, and shall not be refundable under any circumstances.

3.02.    [Reserved.]

3.03.    Mandatory Termination of Commitments.  The Initial Commitments shall terminate in their entirety on the Closing Date (after giving effect to the making of the Initial Term Loans on such date). The Delayed Draw Commitments shall terminate in their entirety on the Delayed Draw Borrowing Date (after giving effect to the making of the Delayed Draw Term Loans on such date). To the extent not terminated earlier, each Lender's Delayed Draw Commitment shall terminate immediately and without further action on the date that is five (5) Business Days following the Final Order Entry Date.

Section 4        Prepayments; Payments; Taxes.

4.01.    Voluntary Prepayments.  The Borrower shall have the right to prepay the Term Loans, subject to the Exit Fee set forth in Section 3.01(b)(2), in whole or in part at any time and from time to time on the following terms and conditions: (i) the Borrower shall give the Administrative Agent prior to 1:00 P.M. (New York City time) at the Notice Office at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans or Eurodollar Rate Loans, which notice (in each case) may be conditioned on the occurrence of a specified transaction or event and revoked if such transaction does not occur and shall specify whether Base Rate Loans or Eurodollar Rate Loans shall be repaid, the amount of such prepayment, and in the case of Eurodollar Rate Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Rate Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) each partial prepayment of the Term Loans pursuant to this Section 4.01 shall be in an aggregate principal amount of at least $2,500,000 (or (A) if less, the entire remaining principal amount of the Term Loans or (B) such lesser amount as is acceptable to the Administrative Agent in any given case); and (iii) each prepayment pursuant to this Section 4.01 shall be applied, pro rata among the Term Loans.

4.02.    Mandatory Repayments.  (a) [Reserved].

(b)    Within one (1) Business Day of each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by Holdings or any of its Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 8.04), an amount equal to 100% of the Net Cash Proceeds of such issuance or incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 4.02(h) and (i).

(c)    Within one (1) Business Day of each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 4.02(h) and (i); provided, that no mandatory repayment pursuant to this Section 4.02(c) shall be required until the

aggregate amount of Net Sale Proceeds received by Holdings and its Subsidiaries shall exceed $50,000.

(d)      [Reserved]

(e)      [Reserved].

(f)      Within one Business Day after each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Recovery Event, an amount equal to 100% of the Net Cash Proceeds from such Recovery Event shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 4.02(h) and (i); provided, that (i) no mandatory repayment pursuant to this Section 4.02(f) shall be required until the aggregate amount of Net Cash Proceeds with respect to Recovery Events received by Holdings and its Subsidiaries shall exceed $50,000 in the aggregate and (ii) up to $100,000 of such Net Cash Proceeds for all Recovery Events shall not be required to be so applied on such date so long as no Default or Event of Default then exists and such Net Cash Proceeds shall be used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 90 days following the date of the receipt of such Net Cash Proceeds, and provided, further, that if all or any portion of such Net Cash Proceeds not required to be so applied pursuant to the preceding proviso are not so used within such 90-day period after the date of the receipt of such Net Cash Proceeds (or such earlier date, if any, as Holdings or the relevant Subsidiary determines (in its sole discretion) not to reinvest the Net Cash Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 4.02(f) without regard to the immediately preceding proviso.

(g)      [Reserved].

(h)      Each amount required to be applied to the Term Loans pursuant to Sections 4.02(b), (c) and (f)  shall be applied (x) *first* to repay the outstanding principal amount of the Term Loans on a pro rata basis and (y) *second* to the outstanding Obligations (as defined in the Prepetition Term Loan Agreement) under the Prepetition Term Loan Agreement, to repay such Obligations in full in cash in the manner set forth in the Prepetition Term Loan Agreement, until such time as all such Obligations (as defined in the Prepetition Term Loan Agreement) have been repaid in full in cash.  With respect to any prepayment of Term Loans pursuant to Section 4.02(b) or Section 4.02(c), the principal amount of Term Loans to be prepaid from Net Cash Proceeds or Net Sale Proceeds, as the case may be, shall be calculated so that the sum of (x) the principal amount of Term Loans to be prepaid, (y) any accrued and unpaid interest and fees due thereon and (z) the applicable Exit Fee calculated in accordance with Section 3.01(b)(2) shall not exceed the total amount of Net Cash Proceeds or Net Sale Proceeds, as applicable. Notwithstanding the foregoing or anything herein to the contrary or otherwise, upon the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code and the Canadian Debtors under section 36 of the CCAA, subject to Section 2.13 and the Orders, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied in accordance with the Bidding Procedures or the Sale Order, whichever document controls at the applicable time.

(i)    Any repayments of Term Loans pursuant to this <u>Section 4.02</u> that are repaid on a date that is not the last day of the applicable Interest Period shall be subject to any additional amounts required to be paid pursuant to <u>Section 2.10</u>.

(j)    All then outstanding Term Loans shall be repaid in full on the Maturity Date.

(k)    Notwithstanding the foregoing, the Net Sale Proceeds or Net Cash Proceeds referred to in <u>Sections 4.02(c)</u> or <u>(f)</u> of, or in respect of, any Foreign Subsidiary (or a Subsidiary of such Foreign Subsidiary) may be retained by the applicable Subsidiary to the extent the making of any such mandatory prepayment from the Net Sale Proceeds or Net Cash Proceeds of such Subsidiary would be prohibited under applicable local law (as reasonably determined by the Borrower, upon written advice of counsel); <u>provided</u>, that such amounts may be retained by the applicable Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agrees to cause the applicable Subsidiary to use commercially reasonable efforts to take such actions required by the applicable local law to permit such repatriation), and once such repatriation is permitted under the applicable local law, such repatriation shall be promptly effected.  Mandatory prepayments arising from such amounts shall be subject to additional time periods to allow for the repatriation of such cash to the extent required hereunder.

4.03.    <u>Method and Place of Payment</u>.  Except as otherwise specifically provided herein, all payments under this Agreement shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 1:00 P.M. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Any payments received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day (other than as contemplated by the proviso in <u>Section 2.08(d)</u>) and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

4.04.    <u>Net Payments</u>.  For purposes of this <u>Section 4.04</u>, the term "**applicable law**" includes FATCA.

(a)    All payments made by any Credit Party hereunder will be made without setoff, counterclaim or other defense.  Except as required by applicable law, all such payments will be made free and clear of, and without deduction or withholding for, any Taxes now or hereafter imposed by any Taxing Authority with respect to such payments.  If any applicable law requires the deduction or withholding of any Tax from any such payment by such Credit Party or the Administrative Agent, then the Credit Party or the Administrative Agent, as applicable, shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and to the extent such Tax is an Indemnified Tax, each Credit Party agrees to pay such additional amounts as may be necessary so that after the withholding or deduction for or on account of any Indemnified Taxes, the applicable Recipient will receive an amount equal to the amount provided for herein or in such Term Note had no such withholding or deduction been made.  The

applicable Credit Party will furnish to the Administrative Agent as promptly as possible after the date the payment of any Indemnified Taxes is due pursuant to applicable law certified copies of tax receipts, or other evidence reasonably acceptable to the Administrative Agent evidencing such payment by such Credit Party.  Each Credit Party agrees to indemnify and hold harmless each Lender within 30 days after its written request, for the full amount of any Indemnified Taxes so levied or imposed and paid by such Lender (including Indemnified Taxes imposed on additional amounts or indemnities payable under this Section 4.04), whether or not correctly or legally asserted, and any out-of-pocket expense (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Credit Party by a Lender or the Administrative Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error and shall constitute a required notice for purposes of this Section 4.04 hereof.

(b)     The Credit Parties shall timely pay to the relevant Taxing Authority in accordance with applicable law, or at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)     (i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the applicable Credit Party and the Administrative Agent, at the time or times reasonably requested by such Credit Party or the Administrative Agent, such properly completed and executed documentation reasonably requested by such Credit Party or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the applicable Credit Party or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by such Credit Party or the Administrative Agent as will enable such Credit Party or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 4.04(c)(ii) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing:

(1)     Any Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes (and the Administrative Agent, to the extent that it is not otherwise a Lender that is required to deliver an Internal Revenue Service W-9) shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender or Administrative Agent becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Recipient is a "United States person" and is exempt from U.S. federal backup withholding tax;

(2)    Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes agrees to deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 11.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN or Form W-8BEN-E (in the case of Form W-8BEN or W-8BEN-E with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement or (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI, Form W-8BEN or W-8BEN-E (in the case of Form W-8BEN or W-8BEN-E with respect to a complete exemption under an income tax treaty) (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit D (any such certificate, a "**Tax Form Certificate**") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement.

(3)    To the extent any Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Form W-8BEN or Form W-8BEN-E (in the case of Form W-8BEN or W-8BEN-E with respect to a complete exemption under an income tax treaty) (or successor forms), a Tax Form Certificate, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a Tax Form Certificate on behalf of each such direct and indirect partner.

(4)    In addition, each Lender agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Lender will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, W-8BEN, W-8BEN-E or W-8IMY (in the case of

Form W-8BEN or W-8BEN-E, with respect to the benefits of any income tax treaty), or Form W-8BEN or W-8BEN-E (with respect to the portfolio interest exemption) and a Tax Form Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement, or such Lender shall immediately notify the Borrower and the Administrative Agent of its legal inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this <u>Section 4.04(c)</u> that it is legally unable to deliver.

(5)    If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (5), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 30 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.04(e)</u> relating to the maintenance of the Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to (at its option) set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>clause (d)</u>.  Failure or delay on the part of the Administrative Agent to demand compensation pursuant to this <u>Section 4.04(d)</u> shall not constitute a waiver of the Administrative Agent's right to demand such compensation.

(e)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this <u>Section 4.04</u> (including by the payment of additional amounts pursuant to this <u>Section 4.04</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this <u>Section 4.04</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this <u>clause (e)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>clause (e)</u>, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this <u>clause (e)</u> the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to (i) apply for any refund of Taxes or (ii) make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)    Each party's obligations under this <u>Section 4.04</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Credit Document.

Section 5    <u>Conditions Precedent.</u>

5.01.    <u>Closing Date</u>.  This Agreement and the obligation of each Lender to make any Term Loan shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with <u>Section 11.11</u>) (it being understood and agreed that any Credit Document and each other document required to be received by the Lenders shall be deemed so received when it is delivered to the Administrative Agent or the Collateral Agent, as applicable):

(a)    <u>Credit Documents</u>.  On or prior to the Closing Date, the Administrative Agent shall have received (x) signed counterparts of (i) this Agreement and the other Credit Documents (which shall be in form and substance satisfactory to the Administrative Agent) from Holdings, the Borrower, each of the Lenders and any other party party hereto or thereto, as applicable, and (ii) the Intercreditor Agreement from the Administrative Agent, the Prepetition Term Agent, the Prepetition ABL Agent, the DIP ABL Agent and each of the Credit Parties, and (y) the exhibits, annexes and schedules to be attached to this Agreement, the other Credit Documents and the Intercreditor Agreement, as applicable, in each case, in form and substance satisfactory to the Administrative Agent.

01:25621776.1

(b)    <u>Financial Statements</u>.  On or prior to the Closing Date, the Administrative Agent and each Lender shall have received true and correct copies of the historical financial statements referred to in <u>Section 6.05(a)</u>.

(c)    <u>Officer's Certificate</u>.  On the Closing Date, the Administrative Agent shall have received a certificate, dated the Closing Date and signed on behalf of the Borrower by an Authorized Officer of such Borrower, certifying on behalf of such Borrower that (i) there shall exist no Default or Event of Default, and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "**materiality,**" "**Material Adverse Effect**" or similar language shall be true and correct in all respects on such date).

(d)    <u>Opinions of Counsel</u>.  On the Closing Date, the Administrative Agent shall have received a legal opinion from each of (i) Loyens & Loeff Luxembourg S.à r.l., Luxembourg counsel to the Lenders, (ii) Arendt & Medernach, Luxembourg counsel to the applicable Credit Parties, (iii) Reeder & Simpson P.C., Marshall Islands counsel to the Lenders and (iv) Paul Weiss Rifkind Wharton & Garrison LLP, New York counsel to the applicable Credit Parties, in each case, addressed to the Administrative Agent and each of the Lenders and dated the Closing Date covering the matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request.

(e)    <u>Company Documents</u>.  On the Closing Date, the Administrative Agent shall have received (a) a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party and attested to by a second Authorized Officer of such Credit Party, attaching copies of the certificate or articles of incorporation and the consolidated articles (if any) or other equivalent formation documents, as applicable, of such Credit Party, the by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party authorizing the Credit Documents, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent, (b) a good standing certificate (or equivalent or other similar certificate reasonably acceptable to the Administrative Agent) from the secretary of state or other applicable Governmental Authority of the jurisdiction of formation or organization of such Credit Party and (c) for Holdings and each of its Subsidiaries incorporated or established in Luxembourg (i) an excerpt of the Luxembourg Trade and Companies Register (*Register de Commerce et des Sociétés*) dated no earlier than three (3) Business Days prior to the date of this Agreement or, if the mentioned excerpt is not available, a notary certificate confirming the corporate details of the relevant entity dated no earlier than three (3) Business Days prior to the date of this Agreement; and (ii) a certificate from the Luxembourg Trade and Companies Register dated no earlier than three (3) Business Days prior to the date of this Agreement stating that no judicial decision has been registered by application of article 13, items 2 to 12 and 13 and article 14 of the Luxembourg law dated 19 December 2002 relating to the register of commerce and companies as well as the accounting and the annual accounts of companies, as amended (the "**RCS Law**"), according to which the relevant entity would be subject to one of the judicial proceedings referred to in these provisions

of the RCS Law including in particular, bankruptcy (*faillite*), controlled management (*gestion contrôlée*), suspension of payments (*sursis de paiement*), arrangement with creditors (*concordat préventif de la faillite*) and judicial liquidation (*liquidation judiciaire*) proceedings.

(f)     Guaranty.    On the Closing Date, each Guarantor shall have duly authorized, executed and delivered the Guaranty in substantially the form of Exhibit E (as amended, modified and/or supplemented from time to time, the "**Guaranty**")).

(g)     Security Documents.    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered (i) a Luxembourg-law governed amended and restated first ranking pledge over the Equity Interests of Clover Leaf Seafoods S.à r.l. held by Holdings (the "**Luxembourg Share Pledge**"), (ii) the security agreement substantially in the form of Exhibit F-1 (as amended, modified, restated and/or supplemented from time to time, the "**U.S. Security Agreement**") and a Ontario law governed security agreement in the form of Exhibit F-2 (as amended, modified, restated and/or supplemented from time to time, the "**Canadian Security Agreement**", and together with the U.S. Security Agreement, the "**Security Agreements**") covering all of such Credit Party's Security Agreement Collateral and (iii) the Perfection Certificate, together with the following, each in form and substance reasonably satisfactory to the Administrative Agent:

(i)     financing statements (Form UCC-1, PPSA or the equivalent) in proper form for filing under the UCC, the PPSA or the equivalent filing offices of the jurisdiction of organization of each Credit Party as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable, to perfect the security interest purported to be created by the applicable Security Agreement to the extent they can be perfected by such filings;

(ii)     results of searches, certified copies of requests for information or other evidence or copies (Form UCC-1, verification statements, or the equivalent), or equivalent reports as of a recent date, listing all effective financing statements that name Holdings or any of its Subsidiaries as debtor and that are filed in the jurisdictions referred to in clause (i) above and in such other jurisdictions in which Collateral is located on the Closing Date, together with copies of such other financing statements that name Holdings or any of its Subsidiaries as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Administrative Agent shall have received termination statements (Form UCC-3 or the equivalent) or such other termination statements as shall be required by local law fully executed for filing);

(iii)     evidence of the completion of all other recordings and filings of, or with respect to, the relevant Security Agreements, including any Intellectual Property Security Agreement (as defined in the U.S. Security Agreement) in the United States Patent and Trademark Office or in the United States Copyright Office, or in the Canadian Intellectual Property Office, as the case may be, as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable,

to perfect the security interests purported to be created by the Security Agreements; and

(iv)    (x) all certificates representing the Equity Interests required to be pledged pursuant to the Security Agreements together with undated endorsements for transfer executed in blank and (y) promissory notes required to be pledged pursuant to the Security Agreements together with undated endorsements for transfer executed in blank, in each case, in form and substance reasonably satisfactory to the Administrative Agent, along with evidence that all other actions necessary or, in the reasonable opinion of the Administrative Agent, desirable, to perfect the security interests purported to be created by the Security Agreements have been taken, and the Security Agreements shall be in full force and effect, including a copy of the shareholders register (*registre des associés*) of Clover Leaf Seafoods S.à r.l. evidencing all registrations to be made pursuant to the Luxembourg Share Pledge.

(h)    [Reserved].

(i)    [Reserved].

(j)    <u>Intercompany Subordination Agreement</u>.  On the Closing Date, each Credit Party and each other Subsidiary of Holdings which is an obligee or obligor with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Intercompany Subordination Agreement.

(k)    <u>Term Notes</u>.  On or prior to the Closing Date, there shall have been delivered to the Administrative Agent, for each of the Lenders that has requested a Term Note, a Term Note executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

(l)    <u>Notice of Borrowing</u>.  The Administrative Agent shall have received a Notice of Borrowing in accordance with (including the applicable notice periods set forth in) <u>Section 2.02(a)</u>.

(m)    <u>Fees and Expenses</u>.  The Borrower shall have paid all fees and expenses required to be paid pursuant to this Agreement (including (x) fees and expenses of Weil, Gotshal & Manges LLP and other local counsel (including, but not limited to, counsel in Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) to the Administrative Agent and the Lenders and (y) the fees set forth in <u>Section 3.01</u> herein that are due and payable on or prior to the Closing Date), and the other Credit Documents and all other expenses payable to the Administrative Agent as have been separately agreed and in each case invoiced at least three (3) Business Days prior to the Closing Date (or such lesser period as may be otherwise reasonably agreed by the Borrower), shall have been paid in full in cash (which amounts may be offset against the proceeds of the Initial Term Loans). The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(n)     DIP ABL Credit Facility.  The DIP ABL Credit Agreement, in form and substance satisfactory to the Administrative Agent, shall, subject to the entry of the Interim Order, become effective substantially concurrently with DIP Term Facility.

(o)     PATRIOT ACT; Beneficial Ownership Certificate.  At least three (3) Business Days prior to the Closing Date, the Administrative Agent shall have received all information with respect to the Credit Parties reasonably requested by it in writing at least 10 Business Days prior to the Closing Date under applicable "know-your-customer" and anti-money laundering rules and regulations, including, the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**PATRIOT Act**") and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower.

(p)     Initial DIP Budget.  The Administrative Agent shall have received (i) the Initial DIP Budget, in form and substance satisfactory to the Administrative Agent, and (ii) projected monthly balance sheets, income statements, statements of cash flows and availability under the DIP ABL Credit Facility of the Credit Parties for the period through to the end of the term of the DIP Term Facility, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Administrative Agent, and an opening pro forma balance sheet for the Credit Parties in form and substance satisfactory to the Administrative Agent.

(q)     No Default; Representations and Warranties.  On the Closing Date (i) there shall exist no Default or Event of Default and no Default or Event of Default would result from such Credit Event or from the application of the proceeds thereof and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

(r)     No Material Adverse Effect.  No change in the business, assets, management, operations, financial condition or prospects of the Borrower and its Subsidiaries, other than the filing of the Cases and the CCAA Cases, shall have occurred since December 31, 2018, which change has had or would reasonably be expected to have a Material Adverse Effect.

(s)     Restructuring Support Agreement.  The Restructuring Support Agreement shall be effective and binding in accordance with its terms, and no event shall have occurred and be continuing that would, or that with the passage of time or the delivery of notice would, allow the Consenting Term Loan Lenders (as defined in the Restructuring Support Agreement) or the Borrower (or any of its Affiliates) to terminate the Restructuring Support Agreement (any such event, an "**RSA Termination Event**").

(t)     Bankruptcy Related Items.

(i)     (1) The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, (2) the CCAA Cases of any of the CCAA Debtors shall not have been dismissed or otherwise terminated and (3) no proceeding under or pursuant to the BIA shall have been commenced in respect of any of the Credit Parties.

(ii)     (1) A motion, in form and substance reasonably satisfactory to the Administrative Agent, seeking approval of the DIP Term Facility, shall have been filed in each of the Cases within one (1) day after the Petition Date and (2) the CCAA Debtors shall have filed an application under the CCAA on the CCAA Filing Date, in form and substance reasonably satisfactory to the Administrative Agent, seeking approval of the CCAA Initial Order, including approval of the DIP Term Facility and the granting of the CCAA DIP Charge.

(iii)     (1) All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be in form and substance reasonably acceptable to the Administrative Agent and (2) the CCAA Initial Order shall have been granted and entered by the CCAA Court and shall be in form and substance reasonably acceptable to the Administrative Agent.

(iv)     The Credit Parties shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made pursuant to "first day" orders reasonably acceptable to the Administrative Agent in its sole discretion. The CCAA Debtors shall have made no payments after the CCAA Filing Date on account of any Indebtedness arising prior to the CCAA Filing Date unless such payment is made pursuant to the CCAA Initial Order.

(v)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases. No (1) receiver, receiver and manager, trustee or restructuring officer or (2) monitor with enhanced powers shall have been appointed in respect of any of the CCAA Debtors or their respective assets.

(u)     <u>No Action</u>.  There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Credit Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases and the CCAA Cases) that would reasonably be expected to have a Material Adverse Effect.

(v)     <u>Interim Order and CCAA Initial Order</u>.  The Interim Order Entry Date shall have occurred not later than three (3) Business Days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent, and the Administrative Agent shall have received a certified copy of the Interim Order entered by the Bankruptcy Court. The CCAA Initial Order Entry Date shall have occurred not later than one (1) Business Day following the

CCAA Filing Date, and the CCAA Initial Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent, and the Administrative Agent shall have received a certified copy of the CCAA Initial Order as entered with the CCAA Court.

(w)    Petition Date and CCAA Filing Date.  The Petition Date shall have occurred, and the Borrower and each Domestic Credit Party shall be a debtor and debtor-in-possession in the Cases. The CCAA Filing Date shall have occurred and each Canadian Credit Party shall be a debtor and debtor-in-possession in the CCAA Cases.

(x)    Governmental Approvals.  All Necessary Authorizations and third party consents and approvals necessary in connection with the DIP Term Facility and the transactions contemplated hereby shall have been obtained.

In determining the satisfaction of the conditions specified in this Section 5.01, to the extent any Lender funds its Initial Commitment hereunder, such Lender thereby certifies that the conditions specified in this Section 5.01 have been satisfied and that such Lender thereby waives the conditions specified in this Section 5.01 that have not been completed as of such date.  Upon the Administrative Agent's good faith determination that the conditions specified in this Section 5.01 have been met, then the Closing Date shall have been deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met; provided that the foregoing shall not be deemed to constitute a waiver of any representation or warranty made, or deemed to have been made, by any Credit Party, or as a waiver of any covenant obligation of any Credit Party or any of their Subsidiaries.

5.02.    Delayed Draw Borrowing.  The obligation of each Lender to make Delayed Draw Term Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 11.11):

(a)    Closing Date. The Closing Date shall have occurred.

(b)    Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing in accordance with (including the applicable notice periods set forth in) Section 2.02(a).

(c)    Final Order Entry Date and CCAA A&R Initial Order Entry Date. The Final Order Entry Date shall have occurred concurrently with or prior thereto, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay, shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent, and the Administrative Agent shall have received a signed copy of the Final Order entered by the Bankruptcy Court. The CCAA A&R Initial Order Date shall have occurred concurrently with or prior thereto, and the CCAA A&R Initial Order shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay, shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent, and the Administrative Agent shall have received a signed copy of the issued and entered CCAA A&R Initial Order.

(d)      Interim Order and CCAA Initial Order. At all times prior to the Final Order Entry Date, the Interim Order shall be in full force and effect, shall not have been vacated or reversed and shall not have been modified or amended, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent. At all times prior to the CCAA A&R Initial Order Date, the CCAA Initial Order shall be in full force and effect, shall not have been vacated or reversed and shall not have been modified or amended, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent.

(e)      No Default; Representations and Warranties.   On the Delayed Draw Borrowing Date (i) there shall exist no Default or Event of Default and no Default or Event of Default would result from such Credit Event or from the application of the proceeds thereof and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

(f)      Fees and Expenses.  The Borrower shall have paid all fees and expenses required to be paid pursuant to this Agreement including (x) fees and expenses of Weil, Gotshal & Manges LLP and other local counsel (including, but not limited to, counsel in Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) to the Administrative Agent and the Lenders and (y) the fees set forth in Section 3.01 herein that are due and payable on or prior to the Delayed Draw Borrowing Date), and the other Credit Documents and all other expenses payable to the Administrative Agent as have been separately agreed and in each case invoiced at least three (3) Business Days prior to the Delayed Draw Borrowing Date (or such lesser period as may be otherwise reasonably agreed by the Borrower), shall have been paid in full in cash (which amounts may be offset against the proceeds of the Delayed Draw Term Loans).

(g)      No Material Adverse Effect.   No change in the business, assets, management, operations, financial condition or prospects of the Borrower and its Subsidiaries, other than the filing of the Cases and the CCAA Cases, shall have occurred since December 31, 2018, which change has had or would reasonably be expected to have a Material Adverse Effect.

(h)      Restructuring Support Agreement. The Restructuring Support Agreement shall be effective and binding in accordance with its terms and no RSA Termination Event shall have occurred and be continuing.

(i)      [Reserved].

(j)      DIP Term Funding Account. (x) The DIP Term Funding Account shall have been opened and (y) the Administrative Agent shall have received a fully-executed account control agreement (to be in form and substance reasonably satisfactory to the Administrative Agent) covering the DIP Term Funding Account.

In determining the satisfaction of the conditions specified in this <u>Section 5.02</u>, to the extent any Lender funds its Delayed Draw Commitment hereunder, such Lender thereby certifies that the conditions specified in this <u>Section 5.02</u> have been satisfied and that such Lender thereby waives the conditions specified in this <u>Section 5.02</u> that have not been completed as of such date.

Section 6        <u>Representations, Warranties and Agreements.</u>

On the Closing Date and any other date specified herein or in any other Credit Document, in order to induce the Lenders to enter into this Agreement and to make the Term Loans, each of Holdings and the Borrower makes the following representations and warranties (in each case after giving effect to the Transactions), which are true and correct in all material respects on and as of the Closing Date, the Delayed Draw Borrowing Date and such other date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

6.01.    <u>Company Status</u>.    Each Credit Party and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing (or, in the case of any Foreign Subsidiary of Holdings, the applicable equivalent of "good standing" to the extent that such concept exists in such Foreign Subsidiary's jurisdiction of organization) under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, in the case of this clause (iii), would not reasonably be expected to have a Material Adverse Effect.  No certifications by any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations are required for operation of the business of Holdings and its Subsidiaries that are not in place, except for such certifications or agreements, the absence of which would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

6.02.    <u>Power and Authority</u>.    Each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents, subject, solely in the case of the Debtors and the CCAA Debtors, to the entry of the Orders and the CCAA Orders, respectively, and the terms thereof.  Each Credit Party (subject, solely in the case of the Debtors and the CCAA Debtors, to the entry of the Orders and the CCAA Orders, respectively, and the terms thereof) has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except, other than with respect to the Debtors and the CCAA Debtors, to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

6.03.   No Violation.   Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions hereof and thereof, (a) contravenes any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority which is applicable to such Credit Party, (b) will conflict with or result in any breach of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except a Permitted Lien) upon any of the property or assets of any such Credit Party or any of its Subsidiaries pursuant to the terms of any material contractual obligation of any Credit Party or any of its Subsidiaries (including the DIP ABL Credit Agreement and any other "Loan Document" (as defined therein) and any agreement governing any Restricted Debt), or (c) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of such Credit Party or any of its Subsidiaries, in each case, under clauses (a) and (b), except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.04.   Approvals.   No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (a) those that have been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (b) filings which are necessary to perfect the security interests on the Collateral of the Credit Parties that are not Debtors created or intended to be created under the Security Documents and (c) solely in the case of the Debtors and the CCAA Debtors, the entry of the Orders and the CCAA Orders, respectively), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary in connection with (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document, in each case, subject, solely in the case of the Debtors and the CCAA Debtors, to the entry of the Orders and the CCAA Orders, respectively, and the terms thereof.

6.05.   Financial Statements; Financial Condition; Undisclosed Liabilities; DIP Budget.   (a)   (i) The audited consolidated balance sheet of Parent and its Subsidiaries at December 31, 2018 and the related consolidated statements of operations, comprehensive income, cash flows and shareholders' equity of Parent and its Subsidiaries for the fiscal year of each such Person, respectively, ended on December 31, 2018, in each case furnished to the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial position of Parent and its Subsidiaries at the date of such financial statements and the results for the respective periods covered thereby and (ii)  the unaudited consolidated balance sheet of Parent and its Subsidiaries at March 30, 2019 and June 29, 2019, respectively, and the related consolidated statements of income and cash flow and changes in shareholders' equity of Parent and its Subsidiaries for the three and/or six month period, as applicable, then ended furnished to the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of Parent and its Subsidiaries at the date of such financial statements and the results for the period covered thereby, subject to normal year-end adjustments.   All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to such financial statements and

01:25621776.1

subject, in the case of the unaudited financial statements, to normal year-end adjustments and the absence of footnotes.

(b)    [Reserved].

(c)    [Reserved].

(d)    (i) On and as of the Closing Date, the Initial DIP Budget, copies of which have heretofore been furnished to Administrative Agent and the Lenders and (ii) following the Closing Date, each DIP Budget delivered pursuant to Section 7.01(f), in each case, present a good faith estimate and assumptions of Holdings and its Subsidiaries as of such date.

(e)    After giving effect to the Transactions, since December 31, 2018, nothing has occurred and is continuing that has had, or would reasonably be expected to have, a Material Adverse Effect.

6.06.    Litigation.    Except for the Cases, the CCAA Cases or as set forth on Schedule 6.06, there are no actions, suits, proceedings, subpoenas or inquiries pending or, to the knowledge of Holdings and the Borrower, threatened, against Holdings or any of its Subsidiaries (including with respect to the Transactions or any Credit Document) that, in each case, has had, or would, if determined adversely, reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

6.07.    True and Complete Disclosure.    The written factual information (taken as a whole) furnished by or on behalf of Holdings or the Borrower to the Administrative Agent or any Lender (including all information contained in the Credit Documents but excluding forward-looking information, projections and information of a general economic nature and general information about the Borrower's industry) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein does not contain any untrue statement of material fact or omit to state any material fact necessary to make the factual statements therein taken as a whole not materially misleading as of the time made or furnished in light of the circumstances under which such information was made or furnished after taking into account any modification or supplement to such information. The information included in the Beneficial Ownership Certificate is true and correct in all material respects.

6.08.    Use of Proceeds; Margin Regulations.

(a)    The proceeds of the Term Loans will be used by the Credit Parties in accordance with the Approved Budget (subject to any Permitted Variances) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order) to (i) pay certain costs, premiums, fees and expenses (including professional fees) related to the Cases and the CCAA Cases, (ii) to fund the working capital needs of the Debtors and their Subsidiaries, including repayments of borrowings under the DIP ABL Credit Facility to the extent not accompanied by a corresponding reduction in commitments under the DIP ABL Credit Facility, and (iii) to fund general corporate needs, including interest payments on the Term Loans and Adequate Protection Payments.

(b)    No part of any Term Loans (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Term Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.09.    <u>Tax Returns and Payments</u>.    Except as set forth on <u>Schedule 6.09</u> or pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, (i) each of Holdings and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all income and other material returns, statements, forms and reports for taxes (the "**Returns**") required to be filed by them, (ii) each of Holdings and each of its Subsidiaries has paid all material taxes and assessments payable by it which have become due, other than those that are being contested in good faith and adequately disclosed and except for Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, (iii) except as set forth on <u>Schedule 6.09</u>, to the knowledge of Holdings and the Borrower, there is no material action, suit, proceeding, investigation, audit or claim now pending by any Taxing Authority regarding any taxes relating to Holdings or any of its Subsidiaries.  Neither Holdings nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of Holdings or any of its Subsidiaries, or is aware of any circumstance that would cause-the-taxable your or other taxable periods of Holdings or any of its Subsidiaries not to be subject (to the normally applicable statute of limitations.

6.10.    <u>Employee Matter Compliance</u>.    (a)  Except (with respect to any matter specified, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect, each Plan is in compliance with its terms and with the applicable provisions of ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or has adopted a prototype or volume submitter plan document and is entitled to reliance on the sponsor's opinion letter from the Internal Revenue Service; no Reportable Event has occurred for which any liability remains outstanding; no Multi-employer Plan is insolvent or in reorganization; no Plan has an Unfunded Current Liability that is not reflected on the financial statements of Holdings or its applicable ERISA Affiliate; no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has an accumulated funding deficiency and each Plan satisfies the minimum funding standards, within the meaning of such sections of the Code or ERISA, or has applied for or received a waiver of the minimum funding standards or an accumulated funding deficiency or an extension of any amortization period, within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA; all contributions required to be made with respect to a Plan have been timely made; neither Holdings, nor any Subsidiary of Holdings nor any ERISA Affiliate has incurred any liability (including any indirect, contingent or secondary liability) to or on account of a Plan or Multiemployer Plan, as applicable, pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201. 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; no proceedings have been instituted to terminate or appoint a trustee to

administer any Plan which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, or to the knowledge of Holdings and the Borrower or threatened; no lien imposed under the Code or ERISA on the assets of Holdings or any ERISA Affiliate exists or is likely to arise on account of any Plan.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, any overtime pay, vacation pay, premiums for unemployment insurance, health and welfare insurance premiums, accrued wages, salaries and commissions, severance pay and employee benefit plan payments have been timely paid by each Canadian Credit Party or, in the case of accrued unpaid overtime pay or accrued unpaid vacation pay for Canadian Employees, has been properly accounted for in the books and records of each Canadian Credit Party.

(c)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no improvements to any Canadian Pension Plan or any Canadian Employee Plan have been promised, except improvements pursuant to any collective bargaining agreement.

(d)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(i)    Each Canadian Pension Plan is in compliance in form and operation with its terms and with Canadian Employee Benefits Legislation and other applicable Laws;

(ii)    All funding obligations regarding the Canadian Pension Plans and the Canadian Employee Plans (including current service contributions and special payments, as applicable) have been satisfied, there are no outstanding defaults or violations by any party to any Canadian Pension Plan and any Canadian Employee Plan;

(iii)    There are no pending or, to the knowledge of each Canadian Credit Party, threatened claims (other than claims for benefits in the ordinary course), sanctions, actions, suits or proceedings asserted or instituted by any Person against any Canadian Pension Plan or any Person as fiduciary or sponsor of any Canadian Pension Plan;

(iv)    No taxes, penalties or fees are past due under any of the Canadian Employee Plans or Canadian Pension Plans; and

(v)    To the best knowledge of each Canadian Credit Party, no fact or circumstance exists that could adversely affect the tax-exempt status of a Canadian Pension Plan or, where applicable, a Canadian Employee Plan.

(e)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, all contributions, assessments, premiums, fees, taxes, penalties or fines in relation to the Canadian Employees have been duly paid or remitted

and there is no outstanding liability of any kind in relation to the employment of the Canadian Employees or the termination of employment of any Canadian Employee.

(f)      Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Canadian Credit Party is in compliance with all requirements of any applicable Law in respect of the Canadian Pension Plans and health and safety, workers compensation, employment standards, labor relations, health insurance, employment insurance, protection of personal information, human rights laws and any Canadian federal, provincial or local counterparts or equivalents in each case, as applicable to the Canadian Employees and as amended from time to time.

6.11.    Security.

(a)      Subject to the entry of the Orders, the Administrative Agent (for the benefit of the Secured Creditors) will have upon entry of the Interim Order, a valid Lien on all of the Debtors' right, title and interest in and to the Collateral described therein and the Security Agreement Collateral and the proceeds thereof, and subject to the entry of the Orders, the Administrative Agent (for the benefit of the Secured Creditors) will have, upon entry of the Interim Order, a perfected Lien on, and security interest in, all right, title and interest of the Debtors in such Collateral and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, in each case prior and superior in right to any other person, subject to the Permitted Liens having priority under applicable Law, the Orders and/or the Intercreditor Agreement.

(b)      The Administrative Agent (for the benefit of the Secured Creditors) will, upon execution and delivery of the applicable Security Documents by the parties thereto, have a valid Lien on all of the Canadian Credit Parties' right, title and interest in and to the Security Agreement Collateral and the proceeds thereof, and subject to the entry of the CCAA Orders, the Administrative Agent (for the benefit of the Secured Creditors) will have, upon entry of the CCAA Initial Order, a valid and perfected Lien on, and security interest in, all right, title and interest of the CCAA Debtors in the Collateral and the Security Agreement Collateral and the proceeds thereof, in each case prior and superior in right to any other Person, subject to the Permitted Liens having priority under applicable Law, the CCAA Orders and/or the Intercreditor Agreement.

(c)      The provisions of the Security Agreements are effective to create in favor of the Administrative Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of each Credit Party that is not a Debtor or CCAA Debtor in the Security Agreement Collateral described therein, and the Administrative Agent, for the benefit of the Secured Creditors, has  (or upon (i) recordation of the Patent Security Agreement and the Trademark Security Agreement in the Canadian Intellectual Property Office, (ii) the recordation of the Copyright Security Agreement in the Canadian Intellectual Property Office and (iii) the recordation of the filings under the PPSA made pursuant to the relevant Security Agreement) a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein to the extent a security interest in such Security Agreement Collateral can be perfected by such recordations, subject to no other Liens other than Permitted Liens.

(d)    Notwithstanding anything herein to the contrary, no perfection actions shall by required with respect to any Material Real Property owned by the Debtors.

6.12.    Properties.

(a)    Each Mortgage (if any) creates as security for the obligations purported to be secured thereby, a legal valid and enforceable security interest in and mortgage lien on the respective Material Real Property in favor of the Administrative Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, subject, solely in the case of Material Real Property owned by the Debtors and the CCAA Debtors, to the entry of the Orders and the CCAA Orders, respectively, in each case, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such Material Real Property may be subject to Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Encumbrances related thereto or Liens permitted pursuant to Sections 8.01(a) (provided, with respect to any proceedings contesting any Tax, such proceedings stay the right to foreclose the Liens on such Taxes), (b) (provided, the proceedings referred thereto have the effect of staying or preventing the forfeiture or sale of the property or assets subject to any Liens), (c), (d), (e)(x), (h), (j), (n), (cc), (ff), (gg), (hh) and (kk) related thereto).

(b)    All Real Property owned or leased by Holdings or any of its Subsidiaries and the nature of the interest therein, is set forth in Schedule 6.12(b). Each of Holdings and each of its Subsidiaries has good and marketable title to all Material Real Property (and to all buildings, fixtures and improvements located thereon) owned by it, including all Material Real Property reflected in the most recent historical balance sheets referred to in Section 6.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than as provided in Section 6.12(a) above.

(c)    All vessels owned by any Canadian Credit Party are listed on Schedule 6.12(c).

6.13.    Capitalization of Holdings.    Schedule 6.13 sets forth the Equity Interests in Holdings (such Equity Interests, together with any subsequently authorized Equity Interests, the "**Holdings Equity Interests**"), all of which are issued and outstanding. All such outstanding Equity Interests have been duly and validly issued and have been issued free of preemptive rights. Except as set forth on Schedule 6.13 hereto, Holdings does not have outstanding any Equity Interests or other securities convertible into or exchangeable for its Equity Interests or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its Equity Interests or any Equity Interests appreciation or similar rights.

6.14.    Subsidiaries.    Holdings has no Subsidiaries other than those Subsidiaries listed on Schedule 6.14.  Schedule 6.14 sets forth the percentage ownership (direct and indirect) of Holdings in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof.  All outstanding shares of Equity Interests of each

Subsidiary of Holdings have been duly and validly issued, are fully paid and, excepting any Nova Scotia unlimited company, non-assessable and have been issued free of preemptive rights. No Subsidiary of Holdings has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.

      6.15.  <u>Compliance with Laws, etc.</u>  Each of Holdings and each of its Subsidiaries is in compliance with all applicable Laws in respect of the conduct of its business and the ownership of its property (including the FCPA, but excluding Environmental Laws, which are the subject of <u>Section 6.18</u>), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      6.16.  <u>Investment Company Act</u>.  Neither Holdings nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

      6.17.  <u>Insurance</u>.  <u>Schedule 6.17</u> sets forth a listing of all property, casualty and liability insurance maintained by Holdings and its Subsidiaries, with the amounts insured (and any deductibles) set forth therein.

      6.18.  <u>Environmental Matters</u>.  (a)  Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (i) each of Holdings and each of its Subsidiaries is in compliance with all applicable Environmental Laws and holds and is in compliance with all Environmental Permits required to operate its business; (ii) no action or proceeding is pending or, to the knowledge of Holdings and the Borrower, threatened to revoke, adversely modify or terminate any such Environmental Permit; (iii) there are no pending or, to the knowledge of Holdings and the Borrower, threatened Environmental Claims against Holdings or any of its Subsidiaries or any Real Property owned, leased or operated by Holdings or any of its Subsidiaries (including any such claim arising out of the ownership, lease or operation by Holdings or any of its Subsidiaries of any Real Property formerly owned, leased or operated by Holdings or any of its Subsidiaries but no longer owned, leased or operated by Holdings or any of its Subsidiaries); and (iv) there are no facts, circumstances, conditions or occurrences with respect to the business or operations of Holdings or any of its Subsidiaries, or any Real Property owned, leased or operated by Holdings or any of its Subsidiaries (including any Real Property formerly owned, leased or operated by Holdings or any of its Subsidiaries but no longer owned, leased or operated by Holdings or any of its Subsidiaries) or, to the knowledge of Holdings and the Borrower, any property adjoining or adjacent to any such Real Property that could be reasonably expected (x) to result in an Environmental Claim against Holdings or any of its Subsidiaries or any Real Property owned, leased or operated by Holdings or any of its Subsidiaries or (y) to cause any Real Property owned, leased or operated by Holdings or any of its Subsidiaries or Holdings or any of its Subsidiaries to be in violation of or subject to liability under any applicable Environmental Law.

      (b)  Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings or any of its Subsidiaries have not at any

time generated, used, treated, stored or Released any Hazardous Materials in violation of Environmental Laws or in a manner that could be reasonably expected to violate any applicable Environmental Law or result in an Environmental Claim against Holdings or any of its Subsidiaries.

6.19.  <u>Employment and Labor Relations</u>.    Neither Holdings nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings and the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings and the Borrower, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings and the Borrower, threatened against Holdings or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of Holdings or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the knowledge of Holdings and the Borrower, threatened against Holdings or any of its Subsidiaries and (v) no wage and hour department investigation has been made of Holdings or any of its Subsidiaries, except (with respect to any matter specified in <u>clauses (i)</u> through <u>(v)</u> above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

6.20.  <u>Intellectual Property</u>.  Each of Holdings and each of its Subsidiaries (a) owns or has the valid and continuing right to use pursuant to a written agreement and free and clear of any Liens (other than Permitted Liens) all the patents, trademarks, domain names, any source or business identifiers, service marks, trade names, brand names, services names, corporate names, company names, business names, fictitious business names, trade styles, trade dress rights, logos, copyrights, inventions, trade secrets, proprietary information and know-how of any type, and general intangibles of a like nature, whether or not written (including, but not limited to, formulas, rights in technology, software, computer programs, designs and databases), all goodwill associated with any of the foregoing, any and all applications for any of the foregoing (including all continuations, divisionals, continuations-in-part, reissues, reexaminations, extensions, registrations, renewals and reversions, as applicable) and any similar intellectual property rights with respect to any of the foregoing used in the business of such Person, whether protected, created or arising under the Laws of the United States, Canada or any other jurisdiction (collectively, "**Intellectual Property**"), and (b) to the knowledge of Holdings and the Borrower, has not and does not infringe, misappropriate or otherwise violate Intellectual Property rights held by others, except in the case of each of the foregoing <u>clauses (a)</u> and <u>(b)</u> as would reasonably be expected, either individually or in the aggregate, not to have a Material Adverse Effect.  No other Person has contested any right, title or interest of Holdings or any of its Subsidiaries in, or the validity of, any Intellectual Property owned by Holdings or any of its Subsidiaries and to the knowledge of Holdings and the Borrower, no Person has infringed, misappropriated or otherwise violated or is infringing, misappropriating or otherwise violating any Intellectual Property owned by Holdings or any of its Subsidiaries, in each case of the foregoing, which has had or would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  Except as has not or would not reasonably be

expected, either individually or in the aggregate, to have a Material Adverse Effect, each of Holdings and its Subsidiaries is not in breach or default under any Intellectual Property license to which it is subject or otherwise a party.  Each of Holdings and its Subsidiaries has complied with all applicable Laws and internal policies relating to privacy and data protection, except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      6.21.  <u>Material Agreements</u>.  The Borrower has delivered true, correct and complete copies of the Material Agreements, such Material Agreements remain in full force and effect and neither Holdings nor any of its Subsidiaries (a) has received a written notice of termination, intent to terminate or material breach or default from any counterparties to such Material Agreements or (b) to the knowledge of the Borrower or any Subsidiary after reasonable inquiry, is in material breach of or default under any such Material Agreements, other than breaches or defaults arising as a result of the commencement of the Cases or the CCAA Cases.

      6.22.  <u>Necessary Authorizations</u>.  Subject to the entry of the Orders and the CCAA Orders, each Credit Party and each Subsidiary of a Credit Party has obtained all Necessary Authorizations, and all such Necessary Authorizations are in full force and effect. None of such Necessary Authorizations is the subject of any pending or, to the best of each Credit Party's knowledge, threatened attack, application, objection, or enforcement action or any other petition with a Governmental Authority for revocation, termination, suspension, denial or material modification of a Necessary Authorization, by the grantor of the Necessary Authorization.  The actions of any applicable Governmental Authority granting all Necessary Authorizations have not been reversed, stayed, enjoined, annulled or suspended.

      6.23.  <u>Anti-Money Laundering and Economic Sanctions Laws</u>.  (a)  No Credit Party, none of its Subsidiaries, none of its controlled Affiliates and, to the knowledge of each Credit Party, none of the respective officers, directors, brokers or agents of such Credit Party, such Subsidiary or controlled Affiliates has in the past five (5) years violated or is in violation of any applicable sanctions or Anti-Money Laundering Law.

      (b)  No Credit Party, none of its Subsidiaries and none of the respective officers, directors, nor to any Credit Party's knowledge, brokers or agents of such Credit Party or such Subsidiary that is acting or benefiting in any capacity in connection with the Term Loans (i) is an Embargoed Person or (ii) will use any proceeds of the Term Loans, or lend, contribute or otherwise make available such proceeds to any Person for the purpose of financing the activities of or with any Person or in any country or territory that, at the time of funding or facilitation, is an Embargoed Person.

      6.24.  <u>Anti-Corruption Laws</u>.

      (a)  Neither Holdings, any of its Subsidiaries nor any of their respective officers or directors, nor, to any Credit Party's knowledge, any agent or representative of Holdings or any of its Subsidiaries, has taken any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any Government Official for the purpose of influencing official action, securing an improper advantage, obtaining or retaining business for or

with, or directing business to, any person, in each case in violation of any provision of the FCPA, the UK Bribery Act of 2010, Anti-Money Laundering Laws, or any other applicable anti-corruption or anti-bribery law.

(b)      Holdings and the Borrower will maintain in effect corporate policies designed to ensure compliance by Holdings, the Borrower, their respective Subsidiaries and their respective employees with the FCPA and any other applicable anti-corruption laws.

6.25.   <u>Food Safety</u>.

(a)      Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) each of Holdings and each of its Subsidiaries is in compliance with all applicable Food Safety Laws applicable to it or its business or properties and (ii) each product grown, harvested, manufactured, processed, tested, stored, shipped, packaged, labeled, marketed, distributed, held or sold by or on behalf of Holdings and its Subsidiaries (each such product, a **"Company Product"**), is and has been grown, harvested, manufactured, processed, tested, stored, shipped, packaged, labeled, marketed, distributed, held, and sold in compliance with all applicable requirements of Food Safety Laws.

(b)      Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, no Company Product has been recalled, withdrawn or suspended for any reason, nor has any Company Product been discontinued (whether voluntarily or otherwise) due to concerns over potential harm to human health or safety.  No proceedings initiated by any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations charged with enforcing the Food Safety Laws seeking the recall, withdrawal, suspension, or seizure of any Company Product are pending or, to the knowledge of Holdings, threatened against Holdings or any of its Subsidiaries, except for proceedings that would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(c)      Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, neither Holdings nor any of its Subsidiaries has received any written notice from any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations or any other Person of any alleged violation of or noncompliance with any Food Safety Laws.

(d)      Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, all sources of tuna are and have been in compliance with the Marine Mammal Protection Act and the "Dolphin Safe" labeling standard of the Dolphin Protection Consumer Information Act as stated in the Magnuson Fishery Conservation Management Act (16 USC 1822, as amended).  Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, Holdings and its Subsidiaries possess scientifically reliable information and/or third party certifications or registrations to substantiate any claims they have made regarding conformance of their facilities, processes, and Company Products to applicable standards including, without limitation, Kosher, Pareve, Heschsher, Halal, Certified Organic, "organic," "gluten free," "low fat," "reduced fat,"

"high protein," "low calorie," "zero trans fats," "all natural," "low sodium," "nitrate-free," "antibiotic-free," "100 percent," and similar claims.

6.26.   <u>Centre of Main Interests and Central Administration</u>.  With respect to Holdings and each of its Subsidiaries incorporated or established in Luxembourg, its Centre of Main Interests (as such term is defined in the Insolvency Regulation) for the purposes of the Insolvency Regulation is located in Luxembourg.  It has no branch or "*establishment*" (as that term is defined in the Insolvency Regulation) in any other jurisdiction.   The central administration (*administration centrale*) (within the meaning of the Luxembourg law of 10 August 1915 on commercial companies as amended) of Holdings and each of its Subsidiaries incorporated or established in Luxembourg is located in Luxembourg.

6.27.   <u>Domiciliation</u>.  Holdings and each of its Subsidiaries incorporated or established in Luxembourg are in compliance with the Luxembourg law dated 31 May 1999 on domiciliation of companies, as amended.

6.28.   <u>No Defaults</u>.  Subject to the entry of the Orders and the CCAA Orders and subject to the terms thereof, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Credit Document.

6.29.   <u>Cases and CCAA Cases; Orders and CCAA Orders</u>.

(a)   The Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Credit Documents and the Interim Order and, when applicable, Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled). The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable. The CCAA Cases were commenced on the CCAA Filing Date in accordance with applicable Laws and proper notice thereof has or will be given for the CCAA Comeback Motion. The CCAA Debtors shall give, on a timely basis as specified in the CCAA Initial Order, all notices required to be given pursuant to the CCAA or as otherwise may be requested by the Administrative Agent.

(b)   After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute DIP Superpriority Claims, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable. After the issuance and entry of the CCAA Initial Order, and pursuant to and to the extent permitted in the CCAA Initial Order and the CCAA A&R Initial Order, as applicable the Obligations of the CCAA Debtors will be secured by the CCAA DIP Charge, subject to the priorities set forth in the CCAA Initial Order or the CCAA A&R Initial Order, as applicable.

(c)   After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and

perfected Lien on all of the Collateral of the Debtors subject, as to priority, to the Carve-Out, all to the extent set forth in the Interim Order or the Final Order. After the issuance and entry of the CCAA Initial Order and pursuant to and to the extent provided in the CCAA Initial Order and the CCAA A&R Initial Order, as applicable, the Obligations of the CCAA Debtors will be secured by a valid and perfected Lien on all of the Collateral of the CCAA Debtors, all to the extent set forth in the CCAA Initial Order or the CCAA A&R Initial Order, as applicable.

(d)       The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.  The Debtors are in compliance in all material respects with the Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order). The CCAA Initial Order (with respect to the period on and after entry of the CCAA Initial Order and prior to entry of the CCAA A&R Initial Order) or the CCAA A&R Initial Order (with respect to the period on and after entry of the CCAA A&R Initial Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended. The CCAA Debtors are in compliance in all material respects with the CCAA Initial Order (with respect to the period on and after entry of the CCAA Initial Order and prior to entry of the CCAA A&R Initial Order) or the CCAA A&R Initial Order (with respect to the period on and after entry of the CCAA A&R Initial Order).

(e)       Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, including the Carve Out (as defined in the Interim Order), upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and, subject to Section 9, to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court. Subject to the applicable provisions of the CCAA Initial Order or the CCAA A&R Initial Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and, subject to Section 9, to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the CCAA Court.

Section 7       Affirmative Covenants.

Each of the Credit Parties hereby covenants and agrees that on and after the Closing Date and until the Commitments have been terminated and the Term Loans (together with interest thereon), fees and all other Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) incurred hereunder, are indefeasibly paid, performed or discharged in full in cash:

7.01.    Information Covenants.    The Credit Parties will furnish to the Administrative Agent for distribution to each Lender:

(a)    Monthly Reports.    Within 30 days after the end of each fiscal month of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of operations and statement of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year, which shall fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end adjustments and the absence of footnotes; and (ii) a Narrative Report.

(b)    Quarterly Financial Statements.    Within 45 days after the close of each of the first three quarterly accounting periods in each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of operations and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, which shall fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end adjustments and the absence of footnotes; and (ii) a Narrative Report.

(c)    Annual Financial Statements.    Within 90 days after the close of each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of operations and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and together with a report without qualification as to scope of audit by independent certified public accountants of recognized national standing or such other certified public accountants as are reasonably acceptable to the Administrative Agent; and (ii) a Narrative Report.

(d)    [Reserved].

(e)    Management Letters.    Promptly after Holdings' or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(f)    Updated DIP Budget and Budget Variance Reports.

(i)    No later than by 11:59 p.m. (Pacific time) on the second Wednesday following the end of each fiscal month of Holdings (commencing with the second Wednesday of the fiscal month of Holdings during which Closing Date occurs) or, to the extent such day is not a Business Day, the next Business Day thereafter (each such date, a "**Budget Delivery Date**"), a DIP Budget covering the period beginning on Sunday of the following week and ending 13

weeks thereafter. Each DIP Budget shall be subject to the written consent of the Administrative Agent (which may be delivered by e-mail);

(ii)     No later than by 11:59 p.m. (Pacific time) on each Wednesday of every week (commencing with the week after the first full calendar week following the Closing Date) or, to the extent such day is not a Business Day, the next Business Day thereafter (each such date, a "**Reporting Date**"), a Budget Variance Report. Each such report shall be certified by the chief financial officer of Holdings as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

(g)     Officer's Certificates.     At the time of the delivery of the financial statements provided for in Sections 7.01(a), (b) and (c), a compliance certificate from the chief financial officer (or other officer with equivalent duties) of Holdings substantially in the form of Exhibit H, which certificate shall (i) certify on behalf of Holdings that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, (ii) [reserved], (iii) [reserved] and (iv) certify that there have been no changes to Schedules 1 through 7, in each case, of the Security Agreements or to the Perfection Certificate, respectively, in each case since the Closing Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 7.01(g), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case with respect to this clause (iv), only to the extent that such changes are required to be reported to the Administrative Agent pursuant to the terms of such Security Documents) and whether Holdings and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(h)     Notice of Default, Litigation and Material Adverse Effect. Promptly, and in any event within three (3) Business Days after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (A) the occurrence of any event which constitutes a Default or an Event of Default, (B) any litigation or governmental investigation or proceeding or Environmental Claim pending against Holdings or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect, (y) involving an alleged liability (regardless of whether insured) of Holdings or its Subsidiaries equal to or greater than $500,000 or any adverse determination involving a potential liability over $500,000 or (z) with respect to any Credit Document, (C) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect, or (D) any final non-appealable judgment, decree, settlement agreement or other similar agreement entered into, by or against Holdings or any of its Subsidiaries, in each case in connection with the Civil Cases.

(i)     SEC Reports and Filings.     Promptly after the filing, delivery or receipt thereof, copies of all financial information, proxy materials, reports, notices and other communications, if any, which Holdings or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "**SEC**").

(j)    Environmental Matters.    Promptly after any officer of Holdings or the Borrower obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters would reasonably be expected to individually result in a liability against, or remediation or other expenses of Holdings and its Subsidiaries in excess of $500,000, or in the aggregate have a Material Adverse Effect:

(i)    any non-compliance by Holdings or any of its Subsidiaries with Environmental Law or Environmental Permit or pending or threatened action or proceeding to revoke, terminate or adversely modify in any material way any such Environmental Permit;

(ii)    any pending or threatened Environmental Claim against Holdings or any of its Subsidiaries including with respect to any third party claims regarding any Material Real Property owned, leased or operated by Holdings or any of its Subsidiaries;

(iii)    any condition or occurrence on or arising from any Release of Hazardous Materials that (a) results in non-compliance by Holdings or any of its Subsidiaries with any applicable Environmental Law or (b) could reasonably be expected to result in an Environmental Claim against Holdings or any of its Subsidiaries;

(iv)    any condition or occurrence on any Material Real Property owned, leased or operated by Holdings or any of its Subsidiaries that could reasonably be expected to cause such Material Real Property or Holdings or any of its Subsidiaries to be in violation of or incur liability under any Environmental Law; and

(v)    the taking of any removal or remedial action in response to the actual or alleged presence, or Release of any Hazardous Material on any Material Real Property owned, leased or operated by Holdings or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; provided, that in any event Holdings shall deliver to each Lender all material notices received by Holdings or any of its Subsidiaries from any Governmental Authority having jurisdiction over Holdings, any Subsidiary or any of their respective assets or operations under, or pursuant to, Environmental Laws which identify Holdings or any of its Subsidiaries as potentially responsible parties for material remediation costs or which otherwise notify Holdings or any of its Subsidiaries of potential material liability under Environmental Laws.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and Holdings' or such Subsidiary's response thereto.

(k)    Insurance.    Prior to the end of each fiscal year of Holdings, Holdings shall deliver current copies of all property, casualty and liability insurance policies of Holdings and its Subsidiaries maintained in accordance with Section 7.03 hereof.

(l)    <u>Food Safety</u>.  Promptly after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following food safety matters to the extent that such matters would reasonably be expected to individually result in a liability against, or other expenses of  Holdings and its Subsidiaries in excess of $500,000, or in the aggregate have a Material Adverse Effect:

   (i)    Any non-compliance with any Food Safety Law applicable to it or its business or properties.

   (ii)    Any pending or threatened recall, withdrawal, seizure or suspension of any Company Product or discontinuation (whether voluntary or otherwise) of any Company Product due to concerns over potential harm to human health or safety.

(m)    <u>Other Information</u>.  From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(n)    <u>Notices of Dispositions</u>.  Prior to the consummation of any sale, transfer or other disposition by Holdings or any of its Subsidiaries to any Person (other than Holdings or any of its Subsidiaries) of any assets with a Fair Market Value greater than $500,000, Holdings shall provide written notice to the Administrative Agent of such sale in reasonable detail, including the amount of consideration received or to be received and a description of such asset sold or to be sold.

(o)    <u>Bankruptcy Court and CCAA Court Filings</u>.  All proceedings, motions and other documents filed with the Bankruptcy Court on behalf of the Debtors in the Cases and all such material proceedings, motions and other documents shall include counsel for the Administrative Agent on any "Special Notice List" or other similar list of parties to be served with papers in the Cases. Counsel for the Administrative Agent shall be included on the service list established in the CCAA Cases and all proceedings, motions and other documents to be filed with the CCAA Court on behalf of the CCAA Debtors in the CCAA Cases shall be served on counsel for the Administrative Agent.

(p)    <u>ABL Documents and Notices</u>. Borrower agrees to (i) deliver to Administrative Agent and Lenders each report, notice, statement or certificate received from or required to be delivered to any of the lenders or agents under the DIP ABL Credit Agreement and any related loan documents, including, without limitation, each Borrowing Base Certificate (as defined in the DIP ABL Credit Agreement) delivered to the DIP ABL Agent and (ii) notify the Administrative Agent and the Lenders of any imposition of any new reserves and any changes in the eligibility criteria set forth in the Borrowing Base (as defined in the DIP ABL Credit Agreement) or any components thereof.

(q)    <u>Professional Fees</u>. No later than 11:59 p.m. on each Reporting Date, a schedule in form satisfactory to the Administrative Agent of professional fees actually paid by the Debtors during the applicable Testing Period.

7.02.  <u>Books, Records and Inspections; Weekly Lender Calls</u>.  (a)  Holdings will, and will cause each of its Subsidiaries to, keep proper books of record and accounts, in which full, true and correct entries in conformity in all material respects with GAAP (or applicable local standards (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder)) and all material requirements of law shall be made of all dealings and transactions in relation to its business and activities.

(b)    Holdings will, and will cause each of its Subsidiaries to permit officers and designated representatives of the Administrative Agent to (x) visit and inspect, under guidance of officers of Holdings or such Subsidiary, any of the properties of Holdings or such Subsidiary, and (y) examine and make copies of the books of account of Holdings or such Subsidiary and discuss the affairs (including, subject to <u>clause (d)</u> below, all matters contemplated by or relating to the Bidding Procedures and the Sale Order, as provided therein), finances and accounts of Holdings or such Subsidiary with, and be advised as to the same by, its and their officers, independent accountants and other advisors (including any consultants, turnaround management, broker or financial advisory firms retained by Holdings or any of its Subsidiaries) as often as may reasonably be requested by the Administrative Agent and, in each case, at the expense of the Borrower and upon reasonable prior notice and at such reasonable times and during normal business hours.

(c)    No less than twice a week, and more frequently upon the reasonable request of the Administrative Agent, Holdings will hold a meeting or conference call with all of the Lenders during which meeting or conference call the financial results, financial position, cash flows, budget variances and operations of Holdings and its Subsidiaries, and, subject to clause (d) below, the matters contemplated by or relating to the Bidding Procedures (as provided therein), including the sale process contemplated thereby, and such other matters as may be reasonably requested by the Administrative Agent will be reviewed.

(d)    Holdings and its Subsidiaries shall provide to the Administrative Agent all information required under and pursuant to the Bidding Procedures and the Bidding Procedures Order in accordance with the terms thereof; <u>provided</u> that, notwithstanding anything in this Agreement (including clause (b) above, clause (c) above or Section 7.19(d)) to the contrary, Holdings and its Subsidiaries shall not be required to share any information related to the matters contemplated by or relating to the Bidding Procedures or the Bidding Procedures Order (i) that the Debtors reasonably determine must remain confidential to not advantage the Administrative Agent or any of the Lenders in connection with a bid for any material portion of the assets of Holdings and its Subsidiaries over any other party or (ii) to the extent that the sharing of such information would be inconsistent with the Bidding Procedures or the Bidding Procedures Order.

7.03.  <u>Maintenance of Property; Insurance</u>.  (a)  Holdings will, and will cause each of its Subsidiaries to, (i) keep all property necessary to the business of Holdings and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, natural catastrophe and other covered occurrences or events that may cause damage to, or partial or complete loss of, the property, (ii) maintain with

insurance companies that Holdings believes (in the good faith judgment of the management of Holdings) are financially sound and reputable at the time the relevant coverage is placed or renewed (or customary self-insurance), policies of business interruption, property and casualty insurance, lawfully issued and enforceable, on all such property in such amounts (after giving effect to any self-insurance that Holdings believes (in the good faith judgment of the management of Holdings) is reasonable and prudent in light of the size and nature of the business of Holdings and its Subsidiaries) and against such other risks that Holdings believes (in the good faith judgment of the management of Holdings) are reasonable and prudent in light of the size and nature of the business of Holdings and its Subsidiaries, on such terms and subject to such conditions that Holdings believes (in the good faith judgment of the management of Holdings) are reasonable and prudent in light of the size and nature of the business of Holdings and its Subsidiaries in similar geographical locations, and (iii) furnish to the Administrative Agent, upon its reasonable request therefor, full information as to the insurance carried in accordance with this Section 7.03.  In addition to the foregoing, the Credit Parties acknowledge and agree that the Administrative Agent and the Administrative Agent have the right, on an annual basis, to review the insurance then being maintained by Holdings and its Subsidiaries to confirm compliance with this Section 7.03.  All material insurance policies shall at all times be valid and enforceable in accordance with their terms and shall be in full force and effect (assuming no default by any such insurer), all premiums thereon should be paid when due and Holdings and the Borrower shall otherwise be in compliance in all material respects with the terms and provisions of such policies. The Borrower shall promptly deliver written notice to the Administrative Agent of any written notice of cancellation, termination or revocation or other written notice that any such policy is no longer in full force or effect or that the issuer of any policy is not willing or able to perform its obligations thereunder that is, in each case, received by any Credit Party.  The Credit Parties shall take all actions reasonably requested by the Administrative Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including providing such agent with the address and/or GPS coordinates of each structure located upon any Material Real Property and, to the extent required by Flood Laws, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral.

(b)    Holdings shall, and shall cause each Credit Party to at all times keep its property insured in the manner and to the extent required by Section 7.03(a), and all policies or certificates (or certified copies thereof) with respect to any such liability or property insurance (i) shall be endorsed to the Administrative Agent's reasonable satisfaction for the benefit of the Administrative Agent (including by naming the Administrative Agent as lender's loss payee and/or additional insured), (ii) shall state (unless otherwise agreed by the Administrative Agent in its reasonable discretion) that such insurance policies shall not be canceled or materially revised without at least 30 days' prior written notice thereof by the respective insurer to the Administrative Agent; provided, however, that if the relevant insurer is unable to state that the Administrative Agent will receive notice of any material revisions, the Credit Parties shall be responsible for providing such advance notice to the Administrative Agent, (iii) the Credit Parties shall use commercially reasonable efforts to cause such insurance to provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Administrative Agent and the other Secured Creditors, and (iv) shall be delivered to the Administrative Agent.

(c)     If Holdings or any of its Subsidiaries shall fail to maintain insurance in accordance with this <u>Section 7.03</u>, or if Holdings or any of its Subsidiaries shall fail to so endorse and deliver policies or certificates with respect thereto to the Administrative Agent in accordance with this <u>Section 7.03</u>, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Credit Parties jointly and severally agree to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

7.04.    <u>Existence; Franchises</u>.    Holdings will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to (x) preserve and keep in full force and effect its existence and the full force, effect and validity of its material Intellectual Property (including the "Bumble Bee" brand) and (y) maintain all Necessary Authorizations; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.04</u> shall prevent (i) sales of assets and other transactions by Holdings or any of its Subsidiaries in accordance with <u>Section 8.02</u> or (ii) the failure of any Subsidiary (other than the Borrower) to maintain its existence or the withdrawal by Holdings or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if any such failure or withdrawal, as the case may be, would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.05.    <u>Compliance with Laws, etc</u>.    Holdings will, and will cause each of its Subsidiaries to, comply with all applicable Laws in respect of the conduct of its business and the ownership of its property, except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Holdings will, and will cause each of its Subsidiaries to, comply in all respects with Food Safety Laws, Anti-Money Laundering Laws, the FCPA, regulations and orders promulgated by any Sanctions Authority, and other applicable sanctions and anti-corruption laws and regulations, and maintain policies and procedures designed to promote and achieve compliance with such laws and regulations.

7.06.    <u>Compliance with Environmental Laws</u>.    (a)    Other than as would not reasonably be expected to have a Material Adverse Effect, Holdings will (i) comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and Environmental Permits required to conduct its business or required by the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (ii) promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and (iii) keep or cause to be kept all Material Real Property free and clear of any Liens (other than Permitted Liens and Liens that are being contested in good faith and by appropriate proceedings) imposed pursuant to such Environmental Laws.  Neither Holdings nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials, or transport or permit the transportation of Hazardous Materials, except for Hazardous Materials generated, used, treated, stored, Released or disposed in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of Holdings or any of its Subsidiaries.

(b)     (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in <u>Sections 7.01(h)(i)(A)</u> or <u>(B)</u> at any time that Holdings or any of

its Subsidiaries are not in compliance with Section 7.06(a), Holdings and the Borrower will (in each case) provide, at the sole expense of Holdings and the Borrower and at the request of the Administrative Agent, an environmental assessment report concerning the matter or any Material Real Property owned, leased or operated by Holdings or any of its Subsidiaries which is impacted by the matter, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any required removal or remedial action in connection with such Hazardous Materials on such Material Real Property. If Holdings or the Borrower fails to commission such report within 30 days after such request was made, the Administrative Agent may instead commission such report, the cost of which shall be borne by Holdings and the Borrower, and Holdings and the Borrower shall grant and hereby grant to the Administrative Agent and the Lenders and their respective agents access to such Material Real Property and specifically grant the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to Holdings or the Borrower, all at the sole expense of Holdings and the Borrower.

7.07.  ERISA.  (a) Holdings will deliver to each of the Lenders written notice of the following, upon any officer of Holdings or any Subsidiary becoming aware of such event (together with any notices required to be filed with or given to the PBGC or any other Governmental Authority or a Plan participant) if such event would, alone or together with any other event described in this paragraph that has or is reasonably expected to occur, or would reasonably be expected to result in a Material Adverse Effect: the occurrence of any Reportable Event; that an accumulated funding deficiency or otherwise a failure to meet the applicable minimum funding standards, within the meaning of Section 412 of the Code or Section 302 of ERISA, has been incurred or an application has been made for a waiver or modification of the minimum funding standard; that any contribution required to be made with respect to a Plan or Canadian Pension Plan has not been timely made; that a Plan has been terminated, reorganized or declared insolvent under Title IV of ERISA; that proceedings may be or have been instituted to terminate or appoint a trustee to administer a Plan which is subject to Title IV of ERISA; that Holdings or any ERISA Affiliate has incurred any liability on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or that Holdings or any Subsidiary of Holdings may incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan, other than such liabilities incurred in the ordinary course of business. If requested by Lenders in writing, Holdings will also deliver, within 30 days following such written request, to each of the Lenders a complete copy of the annual report (on Internal Revenue Service Form 5500-series) of each Plan subject to Section 412 of the Code (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service. If requested by Lenders in writing, in addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, Holdings will also deliver, within 30 days following such written request, copies of annual reports and any records, documents or other information required to be furnished to the PBGC or any other Governmental Authority, and any material notices from the PBGC or any other Governmental Authority received by Holdings, any Subsidiary of Holdings or any ERISA Affiliate subject to Section 412 of the Code or that is a Multiemployer Plan with respect to any Plan.

(b)    With respect to each Canadian Pension Plan, each applicable Canadian Credit Party shall cause to be delivered to the Administrative Agent, promptly notice of the occurrence of any Canadian Pension Event and within 30 days after the Administrative Agent's reasonable written request, copies of annual information returns, actuarial valuations and any other report or form filed with the applicable Governmental Authority or the funding agent.

(c)    Each applicable Canadian Credit Party shall notify Administrative Agent (i) within 30 days of the establishment of any new Canadian Pension Plan, or the commencement of contributions to any such plan to which the Canadian Credit Party was not previously contributing and (ii) within 30 days of any increases or changes having a cost to such Canadian Credit Party in excess of $1,000,000 in any fiscal year in respect of any Canadian Pension Plan.

7.08.    End of Fiscal Years; Fiscal Quarters.    Other than with the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned), Holdings will cause (i) its and each of its Subsidiaries' fiscal years to end on December 31 of each calendar year and (ii) its and each of its Subsidiaries' fiscal quarters to be based on a fiscal calendar year such that the second and third quarters of the fiscal year are 13 weeks in duration, and the first and fourth quarters of the fiscal year are approximately 13 weeks in duration.

7.09.    [Reserved].

7.10.    Payment of Taxes.    In accordance with the Bankruptcy Code and except as set forth on Schedule 7.10 and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), Holdings will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all U.S. federal income Taxes, material state and local income or franchise Taxes and any other material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, including all ad valorem Taxes assessed on any of the Collateral, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of Holdings or any of its Subsidiaries not otherwise permitted under Section 8.01(a); provided, that neither Holdings nor any of its Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

7.11.    Use of Proceeds.    The Borrower will use the proceeds of the Term Loans only as provided in Section 6.08.

7.12.    Additional Security; Further Assurances; etc.    (a)    Subject to the limitations set forth in this Agreement and the other Credit Documents, at any time upon the reasonable request of Administrative Agent (or such later date as may be agreed to by Administrative Agent in its reasonable discretion), Holdings shall, and shall cause each other Credit Party to, execute or deliver to the Administrative Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, transfer powers, registration confirmations, lien searches, endorsements of certificates of title, mortgages, deeds of trust,

opinions of counsel (other than with respect to Debtors), deposit account control agreements and all other documents, including all such documents executed or delivered in favor of DIP ABL Agent or in respect of the DIP ABL Credit Facility  (collectively, the "**Additional Documents**"), that the Administrative Agent may reasonably request in form and substance reasonably satisfactory to Administrative Agent, to create, perfect, and continue perfected or to better perfect the Administrative Agent's Liens in all of the assets (other than Excluded Assets) of the Credit Parties (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), including any Additional Documents to create and perfect Liens in favor of the Administrative Agent in any owned Material Real Property acquired by any Credit Party after the Closing Date (other than any Material Real Property owned by a Debtor), and in order to fully consummate all of the transactions contemplated hereby and under the other Credit Documents.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent may reasonably request from time to time to ensure that all of the Obligations are guaranteed by the Guarantors and are secured by all or substantially all of the assets of each Credit Party (other than Excluded Assets) and all of the outstanding Equity Interests (other than Excluded Stock) of the Subsidiaries of each Credit Party. In connection with any Mortgage of owned Material Real Property (other than any Material Real Property owned by a Debtor), Holdings shall deliver or shall cause to be delivered customary opinions of counsel, Mortgage Policies, zoning reports and ALTA land surveys of owned Material Real Property as may be required to obtain customary zoning and survey coverage endorsements to the Mortgage Policies, and other related documents as may be reasonably requested by the Administrative Agent and/or the issuers and underwriters of the Mortgage Policies.  After the Closing Date, in the case of the accession of a Subsidiary of Holdings to the Guaranty or an acquisition by any Credit Party, where the jurisdiction of organization of such acceding Subsidiary or the location of such acquired assets or business is not the United States, Canada or Luxembourg, the Administrative Agent shall be entitled to require such Subsidiary or Credit Party to take action in any such jurisdiction for the purpose of effecting the security purported to be granted by the Credit Parties pursuant to the Security Documents.

(b)      If the Administrative Agent, or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Material Real Property of Holdings and the other Credit Parties constituting Collateral, the Credit Parties will, at their own expense, provide to the Administrative Agent appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent.

(c)      Notwithstanding anything contained in Section 7.12(a) to the contrary, unless the Administrative Agent so requests (in which case, such actions shall be taken within 30 days after the date of such request (or such later date as may be determined by the Administrative Agent in its sole discretion)), no Credit Party or any Affiliate thereof shall be required to take any action in any non- U.S. jurisdiction (other than Canada or Luxembourg) or be required by the laws of any non-U.S. jurisdiction (other than Canada or Luxembourg) to perfect any security interest in any non-U.S. jurisdiction (other than Canada or Luxembourg) (it being understood that unless requested in the manner provided in this clause (c), there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. Jurisdiction (other than Canada or Luxembourg)) .

(d)    The Credit Parties agree that they shall execute, deliver and cause to have filed in accordance with the *Canada Shipping Act, 2001* or U.S.C. Title 46, as applicable, a Vessel Mortgage in respect of each vessel acquired after the Closing Date with a Fair Market Value in excess of $2,500,000 and each of the other vessels designated by the Administrative Agent on the date hereof and identified on Schedule 6.12(c).

(e)    The Credit Parties agree that each action required by clauses (a) through (d) of this Section 7.12 shall be completed as soon as possible, but in no event later than 30 days after such action is requested in writing to be taken by the Administrative Agent or the Required Lenders; provided that, in no event will Holdings or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 7.12.

(f)    On or prior to the date that is 30 days after the date the Administrative Agent requests that such actions be taken (or such later date as may be determined by the Administrative Agent in its sole discretion), the Credit Parties owning Equity Interests in any entity incorporated or organized in Indonesia shall (i) execute and deliver to the Administrative Agent, an Indonesian-law governed pledge over the Equity Interests of PT Asindo Minesagara and PT Inspection Laboratory held by such Credit Parties (such Equity Interests, the "**Pledged Indonesian Equity Interests**"), in form and substance reasonably satisfactory to the Administrative Agent, (ii) deliver to the Administrative Agent the original share certificates of the Pledged Indonesian Equity Interests, (iii) cause PT Asindo Minesagara and PT Inspection Laboratory to notate the pledge of the Pledged Indonesian Equity Interests in favor of the Administrative Agent, for the benefit of the Secured Creditors, in the shareholders' register of PT Asindo Minesagara and PT Inspection Laboratory, as applicable, and (iv) take all such other actions, and execute and deliver all other documents, in each case, as reasonably requested by the Administrative Agent to perfect and ensure the enforceability of the pledge of the Pledged Indonesian Equity Interests under Indonesian or other applicable law.

7.13.    Plea Agreement; Compliance Program; Company Compliance Program. The Credit Parties shall (a) comply in all respects with the Plea Agreement other than any non-compliance that the Administrative Agent determines are *de minimis* in nature and which do not result in the termination by the Department of Justice of the Plea Agreement, (b) adopt and keep in effect, to the extent required by the terms of the Plea Agreement or otherwise required in connection with or related to the Plea Agreement, the Compliance Program, and comply with such Compliance Program in all respects other than any non-compliance that the Administrative Agent determines are *de minimis* in nature and which do not result in the termination by the Department of Justice of the Plea Agreement, and (c) maintain at all times the Company Compliance Program, which Company Compliance Program shall at all times be at least as stringent (taken as a whole) as the Company Compliance Program as in effect on the Closing Date.

7.14.    [Reserved].

7.15.    [Reserved].

7.16.    [Reserved].

7.17.    <u>Priority of Liens</u>.

(a)    Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order), and in all cases subject to the Carve Out (as defined in the Interim Order):

(i)    its Obligations hereunder and under the other Credit Documents shall at all times constitute an allowed DIP Superpriority Claim against each of the Debtors on a joint and several basis and shall be secured by Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Creditors on the Collateral of the Debtors with the priority and other terms as set forth in the Orders; and

(ii)    pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Creditors on the Collateral of the Debtors shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, security agreement, financing statement, assignment or similar instrument.

(b)    The Borrower and each CCAA Debtor hereby covenants, represents and warrants that, upon entry of the CCAA Initial Order (and when applicable, the CCAA A&R Initial Order), and in all cases subject to the terms of the CCAA Initial Order and the CCAA A&R Initial Order, as the case may be:

(i)    the Obligations of the CCAA Debtors under the Credit Documents shall at all times be secured by the CCAA DIP Charge in favor of the Administrative Agent on behalf of and for the benefit of the Secured Creditors on the Collateral of the CCAA Debtors with the priority and other terms as set forth in the CCAA Orders; and

(ii)    pursuant to the CCAA Initial Order (and, when entered, the CCAA A&R Initial Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Creditors on the Collateral of the CCAA Debtors shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, security agreement, financing statement, assignment or similar instrument.

7.18.    <u>Milestones</u>.  The Credit Parties shall achieve the following milestones (the "**Milestones**") by the dates set forth below (or such later date as may be agreed to by the Administrative Agent):

(a)    On the Petition Date:

(i)    the Debtors shall file a motion with the Bankruptcy Court seeking approval of each of the DIP Term Facility and the DIP ABL Credit Facility; and

(ii)    the Debtors shall have entered into the Stalking Horse APA.

(b)     On the CCAA Filing Date, the CCAA Cases shall have been initiated in the CCAA Court, and on or before the Business Day immediately following the CCAA Filing Date, the CCAA Court shall have issued and entered the CCAA Initial Order.

(c)     On or before the Business Day immediately following the date on which the Bankruptcy Court holds the hearing regarding the Interim Order, the Bankruptcy Court shall have entered the Interim Order.

(i)     On or before the date that is one (1) day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

(d)     On or before the date that is six (6) days after the CCAA Filing Date, the CCAA Debtors shall have filed the CCAA Comeback Motion.

(e)     On or before the date that is fifteen (15) days after the CCAA Filing Date, the CCAA Court shall have issued and entered the CCAA A&R Initial Order.

(f)     On or before the date that is twenty-nine (29) days after the Petition Date, each of the Bankruptcy Court and the CCAA Court shall have entered the Bidding Procedures Order.

(g)     On or before the date that is twenty-nine (29) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.

(h)     On or before the date that is forty-eight (48) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(i)     On or before the date that is fifty (50) days after the Petition Date, the Debtors and the CCAA Debtors shall have commenced the Auction, if necessary.

(j)     On or before the date that is fifty-seven (57) days after the Petition Date:

(i)     the hearing in the Bankruptcy Court to consider approval of the Stalking Horse APA and the Stalking Horse Transaction, or another alternative transaction pursuant to the Bidding Procedures, shall have occurred; and

(ii)     the hearing in the CCAA Court to consider approval of the CCAA Approval and Vesting Order shall have occurred.

(k)     On or before the date that is sixty-two (62) days after the Petition Date:

(i)     the Bankruptcy Court shall have entered the Sale Order; and

(ii)     the CCAA Court shall have issued and entered the CCAA Approval & Vesting Order.

(l)     On or before [March 31, 2020], the sale transaction approved in the Sale Order and CCAA Approval and Vesting Order shall be consummated and closed.

7.19.  <u>Bankruptcy Related Matters</u>.  Holdings and the Borrower will and will cause each of the Debtors and the CCAA Debtors, as applicable, and, with respect to clauses (b) and (e) hereof, each of its other Subsidiaries, to:

(a)    cause all proposed (i) "first day" pleadings, (ii) "second day" pleadings, (iii) pleadings related to or affecting the Obligations, the Credit Documents and the obligations under the Prepetition Term Loan Agreement, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) pleadings concerning the financial condition of Holdings, the Borrower or any of its Subsidiaries or other Indebtedness of the Credit Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, (v) pleadings authorizing additional payments to critical vendors and (vi) pleadings establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, (vii) the application for the CCAA for the CCAA Initial Order, the CCAA Comeback Motion and any other motion or request for relief in the CCAA Cases, in each case, proposed by the Debtors or the CCAA Debtors, as the case may be, to be (x) in accordance with and permitted by the terms of this Agreement and (y) reasonably acceptable to the Administrative Agent in all respects, it being understood and agreed that (1) drafts of all such orders, pleadings, motions and other filings shall be delivered to the Administrative Agent at least two (2) Business Days prior to filing in the Cases or service in the CCAA Cases (unless impracticable, in which case, as soon as reasonably practicable prior to filing or service, as the case may be) for the Administrative Agent to make the determination pursuant to <u>clause (y)</u> above and (2) the forms of orders approved by the Administrative Agent prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in all material respects with (i) each order entered by the Bankruptcy Court in connection with the Cases and (ii) each order issued by the CCAA Court and entered in connection with the CCAA Cases;

(c)    comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order, the Final Order, the Bidding Procedures Order, the Bidding Procedures, the Stalking Horse APA, the Sale Order, the CCAA, the CCAA Initial Order and the CCAA A&R Initial Order, as applicable, and any other order of the Bankruptcy Court and the CCAA Court, as applicable;

(d)    promptly, but no later than two (2) Business Days prior to distribution, subject to Section 7.02(d), provide the Administrative Agent with copies of any informational packages provided to potential bidder, draft agency agreements, purchase agreements, status reports and updated information related to the sale or any other transaction and copies of any such bids and updates, modifications or supplements to such information and materials;

(e)    provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(f)    deliver to counsel to the Administrative Agent (to the extent practicable) promptly as soon as available but no later than two (2) Business Days prior to distribution, copies of all proposed non-ministerial or administrative pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Credit Parties to any Committee or unofficial committee appointed or appearing in the Cases or the CCAA Cases, the CCAA Monitor or any other party in interest, and shall consult in good faith with the Administrative Agent's advisors regarding the form and substance of any such document;

(g)    if not otherwise provided through the Bankruptcy Court's electronic docketing system or otherwise made available to the Administrative Agent or its counsel, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent and Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Credit Parties in the Cases or the CCAA Court in the CCAA Cases, or distributed by or on behalf of the Credit Parties to any Committee or unofficial committee appointed or appearing in the Cases or the CCAA Cases or the CCAA Monitor; and

(h)    provide the Administrative Agent and Lenders no less than five (5) Business Days' (or such shorter notice acceptable to the Administrative Agent in its reasonable discretion) prior written notice prior to any (i) assumption or rejection of any Credit Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, or (ii) disclaimer or resiliation of any CCAA Debtor's material contracts or material non-residential real property leases pursuant to section 32 of the CCAA, and no such contract or lease shall be assumed, rejected, disclaimed or resiliated if such assumption or rejection adversely impacts the Term Loan Priority Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Term Loan Priority Collateral or the priority of any such Liens or DIP Superpriority Claims), if the Administrative Agent informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption, rejection, disclaimer or resiliation, as applicable.

7.20.    <u>Budget Compliance and Variances</u>.

(a)    The Credit Parties will use the proceeds of the Loans solely to make disbursements and pay expenses in accordance with <u>Section 6.08</u> and this <u>Section 7.20</u>. The Debtors shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Approved Budget.

(b)    For each Testing Period, the Borrower shall not permit:

(i)    the actual amount of total operating expenses (excluding professional fees and expenses, to the extent set forth in the schedules delivered pursuant to <u>Section 7.01(q)</u>) of the Credit Parties and their Subsidiaries during such Testing Period to exceed the projected total operating expenses of the Credit Parties and their Subsidiaries (on a cumulative basis) in the Approved Budget for such Testing Period by more than (x) in the case of any Testing Period with a

duration of one or two weeks 15.0% or (y) in the case of any other Testing Period, 12.5% (the "**Permitted Expenditures Variances**"); or

(ii)    the actual amount of total operating receipts of the Credit Parties and their Subsidiaries during any Testing Period to be less than (x) in the case of any Testing Period with a duration of one or two weeks), 85% or (y) in the case of any other Testing Period, 87.5% of the projected total operating receipts of the Credit Parties and their Subsidiaries (on a cumulative basis) set forth in the Approved Budget for such Testing Period (such variance, the "**Permitted Receipts Variances**" and, together with the Permitted Expenditures Variances, the **"Permitted Variances"**)

7.21.    Adequate Protection Payments.    Credit Parties will make adequate protection payments payable in cash on the dates and to the extent required by the Orders (such interest and payments, collectively, the "**Adequate Protection Payments**").

7.22.    DIP ABL Credit Facility.    Keep and maintain the DIP ABL Credit Facility in full force and effect and use the proceeds of advances thereunder solely for purposes and in amounts (subject to Permitted Variances) set forth in the Approved Budget or permitted by the DIP ABL Credit Agreement, the Orders or the CCAA Orders.

7.23.    Challenges.    Notwithstanding anything herein to the contrary, no portion or proceeds of the DIP Term Facility or the Collateral, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) objecting, contesting or raising any defense to the validity, perfection, priority or enforceability of, or any amount due under this Agreement, the Credit Documents, the Prepetition Term Loan Agreement or any security interests, liens or claims granted under the Orders, the CCAA Orders, the Credit Documents or the "Credit Documents" (as defined in the Prepetition Term Loan Agreement) to secure such amounts; (b) asserting any challenges, claims, actions or causes of action against any of the Lenders, the Administrative Agent, the lenders under the Prepetition Term Loan Agreement or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the Collateral; or (d) seeking to amend or modify any of the rights granted to the Administrative Agent, the Lenders, the "Secured Creditors" (as defined in the Prepetition Term Loan Agreement) under this Agreement, the Credit Documents, the Orders, the CCAA Orders or the "Credit Documents" (as defined in the Prepetition Term Loan Agreement), including seeking to use the cash collateral and/or Collateral on a contested basis.

7.24.    Post-Closing Matters.

(a)    Mortgages and Vessel Mortgages. On or prior to the date that is 45 days after the Closing Date (or such later date as may be determined by the Administrative Agent in its sole discretion), the Administrative Agent shall have received evidence of filings in proper form for the filing offices of the jurisdiction necessary or, in the reasonable opinion of the Administrative Agent, desirable, to perfect the security interest purported to be created by the

applicable Mortgage Related Documents and Vessel Mortgages. For the avoidance of doubt, no Mortgages shall be required with respect to any Real Property owned by a Debtor.

(b)    Insurance Endorsements.  On or prior to the date that is 30 days after the Closing Date (or such later date as may be determined by the Administrative Agent in its sole discretion), the Borrower and its Subsidiaries shall deliver to the Administrative Agent, with respect to each liability or property insurance policy required to be maintained by the Credit Parties pursuant to Section 7.03, a lender's loss payable endorsement and such other endorsements as the Administrative Agent shall reasonably require, in each case complying with the requirements of Section 7.03 and in form and substance reasonably satisfactory to the Administrative Agent.

(c)    Insurance Certificates.  The Borrower and its Subsidiaries shall use commercially reasonable efforts to deliver to the Administrative Agent, with respect to each liability or property insurance policy required to be maintained by the Credit Parties pursuant to Section 7.03, all such  certificates of liability and property insurance as the Administrative Agent shall reasonably require, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

Section 8    Negative Covenants.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Total Commitments have terminated and the Term Loans (together with interest thereon), fees and all other Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) incurred hereunder have been indefeasibly paid, performed or discharged in full in cash:

8.01.    Liens.  Holdings will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits thereon; provided that the provisions of this Section 8.01 shall not prevent the creation, incurrence, assumption or existence of the following (the Liens described below are herein referred to as "**Permitted Liens**"):

(a)    Liens for Taxes, assessments or governmental charges or levies not yet delinquent or Liens for Taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)    Liens in respect of property or assets of Holdings or any of its Subsidiaries imposed by law (other than Liens for taxes, assessments or governmental charges or levies that are the subject of Section 8.01(a)), such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of Holdings' or such Subsidiary's property or assets or materially impair the use thereof and (y) which are not overdue or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(c)     Liens in existence on the Closing Date which are listed, and the property subject thereto described, in Schedule 8.01;

(d)     Liens created by or pursuant to this Agreement, the Orders, the CCAA Orders and other Credit Documents;

(e)     (x) licenses, sublicenses, leases or subleases granted by Holdings or any of its Subsidiaries (except with respect to Intellectual Property) to other Persons not materially interfering with the conduct of the business of Holdings or any of its Subsidiaries and (y) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement entered into in the ordinary course of business;

(f)     Liens upon assets of any Subsidiary of Holdings subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 8.04(d), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation attaches only to the asset acquired, repaired, replaced, constructed, expanded, improved or leased, accessions to such property and the proceeds thereof;

(g)     Liens placed upon equipment or machinery used in the ordinary course of business of any Subsidiary of Holdings and placed at the time of the acquisition thereof by such Subsidiary to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 8.04(d) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of Holdings or any other asset of the Borrower or such Subsidiary;

(h)     survey exceptions, easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and zoning, building code or other restrictions (including defects and irregularities in title and similar encumbrances) as to the use of Real Properties, in each case not securing Indebtedness and which do not in the aggregate materially interfere with the conduct of the business of Holdings or any of its Subsidiaries taken as a whole;

(i)     Liens arising from precautionary UCC financing statement filings (or, in a jurisdiction outside the United States, any analogous filing in compliance with local law) regarding operating leases entered into in the ordinary course of business;

(j)     Liens arising out of the existence of judgments, orders or awards (other than any judgments, orders or awards arising out of, related to or in connection with the Plea Agreement) that do not constitute an Event of Default under Section 9.09;

(k)     statutory and common law landlords' liens under and cash deposits in favor of landlords that constitute security deposits, in each case, with regard to leases to which any Subsidiary of Holdings is a party;

(l)       pledges, deposits or security by Holdings or any of its Subsidiaries under workmen's compensation laws, unemployment insurance, employers' health tax, and other social security laws or similar legislation or other insurance related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which Holdings or any of its Subsidiaries are a party, or deposits to secure public or statutory obligations of Holdings or any of its Subsidiaries or deposits of cash or U.S. government bonds to secure surety, stay, customs or appeal bonds to which Holdings or any of its Subsidiaries are a party, or deposits as security for contested taxes or import duties or for the payment of rent, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of any such bonds or to support the issuance thereof and including those to secure health, safety and environmental obligations), in each case incurred in the ordinary course of business;

(m)       Permitted Encumbrances;

(n)       Liens securing Indebtedness permitted by <u>Section 8.04(b) and Section 8.04(n)</u>;

(o)       Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by Holdings or any Subsidiary in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)       Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)       bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Holdings or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(r)       Liens (including Liens on cash deposits) in favor of the issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds or with respect to other regulatory requirements or letters of credit or bankers' acceptances and completion guarantees, in each case issued pursuant to the request of and for the account of Holdings or any of its Subsidiaries in the ordinary course of its business;

(s)       in respect of any interest as lessee, sublessee, licensee or sublicensee, any interest or title of a lessor, sublessor, licensor or sublicensor or secured by, or otherwise encumbering, a lessor's, sublessor's, licensor's or sublicensor's interest relating to any lease,

sublease, license or sublicense (including any subordination of the interest of the lessee, sublessee or licensee under such lease, sublease, license or sublicense to any Liens in respect of the interest of the lessor, sublessor, licensor or sublicensor);

(t)    Liens in favor of insurers (or other Persons financing the payment of insurance premiums) for the premiums payable in respect of insurance policies maintained by any Credit Party issued by such insurers securing Indebtedness permitted under Section 8.04; provided that such Liens attach solely to returned premiums in respect of such insurance policies and the proceeds of such policies;

(u)    [reserved];

(v)    non-exclusive licenses, sublicenses or other rights (including covenants not to sue) under Intellectual Property (i) granted in the ordinary course of business and (ii) that are not material to the business of Holdings and its Subsidiaries (taken as a whole);

(w)    customary assignments of insurance or condemnation proceeds provided to landlords (or their mortgagees) pursuant to the terms of any lease;

(x)    Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right to set off) and which are within the general parameters customary in the banking industry;

(y)    Liens that are customary contractual rights of set-off or bankers' liens (i) relating to the establishment of depository relations with banks or other financial institutions in the ordinary course of business, (ii) relating to pooled deposit or sweep accounts of any Subsidiary of Holdings to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of any Subsidiary of Holdings or (iii) relating to purchase orders and other agreements entered into with customers of any  Subsidiary of Holdings in the ordinary course of business;

(z)    Liens encumbering the Collateral created by or pursuant to the DIP ABL Credit Agreement or any other "Loan Document" as defined therein, so long as such Liens are subject to the Intercreditor Agreement;

(aa)    Liens securing obligations arising out of, related to or in connection with the Plea Agreement in an aggregate amount not to exceed $17,000,000 (provided, that such amount shall be reduced by the aggregate amount of any payments made in satisfaction of the amounts owing under the Plea Agreement), which may be senior in priority to the Liens securing the Term Loans;

(bb)    additional Liens (other than Liens securing the obligations arising out of, related to or in connection with Plea Agreement) of any Subsidiary of Holdings arising after the Closing Date and not otherwise permitted by this Section 8.01 (excluding Section 8.01(aa)) that do not secure obligations in excess of $500,000 in the aggregate for all such Liens at any time;

(cc)    any agreements with any Governmental Authority or utility that do not, in the aggregate, adversely effect in any material respect the use of any Real Property in the operation of the business of the Holdings and its Subsidiaries, taken as a whole;

(dd)    Liens on specific items of inventory or other goods and proceeds of Holdings or any of its Subsidiaries securing such Person's obligations in respect of bankers' acceptances or trade letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(ee)    any encumbrance or restriction (including put and call arrangements) with respect to Equity Interests of any joint venture or similar arrangement pursuant to any joint venture agreement or similar agreement;

(ff)    all rights of expropriation, access or use or other similar rights conferred by or reserved by any Governmental Authority;

(gg)    all rights reserved to or vested in any Governmental Authority by the terms of any lease, license, franchise, grant or permit held by Holdings or any of its Subsidiaries or affecting the relevant Real Property and that does not materially interfere with the ordinary course of conduct of Holdings and its Subsidiaries (taken as a whole) or by any statutory provision to terminate any such lease, license, franchise, grant or permit or to require annual or periodic payments as a condition of the continuance thereof or to distrain against or to obtain a Lien on any property or assets of Holdings or any of its Subsidiaries in the event of failure to make such annual or other periodic payments, so long as in each event such annual or other periodic payments are being made;

(hh)    Liens consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a manner permitted by Section 8.02, solely to the extent such sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(ii)    Liens constituting dispositions permitted by Section 8.02;

(jj)    [reserved];

(kk)    the reservations, limitations, provisos and conditions expressed in any original grants of real or immovable property which does not materially impair the use of the affected land for the purpose used by Holdings or any of its Subsidiaries;

(ll)    Liens securing obligations permitted to be incurred pursuant to Sections 8.04(c) and (u);

(mm)    ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by Holdings or any of its Subsidiaries are located which do not in the aggregate materially interfere with the conduct of the business of Holdings or any of its Subsidiaries taken as a whole; and

(nn)    Liens on the Collateral granted to provide adequate protection pursuant to the Interim Order (and when entered, the Final Order).

8.02.    <u>Consolidation, Merger, Amalgamation, Arrangement, Purchase or Sale of Assets, etc</u>.  Holdings will not, and will not permit any of its Subsidiaries to:

(a)    wind up, liquidate or dissolve its affairs;

(b)    enter into any merger, amalgamation, arrangement, division or consolidation; or

(c)    convey, sell, lease, assign, transfer, license, sublicense, covenant not to sue or assert, abandon, allow to lapse, pledge, surrender, waive rights to or otherwise dispose of all or any part of its property or assets (including Intellectual Property) or enter into any Sale and Lease-Back Transactions, except that, in each case, to the extent permitted by the Approved Budget:

(i)    any Subsidiary of Holdings may liquidate or otherwise dispose of used, surplus, damaged, obsolete or worn-out property in the ordinary course of business;

(ii)    Liens may be incurred to the extent permitted by <u>Section 8.01</u>, mergers, amalgamations, arrangements, divisions and consolidations may be made to the extent permitted by <u>Section 8.02(b)</u>, Restricted Payments may be made to the extent permitted by <u>Section 8.03</u>, and Investments may be made to the extent permitted by <u>Section 8.05</u>;

(iii)    any Subsidiary of Holdings may sell assets (other than the "Bumble Bee" brand) for Fair Market Value and 100% cash consideration, including by way of a Sale and Lease-Back Transaction, so long as no Default or Event of Default has occurred and is continuing or would result therefrom, and the aggregate consideration for all such sales is not in excess of $500,000; <u>provided</u> that the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by <u>Section 4.02(c)</u>;

(iv)    any Subsidiary of Holdings may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction or the settlement of delinquent accounts or in connection with the bankruptcy or reorganization of customers or suppliers;

(v)    Holdings or any Subsidiary of Holdings may grant non-exclusive licenses, sublicenses or other rights (including covenants not to sue) under Intellectual Property (i) in the ordinary course of business and (ii) that are not material to the business of Holdings and its Subsidiaries (taken as a whole);

(vi)    asset sales, transfers or dispositions to Holdings or to a Subsidiary thereof shall be permitted; provided, that such transaction is permitted under Section 8.05 and Section 8.13(b) of this Agreement;

(vii)    the lapse or abandonment of Intellectual Property (not including trademark registrations or trademark applications covering the "Bumble Bee" brand in the United States, Canada or Luxembourg) that is not material to the conduct of the business of the Credit Parties or any of their Subsidiaries, taken as a whole, and does not meet the statutory requirements for maintenance of such Intellectual Property shall be permitted;

(viii)    dispositions resulting from any Recovery Events shall be permitted, provided the proceeds thereof are applied in accordance with Section 4.02(f);

(ix)    [reserved];

(x)    any Subsidiary of Holdings may liquidate or otherwise dispose of Cash Equivalents in the ordinary course of business for cash at Fair Market Value and in a transaction not otherwise prohibited by the other terms of this Agreement;

(xi)    [reserved];

(xii)    [reserved];

(xiii)    any Subsidiary of Holdings may sell inventory in the ordinary course of business;

(xiv)    any Subsidiary of Holdings may lease, sublease, license or sublicense its assets (other than Intellectual Property) in the ordinary course of business, so long as such lease, sublease, license or sublicense does not interfere in any material respect with the business or operations of Holdings and its Subsidiaries (taken as a whole); and

(xv)    any Subsidiary may sell, transfer or otherwise dispose of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements.

To the extent the Required Lenders waive the provisions of this Section 8.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 8.02 (other than to Holdings or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents (provided that such Liens shall continue as to any proceeds of such sale to the extent such assets constituted Collateral), and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

8.03.   <u>Restricted Payments</u>.  Holdings will not, and will not permit any of its Subsidiaries to (x) authorize, declare or pay any Dividends with respect to Holdings or any of its Subsidiaries or (y) make any payment or prepayment of principal of, premium, if any, or interest on, or redeem, purchase, retire, defease (including in substance or legal defeasance) or make a sinking fund or similar payment with respect to, any Restricted Debt or any Indebtedness incurred prior to the Petition Date (other than Indebtedness under the Prepetition Term Loan Agreement or the Pre-Petition Credit Agreement (as defined in the DIP ABL Credit Agreement)) (collectively, "**Restricted Payments**") except that, in each case, to the extent permitted by the Approved Budget:

(a)   any Subsidiary of Holdings may make Restricted Payments to Holdings, the Borrower or to any Wholly-Owned Subsidiary of Holdings (<u>provided</u> that if the paying Subsidiary is a Credit Party, then the recipient Subsidiary shall also be a Credit Party) or to any Person who owns Equity Interests in such Subsidiary to the extent made on a pro rata basis to all holders of such Equity Interests;

(b)   [reserved];

(c)   [reserved];

(d)   [reserved];

(e)   [reserved];

(f)   [reserved];

(g)   [reserved];

(h)   [reserved]; and

(i)   Holdings may make and pay Restricted Payments to its direct or indirect parent companies:

(i)   the proceeds of which will be used to allow any direct or indirect parent of Holdings to pay the tax liability to each relevant jurisdiction in respect of consolidated, combined, unitary or affiliated returns that include Holdings (or, if Holdings is a disregarded entity, the income of Holdings), but only to the extent of taxes that Holdings would have to pay if it had filed a tax return on a standalone basis for itself and its Subsidiaries; and

(ii)   the proceeds of which shall be used by any direct or indirect parent of Holdings to pay its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, in an aggregate amount not to exceed $100,000 in any fiscal year.

8.04.    <u>Indebtedness</u>.    Holdings will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(b)    Indebtedness incurred under the Prepetition Term Loan Agreement;

(c)    Indebtedness of the Borrower under any Hedge Agreements existing on the date hereof;

(d)    Indebtedness of any Subsidiary of Holdings evidenced by Capitalized Lease Obligations described in <u>Section 8.01(f)</u>, and purchase money Indebtedness described in <u>Section 8.01(g)</u> and, in each case, extensions and renewals <u>thereof</u>, provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this <u>clause (d)</u> exceed $500,000 at any time outstanding;

(e)    Indebtedness constituting Intercompany Loans to the extent permitted by <u>Section 8.05(h)</u>;

(f)    Indebtedness consisting of guaranties by Subsidiary Guarantors of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement;

(g)    [reserved];

(h)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within five (5) Business Days of its incurrence and customary cash management services, netting arrangements, overdraft protection and automated clearing house transfers;

(i)    Indebtedness consisting of (i) obligations incurred in the ordinary course of business under surety and appeal bonds, performance bonds, bid bonds, performance and completion guarantees and similar obligations and not in connection with the borrowing of money; (ii) guarantees with respect to Indebtedness of Holdings or one of its Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness; provided that the Investment in such Subsidiary is permitted under <u>Section 8.05(h)</u>; (iii) guarantees incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees and (iv) bankers' acceptances, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance);

(j)    Indebtedness described on <u>Schedule 8.04</u> as of the Closing Date;

01:25621776.1

(k)      the endorsement of negotiable instruments for deposit or collection in the ordinary course of business;

(l)      Indebtedness representing deferred compensation to directors, officers, employees or contractors of any Credit Party or any Subsidiary of a Credit Party incurred in the ordinary course of business;

(m)      so long as no Default or Event of Default then exists or would result therefrom, additional Indebtedness incurred by any Subsidiary of Holdings in an aggregate principal amount not to exceed $500,000 at any one time outstanding, which Indebtedness shall be unsecured unless otherwise permitted under Section 8.01(bb);

(n)      Indebtedness under the DIP ABL Credit Agreement (I) in an aggregate principal amount of outstanding (1) Advances (under and as defined in the DIP ABL Credit Agreement), (2) Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, and (3) undrawn Letters of Credit (under and as defined in the DIP ABL Credit Agreement) to the extent not covered under clause (II) hereof, of (x) at any time on or prior to January 31, 2020, $170,000,000 and (y) at any time on or after February 1, 2020, $175,000,000, (II) with respect to the undrawn Letters of Credit (under and as defined in the DIP ABL Credit Agreement) outstanding on the Closing Date and any replacement Letters of Credit with respect thereto, which replacement Letters of Credit shall be in an aggregate undrawn face amount no greater than that of the Letters of Credit being replaced and (III) described in clauses (b), (d) and (f) of the definition of the "ABL Cap" in the Intercreditor Agreement; provided that Indebtedness under the DIP ABL Credit Agreement incurred as a result of funding the Carve Out Reserves (as defined in the Orders) pursuant to the Orders and in accordance with Section 2.13(h) shall be permitted;

(o)      Indebtedness arising from agreements of Holdings or any Subsidiary providing for indemnification, adjustment of purchase price, or similar obligations, in each case entered into in connection with the sale, transfer or disposition of any business, assets or Equity Interests permitted hereunder; provided that (i) such Indebtedness is not reflected on the balance sheet of Holdings or any Subsidiary (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (i)) and (ii) the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds, including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by Holdings and the Subsidiaries in connection with such disposition;

(p)      (i) Indebtedness in respect of obligations of Holdings or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of Holdings or any Subsidiary in respect of accounts payable incurred

in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(q)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Holdings or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(r)    [reserved];

(s)    [reserved];

(t)    to the extent constituting Indebtedness, Investments permitted by Section 8.05 and Restricted Payments permitted by Section 8.03; and

(u)    Indebtedness constituting Bank Product Obligations (as defined in the DIP ABL Credit Agreement) provided by any Bank Product Provider (as defined in the DIP ABL Credit Agreement).

8.05.    Advances, Investments and Loans.  Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment, except that the following shall be permitted, in each case, to the extent permitted by the Approved Budget:

(a)    extensions of trade credit, asset purchases (including purchases of inventory, supplies and materials), the lease of any asset, in each case in the ordinary course of business;

(b)    Holdings and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)    any Subsidiary of Holdings may hold the Investments held by them on the Closing Date or committed to be made by them as of the Closing Date, and in each case described on Schedule 8.05;

(d)    any Subsidiary of Holdings may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(e)    (i) any Subsidiary of Holdings may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $500,000 for all such loans and advances at any time (determined without regard to any write-downs or write-offs of such loans and advances) and (ii) advances of payroll payments and expenses in the ordinary course of business;

(f)    [reserved];

01:25621776.1

(g)      the Borrower may enter into Hedge Agreements to the extent permitted by Section 8.04(c);

(h)      (a) Investments (i) by any Credit Party in any other Credit Party, (ii) by any Subsidiary that is not a Credit Party in any Credit Party, (iii) by any Credit Party in any Subsidiary that is not a Credit Party in the ordinary course of business in an aggregate amount not to exceed $250,000, and (iv) by any Subsidiary that is not a Credit Party in any other Subsidiary that is not a Credit Party; provided, that (A) Investments made pursuant to the preceding clause (i) shall only be made between Credit Parties organized in Approved Jurisdictions, (B) [reserved], (C) each Investment in the form of an intercompany loan (collectively, "**Intercompany Loans**") made by any Subsidiary that is not a Credit Party to a Credit Party shall be subject to the subordination provisions contained in the Intercompany Subordination Agreement and (D) any Investment made in any Subsidiary Guarantor pursuant to this clause (h) shall cease to be permitted by this clause (h) if such Subsidiary Guarantor ceases to constitute a Subsidiary Guarantor;

(i)      Holdings and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are permitted under another provision of this Section 8.05);

(j)      Contingent Obligations permitted by Section 8.04, and Liens permitted by Section 8.01, in each case, to the extent constituting Investments;

(k)      [reserved];

(l)      any Subsidiary of Holdings may receive and hold promissory notes and other non-cash consideration received in connection with any asset sale permitted by Section 8.02(c);

(m)      any Subsidiary of Holdings may make deposits, prepayments and other credits to vendors, suppliers and trade creditors consistent with their past practices, and incurred in the ordinary course of business;

(n)      bank deposits in the ordinary course of business;

(o)      [reserved];

(p)      [reserved];

(q)      Investments in prepaid expenses, utilities and workers' compensation, performance and other similar deposits, each as entered into in the ordinary course of business;

(r)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(s)     cash Investments to fund any capital expenditures (defined in accordance with GAAP) to the extent permitted by and not to exceed the amount set forth in the Approved Budget (subject to the Permitted Variances) for the applicable Testing Period;

(t)     [reserved];

(u)     in addition to Investments permitted by clauses (a) through (t) of this Section 8.05, any Subsidiary of Holdings may make additional loans, advances and other Investments to or in a Person in an aggregate amount for all loans, advances and other Investments made pursuant to this clause (u) (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a distribution, dividend, redemption or sale) in the case of equity investments, not to exceed $500,000; provided further that on the date of any such Investment and after giving effect thereto, no Default or Event of Default shall exist or shall have occurred and be continuing.

(v)     non-exclusive licenses, sublicenses or other rights (including covenants not to sue) under Intellectual Property that are granted in the ordinary course of business and that are not material to the business of Holdings or any of its Subsidiaries;

(w)     [reserved]; and

(x)     to the extent constituting an Investment, any Restricted Payments permitted by Section 8.03.

8.06.     Transactions with Affiliates.  Holdings will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of Holdings or any of its Subsidiaries with an aggregate consideration in excess of $100,000, whether or not in the ordinary course of business, other than on terms and conditions substantially as favorable to Holdings or such Subsidiary as would reasonably be obtained by Holdings or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)     Restricted Payments may be paid to the extent provided in Section 8.03;

(b)     to the extent permitted by the Approved Budget, loans may be made and other transactions may be entered into by Holdings and its Subsidiaries to the extent permitted by Sections 8.02, 8.04 and 8.05;

(c)     to the extent permitted by the Approved Budget, customary fees, indemnities and reimbursements may be paid to (i) non-officer directors and (ii) officers and other advisors of Holdings and its Subsidiaries;

(d)     [reserved];

(e)     to the extent permitted by the Approved Budget, employment and severance arrangements and health, disability and similar insurance or benefit plans between Holdings (or any of its direct or indirect parent thereof) and the Subsidiaries and their respective

directors, officers, employees (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current or former employees, officers or directors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the Board of Directors of Holdings (or any of its direct or indirect parent thereof);

(f)     transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 8.06 hereto;

(g)     transactions among Credit Parties, to the extent such transactions are not otherwise prohibited by this Agreement;

(h)     [reserved]; and

(i)     to the extent permitted by the Approved Budget, the payment of customary fees and reasonable and documented out-of-pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of Holdings (or any direct or indirect parent thereof) and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Holdings and the Subsidiaries.

Notwithstanding the foregoing, neither Holdings nor any of its Subsidiaries shall be permitted to pay any management, monitoring, consulting, transaction, advisory or similar fees to the Sponsor or any of its Affiliates.

8.07.   [Reserved].

8.08.   [Reserved].

8.09.   [Reserved].

8.10.   Sale and Lease-Back Transactions.  Holdings will not, nor will it permit any Subsidiary to, enter into any Sale and Lease-Back Transaction; provided, that Holdings or any Subsidiary may enter into a Sale and Lease-Back Transaction if (a) Holdings or such Subsidiary, as applicable, could have (i) incurred Indebtedness in an amount equal to the Attributable Indebtedness relating to such Sale and Lease Back Transaction under Section 8.04, (ii) incurred a Lien to secure such Indebtedness without equally and ratably securing the Obligations pursuant to Section 8.01 and (b) the transfer of assets in such Sale and Lease-Back Transaction is permitted by Section 8.02(c)(iii) and Holdings or such Subsidiary applies the proceeds of such transaction in compliance with Section 4.02(c).

8.11.   Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements.  Holdings will not, and will not permit any of its Subsidiaries to:

(a)     amend, modify or change its certificate or articles of incorporation (including by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or

other Equity Interests (including any shareholders agreement and any Qualified Preferred Equity), or enter into any new agreement with respect to its capital stock or other Equity Interests;

(b)    on and after the execution and delivery thereof, amend, modify or waive, or permit the amendment, modification or waiver of any provision of any Restricted Debt in violation of any applicable subordination provisions or the Intercompany Subordination Agreement;

(c)    terminate or otherwise amend, modify, supplement or change any provision of any Material Agreement unless such termination, amendment, modification or change could not reasonably be expected to be materially adverse to the interests of the Lenders; or

(d)    make (or give any notice in respect of) any principal or interest payment on, or any redemption or acquisition for value of, or any other payment with respect to any Restricted Debt in violation of this Agreement or any applicable subordination provisions.

8.12.    <u>Limitation on Certain Restrictions on Subsidiaries</u>.  Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interest or participation in its profits owned by Holdings or any of its Subsidiaries, or pay any Indebtedness owed to Holdings or any of its Subsidiaries, (b) make loans or advances to Holdings or any of its Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, the  DIP ABL Credit Agreement and any "Loan Documents" as defined therein, the Prepetition Term Loan Agreement and any "Credit Documents" as defined therein, (iii) customary provisions restricting subletting or assignment of any lease or license governing any leasehold or license interest of Holdings or any of its Subsidiaries, (iv) customary provisions restricting assignment of any licensing agreement (in which Holdings or any of its Subsidiaries is the licensee) or other contract entered into by Holdings or any of its Subsidiaries in the ordinary course of business, (v) restrictions on the transfer of any asset pending the close of the sale of such asset, (vi) restrictions on the transfer of any asset subject to a Lien permitted by <u>Section 8.01(c)</u> or <u>(i)</u>, (vii) [reserved], (ix) agreements in effect at the time a Person becomes a Subsidiary of Holdings, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of Holdings, (ix) other agreements in effect on the Closing Date as scheduled on <u>Schedule 8.12</u>, (x) customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate solely to the assets subject thereto, (xi) customary net worth provisions contained in real property leases entered into by Subsidiaries of Holdings, so long as Holdings has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of Holdings and its Subsidiaries to meet their ongoing obligation and (xii) any restrictions imposed by any agreement relating to Indebtedness incurred pursuant to <u>Section 8.04(m)</u>, to the extent such restrictions are not materially more restrictive, taken as a whole, than the restrictions contained herein.

8.13.  <u>Business; etc</u>.  (a)  Holdings will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by Holdings and its Subsidiaries on the Closing Date and any businesses that are reasonably similar, incidental, complementary, ancillary or related to, the businesses engaged in by Holdings and its Subsidiaries on the Closing Date.

(b)  Notwithstanding the foregoing or anything else in this Agreement to the contrary, Holdings will not engage in any business or own any significant assets or have any material Indebtedness other than (i) (x) its ownership of the Equity Interests in its Subsidiaries and (y) holding of cash and Cash Equivalents in the aggregate at any time (together with any investment income thereon), (ii) those liabilities which it is responsible for under this Agreement and the other Credit Documents to which it is a party, the DIP ABL Credit Agreement and related documents or the Prepetition Term Loan Agreement and related documents, (iii) customary liabilities, expenses and indemnity obligations for directors, officers and employees and expenses in the ordinary course of business, (iv) [reserved], (v) any transactions that any such Person is permitted to enter into or consummate pursuant to the terms and conditions of this <u>Section 8</u> of this Agreement, including making any Restricted Payments permitted by <u>Section 8.03</u> or making other dividends or distributions or holding any cash or Cash Equivalents received in connection any such dividends or distributions, in each case, in accordance with the Approved Budget, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, in each case, in accordance with the Approved Budget, (vii) [reserved], (viii) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by <u>Section 8.05</u> and applicable solely to such joint venture entered into in the ordinary course of business and prior to the Closing Date and (ix) activities incidental to the businesses or activities described in <u>clauses (i)</u> to <u>(viii)</u> of this <u>Section 8.13(b)</u>; <u>provided</u> that Holdings may engage in those activities that are incidental to (x) the maintenance of its existence in compliance with applicable law and (y) legal, tax and accounting matters in connection with any of the foregoing activities.

8.14.  <u>Limitation on Creation of Subsidiaries</u>.

(a)  Subject to the limitations set forth in this Agreement and the other Credit Documents, at the time that any Credit Party forms any direct or indirect, Wholly-Owned Subsidiary (other than an Excluded Subsidiary), acquires any direct or indirect, Wholly-Owned Subsidiary (other than an Excluded Subsidiary) after the Closing Date, such Credit Party shall:

(i)  within 15 Business Days of such formation or acquisition (or such later date as may be agreed by the Administrative Agent in its reasonable discretion) cause any such new Subsidiary to provide to the Administrative Agent a joinder to the Guaranty, the Security Agreements and the Intercompany Subordination Agreement, in each case together with such other security documents (other than Mortgages, the timing of delivery of which shall be governed by <u>clause (b)</u> below), as well as appropriate financing statements, all in form and substance reasonably satisfactory to the Administrative Agent (including being sufficient to grant the Administrative Agent a first priority Lien

(subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary in accordance with the Credit Documents);

(ii)    within 15 Business Days of such formation or acquisition (or such later date as may be agreed by the Administrative Agent in its reasonable discretion) provide to the Administrative Agent to the extent not covered by the Security Agreements, a pledge agreement and appropriate certificates and powers or financing statements, hypothecating the Equity Interests of any new Subsidiary (other than Excluded Stock) reasonably satisfactory to the Administrative Agent; and

(iii)    within 15 Business Days of such formation or acquisition (or such later date as may be agreed by the Administrative Agent in its reasonable discretion) provide to the Administrative Agent all other documentation, including, if reasonably requested by the Administrative Agent, one or more opinions of counsel reasonably satisfactory to the Administrative Agent.

(b)    Mortgages shall, with respect to any Real Property Collateral, be required to be delivered within 30 days after the acquisition of such Real Property Collateral (or such later date as may be agreed by the Administrative Agent in its reasonable discretion) and shall be accompanied by the Mortgage Related Documents with respect to the Real Property Collateral to be subject to such Mortgage and a local opinion of counsel to the relevant Credit Party with respect to the enforceability of the applicable Mortgages and any related fixture filings (or in the event a Subsidiary of the Borrower is the mortgagor, to such Subsidiary) in form and substance reasonably satisfactory to the Administrative Agent.

(c)    [Reserved]

(d)    Any document, agreement, or instrument executed or issued pursuant to this Section 8.14 shall be a Credit Document.

8.15.    Certain Deposit Accounts.  Commencing on the Closing Date, none of the Credit Parties will maintain a Deposit Account that is not an Excluded Account, unless such Deposit Account is (a) subject to a "control agreement" referred to in Section 6(c) of the Security Agreements or is subject to a perfected Lien in favor of the Administrative Agent pursuant to the Orders or (b) otherwise under the "control" (within the meaning of Section 9-104 of the New York UCC) of the Administrative Agent, or in the case of deposit accounts located in Canada, subject to a blocked account agreement in favor of the Administrative Agent.

8.16.    Anti-Terrorism and Anti-Corruption Laws.  Holdings will not, and will not permit any of its Subsidiaries to, use the proceeds of any Term Loan, or other extension of credit hereunder, directly or indirectly, to fund any activities of or business with any Embargoed Person, or for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage in violation of anti-corruption laws.

8.17.    <u>Civil Cases</u>.  Holdings will not, and will not permit any of its Subsidiaries to, enter into (or request the Bankruptcy Court or CCAA Court to approve) any settlement or similar agreement in connection with the Civil Cases without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

8.18.    <u>Canadian Pension Plans</u>.  No Canadian Credit Party in existence on the Closing Date, nor any Subsidiary created after the Closing Date as permitted under <u>Section 8.14</u> that becomes a Canadian Credit Party, shall, without the prior written consent of the Administrative Agent, commence to participate in a Canadian Defined Benefit Pension Plan not in existence as of the Closing Date, other than to the extent required to do so by applicable local Law.

8.19.    <u>Litigation Spend</u>.  After the Petition Date, any fees, costs and expenses paid, reimbursed or owing, directly or indirectly, by Holdings or any of its Subsidiaries (including any such fees, costs and expenses that have accrued prior to the date hereof, but have not yet been paid as of the date hereof) to any Person in connection with the Civil Cases and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Cases, including, without limitation, to (I) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (II) Keker, Van Nest & Peters LLP and/or any other legal counsel representing Christopher Lischewski, (III) Compass Lexecon and/or any other experts in connection with the Civil Cases and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Cases and/or (IV) any other legal counsel representing Walter Scott Cameron and/or Kenneth Worsham and/or any other individual and/or Holdings and/or any of its Subsidiaries in connection with the Civil Cases and/or any Department of Justice actions brought based on the same or similar conduct at issue in the Civil Cases shall not exceed an aggregate amount of $450,000.

Section 9    <u>Events of Default.</u>

Upon the occurrence of any of the following specified events (each, an "**Event of Default**"):

9.01.    <u>Payments</u>.  The Borrower shall (a) default in the payment when due of any principal of any Term Loan or any Term Note or (b) default, and such default shall continue unremedied for three (3) or more Business Days, in the payment when due of any interest on any Term Loan or Term Note or any fees or any other amounts owing hereunder or under any other Credit Document; or

9.02.    <u>Representations, etc</u>.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate (including any Budget Variance Report) delivered to the Administrative Agent, or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

9.03.    <u>Covenants</u>.  Holdings or any of its Subsidiaries shall (a) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Sections 2.13</u>, <u>7.01(f)</u>, <u>7.01(h)</u>, <u>7.04</u>, <u>7.05</u>, <u>7.11</u>, <u>7.18</u>, <u>7.19</u>, <u>7.20</u>, <u>7.21</u>, <u>7.23</u>, <u>7.24</u> or <u>Section 8</u> of this

Agreement, (b) default in the due performance or observance by it of any terms, covenant, or agreement contained in Sections 7.01(a), (b), (c), (e), (g), (i), (l), (n), (o), (p) or (q) and, in the case of this clause (b), such default shall continue unremedied for a period of two (2) Business Days after the occurrence of such default after the earlier of (x) written notice from the Administrative Agent of such default and (y) actual knowledge of an Authorized Officer of any Credit Party of the occurrence thereof, or (c) default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement (other than those set forth in Section 9.01, Section 9.02 or clause (a) or (b) of this Section 9.03) or any other Credit Document and, in the case of this clause (c), such default shall continue unremedied for a period of 30 days after the earlier of (x) written notice from the Administrative Agent of such default and (y) actual knowledge of an Authorized Officer of any Credit Party of the occurrence thereof; or

9.04.    Default Under Other Agreements.  (a) Holdings or any of its Subsidiaries shall (i) default in any payment of any Material Indebtedness (other than (x) the Obligations and (y) in the case of any Debtor or CCAA Debtor, any other Material Indebtedness incurred by such Debtor or CCAA Debtor prior to the Petition Date or the CCAA Filing Date, respectively, to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Cases or the CCAA Orders) beyond the period of grace, if any, provided in an instrument or agreement under which such Material Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any Material Indebtedness (other than (x) the Obligations and (y) in the case of any Debtor or CCAA Debtor, any other Material Indebtedness incurred by such Debtor or CCAA Debtor prior to the Petition Date or the CCAA Filing Date, respectively, to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Cases or the CCAA Orders) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined after all grace periods have run), any such Material Indebtedness to become due prior to its stated maturity; or (b) any Material Indebtedness (other than (x) the Obligations and (y) in the case of any Debtor or CCAA Debtor, any other Material Indebtedness incurred by such Debtor or CCAA Debtor prior to the Petition Date or the CCAA Filing Date, respectively, to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Cases or the CCAA Orders) of Holdings or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid (other than by (i) a regularly scheduled required prepayment or (ii) a mandatory prepayment (unless such required prepayment or mandatory prepayment results from a default thereunder or an event of the type that constitutes an Event of Default)), prior to the stated maturity thereof; or

9.05.    Bankruptcy, etc.  Any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or a CCAA Debtor, shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"); or an involuntary case is commenced against any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, and the petition is not dismissed within 60 days after the filing thereof, provided, however, that during the pendency of such period, each Lender shall be relieved of its obligation to extend credit hereunder; or a custodian (as defined in the Bankruptcy Code) or a receiver, receiver and manager, trustee, restructuring officer or similar official is appointed for, or takes charge of, all

or substantially all of the property of any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, to operate all or any substantial portion of the business of such Person, or any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, receivership or liquidation or similar law of any jurisdiction, including Canadian Bankruptcy and Insolvency Law, whether now or hereafter in effect relating to any Credit Party or any Subsidiary, in each case, that is not a Debtor or CCAA Debtor, or there is commenced against or with respect to any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, makes a general assignment for the benefit of creditors; or any Company action is taken by any Credit Party or any of its Subsidiaries, in each case, that is not a Debtor or CCAA Debtor, for the purpose of effecting any of the foregoing; or any Credit Party existing under Luxembourg law (i) becomes subject to a judgement or decision in respect of bankruptcy (*faillite*), composition with the creditors (*concordat préventif de la faillite*), suspension of payments (*sursis de paiements*), controlled management (*gestion contrôlée*), judicial liquidation (*liquidation judiciaire*), dissolution, the appointment of a temporary administrator (*administrateur provisoire*) or any other similar proceedings under Luxembourg law, or (ii) is in a state of cessation of payments (*cessation des paiements*); provided, that any of the foregoing actions undertaken by Holdings, or any of its Subsidiaries that are not Debtors or CCAA Debtors, with the consent of the Administrative Agent shall not constitute an Event of Default; or

        9.06.  ERISA.  (a)  Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA, a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any determination that any Plan is considered at-risk or in endangered or critical status as defined in Sections 303, 304 and 305 of ERISA or Sections 430, 431, and 432 of the Code, any Plan which is subject to Title IV of ERISA shall have had or is likely to have a trustee appointed to administer such Plan, any Plan which is subject to Title IV of ERISA is, shall have been or is likely to be terminated or to be the subject of termination proceedings under ERISA, any Plan shall have an Unfunded Current Liability, a contribution required to be made with respect to a Plan has not been timely made, Holdings or any Subsidiary or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4071, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or a withdrawal liability from any multiemployer plan (as defined in Section 4001(a)(3) of ERISA), or Holdings or any Subsidiary of Holdings has incurred or is likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than

as required by Section 601 of ERISA) or Plans, a "default**,**" within the meaning of Section 4219(c)(5) of ERISA, shall occur with respect to any Plan; any applicable law, rule or regulation is adopted, changed or interpreted, or the interpretation or administration thereof is changed, in each case after the Closing Date, by any Governmental Authority (a "**Change in Law**"), or, as a result of a Change in Law, an event occurs following a Change in Law, with respect to or otherwise affecting any Plan; (b) there shall result from any such event or events described in clause (a) above the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; provided any such event or events described in clause (a) above and any such lien, security interest or liability, described in this clause (b) individually, and/or in the aggregate, has had a Material Adverse Effect; or (c) a Canadian Pension Event shall have occurred and such event individually and/or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect; or

       9.07.  Credit Documents.  (i) Any material provision of the Credit Documents, taken as a whole, shall fail or cease to be in full force and effect (except as a result of a release of Collateral in accordance with the terms thereof) or shall be declared null and void, (ii) the applicable Order or CCAA Order or any Security Document shall fail or cease to give the Administrative Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including a perfected (subject to Section 11.16) security interest in, and Lien on, all of the Collateral, in favor of the Administrative Agent, taken as a whole, subject to Permitted Liens) or (iii) any Credit Party or any of their respective Affiliates shall contest the validity or enforceability of any Credit Document or disaffirm any Credit Party's obligations under any Credit Document; or

       9.08.  Guaranties.  Any material provision of any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party; or

       9.09.  Judgments.  One or more judgments, orders, awards or decrees (other than in connection with the Plea Agreement, which is the subject of Section 9.11) arising following the Petition Date shall be entered against Holdings or any Subsidiary involving in the aggregate for Holdings and its Subsidiaries a liability (to the extent not paid (or to the extent such order, award or decree is subject to an approved payment plan, to the extent such order, award or decree has not been paid in accordance with the terms of such plan) or to the extent not covered by indemnity or a reputable and solvent insurance company) and such judgments, orders, awards and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $1,000,000; or

       9.10.  Subordination.  (a)  The subordination provisions of the documents evidencing or governing any subordinated Indebtedness (the "**Subordinated Provisions**") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of applicable subordinated Indebtedness; or (b) the Borrower or

any other Credit Party shall, directly or indirectly, disavow or contest in any manner (i) the effectiveness, validity or enforceability of any of the Subordinated Provisions, (ii) that the Subordinated Provisions exist for the benefit of the Administrative Agent and the Lenders or (iii) that all payments of principal of or premium and interest on the applicable subordinated Indebtedness, or realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordinated Provisions;

9.11.    Plea Agreement.  Holdings, its Subsidiaries or any of their respective Affiliates shall pay, cause to be paid, or agree to pay, any fine, penalty or other amount under the Plea Agreement in excess of (a) $25,000,000 in the aggregate or (b) (i) $4,000,000 after the second anniversary of August 2, 2017 (such date, the "**Approval Date**")  and on or prior to the third anniversary of the Approval Date, (ii) $6,000,000 after the third anniversary of the Approval Date and on or prior to the fourth anniversary of the Approval Date and (iii) $7,000,000 after the fourth anniversary of the Approval Date;

9.12.    [Reserved]; or

9.13.    The Cases and CCAA Cases; Bankruptcy Matters.

(a)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Debtors and the Debtors shall have not obtained use of cash collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent;

(b)    (i) any of the Cases of the Credit Parties shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) any of the CCAA Cases shall be dismissed or otherwise terminated or (iii) any proceeding under or pursuant to the BIA shall have been commenced in respect of any of the Credit Parties;

(c)    (A) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner), (B) a receiver, receiver and manager, trustee or restructuring officer or (C) a monitor with enhanced powers is appointed or elected in any of the Cases or the CCAA Cases (or otherwise in respect of any of the CCAA Debtors or their respective assets), or any Credit Party applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court, the CCAA Court or any other applicable court shall have entered an order providing for such appointment;

(d)    an RSA Termination Event shall have occurred and be continuing or the Restructuring Support Agreement is terminated (other than by agreement among the parties thereto);

(e)    any Credit Party or any of its Subsidiaries, or any person claiming by or through any Credit Party or any of its Subsidiaries, with any Credit Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent or any of the Lenders relating to the DIP Term Facility or (B) the administrative agent or any lender relating to the Prepetition Term Loan Agreement;

(f)    any Credit Party, or any person on behalf of any Credit Party, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above or the granting of any other relief that if granted would give rise to an Event of Default;

(g)    the existence of any claims or charges, or the entry of any order of the Bankruptcy Court or the CCAA Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility, the DIP ABL Credit Facility and the Carve-Out or as otherwise permitted under the applicable Credit Documents, the Orders or the CCAA Orders, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code or superpriority pursuant to the CCAA, as applicable, that are *pari passu* with or senior to the claims or Liens of the Administrative Agent and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests provided for herein securing the Obligations hereunder, except, in each case, as expressly provided in the Credit Documents  or in the Order or the CCAA Order, as applicable, then in effect (but only in the event specifically consented to by the Administrative Agent), whichever is in effect;

(h)    the Bankruptcy Court or the CCAA Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) or a CCAA Debtor and/or the CCAA Monitor shall consent to a lifting of the CCAA stay of proceedings to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets that constitute Collateral of any of the Debtors or the CCAA Debtors which have a value in excess of $250,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole) or the CCAA Debtors (taken as a whole);

(i)    (i) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order, the Bidding Procedures Order, the Final Order, or the Sale Order without the prior written consent of the Administrative Agent or (ii) an order of the CCAA Court shall be granted reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the CCAA Initial Order or the CCAA A&R Initial Order without the prior written consent of the Administrative Agent, or (iii) a Debtor or a CCAA Debtor shall apply for the authority to do any of the foregoing;

(j)    any of the Credit Parties shall (i) fail to comply with the Stalking Horse APA in any material respect or (ii) amend the Stalking Horse APA in a manner that is adverse to the interests of the Lenders without the prior written consent of the Administrative Agent;

(k)    any of (i) the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) or (ii) the CCAA Initial Order (prior to the CCAA A&R Initial Order Date) or the CCAA A&R Initial Order (on and after the CCAA A&R

Initial Order Date) shall cease to create a valid and perfected Lien on the Collateral of any Debtor or CCAA Debtor, as the case may be, or to be in full force and effect, or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent;

(l)      an order shall have been entered by the Bankruptcy Court or the CCAA Court, as applicable, avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations or by any of the lenders under the Prepetition Term Loan Agreement of any amounts received in respect thereof;

(m)      an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Administrative Agent;

(n)      any of the Credit Parties shall fail to comply in any material respect with the Interim Order (prior to the Final Order Entry Date), the Final Order (on and after the Final Order Entry Date), the CCAA Initial Order (prior to the CCAA A&R Initial Order Date) or the CCAA A&R Initial Order (on and after the CCAA A&R Initial Order Date), the Bidding Procedures Order, or the Sale Order;

(o)      an order shall have been entered by the Bankruptcy Court or the CCAA Court providing for a change in venue with respect to the Cases or the CCAA  Cases, as applicable, without the approval of the Administrative Agent and such order shall not be reversed or vacated within 10 days;

(p)      an order in the Cases shall be entered charging any of the Collateral of any Debtor or any of the  "Collateral" (as defined in the Prepetition Term Loan Agreement) under Section 506(c) of the Bankruptcy Code against the Lenders or the lenders under the Prepetition Term Loan Agreement or the commencement of other actions by the Debtors that are materially adverse to Administrative Agent or the Lenders or the lenders under the Prepetition Term Loan Agreement or their respective rights and remedies under the DIP Term Facility or under the Prepetition Term Loan Agreement in any of the Cases or inconsistent with any of the Credit Documents or the "Credit Documents" (as defined in the Prepetition Term Loan Agreement);

(q)      any order shall be entered which dismisses any of the Cases of the Debtors or any of the CCAA Cases of the CCAA Debtors, which order does not provide for payment in full in cash of the Obligations under the Credit Documents (other than contingent indemnification obligations not yet due and payable), or any of the Debtors, the CCAA Debtors and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(r)      any Credit Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 9.13 or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal;

(s)      any Credit Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in

any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the DIP Superpriority Claims, the priority of the CCAA DIP Charge or the Liens granted to secure the Obligations or any other rights granted to the Administrative Agent and the Lenders in the Orders, the CCAA Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code or analogous relief under the CCAA with respect to any Collateral of any Debtor;

(t)     any Credit Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or any lender under the Prepetition Term Loan Agreement with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default;

(u)     without the consent of the Administrative Agent, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(v)     without the Administrative Agent's consent, the entry of any order by the Bankruptcy Court or the CCAA Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court or the CCAA Court (in each case, other than the Orders, the CCAA Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent or to obtain any financing under section 364 of the Bankruptcy Code or the CCAA other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(w)     any Credit Party or any person on behalf of any Credit Party shall file any motion seeking authority to consummate a sale of assets of the Credit Parties or the Collateral having a value in excess of $500,000 outside the ordinary course of business and not otherwise permitted hereunder;

(x)     if any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Credit Parties shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or the CCAA Court or another court to address any such court order;

(y)     any Debtor or CCAA Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments in respect of the repayment of the Indebtedness under the Prepetition Term Loan Agreement or the Pre-Petition Credit Agreement (as defined in the DIP ABL Credit Agreement) or as otherwise permitted under this Agreement,

in each case, to the extent authorized by one or more "first day" or "second day" orders, the Interim Order, the Final Order, or the CCAA Orders and consistent with the Approved Budget;

(z)    without the Administrative Agent's consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court or the CCAA Court seeking (i) to grant or impose, under section 364 of the Bankruptcy Code, the CCAA or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Collateral Agent's liens and security interests; (ii) to use, or seek to use, Cash Collateral; or (iii) to modify or affect any of the rights of the Administrative Agent or the Lenders under the Orders, the CCAA Orders or the Credit Documents, by any order entered in the Cases or the CCAA Cases; or

(aa)    any order shall be entered which dismisses or otherwise terminates any of the Cases of the Debtors or the CCAA Cases of the CCAA Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations under the Credit Documents and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnity obligations not yet due), or any of the Debtors or CCAA Debtors shall seek confirmation of any such plan or entry of any such order.

9.14.    Change of Control.  A Change of Control shall occur; Then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent may, or, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 9.04 shall occur, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (a) and (b) below shall occur automatically without the giving of any such notice): (a) declare the Total Commitments terminated and whereupon all Commitments of each Lender shall forthwith terminate immediately; (b) declare the principal of and any accrued interest in respect of all Term Loans and the Term Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (c) enforce, as Administrative Agent, all of the Liens and security interests created pursuant to the Security Documents; (d) enforce each Guaranty; and (e) apply any cash collateral held by the Administrative Agent pursuant to Section 4.02 to the repayment of the Obligations. Notwithstanding anything to the contrary herein, subject to the provisions of the Interim Order (and, when entered, the Final Order) and the CCAA Initial Order (and, when issued and entered, the CCAA A&R Initial Order), as applicable, (x) the enforcement of certain Liens or remedies with respect to the Collateral of the Debtors and the CCAA Debtors shall be subject to five (5) Business Days prior written notice (the "**Remedies Notice Period**") to the Debtors and the CCAA Debtors, as applicable, and (y) after expiration of the Remedies Notice Period, the Administrative Agent, on behalf of the Secured Creditors, shall be entitled to exercise all rights and remedies provided for in this Agreement, the Orders, the CCAA Orders and the other Credit Documents, and under applicable law. During the Remedies Notice Period, the Debtors and the CCAA Debtors shall be entitled to seek an emergency hearing with the Bankruptcy Court and/or the CCAA Court, for the sole purpose of contesting whether an Event of Default has occurred and is continuing.

01:25621776.1

The rights and remedies of the Administrative Agent under this Agreement, the other Credit Documents, and all other agreements shall be cumulative. The Administrative Agent shall have all other rights and remedies not inconsistent herewith as provided under the UCC, the PPSA, by law, or in equity. No exercise by the Administrative Agent of one right or remedy shall be deemed an election, and no waiver by the Administrative Agent, or the Lenders of any Event of Default shall be deemed a continuing waiver. No delay by the Administrative Agent shall constitute a waiver, election, or acquiescence by it. No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent, any right or remedy under the Credit Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.

Section 10    The Administrative Agent.

10.01. Appointment.    The Lenders hereby irrevocably designate and appoint Brookfield as Administrative Agent to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

10.02. Nature of Duties.    The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents. Neither the Administrative Agent nor any of its officers, directors, agents, employees or Affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

10.03. Lack of Reliance on the Administrative Agent.    (a)  Each Lender from time to time party to this Agreement (i) confirms that it has received a copy of this Agreement and the other Credit Documents, together with copies of the financial statements referred to therein, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to become a Lender under this Agreement, (ii) agrees that it has made and will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Credit Documents and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing

basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter; <u>provided</u> that, upon the reasonable request of a Lender, the Administrative Agent shall provide to such Lender any documents or reports delivered to such Administrative Agent by the Credit Parties pursuant to the terms of this Agreement or any other Credit Document unless the Administrative Agent is restricted from doing so due to the confidentiality requirements of <u>Section 11.15</u>, (iii) acknowledges and agrees that no fiduciary or advisory relationship between the Administrative Agent and any Lender is intended to be or has been created in respect of any of the transactions contemplated by this Agreement, (iv) acknowledges and agrees that the Administrative Agent, on the one hand, and each Lender on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, and no Lender relies on, any fiduciary duty on the Administrative Agent's part, (v) acknowledges and agrees that each Lender is capable of evaluating and understanding, and each such Lender understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement, (vi) acknowledges and agrees that the Administrative Agent or any of its Affiliates may have received fees or other compensation from any Credit Party or any Affiliate of any Credit Party in connection with this Agreement which may or may not be publicly disclosed and such fees or compensation do not affect any Lender's independent credit decision to enter into the transactions contemplated by this Agreement, (vii) acknowledges and agrees that notwithstanding that no fiduciary or similar relationship exists between the Administrative Agent and any Lender, each such Lender hereby waives, to the fullest extent permitted by law, any claims it may have against the Administrative Agent or its Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Administrative Agent and its Affiliates shall have no liability (whether direct or indirect) to any Lender in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Lender, including any such Lender's Affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and their respective heirs, legal representatives, successors and assigns and creditors, and (viii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender.  The Administrative Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

(b)    To the full extent permitted by applicable law, each party hereto and each Indemnified Person shall not assert, and hereby waives, any claim against any other party hereto or any other Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document, any other agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby or any Term Loan or the use of the proceeds thereof; <u>provided</u>, <u>however</u>, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in <u>Section 11.01(a)</u> to the

extent any Indemnified Person is found liable for any such damages. No party hereto and no Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Person results from such Person's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 11.01(a) to the extent any Indemnified Person is found liable for any such damages.

10.04.  Certain Rights of the Administrative Agent.  If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, the Administrative Agent shall be entitled to refrain from any act or action, and no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent refraining from such act or action, unless or until the Administrative Agent shall first be indemnified to its satisfaction by Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Credit Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders. Notwithstanding the foregoing, the Administrative Agent shall not be required to take, or to omit to take, any action that is, in the opinion of the Administrative Agent or its counsel, contrary to any Credit Document or applicable law.

10.05.  Reliance.  (a) The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon (i) any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, fax, email, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person and (ii) with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

(b)  For purposes of determining compliance with the conditions specified in Section 5, each Lender that has signed this Agreement (or an Assignment and Assumption Agreement and/or addendum or joinder to this Agreement) shall be deemed to have consented to, approved or accepted or to be satisfied with the Intercreditor Agreement and each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Closing Date, as applicable, specifying its objection thereto.

10.06. <u>Indemnification</u>. To the extent the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature (including any customary indemnifications provided to a deposit account bank pursuant to a "control agreement" or "blocked account agreement" referred to in the Security Agreements) which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such Affiliate's) bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). No Lender shall be liable hereunder for another Lender's failure to satisfy its obligations under this paragraph.

10.07. <u>The Administrative Agent in its Individual Capacity</u>. With respect to its obligation to make Term Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders," or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities. The Administrative Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement, which may or may not be publicly disclosed and otherwise without having to account for the same to the Lenders.

10.08. <u>Holders</u>. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.

10.09. <u>Resignation by the Administrative Agent</u>. (a) The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 30 days' prior written notice to the Lenders and, unless an Event of Default exists, the Borrower. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to <u>clauses (b)</u> and <u>(c)</u> below or as otherwise provided below.

(b) Upon any such notice of resignation by the Administrative Agent, the Required Lenders, with the prior consent of the Borrower, which shall not be unreasonably withheld or delayed, shall appoint a successor Agent hereunder or thereunder to fulfil the same

role as the resigning Administrative Agent (provided that the Borrower's consent shall not be required if an Event of Default then exists) and in no event shall any such successor Administrative Agent be a Disqualified Lender.

(c)     If no successor Administrative Agent has been appointed pursuant to clause (b) above by the 30th day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)     Upon a resignation of the Administrative Agent pursuant to this Section 10.09, the Administrative Agent shall (i) subject to its rights under Section 10.04, take such action as may be reasonably necessary to assign to the successor Administrative Agent tis rights as Administrative Agent under the Credit Documents and (ii) remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 10 (and the analogous provisions of the other Credit Documents), in each case in accordance with this Agreement as in effect on the date of such resignation, shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

10.10.  Collateral Matters.    (a)     Each Lender authorizes and directs the Administrative Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)     The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral and release any Guarantor from its obligations under the Guaranty, in each case, in accordance with Section 11.21.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral or a Subsidiary Guarantor from its obligations under the Guaranty pursuant to this Section 10.10 and Section 11.21.

(c)     The Administrative Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Administrative Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and

powers granted or available to the Administrative Agent in this Section 10.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral as one of the Lenders and that the Administrative Agent shall have no duty or liability whatsoever to the Lenders, except for its bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

10.11.  Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (a) as specifically provided in this Agreement or any other Credit Document and (b) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

10.12.  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by the Administrative Agent (including Brookfield or any of its Affiliates) or appointed by any Lenders pursuant to any agreement among the Lenders to which the Administrative Agent is a party.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective officers, directors, employees, representatives, agents, sub-agents or advisors thereof.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with bad faith, gross negligence or willful misconduct in the selection of such sub-agents.

10.13.  No Reliance on the Administrative Agent's Customer Identification Program; Certifications From Banks and Participants; the PATRIOT Act.

(a)      Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("**CIP Regulations**"), or any other Laws relating to the prevention of money laundering or the equivalent in any applicable jurisdiction, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the PATRIOT Act.  Each Lender, Affiliate, participant or assignee subject to Section 326 of the PATRIOT Act will perform the measures necessary to satisfy its own

responsibilities under the CIP Regulations or any equivalent provisions in any applicable jurisdiction.

(b)        Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the PATRIOT Act and the applicable regulations because it is both (i) an Affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the PATRIOT Act and the applicable regulations: (1) within ten days after the Closing Date, and (2) as such other times as are required under the PATRIOT Act.

(c)        The PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "**account**" with such financial institution.  Consequently, the Administrative Agent or Lender may from time to time request, and each Credit Party shall provide to the Administrative Agent or Lender, the Borrower's name, address, tax identification number and/or such other identifying information as shall be reasonably necessary for Lender to comply with the PATRIOT Act and any other sanctions.

10.14.  Certain ERISA Matters.

(a)        Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)        the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    (iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) <u>sub-clause (i)</u> in the immediately preceding <u>clause (a)</u> is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with <u>sub-clause (iv)</u> in the immediately preceding <u>clause (a)</u>, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

Section 11    <u>Miscellaneous.</u>

11.01. <u>Payment of Expenses, etc</u>.  (a)  The Borrower hereby agrees to: (i) (A) whether or not the transactions herein contemplated are consummated, pay all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and its Affiliates, including the fees and expenses of the Administrative Agent's legal counsel and consultants (including Rothschild & Co. in its capacity as financial advisor to the Lenders) (but limited, in the case of legal fees and expenses, to the fees and expenses of (x) a single outside counsel to the Administrative Agent and the Lenders taken as a whole (which counsel shall be Weil, Gotshal & Manges LLP) and (y) if necessary, one local counsel to the Administrative Agent and the Lenders, taken as a whole, in each relevant jurisdiction (including Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) (which may include one firm of local counsel acting in multiple jurisdictions)), in connection with (1) the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, (2) [reserved] and (3) any due diligence review of Holdings, the Borrower, the other Guarantors and their respective Subsidiaries, (B) pay all reasonable and documented out-of-pocket costs and expenses of each of the Administrative Agent and Secured Creditors in

connection with (1) the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and (2) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case, the fees and expenses of (X) a single outside counsel to the Administrative Agent and Secured Creditors (taken as a whole), (Y) in the case of an actual or potential conflict of interest, one additional counsel to all affected Persons (and, if necessary, one additional local counsel to all affected Persons in each relevant jurisdiction (including Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) (which may include one firm of local counsel acting in multiple jurisdictions)) and (Z) if necessary, one local counsel to the Administrative Agent and Secured Creditors (taken as a whole) in each relevant jurisdiction (including Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) (which may include one firm of local counsel acting in multiple jurisdictions)), and (C) pay the reasonable, documented and invoiced out-of-pocket costs of obtaining a quality of earnings report on terms and in scope acceptable to the Borrower and the Administrative Agent, which shall be prepared by a nationally recognized accounting firm and other financial advisory services provider that is reasonably acceptable to the Borrower and the Administrative Agent and shall be made available to the Lenders (subject to the Borrower's approval of an estimate for such report, such approval not to be unreasonably withheld); (ii) without duplication of amounts payable pursuant to Section 4.04, pay and hold the Administrative Agent and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment; and (iii) indemnify the Administrative Agent and each Lender, and each of their respective officers, directors, employees, partners, representatives, agents, Affiliates, trustees and advisors and the respective successors and permitted assigns of the foregoing (each, an "**Indemnified Person**") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable and documented attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of entering into and/or performance of this Agreement or any other Credit Document or the use of the proceeds of any Term Loans hereunder or the consummation of the Transactions or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents or any claim, litigation, investigation or proceeding relating to any of the foregoing (each, a "**Proceeding**"), regardless of whether any Indemnified Person is a party thereto or whether such Proceeding is brought by any Credit Party, any of their Affiliates or any third party, including, without limitation, (A) the reasonable and documented fees and expenses of (x) a single outside counsel to the Indemnified Persons, (y) in the case of an actual or potential conflict of interest, one additional counsel to all affected Indemnified Persons (and, if necessary, one additional local counsel to all affected Indemnified Persons in each relevant jurisdiction (which may include one firm of local counsel acting in multiple jurisdictions) and (z) if necessary, one local counsel to the Indemnified Persons in each relevant jurisdiction (including Delaware, Canada, Nova Scotia/New Brunswick and Luxembourg) (which may include one firm of local counsel acting in multiple jurisdictions)), or (B) the actual or alleged presence of

Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by Holdings or any of its Subsidiaries at any location, whether or not owned, leased or operated by Holdings or any of its Subsidiaries, the non-compliance by Holdings or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against Holdings, any of its Subsidiaries or any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, including, in each case, the reasonable and documented fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of (x) the bad faith, gross negligence or willful misconduct of any Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable decision), (y) a material breach of any obligations under any Credit Document by any Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (z) any dispute solely among Indemnified Persons other than any claims against an Indemnified Person in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Credit Documents and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates (as determined by a court of competent jurisdiction in a final and non-appealable decision)).   To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, any Lender or any other Indemnified Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities that is permissible under applicable law.   Except as set forth in clause (ii) in the first sentence of this Section 11.01(a), this Section 11.01(a) shall not apply with respect to Excluded Taxes or Indemnified Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(b)     To the full extent permitted by applicable law, each of Holdings and the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

11.02.  Right of Setoff.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by applicable law, to set off and to appropriate and

apply any and all deposits (general or special but other than Excluded Accounts) and any other Indebtedness at any time held or owing by the Administrative Agent, or such Lender or any Affiliate, branch or agency thereof (including by branches and agencies of the Administrative Agent, or such Lender or Affiliate wherever located) to or for the credit or the account of Holdings or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including all interests in Obligations purchased by such Lender pursuant to Section 11.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent, or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

11.03.  Notices.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including via email, fax or other electronic communication) and mailed, emailed, faxed or otherwise delivered: if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address specified to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.   All such notices and communications shall, when mailed or sent by overnight courier, be effective when (x) deposited in the mails or delivered to the overnight courier, as the case may be or (y) upon return receipt when delivered by fax or e-mail.  Notwithstanding the foregoing, notices and communications to the Administrative Agent and any Credit Party shall not be effective until received by the Administrative Agent, the Borrower or any Credit Party, as the case may be.

11.04.  Benefit of Agreement; Assignments; Participations.  (a)  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; no Credit Party may assign or transfer any of its rights, obligations or interests hereunder unless expressly permitted by the terms of this Agreement or with the prior written consent of the Lenders.  Any Lender may, without the consent of the Borrower, the Administrative Agent, or any other Lender, sell participations to any Person (other than to any Disqualified Lender, any Credit Party or any of its respective Affiliates, or any natural Person) in all or any portion of such Lender's rights and obligations under this Agreement (including all or any portion of its commitments and the Loans owing to it).  Although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Obligations hereunder except as provided in Section 11.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, provided, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Term Loan or Term Note in which such participant is

participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 1.02(c) shall not constitute a reduction in the rate of interest or fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Term Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement (but solely to the extent the consent of the Lenders is required to effect such assignment or transfer) or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Term Loans hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.  Notwithstanding the foregoing, no assignments or participations shall be made to any Disqualified Lenders;

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may:

(i)    assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments have terminated, outstanding Obligations) hereunder to (A) any Affiliate of such Lender, (B) one or more other Lenders or any Affiliate of any such other Lender (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an Affiliate of such other Lender for the purposes of this sub-clause (b)(i)(B)), (C) any commercial bank, (D) any pension fund, insurance fund and/or similar type of institutional investors that are limited partners and/or prospective limited partners of the Administrative Agent or any of its Affiliates or (E) in the case of any Lender that is a fund that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor; or

(ii)    assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by

execution of an Assignment and Assumption Agreement, provided that (A) at such time, Schedule 1.01 shall be deemed modified to reflect the Commitments and/or outstanding Term Loans, as the case may be, of such new Lender and of the existing Lenders after giving effect to such assignment, (B) upon the surrender of the relevant Term Notes, if any, by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Term Note pursuant to a customary indemnification agreement) new Term Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Term Notes to be in conformity with the requirements of Section 2.04 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Term Loans after giving effect to such assignment, as the case may be, (C) the consent of the Administrative Agent and the Borrower shall be required in connection with any such assignment pursuant to this clause (ii) (such consent, in the case of the Administrative Agent or the Borrower, not to be unreasonably withheld, delayed or conditioned), provided that (i) the Borrower shall be deemed to have consented to any such assignment unless they shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof and (ii) the consent of the Borrower shall not be required if an Event of Default has occurred and is continuing, (D) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 and (E) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 11.14 (and the Administrative Agent agrees to promptly record any assignment made in accordance with this paragraph).

To the extent of any assignment pursuant to this Section 11.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Term Loans.  At the time of each assignment pursuant to this Section 11.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Tax Form Certificate) described in Section 4.04(c).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to this Section 11.04(b) would, at the time of such assignment, result in increased costs under Section 2.09 or 4.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs, Indemnified Taxes or additional amounts (although the applicable Credit Party, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs, Indemnified Taxes or additional amount of the type described above resulting from changes after the date of the respective assignment, subject to the limitations and exceptions in this Agreement).  Notwithstanding the foregoing, no assignments or participations shall be made to any Disqualified Lenders.

(c)     Notwithstanding anything to the contrary herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Lender or natural person) (without the consent of, or notice to or

any other action by, any other party hereto) to secure obligations of such Lender or any of its Affiliates to any Person, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and, for the avoidance of doubt, this <u>Section 11.04</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest pursuant to this <u>clause (c)</u> shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(d)    Any Lender that assigns all of its Commitments and/or Term Loans hereunder in accordance with <u>Section 11.04(b)</u> shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including <u>Sections 2.09</u>, <u>2.10</u>, <u>4.04</u>, <u>10.06</u>, <u>11.01</u> and <u>11.07</u>), which shall survive as to such assigning Lender.

(e)    The Borrower also agrees that each participant shall be entitled to the benefits of <u>Sections 2.09</u> and <u>4.04</u> as if it were a Lender (<u>provided</u>, that such participant (A) agrees to be subject to the provisions of <u>Section 2.11</u> and (B) complies with the requirements of <u>Section 4.04(c)</u> as if it were a Lender); <u>provided</u>, <u>further</u>, that no participant shall receive any greater compensation pursuant to <u>Sections 2.09</u> or <u>4.04</u> than would have been paid to the participating Lender if no participation had been sold, except to the extent such entitlement to receive a greater payment results from a change in law that occurs after the participant acquired the applicable participation.  Each Lender that sells a participant agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of <u>Section 2.11</u> with respect to any participant.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Holdings and Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Term Loans or other obligations under the Credit Documents (the "**Participant Register**"); <u>provided</u>, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent shall have no responsibility for maintaining a Participant Register.

(f)    In the event of a transfer, assignment, novation or amendment of the rights and/or the obligations under this Agreement and any other Credit Documents, all security interests, guarantees and privileges created under or in connection with the Credit Documents shall automatically and without any formality be preserved for the benefit of the Administrative Agent, the Eligible Transferee and the other Lenders for the purpose of the provisions of articles 1278 to 1281 of the Luxembourg Civil Code or any other purposes.

11.05.  <u>No Waiver; Remedies Cumulative</u>.  No failure or delay on the part of the Administrative Agent or any Lender in exercising any right, power or privilege hereunder or

under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent or any Lender to any other or further action in any circumstances without notice or demand.

11.06. <u>Payments Pro Rata</u>. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than (i) if any Lender that has consented in writing to waive its <u>pro rata</u> share of any such payment, in which case such amounts shall be reallocated on a <u>pro rata</u> basis among the other Lenders or (ii) if all Lenders shall have consented in writing to waive their <u>pro rata</u> share of such payment, such payment shall be returned to the Borrower) <u>pro rata</u> based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Except as otherwise provided herein, each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) by or on behalf of a Credit Party, which is applicable to the payment of the principal of, or interest on, the Term Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; <u>provided</u> that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

11.07. <u>Currency Indemnity</u>. If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any of the other Credit Documents, it becomes necessary to convert into the currency of such jurisdiction (the "**Judgment Currency**") any amount due under this Agreement or any of the other Credit Documents in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given. In the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as

may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or any of the other Credit Documents in the Currency Due.  If the amount of the Currency Due which the Administrative Agent is able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent harmless from and against loss or damage arising as a result of such deficiency.  The indemnity contained herein shall constitute an obligation separate and independent from the other obligations contained in this Agreement and any of the other Credit Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement, any of the other Credit Documents or under any judgment or order.

   11.08.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.    (a)    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE OR ANY SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION) AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN, THE COURTS OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF (OR IN THE CASE OF ANY SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT IN THE STATE OR OTHER JURISDICTION IN WHICH THE RESPECTIVE COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION).    EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORE-MENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.    EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.    EACH PARTY HERETO

HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.    NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY TERM NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST HOLDINGS OR THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.09.  Counterparts.    This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.    Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof.

11.10.  Headings Descriptive.    The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

11.11.  Amendment or Waiver; etc.  (a)  Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof may be amended, modified, changed, waived, discharged or terminated unless such amendment, modification, change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of Holdings may be released from, the Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), provided that no such change, waiver, discharge or termination shall, without the written consent of each Lender directly and adversely affected thereby, (i) extend the final scheduled maturity of any Term Loan, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the

principal amount thereof, any Exit Fee or other amount payable hereunder, or change <u>Section 4.03</u> (it being understood that amendments to, or waivers or modifications of any conditions precedent, representations, warranties, covenants, Defaults or Events of Default shall not constitute an extension of the maturity, any scheduled installment, or the scheduled date of payment of the Term Loans, interest or fees of any Lender), (ii) release or subordinate all, substantially all or a material portion of the Collateral, or release all, substantially all or a material portion of the value of the guarantees of the Guarantors under any Guaranty (in each case, except as expressly provided in the Credit Documents), (iii) amend, modify or waive any provision of this <u>Section 11.11(a)</u>, (iv) reduce the voting threshold specified in the definition of "Required Lenders", (v) change <u>Section 11.06</u> hereof, Section 17(d) of either Security Agreement or any other analogous section in any other Security Document, in a manner that would alter the sharing or application of payments required thereby without the written consent of each Lender directly affected thereby, (vi) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement except as expressly provided for herein or (vii) except as provided by operation of law and otherwise permitted hereunder, amend or modify (x) the DIP Superpriority Claims status of the Obligations under the Orders or under any Credit Document or (y) the priority of the Obligations granted by the CCAA DIP Charge; <u>provided</u>, <u>further</u>, that no such amendment, modification, change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitments shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the written consent of the Administrative Agent, amend, modify or waive any provision of <u>Section 10</u> or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent or (3) without the written consent of Administrative Agent, amend, modify or waive any provision relating to the rights or obligations of the Administrative Agent.

(b)    Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made solely with the written consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency that is not materially adverse to the interests of the Lenders.  The Lenders acknowledge and agree that the Administrative Agent's discretion shall be conclusive and binding.

11.12.  <u>Survival</u>.  All indemnities set forth herein including in <u>Sections 2.09</u>, <u>2.10</u>, <u>4.04</u>, <u>10.06</u> and <u>11.01</u> shall survive the execution, delivery and termination of this Agreement and the making and repayment of the Obligations.

11.13.  <u>Domicile of Term Loans</u>.  Each Lender may transfer and carry its Term Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Term Loans pursuant to this <u>Section 11.13</u> would, at the time of such transfer, result in increased costs under <u>Section 2.09</u>, <u>2.10</u> or <u>4.04</u> from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the

Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes occurring after the date of the respective transfer).

11.14. <u>Register</u>.    The Borrower and Holdings hereby designate the Administrative Agent to serve as their non-fiduciary agent, solely for purposes of this <u>Section 11.14</u>, to maintain a register (the "**Register**") at one of its offices in the United States on which it will record the Commitments from time to time of each of the Lenders, the Term Loans made by each of the Lenders, the stated interest thereon and each repayment in respect of the principal (and stated interest) amount of the Term Loans of each Lender.    Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Term Loans.    With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Term Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Term Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Term Loans shall remain owing to the transferor.    The registration of assignment or transfer of all or part of any Commitments and Term Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to <u>Section 11.04(b)</u>.    Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Term Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Term Note (if any) evidencing such Term Loan, and thereupon one or more new Term Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.    The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.    Each Lender shall be entitled to review the Register solely relating to such information that pertains specifically to such Lender and shall have no right to view any information that pertains to any other Lender. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.

11.15. <u>Confidentiality</u>.  (a)  Subject to the provisions of <u>clause (b)</u> of this <u>Section 11.15</u>, each Lender agrees that it will not disclose without the prior consent of the Borrower (other than to its employees, accountants, auditors, advisors, subsidiaries, Affiliates, consultants or counsel to the Administrative Agent, and any Lender if the Administrative Agent, or any such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information; <u>provided</u> such Persons shall be subject to the provisions of this <u>Section 11.15</u> to the same extent as such Lender) any information with respect to Holdings or any of its Subsidiaries which is now or in the future will be furnished pursuant to this Agreement or any other Credit Document, <u>provided</u> that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this <u>Section 11.15(a)</u> by the Administrative Agent, any Lender or any other party referred to in this <u>Section 11.15(a)</u>, (ii) as may be required or reasonably appropriate by Law or in any report, statement or testimony submitted to any municipal, state, provincial, territorial or Federal

regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or reasonably appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees in writing to be bound by the provisions of this Section 11.15, (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Term Loans or Commitments or any interest therein by such Lender, provided that such prospective transferee agrees in writing to be bound by the confidentiality provisions contained in this Section 11.15, (viii) to (A) any bank or financial institution and (B) S&P, Moody's, Fitch Ratings and/or other ratings agencies, in each case, as such Lender deems necessary or appropriate in connection with such Lender's obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information, (ix) to its investors or potential investors as such Lender reasonably deems necessary or appropriate; provided, however, that such investors or potential investors shall be informed of the confidentiality of such information or (x) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder; provided, that no disclosures of such information shall be made to any Disqualified Lenders; provided further, that unless specifically prohibited by applicable Law, each Lender and the Administrative Agent shall endeavor to notify Holdings of any request made to such Lender or the Administrative Agent, as applicable, for disclosure of any such non-public information prior to disclosure of such information and shall limit such disclosure to the extent necessary to comply with such request or demand.

(b)    Each of Credit Party hereby acknowledges and agrees that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to Holdings or any of its Subsidiaries (including any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 11.15 to the same extent as such Lender.

(c)    Notwithstanding anything to the contrary contained in this Section 11.15, each Credit Party hereby agrees that the Administrative Agent and its Affiliates may publicize its services in connection with this Agreement and the other Credit Documents and the transactions contemplated herein and therein.  In addition, each Credit Party hereby authorizes the Administrative Agent to place a customary "tombstone" advertisement regarding this Agreement and the transactions contemplated herein related hereto in publications of its choice at the Administrative Agent's expense.

11.16. Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Canada or Pledges over Assets Not Located in the United States or Canada.  The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties may require that, among other things, all promissory notes executed by, and capital stock

and other Equity Interests in, various Persons owned by the respective Credit Party that constitute Collateral be pledged, and delivered for pledge. The parties hereto further acknowledge and agree that, to the extent required and in the manner contemplated by the Credit Documents, each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized or where the respective assets are located to create and perfect the security interests granted pursuant to the various Security Documents and to take all actions under the laws of the United States (and any State thereof), Canada (and any province and territory thereof) and Luxembourg to perfect the security interests in the assets, capital stock and other Equity Interests of, and promissory notes issued by, any Person organized under the laws of such jurisdictions (in each case, to the extent such capital stock, other Equity Interests or promissory notes are owned by any Credit Party and constitute Collateral). Unless as otherwise required under Section 7.12 or requested on 30 days' prior notice by the Administrative Agent in accordance with Section 7.12(c), except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of assets or promissory notes issued by, or capital stock or other Equity Interests in, any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, no actions shall be required to be taken to perfect, under local law of the jurisdiction where the respective assets are located or of the Person who issued the respective promissory notes or whose capital stock or other Equity Interests are pledged, under the Security Documents. All conditions and representations contained in this Agreement and the other Credit Documents shall be interpreted to give effect to the foregoing and so that they are not violated by reason of the failure to take actions under local law (but only with respect to capital stock of, other Equity Interests in, and promissory notes issued by, Persons organized under laws of jurisdictions other than the United States (and any State thereof) or Canada (and any Province thereof) or assets located in jurisdictions other than the United States (and any State thereof) or Canada (and any province thereof) not required to be taken in accordance with the provisions of this Section 11.16, provided that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation or warranty shall be required to be true and correct in all material respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of Section 7.12 and this Section 11.16.

11.17. PATRIOT Act and Canadian Anti-Money Laundering & Anti-Terrorism Compliance. (a) Each Lender subject to the PATRIOT Act hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Credit Parties and other information that will allow such Lender to identify the Credit Parties in accordance with the PATRIOT Act Beneficial Ownership Regulation. Each of Holdings and the Borrower agree to take promptly such actions and to promptly provide, upon request, such information, access to information and certifications regarding Holdings and the Subsidiaries that are required to enable the Administrative Agent and the Lenders to comply with all applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation the PATRIOT Act and the Beneficial Ownership Regulation.

(b)    The Administrative Agent and its successors and assigns may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations, and they hereby notify Holdings and each of its Subsidiaries that in order

to comply with such legislation, rules and regulations, they may be, among other things, required to obtain, verify and record information pertaining to Holdings and the Subsidiaries, which information may relate to, among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, corporate shareholders and banking transactions of Holdings and the Subsidiaries.  Each of Holdings and the Borrower agree to take promptly such actions and to promptly provide, upon request, such information, access to information and certifications regarding Holdings and the Subsidiaries that are required to enable the Administrative Agent and its successors and assigns to comply with such Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "**know your customer**" rules and regulations.  In addition, and to the extent they are required at law to do so, each of Holdings and the Borrower agrees to promptly comply with its obligations under Canadian Anti-Money Laundering & Anti-Terrorism Legislation.

11.18.  <u>[Reserved]</u>.

11.19.  <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower.    In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

11.20.  <u>Entire Agreement</u>.    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE MATTERS SET FORTH HEREIN AND THEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.    THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

11.21.  <u>Release</u>.  The Administrative Agent shall (and is authorized by each of the Secured Creditors under the Security Documents) to (1) release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than contingent, indemnification or reimbursement obligations not then due) at any time arising under or in respect of this Agreement or any of the other Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than Holdings and its Subsidiaries) upon the sale or other disposition thereof in compliance with <u>Section 8.02</u>, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by <u>Section 11.11</u>) or (iv) as otherwise may be expressly provided herein or in the relevant Security Documents, and (2) release any Guarantor from its obligations under the Guaranty (i) if such Person ceases to be a Subsidiary Guarantor as

a result of a transaction expressly permitted under the Credit Documents, (ii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by <u>Section 11.11</u>) or (iii) is, in each case, otherwise expressly permitted to be released from the Guaranty pursuant to the Credit Documents and release any applicable Liens on the assets or Equity Interests of such Guarantor.

11.22.  [Reserved].

11.23.  <u>Limitations Act (Ontario)</u>.  Notwithstanding the provisions of the Limitations Act, 2002 (Ontario), a claim may be brought on this Agreement at any time within 6 years from the date on which payment of the relevant Obligations is due pursuant hereto or, in the case of Obligations that are demand obligations, demand for payment of the relevant Obligations is made to the Borrower in accordance with the terms of this Agreement.

11.24.  <u>Quebec Security</u>.  For the purposes of the grant of security under the laws of the Province of Quebec which may now or in the future be required to be provided by any Credit Party governed by the laws of the Province of Quebec or which has its registered office, domicile, a place of business or assets situated in the Province of Quebec, the Administrative Agent is hereby irrevocably authorized and appointed to act as the hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) on behalf of all Secured Creditors in order to hold any hypothec granted under the laws of the Province of Quebec pursuant to any Canadian deed of hypothec as security for the Obligations and to exercise such rights and duties as are conferred upon a hypothecary representative under the relevant Canadian deed of hypothec and applicable laws (with the power to delegate any such rights or duties). Any person who becomes a Credit Party shall be deemed to have consented to and ratified the foregoing appointment of the Administrative Agent as hypothecary representative on behalf of all Secured Creditors.  For greater certainty, the Administrative Agent, acting as hypothecary representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favour of the Administrative Agent, which shall apply *mutatis mutandis*.  Each successor Administrative Agent shall automatically (and without any further action) become the successor hypothecary representative for the purposes of such Canadian deeds of hypothec.  If requested by the Administrative Agent, the applicable Credit Parties shall prepare and register notices of replacement in each applicable register in which each hypothec created pursuant to such Canadian deeds of hypothec is registered (as contemplated by Article 2692 of the *Civil Code of Québec*).

11.25.  <u>Termination Prior to Closing Date</u>.  Notwithstanding anything else contained herein, Holdings or the Administrative Agent may terminate this Agreement prior to the Closing Date upon written notice to the other.

Section 12    [Reserved].

Section 13    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions.</u>

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit

Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 14    <u>Intercreditor Agreement.</u>

REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT.    EACH LENDER HEREUNDER AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTION CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT AS THE "TERM LOAN AGENT" (OR EQUIVALENT) AND ON BEHALF OF SUCH LENDER.    THE PROVISIONS OF THIS <u>SECTION 14</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE INTERCREDITOR AGREEMENT.    REFERENCE MUST BE MADE TO THE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.    EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN SUCH INTERCREDITOR AGREEMENT.    THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER THE DIP ABL CREDIT AGREEMENT TO EXTEND CREDIT THEREUNDER AND SUCH LENDERS ARE INTENDED THIRD-PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

Notwithstanding anything herein to the contrary, each of (i) the Obligations of the Credit Parties under this Agreement or any other Credit Document, (ii) the Liens and security interests granted to the Administrative Agent for the benefit of the Secured Creditors pursuant to this

Agreement or any other Credit Document (including priority thereof), (iii) the release of Collateral from the Lien granted and created hereby or thereby and (iv) the exercise of any right or remedy by the Administrative Agent hereunder or thereunder are, in each case, subject to the provisions of the Intercreditor Agreement.  In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreement and this Agreement, the provisions of the Intercreditor Agreement shall control.  In furtherance of the foregoing, notwithstanding anything to the contrary set forth herein, until payment and performance, in full, of the Obligations (other than contingent, indemnification or reimbursement obligations not then due) has occurred, to the extent that any Credit Party is required to give physical possession or control (within the meaning of the UCC or the PPSA, as applicable) over any Collateral (as defined in the DIP ABL Credit Agreement) to the Administrative Agent or a Lender under this Agreement or any of the other Credit Documents, such requirement to give possession or control (within the meaning of the UCC or the PPSA, as applicable) shall be satisfied if such Collateral (as defined in the DIP ABL Credit Agreement) is delivered to and held by the DIP ABL Agent, in accordance with the Intercreditor Agreement and such action shall be deemed satisfied to the extent undertaken with respect to the DIP ABL Agent, as the case may be.

<p style="text-align:center">*      *      *</p>

01:25621776.1

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

BUMBLE BEE FOODS S.À R.L (with registered address at 8, rue Lou Hemmer, L-1748 Luxembourg-Findel and registered with number RCS B 140339),
as Holdings

By: _____
    Name:
    Title:   Authorized Signatory

Notice Address:


BUMBLE BEE FOODS, LLC,
as Borrower


By: _____
    Name:
    Title:   Authorized Signatory

Notice Address:

BROOKFIELD PRINCIPAL CREDIT LLC, as
Administrative Agent and Lender


By: _____
    Name:
    Title:

[Signature Page to Term Loan Agreement]

BROOKFIELD PRINCIPAL CREDIT HOLDINGS
LLC, as a Lender

By: _____
    Name:
    Title:

[Signature Page to Term Loan Agreement]

BROOKFIELD PRINCIPAL CREDIT HOLDINGS
L.P., as a Lender

By: _____
    Name:
    Title:

[Signature Page to Term Loan Agreement]

DIRECT LENDING GROUP TCW ASSET
MANAGEMENT COMPANY LLC, as a Lender


By: _____

    Name:
    Title:

01:25621776.1

[Signature Page to Term Loan Agreement]

**<u>Exhibit C</u>**

**Priority Waterfall**

## DIP Facilities Lien Priority[1]

| | | US | | Canada | |
|---|---|---|---|---|---|
| | | **Interim Order** | **Final Order** | **Initial Application** | **Comeback Hearing** |
| **1.** | **DIP ABL Priority Collateral** | 1. Carve Out<br>2. Permitted Prior Liens<br>3. DIP ABL Liens<br>4. ABL Adequate Protection Liens<br>5. Prepetition ABL Credit Agreement Liens<br>6. DIP Term Loan Liens<br>7. Term Loan Adequate Protection Liens<br>8. Prepetition Term Loan Credit Agreement Liens | Same | 1. Administration Charge<br>2. Directors' Charge<br>3. KERP Charge<br>4. DIP ABL Lenders' Charge<br>5. Prepetition ABL Credit Agreement Liens<br>6. DIP Term Lenders' Charge<br>7. Prepetition Term Loan Credit Agreement Liens<br>8. Intercompany Charge | 1. Administration Charge<br>2. Directors' Charge<br>3. KERP Charge<br>4. DIP ABL Lenders' Charge<br>5. Prepetition ABL Credit Agreement Liens<br>6. DIP Term Lenders' Charge<br>7. Prepetition Term Loan Credit Agreement Liens<br>8. Intercompany Charge |
| **2.** | **DIP Term Loan Priority Collateral** | 1. Carve Out<br>2. Permitted Prior Liens<br>3. DIP Term Loan Liens<br>4. Term Loan Adequate Protection Liens<br>5. Prepetition Term Loan Credit Agreement Liens<br>6. DIP ABL Liens<br>7. ABL Adequate Protection Liens<br>8. Prepetition ABL Credit Agreement Liens | Same | 1. Administration Charge<br>2. Directors' Charge<br>3. KEIP Charge<br>4. DIP Term Lenders' Charge<br>5. Prepetition Term Loan Credit Agreement Liens<br>6. DIP ABL Lenders' Charge<br>7. Prepetition ABL Credit Agreement Liens<br>8. Intercompany Charge | 1. Administration Charge<br>2. Directors' Charge<br>3. KEIP Charge<br>4. DIP Term Lenders' Charge<br>5. Prepetition Term Loan Credit Agreement Liens<br>6. DIP ABL Lenders' Charge<br>7. Prepetition ABL Credit Agreement Liens<br>8. Intercompany Charge |
| **3.** | **Proceeds of Avoidance Actions** | N/A | 1. Carve Out<br>2. DIP ABL Liens / Term Loan DIP Liens (*pari passu*)<br>3. Term Loan Adequate Protection Liens / ABL Adequate Protection Liens (*pari passu*)<br>4. Prepetition Term Loan Credit Agreement Liens / Prepetition ABL Credit Agreement Liens (*pari passu*) | N/A | N/A |

---

[1] Capitalized terms used herein have the meanings used in the Interim Order or the CCAA Initial Order, as applicable.

01:25621797.1

**<u>Exhibit D</u>**

**Budget**

## Weekly Cash Flow and Liquidity Forecast - Consolidated

($ in Thousands)  Filing Date: November 21

*Restructuring Period*

| | | Post Petition | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | | Week 11 |
| Week End | 11/23/19 | 11/30/19 | 12/7/19 | 12/14/19 | 12/21/19 | 12/28/19 | 1/4/20 | 1/11/20 | 1/18/20 | 1/25/20 | 2/1/20 | | 2/1/20 |
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Total Cash Receipts | $ 21,144 | $ 18,028 | $ 18,868 | $ 18,607 | $ 17,933 | $ 18,314 | $ 18,296 | $ 18,520 | $ 17,239 | $ 16,807 | $ 17,803 | | $ 201,557 |
| **DISBURSEMENTS** | | | | | | | | | | | | | |
| Raw Purchases | 77 | 1,667 | 78 | 56 | 4,172 | 349 | 2,585 | 112 | 702 | 150 | 594 | | 10,540 |
| Total FG Purchases | 6,054 | 7,819 | 6,404 | 6,233 | 5,316 | 5,177 | 4,026 | 5,064 | 4,454 | 6,003 | 4,757 | | 61,306 |
| Total Freight/Warehousing | 1,008 | 933 | 933 | 933 | 933 | 933 | 928 | 928 | 928 | 928 | 928 | | 10,311 |
| Total Plant Spend | 2,573 | 2,633 | 2,108 | 2,008 | 1,522 | 1,771 | 1,918 | 2,396 | 2,205 | 2,572 | 2,274 | | 23,979 |
| FCF Disbursements | 1,493 | 6,299 | 4,185 | 7,137 | 3,383 | 3,302 | 814 | 4,336 | 4,284 | 3,369 | 2,925 | | 41,528 |
| **Total Cost of Goods** | $ 11,204 | $ 19,351 | $ 13,707 | $ 16,367 | $ 15,325 | $ 11,531 | $ 10,270 | $ 12,837 | $ 12,573 | $ 13,022 | $ 11,477 | | $ 147,664 |
| Total Payroll / Benefits | 985 | 53 | 232 | 898 | 232 | 1,398 | 232 | 898 | 232 | 1,398 | 232 | | 6,791 |
| Total All Other SG&A | 495 | 1,606 | 1,315 | 648 | 1,037 | 1,531 | 1,350 | 1,387 | 1,020 | 709 | 1,575 | | 12,674 |
| **Total SG&A** | $ 1,480 | $ 1,659 | $ 1,547 | $ 1,546 | $ 1,269 | $ 2,929 | $ 1,582 | $ 2,285 | $ 1,252 | $ 2,107 | $ 1,808 | | $ 19,465 |
| FX, Commodity, & IR Hedge Settlements | (10) | – | – | – | – | – | (15) | – | – | – | – | | (24) |
| Capital Expenditures | 82 | 87 | 87 | 87 | 87 | 87 | 311 | 311 | 311 | 311 | 311 | | 2,073 |
| Trade Promotion Checks / Deductions | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | | 935 |
| **Other** | $ 157 | $ 172 | $ 172 | $ 172 | $ 172 | $ 172 | $ 381 | $ 396 | $ 396 | $ 396 | $ 396 | | $ 2,983 |
| **Total Operating Disbursements** | $ 12,841 | $ 21,182 | $ 15,427 | $ 18,085 | $ 16,767 | $ 14,633 | $ 12,233 | $ 15,518 | $ 14,221 | $ 15,525 | $ 13,681 | | |
| **Operating Cash Flow** | $ 8,302 | $ (3,155) | $ 3,440 | $ 522 | $ 1,166 | $ 3,681 | $ 6,063 | $ 3,002 | $ 3,018 | $ 1,283 | $ 4,122 | | |
| US / CAN DIP ABL Interest | – | 209 | 207 | 207 | 206 | 206 | 208 | 204 | 197 | 196 | 204 | | 2,044 |
| US DIP Term Loan Interest | – | – | – | – | – | – | 861 | – | – | – | – | | 1,714 |
| ABL Interest | 141 | – | – | – | – | – | – | – | – | – | – | | 141 |
| US Term Loan B-1 | – | 11,930 | – | – | – | – | 5,277 | – | – | – | 5,284 | | 22,491 |
| CAN Term Loan B-2 | – | 3,332 | – | – | – | – | 1,495 | – | – | – | 1,497 | | 6,324 |
| Restructuring Professional Fee | 476 | 313 | 1,636 | – | 588 | 4,482 | 116 | 431 | 1,242 | – | – | | 24,208 |
| KEIP / KERP / MIP / SIP | – | – | – | – | – | – | – | – | – | – | – | | 9,608 |
| US DIP Term Loan and ABL Fees | – | 4,148 | – | – | – | – | – | – | – | – | 1,600 | | 5,748 |
| CAN DIP ABL Fees | – | 412 | – | – | – | – | – | – | – | – | – | | 412 |
| Wind-Down Budget | – | – | – | – | – | – | – | – | – | – | 3,000 | | 3,000 |
| Utility Deposit / Other APA Schedule Items | – | – | 175 | – | – | – | – | – | – | – | 1,400 | | 1,575 |
| **Net Cash Flow** | $ 7,685 | $ (23,499) | $ 1,423 | $ 315 | $ 372 | $ (1,007) | $ (1,895) | $ 2,367 | $ 1,579 | $ 1,087 | $ (43,531) | | |
| Total Available Collateral | 182,407 | 181,988 | 179,838 | 179,644 | 180,651 | 177,470 | 177,472 | 175,569 | 174,196 | 175,381 | 174,024 | | 174,024 |
| Outstanding LCs | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | | (5,603) |
| Available Collateral (less LCs) | 176,804 | 176,385 | 174,235 | 174,041 | 175,048 | 171,867 | 171,869 | 169,966 | 168,593 | 169,778 | 168,421 | | 168,421 |
| Revolver Line Cap | 194,397 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | | 170,000 |
| Revolver Availability | 176,804 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 169,966 | 168,593 | 169,778 | 168,421 | | 168,421 |
| ABL Outstanding | 180,134 | | | | | | | | | | | | |
| DIP ABL Outstanding | | 163,633 | 162,211 | 161,896 | 161,524 | 161,134 | 162,913 | 160,115 | 157,294 | 156,207 | 162,923 | | 162,923 |
| Consolidated ABL Outstanding | 180,134 | 163,633 | 162,211 | 161,896 | 161,524 | 161,134 | 162,913 | 160,115 | 157,294 | 156,207 | 162,923 | | 162,923 |
| **Cash Balance** | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | | $ – |
| **(1) Prepetition ABL Availability** | $ (3,330) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | | n/a |
| **(2) Prepetition ABL Outstanding** | $ 180,134 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | | n/a |
| **(3) Post petition DIP ABL Availability** | $ – | $ 6,367 | $ 7,789 | $ 8,104 | $ 8,476 | $ 8,866 | $ 7,087 | $ 9,852 | $ 11,299 | $ 13,571 | $ 5,498 | | $ 5,498 |
| **(4) Post petition DIP ABL Outstanding** | $ – | $ 163,633 | $ 162,211 | $ 161,896 | $ 161,524 | $ 161,134 | $ 162,913 | $ 160,115 | $ 157,294 | $ 156,207 | $ 162,923 | | $ 162,923 |
| **(5) Post petition US DIP Term Loan Outstanding** | $ – | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 41,396 | $ 41,512 | $ 41,943 | $ 43,184 | $ 80,000 | | $ 80,000 |
| **(6) Total Post petition DIP Outstanding** | $ – | $ 203,633 | $ 202,211 | $ 201,896 | $ 201,524 | $ 202,530 | $ 204,425 | $ 202,058 | $ 200,479 | $ 199,392 | $ 242,923 | | $ 242,923 |



Liquidity Forecast (Nov 2019 - Jan 2020)

Date Last Updated:  11/20/2019

## Weekly Cash Flow and Liquidity Forecast - US

($ in Thousands)   Filing Date: November 21

| Restructuring Period | | Post Petition | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | | Week 11 |
| Week End | 11/23/19 | 11/30/19 | 12/7/19 | 12/14/19 | 12/21/19 | 12/28/19 | 1/4/20 | 1/11/20 | 1/18/20 | 1/25/20 | 2/1/20 | | 2/1/20 |
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Total Cash Receipts | $ 17,575 | $ 14,520 | $ 14,825 | $ 13,837 | $ 13,542 | $ 13,584 | $ 13,468 | $ 13,886 | $ 12,843 | $ 12,430 | $ 13,495 | | $ 154,005 |
| **DISBURSEMENTS** | | | | | | | | | | | | | |
| Raw Purchases | – | 1,590 | – | – | 4,116 | 293 | 2,379 | – | 552 | – | 444 | | 9,375 |
| Total FG Purchases | 5,292 | 6,204 | 5,656 | 5,355 | 4,676 | 3,915 | 3,050 | 3,956 | 3,182 | 4,563 | 3,503 | | 49,353 |
| Total Freight/Warehousing | 856 | 802 | 802 | 802 | 802 | 802 | 800 | 800 | 800 | 800 | 800 | | 8,867 |
| Total Plant Spend | 1,864 | 2,002 | 1,550 | 1,892 | 1,315 | 1,655 | 1,687 | 2,222 | 1,446 | 1,904 | 1,515 | | 19,050 |
| FCF Disbursements | 1,493 | 6,299 | 4,185 | 7,137 | 3,383 | 3,302 | 814 | 4,336 | 4,284 | 3,369 | 2,925 | | 41,528 |
| Total Cost of Goods | $ 9,505 | $ 16,897 | $ 12,193 | $ 15,186 | $ 14,293 | $ 9,967 | $ 8,730 | $ 11,314 | $ 10,264 | $ 10,636 | $ 9,187 | | $ 128,173 |
| Total Payroll / Benefits | 762 | 53 | 9 | 898 | 9 | 1,398 | – | 898 | 9 | 1,398 | 9 | | 5,452 |
| Total All Other SG&A | 372 | 1,258 | 1,110 | 555 | 944 | 808 | 1,234 | 1,159 | 905 | 593 | 1,234 | | 10,170 |
| Total SG&A | $ 1,134 | $ 1,311 | $ 1,119 | $ 1,453 | $ 953 | $ 2,206 | $ 1,243 | $ 2,057 | $ 914 | $ 1,991 | $ 1,243 | | $ 15,622 |
| FX, Commodity, & IR Hedge Settlements | (10) | – | – | – | – | – | (15) | – | – | – | – | | (24) |
| Capital Expenditures | 30 | 48 | 48 | 48 | 48 | 48 | 20 | 20 | 20 | 20 | 20 | | 369 |
| Trade Promotion Checks / Deductions | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | | 935 |
| Other | $ 105 | $ 133 | $ 133 | $ 133 | $ 133 | $ 133 | $ 91 | $ 105 | $ 105 | $ 105 | $ 105 | | $ 1,280 |
| Total Operating Disbursements | $ 10,743 | $ 18,341 | $ 13,444 | $ 16,772 | $ 15,379 | $ 12,305 | $ 10,063 | $ 13,476 | $ 11,283 | $ 12,733 | $ 10,536 | | $ 145,076 |
| Operating Cash Flow | $ 6,832 | $ (3,821) | $ 1,380 | $ (2,934) | $ (1,836) | $ 1,279 | $ 3,405 | $ 410 | $ 1,560 | $ (303) | $ 2,959 | | $ 8,929 |
| US DIP ABL Interest | – | 161 | 161 | 162 | 161 | 161 | 163 | 159 | 153 | 152 | 154 | | 1,587 |
| US DIP Term Loan Interest | – | – | – | – | – | – | 861 | – | – | – | 853 | | 1,714 |
| ABL Interest | 114 | – | – | – | – | – | – | – | – | – | – | | 114 |
| US Term Loan B-1 | – | 11,930 | – | – | – | – | 5,277 | – | – | – | 5,284 | | 22,491 |
| Restructuring Professional Fee | 476 | – | 1,239 | – | – | 3,244 | 111 | – | 1,239 | – | 23,660 | | 29,969 |
| KEIP / KERP / MIP / SIP | – | – | – | – | – | – | – | – | – | – | 7,870 | | 7,870 |
| US DIP Term Loan and ABL Fees | – | 4,148 | – | – | – | – | – | – | – | – | 1,600 | | 5,748 |
| Wind-Down Budget | – | – | – | – | – | – | – | – | – | – | 3,000 | | 3,000 |
| Utility Deposit / Other APA Schedule Items | – | – | 175 | – | – | – | – | – | – | – | 1,300 | | 1,475 |
| Net Cash Flow | $ 6,241 | $ (20,060) | $ (195) | $ (3,096) | $ (1,997) | $ (2,125) | $ (3,007) | $ 250 | $ 167 | $ (455) | $ (40,762) | | |
| Canadian paydown on US Revolver | – | – | – | 2,825 | 2,370 | 1,118 | 1,112 | 2,117 | 1,412 | 1,542 | 1,731 | | 14,227 |
| Net Cash Flow (after intercompany transactions) | $ 6,241 | $ (20,060) | $ (195) | $ (270) | $ 372 | $ (1,007) | $ (1,895) | $ 2,367 | $ 1,579 | $ 1,087 | $ (39,031) | | |
| US Available Collateral | $ 127,620 | $ 127,319 | $ 125,772 | $ 125,632 | $ 126,357 | $ 124,068 | $ 124,069 | $ 122,700 | $ 121,712 | $ 122,565 | $ 121,588 | | $ 121,588 |
| Reallocation of Canadian Collateral | 14,786 | 14,669 | 14,066 | 14,012 | 14,294 | 13,402 | 13,402 | 12,869 | 12,804 | 12,816 | 12,435 | | 12,435 |
| Total US Available Collateral | 142,407 | 141,988 | 139,838 | 139,644 | 140,651 | 137,470 | 137,472 | 135,569 | 134,516 | 135,381 | 134,024 | | 134,024 |
| Outstanding LCs | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | (5,603) | | (5,603) |
| Available Collateral (less LCs) | 136,804 | 136,385 | 134,235 | 134,041 | 135,048 | 131,867 | 131,869 | 129,966 | 128,593 | 129,778 | 128,421 | | 128,421 |
| Revolver Line Cap | 154,397 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 129,966 | 128,593 | 130,000 | 130,000 | | 130,000 |
| Revolver Availability | 136,804 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 129,966 | 128,593 | 129,778 | 128,421 | | 128,421 |
| ABL Outstanding | 145,870 | – | – | – | – | – | – | – | – | – | – | | – |
| DIP ABL Outstanding | – | 125,930 | 126,126 | 126,396 | 126,024 | 125,634 | 127,413 | 124,615 | 121,794 | 120,707 | 122,923 | | 122,923 |
| Consolidated ABL Outstanding | 145,870 | 125,930 | 126,126 | 126,396 | 126,024 | 125,634 | 127,413 | 124,615 | 121,794 | 120,707 | 122,923 | | 122,923 |
| Cash Balance | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | | $ – |
| **(1) Prepetition ABL Availability** | $ (9,066) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | | |
| **(2) Prepetition ABL Outstanding** | $ 145,870 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | | |
| **(3) Post petition DIP ABL Availability** | $ – | $ 4,070 | $ 3,874 | $ 3,604 | $ 3,976 | $ 4,366 | $ 2,587 | $ 5,352 | $ 6,799 | $ 9,071 | $ 5,498 | | $ 5,498 |
| **(4) Post petition DIP ABL Outstanding** | $ – | $ 125,930 | $ 126,126 | $ 126,396 | $ 126,024 | $ 125,634 | $ 127,413 | $ 124,615 | $ 121,794 | $ 120,707 | $ 122,923 | | $ 122,923 |
| **(5) Post petition US DIP Term Loan Outstanding** | $ – | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 41,396 | $ 41,512 | $ 41,943 | $ 43,184 | $ 43,184 | $ 80,000 | | $ 80,000 |
| **(6) Total Post petition DIP Outstanding** | $ – | $ 165,930 | $ 166,126 | $ 166,396 | $ 166,024 | $ 167,030 | $ 168,925 | $ 166,558 | $ 164,979 | $ 163,892 | $ 202,923 | | $ 202,923 |



Liquidity Forecast (Nov 2019 - Jan 2020)

(1) Prepetition ABL Availability
(2) Prepetition ABL Outstanding
(3) Post petition DIP ABL Availability
(4) Post petition DIP ABL Outstanding
(5) Post petition US DIP Term Loan Outstanding
(6) Total Post petition DIP Outstanding

Date Last Updated: 11/20/2019

DIP Budget

## Weekly Cash Flow and Liquidity Forecast - Canada
($ in Thousands)    Filing Date: November 21

*Restructuring Period*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Total Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week End | 11/23/19 | 11/30/19 | 12/7/19 | 12/14/19 | 12/21/19 | 12/28/19 | 1/4/20 | 1/11/20 | 1/18/20 | 1/25/20 | 2/1/20 | 2/1/20 |
| **CASH RECEIPTS** | | | | | | | | | | | | |
| Total Cash Receipts | $ 3,569 | $ 3,508 | $ 4,043 | $ 4,769 | $ 4,391 | $ 4,730 | $ 4,827 | $ 4,634 | $ 4,396 | $ 4,378 | $ 4,308 | $ 47,552 |
| **DISBURSEMENTS** | | | | | | | | | | | | |
| Raw Purchases | 77 | 77 | 78 | 56 | 56 | 56 | 206 | 112 | 150 | 150 | 150 | 1,166 |
| Total FG Purchases | 762 | 1,615 | 748 | 878 | 639 | 1,262 | 975 | 1,108 | 1,272 | 1,440 | 1,254 | 11,952 |
| Total Freight/Warehousing | 152 | 131 | 131 | 131 | 131 | 131 | 128 | 128 | 128 | 128 | 128 | 1,444 |
| Total Plant Spend | 709 | 631 | 558 | 116 | 207 | 116 | 231 | 174 | 759 | 668 | 759 | 4,929 |
| Total Cost of Goods | $ 1,699 | $ 2,453 | $ 1,514 | $ 1,181 | $ 1,032 | $ 1,564 | $ 1,540 | $ 1,523 | $ 2,308 | $ 2,385 | $ 2,290 | $ 19,491 |
| Total Payroll / Benefits | 223 | – | 223 | – | 223 | – | 223 | – | 223 | – | 223 | 1,339 |
| Total All Other SG&A | 123 | 349 | 206 | 93 | 93 | 723 | 116 | 228 | 116 | 116 | 341 | 2,504 |
| Total SG&A | $ 346 | $ 349 | $ 429 | $ 93 | $ 316 | $ 723 | $ 339 | $ 228 | $ 339 | $ 116 | $ 564 | $ 3,843 |
| Capital Expenditures | 52 | 40 | 40 | 40 | 40 | 40 | 291 | 291 | 291 | 291 | 291 | 1,703 |
| Other | $ 52 | $ 40 | $ 40 | $ 40 | $ 40 | $ 40 | $ 291 | $ 291 | $ 291 | $ 291 | $ 291 | $ 1,703 |
| Total Operating Disbursements | 2,098 | 2,842 | 1,983 | 1,314 | 1,388 | 2,328 | 2,170 | 2,042 | 2,938 | 2,792 | 3,145 | 25,037 |
| Operating Cash Flow | $ 1,471 | $ 666 | $ 2,060 | $ 3,456 | $ 3,002 | $ 2,402 | $ 2,658 | $ 2,593 | $ 1,458 | $ 1,586 | $ 1,163 | $ 22,515 |
| CAN DIP ABL Interest | – | 48 | 46 | 45 | 45 | 45 | 45 | 45 | 44 | 44 | 50 | 457 |
| ABL Interest | 27 | – | – | – | – | – | – | – | – | – | – | 27 |
| CAN Term Loan B-2 | – | 3,332 | – | – | – | – | 1,495 | – | – | – | 1,497 | 6,324 |
| Restructuring Professional Fee | 0 | 313 | 396 | – | 588 | 1,239 | 5 | 431 | 2 | – | 548 | 3,522 |
| KEIP / KERP / MIP / SIP | – | – | – | – | – | – | – | – | – | – | 1,738 | 1,738 |
| CAN DIP ABL Fees | – | 412 | – | – | – | – | – | – | – | – | – | 412 |
| Utility Deposit / Other APA Schedule Items | – | – | – | – | – | – | – | – | – | – | 100 | 100 |
| Net Cash Flow | $ 1,443 | $ (3,439) | $ 1,618 | $ 3,411 | $ 2,370 | $ 1,118 | $ 1,112 | $ 2,117 | $ 1,412 | $ 1,542 | $ (2,769) | $ 9,935 |
| Canadian paydown on US Revolver | – | – | – | (2,825) | (2,370) | (1,118) | (1,112) | (2,117) | (1,412) | (1,542) | (1,731) | (14,227) |
| Net Cash Flow (after intercompany transactions) | $ 1,443 | $ (3,439) | $ 1,618 | $ 585 | $ – | $ – | $ – | $ – | $ – | $ – | $ (4,500) | (14,227) |
| Canadian Available Collateral | 54,786 | 54,669 | 54,066 | 54,012 | 54,294 | 53,402 | 53,402 | 52,869 | 52,484 | 52,816 | 52,435 | 52,435 |
| Reallocation of Canadian Collateral | (14,786) | (14,669) | (14,066) | (14,012) | (14,294) | (13,402) | (13,402) | (12,869) | (12,484) | (12,816) | (12,435) | (12,435) |
| Total Canadian Collateral | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Outstanding LCs | | | | | | | | | | | | |
| Available Collateral (less LCs) | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Revolver Line Cap | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Revolver Availability | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| ABL Outstanding | 34,264 | | | | | | | | | | | |
| DIP ABL Outstanding | | 37,703 | 36,085 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 40,000 | 40,000 |
| Consolidated ABL Outstanding | 34,264 | 37,703 | 36,085 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 40,000 | 40,000 |
| Cash Balance | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – | $ – |
| **(1) Prepetition ABL Availability** | $ 5,736 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| **(2) Prepetition ABL Outstanding** | $ 34,264 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| **(3) Post petition DIP ABL Availability** | $ - | $ 2,297 | $ 3,915 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ - | $ - |
| **(4) Post petition DIP ABL Outstanding** | $ - | $ 37,703 | $ 36,085 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 40,000 | $ 40,000 |
| **(6) Total Post petition DIP Outstanding** | $ - | $ 37,703 | $ 36,085 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 35,500 | $ 40,000 | $ 40,000 |



Liquidity Forecast (Nov 2019 - Jan 2020)

- (1) Prepetition ABL Availability
- (2) Prepetition ABL Outstanding
- (3) Post petition DIP ABL Availability
- (4) Post petition DIP ABL Outstanding
- (6) Total Post petition DIP Outstanding

**Exhibit E**

**DIP Intercreditor Agreement**

**ABL/TL DEBTOR-IN-POSSESSION
INTERCREDITOR AGREEMENT**

by and between,

**WELLS FARGO CAPITAL FINANCE, LLC,**

as DIP ABL Agent for the DIP ABL Claimholders, and

as Pre-Petition ABL Agent for the Pre-Petition ABL Claimholders,

and

**BROOKFIELD PRINCIPAL CREDIT LLC**

as DIP Term Loan Agent for the DIP Term Loan Claimholders, and

as Pre-Petition Term Loan Agent for the Pre-Petition Term Loan Claimholders,

Dated as of November [___], 2019

# TABLE OF CONTENTS

**SECTION 1. Definitions; Rules of Construction** ................................................................. **3**
   1.1  UCC Terms ........................................................................................................3
   1.2  Defined Terms ...................................................................................................3
   1.3  Construction ....................................................................................................22
**SECTION 2. Lien Priorities** ................................................................................................. **24**
   2.1  Relative Priorities ...........................................................................................24
   2.2  Prohibition on Contesting Liens ......................................................................25
   2.3  New Liens ........................................................................................................25
   2.4  Cooperation in Designating Collateral .............................................................26
   2.5  Conflict with Orders ........................................................................................26
**SECTION 3. Exercise of Remedies** ..................................................................................... **27**
   3.1  Exercise of Remedies by Term Loan Agent .....................................................27
   3.2  Exercise of Remedies by ABL Agent ..............................................................28
   3.3  Exclusive Enforcement Rights ........................................................................29
   3.4  Permitted Actions ...........................................................................................30
   3.5  Retention of Proceeds .....................................................................................31
   3.6  Non-Interference .............................................................................................31
   3.7  Commercially Reasonable Dispositions; Notice of Exercise.............................32
   3.8  Inspection and Access Rights ..........................................................................33
   3.9  Sharing of Information and Access ..................................................................37
  3.10  Tracing of and Priorities in Proceeds ..............................................................37
**SECTION 4. Proceeds** .......................................................................................................... **38**
   4.1  Application of Proceeds ...................................................................................38
   4.2  Turnover .........................................................................................................40
   4.3  No Subordination of the Relative Priority of Claims .........................................42
   4.4  Application of Payments ..................................................................................42
   4.5  Revolving Nature of ABL Obligations ............................................................42
**SECTION 5. Releases; Dispositions; Other Agreements** .................................................... **42**
   5.1  Releases ..........................................................................................................42
   5.2  Insurance ........................................................................................................44
   5.3  Amendments; Refinancings; Legend ...............................................................45
   5.4  Bailee for Perfection .......................................................................................49
   5.5  When Discharge of Obligations Deemed to Not Have Occurred ........................52
   5.6  Injunctive Relief .............................................................................................53
**SECTION 6. Insolvency Proceedings** .................................................................................. **53**
   6.1  Enforceability and Continuing Priority ...........................................................53
   6.2  Sales ...............................................................................................................53
   6.3  Interest, Fees, Etc ...........................................................................................54
   6.4  Avoidance Issues ............................................................................................55
**SECTION 7. Reliance; Waivers; Etc** .................................................................................. **55**
   7.1  Reliance ..........................................................................................................55
   7.2  No Warranties or Liability ...............................................................................55
   7.3  No Waiver of Lien Priorities ...........................................................................56
   7.4  Obligations Unconditional ...............................................................................59
**SECTION 8. Representations and Warranties** .................................................................... **60**
   8.1  Representations and Warranties of Each Party ..................................................60
   8.2  Representations and Warranties of Each Agent .................................................60
**SECTION 9. Miscellaneous** ................................................................................................. **61**
   9.1  Conflicts .........................................................................................................61

01:25621813.1

9.2    Effectiveness; Continuing Nature of this Agreement; Severability ..............................61
9.3    Amendments; Waivers..........................................................................................61
9.4    Information Concerning Financial Condition of the Grantors ...................................62
9.5    Subrogation ........................................................................................................62
9.6    **SUBMISSION TO JURISDICTION; WAIVERS** ..............................................63
9.7    Notices ...............................................................................................................64
9.8    Further Assurances..............................................................................................64
9.9    **APPLICABLE LAW** ........................................................................................64
9.10   Binding on Successors and Assigns .......................................................................64
9.11   Headings .............................................................................................................64
9.12   Counterparts.......................................................................................................65
9.13   No Third Party Beneficiaries.................................................................................65
9.14   Provisions Solely to Define Relative Rights ...........................................................65
9.15   Costs and Attorneys Fees......................................................................................65
9.16   Specific Performance ...........................................................................................65
**SECTION 10. Term Loan Claimholder Purchase Option** ............................................**65**
10.1   Right to Purchase; Purchase Notice ......................................................................65
10.2   Notice to Term Loan Claimholders .......................................................................66
10.3   Purchase Price, Cash Collateral, Assumption of Commitments, Etc........................66
10.4   Remittance ..........................................................................................................67
10.5   Purchase Documentation .....................................................................................67
10.6   Resignation Rights...............................................................................................68
10.7   Exercise any Secured Creditor Remedies Following Purchase Notice.......................68
10.8   ABL Retained Interest ..........................................................................................68
**SECTION 11. Condition Precedent** ...........................................................................**69**
**SECTION 12. Limited Effect on Existing Intercreditor Agreements** ..............................**69**

## ABL/TL DEBTOR-IN-POSSESSION
## INTERCREDITOR AGREEMENT

This **ABL/TL DEBTOR-IN-POSSESSION INTERCREDITOR AGREEMENT** (this "<u>Agreement</u>") is dated as of November [__], 2019, and entered into by and between, on the one hand, **WELLS FARGO CAPITAL FINANCE, LLC**, a Delaware limited liability company, in its capacity as administrative agent for the DIP ABL Claimholders (defined below) under the DIP ABL Documents (defined below), including its successors in such capacity from time to time (in such capacity together with its successors and assigns in such capacity, "**DIP ABL Agent**"), and as collateral agent for the Pre-Petition ABL Claimholders (defined below) under the Pre-Petition ABL Documents (defined below), including its successors in such capacity from time to time (in such capacity together with its successors and assigns in such capacity, "**Pre-Petition ABL Agent**"; collectively, with the DIP ABL Agent, the "**ABL Agents**" and, individually, each an "**ABL Agent**"), and, on the other hand, **BROOKFIELD PRINCIPAL CREDIT LLC**, in its capacity as administrative agent and collateral agent for the DIP Term Loan Claimholders (defined below) under the DIP Term Loan Documents (defined below), including its successors in such capacity from time to time (in such capacity together with its successors and assigns in such capacity, "**DIP Term Loan Agent**"), and as administrative agent and collateral agent for the Pre-Petition Term Loan Claimholders (defined below) under the Pre-Petition Term Loan Documents (defined below), including its successors in such capacity from time to time (in such capacity together with its successors and assigns in such capacity, "**Pre-Petition Term Loan Agent**"; collectively, with the DIP Term Loan Agent, the "**Term Loan Agents**" and, individually, each a "**Term Loan Agent**").

## RECITALS

**BUMBLE BEE FOODS S.À R.L.**, a Luxembourg *société à responsabilité limitée*, incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 8, rue Lou Hemmer, L-1748 Luxembourg-Findel (Senningerberg), registered with the Luxembourg Trade and Companies' Register (*Registre de Commerce et des Sociétés*) under number B 140.339 ("**Holdings**"), **CONNORS BROS. CLOVER LEAF SEAFOODS COMPANY**, a Nova Scotia unlimited company, and **BUMBLE BEE FOODS, LLC**, a Delaware limited liability company, and the other Loan Parties (as defined therein) from time to time party thereto, the banks, financial institutions and other investors from time to time party thereto (such banks, financial institutions and other investors, each individually as a "**Pre-Petition ABL Lender**" and collectively as the "**Pre-Petition ABL Lenders**"), **WELLS FARGO CAPITAL FINANCE CORPORATION CANADA**, an Ontario corporation, as Canadian administrative agent for the Canadian Pre-Petition ABL Lenders, **WELLS FARGO CAPITAL FINANCE, LLC**, a Delaware limited liability company, as United States administrative agent for the Pre-Petition ABL Lenders, and in its capacity as Pre-Petition ABL Agent, entered into that certain Amended and Restated Credit Agreement, dated as of August 18, 2017 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Pre-Petition ABL Credit Agreement**"), providing for a revolving credit facility;

Holdings, **BUMBLE BEE HOLDINGS, INC.**, a Georgia corporation, **CONNORS BROS. CLOVER LEAF SEAFOODS COMPANY**, a Nova Scotia unlimited company, and the other Credit Parties (as defined therein) from time to time party thereto, and **BROOKFIELD PRINCIPAL CREDIT LLC**, in its capacity under the Pre-Petition Term Loan Documents (defined below) as Pre-Petition Term Loan Agent, and certain lenders from time to time party thereto (such lenders, each individually a "**Pre-Petition Term Loan Lender**" and collectively as the "**Pre-Petition Term Loan Lenders**"), entered into that certain Term Loan Agreement, dated as of August 15, 2017 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Pre-Petition Term Loan Agreement**"), providing for a term loan facility;

Pre-Petition ABL Agent and Pre-Petition Term Loan Agent, *inter alios*, entered into that certain Intercreditor Agreement, dated as of August 15, 2017 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Pre-Petition Intercreditor Agreement**"), in order to provide, among other things, for the orderly sharing among them, in accordance with the priorities set forth therein, of the proceeds of certain "Collateral" (as defined therein) of Holdings, DIP Borrowers (as defined below), and certain other subsidiaries of Holdings, *inter alios*, upon foreclosure thereupon or other disposition thereof in respect of certain Pre-Petition ABL Obligations (defined below) and Pre-Petition Term Loan Obligations (defined below);

On November 21, 2019 (the "**Petition Date**"), the Debtors (defined below) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having competent jurisdiction over the Cases from time to time, the "**Bankruptcy Court**") and commenced cases numbered [ ], [ ], [ ], and [ ] respectively (each, a "**Case**," and, collectively, the "**Cases**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

On November 22, 2019, the CCAA Debtors (as defined below) filed an application with the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") pursuant to the CCAA (each a "**CCAA Case**" and, collectively, the "**CCAA Cases**") seeking the CCAA Initial Order and have continued in the possession of their assets and in the management of their businesses pursuant to the CCAA Initial Order;

Holdings, **CONNORS BROS. CLOVER LEAF SEAFOODS COMPANY**, a Nova Scotia unlimited company ("**Canadian DIP Borrower**") and **BUMBLE BEE FOODS, LLC**, a Delaware limited liability company ("**U.S. DIP Borrower**"; each individually as a "**DIP Borrower**" and collectively as the "**DIP Borrowers**"), the banks, financial institutions and other investors from time to time party thereto (such banks, financial institutions and other investors, each individually as a "**DIP ABL Lender**" and collectively as the "**DIP ABL Lenders**") and DIP ABL Agent, are entering into that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, to be dated as of November [__], 2019 (as amended, restated, amended and restated, supplemented, Refinanced or otherwise modified in accordance with Section 5.3(a), the "**DIP ABL Credit Agreement**"), providing for a revolving credit facility, which facility includes a "roll-up" of all the existing outstanding Pre-Petition ABL Obligations (defined below);

Holdings, U.S. DIP Borrower, DIP Term Loan Agent, and certain lenders from time to time party thereto (such banks, financial institutions and other investors, each individually as a "**DIP Term Loan Lender**" and collectively as the "**DIP Term Loan Lenders**"), have entered into that certain Super-Priority Secured Debtor-In-Possession Term Loan Agreement, dated as of November [__], 2019 (as amended, restated, amended and restated, supplemented, Refinanced or otherwise modified in accordance with Section 5.3(b), the "**DIP Term Loan Agreement**"), providing for a term loan facility;

Pursuant to (i) that certain General Continuing Guaranty, dated as of November [__], 2019, Holdings and certain of Holdings' Subsidiaries, including the DIP Borrowers (other than with respect to their own obligations) (Holdings, the DIP Borrowers and such Subsidiaries, each, an "**ABL DIP Guarantor**" and collectively, jointly and severally, the "**ABL DIP Guarantors**") have guaranteed the DIP ABL Obligations (defined below) (as amended, restated, amended and restated, supplemented, Refinanced or otherwise modified in accordance with Section 5.3(a), the "**DIP ABL Guaranty**"); and (ii) that certain General Continuing Guaranty, dated as of November [__], 2019 (as amended, restated, amended and restated, supplemented, Refinanced or otherwise modified in accordance with Section 5.3(b), the "**DIP Term Loan Guaranty**"), Holdings and certain of Holdings' Subsidiaries, including the

U.S. DIP Borrower (other than with respect to its own obligations) (Holdings, the U.S. DIP Borrower and such Subsidiaries, each, a "**Term DIP Guarantor**" and collectively, jointly and severally, the "**Term DIP Guarantors**"; together with the ABL DIP Guarantors, each a "**DIP Guarantor**" and collectively, jointly and severally, the "**DIP Guarantors**");

The obligations of (i) the DIP Borrowers under the DIP ABL Credit Agreement and DIP Guarantors under the DIP ABL Guaranty are to be secured, and (ii) the Loan Parties (as defined under the Pre-Petition ABL Credit Agreement) under the Pre-Petition ABL Credit Agreement and the Pre-Petition ABL Documents are secured (x) on a first priority basis by liens on the ABL Priority Collateral and (y) on a second priority basis by Liens on the Term Loan Priority Collateral;

The obligations of (i) U.S. DIP Borrower under the DIP Term Loan Agreement and DIP Guarantors under the DIP Term Loan Guaranty are to be secured, and (ii) the Credit Parties (as defined under the Pre-Petition Term Loan Credit Agreement) under the Pre-Petition Term Loan Credit Agreement and the Pre-Petition Term Loan Documents are secured (x) on a first priority basis by liens on the Term Loan Priority Collateral and (y) on a second priority basis by Liens on the ABL Priority Collateral;

The DIP ABL Documents and the DIP Term Loan Documents and the Orders provide, among other things, that the parties thereto shall set forth in this Agreement their respective relative rights, priorities and remedies with respect to their respective Liens in the Collateral and certain other matters; and

DIP ABL Agent as authorized and directed by the DIP ABL Lenders and the DIP ABL Documents, Pre-Petition ABL Agent as authorized and directed by the Pre-Petition ABL Lenders and the Pre-Petition ABL Documents, DIP Term Loan Agent, as authorized and directed by the DIP Term Loan Lenders and the DIP Term Loan Documents, and Pre-Petition Term Loan Agent, as authorized and directed by the Pre-Petition Term Loan Lenders and the Pre-Petition Term Loan Documents have agreed to the intercreditor and other provisions set forth in this Agreement in order to provide for the orderly sharing among them, in accordance with such priorities, of the proceeds of Collateral upon foreclosure thereupon or other disposition thereof.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1. <u>Definitions; Rules of Construction</u>**.

1.1     <u>UCC Terms</u>. The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC; <u>provided</u>, that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern (such meanings to be equally applicable to both the singular and plural forms, and to the capitalized and non-capitalized forms, of the terms defined): "account", "account debtor", "chattel paper", "commercial tort claim", "deposit account", "equipment", "fixture", "general intangible", "goods", "instruments", "inventory", "letter-of-credit right", "proceeds", "record", "securities account", "security" and "supporting obligation".

1.2     <u>Defined Terms</u>. As used in the Agreement, the following terms shall have the following meanings:

"**ABL Agent**" and "**ABL Agents**" have the respective meanings set forth in the preamble.

"**ABL Bank Product Obligations**" means, collectively, all of the DIP ABL Bank Product Obligations and the Pre-Petition ABL Bank Product Obligations.

"**ABL Cap**" means, as of any date of determination, the result of:

(a)     $175,000,000 *plus*

(b)     the sum of (i) solely when the principal amount of the outstanding Advances (under and as defined in the DIP ABL Credit Agreement), outstanding Advances (under and as defined in the Pre-Petition ABL Credit Agreement) and Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed by the Borrowers, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, is equal to or greater than $175,000,000, the amount that has been added to the principal amount of such Advances and Letter of Credit Disbursements of all interest, fees, costs, expenses, indemnities (contingent or otherwise), premiums, penalties, and other amounts accrued or charged with respect to any of the ABL Obligations (other than Excess ABL Obligations) as and when the same accrues or becomes due and payable (or is required to be cash collateralized), including the same as would accrue and become due but for the commencement of an Insolvency Proceeding, whether or not such amounts are allowed or allowable, in whole or in part, in any such Insolvency Proceeding, plus (ii) to the extent the following amounts have not been added to the principal balance of the outstanding Advances (under and as defined in the DIP ABL Credit Agreement), outstanding Advances (under and as defined in the Pre-Petition ABL Credit Agreement) and Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed by the Borrowers, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, all interest, fees, costs, expenses, indemnities (contingent or otherwise), premiums, penalties, and other amounts accrued or charged with respect to any of the ABL Obligations (other than Excess ABL Obligations) as and when the same accrues or becomes due and payable (or is required to be cash collateralized), including the same as would accrue and become due but for the commencement of an Insolvency Proceeding, whether or not such amounts are allowed or allowable, in whole or in part, in any such Insolvency Proceeding); *plus*

(c)     the aggregate amount of contingent reimbursement DIP ABL Obligations in respect of undrawn Letters of Credit outstanding under the DIP ABL Credit Agreement on the Closing Date and any replacement Letters of Credit with respect thereto, which replacement Letters of Credit shall be in an aggregate undrawn face amount no greater than that of the Letters of Credit being replaced; *plus*

(d)     Protective Advances and Overadvances (each as defined in the ABL Documents) in an outstanding principal amount not to exceed $15,000,000; *plus*

(e)     solely after the delivery of a Carve Out Trigger Notice (as defined in the Orders), the amount of ABL Obligations incurred to fund the Carve Out Reserves (as defined in the Orders); *plus*

(f)    the amount of the then-outstanding ABL Bank Product Obligations that constitute secured ABL Obligations in an aggregate outstanding amount not to exceed the sum of $20,000,000 plus the aggregate outstanding amount of any ABL Hedge Obligations evidenced by a Hedge Agreement in effect on the Petition Date in respect of interest rate Hedge Agreements, *minus*

(g)    the amount of all permanent reductions of the revolving credit commitments under the DIP ABL Credit Agreement in accordance with the provisions thereof.

Any net increase in the aggregate principal amount of an Advance or Letter of Credit (each, as defined in the DIP ABL Credit Agreement), on a U.S. Dollar equivalent basis, after such Advance is made or such Letter of Credit issued that is caused by a fluctuation in the exchange rate of the currency in which such Advance or Letter of Credit is denominated will be ignored in determining whether the ABL Cap has been exceeded.

"**ABL Claimholder**" means any of the DIP ABL Claimholders and the Pre-Petition ABL Claimholders, as the context requires.

"**ABL Collateral**" means, collectively, all of the DIP ABL Collateral and the Pre-Petition ABL Collateral.

"**ABL Collateral Documents**" means, collectively, all of the DIP ABL Collateral Documents and the Pre-Petition ABL Collateral Documents.

"**ABL Default**" means any DIP ABL Default, or any "Event of Default", as such term is defined in the Pre-Petition ABL Credit Agreement.

"**ABL DIP Guarantor**" and "**ABL DIP Guarantors**" have the respective meanings set forth in the preamble.

"**ABL Documents**" means the DIP ABL Documents and the Pre-Petition ABL Documents.

"**ABL Guaranty**" means, collectively, any DIP ABL Guaranty and any Pre-Petition ABL Guaranty.

"**ABL Hedge Obligations**" means, collectively, all of the DIP ABL Hedge Obligations and the Pre-Petition ABL Hedge Obligations.

"**ABL Lender**" means any DIP ABL Lender or any Pre-Petition ABL Lender.

"**ABL Obligations**" means, collectively, any DIP ABL Obligations and any Pre-Petition ABL Obligations.

"**ABL Priority Collateral**" means all of each Grantor's right, title, and interest in and to the following types of property of such Grantor, wherever located and whether such Grantor has such right, title, and interest in such property now or hereafter acquires it, would constitute ABL Priority Collateral (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code or any similar provision of the CCAA (or any provision of any other Bankruptcy Law)):

(a)      all accounts (except to the extent that such accounts constitute specifically identifiable proceeds of the Term Priority Collateral);

(b)      all inventory;

(c)      all instruments, chattel paper (including all tangible and electronic chattel paper) and other contracts, in each case to the extent governing, evidencing, substituting for, arising from or constituting proceeds of any accounts, other Receivables, inventory, or other ABL Priority Collateral;

(d)      (i) all deposit accounts, (ii) all securities accounts, security entitlements, and securities, and (iii) all commodity accounts and commodity contracts and, in each case with respect to clauses (i) through (iii) above, all cash, money, cash equivalents, money checks instruments, funds, ACH transfers, wired funds, investment property, securities entitlements, and other funds or property held in or on deposit therein, except, in each case, (A) subject to the provisions of this Agreement (including Sections 3.10 and 4.2), identifiable proceeds of Term Loan Priority Collateral, (B) Equity Interests issued by any Grantor or any of its Subsidiaries, and (C) the DIP Term Loan Funding Account and any Term Loan Collateral Account and, in each case, any cash, money, cash equivalents, money, checks, instruments, funds, ACH transfers, wired funds, investment property, securities entitlements, and other funds or property held in or on deposit therein;

(e)      all contracts, documents of title and other documents that evidence the ownership of or right to receive or possess, or that otherwise relate to, any inventory, accounts, other Receivables, or other ABL Priority Collateral, including contracts, documents of title, and documents that relate to the acquisition or sale or other disposition of any inventory, and all contracts, documents of title, or other documents that arise from or constitute proceeds of accounts, Receivables, inventory, or other ABL Priority Collateral;

(f)      all tax refunds;

(g)      all guaranties, contracts of suretyship, insurance, letters of credit, letter of credit rights, security and other credit enhancements (including repurchase agreements) and supporting obligations, in each case in respect of the accounts, other Receivables, inventory, or other ABL Priority Collateral, including (i) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lien or secured party, and (ii) identifiable deposits by and property of account debtors or other persons securing the obligations of account debtors in respect of accounts or other Receivables;

(h)      all commercial tort claims and general intangibles (other than Intellectual Property) to the extent (i) arising from, relating to or constituting proceeds of any accounts, other Receivables, inventory, or other ABL Priority Collateral, (ii) related to or arising out of the purchase, manufacture, distribution, sale or other disposition of a Grantor's inventory, or (iii) related to or arising out of the collection of or realization upon any accounts, other Receivables, inventory, or other ABL Priority Collateral of a Grantor;

(i)    all cash, money, and Cash Equivalents (except to the extent that such amounts constitute (x) identifiable proceeds of Term Loan Priority Collateral or (y) amounts in the DIP Term Loan Funding Account);

(j)    all Investment Related Property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and all monies, credit balances, deposits and other property of any Grantor now or hereafter held or received by or in transit to DIP ABL Agent or any other DIP ABL Claimholders or at any other depository institution, bank, securities intermediary or other similar institution from or for the account of any Grantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all "Advances" (as defined in the DIP ABL Credit Agreement), in each case, except (i) the Equity Interests of the Subsidiaries of Holdings owned by any DIP Guarantor and (ii) to the extent that such Investment Related Property or other assets constitute identifiable proceeds of Term Loan Priority Collateral;

(k)    all claims under policies of casualty insurance and all proceeds of casualty insurance, in each case, payable by reason of loss or damage to any accounts, other Receivables, inventory or other ABL Priority Collateral;

(l)    to the extent not otherwise described above, all Receivables;

(m)    all Books evidencing, relating to or referring to any of the foregoing items of ABL Priority Collateral; and

(n)    all substitutions, replacements, accessions, accessories, products or proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion (including claims in respect of condemnation) of any kind or nature of any or all of the foregoing items of ABL Priority Collateral.

Notwithstanding the foregoing, the ABL Priority Collateral shall not include any Excluded Assets.

For purposes of clarification, and notwithstanding anything to the contrary set forth in this Agreement, (i) except as expressly set forth above, Intellectual Property shall not constitute ABL Priority Collateral, but instead shall constitute Term Loan Priority Collateral, (ii) any of the items set forth in this definition that are or become branded, or produced through the use or other application of, any Intellectual Property, whether pursuant to the exercise of rights pursuant to Section 3.9 or otherwise, shall constitute ABL Priority Collateral, and no proceeds arising from any Disposition of any such ABL Priority Collateral shall be, or be deemed to be, attributable to Term Loan Priority Collateral and (iii) except as expressly set forth above, Equity Interests (including the Equity Interests of the Subsidiaries of Holdings owned by any DIP Guarantor) and the proceeds thereof shall not constitute ABL Priority Collateral, but instead shall constitute Term Loan Priority Collateral.

"**ABL Priority Obligations**" means all ABL Obligations other than Excess ABL Obligations.

"**ABL Retained Interest**" has the meaning set forth in Section 10.8.

"**Agent**" means any ABL Agent or any Term Loan Agent, as the context requires.

"**Agreement**" has the meaning set forth in the preamble.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means (i) the BIA, (ii) the CCAA, (iii) the WURA, (iv) the Bankruptcy Code, (v) any other federal, state, provincial or foreign law for the relief of debtors or benefit of creditors, (vi) the arrangement or reorganization provisions under the *Canada Business Corporations Act* and similar provincial corporate statutes and (vii) any other similar statute or law, in each case as applicable and as now and hereafter in effect, or any successor statute.

"**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as now and hereafter in effect, or any successor statute.

"**Books**" means books and records (including each Grantor's Records indicating, summarizing, or evidencing such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's goods or General Intangibles related to such information).

"**Business Day**" means any day other than a Saturday, Sunday, or day on which commercial banks in the state of New York are authorized or required by law to remain close.

"**Cases**" has the meaning set forth in the preamble.

"**Cash Equivalents**" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or Canada or issued by any agency thereof and backed by the full faith and credit of the United States or Canada, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state, or any province of Canada, or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating from either S&P Global Ratings ("**S&P**") or Moody's Investors Service, Inc. ("**Moody's**"), (c) commercial paper maturing no more than one (1) year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank, or any bank listed on Schedule I of the Bank Act (Canada), having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof, or the federal laws of Canada, so long as the amount maintained with any such other bank is less than or equal to $250,000 and is insured by the Federal Deposit Insurance Corporation or the Canadian Deposit Insurance Corporation, as the case may be, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than 30 days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of one (1) year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above, and (i) shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all of the investments of which are one or more of the types of assets described in clauses (a) through (g) above.

"**CCAA**" means the *Companies' Creditors Arrangement Act (Canada)*, as now and hereafter in effect, or any successor statute.

"**CCAA A&R Initial Order**" shall mean the CCAA Initial Order as amended and restated by the CCAA Court at the hearing of the CCAA Comeback Motion to: (i) approve service and/or substitute service on all secured creditors of the CCAA Debtors likely to be affected by the CCAA DIP Charge; and (ii) provide for the full priming of the CCAA DIP Charge on all of the Collateral of the CCAA Debtors on the terms contemplated thereby.

"**CCAA Case**" and "**CCAA Cases**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA Court**" shall have the meaning provided in the recitals to this Agreement.

"**CCAA Debtors**" means Connors Bros. Clover Leaf Seafoods Company, Clover Leaf Holdings Company, K.C.R. Fisheries Ltd., 6162410 Canada Limited, Connors Bros. Holdings Company, and Connors Bros. Seafoods Company.

"**CCAA DIP Charge**" shall mean a super-priority priming charge granted by the CCAA Court on all of the Collateral of the CCAA Debtors.

"**CCAA Comeback Motion**" shall mean the motion seeking the CCAA A&R Initial Order to be heard by the CCAA Court not later than ten (10) days following the entry of the CCAA Initial Order, which motion shall be served by the CCAA Debtors on the service list established in the CCAA Cases, all secured creditors of the CCAA Debtors and any other Person as may be requested by the Agent.

"**CCAA Initial Order**" shall mean an order of the CCAA Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance satisfactory to the Agent, which order shall, among other things, authorize the Loan Documents and the DIP Term Loan Credit Documents to which any CCAA Debtor is a party and the Transactions contemplated by this Agreement and grant the CCAA DIP Charge, with only such modifications as are satisfactory to the Agent, in its sole discretion.

"**Claimholders**" means, with respect to the DIP ABL Obligations, the DIP ABL Claimholders, with respect to the Pre-Petition ABL Obligations, the Pre-Petition ABL Claimholders, with respect to the DIP Term Loan Obligations, the DIP Term Loan Claimholders, and with respect to the Pre-Petition Term Loan Obligations, the Pre-Petition Term Loan Claimholders.

"**Closing Date**" means November [_], 2019.

"**Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, which constitute ABL Collateral or Term Loan Collateral.

"**Debtors**" means Bumble Bee Parent, Inc., a Delaware corporation, Bumble Bee Holdings, Inc., a Georgia corporation, Bumble Bee Foods, LLC, a Delaware limited liability company, Anova Food, LLC, a Virginia limited liability company, and Bumble Bee Capital Corp., a Delaware corporation.

"**Default Disposition**" means any private or public Disposition of (i) all or any material portion of the ABL Priority Collateral by one or more Grantors with the consent of DIP ABL Agent after the occurrence and during the continuance of an DIP ABL Default (and prior to the Discharge of ABL

Obligations) or (ii) all or any material portion of the Term Loan Priority Collateral by one or more Grantors with the consent of DIP Term Loan Agent after the occurrence and during the continuance of a DIP Term Loan Default (and prior to the Discharge of Term Loan Obligations), which Disposition is conducted by such Grantors with the consent of DIP ABL Agent in the case of the former, or DIP Term Loan Agent in the case of the latter, in connection with good faith efforts by DIP ABL Agent or DIP Term Loan Agent, as the case may be, to collect the ABL Obligations through the Disposition of ABL Priority Collateral or the Term Loan Obligations through the Disposition of Term Loan Priority Collateral.

"**DIP ABL Agent**" has the meaning set forth in the preamble.

"**DIP ABL Bank Product Obligations**" means "Bank Product Obligations" as that term is defined in the DIP ABL Credit Agreement as in effect on the Closing Date.

"**DIP ABL Claimholders**" means, at any relevant time, the holders of DIP ABL Obligations at that time, including DIP ABL Lenders, the Underlying Issuer (as defined in the DIP ABL Credit Agreement), Bank Product Providers (as defined in the DIP ABL Credit Agreement), and Agent (as defined in the DIP ABL Credit Agreement).

"**DIP ABL Collateral Documents**" means the Orders, security agreements, pledge agreements, mortgages, hypothecs, collateral assignments, deeds of trust, deeds to secure debt and related agreements, and any other agreements, documents or instruments pursuant to which a Lien is granted (or purported to be granted) to secure any DIP ABL Obligations or under which rights or remedies with respect to such Liens are governed.

"**DIP ABL Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a consensual Lien is granted (or purported to be granted) as security for any DIP ABL Obligation. For the avoidance of doubt, the DIP ABL Collateral shall not include any Excluded Assets.

"**DIP ABL Conforming Amendment**" means any amendment to any DIP ABL Document that is substantively identical to a corresponding amendment to a comparable provision of a DIP Term Loan Document.

"**DIP ABL Credit Agreement**" has the meaning set forth in the recitals.

"**DIP ABL Default**" means any "Event of Default", as such term is defined in the DIP ABL Credit Agreement.

"**DIP ABL Documents**" means the DIP ABL Collateral Documents, the DIP ABL Credit Agreement, the DIP ABL Guaranty, the DIP ABL Mortgages, and each of the other Loan Documents (as defined in the DIP ABL Credit Agreement).

"**DIP ABL Guaranty**" has the meaning set forth in the recitals to this Agreement, but shall also include each other guaranty made by any other guarantor in favor of DIP ABL Agent.

"**DIP ABL Hedge Obligations**" means "Hedge Obligations" as that term is defined in the DIP ABL Credit Agreement as in effect on the Closing Date.

"**DIP ABL Lenders**" means the "Lenders" as defined in the DIP ABL Credit Agreement.

"**DIP ABL Mortgages**" means each mortgage, deed of trust, deed of hypothec, and other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any DIP ABL Obligations or under which rights or remedies with respect to any such Liens are governed.

"**DIP ABL Obligations**" means all obligations and all amounts owing, due, or secured under the terms of the DIP ABL Credit Agreement or any other DIP ABL Document, whether now existing or arising hereafter, including all principal, premium, interest, fees, attorneys fees, costs, charges, expenses, reimbursement obligations, obligations with respect to Letters of Credit, obligations to post cash collateral in respect of Letters of Credit or DIP ABL Bank Product Obligations or indemnities in respect thereof, any other indemnities or guarantees, and all other amounts payable under or secured by any DIP ABL Document, in each case whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

"**DIP ABL Security Agreements**" means each of the Canadian Security Document, the Luxembourg Security Agreement, and the U.S. Security Agreement as such terms are defined in the DIP ABL Credit Agreement, in each case to be dated on or about of November [___], 2019, between the Grantors specified therein and the DIP ABL Agent, together with each other pledge agreement or security agreement executed in connection therewith.

"**DIP Borrower**" and "**DIP Borrowers**" have the respective meanings set forth in the recitals.

"**DIP Guarantor**" and "**DIP Guarantors**" have the respective meanings set forth in the preamble.

"**DIP Term Funding Account**" means the "DIP Term Funding Account" as that term is defined in the DIP Term Loan Agreement.

"**DIP Term Loan Agent**" has the meaning set forth in the preamble.

"**DIP Term Loan Agreement**" has the meaning set forth in the recitals.

"**DIP Term Loan Claimholders**" means, as of any date of determination, the holders of the DIP Term Loan Obligations at that time, including (a) DIP Term Loan Agent and (b) the DIP Term Loan Lenders.

"**DIP Term Loan Collateral Documents**" means all "Security Documents" as that term is defined in the DIP Term Loan Agreement.

"**DIP Term Loan Collateral**" means any and all of the assets and property of any Grantor, whether real, personal, or mixed, with respect to which a consensual Lien is granted as security for any DIP Term Loan Obligations. For the avoidance of doubt, the DIP Term Loan Collateral shall not include any Excluded Assets.

"**DIP Term Loan Conforming Amendment**" means any amendment to any DIP Term Loan Document that is substantively identical to a corresponding amendment to a comparable provision of a DIP ABL Document.

"**DIP Term Loan Default**" means any "Event of Default", as such term is defined in the DIP Term Loan Credit Agreement.

"**DIP Term Loan Documents**" means the DIP Term Loan Collateral Documents, the DIP Term Loan Agreement, the DIP Term Loan Guaranty, the DIP Term Loan Mortgages and each of the other Credit Documents (as defined in the DIP Term Loan Agreement).

"**DIP Term Loan Funding Account**" has the meaning set forth in the DIP Term Loan Agreement.

"**DIP Term Loan Guaranty**" has the meaning set forth in the recitals to this Agreement but shall also include each other guaranty made by any other guarantor in favor of the DIP Term Loan Agent.

"**DIP Term Loan Lenders**" has the meaning set forth in the recitals.

"**DIP Term Loan Mortgages**" means each mortgage, deed of trust, deed of hypothec, and other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secured any DIP Term Loan Obligations or under which rights or remedies with respect to any such Liens are governed.

"**DIP Term Loan Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of any Grantor arising under any DIP Term Loan Document or otherwise with respect to any loans made under the DIP Term Loan Agreement, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses and premiums (including any Exit Fee  (as defined in the DIP Term Loan Agreement)) that accrue after the commencement by or against any Grantor or any proceeding under the Bankruptcy Code, the CCAA or any other Bankruptcy Law naming such person as a debtor in such proceeding, regardless of whether such interest, fees and expenses are allowed claims in such proceeding.

"**DIP Term Loan Security Agreements**" means all "Security Agreements" as that term is defined in the DIP Term Loan Agreement, together with each other pledge agreement or security agreement executed in connection with the DIP Term Loan Agreement.

"**Discharge of ABL Obligations**" means, except to the extent otherwise expressly provided in Section 5.5 or in Section 6.8:

        (a)      the payment in full in cash of all DIP ABL Obligations (other than outstanding Letters of Credit, DIP ABL Bank Product Obligations, and contingent indemnification obligations for which no underlying claim has been asserted);

        (b)      termination or expiration of all commitments, if any, to extend credit that would constitute DIP ABL Obligations;

        (c)      termination or cash collateralization (in an amount and in the manner required by the DIP ABL Credit Agreement) of all outstanding Letters of Credit (as defined in the DIP ABL Credit Agreement);

        (d)      with respect to DIP ABL Bank Product Obligations, in the discretion of the applicable DIP ABL Claimholder, either (i) cash collateralization of such obligations in an amount reasonably determined by the applicable DIP ABL Claimholder to be equal to the potential amount of such obligations, or (ii) at the option of the DIP ABL Claimholder with respect to such obligations, termination of the

applicable agreement governing such DIP ABL Bank Product Obligations and making of all payments pursuant thereto, as applicable;

(e)     cash collateralization for any costs, expenses and contingent indemnification obligations consisting of DIP ABL Obligations not yet due and payable but with respect to which a claim has been threatened or asserted (which, for the avoidance of doubt, includes costs and expenses incurred with respect to any actual or potential Challenge (as such term is defined in either of the Orders)), in each case in writing (in an amount reasonably determined by the applicable DIP ABL Claimholder); and

(f)     the Discharge of Pre-Petition ABL Obligations.

"**Discharge of Pre-Petition ABL Obligations**" has the meaning ascribed to the term "Discharge of ABL Obligations" in the Pre-Petition Intercreditor Agreement.

"**Discharge of Pre-Petition Term Loan Obligations**" has the meaning ascribed to the term "Discharge of Term Loan Obligations" in the Pre-Petition Intercreditor Agreement.

"**Discharge of Term Loan Obligations**" means, except to the extent otherwise expressly provided in Section 5.5 or in Section 6.8:

(a)     the payment in full in cash of all DIP Term Loan Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted);

(b)     [reserved];

(c)     cash collateralization for any costs, expenses and contingent indemnification obligations consisting of DIP Term Loan Obligations not yet due and payable but with respect to which a claim has been threatened or asserted (which, for the avoidance of doubt, includes costs and expenses incurred with respect to any actual or potential Challenge (as such term is defined in either of the Orders)), in each case in writing (in an amount reasonably determined by the applicable DIP Term Loan Claimholder); and

(d)     the Discharge of Pre-Petition Term Loan Obligations.

"**Disposition**" or "**Dispose**" means the sale, assignment, transfer, license, lease (as lessor), exchange, or other disposition (including any sale and leaseback transaction) of any property by any person (or the granting of any option or other right to do any of the foregoing).

"**Enforcement Notice**" shall mean a written notice delivered by either the DIP ABL Agent or the DIP Term Loan Agent to the other Agents stating that a DIP ABL Default or a DIP Term Loan Default, as applicable, has occurred and is continuing under the DIP ABL Credit Agreement or the DIP Term Loan Agreement, as applicable, and that an Enforcement Period has commenced with respect to the ABL Priority Collateral or Term Loan Priority Collateral, as applicable, specifying the relevant event of default, stating the current balance of the ABL Obligations or the Term Loan Obligations, as applicable, and requesting the current balance of the ABL Obligations or Term Loan Obligations, as applicable, owing to the noticed party.

"**Enforcement Period**" shall mean the period of time following the receipt by either the DIP ABL Agent or the DIP Term Loan Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in case of an Enforcement Period commenced by the DIP Term Loan Agent, the Discharge of Term Loan Obligations, (b) in the case of an Enforcement Period commenced by the DIP ABL Agent, the Discharge of ABL Obligations, or (c) the applicable Agent terminates, or agrees in writing to terminate, the Enforcement Period (including in connection with a waiver or cure of the default that gave rise to such Enforcement Notice).

"**Equity Interests**" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission or any successor thereto under the Securities Exchange Act of 1934, as amended and as in effect from time to time).

"**Excess ABL Obligations**" means the sum of (a) the portion of the principal amount of the outstanding Advances (under and as defined in the DIP ABL Credit Agreement), the outstanding Advances (under and as defined in the Pre-Petition ABL Credit Agreement) and the Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed by the Borrowers, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, that is in excess of the ABL Cap, plus (b) the portion of interest and fees that accrues or is charged with respect to that portion of the principal amount of the Advances (under and as defined in the DIP ABL Credit Agreement), the Advances (under and as defined in the Pre-Petition ABL Credit Agreement) and Letter of Credit Disbursements (under and as defined in the DIP ABL Credit Agreement) not yet reimbursed by the Borrowers, including outstanding Advances (under and as defined in the DIP ABL Credit Agreement) made with respect to such Letter of Credit Disbursements, in excess of the ABL Cap as described in clause (a) of this definition.

"**Excess ABL Purchase Triggering Event**" means, with respect to the purchase option in favor of the Term Loan Claimholders, any time on or after the first date after the Term Loan Application Date upon which the aggregate outstanding principal amount of the ABL Obligations exceeds $145,000,000.

"**Excess Term Loan Obligations**" means the sum of (a) the portion of the principal amount of the loans outstanding under the DIP Term Loan Documents and the loans outstanding under the Pre-Petition Term Loan Documents that is in excess of the Term Loan Cap, plus (b) the portion of interest and fees that accrues or is charged with respect to that portion of the principal amount of the loans described in clause (a) of this definition.

"**Excluded Assets**" means any assets described as "Excluded Assets" in both the DIP ABL Security Agreements and the DIP Term Loan Security Agreements, and with respect to which a Lien is not granted (and not purported to be granted) as security for the ABL Obligations or the Term Loan Obligations (excluding, for the avoidance of doubt, any asset that, but for the application of Section 552 of the Bankruptcy Code or any applicable provision of the CCAA (or any provision of any other Bankruptcy Law), would constitute Collateral).

"**Exercise any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" means (a) the taking of any action to enforce any Lien in respect of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its interest in or realize upon, or take any other action available to it in respect of, the Collateral, including the institution of any judicial or non-judicial foreclosure proceedings, the noticing of any public or private sale or other disposition

pursuant to Article 9 of the UCC or other applicable law, having or seeking to have a trustee, receiver, receiver-manager, liquidator or similar official appointed for or over the Collateral or taking any action to take possession of the Collateral, the noticing of any public or private sale or other Disposition pursuant to Article 9 of the UCC or other applicable law, or any diligently pursued in good faith attempt to vacate or obtain relief from a stay or other injunction restricting any other action described in this definition, (b) the exercise of any right or remedy provided to a secured creditor under the Orders, the ABL Documents or the Term Loan Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Grantor or the taking of any action or the exercise of any right or remedy in respect of the setoff or recoupment against the Collateral or proceeds of Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including credit bidding or otherwise the acceptance of Collateral in full or partial satisfaction of a Lien, (c) the sale, assignment, transfer, lease, license, or other Disposition of all or any portion of the Collateral, by private or public sale or any other means, (d) the solicitation of bids from third parties to conduct the Disposition of all or a material portion of Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, (e) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties for the purposes of valuing, marketing, or Disposing of, all or a material portion of the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, (f) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any capital stock composing a portion of the Collateral or seeking relief from the automatic stay or other stay) whether under the Orders, the DIP ABL Documents, the Pre-Petition ABL Documents, the DIP Term Loan Documents, the Pre-Petition Term Loan Documents, under applicable law of any jurisdiction, in equity, in the Cases or another Insolvency Proceeding, or otherwise, (g) subject to, and to the extent not inconsistent with, <u>Section 6.3</u>, the pursuit of Default Dispositions relative to all or a material portion of the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, or (h) the commencement of, or the joinder with any creditor in commencing, any Insolvency Proceeding against any Grantor or any assets of any Grantor, but in all cases excluding (i) the establishment of borrowing base reserves, collateral ineligibles, or other conditions for advances, (ii) the changing of advance rates or advance sublimits, (iii) the imposition of a default rate or late fee, (iv) the collection and application of accounts or other monies deposited from time to time in deposit accounts or securities accounts, in each case, to the extent constituting ABL Priority Collateral, against the ABL Obligations pursuant to the provisions of the DIP ABL Documents or the Pre-Petition ABL Documents, as applicable (including, without limitation, the notification of account debtors, depositary institutions or any other person to deliver proceeds of Collateral to the DIP ABL Agent, (v) the cessation of lending pursuant to the provisions of the DIP ABL Documents, including upon the occurrence of a default on the existence of an overadvance, (vi) the filing of a proof of claim in any Insolvency Proceeding (including in the Cases), (vii) the consent by any ABL Agent or the requisite ABL Lenders to the disposition by any Grantor of any of the ABL Priority Collateral (other than in connection with liquidation of the ABL Priority Collateral by or at the request of any ABL Agent), and (viii) the acceleration of the Term Loan Obligations or the ABL Obligations.

"**Exigent Circumstances**" means (a) a good faith belief that a fraud has been committed by any Grantor in connection with the ABL Obligations or Term Loan Obligations, (b) any withholding of collections of Accounts or other Proceeds or any other property in violation of the terms of the DIP ABL Documents, or (c) an event or circumstance that in the reasonable judgment of the DIP ABL Agent or the DIP Term Loan Agent, as applicable, materially and imminently threatens the value of, or ability of the DIP ABL Agent or the DIP Term Loan Agent, as applicable, to realize upon, a portion the ABL Priority Collateral or the Term Loan Priority Collateral, as applicable, such as, without limitation,

fraudulent removal, concealment, destruction (other than to the extent covered by insurance), material waste or abscondment thereof.

"**Final Order**" has the meaning specified in the DIP ABL Credit Agreement.

"**Governmental Authority**" means the government of the United States of America, Canada, Luxembourg or any other nation, any political subdivision thereof, whether state, provincial, or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government.

"**Grantors**" means each DIP Borrower, each DIP Guarantor, and each other person that may, as applicable, from time to time execute and deliver an ABL Collateral Document or a Term Loan Collateral Document as a "debtor," "grantor," "obligor," or "pledgor" (or the equivalent thereof).

"**Guarantor**" and "**Guarantors**" have the respective meanings set forth in the recitals.

"**Hedge Agreement**" means a "swap agreement" as the term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"**Indebtedness**" means "Indebtedness" as that term is defined in the DIP ABL Credit Agreement as in effect on the Closing Date.

"**Insolvency Proceeding**" means:

(a)    any voluntary or involuntary case or proceeding under any Bankruptcy Law with respect to any Grantor;

(b)    any filing under the BIA of a notice of intention to make a proposal, or a proposal is made, under the BIA;

(c)    any other voluntary or involuntary insolvency or bankruptcy case or proceeding, or any receivership, liquidation or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(d)    any liquidation, dissolution, or winding up of any Grantor (other than as permitted by the DIP Term Loan Documents or the DIP ABL Documents) whether voluntary or involuntary and whether or not involving insolvency or bankruptcy;

(e)    any assignment for the benefit of creditors or any other marshaling of assets for creditors of any Grantor or any other similar arrangement in respect of such Grantor's creditors generally, and liabilities of any Grantor; or

(f)    any of the Cases.

"**Intellectual Property**" means the "Intellectual Property" as that term is defined in the Term Loan Security Agreement as in effect on the Closing Date.

"**Interim Order**" has the meaning specified in the DIP ABL Credit Agreement.

"**Investment Related Property**" means any and all investment property (as that term is defined in the UCC or the PPSA, as applicable).

"**Letters of Credit**" means the "Letters of Credit," as that term is defined in the DIP ABL Credit Agreement.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, hypothec, charge, or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, or other preferential arrangement having the practical effect of any of the foregoing.

"**Litigation Provisions**" means (a) in the case of the DIP ABL Documents, any representation and warranty, covenant, default, DIP ABL Default or any other provision relating to any "Civil Antitrust Claim," "DOJ Payment," "DOJ Reserve", "DOJ Settlement," "Other DOJ Individuals," "Other DOJ Matter" or "Other Payment" (in each case, as defined in the DIP ABL Credit Agreement as in effect on the Closing Date) and (b) in the case of the Term Loan Documents, any representation and warranty, covenant, default, DIP Term Loan Default or any other provision relating to the "Civil Cases," "Criminal Cases" or "Plea Agreement" (in each case, as defined in the Term Loan Agreement as in effect on the Closing Date).

"**Mortgage**" means each mortgage, deed of trust, deed of hypothec or deed to secure debt pursuant to which a Grantor grants to the (a) DIP ABL Agent, for the benefit of the DIP ABL Claimholders, Liens upon the real estate Collateral owned by such Grantor, as security for the DIP ABL Obligations, (b) DIP Term Loan Agent, for the benefit of the DIP Term Loan Claimholders, Liens upon the real estate Collateral owned by such Grantor, as security for the DIP Term Loan Obligations, (c) Pre-Petition ABL Agent, for the benefit of the Pre-Petition ABL Claimholders, Liens upon the real estate Collateral owned by such Grantor, as security for the Pre-Petition ABL Obligations, or (d) Pre-Petition Term Loan Agent, for the benefit of the Pre-Petition Term Loan Claimholders, Liens upon the real estate Collateral owned by such Grantor, as security for the Pre-Petition Term Loan Obligations.

"**Obligations**" shall mean, as applicable, (a) all ABL Obligations and (b) all Term Loan Obligations.

"**Orders**" means, the Interim Order, the Final Order, CCAA Initial Order and the CCAA A&R Initial Order.

"**person**" means any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority, or other entity.

"**Pledged Collateral**" has the meaning set forth in <u>Section 5.4(a)</u>.

"**PPSA**" means the Personal Property Security Act (Ontario) or the Personal Property Security Act of any province to which relevant property is subject, or any other applicable federal or provincial statute (including the Civil Code of Quebec) pertaining to the granting, perfecting, priority or ranking of security interests, liens, hypothecs or personal property, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time.

"**Pre-Petition ABL Agent**" has the meaning set forth in the preamble.

"**Pre-Petition ABL Bank Product Obligations**" has the meaning ascribed to "Bank Product Obligations" in the Pre-Petition ABL Credit Agreement.

"**Pre-Petition ABL Claimholders**" means, at any relevant time, the holders of Pre-Petition ABL Obligations at that time, including Pre-Petition ABL Lenders, the Underlying Issuer (as defined in the Pre-Petition ABL Credit Agreement), Bank Product Providers (as defined in the Pre-Petition ABL Credit Agreement), and Agents (as defined in the Pre-Petition ABL Credit Agreement).

"**Pre-Petition ABL Collateral**" has the meaning ascribed to "ABL Collateral" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition ABL Collateral Document**" has the meaning ascribed to "ABL Collateral Document" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition ABL Credit Agreement**" has the meaning set forth in the recitals.

"**Pre-Petition ABL Documents**" has the meaning ascribed to the term "ABL Documents" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition ABL Guaranty**" has the meaning ascribed to the term "ABL Guaranty" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition ABL Hedge Obligations**" has the meaning ascribed to "Hedge Obligations" in the Pre-Petition ABL Credit Agreement.

"**Pre-Petition ABL Obligations**" has the meaning ascribed to the term "ABL Obligations" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition ABL Roll Up**" has the meaning set forth in Section 4.1(a).

"**Pre-Petition Closing Date**" means August 15, 2017.

"**Pre-Petition Intercreditor Agreement**" has the meaning set forth in the recitals.

"**Pre-Petition Term Loan Agent**" has the meaning set forth in the preamble.

"**Pre-Petition Term Loan Agreement**" has the meaning set forth in the recitals.

"**Pre-Petition Term Loan Claimholders**" means, as of any date of determination, the holders of the Pre-Petition Term Loan Obligations at that time, including (a) Term Loan Agent (as defined in the Pre-Petition Term Loan Agreement) and (b) the Term Loan Lenders (as defined in the Pre-Petition Term Loan Agreement).

"**Pre-Petition Term Loan Collateral**" has the meaning ascribed to "Term Loan Collateral" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition Term Loan Collateral Document**" has the meaning ascribed to "Term Loan Collateral Document" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition Term Loan Documents**" has the meaning ascribed to the term "Term Loan Documents" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition Term Loan Guaranty**" has the meaning ascribed to the term "Term Loan Guaranty" in the Pre-Petition Intercreditor Agreement.

"**Pre-Petition Term Loan Obligations**" has the meaning ascribed to the term "Term Loan Obligations" in the Pre-Petition Intercreditor Agreement.

"**Priority Collateral**" means, with respect to the ABL Claimholders, all ABL Priority Collateral, and with respect to the Term Loan Claimholders, all Term Loan Priority Collateral

"**Purchase Notice**" has the meaning set forth in <u>Section 10.1</u>.

"**Purchase Triggering Event**" means with respect to the purchase option in favor of the Term Loan Claimholders:

(a)    the acceleration of the DIP ABL Obligations and/or termination of all or substantially all of the commitments under the DIP ABL Credit Agreement;

(b)    the Exercise of Secured Creditor Remedies by DIP ABL Agent or any DIP ABL Claimholder with respect to all or a material portion of the ABL Priority Collateral;

(c)    prior to the occurrence of an DIP ABL Default, the DIP ABL Lenders or other DIP ABL Claimholders do not fund loans or other extensions of credit requested by any of the DIP Borrowers under the DIP ABL Credit Agreement for a period of more than five (5) consecutive Business Days (unless the reason for not funding is that the DIP Borrowers do not have availability or have failed to satisfy any of the relevant conditions to funding set forth in the DIP ABL Credit Agreement); or

(d)    the commencement of an Insolvency Proceeding with respect to any Grantor that is not a Debtor or a CCAA Debtor or any Subsidiary of a Grantor that is not a Debtor or a CCAA Debtor.

"**Real Estate Asset**" means, at any time of determination, any fee interest of any Grantor in owned real property.

"**Receivables**" shall mean all of the following now owned or hereafter arising or acquired property of any Grantor: (a) all Accounts; (b) all amounts at any time payable to any Grantor in respect of the sale or other disposition by any Grantor of any Account; (c) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (d) all tax refunds; and (e) all receivables, payment intangibles, and other rights to payment of each Grantor and other contact rights, chattel paper, instruments, notes, and other forms of obligations owing to any Grantor, in each case arising from the sale, lease, rental, license or other disposition of Inventory or Accounts or other ABL Priority Collateral, or the provision of services rendered or to be rendered or otherwise directly related to any Accounts or Inventory or other ABL Priority Collateral of a Grantor (including, without limitation, choses in action, causes of action, or other rights and claims against carriers and shippers, rights to indemnification, and identifiable Proceeds thereof, casualty or any similar types of insurance, in each case relating to ABL Priority Collateral and identifiable Proceeds thereof).

"**Records**" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"**Refinance**" means, in respect of any indebtedness, to refinance, modify, extend, renew, defease, supplement, restructure, replace, refund or repay, or to issue other indebtedness in exchange or replacement for such indebtedness, in whole or in part, whether with the same or different lenders, arrangers or agents. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Securities Account**" means a securities account (as that term is defined in the UCC or the PPSA, as applicable).

"**Stock**" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"**Subsidiary**" of a person means a corporation, partnership, limited liability company, or other entity in which that person directly or indirectly owns or controls the shares of capital stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"**Term DIP Guarantor**" and "**Term DIP Guarantors**" have the respective meanings set forth in the preamble.

"**Term Loan Application Date**" means the date on or after the date hereof when a portion of the proceeds of the Initial Term Loans (as such term is defined in the DIP Term Loan Agreement) are applied to the repayment of a portion of the outstanding principal balance of the Pre-Petition ABL Obligations.

"**Term Loan Cap**" means, as of any date of determination, the sum (which amount shall be increased by the amount of all interest (including any interest paid-in-kind and added to the principal amount thereof), fees, premiums, penalties, costs, expenses, indemnities (contingent or otherwise), and other amounts accrued or charged with respect to any of the Term Loan Obligations (other than Excess Term Loan Obligations) as and when the same accrues or becomes due and payable (or is required to be cash collateralized), irrespective of whether the same is added to the principal amount of the Term Loan Obligations and including the same as would accrue and become due but for the commencement of an Insolvency Proceeding (including, but not limited to, the Cases and the CCAA Cases), whether or not such amounts are allowed or allowable, in whole or in part, in any such Insolvency Proceeding) of (a) $756,733,814 minus (b) the aggregate amount of all payments or prepayments of the principal amount of the term loans under the Pre-Petition Term Loan Agreement and DIP Term Loan Agreement (in each case, other than payments of such term loans in connection with a Refinancing thereof) on and after the Closing Date.

Any net increase in the aggregate principal amount of a loan, on a U.S. Dollar Equivalent basis, after the loan is made that is caused by a fluctuation in the exchange rate of the currency in which the loan is denominated will be ignored in determining whether the Term Loan Cap has been exceeded.

"**Term Loan Claimholders**" means any of the DIP Term Loan Claimholders and the Pre-Petition Term Loan Claimholders.

"**Term Loan Collateral Account**" means any deposit account that solely contains Term Loan Priority Collateral or identifiable proceeds of the Term Loan Priority Collateral and which has been specifically identified as a "Term Loan Collateral Account" in writing to each ABL Agent and each Term Loan Agent (it being understood that any property in such deposit account which is not Term Loan Priority Collateral or identifiable proceeds of Term Loan Priority Collateral shall not be Term Loan Priority Collateral solely by virtue of being on deposit in such deposit account).

"**Term Loan Collateral**" means, collectively, all of the DIP Term Loan Collateral and the Pre-Petition Term Loan Collateral.

"**Term Loan Collateral Documents**" means, collectively, all of the DIP Term Loan Collateral Documents and the Pre-Petition Term Loan Collateral Documents.

"**Term Loan Default**" means any DIP Term Loan Default, or any "Event of Default", as such term is defined in the Pre-Petition Term Loan Agreement.

"**Term Loan Documents**" means the DIP Term Loan Documents and the Pre-Petition Term Loan Documents.

"**Term Loan Guaranty**" means, collectively, any DIP Term Loan Guaranty and any Pre-Petition Term Loan Guaranty.

"**Term Loan Lender**" means any DIP Term Loan Lender or any Pre-Petition Term Loan Lender.

"**Term Loan Obligations**" means, collectively, all of the DIP Term Loan Obligations and Pre-Petition Term Loan Obligations.

"**Term Loan Priority Collateral**" means all of each Grantor's right, title, and interest in and to the following types of property of such Grantor that do not constitute ABL Priority Collateral (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code or any applicable provision of the CCAA (or any provision of any other Bankruptcy Law)), wherever located and whether such Grantor has such right, title, and interest in such property now or hereafter acquires it:

        (a)     all Investment Related Property (including Equity Interests) that does not constitute ABL Priority Collateral;

        (b)     all equipment;

        (c)     all Intellectual Property (including the "Bumble Bee" brand and all other brands);

        (d)     all Negotiable Collateral (as defined in the Term Loan Security Agreements) that does not constitute ABL Priority Collateral;

        (e)     all Real Estate Assets;

        (f)     all general intangibles, instruments, Books and supporting obligations related to the foregoing and proceeds of the foregoing (except to the extent that any of the foregoing constitute ABL Priority Collateral);

(g)     all other goods (including but not limited to fixtures) and assets of each Grantor not constituting ABL Priority Collateral, whether tangible or intangible and wherever located;

(h)     the DIP Term Loan Funding Account and any Term Loan Collateral Account and, in each case, any cash, money, cash equivalents, money checks instruments, funds, ACH transfers, wired funds, investment property and other funds or property held in or on deposit therein;

(i)     any other Term Loan Collateral that does not constitute ABL Priority Collateral.

Notwithstanding the foregoing, the Term Loan Priority Collateral shall not include any Excluded Assets.

"**Term Loan Priority Obligations**" means all Term Loan Obligations other than Excess Term Loan Obligations.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Use Period**" means the period commencing on the date that the DIP ABL Agent (or any DIP ABL Claimholder acting with the consent of the DIP ABL Agent) commences the Exercise of Secured Creditor Remedies in connection with any ABL Priority Collateral in a manner as provided in Section 3.8 (having theretofore furnished the Term Loan Agents with an Enforcement Notice) and ending on the earlier to occur of (i) 180 days thereafter and (ii) the Discharge of ABL Obligations. If any stay or other order that prohibits DIP ABL Agent or the other DIP ABL Claimholders from commencing and continuing to Exercise any Secured Creditor Remedies or to liquidate and sell the ABL Priority Collateral has occurred by operation of law or has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended and upon lifting of the automatic stay or other stay, if there are fewer than 180 days remaining in such 180 day period, then such 180 day period shall be extended so that each DIP ABL Agent and the DIP ABL Claimholders have 180 days upon lifting of the automatic stay or other stay.

"**WURA**" means the Winding Up and Restructuring Act (Canada).

1.3    Construction. The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The term "or" shall be construed to have, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." Any term used in this Agreement and not defined in this Agreement shall have the meaning set forth in the DIP ABL Credit Agreement. Unless the context requires otherwise:

(a)     except as otherwise provided herein, any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, supplemented, modified, renewed, extended, Refinanced, refunded, or replaced;

(b)    any reference to any agreement, instrument, or other document herein "as in effect on the Closing Date" (not including, except as otherwise provided herein, any reference to an agreement, instrument or other document "dated as of the Closing Date" or similar formulation) shall be construed as referring to such agreement, instrument, or other document without giving effect to any amendment, restatement, supplement, modification, or Refinance after the Closing Date;

(c)    any definition of or reference to ABL Obligations or the Term Loan Obligations herein shall be construed as referring to the ABL Obligations or the Term Loan Obligations (as applicable) as from time to time amended, restated, supplemented, modified, renewed, extended, Refinanced, refunded, or replaced;

(d)    any reference herein to any person shall be construed to include such person's successors and assigns;

(e)    the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(f)    all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(g)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

1.4    <u>Interpretation in</u> Québec. For all purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (i) "personal property" shall include "movable property", (ii) "real property" shall include "immovable property", (iii) "tangible property" shall include "corporeal property", (iv) "intangible property" shall include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall include a "hypothec", "prior claim" and a "resolutory clause", (vi) all references to filing, registering or recording under the Code shall include publication under the Register of Personal and Movable Real Rights of Québec, (vii) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" lien or security interest as against third parties, (viii) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (ix) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall include a "mandatary", (xi) "construction liens" shall include "legal hypothecs", (xii) "joint and several" shall include solidary, (xiii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiv) "beneficial ownership" shall include "ownership on behalf of another as "mandatary", (xv) "easement" shall include "servitude", (xvi) "priority" shall include "prior claim", (xvii) "survey" shall include "certificate of location and plan", (xviii) "fee simple title" shall include "absolute ownership" and (xix) "leasehold interest" shall include "valid lease " ", (xx) "leasehold interest" shall include "valid lease", (xxi) "accounts" and "accounts receivable" shall include "claims", (xxii) "guarantee" and "guarantor" shall include "suretyship" and "surety" respectively, and (xxiii) "Deposit Account" shall include a "financial account" (as defined in the *Civil Code of Quebec*).  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only. *Les parties aux présentes confirment que c'est leur volonté que cette convention et les*

*autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

**SECTION 2. Lien Priorities**.

2.1    Relative Priorities. Notwithstanding the date, time, method, manner, or order of grant, attachment, or perfection of any Liens securing (or purportedly securing) the ABL Obligations granted with respect to the Collateral or of any Liens securing (or purportedly securing) the Term Loan Obligations granted with respect to the Collateral (including, in each case, irrespective of whether any such Lien is granted, or secures Obligations relating to the period, before or after the commencement of any Insolvency Proceeding in respect of any Grantor that is not a Debtor or a CCAA Debtor and, with respect to any Debtor or CCAA Debtor, irrespective of whether the Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code or otherwise or whether the CCAA Cases are dismissed or otherwise terminated) and notwithstanding any contrary provision of the UCC, the PPSA or any other applicable law, the Orders or the ABL Documents or the Term Loan Documents, as applicable, or any defect or deficiencies in, or failure to attach or perfect, the Liens securing (or purportedly securing) any of the Obligations, or any other circumstance whatsoever, the DIP ABL Agent, on behalf of the DIP ABL Claimholders, Pre-Petition ABL Agent, on behalf of the Pre-Petition ABL Claimholders, DIP Term Loan Agent, on behalf of the DIP Term Loan Claimholders and the Pre-Petition Term Loan Agent, on behalf of the Pre-Petition Term Loan Claimholders, hereby agree that:

(a)    any Lien with respect to the ABL Priority Collateral securing any ABL Priority Obligations under the DIP ABL Documents now or hereafter held by or on behalf of, or created for the benefit of, DIP ABL Agent or any of the DIP ABL Claimholders or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, court order, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien with respect to the ABL Priority Collateral securing (A) any Term Loan Obligations, (B) any Excess ABL Obligations, and (C) any Pre-Petition ABL Obligations;

(b)    any Lien with respect to the ABL Priority Collateral securing any Term Loan Obligations now or hereafter held by or on behalf of, or created for the benefit of, any Term Loan Agent or any of the Term Loan Claimholders or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, court order, operation of law, subrogation or otherwise, shall be (A) junior and subordinate in all respects to all Liens with respect to the ABL Priority Collateral securing any ABL Priority Obligations, (B) excluding the extent to which such Lien secures Excess Term Loan Obligations, senior in all respects and prior to any Lien with respect to the ABL Priority Collateral securing any Excess ABL Obligations and (C) to the extent such Lien secures Excess Term Loan Obligations, junior and subordinate to all Liens with respect to the ABL Priority Collateral securing Excess ABL Obligations;

(c)    any Lien with respect to the Term Loan Priority Collateral securing any Term Loan Priority Obligations under the DIP Term Loan Documents now or hereafter held by or on behalf of, or created for the benefit of, DIP Term Loan Agent or any of the DIP Term Loan Claimholders or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, court order, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien with respect to the Term Loan Priority Collateral securing (A) any ABL

Obligations, (B) any Excess Term Loan Obligations, and (C) any Pre-Petition Term Loan Obligations; and

(d)        any Lien with respect to the Term Loan Priority Collateral securing any ABL Obligations now or hereafter held by or on behalf of, or created for the benefit of, any ABL Agent, any of the ABL Claimholders or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, court order, operation of law, subrogation or otherwise, shall be (A) junior and subordinate in all respects to all Liens with respect to the Term Loan Priority Collateral securing any Term Loan Priority Obligations, (B) excluding the extent to which such Lien secures Excess ABL Obligations, senior in all respects and prior to any Lien with respect to the Term Loan Priority Collateral securing any Excess Term Loan Obligations and (C) to the extent such Lien secures Excess ABL Obligations, junior and subordinate to all Liens with respect to the Term Loan Priority Collateral securing Excess Term Loan Obligations.

The subordination of Liens provided for in this Agreement shall continue to be effective with respect to any part of the Collateral from and after the Closing Date whether such Liens are declared, or ruled to be, invalid, unenforceable, void or not allowed by a court of competent jurisdiction, as a result of any action taken by the Term Loan Agent or the ABL Agent, as applicable, or any failure by such person to take any action, with respect to any financing statement (including any amendment to or continuation thereof), mortgage or other perfection document.

2.2        Prohibition on Contesting Liens. Each Term Loan Agent, for itself and on behalf of each Term Loan Claimholder, and each ABL Agent, for itself and on behalf of each ABL Claimholder, agrees that it will not (and hereby irrevocably, absolutely and unconditionally waives any right to), directly or indirectly, contest (directly or indirectly), seek the avoidance of, support any other person in contesting (directly or indirectly), in any proceeding (including any of the Cases, the CCAA Cases or any other Insolvency Proceeding), or encourage, support or discuss with any other person a challenge or contestation of (a) the priority, validity, attachment, perfection or enforceability of a Lien in the Collateral held by or on behalf of an ABL Agent or any other ABL Claimholder or by or on behalf of a Term Loan Agent or any other Term Loan Claimholder, (b) the priority, validity, perfection or enforceability of any Obligations (including any ABL Guaranty or Term Loan Guaranty), including the allowability or priority of any Obligations in any of the Cases, the CCAA Cases or any other Insolvency Proceeding, or (c) the validity or enforceability of, or the priorities, rights or duties established by, or other provisions of this Agreement; provided, however that nothing in this Agreement shall be construed to prevent or impair the rights of any ABL Agent, any ABL Claimholder, any Term Loan Agent, or any Term Loan Claimholder to enforce the terms of this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the ABL Obligations and the Term Loan Obligations, as applicable, as provided in Sections 2.1, 3 and 6.2.

2.3        New Liens. During the term of this Agreement, so long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor, and, in the case of any Debtor or CCAA Debtor, whether or not the Cases have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code or whether or not the CCAA Cases have been dismissed or otherwise terminated, the parties hereto agree that no Grantor shall:

(a)        grant or suffer to exist any Liens on any asset to secure any Term Loan Obligation unless such Grantor also offers to grant, and, at the option of the ABL Agents, grants a Lien on such asset to secure the ABL Obligations concurrently

with the grant of a Lien thereon in favor of each Term Loan Agent in accordance with the priorities set forth in this Agreement; or

(b)      grant or suffer to exist any Liens on any asset to secure any ABL Obligations unless such Grantor also offers to grant, and, at the option of the Term Loan Agents, grants a Lien on such asset to secure the Term Loan Obligations concurrently with the grant of a Lien thereon in favor of each ABL Agent in accordance with the priorities set forth in this Agreement.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to each ABL Agent or any ABL Claimholder, the Term Loan Agents, on behalf of each Term Loan Claimholder, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2, and without limiting any other rights and remedies available to each Term Loan Agent or any Term Loan Claimholder, the ABL Agents, on behalf of each ABL Claimholder, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4      Cooperation in Designating Collateral.

(a)      The parties hereto agree that it is their intention that the ABL Collateral and the Term Loan Collateral be identical except as except as otherwise provided herein or in the Orders. In furtherance of the foregoing and of Section 9.8, the parties hereto agree to and the Grantors shall, in each case subject to the other provisions of this Agreement upon request by any ABL Agent or any Term Loan Agent, cooperate in good faith (and direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Priority Collateral and the Term Loan Priority Collateral and the steps taken or to be taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Documents and the Term Loan Documents.

(b)      The foregoing to the contrary notwithstanding, each of the parties agrees that to the extent that any ABL Agent or any Term Loan Agent obtains a Lien in an asset (of a type that is not included in the types of assets included in the Collateral as of the Closing Date or which would not constitute Collateral without a grant of a security interest or lien separate from the ABL Documents or Term Loan Documents, as applicable, as in effect immediately prior to obtaining such Lien on such asset) which the other party to this Agreement elects not to obtain after receiving prior written notice thereof in accordance with the provisions of Section 2.3, the Collateral securing the ABL Obligations and the Term Loan Obligations will not be identical, and the provisions of the documents, agreements and instruments evidencing such Liens also will not be substantively similar, and any such difference in the scope or extent of perfection with respect to the Collateral resulting therefrom are hereby expressly permitted by this Agreement.

2.5      Conflict with Orders. Any conflict or ambiguity as between this Agreement and the Orders shall, to the extent legally enforceable as between the parties hereto, be resolved in favor of the Orders.

### SECTION 3. <u>Exercise of Remedies</u>.

3.1     <u>Exercise of Remedies by Term Loan Agent</u>. Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency Proceedings has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor, each Term Loan Agent and each Term Loan Claimholder:

(a)     will not exercise or seek to exercise any rights, powers, or remedies with respect to any ABL Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral); <u>provided</u>, <u>however</u>, that upon the occurrence of a DIP Term Loan Default and for so long as such DIP Term Loan Default is continuing, the DIP Term Loan Agent may Exercise any Secured Creditor Remedies with respect to the ABL Priority Collateral after a period of one hundred eighty (180) days (provided, that such one hundred eighty (180) day period shall be tolled for any period during which each ABL Agent is stayed by an order issued in any Insolvency Proceeding or by any other court of competent jurisdiction from exercising its default and enforcement rights and remedies against substantially all or a material portion of the ABL Priority Collateral) has elapsed since the date on which the DIP ABL Agent receives an Enforcement Notice from the DIP Term Loan Agent with respect to such DIP Term Loan Default (the "**ABL Priority Standstill Period**") (it being understood that, if at any time after the delivery by the DIP Term Loan Agent of the Enforcement Notice that commences an ABL Priority Standstill Period, no DIP Term Loan Default is continuing, the DIP Term Loan Agent may not Exercise any Secured Creditor Remedies with respect to the ABL Priority Collateral until the passage of a new ABL Priority Standstill Period commenced by a new Enforcement Notice relative to the occurrence of a new DIP Term Loan Default under the DIP Term Loan Documents); <u>provided</u>, <u>further</u>, <u>however</u>, that any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral by any Term Loan Agent is at all times subject to the provisions of this Agreement;

(b)     subject to <u>Section 3.4</u> and <u>Section 3.7</u> and the Orders, will not, directly or indirectly contest, protest, object to (and seek or be awarded any relief of any nature whatsoever based on any such objection), interfere with, hinder or delay any (i) action to enforce or collect (or attempt to collect) the ABL Obligations, or (ii) Exercise of Secured Creditor Remedies by any ABL Agent or any ABL Claimholder with respect to any ABL Priority Collateral (regardless of whether any action or failure to act by or on behalf of such ABL Agent or the ABL Claimholders is adverse to the interest of any Term Loan Agent or any Term Loan Claimholder), and have no right to direct any ABL Agent to Exercise any Secured Creditor Remedies or take any other action under the ABL Documents;

(c)     will not, in any manner, contest, oppose or otherwise bring into question the validity, priority, perfection or enforceability of any of the ABL Documents;

(d)     will not object to (and waive any and all claims with respect to) any waiver or forbearance by any ABL Agent or any ABL Claimholder from Exercising any Secured Creditor Remedies;

(e)     will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Lien that any Term Loan Claimholder has on ABL Priority Collateral equal with, or to give any Term Loan Claimholder any

preference or priority relative to, any Lien that any ABL Claimholder has with respect to such ABL Priority Collateral;

(f)    will have no right to (i) direct any ABL Agent or any ABL Claimholder to exercise any right, remedy or power or (ii) consent to the exercise by any ABL Agent or any ABL Claimholder of any right, remedy or power with respect to any ABL Priority Collateral;

(g)    acknowledge and agree that no covenant, agreement or restriction contained in the Term Loan Documents shall be deemed to restrict in any way the rights and remedies of any ABL Agent or any ABL Claimholder with respect to the ABL Priority Collateral as set forth in this Agreement and the ABL Documents; and

(h)    will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement.

3.2    Exercise of Remedies by ABL Agent. Until the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency Proceedings has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor, each ABL Agent and each ABL Claimholder:

(a)    will not exercise or seek to exercise any rights, powers, or remedies with respect to any Term Loan Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any Term Loan Priority Collateral); provided, however, that upon the occurrence of an DIP ABL Default and for so long as such DIP ABL Default is continuing, the DIP ABL Agent may Exercise any Secured Creditor Remedies with respect to the Term Loan Priority Collateral after a period of one hundred eighty (180) days (provided, that such one hundred eighty (180) day period shall be tolled for any period during which each Term Loan Agent is stayed by an order issued in any Insolvency Proceeding or by any other court of competent jurisdiction from exercising its default and enforcement rights and remedies against substantially all or a material portion of the Term Loan Priority Collateral) has elapsed since the date on which the DIP Term Loan Agent receives an Enforcement Notice from the DIP ABL Agent with respect to such DIP ABL Default (the "**Term Loan Priority Standstill Period**") (it being understood that, if at any time after the delivery by the DIP ABL Agent of the Enforcement Notice that commences a Term Loan Priority Standstill Period, no DIP ABL Default is continuing, the DIP ABL Agent may not Exercise any Secured Creditor Remedies with respect to the Term Loan Priority Collateral until the passage of a new Term Loan Priority Standstill Period commenced by a new Enforcement Notice relative to the occurrence of a new DIP ABL Default under the ABL Documents); provided, further, however, that any Exercise of Secured Creditor Remedies with respect to any Term Loan Priority Collateral by any ABL Agent is at all times subject to the provisions of this Agreement;

(b)    subject to Section 3.4 and Section 3.7 and the Orders, will not, directly or indirectly, contest, protest, object to (and seek or be awarded any relief of any nature whatsoever based on any such objection), interfere with, hinder or delay any (i) action to enforce or collect (or attempt to collect) the Term Loan Obligations, or (ii) Exercise of Secured Creditor Remedies by any Term Loan Agent or any Term Loan Claimholder with respect to any Term Loan Priority Collateral (regardless of whether

any action or failure to act by or on behalf of such Term Loan Agent or the Term Loan Claimholders is adverse to the interest of any ABL Agent or the any ABL Claimholder), and have no right to direct Term Loan Agent to Exercise any Secured Creditor Remedies or take any other action under the Term Loan Documents;

(c)    will not, in any manner, contest, oppose or otherwise bring into question the validity, priority, perfection or enforceability of any of the Term Loan Documents;

(d)    will not object to (and waive any and all claims with respect to) any waiver or forbearance by any Term Loan Agent or any Term Loan Claimholder from Exercising any Secured Creditor Remedies;

(e)    will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Lien that any ABL Claimholder has on Term Loan Priority Collateral equal with, or to give any ABL Claimholder any preference or priority relative to, any Lien that any Term Loan Claimholders has with respect to such Term Loan Priority Collateral;

(f)    will have no right to (i) direct any Term Loan Agent or any Term Loan Claimholder to exercise any right, remedy or power or (ii) consent to the exercise by any Term Loan Agent or any Term Loan Claimholder of any right, remedy or power with respect to any Term Loan Priority Collateral;

(g)    acknowledge and agree that no covenant, agreement or restriction contained in the ABL Documents shall be deemed to restrict in any way the rights and remedies of any Term Loan Agent or any Term Loan Claimholder with respect to the Term Loan Priority Collateral as set forth in this Agreement and the ABL Documents; and

(h)    will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement.

3.3    <u>Exclusive Enforcement Rights</u>. (a) Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency Proceedings has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor but subject to the first proviso in <u>Section 3.1(a)</u>, DIP ABL Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to any ABL Priority Collateral (and in connection therewith, make determinations regarding the release or Disposition thereof or any restrictions with respect thereto), in each case without any consultation with or the consent of any Term Loan Agent or any Term Loan Claimholder, and (b) until the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency Proceedings has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor but subject to the first proviso in <u>Section 3.2(a)</u>, DIP Term Loan Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to any Term Loan Priority Collateral and in connection therewith, subject to <u>Section 3.8</u>, make determinations regarding the release or Disposition thereof or any restrictions with respect thereto without any consultation with or the consent of any ABL Agent or any ABL Claimholder. In connection with (x) any Exercise of Secured Creditor Remedies with respect to the ABL Priority Collateral, each ABL Agent may enforce the provisions of the ABL Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion, or (y) any Exercise of Secured Creditor Remedies with respect to the Term Loan Priority Collateral, each Term Loan Agent may enforce the

provisions of the Term Loan Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to Dispose of Collateral, to incur expenses in connection with such Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC, the PPSA, the Bankruptcy Laws or other applicable law.

3.4     Permitted Actions. Anything to the contrary in this Section 3 notwithstanding, each Term Loan Agent and each ABL Agent may:

(a)     if an Insolvency Proceedings has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor and in connection with the Cases or the CCAA Cases, file a proof of claim or statement of interest with respect to its Collateral or otherwise with respect to the Term Loan Obligations or the ABL Obligations, as applicable and as the case may be, or otherwise file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of such Grantor arising under any Insolvency Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws), except that no Claimholder may take (or support any other person in taking) any action as an unsecured creditor that such party could not take as a secured creditor pursuant to this Agreement (including pursuant to Sections 2.2, 3.1, 3.2, 3.3, 3.6, or 6 of this Agreement);

(b)     subject to the Orders, the Bankruptcy Code, the CCAA, the Bankruptcy Laws or other applicable law, take any action (not adverse to the priority status of the Liens on the Collateral of the other, or the rights, subject to the terms of this Agreement, of the other or any Claimholders to Exercise any Secured Creditor Remedies) in order to create or perfect its Lien in and to the Collateral;

(c)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance or subordination of its claims or the claims of its Claimholders, or the avoidance of its Liens;

(d)     make any arguments and motions that are, in each case, in accordance with the terms of this Agreement;

(e)     vote on any plan of reorganization or plan of arrangement;

(f)     join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Priority Collateral of the other Agent initiated by such other Agent to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with the Exercise of Secured Creditor Remedies by such other Agent (it being understood that, (i) with respect to ABL Priority Collateral, neither any Term Loan Agent nor any Term Loan Claimholder shall be entitled to receive any proceeds thereof unless otherwise expressly permitted herein and (ii) with respect to Term Loan Priority Collateral, neither any ABL Agent nor any ABL Claimholder shall be entitled to receive any proceeds thereof unless otherwise expressly permitted herein); and

(g)      take any action described in clauses (i) through (viii) of the definition of Exercise of Secured Creditor Remedies.

3.5      <u>Retention of Proceeds</u>.

(a)      Each Term Loan Agent agrees that prior to the Discharge of ABL Obligations, but subject to <u>Section 3.5(c)</u> below, no Term Loan Claimholders shall be permitted to retain any proceeds of ABL Priority Collateral in any circumstance unless and until the Discharge of ABL Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to <u>Section 4.2</u>.

(b)      Each ABL Agent agrees that prior to the Discharge of Term Loan Obligations, but subject to <u>Section 3.5(c)</u> below, no ABL Claimholders shall be permitted to retain any proceeds of Term Loan Priority Collateral in any circumstance unless and until the Discharge of Term Loan Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to <u>Section 4.2</u>.

(c)      Notwithstanding anything contained in this Agreement to the contrary, in the event of any Disposition or series of related Dispositions that includes ABL Priority Collateral and Term Loan Priority Collateral (including in connection with or as a result of the sale of the capital stock of a Grantor that owns assets that are ABL Priority Collateral), then solely for purposes of this Agreement, the allocation of proceeds of such Disposition to the ABL Priority Collateral shall be based upon, in the case of (i) any ABL Priority Collateral consisting of inventory, the book value thereof as assessed on the date of such Disposition, (ii) any ABL Priority Collateral consisting of accounts receivable, the book value thereof as assessed on the date of such Disposition and (iii) all other ABL Priority Collateral and Term Loan Priority Collateral, fair market value of such ABL Priority Collateral and Term Loan Priority Collateral sold, as determined by the Grantors in their reasonable judgment or, if the aggregate amount of such other ABL Priority Collateral and Term Loan Priority Collateral sold is greater than $20,000,000, an independent appraiser.

3.6      <u>Non-Interference</u>. Subject to <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u> and <u>3.4</u>, each Term Loan Agent, for itself and on behalf of its respective Term Loan Claimholders, and each ABL Agent, for itself and on behalf of its respective ABL Claimholders, hereby:

(a)      subject to <u>Section 3.7</u>, agrees that it will not, directly or indirectly, take any action that would restrain, hinder, limit, delay, or otherwise interfere with any Exercise of Secured Creditor Remedies by any other Agent with respect to such other Agent's Priority Collateral or that is otherwise prohibited hereunder, including any Disposition of any other Agent's Priority Collateral, whether by foreclosure or otherwise; and

(b)      subject to <u>Section 3.7</u>, waives any and all rights it or its Claimholders may have as a junior lien creditor or otherwise to object to the manner in which such other Agent seeks to enforce or collect such other party's respective Obligations or enforce the Liens securing such Obligations granted in any of such other Agent's Priority Collateral, regardless of whether any action or failure to act by or on behalf of such other Agent is adverse to the interest of it or its Claimholders.

3.7      <u>Commercially Reasonable Dispositions; Notice of Exercise</u>.

(a)      Each Term Loan Agent, for itself and on behalf of its respective Term Loan Claimholders, hereby irrevocably, absolutely, and unconditionally waives any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior or subsequent to any disposition of any of the ABL Priority Collateral, on the ground(s) that any such disposition of ABL Priority Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC, PPSA or other applicable law and/or (y) would not or did not comply with any other requirement under any applicable UCC, PPSA or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its collateral. Each ABL Agent, for itself and on behalf of its respective ABL Claimholders, hereby irrevocably, absolutely and unconditionally waives any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any Term Loan Priority Collateral, on the ground(s) that any such disposition of Term Loan Priority Collateral (i) would not be or was not "commercially reasonable" within the meaning of any applicable UCC, PPSA or other applicable law and/or (ii) would not or did not comply with any other requirement under any applicable UCC, PPSA or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its Collateral.

(b)      Except as expressly set forth in this Agreement, subject to the Orders each Term Loan Claimholder and each ABL Claimholder shall have any and all rights and remedies it may have as a creditor under any applicable law, including the right to the Exercise of Secured Creditor Remedies; <u>provided</u>, <u>however</u>, that (i) the Exercise of Secured Creditor Remedies with respect to the Collateral (and any judgment Lien obtained in connection therewith) shall be subject to the Lien priorities set forth herein and to the provisions of this Agreement and (ii) no Claimholder may take (or support any other person in taking) any action as an unsecured creditor that such party could not take as a secured creditor pursuant to this Agreement (including pursuant to <u>Sections 2.2</u>, <u>3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.6</u>, or <u>6</u> of this Agreement). Subject to the Orders, each ABL Agent may enforce the provisions of the ABL Documents, as applicable, each Term Loan Agent may enforce the provisions of applicable Term Loan Documents, as applicable, and each Agent may Exercise any Secured Creditor Remedies, all in such order and in such manner as each may determine in the exercise of its sole discretion, consistent with the terms of this Agreement and mandatory provisions of applicable law; <u>provided</u>, <u>however</u>, that each ABL Agent and each Term Loan Agent agrees to provide to the other (x) an Enforcement Notice prior to (unless there are Exigent Circumstances, in which case such notice may be provided promptly thereafter) its Exercise of Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to any Grantor; <u>provided further</u>, <u>however</u>, that any ABL Agent's failure to provide copies of any such notices to the any Term Loan Agent shall not impair any of the ABL Agents' rights hereunder or under any of the ABL Documents and any Term Loan Agent's failure to provide copies of any such notices to any ABL Agent shall not impair any of the Term Loan Agents' rights hereunder or under any of the Term Loan Documents. Each Term Loan Agent, each Term Loan Claimholder, each ABL Agent, and each ABL Claimholder agrees that it will not institute any suit or other proceeding or assert in any suit, the Cases, the CCAA Cases, any other Insolvency Proceeding or other proceeding any claim, in the case of

each Term Loan Agent and each Term Loan Claimholder, against any ABL Agent or any other ABL Claimholder, and in the case of each ABL Agent and each other ABL Claimholder, against any Term Loan Agent or any other Term Loan Claimholder, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such person with respect to the Collateral which is consistent with the terms of this Agreement, and none of such parties shall be liable for any such action taken or omitted to be taken.

3.8     <u>Inspection and Access Rights</u>.

(a)     If any Term Loan Agent, or any agent or representative of any Term Loan Agent, or any receiver, shall, after any Term Loan Default, obtain possession or physical control of any of the real properties subject to a Mortgage or any of the tangible Term Loan Priority Collateral located on any premises other than real properties subject to a Mortgage or control over any intangible Term Loan Priority Collateral, such Term Loan Agent shall promptly notify the ABL Agents in writing of that fact, and the ABL Agents may thereafter notify such Term Loan Agent in writing as to whether such ABL Agent desires to exercise access rights under this <u>Section 3.8</u>. In addition, if any ABL Agent, or any agent or representative of any ABL Agent, or any receiver, shall obtain possession or physical control of any of the real properties subject to a Mortgage or any of the tangible Term Loan Priority Collateral located on any premises other than real properties subject to a Mortgage or control over any intangible Term Loan Priority Collateral, following the delivery to the Term Loan Agents of an Enforcement Notice, then such ABL Agent may at any time thereafter notify the Term Loan Agents in writing that such ABL Agent is exercising its access rights under this Agreement under either circumstance. Upon delivery of such notice by such ABL Agent to the Term Loan Agents, the parties shall confer in good faith to coordinate with respect to such ABL Agent's exercise of such access rights. Consistent with the definition of "Use Period," access rights may apply to differing parcels of real properties subject to a Mortgage and to different assets that constitute a portion of the Term Loan Priority Collateral, in each case at differing times, in which case, a differing Use Period will apply to each such property and to each such portion of the Term Loan Priority Collateral.

(b)     Without limiting any rights any ABL Agent or any other ABL Claimholder may otherwise have under applicable law or by agreement and whether or not any Term Loan Agent or any other Term Loan Claimholder has commenced and is continuing to Exercise any Secured Creditor Remedies of such Term Loan Agent, each ABL Agent or any other person (including any ABL Claimholder) acting with the consent, or on behalf, of any ABL Agent, shall have an irrevocable, non-exclusive right to have access to, and a royalty-free and rent-free license and right to use the Term Loan Priority Collateral (including, without limitation, equipment, fixtures, general intangibles and real property and equipment, processors, computers and other machinery related to the storage or processing of records, documents or files, but excluding Intellectual Property) during the Use Period (i) during normal business hours on any Business Day, to access the ABL Priority Collateral that (x) is stored or located in or on, (y) has become an accession with respect to (within the meaning of Section 9-335 of the UCC), or (z) has been commingled with (within the meaning of Section 9-336 of the UCC), Term Loan Priority Collateral, and (ii) in order to assemble, inspect, copy or download information stored on, take actions to perfect its Lien on, process raw materials or work-in-process into finished Inventory, take possession of, move,

package, prepare and advertise for sale or disposition, sell (by public auction, private sale or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in Grantors' business), store, collect, take reasonable actions to protect, secure and otherwise enforce the rights of such ABL Agent in and to the ABL Priority Collateral, or otherwise deal with the ABL Priority Collateral, in each case without the involvement of or interference by any Term Loan Claimholder or liability to any Term Loan Claimholder; provided that (A) any such license or right to use is granted on an "AS IS" basis, without any representation or warranty whatsoever (including any representation or warranty as to merchantability, fitness for a particular purpose or non-infringement), (B) any such license or right to use shall automatically terminate upon the sale of all (but not less than all) of the ABL Priority Collateral with respect to which such ABL Agent elects to utilize such Term Loan Priority Collateral, and shall not extend or transfer to the purchaser of such ABL Priority Collateral, and (C) any ABL Agent's use of such Term Loan Priority Collateral shall be reasonable and lawful. This Agreement will not restrict the rights of any Term Loan Agent to sell, assign or otherwise transfer the related Term Loan Priority Collateral prior to the expiration of the Use Period if (but only if) the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.8.

(c)    During the period of actual occupation, use and/or control by any ABL Claimholder and/or any ABL Agent (or their respective employees, agents, advisers and representatives) of any Term Loan Priority Collateral or other assets or property, such ABL Claimholders and such ABL Agent shall be obligated to repair at their expense any physical damage (ordinary wear and tear excepted) to such Term Loan Priority Collateral caused by such occupancy, use or control by such ABL Agent or its agents, representatives or designees, and to leave such Term Loan Priority Collateral or other assets or property in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted; provided, however, that such ABL Agent and such ABL Claimholder will not be liable for any diminution in the value of the Term Loan Priority Collateral caused by the absence of the ABL Priority Collateral therefrom. Notwithstanding the foregoing, in no event shall any ABL Claimholders or any ABL Agent have any liability to any Term Loan Claimholder and/or to any Term Loan Agent pursuant to this Section 3.8 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by such ABL Claimholders (or such ABL Agent, as the case may be) of their rights under this Section 3.8 and such ABL Claimholder and/or such ABL Agent shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by such ABL Claimholder and/or such ABL Agent, or for any diminution in the value of the Term Loan Priority Collateral that results solely from ordinary wear and tear resulting from the use of the Term Loan Priority Collateral by such ABL Claimholder and/or such ABL Agent in the manner and for the time periods specified under this Section 3.8. Without limiting the rights granted in this Section 3.8, such ABL Claimholders and such ABL Agent shall use commercially reasonable efforts to cooperate with the Term Loan Claimholders and/or the Term Loan Agent in connection with any efforts made by the Term Loan Claimholders and/or the Term Loan Agent to sell the Term Loan Priority Collateral.

(d)        Consistent with the definition of the term "Use Period," if any order or injunction is issued or stay is granted or is otherwise effective by operation of law that prohibits any ABL Agent from exercising any of its rights hereunder, then the Use Period granted to such ABL Agent under this <u>Section 3.8</u> shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining as required under this <u>Section 3.8</u>. Each Term Loan Agent agrees, for the benefit of each ABL Agent, that it shall not sell or dispose of any of the Term Loan Priority Collateral during the Use Period unless the buyer agrees in writing to acquire the Term Loan Priority Collateral subject to the terms of <u>Section 3.8</u> of this Agreement and agrees therein to comply with the terms of this <u>Section 3.8</u>. The rights of each ABL Agent and each ABL Claimholder under this <u>Section 3.8</u> during the Use Period shall continue notwithstanding such foreclosure, sale or other disposition by any Term Loan Agent.

(e)        No ABL Agent and no ABL Claimholder shall be obligated to pay any amounts to any Term Loan Agent or any Term Loan Claimholders (or any person claiming by, through or under any Term Loan Claimholders, including any purchaser of the Term Loan Priority Collateral) or to any Grantor, for or in respect of the use by any ABL Agent and any ABL Claimholder of the Term Loan Priority Collateral; <u>provided</u> that such ABL Agent or such other ABL Claimholder shall be obligated to pay any third-party expenses related thereto, including costs with respect to heat, light, electricity and water with respect to that portion of any premises so used or occupied, or that arise as a result of such use. In the event, and only in the event, that in connection with its use of some or all of the premises constituting Term Loan Priority Collateral, such ABL Agent or such other ABL Claimholder requires the services of any employees of the Grantors, such ABL Agent or such other ABL Claimholder shall pay directly to any such employees the appropriate, allocated wages of such employees, if any, during the time periods that such ABL Agent or such other ABL Claimholder requires their services. In each case, all amounts paid by any ABL Agent or any other ABL Claimholder hereunder shall be added to the outstanding principal balance of the ABL Obligations.

(f)        Each ABL Claimholders shall use the Term Loan Priority Collateral in accordance with applicable law.

(g)        Subject to <u>Section 3.7</u>, each Term Loan Agent and the other Term Loan Claimholders (i) will cooperate with each ABL Agent in its efforts pursuant to <u>Section 3.8(b)</u> to enforce such Agent's Liens in the ABL Priority Collateral and to finish any work-in-process and assemble the ABL Priority Collateral, (ii) will not hinder or restrict in any respect any ABL Agent from enforcing its Liens in the ABL Priority Collateral or from finishing any work-in-process or assembling the ABL Priority Collateral pursuant to <u>Section 3.8(b)</u>, and (iii) will, subject to the rights of any landlords under real estate leases, permit such ABL Collateral Agent, its employees, agents, advisers and representatives to exercise the rights described in <u>Section 3.8(b)</u>.

(h)        Subject to the terms hereof, each Term Loan Agent may advertise and conduct public auctions or private sales of the Term Loan Priority Collateral, without the involvement of or interference by any ABL Claimholder or liability to any ABL Claimholder as long as, in the case of an actual sale, the respective purchaser assumes and agrees in advance in writing to the obligations of each Term Loan Agent and each Term Loan Claimholder under this <u>Section 3.8</u>. If any ABL

Agent conducts a public auction or private sale of the ABL Priority Collateral at any of the real property included within the Term Loan Priority Collateral, such ABL Agent shall provide the Term Loan Agents with reasonable notice and use reasonable efforts to hold such auction or sale in a manner which would not unduly disrupt the Term Loan Agents' use of such real property.

(i)    In addition to and in furtherance of the foregoing, each Term Loan Agent, in its capacity as a secured party (or as a purchaser, assignee or transferee, as applicable), and to the extent of its interest therein, hereby grants to each ABL Agent, effective upon the commencement of the Use Period, a nonexclusive, irrevocable, royalty-free, worldwide license to use any and all Intellectual Property now owned or hereafter acquired by the Grantors (except to the extent such grant is prohibited by any rule of law, statute or regulation), that is included as part of the Term Loan Priority Collateral (and including in such license, access to all media in which any of such licensed Intellectual Property are recorded or stored and to all computer software and programs used for the compilation or printout thereof) as is or may be necessary or advisable in such ABL Agent's reasonable judgment for such ABL Agent to process, ship, produce, store, supply, lease, complete, sell, liquidate or otherwise deal with the ABL Priority Collateral in existence on or prior to the last day of the Use Period (but not to commence new orders), or to collect or otherwise realize upon any Accounts in existence on or prior to the last day of the Use Period comprising ABL Priority Collateral, in each case, solely during the Use Period in connection with any Exercise of Secured Creditor Remedies; <u>provided</u> that (i) any such license shall automatically terminate upon the sale of all (but not less than all) of the ABL Priority Collateral and shall not extend or transfer to the purchaser of such ABL Priority Collateral, (ii) such ABL Agent's use of such Intellectual Property shall be reasonable and lawful, and (iii) any such license is granted on an "AS IS" basis, without any representation or warranty whatsoever (including any representation or warranty as to merchantability, fitness for a particular purpose or non-infringement). Each Term Loan Agent (i) acknowledges and consents to the grant to each ABL Agent by the Loan Parties of the license referred to in the ABL Collateral Documents, and (ii) agrees that its Liens in the Term Loan Priority Collateral shall be subject in all respects to such license. Furthermore, each Term Loan Agent agrees that, in connection with any Exercise of Secured Creditor Remedies conducted by such Term Loan Agent in respect of Term Loan Priority Collateral, such Term Loan Agent shall provide written notice to any purchaser, assignee or transferee pursuant to an Exercise of Secured Creditor Remedies that the applicable assets are subject to such license.

(j)    Each ABL Agent and each ABL Claimholder shall indemnify each Term Loan Agent and any Term Loan Claimholders for any injury or damage to persons or Term Loan Priority Collateral (other than (i) diminution in value (as opposed to actual physical damage) as a result of its removal of ABL Priority Collateral therefrom and (ii) ordinary wear and tear) caused by any act or omission of such ABL Agent or ABL Claimholder or its respective employees, agents and representatives in connection the exercise of its rights of access and the use under this <u>Section 3.8</u> to the extent not covered by insurance. Each ABL Agent shall promptly repair, at such ABL Agent's expense, any physical damage to any Term Loan Priority Collateral to the extent caused by the occupation and/or use thereof by such ABL Agent or any of its respective ABL Claimholders or any of its or their respective employees, agents, advisers or representatives acting under the direction of such ABL Agent or its respective ABL Claimholder (other than (i) diminution in value (as

opposed to actual physical damage) as a result of the removal of ABL Priority Collateral therefrom and (ii) ordinary wear and tear). Except to the extent expressly provided in this <u>Section 3.8</u>, no ABL Agent nor ABL Claimholder shall be obligated to secure, protect, insure or repair any such Term Loan Collateral. In no event shall any ABL Agent or any ABL Lender have any liability to any Term Loan Agent or any Term Loan Lender pursuant to this <u>Section 3.8</u> or otherwise as a result of any condition on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by such ABL Agent of its rights under this <u>Section 3.8</u> or, to the extent not caused as a result of any act or omission of any ABL Agent, any ABL Claimholder or any of their respective employees, agents, advisers or representatives, and each ABL Agent and each ABL Claimholder shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by such ABL Agent and/or such ABL Claimholder, as applicable. Each ABL Agent, for itself and on behalf of its respective ABL Claimholders, hereby acknowledges that, during the period that any Term Loan Agent has acquired control or possession of any Term Loan Collateral, neither any Term Loan Agent nor any other Term Loan Claimholder shall be obligated to take any action to protect or to procure insurance with respect to any ABL Priority Collateral, it being understood that neither any Term Loan Agent or any Term Loan Claimholder shall have any responsibility for loss or damage to ABL Priority Collateral (other than as a result of any gross negligence or willful misconduct of the Term Loan Agent or the Term Loan Claimholders or their agents).

(k)     For the avoidance of doubt, and without limiting the generality of the other provisions of this Agreement, it is hereby acknowledged and agreed that each ABL Agent and each ABL Claimholder shall have the right to bring an action to enforce their rights under this <u>Section 3.8</u> and <u>Section 3.9</u>, including an action seeking possession of the applicable Collateral and/or specific performance of this <u>Section 3.8</u> and <u>Section 3.9</u>.

3.9     <u>Sharing of Information and Access</u>. In the event that any ABL Agent shall, in the exercise of its rights under any of the ABL Collateral Documents or otherwise, receive possession or control of any books and records of any Grantor which contain information identifying or pertaining to any of the Term Loan Priority Collateral, such ABL Agent shall, upon request from any Term Loan Agent and as promptly as practicable thereafter, either make available to such Term Loan Agent such books and records for inspection and duplication or provide to such Term Loan Agent copies thereof. In the event that any Term Loan Agent shall, in the exercise of its rights under any of the Term Loan Documents or otherwise, receive possession or control of any books and records of any Grantor which contain information identifying or pertaining to any of the ABL Priority Collateral, such Term Loan Agent shall, upon request from any ABL Agent and as promptly as practicable thereafter, either make available to such ABL Agent such books and records for inspection and duplication or provide to such ABL Agent copies thereof.

3.10     <u>Tracing of and Priorities in Proceeds</u>. Each ABL Agent, for itself and on behalf of its respective ABL Claimholders, and each Term Loan Agent, for itself and on behalf of its respective Term Loan Claimholders, further agree that prior to an issuance of any Enforcement Notice by such Claimholder, any proceeds of Collateral obtained in accordance with the terms of the ABL Documents and the Term Loan Documents, whether or not deposited in deposit accounts or securities accounts subject to control agreements, which are used by any Grantor to acquire other property which is Collateral shall not (solely as between the Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired. In addition, unless and until the

Discharge of ABL Obligations occurs, each Term Loan Agent, for itself and on behalf of its respective Term Loan Claimholders, each hereby consents to the application of amounts received prior to the receipt by any ABL Agent of an Enforcement Notice issued by any Term Loan Agent, of cash or other proceeds of Collateral, deposited into deposit accounts or securities accounts, to the repayment of ABL Obligations pursuant to the applicable ABL Documents.

**SECTION 4. Proceeds**.

4.1    Application of Proceeds.

(a)    Except as otherwise provided in the Orders (and except with respect to any "roll-up" of the Pre-Petition ABL Obligations provided for therein with the proceeds of the DIP ABL Obligations (the "**Pre-Petition ABL Roll Up**")), prior to the Discharge of ABL Obligations, except as otherwise provided in Section 3.5, any ABL Priority Collateral or proceeds thereof received (or amounts distributed on account of a Lien in the ABL Priority Collateral or the proceeds thereof) by any ABL Agent or any ABL Claimholder or any Term Loan Agent or any Term Loan Claimholder with respect to ABL Priority Collateral shall be delivered to the ABL Agents and shall be applied or further distributed in the following order of application:

(i)    first, to the DIP ABL Agent for application to the ABL Priority Obligations (including costs and expenses of the DIP ABL Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the DIP ABL Documents in accordance with the Orders and the terms of the relevant DIP ABL Documents until the payment in full in cash or cash collateralization of the ABL Priority Obligations under the DIP ABL Documents has occurred;

(ii)    second, to the Pre-Petition ABL Agent for application to the ABL Priority Obligations (including costs and expenses of the Pre-Petition ABL Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the Pre-Petition ABL Documents in accordance with the Orders and the terms of the relevant Pre-Petition ABL Documents until the payment in full in cash or cash collateralization of the ABL Priority Obligations under the Pre-Petition ABL Documents has occurred (including, for the avoidance of doubt, by way of the Pre-Petition ABL Roll Up);

(iii)    third, to the DIP Term Loan Agent for application to the Term Loan Priority Obligations (including costs and expenses of the DIP Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the DIP Term Loan Documents in accordance with the Orders and the terms of the relevant DIP Term Loan Documents until the payment in full in cash or cash collateralization of the Term Loan Priority Obligations under the DIP Term Loan Documents has occurred;

(iv)    fourth, to the Pre-Petition Term Loan Agent for application to the Term Loan Priority Obligations (including costs and expenses of the Pre-Petition Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding)

under the Pre-Petition Term Loan Documents in accordance with the Orders and the terms of the relevant Pre-Petition Term Loan Documents until the payment in full in cash or cash collateralization of the Term Loan Priority Obligations under the Pre-Petition Term Loan Documents has occurred;

(v)    <u>fifth</u>, to the DIP ABL Agent for application to the Excess ABL Obligations (including costs and expenses of the DIP ABL Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) in accordance with the Orders and the terms of the relevant ABL Documents until the payment in full in cash or cash collateralization of the Excess ABL Obligations has occurred;

(vi)    <u>sixth</u>, to the DIP Term Loan Agent for application to the Excess Term Loan Obligations (including costs and expenses of the DIP Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) in accordance with the Orders and the terms of the relevant DIP Term Loan Documents until the payment in full in cash or cash collateralization of the Excess Term Loan Obligations has occurred; and

(vii)    <u>seventh</u>, the balance, if any, in accordance with the Orders to the Grantors or as a court of competent jurisdiction may direct.

(b)    Except as otherwise provided in the Orders (and except with respect to the Pre-Petition ABL Roll Up), prior to the Discharge of Term Loan Obligations, except as otherwise provided in <u>Section 3.5</u>, any Term Loan Priority Collateral or proceeds thereof received (or amounts distributed on account of a Lien in the Term Loan Priority Collateral or the proceeds thereof) by any ABL Agent or any ABL Claimholder or any Term Loan Agent or any Term Loan Claimholder with respect to Term Loan Priority Collateral shall be delivered to the Term Loan Agents and shall be applied or further distributed in the following order of application:

(i)    <u>first</u>, to the DIP Term Loan Agent for application to the Term Loan Priority Obligations (including costs and expenses of the DIP Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the DIP Term Loan Documents in accordance with the Orders and the terms of the relevant DIP Term Loan Documents until the payment in full in cash of the Term Loan Priority Obligations under the DIP Term Loan Documents has occurred;

(ii)    <u>second</u>, to the Pre-Petition Term Loan Agent for application to the Term Loan Priority Obligations (including costs and expenses of the Pre-Petition Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the Pre-Petition Term Loan Documents in accordance with the Orders and the terms of the relevant Pre-Petition Term Loan Documents until the payment in full in cash or cash collateralization of the Term Loan Priority Obligations under the Pre-Petition Term Loan Documents has occurred;

(iii)    <u>third</u>, to the DIP ABL Agent for application to the ABL Priority Obligations (including costs and expenses of the DIP ABL

Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the DIP ABL Documents in accordance with the Orders and the terms of the relevant DIP ABL Documents until the payment in full in cash or cash collateralization of the ABL Priority Obligations under the DIP ABL Documents has occurred;

(iv)    _fourth_, to the Pre-Petition ABL Agent for application to the ABL Priority Obligations (including costs and expenses of the Pre-Petition ABL Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) under the Pre-Petition ABL Documents in accordance with the Orders and the terms of the relevant Pre-Petition ABL Documents until the payment in full in cash or cash collateralization of the ABL Priority Obligations under the Pre-Petition ABL Documents has occurred (including, for the avoidance of doubt, by way of the Pre-Petition ABL Roll Up);

(v)    _fifth_, to the DIP Term Loan Agent for application to the Excess Term Loan Obligations (including costs and expenses of the DIP Term Loan Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) in accordance with the Orders and the terms of the relevant DIP Term Loan Documents until the payment in full in cash or cash collateralization of the Excess Term Loan Obligations has occurred;

(vi)    _sixth_, to the DIP ABL Agent for application to the Excess ABL Obligations (including costs and expenses of the DIP ABL Agent in connection with any Exercise of Secured Creditor Remedies and any Insolvency Proceeding) in accordance with the Orders and the terms of the relevant ABL Documents until the payment in full in cash or cash collateralization of the Excess ABL Obligations has occurred; and

(vii)    _seventh_, the balance, if any, in accordance with the Orders to the Grantors or as a court of competent jurisdiction may direct.

(c)    If any Exercise of Secured Creditor Remedies with respect to the Collateral produces non-cash proceeds, then such non-cash proceeds shall be held by such Agent that conducted the Exercise of Secured Creditor Remedies as additional Collateral and, at such time as such non-cash proceeds are monetized, shall be applied as set forth above.

4.2    _Turnover_. Unless and until the earlier of Discharge of ABL Obligations or the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Grantor that is not a Debtor or a CCAA Debtor, except as otherwise provided in _Section 3.5_, (a) any ABL Priority Collateral, proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of _Section 2.3_), or amounts distributed on account of a Lien in the ABL Priority Collateral or the proceeds thereof, or any insurance proceeds described in _Section 5.2(a)_ received by any Term Loan Agent or any Term Loan Claimholder, (i) pursuant to any Term Loan Document, or by the exercise of any rights available to it under applicable law, or in any Insolvency Proceeding, or pursuant to any Exercise of Secured Creditor Remedies or through any other exercise of remedies, if such Term Loan Agent or such Term Loan Claimholder obtains actual knowledge or notice from any ABL Agent (in the case of any mandatory prepayment received by such Term Loan Agent pursuant to _Section_

4.02(c) or (f) of the DIP Term Loan Agreement or Section 4.02(c), (d) or (f) of the Pre-Petition Term Loan Agreement, such actual knowledge or notice from an ABL Agent to be obtained by such Term Loan Agent or such Term Loan Claimholder prior to the date that is 10 days after the receipt by such ABL Agent of written notice with respect to such mandatory prepayment so received by such Term Loan Agent (A) that the applicable Asset Sale, Canadian Asset Sale or Recovery Event (as each such term is defined in the DIP Term Loan Agreement and Pre-Petition Term Loan Agreement as in effect on the Closing Date) has occurred, and (B) certifying the amount of the mandatory prepayment that was made to such Term Loan Agent in connection with such Asset Sale, Canadian Asset Sale or Recovery Event, as applicable) that such Term Loan Agent or such Term Loan Claimholder has possession of such ABL Priority Collateral or proceeds thereof and the aggregate amount of such proceeds of ABL Priority Collateral, or (ii) as a result of any Term Loan Agent's or any Term Loan Claimholder's collusion with any Grantor in violating the rights of any ABL Agent or any ABL Claimholder (within the meaning of Section 9-332 of the UCC), in each case, shall be segregated and held in trust and shall reasonably promptly be paid over to the such ABL Agent for the benefit of its respective ABL Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct; provided, that in no event shall the making by any Grantor of any regularly scheduled payment of principal, interest or expenses, any mandatory prepayment pursuant to Section 4.02(e) of the Pre-Petition Term Loan Agreement or any voluntary prepayment of principal, in each case in respect of the Term Loan Obligations in accordance with the provisions of the Term Loan Documents prior to the commencement by any Agent of the Exercise of Secured Creditor Remedies, be subject to the turnover provisions set forth above in this Section 4.2(a), and (b) any Term Loan Priority Collateral, proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3), or amounts distributed on account of a Lien in the Term Loan Priority Collateral or the proceeds thereof, or any insurance proceeds described in Section 5.2(b) received by any ABL Agent or any ABL Claimholder, (i) pursuant to any ABL Document, or by the exercise of any rights available to it under applicable law, or in any Insolvency Proceeding, or pursuant to any Exercise of Secured Creditor Remedies or through any other exercise of remedies, if such ABL Agent or such ABL Claimholder obtains actual knowledge or notice from such Term Loan Agent, in each case at any time prior to the later of (x) 3 Business Days after the receipt by such ABL Agent or such ABL Claimholder of such Term Loan Priority Collateral or proceeds thereof and (y) 5 days after the receipt by such ABL Agent or such ABL Claimholder of such Term Loan Priority Collateral or proceeds thereof, that such ABL Agent or such ABL Claimholder has possession of such Term Loan Priority Collateral or proceeds thereof and the aggregate amount of such proceeds of Term Loan Priority Collateral, or (ii) as a result of any ABL Agent's or any ABL Claimholder's collusion with any Grantor in violating the rights of any Term Loan Agent or any Term Loan Claimholder (within the meaning of Section 9-332 of the UCC), shall be segregated and held in trust and shall reasonably promptly be paid over to such Term Loan Agent for the benefit of the Term Loan Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct; provided, that if the ABL Agents and the ABL Claimholders no longer have possession of such proceeds of Term Loan Priority Collateral at the time that they received actual knowledge or notice from a Term Loan Agent thereof as is contemplated above in subclause (b)(i) hereof, then to the extent that such ABL Agent subsequently receives cash proceeds that constitute ABL Priority Collateral, to the extent not prohibited by applicable law, such ABL Agent may satisfy any obligations that it has pursuant to this Section 4.2(b) by turning over to such Term Loan Agent a portion of such proceeds of ABL Priority Collateral equal to the amount of the proceeds of the Term Loan Priority Collateral previously received by such ABL Agent or such ABL Claimholder. Each Term Loan Agent and each ABL Agent is hereby authorized to make any such endorsements as agent for the other or any of its Claimholders. This authorization is coupled with an interest and is irrevocable until the earlier of the Discharge of ABL Obligations or the Discharge of Term Loan Obligations.

Each Term Loan Agent for itself and each Term Loan Claimholder agrees that if, at any time, all or part of any payment with respect to any ABL Obligations secured by any ABL Priority Collateral

previously made shall be rescinded for any reason whatsoever, it will upon request promptly pay over to such ABL Agent any payment received by it in respect of any such ABL Priority Collateral and shall promptly turn any such ABL Priority Collateral then held by it over to such ABL Agent, and the provisions set forth in this Agreement will be reinstated as if such payment had not been made, until the payment and satisfaction in full of such ABL Obligations.

Each ABL Agent for itself and each ABL Claimholder agrees that if, at any time, all or part of any payment with respect to any Term Loan Obligations secured by any Term Loan Priority Collateral previously made shall be rescinded for any reason whatsoever, it will promptly pay over to such Term Loan Agent any payment received by it in respect of any such Term Loan Priority Collateral and shall promptly turn any such Term Loan Priority Collateral then held by it over to such Term Loan Agent, and the provisions set forth in this Agreement will be reinstated as if such payment had not been made, until the payment and satisfaction in full of such Term Loan Obligations.

4.3     No Subordination of the Relative Priority of Claims. Anything to the contrary contained herein notwithstanding, the subordination of the Liens of Term Loan Claimholders in respect of the ABL Priority Collateral to the Liens of ABL Claimholders therein and of the Liens of ABL Claimholders in respect of the Term Loan Priority Collateral to the Liens of Term Loan Claimholders therein as set forth herein is with respect to the priority of the respective Liens held by or on behalf of them only and shall not constitute a subordination of the Term Loan Obligations to the ABL Obligations or the ABL Obligations to the Term Loan Obligations.

4.4     Application of Payments. Subject to the other terms of this Agreement and the Orders, all payments received (not in violation of this Agreement and the Orders) by (a) any ABL Agent or the ABL Claimholders may be applied, reversed and reapplied, in whole or in part, to the ABL Obligations to the extent provided for in the ABL Documents and (b) the any Term Loan Agent or the Term Loan Claimholders may be applied, reversed and reapplied, in whole or in part, to the Term Loan Obligations to the extent provided for in the Term Loan Documents.

4.5     Revolving Nature of ABL Obligations. Each Term Loan Agent, on behalf of its respective Term Loan Claimholders, acknowledges and agrees that the DIP ABL Credit Agreement, and Pre-Petition ABL Credit Agreement include revolving commitments and that the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed.

**SECTION 5. Releases; Dispositions; Other Agreements**.

5.1     Releases.

(a)     If, in connection with the Exercise of Secured Creditor Remedies by any ABL Agent as provided for in Section 3, irrespective of whether an ABL Default or a Term Loan Default has occurred and is continuing, such ABL Agent releases any of its Liens on any part of the ABL Priority Collateral, then the Liens of each Term Loan Agent on such ABL Priority Collateral shall be automatically, unconditionally, and simultaneously released so long as all proceeds therefrom are applied to permanently repay the ABL Obligations, together with a concurrent permanent reduction of any revolving loan commitment under the applicable ABL Documents in an amount equal to the amount of any such principal repayment of Advances (as defined in the DIP ABL Credit Agreement and the Pre-Petition ABL Credit Agreement); provided, however, that any proceeds remaining after the Discharge of ABL Obligations shall be subject to the Liens of the Term Loan

Claimholders. Each Term Loan Agent, for itself or on behalf of any of its respective Term Loan Claimholders, promptly shall execute and deliver to any ABL Agent such termination or amendment statements, releases, and other documents as such ABL Agent may request in writing to effectively confirm such release, at the cost and expense of the Grantors and without the consent or direction of any other Term Loan Claimholders.

(b)    If, in connection with the Exercise of Secured Creditor Remedies by any Term Loan Agent as provided for in <u>Section 3</u>, irrespective of whether an ABL Default or a Term Loan Default has occurred and is continuing, such Term Loan Agent releases any of its Liens on any part of the Term Loan Priority Collateral, then the Liens of each ABL Agent on such Term Loan Priority Collateral shall be automatically, unconditionally, and simultaneously released so long as all proceeds therefrom are applied to permanently repay, repurchase, or otherwise retire the Term Loan Obligations; <u>provided</u>, <u>however</u>, that any proceeds remaining after the Discharge of Term Loan Obligations shall be subject to the Liens of the ABL Claimholders. Each ABL Agent, for itself or on behalf of any of its respective ABL Claimholders, promptly shall execute and deliver to any Term Loan Agent such termination or amendment statements, releases, and other documents as such Term Loan Agent may request in writing to effectively confirm such release, at the cost and expense of the Grantors and without the consent or direction of any other ABL Claimholders.

(c)    If, in connection with any Disposition of any ABL Priority Collateral permitted under the terms of both the ABL Documents and the Term Loan Documents, in each case as in effect at the time of such Disposition, any ABL Agent, for itself or on behalf of any ABL Claimholders, releases any of its Liens on the portion of the ABL Priority Collateral that is the subject of such Disposition, other than (i) in connection with the Discharge of ABL Obligations, or (ii) after the occurrence and during the continuance of any DIP Term Loan Default, then the Liens of each Term Loan Agent on such Collateral shall be automatically, unconditionally, and simultaneously released. Each Term Loan Agent, for itself or on behalf of any of its respective Term Loan Claimholders, promptly shall execute and deliver to any ABL Agent such termination or amendment statements, releases, and other documents as such ABL Agent may request in writing to effectively confirm such release, at the cost and expense of the Grantors and without the consent or direction of any other Term Loan Claimholders.

(d)    If, in connection with any Disposition of any Term Loan Priority Collateral permitted under the terms of both the Term Loan Documents and the ABL Documents, in each case as in effect at the time of such Disposition, any Term Loan Agent, for itself or on behalf of any Term Loan Claimholders, releases any of its Liens on the portion of the Term Loan Priority Collateral that is the subject of such Disposition, other than (i) in connection with the Discharge of Term Loan Obligations, or (ii) after the occurrence and during the continuance of any DIP ABL Default, then the Liens of each ABL Agent on such Collateral shall be automatically, unconditionally, and simultaneously released. Each ABL Agent, for itself or on behalf of any its respective ABL Claimholders, promptly shall execute and deliver to any Term Loan Agent such termination or amendment statements, releases, and other documents as such Term Loan Agent may request to effectively confirm such release,

at the cost and expense of the Grantors and without the consent or direction of any other ABL Claimholders.

(e)    Each ABL Agent, with respect to the Term Loan Priority Collateral, on behalf of its respective ABL Claimholders, hereby irrevocably constitutes and appoints each Term Loan Agent with respect to such Term Loan Priority Collateral and any officer or agent of such Term Loan Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such ABL Agent or in such ABL Agent's own name, from time to time in such Term Loan Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

(f)    Each Term Loan Agent, with respect to the ABL Priority Collateral, on behalf of its respective Term Loan Claimholders, hereby irrevocably constitutes and appoints each ABL Agent with respect to such ABL Priority Collateral and any officer or agent of such ABL Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Term Loan Agent or in such Term Loan Agent's own name, from time to time in such ABL Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

5.2    Insurance.

(a)    Unless and until the ABL Agents have provided written notice to the Term Loan Agents that the Discharge of ABL Obligations has occurred: (i) each ABL Agent and the ABL Claimholders shall have the sole and exclusive right, subject to the rights of Grantors under the ABL Documents, to adjust and settle any claim under any insurance policy covering the ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the ABL Priority Collateral; and (ii) all proceeds of any such insurance policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of ABL Priority Collateral, shall be paid, subject to the rights of Grantors under the ABL Documents, first, to the ABL Claimholders, until the Discharge of ABL Obligations, second, to the Term Loan Claimholders, until the Discharge of Term Loan Obligations, and third, to the owner of the subject property, such other person as may be entitled thereto, or as a court of competent jurisdiction may otherwise direct. If any Term Loan Agent or any Term Loan Claimholders shall at any time receive any proceeds of any such insurance policy or award in contravention of this Agreement, it shall hold such proceeds in trust and upon request pay over such proceeds to the ABL Agents.

(b)    Unless and until the Term Loan Agents have provided written notice to the ABL Agents that the Discharge of Term Loan Obligations has occurred: (i) each Term Loan Agent and the Term Loan Claimholders shall have the sole and exclusive right, subject to the rights of Grantors under the Term Loan Documents, to

adjust and settle any claim under any insurance policy covering the Term Loan Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Term Loan Priority Collateral; and (ii) all proceeds of any such insurance policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of Term Loan Priority Collateral, shall be paid, subject to the rights of Grantors under the Term Loan Documents, <u>first</u>, to the Term Loan Claimholders, until the Discharge of Term Loan Obligations, <u>second</u>, to the ABL Claimholders, until the Discharge of ABL Obligations, and <u>third</u>, to the owner of the subject property, such other person as may be entitled thereto, or as a court of competent jurisdiction may otherwise direct. If any ABL Agent or any ABL Claimholders shall at any time receive any proceeds of any such insurance policy or award in contravention of this Agreement, it shall hold such proceeds in trust and upon request pay over such proceeds to the Term Loan Agents.

In the event that any proceeds are derived from any insurance policy that covers ABL Priority Collateral and Term Loan Priority Collateral, the ABL Agents and the Term Loan Agents, at the direction of the applicable Term Loan Claimholders, will work jointly and in good faith to collect, adjust or settle (subject to the rights of the Grantors under the applicable ABL Documents and the applicable Term Loan Documents) any claim under the relevant insurance policy.

Notwithstanding anything contained in this Agreement to the contrary, in the event that any proceeds are derived from any insurance policy that covers ABL Priority Collateral and Term Loan Priority Collateral where the allocation of proceeds is not stipulated between ABL Priority Collateral and Term Loan Priority Collateral, then the allocation of proceeds of such insurance policy to the ABL Priority Collateral shall be based upon, in the case of (A) any ABL Priority Collateral consisting of inventory, at book value as assessed on the date of such loss, (B) any ABL Priority Collateral consisting of accounts receivable, at the face amount thereof and (C) all other ABL Priority Collateral and Term Loan Priority Collateral, at fair market value of such ABL Priority Collateral and Term Loan Priority Collateral lost, as determined by Grantors in their reasonable judgment or, if the aggregate amount of such other ABL Priority Collateral and Term Loan Priority Collateral sold is greater than $20,000,000, an independent appraiser.

5.3    <u>Amendments; Refinancings; Legend</u>.

(a)    Subject to the terms of the Orders, the ABL Documents may be amended, restated, supplemented, or otherwise modified in accordance with their terms and the ABL Obligations may be Refinanced in accordance with the terms of the ABL Documents, in each case without notice to, or the consent of, any Term Loan Agent or any Term Loan Claimholders, all without affecting the lien subordination or other provisions of this Agreement and the Orders; <u>provided</u>, <u>however</u>, that, in the case of any such Refinancing secured by any Collateral, the holders of such Refinancing debt (or an authorized representative on their behalf) bind themselves (in a writing addressed to such Term Loan Agent for the benefit of itself and its respective Term Loan Claimholders in form and substance reasonably acceptable to such Term Loan Agent) to the terms of this Agreement; <u>provided</u> <u>further</u>, <u>however</u>, that any such amendment, restatement, supplement, modification, or Refinancing shall not, without the prior written consent of each Term Loan Agent:

(i)    increase the "Applicable Margin" (or similar term) applicable to the Pre-Petition ABL Obligations by more than 3.00% per

annum applicable thereto (excluding increases (A) resulting from application of (or change in level of grid applicable in accordance with its terms) the pricing grid set forth in the Pre-Petition ABL Credit Agreement as in effect on the Pre-Petition Closing Date, (B) resulting from the accrual of interest at the "default rate" as in effect on the Pre-Petition Closing Date, or (C) resulting from changes in reference rates in accordance with their terms as in effect on the Pre-Petition Closing Date);

(ii)    increase the "Base Rate Margin" or "LIBOR Rate Margin" (or similar term) applicable to the DIP ABL Obligations by more than 3.00% per annum applicable thereto (excluding increases (A) resulting from the accrual of interest at the "default rate" as in effect on the Closing Date, or (B) resulting from changes in reference rates in accordance with their terms as in effect on the Closing Date);

(iii)    change any representations and warranties, covenants, defaults, Events of Default, or any other provisions under any ABL Document (including the addition of representations and warranties, covenants, defaults, Events of Default, or any other provisions not contained in the ABL Documents as in effect on the Closing Date) in a manner that would restrict any Grantor from making payments of the Term Loan Obligations that would otherwise be permitted under the ABL Documents as in effect on the Closing Date;

(iv)    change any Litigation Provisions under any ABL Document (including the addition of any Litigation Provisions not contained in the ABL Documents as in effect on the Closing Date) in a manner that makes them more restrictive on the Grantors; provided, that if at such time such Litigation Provisions under the ABL Documents are less restrictive on the Grantors than the analogous Litigation Provision under the Term Loan Documents, then any such Litigation Provisions may be changed (or new Litigation Provisions added) so long as such Litigation Provisions (as so modified or supplemented) are not more restrictive on the Grantors than the analogous Litigation Provision under the Term Loan Documents;

(v)    add or make more restrictive any event of default or any covenant under the ABL Documents or add or make any change to any event of default or any covenant which would have the effect of making such event of default or covenant more restrictive on the Grantors than the events of default or covenants in effect under the ABL Documents on the date of this Agreement, unless (x) such event of default or covenant (after giving effect thereto) is not more restrictive on the Grantors than the analogous event of default or covenant under the relevant Term Loan Document, (y) such amendment, restatement, supplement, modification, or Refinancing consists solely of one or more amendments to existing provisions of the ABL Documents (and does not include the addition of a new covenant or event of default) with respect to which there is no substantially identical provision set forth in the provisions of the Term Loan Documents, or (z) a DIP Term Loan Conforming Amendment with respect thereto is executed in connection therewith;

(vi)    modify (or have the effect of a modification of) the mandatory prepayment provisions of any ABL Document in a manner that makes them more restrictive on the Grantors;

(vii)    shorten the scheduled maturity date under the DIP ABL Credit Agreement (excluding, for the avoidance of doubt, any of the foregoing that results from an acceleration of the Obligations in accordance with the terms of the ABL Documents or any repayment in full of the ABL Obligations in connection with a Refinancing thereof); or

(viii)    contravene the provisions of this Agreement;

provided further, however, that, if such Refinancing debt is secured by a Lien on any Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such writing is provided. For the avoidance of doubt, the sale or other transfer of indebtedness is not restricted by this Agreement but the provisions of this Agreement shall be binding on all holders of ABL Obligations and Term Loan Obligations.

(b)    Subject to the terms of the Orders, the Term Loan Documents may be amended, restated, supplemented, or otherwise modified in accordance with their terms and the Term Loan Obligations may be Refinanced in full but not in part in accordance with the terms of the Term Loan Documents, in each case without notice to, or the consent of, any ABL Agent or any ABL Claimholders, all without affecting the lien subordination or other provisions of this Agreement and the Orders; provided, however, that, in the case of any such Refinancing secured by any Collateral, the holders of such Refinancing debt (or an authorized representative on their behalf) bind themselves (in a writing addressed to such ABL Agent for the benefit of itself and its respective ABL Claimholders as such ABL Agent shall reasonably request) to the terms of this Agreement; provided further, however, that any such amendment, restatement, supplement, modification, or Refinancing shall not, without the prior written consent of each ABL Agent:

(i)    increase (x) the "Applicable Margin" (or similar term) applicable to the Pre-Petition Term Loan Obligations by more than an amount that exceeds 3.00% in the aggregate per annum, payable in cash, and (y) the "Applicable Margin" (or similar term) applicable to the Pre-Petition Term Loan Obligations by more than 3.00% per annum payable in kind, in each case, applicable thereto (excluding increases (A) resulting from the accrual of interest at the "default rate" as in effect on the Pre-Petition Closing Date, or (B) resulting from changes in reference rates in accordance with their terms as in effect on the Pre-Petition Closing Date);

(ii)    increase (x) the "Applicable Margin" (or similar term) applicable to the DIP Term Loan Obligations by more than an amount that exceeds 3.00% in the aggregate per annum, payable in cash, and (y) the "Applicable Margin" (or similar term) applicable to the DIP Term Loan Obligations by more than 3.00% per annum payable in kind, in each case, applicable thereto (excluding increases (A) resulting from the accrual of interest at the "default rate" as in effect on the Closing Date, or (B) resulting from changes in reference rates in accordance with their terms as in effect on the Closing Date);

(iii)    change any representations and warranties, covenants, defaults, Events of Default, or any other provisions under any Term Loan Document (including the addition of representations and warranties, covenants, defaults, Events of Default, or any other provisions not contained in the Term Loan Documents as in effect on the Closing Date) in a manner that would restrict any Grantor from making payments of the ABL Obligations that would otherwise be permitted under the Term Loan Documents as in effect on the Closing Date;

(iv)    change any Litigation Provisions under any Term Loan Document (including the addition of any Litigation Provisions not contained in the Term Loan Documents as in effect on the Closing Date) in a manner that makes them more restrictive on the Grantors; provided, any such Litigation Provisions may be changed (or new Litigation Provisions added) so long as such Litigation Provision is not more restrictive to the Grantors than the analogous Litigation Provision under the ABL Documents;

(v)    add or make more restrictive any event of default or any covenant under the Term Loan Documents or add or make any change to any event of default or any covenant which would have the effect of making such event of default or covenant more restrictive on the Grantors than the events of default or covenants in effect under the Term Loan Documents on the date of this Agreement, unless (x) such event of default or covenant (after giving effect thereto) is not more restrictive on the Grantors than the analogous event of default or covenant under the relevant ABL Document, (y) such amendment, restatement, supplement, modification, or Refinancing consists solely of one or more amendments to existing provisions of the Term Loan Documents (and does not include the addition of a new covenant or event of default) with respect to which there is no substantially identical provision set forth in the provisions of the ABL Documents, or (z) a DIP ABL Conforming Amendment with respect thereto is executed in connection therewith;

(vi)    add or modify (or have the effect of a modification of or an addition to) any of the mandatory prepayment provisions of any Term Loan Document or any of the provisions of the Term Loan Documents providing for scheduled payments of the principal balance of the Term Loan Obligations, in each case that increases the amount payable under the Term Loan Documents during any fiscal year, or that requires that any such payment be made earlier than the date scheduled for such payment pursuant to the provisions of the Term Loan Documents as in effect on the Closing Date;

(vii)    shorten the scheduled maturity date under the DIP Term Loan Agreement (excluding, for the avoidance of doubt, any of the foregoing that results from an acceleration of the Obligations in accordance with the terms of the Term Loan Documents or any repayment in full of the Term Loan Obligations in connection with a Refinancing thereof); or

(viii)    contravene the provisions of this Agreement;

provided further, however, that, if such Refinancing debt is secured by a Lien on any Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such writing is provided. For the avoidance of doubt, the sale or other transfer of indebtedness is not restricted by this Agreement but the provisions of this Agreement shall be binding on all holders of ABL Obligations and Term Loan Obligations.

(c)    So long as the Discharge of ABL Obligations has not occurred, each Term Loan Agent agrees that each Term Loan Collateral Document shall include the following language (or similar language acceptable to the ABL Agents):

"Anything herein to the contrary notwithstanding, the liens and security interests granted to Brookfield Principal Credit LLC, as administrative agent and collateral agent pursuant to this Agreement and the exercise of any right or remedy by Brookfield Principal Credit LLC hereunder, are subject to the provisions of the Intercreditor Agreement dated as of November [__], 2019, (as amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), by and between Wells Fargo Capital Finance, LLC, in its capacity as ABL Agents, and Brookfield Principal Credit LLC, in its capacity as Term Loan Agents. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(d)    So long as the Discharge of Term Loan Obligations has not occurred, each ABL Agent agrees that each ABL Collateral Document shall include the following language (or similar language acceptable to Term Loan Agents):

"Anything herein to the contrary notwithstanding, the liens and security interests granted to Wells Fargo Capital Finance, LLC, as administrative agent and/or collateral agent, pursuant to this Agreement and the exercise of any right or remedy by Wells Fargo Capital Finance, LLC, as administrative agent and/or collateral agent hereunder, are subject to the provisions of the Intercreditor Agreement dated as of November [__], 2019, (as amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), by and between Wells Fargo Capital Finance, LLC, in its capacity as ABL Agents, and Brookfield Principal Credit LLC, in its capacity as Term Loan Agents. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(e)    No consent furnished by any ABL Agent or any Term Loan Agent pursuant to this Section 5.3 shall be deemed to constitute the modification or waiver of any provisions of the ABL Documents or the Term Loan Documents, each of which remain in full force and effect as written and as modified in accordance with the provisions thereof.

5.4    Bailee for Perfection.

(a)    Each ABL Agent and each Term Loan Agent each agree to hold or control that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees), to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC, PPSA or other applicable law (such Collateral being referred to as the "**Pledged Collateral**"), as gratuitous bailee and as a non-fiduciary agent for the benefit of and on behalf of the each Term Loan Agent

and each ABL Agent, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of possession or control under the PPSA, Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC or other applicable law), solely for the purpose of perfecting the Lien granted under the Term Loan Documents or the ABL Documents, as applicable, subject to the terms and conditions of this Section 5.4. Each Term Loan Agent and each Term Loan Claimholder hereby appoints each ABL Agent as their gratuitous bailee for the purposes of perfecting their Liens in all Pledged Collateral in which such ABL Agent has a perfected Liens under the UCC, the PPSA or other applicable law. Each ABL Agent and each ABL Claimholder hereby appoints each Term Loan Agent as their gratuitous bailee for the purposes of perfecting their Liens in all Pledged Collateral in which such Term Loan Agent has a perfected Liens under the UCC, the PPSA or other applicable law. Each ABL Agent and each Term Loan Agent hereby accept such appointments pursuant to this Section 5.4(a) and acknowledge and agree that it shall act for the benefit of and on behalf of the other Claimholders with respect to any Pledged Collateral and that any Proceeds received by the ABL Agents or Term Loan Agents, as the case may be, under any Pledged Collateral shall be applied in accordance with Section 4. Unless and until the Discharge of ABL Obligations, each Term Loan Agent agrees to promptly notify each ABL Agent of any Pledged Collateral constituting ABL Priority Collateral held by it or known by it to be held by any other Term Loan Claimholders, and, immediately upon the request of any ABL Agent in writing at any time prior to the Discharge of ABL Obligations, each Term Loan Agent agrees to deliver to such ABL Agent any such Pledged Collateral held by it or by any other Term Loan Claimholders, together with any necessary endorsements (or otherwise allow such ABL Agent to obtain control of such Pledged Collateral). Unless and until the Discharge of Term Loan Obligations, each ABL Agent agrees to promptly notify each Term Loan Agent of any Pledged Collateral constituting Term Loan Priority Collateral held by it or known by it to be held by any other ABL Claimholders, and, promptly following the request of any Term Loan Agent in writing at any time prior to the Discharge of Term Loan Obligations, each ABL Agent agrees to deliver to such Term Loan Agent any such Pledged Collateral held by it, together with any necessary endorsements (or otherwise use commercially reasonable efforts to cooperate with Term Loan Agent to obtain control of such Pledged Collateral). Each ABL Agent hereby agrees that upon the Discharge of ABL Obligations, upon the written request of any Term Loan Agent, to the extent that the applicable control agreement is in full force and effect and has not been terminated, such ABL Agent shall continue to act as such a gratuitous bailee and non-fiduciary agent for each Term Loan Agent (solely for the purpose of perfecting the Liens granted under the Term Loan Documents and at the expense of Grantors) with respect to the deposit account or securities account that is the subject of such control agreement, until the earlier to occur of (x) 30 days after the date when the Discharge of ABL Obligations has occurred (or such later date to which the such ABL Agent agrees in its reasonable discretion), and (y) the date when a control agreement is executed in favor of such Term Loan Agent(s) with respect to such deposit account or securities account.

(b)    Each ABL Agent and the ABL Claimholders shall have no obligation whatsoever to each Term Loan Agent or any Term Loan Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any person except as expressly set forth in this Section 5.4. Each Term Loan Agent and the Term Loan Claimholders shall have no obligation whatsoever to each ABL Agent or any ABL Claimholder to ensure that the Pledged

Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any person except as expressly set forth in this <u>Section 5.4</u>. The duties or responsibilities of each ABL Agent under this <u>Section 5.4</u> shall be limited solely to holding or controlling the Pledged Collateral as a gratuitous bailee and a non-fiduciary agent in accordance with this <u>Section 5.4</u> and delivering the Pledged Collateral upon a Discharge of ABL Obligations as provided in paragraph (d) of this <u>Section 5.4</u>. The duties or responsibilities of each Term Loan Agent under this <u>Section 5.4</u> shall be limited solely to holding or controlling the Pledged Collateral as a gratuitous bailee and a non-fiduciary agent in accordance with this <u>Section 5.4</u> and delivering the Pledged Collateral upon a Discharge of Term Loan Obligations as provided in paragraph (e) of this <u>Section 5.4</u>.

(c)        Each ABL Agent acting pursuant to this <u>Section 5.4</u> shall not have by reason of the ABL Collateral Documents, the Term Loan Collateral Documents, or this Agreement a fiduciary relationship in respect of any Term Loan Agent or any Term Loan Claimholder. Each Term Loan Agent acting pursuant to this <u>Section 5.4</u> shall not have by reason of the ABL Collateral Documents, the Term Loan Collateral Documents, or this Agreement a fiduciary relationship in respect of any ABL Agent or any ABL Claimholder.

(d)        Each ABL Agent shall transfer to the Term Loan Agents (i) any proceeds of any ABL Priority Collateral in which the Term Loan Agents continues to hold a Lien remaining following any sale, transfer or other disposition of such ABL Priority Collateral (in each case, unless such Term Loan Agent's Lien on all such ABL Priority Collateral is terminated and released prior to or concurrently with such sale, transfer, disposition, payment or satisfaction), following the Discharge of ABL Obligations, or (ii) if such ABL Agent is in possession of all or any part of such ABL Priority Collateral after the Discharge of ABL Obligations, such ABL Priority Collateral or any part thereof remaining, in each case without representation or warranty on the part of such ABL Agent or any ABL Claimholder. At such time, each ABL Agent further agrees to take all other action reasonably requested by the Term Loan Agents in writing at the expense of the Grantors (including amending any outstanding control agreements) to enable the Term Loan Agents to obtain a first priority Lien in the Collateral. To the extent no Term Loan Obligations that are secured by such Pledged Collateral remain outstanding as confirmed in writing by the Term Loan Agents (so as to allow such person to obtain possession or control of such Pledged Collateral), the ABL Agents shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements to the Grantors. Without limiting the foregoing, each Term Loan Agent agrees for itself and each of its respective Term Loan Claimholders that no ABL Agent nor any ABL Claimholder will have any duty or obligation first to marshal or realize upon the ABL Priority Collateral, or to sell, dispose of or otherwise liquidate all or any portion of the ABL Priority Collateral, in any manner that would maximize the return to the Term Loan Claimholders, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by any Term Loan Claimholders from such realization, sale, disposition or liquidation.

(e)        Each Term Loan Agent shall transfer to ABL Agents (i) any proceeds of any Term Loan Priority Collateral in which the ABL Agents continues to hold a Lien remaining following any sale, transfer or other disposition of such Term Loan Priority Collateral (in each case, unless such ABL Agent's Lien on all such Term

Loan Priority Collateral is terminated and released prior to or concurrently with such sale, transfer, disposition, payment or satisfaction), following the Discharge of Term Loan Obligations, or (ii) if such Term Loan Agent is in possession of all or any part of such Term Loan Priority Collateral after the Discharge of Term Loan Obligations, such Term Loan Priority Collateral or any part thereof remaining, in each case without representation or warranty on the part of such Term Loan Agent or any Term Loan Claimholder. At such time, each Term Loan Agent further agrees to take all other action reasonably requested by the ABL Agents in writing at the expense of the Grantors (including amending any outstanding control agreements) to enable the ABL Agents to obtain a first priority Lien in the Collateral. To the extent no ABL Obligations that are secured by such Pledged Collateral remain outstanding as confirmed in writing by the ABL Agents (so as to allow such person to obtain possession or control of such Pledged Collateral), the Term Loan Agents shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements to the Grantors. Without limiting the foregoing, each ABL Agent agrees for itself and each of its respective ABL Claimholders that no Term Loan Agent nor any Term Loan Claimholder will have any duty or obligation first to marshal or realize upon the Term Loan Priority Collateral, or to sell, dispose of or otherwise liquidate all or any portion of the Term Loan Priority Collateral, in any manner that would maximize the return to the ABL Claimholders, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by any ABL Claimholders from such realization, sale, disposition or liquidation.

5.5    <u>When Discharge of Obligations Deemed to Not Have Occurred</u>.

(a)    If the Grantors enter into any Refinancing of the ABL Obligations that is intended to be secured by the ABL Priority Collateral on a first-priority basis, then a Discharge of ABL Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the obligations under such Refinancing of such ABL Obligations shall be treated as ABL Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the lender or group of lenders or any of their designees under the ABL Documents effecting such Refinancing shall be ABL Agent for all purposes of this Agreement. The lender or group of lenders or any of their designees under such ABL Documents shall agree (in a writing addressed to each Term Loan Agent for the benefit of itself and its respective Term Loan Claimholders) to be bound by the terms of this Agreement.

(b)    If the Grantors enter into any Refinancing of the Term Loan Obligations that is intended to be secured by the Term Loan Priority Collateral on a first-priority basis, then a Discharge of Term Loan Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the obligations under such Refinancing of such Term Loan Obligations shall be treated as Term Loan Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the lender or group of lenders or any of their designees under the Term Loan Documents effecting such Refinancing shall be Term Loan Agent for all purposes of this Agreement. The lender or group of lenders or any of their designees under such Term Loan Documents shall agree (in a writing addressed to each ABL Agent for the benefit of itself and its respective ABL Claimholders) to be bound by the terms of this Agreement.

5.6     Injunctive Relief. Should any Claimholder in any way take, attempt to, or threaten to take any action contrary to terms of this Agreement with respect to the Collateral, or fail to take any action required by this Agreement, each Term Loan Agent, each ABL Agent or any other Claimholder may obtain relief against such Claimholder by injunction, specific performance, or other appropriate equitable relief, it being understood and agreed by each ABL Agent, each Term Loan Agent and each Claimholder that (a) non-breaching Claimholders' damages from such actions may at that time be difficult to ascertain and may be irreparable, and (b) each Claimholder waives any defense that such Claimholders cannot demonstrate damage and/or be made whole by the awarding of damages. Each ABL Agent, each Term Loan Agent and each Claimholder hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any ABL Agent, ABL Claimholder, Term Loan Agent, or Term Loan Claimholder, as the case may be.

**SECTION 6. Insolvency Proceedings**.

6.1     Enforceability and Continuing Priority. This Agreement shall be applicable, in respect of any Debtor, except as otherwise provided in the Orders, during the Cases, any CCAA Debtor, during the CCAA Cases, and in respect of any Grantor that is not a Debtor or a CCAA Debtor, both before and after the commencement of any Insolvency Proceeding, and all converted or succeeding cases in respect thereof. The relative rights of Claimholders in or to any distributions from or in respect of any Collateral or Proceeds of Collateral, shall continue after the commencement of any Insolvency Proceeding. Accordingly, the provisions of this Agreement (including the provisions of Section 2.1 hereof) are intended to be and shall be enforceable as a subordination agreement within the meaning of Section 510(a) of the Bankruptcy Code and any equivalent provision of the CCAA. All references in this Agreement to any person that is a Grantor will include such person as a debtor-in-possession and any receiver or trustee for such person in an Insolvency Proceeding.

6.2     Sales.

(a)     Until the Discharge of ABL Obligations, each Term Loan Agent, for itself and its respective Term Loan Claimholders, agree that such Term Loan Claimholders will not object or oppose (or support, any person in objecting or opposing), and will be deemed to have consented to pursuant to Section 363(f) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, (i) a motion to sell or otherwise dispose of any ABL Priority Collateral under Sections 363, 365 or 1129 of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, free and clear of any Liens or other claims, (ii) a motion establishing notice, sale or bidding procedures for such Disposition (including any break-up fee or other bidder protections) or (iii) a motion to permit a credit bid of all or any portion of the claims of the ABL Claimholders under Section 363(k) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, in each case, if the ABL Agent has consented to such sale or Disposition of such ABL Priority Collateral; provided that (x) the terms of any proposed order approving such transaction provide for the parties' respective Liens to attach to the proceeds of the ABL Priority Collateral that is the subject of such sale or Disposition, subject to the lien priorities set forth in Section 2.1 and the other terms and conditions of this Agreement, or such proceeds are applied among the ABL Obligations and the Term Loan Obligations in accordance with Section 4.1; and (y) such motion to sell or otherwise dispose of any ABL Priority Collateral does not impair the rights of the Term Loan Claimholders under Section 363(k) of the Bankruptcy Code or any similar provisions under the CCAA or any other

applicable Bankruptcy Laws (except that the Term Loan Claimholders will be permitted to "credit bid" their claims (including under Section 363, 365 or 1129 of the Bankruptcy Code, or any similar provisions under the CCAA or any other applicable Bankruptcy Laws) in such sale only if any such credit bid submitted on account of Term Loan Obligations results in the Discharge of ABL Obligations). Each Term Loan Agent for itself and its respective Term Loan Claimholders further agrees that it will not object to or oppose, or support any party in opposing, the right of the ABL Claimholders to credit bid under Section 363(k) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws with respect to the ABL Priority Collateral, subject to the provision of the immediately preceding sentence; provided that the Term Loan Claimholders shall not be deemed to have agreed to any credit bid by other Claimholders in connection with a single sale of both Term Loan Priority Collateral and ABL Priority Collateral.

(b)    Until the Discharge of Term Loan Obligations, each ABL Agent, for itself and its respective ABL Claimholders, agree that such ABL Claimholders will not object or oppose (or support any person in objecting or opposing), and will be deemed to have consented to pursuant to Section 363(f) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, (i) a motion to sell or otherwise dispose of any Term Loan Priority Collateral under Sections 363, 365 or 1129 of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, free and clear of any Liens or other claims, (ii) a motion establishing notice, sale or bidding procedures for such Disposition (including any break-up fee or other bidder protections) or (iii) a motion to permit a credit bid of all or any portion of the claims of the Term Loan Claimholders under Section 363(k) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws, in each case, if the Term Loan Agent has consented to such sale or Disposition of such Term Loan Priority Collateral; provided that (x) the terms of any proposed order approving such transaction provide for the parties' respective Liens to attach to the proceeds of the Term Loan Priority Collateral that is the subject of such sale or Disposition, subject to the lien priorities set forth in Section 2.1 and the other terms and conditions of this Agreement, or such proceeds are applied among the ABL Obligations and the Term Loan Obligations in accordance with Section 4.1; and (y) such motion to sell or otherwise dispose of any Term Loan Priority Collateral does not impair the rights of the ABL Claimholders under Section 363(k) of the Bankruptcy Code or any similar provisions under the CCAA or any other applicable Bankruptcy Laws (except that the ABL Claimholders will be permitted to "credit bid" their claims (including under Section 363, 365 or 1129 of the Bankruptcy Code, or any similar provisions under the CCAA or any other applicable Bankruptcy Laws) in such sale only if any such credit bid submitted on account of ABL Obligations results in the Discharge of Term Loan Obligations). Each ABL Agent for itself and its respective ABL Claimholders further agrees that it will not object to or oppose, or support any party in opposing, the right of the Term Loan Claimholders to credit bid under Section 363(k) of the Bankruptcy Code or any similar provision under the CCAA or any other applicable Bankruptcy Laws with respect to the Term Loan Priority Collateral, subject to the provision of the immediately preceding sentence; provided that the ABL Claimholders shall not be deemed to have agreed to any credit bid by other Claimholders in connection with a single sale of both ABL Priority Collateral and Term Loan Priority Collateral.

6.3    Interest, Fees, Etc.

(a)      Until the Discharge of ABL Obligations has occurred, the Term Loan Claimholders agree not to oppose or seek to challenge any claim by an ABL Claimholder for allowance or payment in the Cases, the CCAA Cases or any future Insolvency Proceeding of any interest on ABL Obligations or any other fees, costs or expenses in connection thereto.

(b)      Until the Discharge of Term Loan Obligations has occurred, the ABL Claimholders agree not to oppose or seek to challenge any claim by a Term Loan Claimholder for allowance or payment in the Cases, the CCAA Cases or any future Insolvency Proceeding of any interest on Term Loan Obligations or any other fees, costs or expenses in connection thereto.

6.4      Avoidance Issues. If any Claimholder is required in any of the Cases, the CCAA Cases, any Insolvency Proceeding in respect of any Grantor that is not a Debtor or a CCAA Debtor or any converted or succeeding cases in respect thereof to turn over, disgorge or otherwise pay to the estate of any Grantor any amount paid in respect of the Obligations of such Claimholder (a "**Recovery**"), then such Claimholders shall be entitled to a reinstatement of the applicable Obligations with respect to all such recovered amounts, and all rights, interests, priorities and privileges recognized in this Agreement shall apply with respect to any such Recovery. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement.

**SECTION 7. Reliance; Waivers; Etc**.

7.1      Reliance. Other than any reliance on the terms of this Agreement, each ABL Agent, on behalf of its respective ABL Claimholders, acknowledges that it and such ABL Claimholders have, independently and without reliance on any other Agent or any other Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such ABL Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the ABL Documents or this Agreement. Other than any reliance on the terms of this Agreement, each Term Loan Agent, on behalf of its respective Term Loan Claimholders, acknowledges that it and such Term Loan Claimholders have, independently and without reliance on any other Agent or any other Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Term Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Term Loan Documents or this Agreement.

7.2      No Warranties or Liability. Each ABL Agent, on behalf of its respective ABL Claimholders, acknowledges and agrees that each Term Loan Agent and each Term Loan Claimholder has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the Term Loan Documents, the ownership by any Grantor of any Collateral, or the perfection or priority of any Liens thereon. Except as otherwise expressly provided herein, each Term Loan Agent and the other Term Loan Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Term Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Each Term Loan Agent, on behalf of its respective Term Loan Claimholders, acknowledges and agrees that each ABL Agent and each ABL Claimholder has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the ABL Documents, the ownership of any Collateral, or the perfection or priority

of any Liens thereon. Except as otherwise expressly provided herein, each ABL Agent and the other ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective ABL Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. For the avoidance of doubt, neither any ABL Agent nor any ABL Claimholder shall have any liability of any kind or nature to any Term Loan Agent or any Term Loan Claimholder for making any loans, issuing any letters of credit or making any other extensions of credit available to any Loan Party in accordance with the provisions of the DIP ABL Credit Agreement and this Agreement, regardless of whether the foregoing is permitted under the DIP Term Loan Agreement or would result in a Term Loan Default, and each Term Agent, on behalf of each Term Loan Claimholder, hereby irrevocably waives and releases any and all such claims.  Except as expressly provided herein, each Term Loan Agent and each Term Loan Claimholder shall have no duty to any ABL Agent or any ABL Claimholders, and each ABL Agent and each ABL Claimholder shall have no duty to any Term Loan Agent or any Term Loan Claimholders, to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreements with any Grantor (including the ABL Documents and the Term Loan Documents), regardless of any knowledge thereof which they may have or be charged with. Each Term Loan Agent hereby waives to the fullest extent permitted by law any claim that may be had against any ABL Agent or any ABL Claimholder arising out of any actions which the such ABL Agent or such ABL Claimholder take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the ABL Obligations from any account debtor, guarantor or any other party), or the valuation, use, protection or release of any security for such ABL Obligations. Each ABL Agent hereby waives to the fullest extent permitted by law any claim that may be had against any Term Loan Agent or any Term Loan Claimholder arising out of any actions which such Term Loan Agent or such Term Loan Claimholder take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Term Loan Obligations from any account debtor, guarantor or any other party), or the valuation, use, protection or release of any security for such Term Loan Obligations.

7.3     No Waiver of Lien Priorities.

(a)     No right of any ABL Claimholder, any ABL Agent or any of them to enforce any provision of this Agreement or any ABL Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Grantor or by any act or failure to act by any ABL Claimholder or any ABL Agent, or by any noncompliance by any person with the terms, provisions, and covenants of this Agreement, any of the ABL Documents or any of the Term Loan Documents, regardless of any knowledge thereof which such ABL Agent or such ABL Claimholders, or any of them, may have or be otherwise charged with. No right of any Term Loan Claimholder, any Term Loan Agent or any of them to enforce any provision of this Agreement or any Term Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Grantor or by any act or failure to act by any Term Loan Claimholder or any Term Loan Agent, or by any noncompliance by any person with the terms, provisions, and covenants of this Agreement, any of the Term Loan Documents or any of the ABL Documents, regardless of any knowledge thereof which such Term Loan Agent or such Term Loan Claimholders, or any of them, may have or be otherwise charged with.

(b)       Without in any way limiting the generality of the foregoing paragraph (a) (but subject to any rights of Grantors under the ABL Documents and the Term Loan Documents and subject to the provisions of <u>Section 5.3(a)</u>), each ABL Claimholder, each ABL Agent and any of them may, at any time and from time to time in accordance with the ABL Documents and/or applicable law, without the consent of, or notice to, any Term Loan Agent or any Term Loan Claimholders, without incurring any liabilities to any Term Loan Agent or any Term Loan Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Term Loan Agent or any Term Loan Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following without the prior written consent of any Term Loan Agent or any Term Loan Claimholders:

(i)       change the manner, place, or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase, or alter, the terms of any of the ABL Obligations or any Lien on any ABL Collateral or guarantee thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the ABL Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any Liens held by any ABL Agent or any ABL Claimholders, the ABL Obligations, or any of the ABL Documents;

(ii)       sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the ABL Priority Collateral or any liability of any Grantor to any ABL Claimholder or any ABL Agent, or any liability incurred directly or indirectly in respect thereof;

(iii)       settle or compromise any ABL Obligation or any other liability of any Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the ABL Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

(iv)       exercise or delay in or refrain from exercising any right or remedy against any Grantor or any other person, elect any remedy and otherwise deal freely with any Grantor or any ABL Priority Collateral and any security and any guarantor or any liability of any Grantor to any ABL Agent or any ABL Claimholder or any liability incurred directly or indirectly in respect thereof.

(c)       Except as otherwise provided herein, each Term Loan Agent also agrees that each ABL Claimholder and each ABL Agent shall have no liability to any Term Loan Agent or any Term Loan Claimholders, and each Term Loan Agent hereby waives any claim against any ABL Claimholder or any ABL Agent, arising out of any and all actions which any ABL Claimholders or any ABL Agent may, pursuant to the terms hereof, take, permit or omit to take with respect to:

(i)      the ABL Documents;

(ii)     the collection of the ABL Obligations; or

(iii)    the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any ABL Priority Collateral. Each Term Loan Agent agrees that each ABL Claimholder and each ABL Agent has no duty to them in respect of the maintenance or preservation of the ABL Priority Collateral, the ABL Obligations, or otherwise.

(d)     Without in any way limiting the generality of the foregoing paragraph (a) (but subject to any rights of Grantors under the Term Loan Documents and subject to the provisions of Section 5.3(b)), each Term Loan Claimholder, each Term Loan Agent and any of them may, at any time and from time to time in accordance with the Term Loan Documents and/or applicable law, without the consent of, or notice to, any ABL Agent or any ABL Claimholders, without incurring any liabilities to any ABL Agent or any ABL Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any ABL Agent or any ABL Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following without the prior written consent of any ABL Agent or any ABL Claimholders:

(i)      change the manner, place, or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase, or alter, the terms of any of the Term Loan Obligations or any Lien on any Term Loan Collateral or guarantee thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Term Loan Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any Liens held by any Term Loan Agent or any Term Loan Claimholders, the Term Loan Obligations, or any of the Term Loan Documents;

(ii)     subject to Section 3.8, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Term Loan Priority Collateral or any liability of any Grantor to any Term Loan Claimholder or any Term Loan Agent, or any liability incurred directly or indirectly in respect thereof;

(iii)    settle or compromise any Term Loan Obligation or any other liability of any Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Term Loan Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

(iv)     exercise or delay in or refrain from exercising any right or remedy against any Grantor or any other person, elect any remedy

and otherwise deal freely with any Grantor or any Term Loan Priority Collateral and any security and any guarantor or any liability of any Grantor to any Term Loan Agent or any Term Loan Claimholder or any liability incurred directly or indirectly in respect thereof.

(e)  Except as otherwise provided herein, each ABL Agent also agrees that each Term Loan Claimholder and each Term Loan Agent shall have no liability to any ABL Agent or any ABL Claimholders, and each ABL Agent hereby waives any claim against any Term Loan Claimholder or any Term Loan Agent, arising out of any and all actions which any Term Loan Claimholders or any Term Loan Agent may, pursuant to the terms hereof, take, permit or omit to take with respect to:

(i)  the Term Loan Documents;

(ii)  the collection of the Term Loan Obligations; or

(iii)  the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any Term Loan Priority Collateral. Each ABL Agent agrees that each Term Loan Claimholder and each Term Loan Agent has no duty to them in respect of the maintenance or preservation of the Term Loan Priority Collateral, the Term Loan Obligations, or otherwise.

(f)  Until the Discharge of ABL Obligations and the Discharge of Term Loan Obligations, each ABL Agent and each Term Loan Agent agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead, or otherwise assert, or otherwise claim the benefit of, any marshaling, appraisal, valuation, or other similar right that may otherwise be available under applicable law with respect to each other Agent's Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

7.4  Obligations Unconditional. For so long as this Agreement is in full force and effect, all rights, interests, agreements and obligations of each ABL Agent, each ABL Claimholder, each Term Loan Agent and each Term Loan Claimholder, respectively, hereunder shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any ABL Documents or any Term Loan Documents or any reversal, vacating, stay, modification or amendment of the Orders;

(b)  except as otherwise expressly restricted in this Agreement, any change in the time, manner, or place of payment of, or in any other terms of, all or any of the ABL Obligations or Term Loan Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Document or any Term Loan Document;

(c)  except as otherwise expressly restricted in this Agreement, any exchange, release, voiding, avoidance or non perfection of any Lien in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in

writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Loan Obligations or any guarantee thereof;

(d)     the status (including the dismissal or conversion to chapter 7 under the Bankruptcy Code) of any of the Cases or the CCAA Cases, or the commencement of any Insolvency Proceeding in respect of any Grantor that is not a Debtor or a CCAA Debtor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of each ABL Agent, the ABL Obligations, any ABL Claimholder, each Term Loan Agent, the Term Loan Obligations or any Term Loan Claimholder in respect of this Agreement.

**SECTION 8. <u>Representations and Warranties.</u>**

8.1     <u>Representations and Warranties of Each Party</u>. Each party hereto represents and warrants to the other parties hereto as follows:

(a)     Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(b)     This Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law); and

(c)     The execution, delivery, and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any governmental authority and (ii) will not violate any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of such party or any order of any governmental authority or any provision of any agreement or other instrument binding upon such party.

8.2     <u>Representations and Warranties of Each Agent</u>. Each Agent each represents and warrants to the other that it has been authorized by the ABL Claimholders or the Term Loan Claimholders, as applicable, under the ABL Loans Documents or the Term Loan Documents, as applicable, to enter into this Agreement and that each of the agreements, covenants, waivers, and other provisions hereof is valid, binding, and enforceable against the other ABL Claimholders or the other Term Loan Claimholders, as applicable, as fully as if they were parties hereto, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

**SECTION 9. <u>Miscellaneous</u>.**

9.1 <u>Conflicts</u>. Except to the extent expressly provided in <u>Section 9.15</u>, in the event of any conflict between the provisions of this Agreement and the provisions of any of the ABL Documents or any of the Term Loan Documents, the provisions of this Agreement shall govern and control.

9.2 <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination (as opposed to debt or claim subordination) and the Claimholders may continue, at any time and without notice to any Agent or any other Claimholder, to extend credit and other financial accommodations to or for the benefit of any Grantor constituting ABL Obligations or Term Loan Obligations, as applicable, in reliance hereof. Each Term Loan Agent and each ABL Agent hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding (including but not limited to the Cases and the CCAA Cases). Consistent with, but not in limitation of, the preceding sentence, each ABL Agent and each Term Loan Agent, on behalf of the applicable Claimholders, irrevocably acknowledges that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code or any similar provision under the CCAA. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to any Grantor shall include such Grantor as debtor and debtor-in-possession and any receiver or trustee for such Grantor in, as applicable, the Cases, the CCAA Cases or any other Insolvency Proceeding. This Agreement shall terminate and be of no further force and effect:

    (a)  with respect to any ABL Agent, any ABL Claimholder, and the ABL Obligations, on the date that the Discharge of ABL Obligations has occurred; and

    (b)  with respect to any Term Loan Agent, any Term Loan Claimholder, and the Term Loan Obligations, on the date that the Discharge of Term Loan Obligations has occurred.

9.3 <u>Amendments; Waivers</u>. Except as provided in the last sentence of this Section, no amendment, modification, or waiver of any of the provisions of this Agreement shall be effective unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Any amendments, modifications or waivers can be effected by any ABL Agent, at the direction of the requisite ABL Claimholders under the ABL Documents, and by any Term Loan Agent, at the direction of the requisite Term Loan Claimholders under the Term Loan Documents. Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights under the ABL Documents, the Term Loan Documents or this Agreement are directly affected. In connection with any Refinancing of the Term Loan Obligations or ABL Obligations permitted under <u>Section 5.3(a)</u> or <u>5.3(b)</u>, as applicable, this Agreement may be amended at the request and sole expense of the Grantors, and without the consent of any ABL Agent or any Term Loan Agent, (i) to add parties (or any authorized agent or trustee therefor) providing any such Refinancing, (ii) to establish that Liens on any Term Loan Priority Collateral securing such Refinanced debt shall have the same priority as the Liens on any Term Loan Priority Collateral securing the debt being Refinanced and (iii) to establish that the Liens on any

ABL Priority Collateral securing such Refinanced debt shall have the same priority as the Liens on any ABL Priority Collateral securing the debt being Refinanced.

9.4    Information Concerning Financial Condition of the Grantors. Each ABL Agent and each ABL Claimholder, on the one hand, and each Term Loan Agent and each Term Loan Claimholder, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and all endorsers and/or guarantors of the ABL Obligations or the Term Loan Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Term Loan Obligations. Each ABL Agent and the ABL Claimholders shall have no duty to advise any Term Loan Agent or any Term Loan Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. Each Term Loan Agent and the Term Loan Claimholders shall have no duty to advise any ABL Agent or any ABL Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event any ABL Agent or any ABL Claimholders, or any Term Loan Agent or any Term Loan Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party to this Agreement, it or they shall be under no obligation:

(a)    to make, and each ABL Agent and ABL Claimholders, or each Term Loan Agent and Term Loan Claimholders, as the case may be, shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness, or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

9.5    Subrogation. (a) With respect to any payments or distributions in cash, property, or other assets that any Term Loan Claimholders or any Term Loan Agent pays over to any ABL Agent or any ABL Claimholder under the terms of this Agreement, such Term Loan Claimholder and such Term Loan Agent shall be subrogated to the rights of such ABL Agents and such ABL Claimholders and (b) with respect to any payments or distributions in cash, property, or other assets that any ABL Claimholders or any ABL Agent pays over to any Term Loan Agent or any Term Loan Claimholder under the terms of this Agreement, such ABL Claimholder and such ABL Agent shall be subrogated to the rights of such Term Loan Agents and Term Loan Claimholders; provided, however, that, each ABL Agent and each Term Loan Agent each hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of ABL Obligations or Discharge of Term Loan Obligations, as applicable, has occurred. Any payments or distributions in cash, property or other assets received by any ABL Agent or any ABL Claimholder that are paid over to any Term Loan Agent or any Term Loan Claimholder pursuant to this Agreement shall not reduce any of the ABL Obligations. Any payments or distributions in cash, property or other assets received by any Term Loan Agent or any Term Loan Claimholder that are paid over to any ABL Agent or any ABL Claimholder pursuant to this Agreement shall not reduce any of the Term Loan Obligations. Notwithstanding the foregoing provisions of this Section 9.5, none of the ABL Claimholders shall have any claim against any of the Term Loan Claimholders for any impairment of any subrogation rights herein granted to the Term Loan Claimholders and none of the Term Loan Claimholders shall have any claim against any of the ABL Claimholders for any impairment of any subrogation rights herein granted to the ABL Claimholders.

9.6     **SUBMISSION TO JURISDICTION; WAIVERS.**

(a)     **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, TO ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY, AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:**

(i)     **ACCEPTS GENERALLY AND UNCONDITIONALLY THE JURISDICTION AND VENUE OF SUCH COURTS;**

(ii)     **WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;**

(iii)     **AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.7; AND**

(iv)     **AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. NOTWITHSTANDING THE FOREGOING, IN THE EVENT ANY GRANTOR IS SUBJECT TO AN INSOLVENCY PROCEEDING, THE PARTIES HERETO MAY SEEK TO ENFORCE THIS AGREEMENT IN THE COURT OR OTHER TRIBUNAL HAVING JURISDICTION OVER OR OTHERWISE OVERSEEING SUCH INSOLVENCY PROCEEDING.**

(b)     **NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSE OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO THE JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.**

(c)     **EACH OF THE PARTIES HERETO (INCLUDING HOLDINGS ON BEHALF OF ITSELF AND ITS SUBSIDIARIES) HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND**

**THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.6(c) AND EXECUTED BY ABL AGENT AND TERM LOAN AGENT), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

9.7    <u>Notices</u>. All notices to Term Loan Claimholders and ABL Claimholders permitted or required under this Agreement shall also be sent to each Term Loan Agent and each ABL Agent, respectively. Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile or United States mail or courier service or electronic mail and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or 3 Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as may be designated by such party in a written notice to all of the other parties. Grantors shall provide written notice to each ABL Agent of the Discharge of Term Loan Obligations and shall provide written notice to each Term Loan Agent of the Discharge of ABL Obligations.

9.8    <u>Further Assurances</u>. Each ABL Agent and each Term Loan Agent agree to take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as any ABL Agent or any Term Loan Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement, all at the expense of Grantors to the extent permitted by the Orders.

9.9    **<u>APPLICABLE LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

9.10    <u>Binding on Successors and Assigns</u>. This Agreement shall be binding upon each ABL Agent, each ABL Claimholder, each Term Loan Agent, each Term Loan Claimholder, and each of their respective successors and assigns.

9.11    <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

9.12    <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

9.13    <u>No Third Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of and bind each of ABL Claimholders and Term Loan Claimholders. In no event shall any Grantor be a third party beneficiary of this Agreement.

9.14    <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of each ABL Agent and ABL Claimholders on the one hand and each Term Loan Agent and Term Loan Claimholders on the other hand. No Grantor or any other creditor thereof shall have any rights hereunder and no Grantor may rely on the terms hereof. Nothing in this Agreement shall impair, as between Grantors and each ABL Agent and its respective ABL Claimholders, or as between Grantors and each Term Loan Agent and its respective Term Loan Claimholders, the obligations of Grantors, which are absolute and unconditional, to pay principal, interest, fees and other amounts as provided in the ABL Documents and the Term Loan Documents, respectively, including as and when the same shall become due and payable in accordance with their terms.

9.15    <u>Costs and Attorneys Fees</u>. In the event it becomes necessary for any ABL Agent, any ABL Claimholder, any Term Loan Agent, or any Term Loan Claimholder to commence or become a party to any proceeding or action to enforce the provisions of this Agreement, the Bankruptcy Court, the CCAA Court or other court or body before which the same shall be tried shall award to the prevailing party all costs and expenses thereof, including reasonable attorneys fees, the usual and customary and lawfully recoverable court costs, and all other expenses in connection therewith.

9.16    <u>Specific Performance</u>. Each ABL Agent and each Term Loan Agent may demand specific performance of this Agreement. Any ABL Agent, on behalf of itself and its respective ABL Claimholders, and each Term Loan Agent, on behalf of itself and its respective Term Loan Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any ABL Agent or the other ABL Claimholders or any Term Loan Agent or the other Term Loan Claimholders, as applicable. Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in the Cases or the CCAA Cases (or any other Insolvency Proceeding), each ABL Agent or each Term Loan Agent may seek such or any other relief as if it were the "holder" of the claims of the other agent's Claimholders under Section 1126(a) of the Bankruptcy Code or any equivalent provision of the CCAA or otherwise had been granted an irrevocable power of attorney by the other Agent's Claimholders.

**SECTION 10. <u>Term Loan Claimholder Purchase Option</u>**.

10.1    <u>Right to Purchase; Purchase Notice</u>. Upon the occurrence and during the continuation of a Purchase Triggering Event or at any time following an Excess ABL Purchase Triggering Event, then, in any such case, any one or more of the Term Loan Claimholders (acting in their individual capacity or through one or more affiliates) designated by holders of more than 50% of the aggregate outstanding principal amount of the Term Loan Obligations shall have the right, but not the obligation, to purchase (at par) all (but not less than all) of the ABL Priority Obligations pursuant to this <u>Section 10.1</u>. In order to

exercise such purchase option, the Term Loan Agent or the designated Term Loan Claimholders shall deliver a written notice (a "**Purchase Notice**") to each ABL Agent, which Purchase Notice shall (A) be signed by the designated Term Loan Claimholders committing to such purchase (the "**Purchasing Creditors**") and indicate the percentage of the ABL Priority Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the ABL Priority Obligations), (B) state that (1) it is a Purchase Notice delivered pursuant to <u>Section 10.1</u> of this Agreement and (2) the offer contained therein is irrevocable, and (C) identify the proposed purchase date (which shall not be not less than two (2) Business Days after, and not more than 15 Business Days after the receipt by the ABL Agents of the Purchase Notice); <u>provided</u>, that, with respect to each Purchase Triggering Event (but not, for the avoidance of doubt, with respect to any Excess ABL Purchase Triggering Event), such purchase option shall expire if such Term Loan Agent or the designated Term Loan Claimholders fail to deliver a Purchase Notice within ten (10) Business Days following the first date such Term Loan Agent obtains actual knowledge of the occurrence of such Purchase Triggering Event. Upon receipt of a Purchase Notice by the ABL Agents, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is fifteen (15) Business Days after the Purchase Notice was received by the ABL Agents to consummate such purchase of all (but not less than all) of the ABL Priority Obligations pursuant to this <u>Section 10</u> (the date of such purchase, the "**Purchase Date**"). The Purchase Notice, if given, shall be irrevocable.

10.2    <u>Notice to Term Loan Claimholders</u>. Each Term Loan Agent, on behalf of its respective Term Loan Claimholders, solely as among themselves, agrees that upon the occurrence of any Purchase Triggering Event or any Excess ABL Purchase Triggering Event, each Term Loan Agent shall send a notice to all its respective Term Loan Claimholders giving each Term Loan Claimholder the option to purchase at least its pro rata share of the ABL Priority Obligations. No Term Loan Claimholder shall be required to participate in any purchase offer hereunder, and each Term Loan Claimholder acknowledges and agrees that a purchase offer may be made by any or all of the Term Loan Claimholders, subject to the requirements of the preceding sentence and <u>Section 10.1</u>.

10.3    <u>Purchase Price, Cash Collateral, Assumption of Commitments, Etc</u>. On the Purchase Date, the ABL Claimholders shall sell to the Purchasing Creditors and the Purchasing Creditors shall purchase from the ABL Claimholders, all (but not less than all) of the ABL Priority Obligations. On the Purchase Date, the Purchasing Creditors shall:

(a)    pay to ABL Agents, for the benefit of their respective ABL Claimholders, as the purchase price therefor, the full amount of all the ABL Priority Obligations then outstanding and unpaid, other than (i) indemnification and reimbursement obligations for which no claim or demand for payment has been threatened or asserted, in each case in writing, at such time, and (ii) ABL Priority Obligations cash collateralized in accordance with clause (b) below,

(b)    furnish cash collateral to each ABL Agent in an amount equal to the sum of (A) 105% (or 115% in the case of letters of credit denominated in a currency other than U.S. Dollars that are not cash collateralized in such other currency) of the aggregate undrawn amount of any issued and outstanding letters of credit (such cash collateral shall be applied to the reimbursement of any drawing under a letter of credit as and when such drawing is paid and, if a letter of credit expires undrawn or not fully drawn, the cash collateral held by such ABL Agent in respect of such letter of credit shall be remitted to the Term Loan Agents for the benefit of the Purchasing Creditors), <u>plus</u> (B) an amount as such ABL Agent determines is reasonably necessary to secure such ABL Agent and its respective ABL Claimholders in respect of any outstanding ABL Bank Product Obligations (such cash collateral shall be applied to the

reimbursement of such ABL Bank Product Obligations as and when such obligations become due and payable and, at such time as all of such ABL Bank Product Obligations are paid in full (other than indemnification and reimbursement obligations for which no claim or demand for payment has been threatened or asserted, in each case in writing), the remaining cash collateral held by such ABL Agent in respect of such ABL Bank Product Obligations shall be remitted to the Term Loan Agents for the benefit of the Purchasing Creditors), plus (C) any claims demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, damages or other indemnification obligations that are threatened or asserted, in each case in writing, and the subject of the indemnification provisions of the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement (such cash collateral shall be applied to the reimbursement of such obligations as and when they become due and payable and, at such time as all of such obligations are paid in full, the remaining cash collateral held by such ABL Agent in respect of indemnification obligations shall be remitted to the Term Loan Agents for the benefit of the Purchasing Creditors),

(c)    assume the remaining commitments (if any) of the ABL Claimholders to extend credit under the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement,

(d)    pay to ABL Agents and the other ABL Claimholders the amount of all expenses to the extent incurred, earned and due and payable in accordance with the ABL Documents (including the reimbursement of attorneys fees, financial examination expenses, and appraisal fees), and

(e)    agree to reimburse the ABL Agents and the other ABL Claimholders for any loss, cost, damage or expense (including reasonable and documented out-of-pocket attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit, banker's acceptances and similar instruments as described above and any checks or other payments provisionally credited to the ABL Priority Obligations, and/or as to which such ABL Agent and its respective ABL Claimholders have not yet received final payment.

10.4    Remittance. Such purchase price and cash collateral shall be remitted by wire transfer of federal funds to such bank account of the ABL Agents as ABL Agents may designate in writing to the Term Loan Agents for such purpose. Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by the Purchasing Creditors to the bank account designated by such ABL Agent are received in such bank account prior to 2:00 p.m., New York time, and interest shall be calculated to and including such Business Day if the amounts so paid by the Purchasing Creditors to the bank account designated by such ABL Agent are received in such bank account later than 2:00 p.m., New York time.

10.5    Purchase Documentation. Such purchase shall be effected by the execution and delivery of a customary form of assignment and acceptance agreement and shall be expressly made without representation or warranty of any kind by any ABL Agent and the other ABL Claimholders as to the ABL Priority Obligations so purchased, or otherwise, and without recourse to any ABL Agent or any other ABL Claimholder, except that each ABL Claimholder shall represent and warrant: (i) that the amount quoted by such ABL Claimholder as its portion of the purchase price represents the amount shown as owing with respect to the claims transferred as reflected on its books and records, (ii) it owns, or has the

right to transfer to the Purchasing Creditors, the rights being transferred, and (iii) such transfer will be free and clear of Liens.

10.6    <u>Resignation Rights</u>. In the event that any one or more of the Purchasing Creditors exercises and consummates the purchase option set forth in this <u>Section 10</u>, (i) each ABL Agent and each Issuing Bank (as defined in the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement) and Swingline Lender (as defined in the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement) shall have the right, but not the obligation, to immediately resign under the as defined in the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement, as applicable, and (ii) the Purchasing Creditors shall have the right, but not the obligation, to require each ABL Agent, each Issuing Bank and each Swingline Lender to immediately resign under the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement, as applicable.

10.7    <u>Exercise any Secured Creditor Remedies Following Purchase Notice</u>. During the period following receipt of a Purchase Notice and continuing through and including the Purchase Date, each ABL Agent shall not, without the prior written consent of the Term Loan Agents, unless Exigent Circumstances exist in which case no such consent shall be required (<u>provided</u>, each ABL Agent shall use commercially reasonable efforts to the extent practicable to consult with the Term Loan Agent in respect thereof), (x) Exercise any Secured Creditor Remedies consisting of a foreclosure or other Disposition of all or a material portion of the ABL Priority Collateral or (y) make any Overadvance or any Protective Advance (in each case, as defined in the ABL Documents), except to the extent resulting from any Advance made to fund the payment of accrued interest, fees or Lender Group Expenses (as such term is defined in the DIP ABL Credit Agreement) that are due and payable; <u>provided</u> that, if for any reason, the Purchasing Creditors shall fail to complete the purchase of the ABL Priority Obligations by the date set forth in the Purchase Notice, each ABL Agent shall be entitled to immediately commence (or to continue) any Exercise of Secured Creditor Remedies in respect of the ABL Priority Collateral.

10.8    <u>ABL Retained Interest</u>. In the event that any one or more of the Purchasing Creditors exercises and consummates the purchase option set forth in this <u>Section 10</u>, (a) the ABL Claimholders shall retain their indemnification and reimbursement rights under the ABL Documents for actions or other matters arising on or prior to the date of such purchase, and (b) and in the event that, at the time of such purchase, there exists Excess ABL Obligations, the consummation of such purchase option shall not include (nor shall the purchase price be calculated with respect to) such Excess ABL Obligations (clauses (a) and (b), the "**ABL Retained Interest**"). In the event that an ABL Retained Interest exists, each Grantor and each ABL Claimholder shall, at the request of the Purchasing Creditors, execute an amendment to the DIP ABL Credit Agreement or the Pre-Petition ABL Credit Agreement acknowledging and agreeing that such ABL Retained Interest consisting of Excess ABL Obligations is a last-out tranche of the ABL Obligations, payable after payment in full of all of the ABL Priority Obligations and subject to the terms of this Agreement with respect to the Term Loan Obligations. Interest with respect to such ABL Retained Interest consisting of Excess ABL Obligations shall continue to accrue and be payable in accordance with the terms of the ABL Documents, the ABL Retained Interest shall continue to be secured by the Collateral, and the ABL Retained Interest shall be paid (or cash collateralized, as applicable) in accordance with the terms of the ABL Documents and this Agreement. Each ABL Claimholder shall continue to have all rights and remedies of a lender under the applicable ABL Documents; <u>provided</u>, that no ABL Lender shall have any right to vote on, or otherwise consent to (in each case in respect of its interest in the ABL Retained Interest), any amendment, waiver, departure from, or other modification of any provision of any ABL Document, except that (i) the consent of each such ABL Lender shall be required for those matters that, under the DIP ABL Credit Agreement and Pre-Petition ABL Credit Agreement that require the agreement or consent of all applicable ABL Lenders party thereto or all ABL Lenders directly and adversely affected thereby, and (ii) the consent of each of the ABL Lenders that hold a portion of the ABL Retained Interest shall be required for any amendment, waiver, departure from, or

other modification of any provision of any ABL Document that is inconsistent with the priorities or other provisions set forth in this Agreement with respect to the ABL Retained Interest.

**SECTION 11. Condition Precedent.** The effectiveness of this Agreement is subject to the satisfaction of each of the following conditions:

      (a)      the entry of the Interim Order;

      (b)      the entry of the CCAA Initial Order;

      (c)      the satisfaction or waiver of the conditions set forth in Section 5 of the DIP Term Loan Agreement and the making of the term loans in accordance with the provisions thereof; and

      (d)      the satisfaction or waiver of the conditions set forth in Sections 3.1 and 3.2 of the DIP ABL Credit Agreement.

**SECTION 12. Limited Effect on Existing Intercreditor Agreements**. Nothing in this Agreement is intended or shall be construed to amend, alter, limit, diminish or otherwise affect the rights, remedies, terms or agreements set forth in any other subordination or intercreditor agreement to which the Pre-Petition ABL Agent and the Pre-Petition Term Loan Agent are parties, including, without limitation, in connection with the Pre-Petition Term Loan Obligations and the Pre-Petition ABL Obligations under the Pre-Petition Intercreditor Agreement, except that by their signatures below, each of **WELLS FARGO CAPITAL FINANCE, LLC**, in its capacity as ABL Agent under (and as defined in) the Pre-Petition Intercreditor Agreement, and **BROOKFIELD PRINCIPAL CREDIT LLC**, in its capacities as Term Loan Agent and under (and as defined in) the Pre-Petition Intercreditor Agreement, hereby agree as follows:

      (a)      They have no objection to the financings or liens contemplated by the Orders, the DIP ABL Documents or the DIP Term Loan Documents and agree that consummation of the transactions described therein is permitted by and does not violate in any respect the Pre-Petition Intercreditor Agreement, and

      (b)      (i) Discharge of ABL Obligations under (and as defined in) the Pre-Petition Intercreditor Agreement shall not occur unless and until (in addition to the other requirements therefor) Discharge of ABL Obligations under (and as defined in) this Agreement occurs, and (ii) Discharge of Term Loan Obligations under (and as defined in) the Pre-Petition Intercreditor Agreement shall not occur unless and until (in addition to the other requirements therefor) Discharge of Term Loan Obligations under (and as defined in) this Agreement occurs; provided, however, that until the effectiveness of the Pre-Petition ABL Roll Up, the DIP ABL Credit Agreement shall be deemed a "refinancing" of the Pre-Petition ABL Obligations, and upon its effectiveness the Pre-Petition ABL Roll Up shall constitute a Discharge of ABL Obligations under (and as defined in) the Pre-Petition Intercreditor Agreement.

[Signature pages to follow.]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**WELLS FARGO CAPITAL FINANCE, LLC**,
in its capacity as DIP ABL Agent and Pre-Petition ABL Agent

By: _____

Name: _____

Title: _____

[SIGNATURE PAGE TO ABL/TL DEBTOR-IN-POSSESSION INTERCREDITOR AGREEMENT]

**BROOKFIELD PRINCIPAL CREDIT LLC**,
in its capacity as DIP Term Loan Agent and Pre-Petition
Term Loan Agent


By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO ABL/TL DEBTOR-IN-POSSESSION INTERCREDITOR AGREEMENT]

## **ACKNOWLEDGMENT**

Each of the undersigned hereby acknowledges that it has received a copy of the foregoing Intercreditor Agreement and consents thereto, agrees to recognize all rights granted thereby to each ABL Agent, the ABL Claimholders, each Term Loan Agent, and the Term Loan Claimholders, and will not do any act or perform any obligation which is not in accordance with the agreements set forth therein. Each of the undersigned further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under the foregoing Intercreditor Agreement.

[Signature pages to follow.]

**ACKNOWLEDGED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BUMBLE BEE FOODS S.À R.L.,**
a société à responsabilité limitée incorporated and existing
under the laws of the Grand Duchy of Luxembourg, with
registered office at 4, rue Lou Hemmer, L- I 748
Luxembourg-Findel (Senningerberg) and registered with the
R.C.S. Luxembourg under number B 140339


By: _____
Name: _____
Title:    Authorised Signatory

**BUMBLE BEE PARENT, INC.**,
a Delaware corporation


By: _____
Name: _____
Title: _____


**BUMBLE BEE HOLDINGS, INC.**,
a Georgia corporation


By: _____
Name: _____
Title: _____


**BUMBLE BEE CAPITAL CORP.**,
a Delaware corporation


By: _____
Name: _____
Title: _____


**BUMBLE BEE FOODS, LLC**,
a Delaware limited liability company


By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO ACKNOWLEDGMENT TO
ABL/TL DEBTOR-IN-POSSESSION INTERCREDITOR AGREEMENT]

**ANOVA FOOD, LLC**,
a Virginia limited liability company


By:      _____
Name:  _____
Title:    _____

**CLOVER LEAF SEAFOOD S.À R.L.**,
a société à responsabilité limitée incorporated and existing
under the laws of the Grand-Duchy of Luxembourg, with
registered office at 8, rue Lou Hemmer, L-1748
Luxembourg-Findel (Senningerberg) and registered with
the R.C.S. Luxembourg under number RCS B 159871


By:      _____
Name:  _____
Title:    Authorised Signatory

**CLOVER LEAF HOLDINGS COMPANY**,
a Nova Scotia unlimited company


By:      _____
Name:  _____
Title:    _____

**CONNORS BROS. CLOVER LEAF SEAFOODS
COMPANY**, a Nova Scotia unlimited company


By:      _____
Name:  _____
Title:    _____

**CONNORS BROS. HOLDINGS COMPANY**,
a Nova Scotia unlimited company


By:      _____
Name:  _____
Title:    _____

01:25621813.1

[SIGNATURE PAGE TO ACKNOWLEDGMENT TO
ABL/TL DEBTOR-IN-POSSESSION INTERCREDITOR AGREEMENT]

**CONNORS BROS. SEAFOODS COMPANY**,
a Nova Scotia unlimited company

By: _____
Name: _____
Title: _____

**6162410 CANADA LIMITED**,
a corporation formed under the federal laws of Canada

By: _____
Name: _____
Title: _____

**K.C.R. FISHERIES LTD.**,
a corporation formed under the laws of New Brunswick

By: _____
Name: _____
Title: _____

**CORAL TRIANGLE PROCESSORS, LLC**,
a Marshall Islands limited liability company

By: _____
Name: _____
Title: _____

**ANOVA TECHNICAL SERVICES, LLC**,
a Marshall Islands limited liability company

By: _____
Name: _____
Title: _____

01:25621813.1

**Exhibit F**

**Milestones**

(a)    On the Petition Date:

    (i)    the Debtors shall file a motion with the Bankruptcy Court seeking approval of each of the DIP Term Facility and the DIP ABL Credit Facility; and

    (ii)    the Debtors shall have entered into the Stalking Horse APA.

(b)    On the CCAA Filing Date, the CCAA Cases shall have been initiated in the CCAA Court, and on or before the Business Day immediately following the CCAA Filing Date, the CCAA Court shall have issued and entered the CCAA Initial Order.

(c)    On or before the Business Day immediately following the date on which the Bankruptcy Court holds the hearing regarding the Interim Order, the Bankruptcy Court shall have entered the Interim Order.

    (i)    On or before the date that is one (1) day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

(d)    On or before the date that is six (6) days after the CCAA Filing Date, the CCAA Debtors shall have filed the CCAA Comeback Motion.

(e)    On or before the date that is fifteen (15) days after the CCAA Filing Date, the CCAA Court shall have issued and entered the CCAA A&R Initial Order.

(f)    On or before the date that is twenty-nine (29) days after the Petition Date, each of the Bankruptcy Court and the CCAA Court shall have entered the Bidding Procedures Order.

(g)    On or before the date that is twenty-nine (29) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.

(h)    On or before the date that is forty-eight (48) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(i)    On or before the date that is fifty (50) days after the Petition Date, the Debtors and the CCAA Debtors shall have commenced the Auction, if necessary.

(j)    On or before the date that is fifty-seven (57) days after the Petition Date:

    (i)    the hearing in the Bankruptcy Court to consider approval of the Stalking Horse APA and the Stalking Horse Transaction, or another alternative transaction pursuant to the Bidding Procedures, shall have occurred; and

        (ii)     the hearing in the CCAA Court to consider approval of the CCAA Approval and Vesting Order shall have occurred.

(k)     On or before the date that is sixty-two (62) days after the Petition Date:

        (i)     the Bankruptcy Court shall have entered the Sale Order; and

        (ii)     the CCAA Court shall have issued and entered the CCAA Approval & Vesting Order.

(l)     On or before March 31, 2020, the sale transaction approved in the Sale Order and CCAA Approval and Vesting Order shall be consummated and closed.

## **EXHIBIT 2**

**Organizational Chart of the Debtors and Affiliates**



Simplified equity ownership
Big Catch 1 L.P.
Cayman
Big Catch Cayman L.P.
Cayman
Ownership 100% unless stated otherwise
= ABL & Term Loan Obligor
= U.S. Chapter 11 Debtor
= CCAA Canadian Debtor
Bumble Bee Holdco S.C.A.
Luxembourg
Bumble Bee Foods S.à.r.l.
Luxembourg
Clover Leaf Seafood S.à.r.l.
Luxembourg
U.S. Chapter 11 Debtors
CCAA Canadian Debtors
Bumble Bee Parent, Inc.
US (DE)
Bumble Bee Holdings, Inc.
US (GA)
Bumble Bee Foods, LLC
US (DE)
Bumble Bee Capital Corp.
US (DE)
Anova Food, LLC
US (VA)
Bumble Bee Foods, LLC
Rep Office
Thailand
3d Party
JV Owners
43.6%
56.4%
RiceWrap Foods Corporation
US (NC)
Coral Triangle Processors, LLC
Marshall Islands
Anova Technical Services, LLC
SLLC/Marshall Islands
95%
5%
96.4%
3.6%
PT Asindo Minasagara
PT (LLC) Indonesia
PT Seafood Inspection Laboratory
PT (LLC) Indonesia
Technical Services 1, LLC
SLLC/Marshall Islands
Technical Services 2, LLC
SLLC/Marshall Islands
Seafood Ventures, LLC
SLLC/Marshall Islands
Anova Technical Services
Rep Office
Indonesia
Connors Bros. Holdings Company
NSULC/Canada
Clover Leaf Holdings Company
NSULC/Canada
Connors Bros. Clover Leaf Seafoods Company
NSULC/Canada
Connors Bros. Seafoods Company
NSULC/Canada
6162410 Canada Limited
CBCA/Canada
K.C.R. Fisheries Ltd.
NB/Canada

**<u>EXHIBIT 3</u>**

**ABL Fee Letter**

**[FILED UNDER SEAL]**

**<u>EXHIBIT 4</u>**

**Term Loan Fee Letter**

**[FILED UNDER SEAL]**