**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BUMBLE BEE PARENT, INC., *et al.*,[1]<br><br>                            Debtors. | Chapter 11<br><br>Case No. 19-12502 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF ERIC WINTHROP IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B)
UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE
PROTECTION; (IV) MODIFYING AUTOMATIC STAY; (V) SCHEDULING
FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Eric Winthrop, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director in the Financial Restructuring Group and Co-Head of the Liability Management Practice of Houlihan Lokey Capital, Inc. ("Houlihan"), a financial advisory firm that maintains an office at 10250 Constellation Blvd., Los Angeles, California 90067. In the near term, the debtors and debtors in possession (collectively, the "Debtors") expect to file an application seeking the authority to retain Houlihan as their financial advisor and investment banker in these chapter 11 cases.

2. Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816). The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

01:25618698.1

members of the Debtors' management and the Debtors' other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3. I am authorized to submit this Declaration, on the Debtors' behalf, in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion").[2]

### Qualifications

4. Houlihan is an internationally recognized investment banking and financial advisory firm with twenty-two offices worldwide and approximately 1,200 employees. Houlihan provides corporate finance, financial advisory, and financial restructuring services. In 2018, Houlihan was ranked as the No. 1 M&A advisor for U.S. transactions, according to Thomson Reuters. The firm is one of the leading providers of M&A fairness opinions and has the largest worldwide financial restructuring practice of any investment bank. Houlihan annually serves more than 1,000 clients ranging from closely held companies to Global Fortune 500 corporations.

5. Houlihan's Financial Restructuring Group, which has approximately 190 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirors, and other parties-in-interest involved in financially troubled companies based in a variety of industries and requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan has been and is involved in a number of large restructuring

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

01:25618698.1

2

cases in the United States, including representing debtors in: *In re Promise Healthcare Group, LLC,* Case No. 18-12491 (CSS) (Bankr. D. Del. November 5, 2018); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) (Bankr. D. Del. July 29, 2018); *In re Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. June 10, 2016); *In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); *In re Phoenix Brands, LLC*, Case No. 16-11242 (BLS) (Bankr. D. Del. Jul. 5, 2016); *In re Trump Entertainment Resorts, Inc.*, Case No. 14-12103 (KG) (Bankr. D. Del. Sept. 9, 2014); *In re Tactical Intermediate Holdings, Inc.*, Case No.14-11659 (KG) (Bankr. D. Del. July 8, 2014); *In re Northhampton Generating Co., LP*, Case No. 11-33095 (JCW) (Bankr. W.D.N.C. Dec. 5, 2011); *In re AES Thames, L.L.C.*, No. 11-10334 (KJC) (Bankr. D. Del. Feb. 1, 2011); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011); *In re Truvo USA LLC*, No. 10-13513 (AJG) (Bankr. S.D.N.Y July 1, 2010); *In re Mark IV Indus., Inc.*, Case No. 09-12705 (SMB) (Bankr. S.D.N.Y. Apr. 30, 2009); *In re Premier Inter. Holdings, Inc.*, Case No. 09-12019 (CSS) (Bankr. D. Del. Jun. 13, 2009); *In re Aventine Renewable Energy Holdings, Inc.*, Case No. 09-11214 (KG) (Bankr. D. Del. Apr. 7, 2009); *In re Foamex Inter. Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Feb. 18, 2009); and *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008).

6.      I have been employed by Houlihan for twenty-one years.  During the course of my career, I have advised both debtors and creditors in financial restructurings and distressed mergers and acquisitions, raised capital for troubled businesses, and represented debtors and creditor constituencies in bankruptcy proceedings.  I have also advised companies and creditor

groups in connection with a variety of financing-related issues, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession loans. My restructuring experience includes the following: Windstream Holdings, Gibson Brands, Nextel Communications, Cengage Learning, GateHouse Media, Dex One (f.k.a. RH Donnelley), Freedom Communications, American Restaurant Group, Silicon Graphics, Bi-Lo, Charter Communications, Scotia Pacific Company, Northwest Airlines, Atlas Air Worldwide, Pacific Lumber Company, Malden Mills Industries, Atlas Air Worldwide, DDi Corp., SpectraSite Communications, Guitar Center, Affinion Group, Intelstat, Getty Images, Travelport Worldwide, Education Media and Publishing Group International (a.k.a. Houghton Mifflin Harcourt), and Huntsman International, among others.

