# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(a), 363(b), 503(b), 1107(a), AND 1108 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) FOREIGN VENDORS; (B) DOMESTIC CRITICAL VENDORS; AND (C) LIENHOLDERS; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; AND (III) GRANTING CERTAIN RELATED RELIEF**

The above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for the entry of interim and final orders, substantially in the form attached hereto as Exhibit A (the "Interim Order") and Exhibit B (the "Final Order," and together with the Interim Order, the "Proposed Orders"), respectively, pursuant to sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay, in the ordinary course of business:  (a) certain prepetition claims of shippers, warehousemen, and other lien claimants (collectively, the "Lienholders," whose claims shall be identified herein collectively as the "Lien Claims"); (b) prepetition claims of certain critical vendors and service providers (collectively, the "Domestic Critical Vendors," whose claims shall be identified herein as the "Domestic Critical Vendor Claims"); and (c) prepetition claims of foreign vendors and service providers located outside the United States

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

(collectively, the "Foreign Vendors," whose claims shall be identified herein as the "Foreign Vendor Claims") and (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kent McNeil in Support of Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

01:25599290.3

## BACKGROUND

**A.      General Background**

3.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

4.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

**B.      Foreign Vendors**

5.      The Debtors operate one of North America's largest branded shelf-stable seafood companies, offering a full line of canned and pouched tuna, salmon, sardines, chicken, and specialty seafood products marketed in the United States under various brands.  While the Debtors rely on suppliers in the United States to obtain certain goods and services, the Debtors obtain the overwhelming majority of goods and services used in the operation of their business from the Foreign Vendors, which are primarily located in the Asia Pacific region.  Specifically, the Debtors obtain nearly all of their albacore tuna, as well as a significant amount of their "light meat" tuna, including skipjack, yellowfin, and bigeye, from FCF Co., Ltd. ("FCF"), who is discussed in more detail below.  The Debtors obtain smaller volumes of fresh and frozen tuna as well as oysters, sardines, and other raw and finished food products from other Foreign Vendors. In addition, the Debtors rely exclusively on the Foreign Vendors to provide processing services,

01:25599290.3

such as cleaning, de-boning, and loining fish and other raw seafood purchased by the Debtors. The Foreign Vendors also provide preparation and packaging services, canning supplies, and equipment essential to the Debtors' business operations.  Each of the Foreign Vendors plays a critical role in the Debtors' manufacturing process and could not be easily replaced.

6.      To the best of the Debtors' knowledge, the Foreign Vendors may lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of the Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the automatic stay.  Based on the knowledge of the Debtors' personnel regarding the Foreign Vendors, the Debtors believe there is a material risk that the Foreign Vendors holding the Foreign Vendor Claims against the Debtors may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay, and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.  Notably, Foreign Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

7.      Foreign Vendors may also sue the Debtors in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to withhold vital supplies and services from the Debtors.  Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation or, most importantly, the ability to replace these Foreign Vendors (absent payment of amounts sought),

their business could be irreparably harmed by any such action to the detriment of their estates and creditors.

8.    Given the importance the Foreign Vendors play in the Debtors' manufacturing process, even a temporary disruption in the Debtors' supply chain would have a devastating effect on the operation of the Debtors' business.  Indeed, the vast majority of Foreign Vendors also satisfy the criteria for consideration as a Critical Vendor set forth in paragraph 17, including, as described in more detail below, FCF.  Accordingly, the Debtors need the ability to pay the Foreign Vendor Claims on an uninterrupted basis.  The Debtors estimate that, as of the Petition Date, the aggregate amount of the Foreign Vendor Claims is approximately $58.4 million, $28.6 million of which will be due within the first thirty (30) days of the Chapter 11 Cases.  The Debtors believe that approximately $14 million of this amount is entitled to priority under section 503(b)(9) of the Bankruptcy Code.

    *i.*        ***The Debtors' relationship with FCF***

9.    FCF, a Taiwanese company, supplies the Debtors with nearly all of their albacore tuna and a substantial majority of their "light meat" tuna, including skipjack, yellowfin, and bigeye, pursuant to a prepetition supply agreement (as amended, the "<u>FCF Supply Contract</u>"). One of the world's largest seafood suppliers, FCF acts as a broker for fishing vessels and contracts directly with over 500 independent tuna fishing vessels located in oceans around the world.  As a practical matter, FCF is the only vendor from which the Debtors are able to obtain in the near term the large quantity of tuna necessary to supply their customers with shelf-stable seafood products in the ordinary course of business.

10.    FCF indirectly holds a passive, minority equity interest in the Debtors. Through its affiliates, FCF owns an approximately 23% limited partnership interest in Big Catch

1 L.P., a limited partnership that is three layers removed from the Debtors' direct parent company, Clover Leaf Seafood S.à.r.l.[3]   FCF does not have any designees on the Special Restructuring Committee ("SRC") or boards of directors of any of the Debtors, the CCAA Debtors, their direct or indirect parent entities, or any other entity in the Bumble Bee corporate family.   FCF and the Debtors have transacted business for many years, and continue to do so, on a strictly arms'-length basis.