7.     Prior to my time at Houlihan, I was a member of the corporate finance, restructuring, and disputes group of PricewaterhouseCoopers. During my time there, I specialized in operational consulting for financially distressed companies as well as in valuations and litigation consulting-related projects.

8.     I have authored or co-authored materials and/or spoken on a number of topics, including: "Trends and Opportunities in U.S. Restructurings"; "Financial Restructuring Issues Impacting Trade Creditors"; "Buying & Selling the Troubled Company"; and "Investing in Distressed Securities: An Overview of an Expanding Asset Class". I hold a B.A. in Business Economics, with honors, from the University of California, Santa Barbara and am a member of the Turnaround Management Association and the American Bankruptcy Institute.

### The Debtors' Need for Postpetition Financing

9.     Based on my familiarity with the Debtors' operations and their forecasted cash flow, I understand that the Debtors' proposed debtor-in-possession financing, including the Term Loan DIP Facility and the ABL DIP Facility (together, the "<u>DIP Facilities</u>"), and access to

liquidity thereunder will be critical towards preserving and maximizing the asset value of the Debtors' estates. In particular, the Debtors require immediate access to the DIP Facilities to preserve their assets and maintain operations during the Sale Process to maximize value for their stakeholders.

10. I believe that without immediate access to the DIP Facilities, the Debtors will suffer immediate and irreparable harm and significant impairment to their business operations and as a result, will find it challenging to preserve the value inherent in the Sale Process contemplated by the Debtors and their affiliates at this time. Further, I believe that the Debtors will benefit from the message the funding will provide to their key stakeholders that operations are continuing, and will continue, to be adequately funded throughout these Chapter 11 Cases. The ability of the Debtors to maintain business relationships with their customers, vendors, suppliers, and service providers requires the availability of working capital from the DIP Facilities, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. I therefore believe that approval of the DIP Facilities as described herein and in the DIP Motion is in the best interests of the Debtors' estates. I also believe that these DIP Facilities will provide the Debtors with the financing necessary to preserve the value of the Debtors' estates during the pendency of these Chapter 11 Cases and to successfully pursue a Sale Process that will maximize value for the benefit of the Debtors' estates and their creditors.

**Efforts to Obtain Postpetition Financing**

11. Since April 2019, Houlihan has worked closely with the Debtors, the Debtors' restructuring advisor, AlixPartners, LLP, the Debtors' restructuring co-counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young Conaway Stargatt & Taylor, LLP, and other advisors to evaluate strategic alternatives for the Debtors, including the potential filing of chapter

01:25618698.1

5

11 cases. Ultimately, the Debtors and their advisors concluded that the most viable and value-maximizing alternative for the Debtors and their estates would be through a sale of substantially all of the Debtors' assets in connection with a chapter 11 filing.

12.     I believe that the marketing process used to obtain postpetition financing facilities necessary to fund these chapter 11 cases was appropriate in light of the Debtors' condition, timing concerns, and existing capital structure.  In accordance with the terms of that certain Restructuring Support Agreement, dated July 10, 2019 (as amended, the "RSA"), the Debtors' existing secured lenders, including the Prepetition Term Loan Lenders and the Prepetition ABL Lenders, agreed to provide the Debtors with the debtor-in-possession financing needed to permit the Debtors to implement the restructuring required under the RSA.  Due to the necessity of a bankruptcy filing, the nature of the Debtors' prepetition capital structure, and the agreements set forth in the RSA, the Debtors and their advisors believed that the Debtors' existing secured lenders would be more likely than outside investors to provide financing that would enable the Debtors to pursue a value-maximizing sale and restructuring process unless such financing refinanced a portion of the Prepetition Secured Debt.