11.   As set forth more fully in the First Day Declaration, FCF, through its affiliates,[4] offered to acquire substantially all of the Debtors' and their affiliates' assets at a total implied enterprise value of approximately $925 million (which was subsequently increased to $925.6 million), which may be increased by up to an additional $5 million in certain instances based on increases in the amount of aggregate funded indebtedness of the Debtors and their affiliates, including $275 million of cash, roughly $633.6 million of new senior secured financing (which will take the form of rolled-over term loan indebtedness), and the assumption of the $17 million outstanding DOJ Fine.   The SRC determined that FCF's proposal represented the highest and best offer received as a result of the sale process, and directed the Debtors to proceed with negotiating definitive terms with FCF.   After extensive, arms'-length negotiations, the Debtors and their affiliates executed a stalking horse asset purchase agreement (the "Stalking Horse APA") with FCF, and commenced the Chapter 11 Cases to continue marketing the Company's assets to pursue a value-maximizing, going concern sale.   The Stalking Horse APA provides for:

---

[3]   Besford Ltd. and FCF International Limited—affiliates of FCF—together own 100% of the interests in Lion LLP/Big Catch Co-Investors 1 L.P., which holds a roughly 23% interest in Big Catch Cayman L.P., which, together with Bumble Bee GP S.à.r.l. owns Bumble Bee Holdco S.C.A., which in turn wholly owns Bumble Bee Foods S.à.r.l., which wholly owns Clover Leaf Sea Seafood S.à.r.l., the direct parent company of Debtor Bumble Bee Parent, Inc.

[4]   Tonos US LLC, Tonos 1 Operating Corp, and Melissi 4 Inc. (collectively, the "Stalking Horse Bidder") are wholly owned affiliates of FCF.   FCF has guaranteed all of the Stalking Horse Bidder's performance and payment obligations under the Stalking Horse APA.

(i) the assumption of the FCF Supply Contract, (ii) payment by the Debtors during the Chapter 11 Cases or as a cure amount in an amount approximating the outstanding pre-petition amount due under the FCF Supply Contract, and (iii) the Stalking Horse Bidder to assume responsibility for the remaining amounts owing under the FCF Supply Contract that are outstanding at closing.

12.     FCF is, by far, the most critical among the Debtors' vendors.  Albacore tuna products are the Debtors' leading product segment, representing $279 million (or 38%) of the Debtors' annual sales in the United States and $62 million (or 44%) of the Debtors' annual gross profit.  Since 2010, FCF has met between 95% to 100% of the Debtors' albacore demand and 70% to 100% of their light meat tuna demand.  This is not surprising because FCF is responsible for a large percentage of the longline-caught tuna in markets available to the Debtors, and the Debtors' specifications require them to use only longline-caught tuna in their products. The remaining available longline-caught tuna is dispersed among one other larger participant and multiple smaller brokers and fisheries.  The Debtors estimate that replacing FCF would take no less than six months and as long as one year.  To do so would also be capital and resource intensive and might even require the Debtors to take on the "middle-man" role that FCF currently serves by directly sourcing fish from boats in various foreign locations.  Of course, FCF is significantly advantaged in those markets because it operates in the native languages—a capability the Debtors do not currently have—and has pre-existing relationships with fishing vessels in these locations.

13.     There are three important financial elements underlying the Debtors' request to provide FCF critical vendor status beyond the outright critical nature of the products that FCF supplies.  *First*, the Debtors are conditioning critical vendor status on FCF continuing to provide the 90-day payment terms that it afforded to the Debtors prior to the Chapter 11 Cases

and to continue to adhere to pricing terms favorable to the Debtors.  *Second*, the Debtors' DIP Financing incorporates as a key assumption that such additional payment terms will be provided by FCF.  *Third*, and related to the prior two points, FCF will be paid its pre-petition claim, which is approximately $51 million, in accordance with the agreed-upon 90-day payment terms, rather than as a lump-sum or on an otherwise accelerated schedule.  Assuming that the relief requested herein is granted, the Stalking Horse Bidder has agreed to assume under the Stalking Horse APA the balance of the post-petition deliveries from FCF that are unpaid as of Closing.  In sum, the Debtors believe that there will be substantial financial benefits to the estates from maintaining the 90-day payment terms with FCF during the course of the Chapter 11 Cases; indeed, the Debtors' DIP financing budget is premised on the maintenance of such payment terms and the Stalking Horse Agreement contemplates the assumptions of post-petition liabilities for goods delivered that remain due and payable consistent with the ordinary course terms of the parties as of the Closing.

14.    The Debtors identified FCF as their most important vendor in the very early stages of planning for the Chapter 11 Cases and well before FCF emerged as a serious bidder.  In obtaining important accommodations from FCF prior to the Chapter 11 Cases, the Debtors communicated to FCF that it would be considered for foreign or critical vendor treatment and that the Debtors would seek a first day order to continue to satisfy FCF's claims—arising both pre- and post-petition—in accordance with the parties' prevailing business practices.  The Debtors believe FCF's comfort that it would be paid as a foreign or critical vendor during the Chapter 11 Cases was a significant factor contributing to FCF's decision to provide the Debtors with 90-day payment terms as the Debtors underwent their financial restructuring, and this additional liquidity allowed the Debtors to conduct a robust marketing process, among other

things.  For these reasons, the Debtors believe that it is essential to maintain the ordinary course payment terms between the Debtors and FCF, including payment for goods received prepetition and to continue to purchase goods postpetition, all on the agreed to 90-day payment terms, in the Chapter 11 Cases.