13.     Notwithstanding that belief, Houlihan also engaged in preliminary discussions with certain alternative financing sources and/or asset purchasers regarding potential alternative DIP financing on better terms than those available from the Prepetition Secured Lenders. In all, Houlihan contacted eleven (11) potential DIP providers to develop viable alternatives to the existing secured lenders.  Those efforts resulted in the Debtors receiving just one DIP proposal from a third-party.  That party was unwilling to provide financing on a junior basis, and the Debtors' existing lenders were unwilling to consent to the priming of their liens by a new, third-party lender.  Upon learning of the timing of the Debtors' restructuring process and the

unwillingness of certain existing secured creditors to be primed by third parties and potential economic terms, the potential lender declined to further pursue the possibility of providing DIP financing. Houlihan also determined that third-party financing was not likely to be a feasible alternative given confirmation from the Prepetition Secured Lenders that they would not consent to the priming of their prepetition liens and claims.

14. Houlihan then conducted a targeted marketing process seeking proposals to replace the Debtors' Prepetition ABL Facility. We contacted eight (8) additional institutions and received just two (2) proposals as a result of those efforts. After reviewing the proposals, which were subject to certain closing conditions and due diligence requirements, it was determined that pursing an alternative to the Debtors' Prepetition ABL Facility would likely delay the Sale Process, which could have jeopardized negotiations with the Stalking Horse Bidder and therefore the Debtors' ability to maximize value for stakeholders.

15. As a result, Houlihan, together with the Debtors and their other advisors, focused its efforts on obtaining financing from the Prepetition Secured Lenders on the best possible terms and engaged in extensive discussions and multiple rounds of good faith and arm's length negotiations to achieve that objective. Those negotiations ultimately resulted in the proposed DIP Facilities, which are comprised of (a) a $80 million Term Loan DIP Facility secured by (i) consensual, first priority priming liens on the Term Loan Priority Collateral (subject only to certain permitted liens) and (ii) junior priority liens on the ABL Priority Collateral, junior only to the existing liens securing the ABL DIP Facility and the Prepetition ABL Facility, (b) an ABL DIP Facility of up to $200 million with up to (i) $160 million available to the U.S. ABL Borrower, subject to a borrowing base limitation based on the U.S. ABL Borrower's eligible accounts receivable, reserves, and inventory and (ii) $40 million available to the Canadian ABL

Borrower, subject to a borrowing base limitation on the Canadian ABL Borrower's eligible accounts receivable, reserves and inventory and in each case secured by (i) first priority priming liens on the ABL Priority Collateral and (ii) junior priority liens on the Term Loan Priority Collateral, junior only to the liens securing the Term Loan DIP Facility and the Prepetition Term Loan Facility, as well as additional liens described herein, (c) borrowings and disbursements to be made pursuant to the terms of an agreed budget, and (d) a scheduled maturity date for both DIP Facilities of the earlier of the closing of the Sale and six months, with additional, customary termination events.

### The Need for Interim Relief

16. The Debtors seek immediate approval of the DIP Facilities on an interim basis solely to the extent set forth in the Interim Order. Obtaining interim approval on the first day of these bankruptcy cases is necessary to allow the Debtors to communicate to its employees, vendors, regulators and customers, as well as potential bidders for the Debtors' assets, that the Debtors are entering chapter 11 on strong financial footing and will continue operating without interruption.

17. Additionally, interim relief is critical to prevent any value destruction that could diminish the likelihood of receiving bids in connection with the Sale Process. By obtaining authority to access the DIP Facilities at the outset of these cases, the Debtors will be able to maintain the value of their businesses during the course of the Sale Process and fund these bankruptcy cases through the consummation of the sale.