15.     Moreover, even without critical vendor status, FCF would be entitled to payment in full of its claims in the Chapter 11 Cases in any realistic scenario.  As stated above, the FCF Supply Contract is critical to the Debtors' business and will likely need to be assumed by any acquirer of the Debtors' assets.  Assumption, of course, would require that all outstanding amounts due under the FCF Supply Contract, including those arising prepetition, would need to be paid to cure the defaults under the FCF Supply Contract.  Therefore, affording FCF critical vendor status will merely alter the timing of FCF's statutory entitlement to payment in full of its prepetition claim under the FCF Supply Contract.  The Debtors submit that the unique circumstances described above are more than sufficient to justify granting FCF critical vendor status at this time.

## C.     Domestic Critical Vendor Claims

16.     In the ordinary course of business, the Debtors engage the Domestic Critical Vendors to provide various goods and services essential to the production and distribution of their products.  Among other things, the Domestic Critical Vendors: (i) supply fish, clams, meat, and other food product used to prepare the Debtors' products; (ii) provide packaging services; and (iii) supply cans, lids, and other goods necessary to package the Debtors' products. The Debtors' business depends on, among other things, the Debtors' ability to retain their Domestic Critical Vendors and maintain their reputation and customer loyalty.  The Debtors need to be able to assure their customers, vendors, services providers, and employees that,

01:25599290.3

notwithstanding the filing of the Chapter 11 Cases, they will continue to operate at the highest level.

17.     To identify the Domestic Critical Vendors, the Debtors have reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria: (i) whether there is an alternative source for the goods or services that can be acquired within a reasonable amount of time; (ii) whether there is a unique process or special knowledge of the Debtors that the vendor has possessed over time that no one else has; (iii) whether the vendor's products have been pre-approved for use in the Debtors' end product by the Debtors' customers; and (iv) whether a vendor meeting any of the foregoing criteria is able or likely to refuse to provide goods or services to the Debtors postpetition if its prepetition balances are not paid.

18.     In many instances, the Domestic Critical Vendors provide services or goods unique to the Debtors that could not be easily or quickly obtained from another vendor or are sole-source providers.  In addition, although certain services or goods provided by the Domestic Critical Vendors could be obtained elsewhere, the Debtors do not believe that alternative providers could be found within a reasonable amount of time or would be acceptable to their customers.  Accordingly, it is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, the Domestic Critical Vendors given the critical role that they play in the Debtors' business.  To prevent the commencement of the Chapter 11 Cases from causing an unexpected or inopportune interruption to their business operations, the Debtors are seeking to pay Domestic Critical Vendor Claims to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the Domestic Critical Vendors.

19.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Domestic Critical Vendor Claims is approximately $4.4 million, $4.3 million of which will be due within the first thirty (30) days of the Chapter 11 Cases.  Of this amount, the Debtors believe that approximately $3.3 million is entitled to priority under section 503(b)(9) of the Bankruptcy Code.

**D.     Lien Claims**

20.     <u>The Shippers and Warehousemen</u>.  In the ordinary course of business, the Debtors necessarily depend on an extensive shipping, warehousing and distribution network to move goods to their factories and finished product to their customers.  The Debtors accordingly engage the use of reputable common carriers, dedicated carriers, freight-forwarders, ocean carriers, parcel carriers, consolidators, brokers and customs agents (collectively, the "<u>Shippers</u>").  The Debtors also support their distribution capabilities by contracting with certain third-party warehousemen, distributors and logistics providers who store goods in transit on behalf of the Debtors (the "<u>Warehousemen</u>").

21.     If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation and storage of the Debtors' property, various statutes, tariffs, and agreements may permit the Shippers or Warehousemen, as applicable, to assert possessory liens against or otherwise exercise control over the Debtors' property in their possession.  In addition, shipments may be stopped in transit or not released if customs duties are not paid by the Debtors or their customs agents when due in the ordinary course.  The successful operation of the Debtors' business, and thus their ability to maximize the value of their assets, depends on their ability to process such goods.

22.    <u>Other Potential Lienholders</u>.  In addition to the Vendor Claims of Shippers and Warehousemen, the Debtors also from time to time transact business with a number of other third parties (collectively, the "<u>Lien Claimants</u>") who, under applicable non-bankruptcy law, may have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date.  Such Lien Claimants may have provided equipment and/or performed various services for the Debtors, including (i) providing equipment and parts necessary for the operation of the Debtors' factories and (ii) rendering essential services related to the operation of the Debtors' facilities, such as machine repair and maintenance.

23.    As of the Petition Date, certain Lien Claimants may not have been paid in full for certain prepetition goods, equipment and services, which may result in such Lien Claimants asserting, and perfecting, statutory liens against the Debtors' facilities or the Debtors' goods or equipment, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).[5]  Furthermore, certain Lien Claimants may refuse to perform ongoing services to the Debtors, including manufacturing, installation, repair and servicing obligations, unless their claims are paid in full.