### The Terms of the DIP Facilities Are Reasonable

18. I understand the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders pursuant to the DIP Documents. Specifically, the DIP Documents

provide that all reasonable and documented out-of-pocket fees and expenses of the DIP Lenders shall be paid upon the Closing Date of the DIP Facilities. In addition, the DIP Facilities contemplate that the Debtors will pay certain other fees to the DIP Lenders, including a commitment fee, an unused line fee, a closing fee, a servicing fee, and an administrative agent fee. The fees and interest to be paid are the subject of arm's-length and good faith negotiations between the Debtors and the DIP Lenders and are an integral component of the overall terms of the proposed DIP Facilities, and were required by the DIP Lenders as consideration for the extension of postpetition financing. I also believe these rates and fees are reasonable given the Debtors' circumstances and the absence of an actionable alternative. Based on my experience and under the circumstances of these cases, these fees, costs, and rates are reasonable, customary, and appropriate under the circumstances, particularly in light of the consideration given therefor and the lack of viable options available.

19. I also believe the provisions providing for the "roll-up" of the Prepetition ABL Obligations into the DIP Obligations are a reasonable component of the DIP Facilities. Because the Prepetition ABL Lenders are oversecured, repaying such creditors with postpetition DIP loans should not harm the Debtors' estates and other creditors because the secured claims arising under the Prepetition ABL Facility would otherwise need to be satisfied in full before junior creditors receive any recovery regardless of the roll-up. I further believe the Roll-Up Provisions will not prejudice the Debtors or their estates because they are also subject to the rights of parties-in-interest to assert a challenge.

20. The DIP Facilities also contain certain milestones related to certain filings and approvals related to the DIP Facilities and the Sale Process. I believe these sale-related

01:25618698.1

9

milestones are reasonably feasible under the circumstances and provide the Debtors a reasonable amount of runway to achieve the respective milestones.

21. In sum, it is my opinion that the terms of the DIP Facilities are reasonable under the circumstances and the lack of actionable alternatives. It is also my opinion that the DIP Facilities are the product of good-faith, arm's-length negotiations and will benefit all stakeholders in the Chapter 11 Cases. Absent the immediate availability of the crucial liquidity provided by the DIP Facilities, the Debtors will suffer immediate and irreparable harm and lose the ability to preserve and maximize the value of their assets through the Sale Process.

**Inclusion of Non-Debtor DIP Parties in the DIP Facilities Is in the**

**Best Interests of the Debtors' Estate**

22. Additionally, as explained more fully in the *Declaration of Kent McNeil in Support of Chapter 11 Petitions and First-Day Motions*, the Debtors' Canadian non-Debtor affiliates are leaders in Canada to virtually every segment of the Canadian shelf-stable seafood category. These Non-Debtor DIP Parties have valuable business operations that are likely to enhance the Debtors' global enterprise value in the ongoing Sale Process. It is also my understanding that the Non-Debtor DIP Parties bear their own pro rata portion of the aggregate lending costs under the DIP Facilities and will provide additional liquidity to the Debtors during the pendency of the Chapter 11 Cases by allowing the Debtors to utilize a portion of such affiliates' assets to obtain advances under the ABL DIP Facility. It is therefore my professional opinion that the inclusion of certain Non-Debtor DIP Parties as described in the DIP Motion provides significant benefits to, and is in the best interests of, the Debtors' estates. Furthermore, the inclusion of the Non-Debtor DIP Parties is similar to the Debtors' prepetition secured debt arrangement and was required by the DIP Lenders as a condition to providing the DIP Facilities.

**Conclusion**

23. Based on my experience and observation, the terms of the DIP Facilities are reasonable under the circumstances and generally consistent with market terms for companies facing similar circumstances as the Debtors. Given the circumstances, the proposed forms of adequate protection being granted are fair and reasonable to what I would typically find granted in similar circumstances. In addition, I believe that the proposed milestones set forth in the Term Loan DIP Agreement and in the ABL DIP Agreement are appropriate under the circumstances. Accordingly, based on the foregoing, the DIP Facilities are the best and only actionable financing option available to the Debtors, and the Debtors' entry into the DIP Facilities will benefit the Debtors' estates and their creditors.

24. I therefore believe it is appropriate to approve the DIP Facilities and authorize the use of cash collateral as contemplated in the DIP Motion.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November __21__, 2019

By: __/s/_____
Name: Eric Winthrop
Title: Managing Director
Houlihan Lokey Capital, Inc.

[*Execution Page – Winthrop Declaration*]