24.    If the Debtors are unable to pay the Lien Claims, they risk losing access to critical property, which could immediately and irreparably harm the Debtors to the detriment of

---

[5]   The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

all stakeholders.    Accordingly, the Debtors seek authority, in their discretion, to pay and

discharge, on a case-by-case basis, the Lien Claims that the Debtors believe have created, or could

give rise to, a lien against the Debtors' property, regardless of whether the related Lienholders

have already perfected their interests, where the Debtors determine, in their reasonable business

judgment, that such payment is in the best interests of the Debtors' estates.

      25.    The Debtors estimate that, as of the Petition Date, the aggregate amount of

the Lien Claims is approximately $3.6 million, all of which will be due within the first thirty (30)

days of the Chapter 11 Cases.

## **RELIEF REQUESTED**

      26.    By this Motion, the Debtors request the Court enter the Proposed Orders,

(i) authorizing, but not directing, the Debtors, in their discretion, to pay Lien Claims, Domestic

Critical Vendor Claims, and Foreign Vendor Claims (each, a "Vendor Claim," and collectively,

the "Vendor Claims") held by the Lien Claimants, Domestic Critical Vendors, or Foreign

Vendors (each a "Vendor" and collectively, the "Vendors") subject to the caps provided for in the

Interim Order and the Final Order, as summarized immediately below, and (ii) authorizing the

Banks to honor and process check and electronic transfer requests related thereto.

|  | Proposed Interim Order Cap | Proposed Final Order Cap |
|---|---|---|
| **Lien Claims** | $3.6 million | $3.6 million |
| **Domestic Critical Vendor Claims** | $4.3 million | $4.4 million |
| **Foreign Vendor Claims** | $28.6 million | $58.4 million |

      27.    The Debtors further request that they be authorized, but not required, in

their discretion, to condition the payment of a Vendor Claim on the agreement of the Vendor to

continue supplying goods and services to the Debtors on terms that are as or more favorable to the

Debtors as the most favorable trade terms, practices, and programs in effect between the Vendor

and the Debtors in the six (6) months prior to the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Vendor.

28.     To the extent that the Debtors determine, in their business judgment, to condition the payment of a Vendor Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, the Debtors propose that a letter (a "Vendor Letter") be sent to the Vendor, along with a copy of any order granting this Motion (the "Vendor Order"), including, without limitation, the following terms:

a.     The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of the Vendor Order and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

b.     The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions set forth in the Vendor Order;

c.     The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

d.     The Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

e.     The Vendor's acknowledgment that it has reviewed the terms and provisions of the Vendor Order and consents to be bound thereby;

f.     The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

01:25599290.3

g.      If a Vendor which has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for any further order of the Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor, such Vendor shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding to such Vendor, without the right of setoff, recoupment or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in the Chapter 11 Cases and subject to the terms of any bar date order entered in the Chapter 11 Cases.

29.      Any such Vendor Letter, once agreed to by the Debtors and a Vendor, shall be the agreement between the parties that governs their postpetition trade relationship (the "Trade Agreement").  The Debtors request that they be authorized, but not required, in their discretion, to enter into Trade Agreements with the Vendors.

## BASIS FOR RELIEF

**A.      The Court Should Authorize, But Not Direct, the
Debtors, in Their Discretion, to Pay Vendor Claims**

**I.      The Vendors Are Essential to Avoiding Any Unexpected or Inopportune
Interruption to the Debtors' Business Operations**

30.      The Debtors believe that the goods and services provided by the Vendors are necessary to ensure that there are not any unexpected or inopportune interruptions to the Debtors' operations, because the Vendors are the most cost-efficient and, in many cases, the only source from which the Debtors can procure critical goods and services within a timeframe that would permit the Debtors to avoid unanticipated interruptions, delays or shutdowns in their operations.  Any failure to pay the Vendor Claims would, in the Debtors' business judgment, result in the Vendors refusing to provide necessary goods and services to the Debtors.  Any unexpected or inopportune interruption, delay or shutdown in the Debtors' operations resulting from a refusal by the Vendors to do business with the Debtors on a postpetition basis would have

01:25599290.3

disastrous effects on the Debtors' business and undermine the Debtors' ability to preserve and maximize the value of their estates.

31.     As noted above, the Lienholders may assert and perfect possessory, construction, materialman's, mechanic's or other similar statutory liens on the Debtors' assets, thereby jeopardizing the Debtors' ability to prosecute the Chapter 11 Cases in a timely and efficient manner.

32.     With respect to the Domestic Critical Vendor Claims and Foreign Vendor Claims, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors which are essential to avoid any unexpected or inopportune interruptions to their operations.    The Debtors have further developed certain procedures that, if and when implemented, in their discretion and business judgment, will ensure that the Foreign Vendors or Domestic Critical Vendors receiving payment of their Vendor Claims will continue to provide goods and services to the Debtors based upon the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendors.

33.     As noted above, the Debtors believe that the Foreign Vendors could take drastic action if their Foreign Vendor Claims are not paid.  Indeed, non-U.S. entities occasionally assert that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although the Debtors would vigorously dispute any such contention, the Foreign Vendors could stop providing services to the Debtors on a timely basis, and foreign governmental and other entities may take action to seize assets of the Debtors or exercise control over property of the Debtors, on the basis of such assertions.  Irrespective of the accuracy of any Foreign Vendor's belief that the automatic stay does not apply to these actions, the consequences of such actions would be severe

and irreparable.  Simply put, absent the goods and services of the Foreign Vendors, the operations of the Debtors would be thrown into disarray.  Therefore, even if the Foreign Vendors' legal arguments are completely without merit, it is unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Foreign Vendors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to the Debtors' businesses—particularly because injunctive relief may not be available in all jurisdictions.  Even if they could obtain such orders, such orders would likely come at a great cost to the Debtors.  Indeed, the impact on the Debtors' business if the Debtors had to take action against the Foreign Vendors would be disproportionate to the amount of the Foreign Vendor Claims paid to the Foreign Vendors.

34.    With respect to FCF, in particular, the Debtors have extensively negotiated with FCF to continue to provide goods to the Debtors post-petition, provided that adequate liquidity is available to avoid increasing FCF's exposure to non-payment, and FCF has agreed to continue supplying the Debtors, without interruption or disruption, in accordance with their historical 90-day terms if its prepetition claims are paid.  While FCF has historically been very supportive of the Debtors, the Debtors cannot be assured that FCF will further increase its credit exposure to the Debtors during the Chapter 11 Cases and may seek to reduce that exposure due to the commencement of the Chapter 11 Cases or take steps to mitigate any further increases.  If the Debtors were not permitted to continue to honor their obligations to FCF on their existing terms, the Debtors are at risk that their supply from FCF may be interrupted, which would result in significant disruption and harm to the Debtors' business—particularly since FCF is the Debtors' primary (if not exclusive) source of longline-caught albacore and light meat tuna.

01:25599290.3

35.    In the exercise of the Debtors' business judgment, the Debtors have determined that continuing payment of FCF in the ordinary course is the appropriate measure to take to protect the Debtors from the potentially adverse consequences that could result from their failure to pay FCF.  Importantly, the Debtors are not proposing to immediately bring FCF current through a $51 million payment; instead, they simply plan to continue paying down their 90-day-old invoices, of which approximately $10.2 million is entitled to protection under section 503(b)(9) of the Bankruptcy Code.  Lastly, in recognition of the critical importance of FCF to the Debtors' business, the Debtors' secured lenders support the relief requested herein and have budgeted for adequate liquidity to continue to pay amounts due under the FCF Supply Contract.

36.    The Debtors believe that authority to pay Vendor Claims is vital to their efforts to preserve and maximize the value of their estates.  If the Proposed Orders are not entered, the Debtors believe that many of the Vendors will refuse to do business with the Debtors and some may have to cease their own operations.  Such a result would be damaging to the Debtors' efforts to successfully prosecute the Chapter 11 Cases, to the detriment of the Debtors' estates and creditors.  Moreover, the continued availability of trade credit in amounts and on terms consistent with the Debtors' prepetition trade terms is critical to the assumptions used to build the Debtors' debtor-in-possession financing budget.  The retention or reinstatement of the Customary Trade Terms will enable the Debtors to maximize the value of their business.  Conversely, a deterioration in postpetition trade credit available to the Debtors, together with a disruption in the Debtors' receipt of necessary goods and services, would, among other things, increase the amount of liquidity needed by the Debtors postpetition, and impede the Debtors' chapter 11 efforts.

37.     For the foregoing reasons, the Debtors respectfully submit that entry of the Proposed Orders is in the best interests of the Debtors, their estates, and creditors.

**II.      The Relief Requested Herein is Supported by the "Doctrine of Necessity"**

38.     Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business. property of the estate[.]"  11 U.S.C. § 363(b)(1).

39.     Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Bankruptcy courts have invoked the equitable power of section 105 of the Bankruptcy Code to authorize the postpetition payment of prepetition claims where such payment is necessary to preserve the value of a debtor's estate.  *See, e.g.*, *Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M. D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks.").  Courts have likewise acknowledged that "[u]nder [section] 105, the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."  *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989)); *see In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (citing *In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972)) (holding that the court is authorized under section 105(a) of the Bankruptcy Code to allow immediate payment of prepetition claims of vendors found to be critical to the debtor's continued operation).

40.     In a long line of well-established cases, federal courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance

the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport, C. & S. W. Ry. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim permitted to prevent "stoppage of [crucial] business relations"); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to [the commencement of the bankruptcy case] is essential to the continued operation of the . . . [business] during [the bankruptcy case], payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases).

41.     This legal principle—known as the "doctrine of necessity"—functions in chapter 11 cases as a mechanism by which a bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See Just for Feet*, 242 B.R. at 826 (finding that "to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's [continued operation]."); *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim is essential to the continued operation of [the debtor], payment may be authorized"); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation). The doctrine is frequently invoked early in a bankruptcy case, particularly in connection with those Bankruptcy Code sections that relate to payment of prepetition claims. In one case, the court indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary

'to permit the greatest likelihood of . . . payment of creditors in full or at least proportionately.'"

*In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S. D. Ohio 1988).

42.     As explained above, the goods and services provided by the Vendors are essential to ensure that there is not an unexpected or inopportune interruption to the operation of the Debtors' business.  While the amount of the Vendor Claims is significant, the relief requested herein is critical to the operation of the Debtors' business as the Debtors cannot operate without the cooperation and continued supply of goods and services by the Vendors.  Simply put, the Debtors do not believe there are cost-effective or readily accessible alternatives to the Vendors, particularly with respect to FCF and the Debtors' other significant seafood providers.

43.     Accordingly, the Debtors submit that the Court should exercise its equitable power to grant the relief requested herein.

## III.    The Court Should Authorize Payment of Vendor Claims as a Valid Exercise of the Debtors' Fiduciary Duties

44.     Authority for satisfying Vendor Claims also may be found in sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors, operating their business as a debtor in possession under sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

45.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *Id.*  The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate," *id.*, and also when the payment was to "sole suppliers of a given product." *Id.* at 498.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

46.    Payment of Vendor Claims meets each element of the *CoServ* court's standard.  As described above, the Debtors believe that the Vendor Claims encompass the claims of those vendors that are able to assert and perfect liens against the Debtors' property, are entitled to administrative priority claims that must be satisfied in full prior to any payments to pre-petition unsecured creditors (priority or general unsecured), or would otherwise refuse, or would be unwilling to, provide goods and services to the Debtors on a postpetition basis if their prepetition balances are not paid, thereby creating the significant risk that the Debtors will experience an unexpected or inopportune interruption to their operations.  Any such interruption would diminish estate value and frustrate the Debtors' chapter 11 efforts.  The  harm and economic disadvantage that would stem from the failure of any of the Vendors to perform is disproportionate to the amount of the Vendor Claims.

47.    Finally, the Debtors have examined other options short of payment of Vendor Claims and have determined that, to avoid an unexpected or inopportune interruption to their business operations, there exists no practical alternative to their payment of Vendor Claims. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of Vendor Claims.

IV.     **Payment of Certain Vendor Claims Now Will Not Adversely Affect Creditor Recoveries in the Chapter 11 Cases**

48.     Where the amounts owed to the Lienholders are less than the value of the goods that could be held to secure the related Lien Claims, such parties are arguably fully-secured creditors of the Debtors' estates.  Also, the Debtors believe that a substantial portion of Domestic Critical Vendor Claims and Foreign Vendor Claims may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code given that the Debtors received much of the goods provided by the Critical or Foreign Vendor, in the ordinary course of business, within the twenty-day period immediately prior to the Petition Date.  Because such claims are entitled to priority status under section 503(b)(9) of the Bankruptcy Code, they must be paid, in full, prior to payment of any other unsecured prepetition (priority or general unsecured) creditor.  Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants outside of a chapter 11 plan if the debtor has the ability to pay and there is a need to pay.  Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims if they choose to do so, or the Court from exercising its discretion to authorize the postpetition payment of such obligations, immediately.  Since the enactment of section 503(b)(9) of the Bankruptcy Code, courts in this jurisdiction have exercised their discretion and have routinely authorized the payment of prepetition claims under section 503(b)(9) of the Bankruptcy Code at the outset of a chapter 11 case.  *See, e.g.*, *In re RM Holdco*, Case No. 18-11795 (MFW).  Indeed, in granting a request for similar relief, at least one judge in this District asked an objecting United States Trustee, "[a]rguably, would you agree that the debtor would be able to pay the 503(b)(9) claims without Court approval?"  Tr. of Hr'g Held on Oct. 31, 2006, at 24:14-16, *In re Dura Auto.*, Case

No. 06-11202 (KJC) (approving payment of claims under section 503(b)(9) of the Bankruptcy Code as part of "first day" relief).

49.     Finally, as discussed above, the Debtors expect that any purchaser of the Debtors' assets will likely seek to assume the FCF Supply Agreement, requiring the amount owed to FCF to be paid as a "cure cost" under section 365 of the Bankruptcy Code.

50.     As explained above, it is critical to the Debtors' chapter 11 efforts that they continue to receive goods and services, as applicable, from the Vendors on an uninterrupted basis throughout the chapter 11 process. The Debtors believe that without the relief requested herein, many of the Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors and their estates.

51.     As a result, the Debtors respectfully submit that they should have the authority (but not the direction) to pay such claims, in the ordinary course of business, during the pendency of the Chapter 11 Cases, to the extent necessary to preserve and maximize the value of their estates.

**B.      The Court Should Authorize the Banks to Honor and Process
the Debtors' Payments on Account of Vendor Claims**

52.     The Debtors also request the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

01:25599290.3

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

53.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."   The failure of any Vendor to deliver necessary goods and services to the Debtors would have immediate and detrimental consequences to the Debtors' business and would jeopardize the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders.   Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Vendors is critical to avoid any unexpected or inopportune interruption to their operations and increases the likelihood of successfully prosecuting the Chapter 11 Cases.   Thus, if the relief requested herein is not granted, the Debtors' failure to satisfy Vendor Claims would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

54.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

55.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Fed. R. Bankr. P. 6004(h).   As set forth throughout this Motion, any delay in paying Vendor Claims would be detrimental to the Debtors, their creditors, and estates, as the Debtors' ability to manage and run their business operations without any unexpected or inopportune interruption requires, in part, that they continue to receive

the goods and services provided by the Vendors.  For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

56.    To implement the foregoing immediately, the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are applicable to the Proposed Orders.

## **RESERVATION OF RIGHTS**

57.    Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (iii) shall be construed as a promise to pay a claim.

## **NOTICE**

58.    Notice of this Motion has been or will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the ABL Agent and ABL DIP Agent; (d) counsel to the Term Loan Agent and Term Loan DIP Agent; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Offices of the United States Attorney for each of the District of Delaware and the Northern District of California; and (h) the Banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

01:25599290.3

## **CONCLUSION**

WHEREFORE, the Debtors respectfully entry of the Proposed Orders, granting the

relief requested herein and such other and further relief as is just and proper.

Dated:  November 21, 2019             YOUNG CONAWAY STARGATT & TAYLOR, LLP
        Wilmington, Delaware

                                      */s/ Ryan M. Bartley*
                                      Pauline K. Morgan (No. 3650)
                                      Ryan M. Bartley (No. 4985)
                                      Ashley E. Jacobs (No. 5635)
                                      Elizabeth S. Justison (No. 5911)
                                      Jared W. Kochenash (No. 6557)
                                      Rodney Square
                                      1000 North King Street
                                      Wilmington, Delaware 19801
                                      Telephone:  (302) 571-6600
                                      Facsimile:  (302) 571-1253

                                      -and-

                                      PAUL, WEISS, RIFKIND, WHARTON &
                                      GARRISON LLP
                                      Alan W. Kornberg
                                      Kelley A. Cornish
                                      Claudia R. Tobler
                                      Christopher Hopkins
                                      Rich Ramirez
                                      1285 Avenue of the Americas
                                      New York, New York 10019
                                      Telephone: (212) 373-3000
                                      Facsimile: (212) 757-3990

                                      *Proposed Co-Counsel to the Debtors and*
                                      *Debtors in Possession*

01:25599290.3

27

## **EXHIBIT A**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER, PURSUANT TO SECTIONS 105(a), 363(b), 503(b), 1107(a), AND 1108 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) FOREIGN VENDORS; (B) DOMESTIC CRITICAL VENDORS; AND (C) LIENHOLDERS; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; AND (III) GRANTING CERTAIN RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of interim and final orders, pursuant to sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors, in their discretion, to pay, in the ordinary course of business, (a) Foreign Vendor Claims, (b) Domestic Critical Vendor Claims, and (c) Lien Claims, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of the Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and upon consideration of the First Day Declaration; and upon the record in the Chapter 11 Cases and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Foreign Vendor Claims in the ordinary course of their business up to an aggregate amount of $28.6 million.

3.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Domestic Critical Vendor Claims in the ordinary course of their business up to an aggregate amount of $4.3 million.

4.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Lien Claims in the ordinary course of their business up to an aggregate amount of $3.6 million.

5.      Nothing in this Interim Order shall prejudice the Debtors' right to request authority to pay additional amounts on account of Foreign Vendor Claims, Domestic Critical Vendor Claims, or Lien Claims and the Debtors' right to seek such relief is expressly reserved.

01:25599290.3

6.    The Debtors are authorized, but not directed, in their discretion, to condition the payment of a Vendor Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendor.

7.    The Debtors are authorized, but not directed, in their discretion, to enter into Trade Agreements with the Vendors, including, without limitation, on the following terms:

a.    The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of this Interim Order and shall not be deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

b.    The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions set forth in this Interim Order;

c.    The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

d.    The Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

e.    The Vendor's acknowledgment that it has reviewed the terms and provisions of this Interim Order and consents to be bound thereby;

f.    The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

g.    If a Vendor which has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for

any further order of this Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor, such Vendor shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding to such Vendor, without the right of setoff, recoupment or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in the Chapter 11 Cases and subject to the terms of any bar date order entered in the Chapter 11 Cases.

8.    Notwithstanding anything to the contrary herein, the Debtors shall not make any payments to FCF under this Interim Order unless FCF enters into a Trade Agreement providing at least ninety-day payment terms to the Debtors.  Further, the Debtors shall not make payments to FCF in excess of $24.8 million in the aggregate under this Interim Order.

9.    The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

10.    The Debtors shall maintain a matrix identifying (i) the name of each Domestic Critical Vendor, Foreign Vendor or Lienholder paid on account of its Domestic Critical Vendor Claim, Foreign Vendor Claim or Lien Claim, and (ii) the amount paid by each Debtor to each Domestic Critical Vendor, Foreign Vendor or Lienholder on account of its Domestic Critical Vendor Claim, Foreign Vendor Claim or Lien Claim.  This matrix shall be provided on a weekly basis, one week in arrears, to counsel for the Term Loan Agent and the professionals retained by

any statutory committee appointed in the Chapter 11 Cases, if any; *provided, however*, that the matrix shall be considered confidential.

11.    A final hearing on the relief sought in the Motion shall be conducted on _____, 2019 at _____ (ET) (the "Final Hearing").  Any party-in-interest objecting to the relief sought at the Final Hearing or the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed counsel for the Debtors, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alan W. Kornberg, Esq., Kelley A. Cornish, Esq., and Claudia R. Tobler, Esq.), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (Attn: Pauline K. Morgan, Esq., Ryan M. Bartley, Esq., and Ashley E. Jacobs, Esq.); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801 (Attn: David L. Buchbinder, Esq.); (iii) counsel to the ABL Agent and ABL DIP Agent, (a) Paul Hastings LLP, 515 S. Flower St., 25th Floor, Los Angeles, California 90071 (Attn: Peter S. Burke, Esq.) and Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: Andrew V. Tenzer, Esq. and Michael E. Comerford, Esq.), and (b) Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Matthew P. Ward, Esq. and Morgan L. Patterson, Esq.); (iv) counsel to the Term Loan Agent and Term Loan DIP Agent, (a) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Matthew S. Barr, Esq. and David N. Griffiths, Esq.), and (b) Richards, Layton & Finger PA, 920 N. King Street, Wilmington, Delaware 19801 (Attn: Paul N. Heath, Esq. and Zachary I. Shapiro, Esq.); and (v) counsel to any statutory committee appointed in the Chapter 11 Cases, in each case so as to be received no later than

_____, 2019 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

12.    Nothing in this Interim Order (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (b) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (c) shall be construed as a promise to pay a claim.

13.    The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

14.    The requirements of Bankruptcy Rule 6003(b) are satisfied.

15.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be effective and enforceable immediately upon its entry.

16.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

Dated:  November _____, 2019
          Wilmington, Delaware

_____
United States Bankruptcy Judge

01:25599290.3

## **EXHIBIT B**

**Final Order**

01:25599290.3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (____) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. ___ & ___** |

### FINAL ORDER, PURSUANT TO SECTIONS 105(a), 363(b), 503(b), 1107(a), AND 1108 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) FOREIGN VENDORS; (B) DOMESTIC CRITICAL VENDORS; AND (C) LIENHOLDERS; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; AND (III) GRANTING CERTAIN RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of interim and final orders, pursuant to sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors, in their discretion, to pay, in the ordinary course of business, (a) Foreign Vendor Claims, (b) Domestic Critical Vendor Claims, and (c) Lien Claims, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of the Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and upon consideration of the First Day Declaration; and upon the record in the Chapter 11 Cases and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having entered that certain *Interim Order, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Foreign Vendors, (B) Domestic Critical Vendors, and (C) Lienholders, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto and (II) Granting Certain Related Relief* [D.I. __]; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Foreign Vendor Claims in the ordinary course of their business up to an aggregate amount of $58.4 million.

3.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Domestic Critical Vendor Claims in the ordinary course of their business up to an aggregate amount of $4.4 million.

01:25599290.3

2

4.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Lien Claims in the ordinary course of their business up to an aggregate amount of $3.6 million.

5.      Nothing in this Final Order shall prejudice the Debtors' right to request authority to pay additional amounts on account of Foreign Vendor Claims, Domestic Critical Vendor Claims, or Lien Claims and the Debtors' right to seek such relief is expressly reserved.

6.      The Debtors are authorized, but not directed, in their discretion, to condition the payment of a Vendor Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendor.

7.      The Debtors are authorized, but not directed, in their discretion, to enter into Trade Agreements with the Vendors, including, without limitation, on the following terms:

a.      The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of this Final Order and shall not be deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

b.      The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions set forth in this Final Order;

c.      The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

d.      The Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and

that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

        e.     The Vendor's acknowledgment that it has reviewed the terms and provisions of this Final Order and consents to be bound thereby;

        f.     The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

        g.     If a Vendor which has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for any further order of this Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor, such Vendor shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding to such Vendor, without the right of setoff, recoupment or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in the Chapter 11 Cases and subject to the terms of any bar date order entered in the Chapter 11 Cases.

8.     Notwithstanding anything to the contrary herein, the Debtors shall not make any payments to FCF under this Final Order unless FCF enters into a Trade Agreement providing at least ninety-day payment terms to the Debtors.  Further, the Debtors shall not make payments to FCF in excess of $51 million in the aggregate under this Final Order.

9.     The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

01:25599290.3

10.     The Debtors shall maintain a matrix identifying (i) the name of each Domestic Critical Vendor, Foreign Vendor or Lienholder paid on account of its Domestic Critical Vendor Claim, Foreign Vendor Claim or Lien Claim, and (ii) the amount paid by each Debtor to each Domestic Critical Vendor, Foreign Vendor or Lienholder on account of its Domestic Critical Vendor Claim, Foreign Vendor Claim or Lien Claim.  This matrix shall be provided on a weekly basis, one week in arrears, to counsel for the Term Loan Agent and the professionals retained by any statutory committee appointed in the Chapter 11 Cases, if any; *provided, however*, that the matrix shall be considered confidential.

11.     Nothing in this Final Order (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (b) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (c) shall be construed as a promise to pay a claim.

12.     The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

13.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

14.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be effective and enforceable immediately upon its entry.

01:25599290.3

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

Dated: _____, 2019
       Wilmington, Delaware            _____

                                           United States Bankruptcy Judge