**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 ( |
| Debtors. | _____ ) (Joint Administration Requested) |

**DECLARATION OF KENT MCNEIL IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Kent McNeil, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the Chief Financial Officer ("CFO") of Bumble Bee Foods, LLC ("Bumble Bee Foods" and, collectively with its affiliated debtors and debtors in possession, the "Debtors") and hold various officer positions at each of the other Debtors.  I have served in this capacity for fourteen (14) years.  Prior to joining the Debtors, I held various domestic and international financial and business development positions at The Clorox Company, a global manufacturer and marketer of consumer and professional products, and I served as the chief financial officer of Savers Inc., a privately held thrift retailer.

2.      In my capacity as CFO, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases") and in support of the Debtors' petitions and motions requesting various types of "first day" relief

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

(collectively, the "<u>First Day Motions</u>").    I am authorized by the Debtors to submit this Declaration.

3.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' professional advisors, including:   (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Young Conaway Stargatt & Taylor, LLP, as restructuring co-counsel to the Debtors; (ii) AlixPartners, LLP ("AlixPartners"), as financial advisor to the Debtors; and (iii) Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), as investment banker to the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth herein.

4.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. No trustee or examiner has been appointed in the Chapter 11 Cases.  As of the date hereof, no creditors' committee has been appointed.

5.    Part I of this Declaration provides an overview of the Debtors' businesses and capital structure.   Part II provides a discussion of the events that compelled the commencement of the Chapter 11 Cases and the Debtors' prepetition restructuring efforts. Part III affirms and incorporates the facts that support the relief requested in the First Day Motions.

01:25621777.4

## INTRODUCTION

6.      The Debtors are headquartered in San Diego, California and conduct operations in various other domestic and international locations.  The Debtors, together with their non-Debtor affiliates based in Canada,[2] comprise one of North America's largest branded shelf-stable seafood providers.  The Debtors, together with their non-Debtor affiliates (collectively, the "Company"), offer a full line of canned and pouched tuna, salmon, sardines, and specialty seafood products marketed in the United States under leading brands including Bumble Bee, Brunswick, Sweet Sue, Snow's, Beach Cliff, and Wild Selections and marketed in Canada primarily under the Clover Leaf brand.  Due to the quality, nutritional value, and affordability of the Company's products, this diverse product line-up is sold by virtually every major United States and Canadian food retailer and in all major food channels, including supermarkets, mass merchandisers, drug stores, warehouse clubs, and dollar stores.  Over the last century, the Debtors, their affiliates, and their predecessor companies have been leaders in the shelf-stable seafood industry, and their brands enjoy nearly 90% consumer awareness levels in the United States and Canada.

7.      Despite this long history of success, the Debtors have recently experienced financial distress due to a number of factors.  First, certain legal matters have adversely impacted the Debtors.  In 2017, the United States Department of Justice (the "DOJ") brought criminal charges against Bumble Bee Foods, alleging price-fixing in violation of the Sherman Antitrust Act, which resulted in a plea agreement (as amended, the "DOJ Plea Agreement"), requiring the

---

[2] Substantially contemporaneously with the Petition Date, the Debtors' Canadian non-Debtor affiliates— Connors Bros. Holdings Company, Clover Leaf Holdings Company, Connors Bros. Clover Leaf Seafoods Company ("Connors Bros. Clover Leaf"), Connor Bros. Seafoods Company, 6162410 Canada Limited, and K.C.R. Fisheries Ltd. (collectively, the "CCAA Debtors")— have initiated or will initiate proceedings pursuant to the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice (Commercial List).

payment of a $25 million criminal fine over five years (the "DOJ Fine"), as more fully described below. Civil suits from direct and indirect purchasers of the Debtors' products (the "Civil Litigation") were subsequently commenced claiming damages arising out of this alleged price-fixing. The DOJ Fine, the Civil Litigation, and related proceedings have resulted in the Debtors spending tens of millions of dollars in defense costs and have negatively impacted their businesses.

8.     Beleaguered by the overhang and expense of the Civil Litigation and the DOJ Fine, the Debtors found themselves facing an imminent event of default under their Term Loan Agreement (as defined below) in the spring of 2019 as a consequence of a non-Debtor parent company's breach of the maximum total net leverage ratio permitted under the Term Loan Agreement for the fiscal quarter ended December 31, 2018. The occurrence of that event of default would also have prevented the Debtors from delivering an unqualified audit opinion, which could have resulted in a second default. The Debtors' Term Loan Lenders (as defined below) agreed to a series of short-term limited waivers of this event of default through the Petition Date. In light of these considerable challenges, the Debtors began to consider and pursue strategic alternatives.

9.     On July 10, 2019, the Debtors entered into that certain Restructuring Support Agreement (as amended, the "RSA") with their major stakeholders. The RSA contemplated a restructuring of the Debtors through one of three paths. The first path was predicated on an out-of-court settlement of all or substantially all of the Civil Litigation and an infusion of junior capital that would be used to fund the Civil Litigation settlements, thereby substantially reducing the Debtors' total outstanding financial obligations. An alternative path involved the pursuit of an in-court transaction on terms set forth in a term sheet to the RSA

through a prearranged chapter 11 plan of reorganization.  But despite the Debtors' concerted efforts, these paths proved unattainable, as settlement negotiations with certain civil-litigant contingents stalled, actionable junior fundraising proposals failed to materialize, and the Debtors' Term Loan Lenders were no longer willing to permit the indefinite use of their cash collateral to fund an open-ended effort to settle the Civil Litigation.

10.    Thus, in late August 2019, the Debtors began to pursue a sale of the Company's U.S. and Canadian businesses as going concerns—the third path contemplated by the RSA.  On September 4, 2019, the boards of Clover Leaf Holdings Company, Bumble Bee Parent, Inc., and Bumble Bee Foods formed Special Restructuring Committees and on September 20, 2019, the board of Connors Bros. Clover Leaf formed a Special Restructuring Committee (collectively, the "SRC").  Two independent directors, Scott Vogel and Steven Panagos, compose the SRC, which was vested with sole authority over the restructuring activities of those companies.  And while the SRC continued to consider settlements with civil litigants and related strategic alternatives, the SRC focused the Debtors' efforts on conducting a thorough marketing process for a going-concern sale.

11.    After a robust marketing process, on November 21, 2019, the Debtors and the CCAA Debtors entered into a stalking horse asset purchase agreement (the "Stalking Horse APA") with certain affiliates of FCF Co., Ltd. ("FCF") for the sale of substantially all of the Company's assets at a total implied enterprise value of up to $930.6 million, comprised of $275 million of cash, assumption of the remaining $17 million of the DOJ Fine, and the roll-over of up to $638.6 million in outstanding term loan indebtedness.  The Stalking Horse APA preserves the Company's businesses as going concerns, contemplates the employment of nearly all of the

Company's employees, and maintains a business partner to scores of vendors and customers who have done business with the Company for decades.

**Part I**

**THE COMPANY'S BUSINESSES**

**A.      The Company's History**

12.      Beginning in the 1860s, salmon fishers and canners flocked to Astoria, Oregon to capitalize on the abundant salmon supply in the Columbia River.  Over the following decades, dozens of fishing and canning businesses were established in Astoria.  In this bustling fishing town in 1899, a small group of dedicated fishermen formed the Columbia River Packers Association (the "CRPA"), the predecessor to Bumble Bee Foods, and set out to fish and process salmon.

13.      In 1910, the CRPA discovered a seasonal abundance of albacore tuna off the Oregon coast and the "Bumble Bee" tuna brand was born.  Over the following decades, the CRPA expanded its cannery in Astoria to capitalize on albacore tuna, which became its top product, and grew into one of the most respected names in the canned seafood industry.  At the same time, the Bumble Bee brand became an iconic market leader.

14.      In 1960, Castle & Cooke, a prominent Hawaii-based seafood company, acquired a majority ownership interest in the CRPA.  The CRPA became a wholly-owned subsidiary of Castle & Cooke and was renamed Bumble Bee Seafoods Inc. ("BBS").  BBS continued to expand its operations over the next two decades and, in the late 1970s, acquired a tuna cannery in Puerto Rico, a fish base operation in Ecuador, and the Harbor Industry cannery in San Diego.

01:25621777.4

15.     Beginning in 1984, BBS underwent a series of ownership changes.  These changes resulted in BBS becoming a privately-held company and moving up from the third to the second most popular tuna brand in the United States.  By 1997, BBS was owned by International Home Foods, Inc. ("IHF").  Shortly thereafter, IHF acquired Orleans Seafood, Inc., a company that produced specialty seafood products including shrimp, oysters, smoked scallops, anchovies, and more, thereby substantially expanding BBS's product line.  IHF also acquired BC Packers, a Canadian company that was the leading brand of salmon and tuna in Canada under the "Clover Leaf" label.

16.     In 2000, ConAgra Foods, Inc. ("ConAgra") purchased BBS from IHF.  In 2003, ConAgra sold the assets of BBS to a new Bumble Bee entity, Bumble Bee Holdings, L.P., established by Centre Partners Management LLC.  Bumble Bee Seafoods, LLC ("Bumble Bee Seafoods") was formed to acquire the assets of BBS.

17.     In 2004, Bumble Bee Seafoods was rolled up into a Canadian trust, Connors Bros. Income Fund ("CBIF"), which owned the largest producer of canned sardines in the world, Connors Bros. Clover Leaf.  These combined companies became the largest branded seafood company in North America.  The current equity ownership of the Debtors (and their non-Debtor Canadian affiliates) was the result of a 2010 acquisition by a fund managed by Lion Capital LLP ("Lion LLP").

18.     For over a century, the Company has experienced unprecedented success in the shelf-stable seafood industry.  Its products encapsulate a rare combination of qualities that make them desirable to a broad customer base – they are affordable, convenient, low-calorie, protein-based, and rich in Omega-3 fatty acids.

**B.      The Company's Organizational Structure**

19.      A corporate organizational chart for the Company, including the Debtors, is attached hereto as **Exhibit A**.   Non-Debtor Clover Leaf Seafood S.à.r.l. ("CLSS"), a Luxembourg société à responsabilité limitée, is the direct or indirect parent of each of the Debtors, and is the 100% owner of non-Debtor Connors Bros. Clover Leaf, which is a CCAA Debtor.   CLSS is wholly owned by non-Debtor Bumble Bee Foods S.à.r.l. ("BBFS"), a Luxembourg société à responsabilité limitée.   Bumble Bee Foods and Anova Food, LLC ("Anova Food") operate the Company's shelf-stable seafood line and fresh frozen seafood line, respectively, in the United States.   Non-Debtor Connors Bros. Clover Leaf operates the Company's shelf-stable seafood line in Canada and internationally with assistance from other non-Debtor affiliates.

20.      The Debtors comprise the Company's United States operations.   Each Debtor's role and corporate formation background is briefly summarized below:

a) **Bumble Bee Parent, Inc.**  Bumble Bee Parent, Inc. ("Bumble Bee Parent") was formed as a Delaware corporation on November 22, 2010 in connection with the acquisition of the Company by a fund managed by Lion LLP.  It is the direct or indirect parent of the other Debtors and is wholly owned by CLSS.  It is a non-operating holding company that owns all of the shares in Bumble Bee Holdings, Inc. ("Bumble Bee Holdings").

b) **Bumble Bee Holdings, Inc.**  Bumble Bee Holdings was originally formed as RPK Acquisition Company, Inc. ("RPK") on March 1, 1991, and its current name was adopted on October 14, 2008.  Bumble Bee Holdings is a Georgia corporation that is wholly owned by Bumble Bee Parent.  It is a non-operating holding company that owns all of the membership interests in Bumble Bee Foods.

c) **Bumble Bee Foods, LLC.**  As noted above, Bumble Bee Foods is the ultimate successor to the original CRPA, and it is the Company's most significant operating subsidiary in the United States.  Bumble Bee Seafoods, LLC was formed on May 12, 2003 to acquire the assets of its predecessor, Bumble Bee Seafoods, Inc.  On June 1, 2005, the name of Bumble Bee Seafoods, LLC was changed to Bumble Bee Foods, LLC.

d) **Anova Food, LLC.**  Anova Food was formed as a Virginia limited liability company on May 26, 2010.  It is wholly owned by Bumble Bee Foods.  Anova Food is also a significant operating subsidiary and the Company's frozen raw seafood business is run through this entity.

e) **Bumble Bee Capital Corp.**  Bumble Bee Capital Corp. was formed as a Delaware corporation on November 30, 2009.  It is wholly owned by Bumble Bee Foods and is a dormant entity.

## C.    The Debtors' Current Business Operations

### *Products and Customers*

21.    The Debtors operate the following ocean-inspired collection of brands, among others, many of which are household names in the North American seafood market:

a) **Bumble Bee**.  Bumble Bee is a leading brand in the United States shelf-stable seafood category.  It is the #1 provider of albacore tuna in the United States and the #2 overall tuna brand.  It also holds leading positions in the United States in specialty seafood, sardines, and canned salmon.

b) **Brunswick**.  Brunswick is the #1 brand of sardines in Canada and the Caribbean.  It is the #2 brand of value-priced sardines in the United States.

c) **Beach Cliff**.  Beach Cliff is the #1 brand of value-priced sardines in the United States.

d) **Snow's**.  Snow's is the #1 brand of chopped and minced clams and clam juice in the United States.

e) **Anova**.  Anova is the leading supplier of raw frozen tuna to the foodservice channel in the United States.

f) **Natural Blue**.  Natural Blue is a frozen Ahi tuna product line distributed by Anova Food that is notable for being Fair Trade Certified™.

g) **Kumabachi**. Kumabachi is a bigeye tuna product that is untreated and frozen at an ultra low temperature on the vessel where it is caught within one hour.

h) **Yoi Umi**.  Yoi Umi is a sashimi-grade yellowfin tuna product that is preserved with Anova Food's patented ClearSmoke technology that results in a consistent presentation, texture, and flavor.

As discussed below, the CCAA Debtors distribute products in Canada under, among others, the "Clover Leaf" brand name.

22.    Collectively, these brands advance the Company's philosophy of providing customers with nutritious foods that contain all the health benefits the ocean has to offer.  The Company's products are well-positioned to address a number of important consumer preferences and food trends, including shifts toward protein-rich, low-fat/low-calorie, and high Omega-3 fatty acid diets and trends towards eating multiple small or "snack-sized" portions per day rather than the traditional three-square meals per day, and an overall increase in "snacking." The Company is also a leader in global sustainability within its industry, with Bumble Bee Foods and Connors Bros. Clover Leaf among the founders of the International Seafood Sustainability Foundation.  The Company focuses on environmentally responsible practices in both sourcing and processing its raw materials.  Among those initiatives is the introduction of a traceability website (www.BumbleBee.com/TraceMyCatch) that allows consumers to enter a code from a can of fish and receive information on species, ocean of catch, fishing method, fishing vessel(s), and production location.

23.    The Debtors, through Bumble Bee Foods, have been a long-standing market leader in the United States for shelf-stable seafood.  They enjoy the #1 or #2 share position in virtually every segment of the U.S. shelf-stable seafood category.  They hold approximately 41% of the U.S. share of sales of canned albacore tuna, approximately 13% of the U.S. share of sales of canned "light meat" tuna, approximately 12% of the share of sales in tuna pouches, approximately 71% of the U.S. share of sales in ready-to-eat tuna meals, approximately 40% of the U.S. share of sales in sardines, and approximately 16% of the U.S. share of sales in salmon.  Due to their reputation as an indispensable, trusted choice for shelf-stable seafood, the

Debtors' products have become a staple with top customers in the United States, including Walmart, C&S/Ahold, Costco Wholesale, Sam's Club, Kroger, Publix, BJ's Wholesale Club, Aldi, ShopRite, Supervalu, Walgreens, and CVS.

24.     Bumble Bee Foods acquired Anova Food in 2013 to accelerate its entry into the fresh/frozen seafood category.   Anova Food is the largest supplier of quality sashimi-grade tuna in the United States and distributes products under the trade names Anova, Natural Blue, Kumabachi, and Yoi Umi.   It is the leader in the global sourcing of wild, sustainably harvested tuna and utilizes key processing facilities in Indonesia, Thailand, and Vietnam.   Specializing in yellowfin tuna, Anova Food's high-quality products have earned it relationships with customers such as US Foods, P.F. Chang's, Outback Steakhouse, Ruth's Chris Steak House, and others.   Since its acquisition, Anova Food's sales revenue has more than doubled due to new distributions and new products.

25.     To complement Anova Food's frozen foods business, Bumble Bee Foods acquired a 44% equity ownership stake in RiceWrap Foods Corporation ("RiceWrap"), a start-up frozen rice producer that has developed a process for freezing rice for sushi, such that it retains the properties of freshly cooked rice once thawed.   RiceWrap's products solve a major food service challenge of preparing sushi on a large scale with unskilled labor in environments where the demand for sushi is high, like college campuses, delicatessens, mid-range sushi restaurants, and grocery deli counters.

*The Debtors' Production Process*

26.     The Debtors control the sourcing and production of approximately 50% of their U.S. volume requirements, either through direct ownership interests or exclusive supply relationships.   Much of the Debtors' tuna production is subject to a two-stage process.   First, the

Debtors source and process raw tuna into frozen loins at third-party facilities strategically located in the Western Tropical Pacific and the Indian Oceans near primary tuna fisheries.  The frozen loins are then shipped to the Debtors' approximately 300-employee facility based in Santa Fe Springs, California, where the loins are processed into approximately 360 million cans of tuna each year.  The Debtors also operate an approximately seventy (70)-employee facility in Cape May, New Jersey, where the Debtors process and can approximately six (6) million pounds of quahog clams each year.  To satisfy their remaining supply requirements, the Debtors use strategic co-packing arrangements in the United States and about fifteen (15) other countries, primarily concentrated in Southeast Asia.  The Debtors implement species-specific purchasing strategies to secure consistent, high-quality supply at the lowest cost.

27.    FCF, a Taiwanese company, supplies the Debtors with nearly all of their albacore tuna and a substantial majority of their "light meat" tuna, including skipjack, yellowfin, and bigeye, pursuant to a prepetition supply agreement (as amended, the "FCF Supply Contract").  One of the world's largest seafood suppliers, FCF acts as a broker for fishing vessels and contracts directly with over 500 independent tuna fishing vessels located in oceans around the world.  As a practical matter, FCF is the only vendor from which the Debtors are able to obtain in the near term the large quantity of tuna necessary to supply their customers with shelf-stable seafood products in the ordinary course of business.[3]

28.    The Debtors obtain other "light meat" tuna, sardines, salmon, clams, and other specialty seafood (including crab, oysters, shrimp, mackerel, and mussels, among others), from various other vendors located in Thailand, Vietnam, China, Papua New Guinea, the

---

[3] The Debtors' relationship with FCF is further discussed below in connection with the Debtors' sale process and the bid that FCF has submitted to acquire substantially all of the Company's assets.

Marshall Islands, Indonesia, Poland, Latvia, Morocco, Canada's Bay of Fundy, Alaska, and Korea, among other places.

*The Company's Non-Debtor Canada/International Business.*

29.     The CCAA Debtors are the clear market leader in Canada and hold leading shares in virtually every segment of the Canadian shelf-stable seafood category. Clover Leaf is the top-ranked shelf stable tuna brand in Canada and #1 in almost every other major shelf-stable seafood segment in Canada. The core product offerings in Canada include tuna, salmon, sardines, flavored tuna, surimi, snacks, and other specialty seafood. In addition, the Canadian affiliates distribute into Caribbean and certain Latin American markets, and they make an estimated 60% to 85% of the sale of tuna and 50% to 95% of the sale of sardines in Barbados, Jamaica, Trinidad and Tobago, and Guyana. The Company's core products internationally are sardines, tuna, salmon, specialty seafood, and value-added seafood offerings.

*The Company's Financial Performance*

30.     Over the past century, the Company has demonstrated resilient financial performance with a strong free cash flow conversion and a strategic focus on higher-margin products. Approximately 50% of the Company's revenue is generated from tuna products and the remaining 50% is generated from other shelf-stable and frozen seafood products. In 2018, the Company sold over twenty (20) million equivalent cases of product, resulting in net sales exceeding $933 million and adjusted EBITDA of $112.3 million. The Debtors' U.S.-based operations contributed $722.2 million of net sales and adjusted EBITDA of $86.3 million for 2018.

**D.      The Debtors' Capital Structure**

31.      As of December 31, 2018, the Company reported total assets of approximately $1 billion and total liabilities of approximately $1 billion.  As of the Petition Date, the obligations outstanding under the Debtors' pre-petition secured facilities are estimated at no less than the following amounts:

|  |  | $ Totals |
|---|---|---|
| ABL Facility |  | $186,817,599 |
| U.S. Revolver | $151,452,405 |  |
| Canadian Revolver | $35,365,193 |  |
| Term Loan Facility |  | $649,233,814 |
| U.S. Term Loan | $505,902,964 |  |
| Canadian Term Loan | $143,330,850 |  |
| **TOTAL** |  | $836,051,412 |

A description of the Debtors' prepetition credit facilities and other obligations follows.

*The ABL Facility.*

32.      Bumble Bee Foods is a borrower under that certain amended and restated asset-based loan agreement, dated as of August 18, 2017 (as may have thereafter been amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement"), among Bumble Bee Foods, as U.S. Borrower, Connors Bros. Clover Leaf, as the initial Canadian Borrower, the several financial institutions from time to time party thereto (the "ABL Lenders"), Wells Fargo Capital Finance, LLC, as administrative agent for the U.S. ABL Lenders (in such capacity, the "U.S. ABL Agent"), Wells Fargo Capital Finance Corporation Canada, as administrative agent for the Canadian ABL Lenders (in such capacity, the "Canadian ABL Agent," and together with the U.S. ABL Agent and the ABL Lenders, the "ABL Secured Parties"), Bank of America, N.A., as co-lead arranger, and MUFG Union Bank, N.A. as syndication agent.  The ABL Credit Agreement provides for an asset-based revolving credit facility with aggregate commitments of up to $200 million, subject to a borrowing base

01:25621777.4

limitation based on the Debtors' eligible accounts receivable, reserves, and inventory (the "ABL Facility"), with Bumble Bee Foods, as U.S. Borrower, able to draw up to $160 million (the "U.S. Revolver") and Connors Bros. Clover Leaf, as Canadian Borrower, able to draw up to $40 million (the "Canadian Revolver"), of advances, in each case limited by, among other things, the remaining DOJ Fine and the portion of the borrowing base attributable to the respective borrower and its subsidiaries.  As of the Petition Date, the amounts outstanding under the U.S. Revolver and Canadian Revolver are approximately $151,452,405, and $35,365,193, respectively.

33.    Loans under the ABL Facility bear interest at variable levels depending on the type of loan and the average excess availability under the ABL Facility and are subject to an unused line fee of 0.25% per annum applied to the unused amounts.  Interest rates are indexed either to the applicable U.S. prime rate or LIBOR rate for the U.S. Revolver, or the Canadian prime rate or CDOR rate for the Canadian Revolver, plus an applicable margin of 0.50% to 2.0% depending on the type of loan and the average excess availability.  Loans under the U.S. Revolver currently bear interest at the applicable LIBOR rate plus 2.00% or at the applicable Prime rate plus 1.00%, and the Debtors have remained current on interest owing under the U.S. Revolver.

34.    The entirety of the borrowings under the ABL Facility is secured on a first-priority basis by substantially all of the current assets of the Debtors, as well as those of certain of their non-Debtor affiliates, such as cash, cash equivalents, accounts receivable, and inventory (collectively, the "ABL Priority Collateral") and is secured on a second-priority basis by security interests in substantially all of the other assets (subject to certain excluded assets) of the borrowers and guarantors under the ABL Credit Agreement (collectively, the "Term Loan Priority Collateral").  The ABL Facility is cross-collateralized and cross-guaranteed, such that

01:25621777.4

amounts borrowed by each of Bumble Bee Foods and Connors Bros. Clover Leaf, as borrowers, are guaranteed by and secured by the assets of BBFS and its direct and indirect subsidiaries (other than certain excluded subsidiaries), including Bumble Bee Foods and Connors Bros. Clover Leaf. The ABL Facility matures on August 18, 2022.

35. Since March 2019, the Debtors and other loan parties under the ABL Facility have been under cash dominion with cash financing for their operations dependent on the availability of borrowings under the ABL Facility.

*The Term Loan Facility.*

36. Bumble Bee Foods and Connors Bros. Clover Leaf are borrowers under that certain term loan credit agreement, dated as of August 15, 2017 (as may have thereafter been amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Agreement"), among Bumble Bee Foods, the lenders from time to time party thereto (the "Term Loan Lenders" and, together with the Prepetition ABL Lenders, the "Prepetition Secured Lenders"), and Brookfield Principal Credit, LLC, as administrative agent and collateral agent for the Term Loan Lenders (in such capacity, the "Term Loan Agent" and together with the Term Loan Lenders, the "Term Secured Parties"). The Term Loan Agreement provides for the issuance of term loans in the aggregate initial principal amount of $650.0 million (the "Term Loan Facility"), with approximately $506.5 million of Term B-1 Loans issued to Bumble Bee Foods (the "U.S. Term Loan") and approximately $143.5 million of Term B-2 Loans issued to Connors Bros. Clover Leaf (the "Canadian Term Loan" and, together with the U.S. Term Loan, the "Term Loans"). As of the Petition Date, the amount outstanding under the U.S. Term Loan and the Canadian Term Loan are approximately $505,902,964 and $143,330,850, respectively.

37.     Interest under the Term Loan Agreement accrues per annum at the applicable prime rate plus 9.0%, with 7.5% paid in cash and 1.5% paid in kind.  As a result of the potential events of default under the Term Loan Agreement which are subject to a series of waivers, as described above, additional Default Rate interest is accruing on outstanding obligations under the Term Loan Agreement at the per annum rate of 2.0%, for an effective rate of interest at the applicable prime rate plus 11.0%.  The Term Loan Agreement also requires quarterly amortization payments, currently at the rate 0.25% of the outstanding principal amount, which is scheduled to step up to 0.625% beginning with the fiscal quarter ending December 31, 2019.  The Term Loan Agreement also provides that upon any acceleration of the Term Loans on or before April 26, 2020, the Term Loan Lenders are entitled to a 5% prepayment premium.  As of the Petition Date, the prepayment premium in the amount $32,461,691.00 is due and payable.

38.     The Term Loan Facility is secured on a first-priority basis by substantially all of the assets of the Debtors, as well as those of certain of their non-Debtor affiliates, that do not constitute ABL Collateral, including the capital stock of each of the present and future subsidiaries of the loan parties and all of their owned real property, equipment and fixtures, investment property, and intellectual property, and all proceeds from such property and assets (the "Term Loan Priority Collateral").  Obligations under the Term Loans are secured by second-priority security interests in the ABL Collateral.  Like the ABL Facility, the Term Loan Facility is cross-collateralized and cross-guaranteed, such that amounts borrowed by each of Bumble Bee Foods and Connors Bros. Clover Leaf, as borrowers, are guaranteed by and secured by the assets of each of BBFS and its direct and indirect subsidiaries, including Bumble Bee Foods and Connors Bros. Clover Leaf, other than certain excluded subsidiaries.  The Term Loan Facility matures on August 15, 2023.

*The Intercreditor Agreement.*

39.     The relative rights of the ABL Lenders and the Term Loan Lenders with respect to the ABL Priority Collateral and Term Loan Priority Collateral are governed by that certain amended and restated intercreditor agreement, dated as of August 15, 2017 (as may be amended, restated, or amended and restated from time to time, the "Intercreditor Agreement"), by and between the ABL Agent and the Term Loan Agent and acknowledged by the Debtors and their affiliates that are parties to the ABL Facility and Term Loan Facility.

*Intercompany Borrowings from Connors Bros. Clover Leaf*

40.     Historically, Connors Bros. Clover Leaf has made funds available to Bumble Bee Foods through an intercompany revolver (the "Intercompany Facility").   The Intercompany Facility is unsecured, has a maximum availability of $20 million, and bears interest at a rate of 8.11% per annum.   As of the Petition Date, Bumble Bee Foods owes approximately $9 million under the Intercompany Facility.

*Trade Payables and Other Unsecured Claims*

41.     The Debtors also estimate that they have approximately $77 million in trade payables outstanding.   As discussed below, the majority of these amounts are owed to vendors based outside of the U.S. that are involved in the sourcing and processing of raw materials prior to delivering them to the Debtors' U.S.-based facilities for finishing and delivery to market. As detailed below, the Debtors' prepetition trade payables owing to FCF are approximately $51 million.

## Part II

## EVENTS LEADING TO CHAPTER 11

A.      **The Antitrust Litigation**

*DOJ Investigations*

42.      For over one hundred years, Bumble Bee Foods has been a trailblazer in the sale of nutritious and affordable shelf-stable seafood and has earned an impeccable reputation for its integrity and transparency.  A few years ago, however, it was brought to Bumble Bee Foods' attention that certain former executives purportedly took actions that jeopardized this legacy.

43.      In 2015, attorneys at the DOJ reviewed information related to Bumble Bee Foods' proposed merger with Thai Union Group P.C.L. (the parent entity of Chicken of the Sea) and, based on that review, alleged that anticompetitive conduct occurred among the producers of Bumble Bee, Star-Kist, and Chicken of the Sea branded canned tuna.  On July 15, 2015, and October 1, 2015, Bumble Bee Foods received grand jury subpoenas relating to an investigation by the DOJ into potential antitrust violations based on alleged price-fixing in the packaged seafood industry.  Immediately upon being notified of this investigation, Bumble Bee Foods fully cooperated with the DOJ.

44.      On May 5, 2017, Bumble Bee Foods entered into the DOJ Plea Agreement in which Bumble Bee Foods agreed to enter a guilty plea in connection with the DOJ's ongoing criminal investigation, which DOJ Plea Agreement was amended on August 2, 2017.  Thereafter, a one-count felony charge for violations of the Sherman Antitrust Act was filed on May 8, 2017 in the United States District Court for the Northern District of California in San Francisco.  Under the DOJ Plea Agreement, Bumble Bee Foods agreed to the payment of a $25 million

01:25621777.4

criminal fine, payable over a five-year period.  As of the Petition Date, $17 million of this criminal fine is outstanding.  In addition to entering into the DOJ Plea Agreement, Bumble Bee Foods independently implemented measures to ensure that nothing like the alleged anticompetitive behavior would happen again.  Among other things, Bumble Bee Foods hired a chief compliance officer and reformed its guidelines and policies.

45.    Separately, in May 2018, the then-CEO of Bumble Bee Foods was criminally charged by the DOJ for his alleged role in the alleged price-fixing.  He subsequently stepped down from his role as CEO, and his criminal trial commenced on November 4, 2019.

*Multidistrict Civil Litigation*

46.    Following the DOJ's investigation, fifty (50) putative class action complaints were filed against Bumble Bee Foods and other defendants, including in some instances, Lion LLP and certain of its affiliates, alleging violations of Sections 1 and 3 of the Sherman Antitrust Act and various analogous state law causes of action.  A motion was filed before the United States Judicial Panel on Multidistrict Litigation ("JPML") on August 28, 2015 seeking to transfer and centralize these cases in a single federal district court.

47.    On December 9, 2015, the JPML transferred the complaints outside of the Southern District of California that were pending at the time of the motion to the United States District Court for the Southern District of California (the "District Court").  On July 30, 2019, the District Court certified three (3) classes: (i) direct purchaser plaintiffs, *i.e.*, retail sellers and distributors; (ii) commercial food preparer plaintiffs, *i.e.*, indirect purchasers of food-service-size products; and (iii) indirect purchaser end-payer plaintiffs, *i.e.*, individual consumers who bought tuna for personal consumption.  Rather than proceed as part of the direct purchaser plaintiff class, a number of direct purchasers have pursued separate, non-class based claims against

Bumble Bee Foods and, in certain instances, Lion LLP and certain of its affiliates. Bumble Bee Foods, through its counsel, has engaged in settlement discussions with the plaintiffs in the Civil Litigation, which are discussed in more detail below.

**B.      Other Financial Pressures Facing the Debtors**

48.      The antitrust litigation facing the Debtors has negatively impacted the Debtors' cash flow and dragged on financial performance and overall EBITDA. The DOJ Plea Agreement resulted in the Debtors incurring a $25 million fine owed to the federal government, of which the Debtors have now paid $8 million, including $4 million in August 2019. And the Debtors' legal defense costs resulting from the Civil Litigation have been substantial.

49.      The Company's overall Adjusted EBITDA has declined by approximately 20% from 2015 to 2018. This negative trend contributed to the Company's inability to maintain the maximum total net leverage covenant required under the Term Loan Agreement, which would have resulted in a potential event of default under the Term Loan Agreement in March 2019, when the Company delivered its 2018 audited financial statements. In light of this potential default, the Debtors began focusing on potential deleveraging transactions to address their covenant non-compliance.

50.      Finally, in the weeks leading up to the Petition Date, the Debtors' liquidity further suffered as a result of a shortening of available payment terms among certain of their large foreign vendors, which coincided with news reports regarding the Debtors' financial difficulties as well as the struggles of one of their largest competitors. The Debtors were able to address this contraction in payment terms through managing their payables and obtaining important concessions from FCF in August 2019, when FCF agreed temporarily to provide additional relief from the already favorable payments terms the Debtors enjoyed with FCF, but

the Debtors remain at risk of further contractions in payment terms and have limited borrowing availability under the U.S. Revolver to weather any further significant contractions.

## C.    Prepetition Restructuring Efforts

51.    Taking into consideration the Company's outstanding debt under the ABL Facility and Term Loan Facility, the magnitude of the liability asserted against Debtor Bumble Bee Foods in the Civil Litigation, and the Company's failure to maintain the financial maintenance covenant under the Term Loan Agreement, in the spring of 2019, the Company determined to explore its strategic alternatives. In December 2018, the Company retained Houlihan Lokey with the initial mandate of exploring a sale of the Company's Canadian business, which was expanded in April 2019 to include a potential recapitalization of the Company. Also in April 2019, the Company retained AlixPartners to conduct a strategic review of the Debtors' operations. In addition, the Debtors entered into negotiations with the ABL Lenders and the Term Loan Lenders which, among other things, resulted in agreements to waive certain defaults and events of default and to extend milestones to enter into a restructuring support agreement and deliver a term sheet for a restructuring transaction.

52.    These efforts culminated in the execution of the RSA on July 10, 2019 by and among (i) Bumble Bee Foods, BBFS, Bumble Bee Holdings, Connors Bros. Clover Leaf, (ii) Big Catch Cayman L.P., the Debtors' indirect equity holders, (iii) Brookfield Principal Credit LLC, as Term Loan Agent, and (iv) each consenting lender party thereto (collectively, the "RSA Parties"). The RSA sets forth an agreement by the RSA Parties to support a restructuring to be implemented either through: (i) a settlement transaction consummated either (a) as an out-of-court transaction, provided that the Debtors enter into an acceptable junior financing agreement and settle all Civil Litigation claims on the terms and timeline set forth in the RSA; or

(b) in the sole discretion of the Consenting Term Loan Lenders (as defined in the RSA), in consultation with the Debtors, as an in-court transaction through a joint prearranged chapter 11 plan of reorganization consistent with the terms set forth in the RSA, provided that the Debtors enter into an acceptable junior financing agreement and settle the Civil Litigation claims at a level satisfactory to the Consenting Term Loan Lenders; or (ii) if the Debtors fail to achieve the settlement threshold under the RSA and obtain acceptable junior financing, an in-court transaction implemented through a sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code.

53.     The Debtors expended significant efforts to try to reach resolutions with the plaintiffs in the Civil Litigation (including counsel to the class representatives for the three (3) court-certified classes) from the spring of 2018 through early fall of 2019.  These efforts included individual settlement conferences and negotiations with the plaintiffs through the duration of the spring and summer, an all-day settlement meeting in New York on September 6, 2019, and continued negotiations with various plaintiffs and plaintiff contingents thereafter. These negotiations were predicated and conditioned on the Debtors' ability to obtain the junior capital financing required by the RSA.  While the Debtors had some early success in resolving certain aspects of the Civil Litigation, reaching settlements with approximately 35% (by volume of commerce) of their direct purchaser customers by the summer of 2019, the Debtors ultimately were not able to reach settlements with a number of plaintiffs reaching a threshold sufficiently high enough to proceed with restructuring the Debtors (and their non-Debtor affiliates) through an out-of-court transaction or a chapter 11 plan.

54.     In addition, with the assistance of Houlihan Lokey, the Company attempted to raise the junior capital required under the RSA.  The Debtors entered into

non-disclosure agreements with approximately fifty (50) parties and entered into advance negotiations with three (3) groups of investors to provide such funding.  Ultimately, the Company was unsuccessful in obtaining a firm commitment for financing.

55.     Despite their efforts, the Company could not achieve the dual goals of raising acceptable junior financing and settling the Civil Litigation.  Without a global resolution of the Civil Litigation, the Debtors continued to face unsustainable litigation costs to defend against the various pending lawsuits, as well as the risk that substantial judgments may be rendered against the Debtors, which the Debtors do not have the resources to satisfy.  In addition, the Debtors faced multiple unresolved events of default under the Term Loan Agreement, which could lead to the exercise of remedies by the Term Loan Agent, including the acceleration of the indebtedness thereunder.  Accordingly, in late August, the Company and Houlihan Lokey commenced the sale process described below to maximize the value of the Company for the benefit of its stakeholders.

**D.     Formation of the Special Restructuring Committee**

56.     In connection with the entry into the RSA, two independent directors, Steven Panagos and Scott Vogel, were appointed to the boards of Debtors Bumble Bee Parent and Bumble Bee Foods and non-Debtors Clover Leaf Holdings Company (the parent of Connors Bros. Clover Leaf) and Connors Bros. Clover Leaf.  Messrs. Panagos and Vogel have extensive experience in the restructuring industry, and both serve on the boards of a number of large companies, including those in financial distress.  On September 4, 2019, the boards of Bumble Bee Parent, Bumble Bee Foods, and Clover Leaf Holdings Company formed Special Restructuring Committees and on September 20, 2019, the board of Connors Bros. Clover Leaf formed a Special Restructuring Committee.  The SRC is vested with sole authority over the

01:25621777.4

restructuring activities of those companies.  At the SRC's direction, the Debtors engaged Paul, Weiss to serve as general restructuring counsel to the Debtors.

57.    Since its appointment, the SRC has directed the restructuring activities of the Debtors.  This has included overseeing (i) the sales process conducted by Houlihan Lokey, (ii) negotiations with the Debtors' secured lenders over the terms of amendments to their existing credit facilities and the RSA, (iii) the preparation for the commencement of the Chapter 11 Cases, and (iv) the negotiation of debtor-in-possession financing.

E.    **The Debtors' Pre-Petition Marketing Efforts and Entry Into the Stalking Horse Purchase Agreement**

58.    As noted above, the Company initially retained Houlihan Lokey in December 2018.  Houlihan Lokey's initial mandate, along with Nomura Securities Co. Ltd. ("Nomura"), was to explore a sale of certain of the Company's assets, including the "Clover Leaf" business in Canada (the "Canada Only Sales Process").  In connection with the Canada Only Sales Process, Houlihan Lokey and Nomura contacted nine (9) potentially interested parties, all of which were strategic buyers.  Four (4) interested parties executed non-disclosure agreements and received a confidential information memorandum that provided a comprehensive overview of the Clover Leaf business and were provided access to a diligence data room and substantial background information on the Clover Leaf business to assist them in formulating bids for the Clover Leaf business.  Three (3) interested parties submitted indications of interest in the first round of bidding, and one (1) interested party subsequently submitted a letter of intent in the second round of bidding.

59.    However, prior to the consummation of any transaction in the Canada Only Sales Process, the Company determined that potential lenders were unwilling to implement a global recapitalization of the Company's business in the absence of a settlement of

substantially all of the Civil Litigation.  As a result, the Company, with the assistance of its advisors, concluded that it was in the best interests of the Company to terminate the Canada Only Sales Process and explore additional options for restructuring or recapitalizing the entire business, including marketing the entire Company for sale, either to a single buyer of the Company as a whole or to multiple buyers acquiring the component parts of the Company.

60.    Beginning in late August 2019, Houlihan Lokey commenced a process to solicit interest in a sale of the Company's U.S.-based and Canadian-based businesses, together or individually.  As stated above, this followed a process run by Houlihan Lokey in the spring and summer to sell the Canadian-based business on a stand-alone basis, during which the Company obtained three indications of interest for the Canadian-based business.

61.    During this whole-Company sale process, Houlihan Lokey contacted 190 parties, comprising 66 strategic buyers and 124 financial buyers.  A number of these parties were already familiar with the Company and its business based on Houlihan Lokey's prior efforts in the summer to raise junior capital financing and sell the Clover Leaf business.  Approximately sixty-five (65) parties signed non-disclosure agreements and received a confidential information memorandum that provided a comprehensive overview of the Company's business and the investment opportunity.  The Company prepared a "first round" diligence data room and provided potential buyers access to substantial information to assist them in formulating their indications of interest.  Contemporaneously with the conduct of this marketing process, the Debtors engaged in negotiations with the Term Loan Lenders over the terms and provisions of a purchase agreement under which the Term Loan Lenders may acquire the Company's assets, including the acquisition of substantially all of the Debtors' assets pursuant to a transaction under

section 363 of the Bankruptcy Code supported by a credit bid of certain of the outstanding obligations under the Term Loan Agreement, as contemplated by the terms of the RSA.

62.     Interested parties were advised that they would have until September 30, 2019 to submit indications of interest (each an "IOI") for a transaction to acquire the Company's assets, either as a whole or limited to the U.S.-based or Canadian-based business, and through an in-court or out-of-court transaction.  Eleven (11) parties submitted IOIs, a number of which, on an initial basis, approached or perhaps slightly exceeded the value of a credit-bid proposal advanced by the Prepetition Term Loan Lenders on September 21, 2019.  In light of these results, the Prepetition Secured Lenders afforded the Debtors additional time to evaluate the interested parties and arrange follow-up diligence.  Indeed, in mid-October the Term Loan Lenders began to focus on assessment and support of the third-party bidders in the process and determined not to submit a stalking horse credit bid.

63.     Based on a review of the IOIs received, Houlihan Lokey advanced seven (7) bidders to a second round of diligence.  Parties participating in this second round of the process were instructed to submit final bids to Houlihan Lokey by October 30, 2019.  Over the course of October, Houlihan Lokey arranged second-round data room access, coordinated management presentations and on-site visits, circulated second-round process letters, and otherwise worked closely with interested bidders to explore and address transaction structure, timing, and process considerations.

64.     Ultimately, three (3) parties submitted final bids on or around October 30th.  Based on their review of the proposals received, the Debtors, after consultation with their advisors, focused their attention on the bid submitted by FCF (described below), which the SRC concluded was the highest or otherwise best offer among the final bids.

*The Debtors' relationship with FCF and Entry in the Stalking Horse APA*

65.     FCF indirectly holds a passive, minority equity interest in the Debtors. Through its affiliates, FCF owns an approximately 23% limited partnership interest in Big Catch 1 L.P., a limited partnership that is three layers removed from the Debtors' direct parent company, Clover Leaf Seafood S.à.r.l.[4]  FCF does not have any designees on the SRC or the boards of directors of any of the Debtors, the CCAA Debtors, their direct or indirect parent entities, or any other entity in the Bumble Bee corporate family.  FCF and the Debtors have transacted business for many years, and continue to do so, on a strictly arms'-length basis.

66.     In its proposal dated October 30, 2019, FCF, through its affiliates,[5] offered to acquire substantially all of the Company's assets at a total implied enterprise value of approximately $925 million (which was subsequently increased to $925.6 million), which may be increased by up to an additional $5 million in certain instances based on increases in the amount of the Company's aggregate funded indebtedness, including $275 million of cash, up to $638.6 million of new senior secured financing (which will take the form of rolled-over term loan indebtedness), and the assumption of the $17 million outstanding DOJ Fine.  The SRC determined that FCF's proposal represented the highest and best offer received as a result of the sale process, and directed the Company to proceed with negotiating definitive terms with FCF. After extensive, arms'-length negotiations, the Debtors executed the Stalking Horse APA with

---

[4]   Besford Ltd. and FCF International Limited—affiliates of FCF—together own 100% of the interests in Lion LLP/Big Catch Co-Investors 1 L.P., which holds a roughly 23% interest in Big Catch Cayman L.P., which, together with Bumble Bee GP S.à.r.l. owns Bumble Bee Holdco S.C.A., which in turn wholly owns BBFS, which wholly owns CLSS, the direct parent company of Debtor Bumble Bee Parent.

[5] Tonos US LLC, Tonos 1 Operating Corp, and Melissi 4 Inc. (collectively, the "Stalking Horse Bidder") are wholly owned affiliates of FCF.  FCF has guaranteed all of the Stalking Horse Bidder's performance and payment obligations under the Stalking Horse APA.

FCF, and commenced these Chapter 11 Cases to continue marketing the Company's assets to pursue a value-maximizing, going concern sale.

**F.      The Debtors' DIP Financing Negotiations[6]**

67.      The Debtors require additional liquidity to fund operations and these Chapter 11 Cases during the ongoing conduct and consummation of the sale process.  Pursuant to the RSA, the Prepetition Secured Lenders agreed to provide DIP financing on the terms set forth in the DIP Motion to provide that liquidity.  Accordingly, the Debtors, at the direction of the SRC, and with the advice of their professional advisors, began negotiations with their Prepetition Secured Lenders on the specific terms and amounts of these facilities.  The Debtors and their advisors also commenced a targeted marketing process with potential third-party financing providers to determine whether the Debtors could obtain the necessary financing on more favorable terms than those offered by the Prepetition Secured Lenders (the "DIP Marketing Process").[7]

68.      Ultimately, the DIP Marketing Process did not generate an actionable alternative to the financing offered by the Prepetition Secured Lenders.  It is my understanding that the Debtors' current capital structure and the challenges of attempting to prime the liens and use the cash collateral of the Prepetition Secured Lenders without their consent (which the Prepetition Secured Lenders would not provide), taken together, made actionable third-party DIP

---

[6] Capitalized terms used in this subsection F but not otherwise defined in this Declaration have the meanings set forth in the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief,* filed contemporaneously herewith (the "DIP Motion").

[7] These marketing efforts are discussed at length in the *Declaration of Eric Winthrop in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief,* filed contemporaneously herewith (the "Winthrop Declaration").

01:25621777.4

financing virtually impossible under the circumstances. As a result, the Debtors and their advisors focused on negotiating the best possible financing terms with the Prepetition Secured Lenders and commenced these Chapter 11 Cases seeking approval of the DIP Facilities described at length in the DIP Motion.  In sum, the DIP Facilities consist of:  (i) a new money multiple draw term loan (the "Term Loan DIP Facility") of up to $80 million provided by the Prepetition Term Loan Lenders (the "Term Loan DIP Lenders"), of which $40 million will be available upon entry of the Interim Order and the closing of the Term Loan DIP Facility; and (ii) a new asset-based revolving credit facility (the "ABL DIP Facility," and together with the Term Loan DIP Facility, the "DIP Facilities") in an amount not to exceed $200 million, provided by the Prepetition ABL Lenders (the "ABL DIP Lenders" and collectively with the Term Loan DIP Lenders, the "DIP Lenders") that provides up to (i) $160 million of availability to the U.S. ABL Borrower (as defined in the DIP Motion), subject to a borrowing base limitation based on the U.S. ABL Borrower's eligible accounts receivable, reserves, and inventory  and other conditions to drawing contained in the DIP Facilities and (ii) $40 million of availability to the Canadian ABL Borrower (as defined in the DIP Motion), subject to a substantially similar borrowing base with regard to the Canadian ABL Borrower's assets.  Wells Fargo Capital Finance, LLC will act as the administrative agent to the ABL DIP Facility and Brookfield Principal Credit LLC will act as the administrative agent to the Term Loan DIP Facility.  The DIP Facilities will be secured by first priority priming liens and will allow the Debtors to utilize cash collateral on a fully-consensual basis (subject to the limitations in the Interim Order).  I understand this refinancing was required by the ABL DIP Lenders as a condition to their commitment to provide postpetition financing.

01:25621777.4

69.     I believe that the commercial terms of the DIP Facilities are reasonable and that they provide sufficient liquidity to fund the Chapter 11 Cases, conduct the sale process, and wind down the Debtors' affairs after the sale has closed.  I also believe that approval of the DIP Facilities will instill much needed confidence in parties that are critical to the success of the Chapter 11 Cases and the ongoing sale process, including the Debtors' employees, vendors, suppliers, and customers.  In addition, I believe the DIP Facilities will increase the opportunity for a robust, competitive postpetition sale process by facilitating the Debtors' efforts to preserve operations and their going-concern value during that process.  Absent the DIP Facilities, the Debtors would be unable to purchase new inventory, maintain valuable customer accounts, pay the costs of the chapter 11 process or avoid a value-destructive liquidation—all of which would result in irreparable harm to the Debtors and their stakeholders.

70.     I also understand that certain of the Debtors' foreign affiliates, including the CCAA Debtors, will be party to the DIP Facilities and provide credit support for the Debtors' obligations thereunder, as they did in connection with the Prepetition Secured Debt.  I also understand that the ABL DIP Facility provides for a Canadian Revolver Commitment to be available to the Canadian ABL Borrower for which the Debtors will be jointly and severally liable under the applicable ABL DIP Facility documents.

71.     I believe that the inclusion of the Canadian Revolver Commitment ultimately benefits the Debtors for at least two reasons.  First, based on knowledge available to me and discussions with the Debtors' advisors, I understand that the inclusion of the CCAA Debtors in the ABL DIP Facility decreases the Debtors' DIP financing needs and provides the Debtors approximately $27 million of incremental liquidity during the first twelve (12) weeks of the Chapter 11 Cases.  The Debtors expect that a portion of the CCAA Debtors' positive cash

flow will be used to pay down amounts outstanding under the ABL DIP Facility—including approximately $14.2 million of advances outstanding under the U.S. Revolver Commitment— which will increase the Debtors' liquidity during the Chapter 11 Cases.  In addition, the Debtors expect the CCAA Debtors to maintain between approximately $12.4 and $14 million in excess availability under the Canadian Revolver Commitment, which the Debtors can utilize through the U.S. Borrowing Base Enhancement to obtain additional advances, if necessary.  Put differently, the U.S. ABL Borrower can use assets of the Canadian Prepetition Credit Parties whose assets comprise the Canadian Borrowing Base to increase the amounts the U.S. ABL Borrower (a Debtor) can borrow under the Prepetition ABL Facility.  Absent that additional liquidity, I believe the Debtors would have been forced to negotiate for additional DIP borrowings that likely would have increased the overall financing costs to the Debtors' estates.

72.    Second, I understand that the ABL DIP Facility requires the ABL DIP Agent to maintain separate loan accounts for the Canadian ABL Borrower and the U.S. ABL Borrower to ensure that the respective costs of any advances made to each respective borrower (including any interest, fees or other Lender Group Expenses (as defined in the ABL DIP Documents)) are charged to the appropriate borrower's account.  I also understand the borrowers have a primary obligation to pay their individual unused line fees.  Thus, although the Debtors are ultimately jointly and severally liable for all obligations under the ABL DIP Facility, the Canadian ABL Borrower will bear its own fees, expenses, and interest in the first instance for amounts owed under the Canadian Revolver Commitment.  Accordingly, I believe that the inclusion of the Canadian Revolver Commitment in the ABL DIP Facility is in the best interests of the Debtors' estates, provides the Debtors with incremental liquidity, and helps reduce the

costs and burdens the Debtors would otherwise incur to obtain sufficient DIP financing absent the CCAA Debtors' inclusion in the DIP Facilities.

73.    For all these reasons, I believe the DIP Facilities are a necessary and appropriate component of the ongoing sale process and are essential to the Debtors' ability to conduct these Chapter 11 Cases for the benefit of their stakeholders.

## Part III

## SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

74.    The Debtors filed the First Day Motions concurrently with the commencement of the Chapter 11 Cases.  As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses would be exposed unless the relief requested in the First Day Motions is granted without delay.

75.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein to be true and correct.  This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

76.    The relief sought in the First Day Motions is critical to the continuing success of the sale process, the Chapter 11 Cases, and the Company's business as a going

concern.  The First Day Motions will maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any adverse effects caused by the Chapter 11 Cases to the Debtors' businesses and operations.  As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm as a result of the Chapter 11 Cases.  For the reasons set forth below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

### A.    Administrative Pleadings.

#### i.    *Motion for Joint Administration*

77.    Many of the motions, applications, hearings, and orders in the Chapter 11 Cases will jointly affect each of the Debtors, who I understand are "affiliates" within the meaning of the Bankruptcy Code.  Under these circumstances, the interests of the Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of the Chapter 11 Cases for procedural purposes only.  Joint administration of the Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest.

78.    For these reasons, the Debtors submit, and I believe, that the relief requested in the motion is in the best interest of the Debtors, their estates, and their creditors and therefore should be approved.

#### ii.    *Application to Appoint 156(c) Claims Agent*

79.    The Debtors request entry of an order authorizing the retention and appointment of Prime Clerk LLC ("Prime Clerk") as their claims and noticing agent in the Chapter 11 Cases.  The Debtors selected Prime Clerk after soliciting proposals from Prime Clerk

and two other potential claims and noticing agents.  I believe that the relief requested in Prime Clerk's retention application will ease the administrative burden on the Clerk of the Court in connection with the Chapter 11 Cases.  In addition, I have been advised by counsel that Prime Clerk's retention is required by the Local Rules in light of the aggregate number of the Debtors' creditors.  Accordingly, the Debtors believe that the application should be approved on the terms proposed.

### B.    Operational Motions Requesting Immediate Relief.

#### i.    *Motion Confirming the Applicability of the Automatic Stay and the Debtors' Operating Status*

80.    The Debtors obtain the overwhelming majority of goods and services used in the operation of their business from foreign vendors, including vendors located in Taiwan, Indonesia, Thailand, and Mexico, among other countries.  As such, many are not aware of the provisions of the automatic stay in section 362 of the Bankruptcy Code or of the scope of a debtor in possession's authority to conduct business.  Nor are all such creditors likely cognizant of their significance and impact.  I have been informed that debtors in bankruptcy often must advise third parties of the existence and effect of section 362 of the Bankruptcy Code and the automatic stay it creates, and occasionally a chapter 11 debtor must initiate proceedings in the bankruptcy court to enforce the protections contained therein.  Creditors may inaccurately believe that the Debtors are no longer operating or that an administrator or liquidator has been appointed and the Debtors are no longer in control of their operations.  Without the basics for understanding the authority the Bankruptcy Code provides for continued operation of the business, I believe that some of the Debtors' foreign creditors may be unwilling to continue to deal with the Debtors, to the detriment of their business and prospects for the Chapter 11 Cases.  To avoid such unnecessary actions, and to provide notice to parties unfamiliar with the

01:25621777.4

35

Bankruptcy Code of the scope and effect of the automatic stay, I am advised a bankruptcy court may issue an order embodying and restating those provisions.

81.    Given the composition of the Debtors' vendor base and the potential adverse impact on the Debtors' operations from misunderstandings on the part of the Debtors' foreign vendors, I consider such a motion necessary in the Chapter 11 Cases.

ii.    *Motion to Provide Utility Companies with Adequate Assurance*

82.    The Debtors require various utility services at their offices and facilities located around the country, and such services are provided by numerous utility companies (collectively, the "Utility Companies").    Because the Utility Companies provide essential services to the Debtors, any significant interruption in utility services would be highly problematic.  In fact, the temporary or permanent discontinuation of utility services at any of the Debtors' locations could irreparably disrupt business operations and diminish sales revenue, and, as a result, fundamentally undermine the Debtors' efforts to maximize value.  I understand that under section 366 of the Bankruptcy Code, the Debtors' Utility Companies are entitled to a form of "adequate assurance" of future performance.  Accordingly, the Debtors have proposed to protect the rights of the Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately 50% of the Debtors' estimated monthly cost of utility services subsequent to the Petition Date.  The Debtors submit that the deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business, constitute adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code.  To the extent that the Utility Companies disagree, however, the Utility Companies would be able to utilize the Debtors' proposed procedures to seek additional adequate assurance.

83.     I believe the Debtors' proposed treatment of the Utility Companies is appropriate under the circumstances, and I am advised by counsel that the proposed procedures are consistent with procedures routinely approved in this District.  Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

    iii.     *Motion to Honor and Continue Insurance Programs*

84.     In the ordinary course of their business, the Debtors maintain numerous insurance policies that provide coverage for, among other things, directors' and officers' liability, general and excess liability, automobile, property, marine cargo, foreign liability, umbrella, and premises pollution liability (collectively, the "Insurance Policies").  A listing of all known policies currently in effect, which list I have reviewed, is attached as an exhibit to the Debtors' motion.

85.     In connection with the Insurance Policies, the Debtors obtain brokerage services from Marsh Risk & Insurance Services (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.

86.     The Debtors' Insurance Policies are essential to preserve the value of the Debtors' business and assets, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business (and I am advised that certain insurance policies are also required by the Guidelines established by the Office of the United States Trustee for chapter 11 bankruptcy cases).  It is critical that the Insurance Policies be maintained and renewed on an ongoing and uninterrupted basis.  Therefore, the Debtors request that the Court authorize them to

pay all prepetition premiums, fees, and expenses arising under, or related to, the Insurance Policies, including with respect to any Broker's fees.  For these reasons, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

        *iv.*      *Motion to Honor Prepetition Taxes*

87.    The Debtors, in the ordinary course of their businesses, incur various tax liabilities, including, without limitation, (i) sales and use taxes; (ii) a gross receipts tax; (iii) real and personal property taxes; (iv) franchise taxes; and (v) certain other miscellaneous taxes (collectively, the "Taxes") and various other fees and assessments, including fees for customs duties and business licenses and permits, (collectively, the "Fees," and together with the Taxes, the "Taxes and Fees") owed to certain authorities (collectively, the "Authorities").

88.    Prior to the Petition Date, the Debtors generally paid their Taxes and Fees as they became due, and the Debtors believe any Taxes and Fees actually incurred as of the Petition Date are for current tax periods in the approximate amount of $350,000.

89.    The Debtors seek entry of an order allowing them to pay the Taxes and Fees to the Authorities, including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.  The Debtors have ample business justification to pay the Taxes and Fees because it is my understanding that:  (i) many, if not all, of the Taxes and Fees are priority claims under the Bankruptcy Code that come ahead of the Debtors' general unsecured creditors; (ii) the funds to satisfy certain of the Taxes and Fees may not constitute property of the Debtors' chapter 11 estates; (iii) the Debtors are required to pay the Taxes and Fees to maintain their good standing in certain jurisdictions in which they do business; (iv) failure to pay certain of the Taxes and Fees could give rise to liens on certain of the Debtors'

property; and (v) the Debtors' directors and officers may face personal liability if certain of the Taxes and Fees are not paid.  Therefore, to prevent immediate and irreparable harm that would result from such disruptions and distractions, the Debtors seek authority to pay the Taxes and Fees.  I believe that the motion should be approved because it is in the best interests of the Debtors, their estates, and creditors.

<em>v.    Postpetition Goods and Services Motion</em>

90.    As a result of the commencement of the Chapter 11 Cases, the Debtors believe that several suppliers of goods and services (collectively, the "<u>Suppliers</u>") with whom, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (the "<u>Outstanding Orders</u>") may perceive a risk that they will be treated as prepetition general unsecured creditors with respect to any shipments made after the Petition Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to deliver such goods or services to the Debtors unless the Debtors can assure payment.  The Debtors' business depends on the ability to quickly obtain necessary goods and services from the Suppliers in order to generate their product line.  The inability to maintain sufficient inventory due to the Suppliers' refusal to deliver goods could have a significant detrimental impact on the Debtors' business.

91.    Accordingly, for the reasons set forth herein and in the Postpetition Goods and Services Motion, the Debtors seek authority, but not direction, to satisfy their obligations in connection with the Outstanding Orders.  On behalf of the Debtors, I respectfully submit that the relief requested in the Postpetition Goods and Services Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and therefore should be approved.

vi.     *Employee Wages Motion*

92.     The continued and uninterrupted support of the Debtors' workforce is essential to the Debtors' success.  The skills and experience of the Debtors' employees, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' businesses are essential to the preservation and maximization of the value of the Debtors' estates.  Interruptions in payment of prepetition employee-related obligations will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

93.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, their employee-related obligations, as detailed in the Debtors' motion, including with respect to the following, whether arising pre- or post-petition:  (i) employee wages, salaries, paid time off, and other compensation, including, as applicable, any amounts due in accordance with the terms and conditions of collective bargaining agreements and amounts owed to staffing agencies; (ii) employee business expenses; (iii) contributions to prepetition benefit programs provided to employees; (iv) workers' compensation obligations; (v)  payments for which prepetition payroll deductions were made; (vi) processing costs and administrative expenses relating to the foregoing payments and contributions; and (vii) payments to third parties incident to the foregoing payments and contributions.  A chart setting forth the proposed maximum prepetition amounts the Debtors seek to pay with respect to each category of employee wages and benefits is set forth below:

01:25621777.4

| Employee Obligations | Approximate Amount Outstanding |
|---|---|
| Unpaid Wages and Related Amounts | $800,000 |
| Paid Time Off (Vacation and Holiday) | $2,400,000 |
| Accrued Sick Leave | $500,000 |
| Employee Expenses | $160,000 |
| Wage Deductions | $130,000 |
| Trust Fund Taxes and Payroll Taxes | $245,000 |
| Health Benefits | $40,000 |
| 401(k) Plans | $80,000 |
| Additional Employee Benefits | $16,000 |
| Union Benefits | $15,000 |
| **Total:** | $4,386,000 |

Through the motion, the Debtors seek authority to pay $1,486,000 on account of prepetition employee wages and benefits on an interim basis and $4,386,000 on account of prepetition employee wages and benefits on a final basis.

94.     The relief requested in the Debtors' motion is essential to the continued operation of the Debtors' businesses and will enable the Debtors to operate during the Chapter 11 Cases without disruption, thereby maximizing value for the Debtors' estates, creditors and other stakeholders.  Moreover, I am advised by counsel that the Debtors do not seek to compensate any employees on behalf of pre-petition obligations in an amount that exceeds the statutory priority cap of $13,650, unless required by applicable state law, and the Debtors will not make any payments to insiders that would violate the Bankruptcy Code.  For these reasons, I believe that the motion is in the best interests of the Debtors, their estates, and creditors, and, therefore, should be approved.

01:25621777.4

### vii.    Customer Programs Motion

95.    As discussed above, the Debtors' customer base is diverse and includes supermarkets, mass merchants, warehouse clubs, drug stores, restaurants, and food service distributors, among others (collectively, the "Customers").    In the ordinary course of their business, the Debtors engage in a number of practices to develop, support, and sustain a positive reputation with their Customers and in the marketplace generally (collectively, the "Customer Programs"), including rebate programs, slotting programs, a military sale program, and non-conforming goods and invoicing errors programs.    The Customer Programs are an essential component of the Debtors' competitive pricing structure and incentivize the Customers to continue purchasing the Debtors' products.

96.    The Debtors' industry is competitive, and the success of the Debtors' business hinges on the Debtors' relationship with their Customers.    It is therefore essential that they maintain a strong connection with their current Customers.    Ultimately, the Debtors believe that it is in the best interest of the estates to continue to honor the Customer Programs in order to maintain the productive relationships the Debtors have with their Customers, without the benefit of which the Debtors' business, and ultimately the outcome of the Chapter 11 Cases, would be irreparably harmed.    In furtherance thereof, I believe that the continuation of the Customer Programs is a critical component of maximizing estate value and that the relief requested in the motion should therefore be approved.

### viii.    Cash Management Motion

97.    In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving eleven (11) bank accounts (collectively,

01:25621777.4

the "Bank Accounts").  The Cash Management System provides a well-established mechanism for the collection, management, and disbursement of funds used in the Debtors' business.

98.     In light of the substantial size and complexity of the Debtors' operations, significant disruptions to the Debtors' business would be highly likely if the cash management procedures must be quickly altered.  As such, it is essential that the Debtors be permitted to maintain their Cash Management System in its current format.

99.     Given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of bank accounts and a new cash management and disbursement system for each of the five (5) legal entities that comprise the Debtors.  The Debtors, therefore, seek authority for the continued use of the Cash Management System and Bank Accounts.  The Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts.  The Debtors also request authority for the banks to charge and the Debtors to pay or honor service and other fees, costs, charges and expenses to which the banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors.

100.     The Debtors believe that the use of the bank accounts substantially complies with section 345(b) of the Bankruptcy Code, other than with respect to certain bank accounts held at Kasikornbank.  Kasikornbank is not an authorized depository but it is insured by the Deposit Protection Agency of Thailand.  The Debtors seek an interim waiver of section 345(b) as it pertains to the Kasikornbank Accounts to permit them to continue to deposit funds in such bank accounts.

101.    In the ordinary course of their business, the Debtors maintain business relationships between and among themselves and certain of their non-Debtor affiliates (the "Non-Debtor Affiliates").  As part of these business relationships, the Debtors and Non-Debtor Affiliates participate in a variety of intercompany transactions (the "Intercompany Transactions") that generate intercompany receivables and payables (the "Intercompany Claims").  The Debtors maintain strict records of the Intercompany Claims and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

102.    Although each Debtor and Non-Debtor Affiliate plays a role that is integral to the Debtors' overall operations and financing arrangements, not all entities generate sufficient cash flow from external customers for their operations.  Thus, as described below, the Cash Management System provides the mechanism for cash to flow through the Debtors and Non-Debtor Affiliates so that operations may be maintained.  To lessen the disruption caused by the Chapter 11 Cases and to maximize the value of the Debtors' estates, I believe it is essential that the Debtors be allowed to continue to the Intercompany Transactions in the ordinary course.

*(1) Intercompany Claims for General Support Services*

103.    In the ordinary course of business, Bumble Bee Foods provides certain services to its Debtor and Non-Debtor Affiliates, including headquarter, computer system, quality assurance, accounting services, and procurement services, among others.  Bumble Bee Foods charges its affiliates for the reasonable value of the services on pricing that Bumble Bee Foods believes is equivalent to pricing that would be provided in an arm's-length third party transaction.  These charges are made on a periodic basis and settled through book entries.  Historically, no cash is exchanged between Bumble Bee Foods and its affiliates for these support

services as they are provided. Certain of the Non-Debtor Affiliates have valuable business operations that service the Debtors directly, while others enhance the overall value of the global enterprise of which the Debtors are a part that is being marketed for sale. I believe that the services provided by Bumble Bee Foods are essential to the functioning of these Non-Debtor Affiliates.

104.    In the ordinary course of business, a salesperson employed by Non-Debtor Affiliate Connors Bros. Clover Leaf provides certain support services to Anova Food. Connors Bros. Clover Leaf charges Anova Food for the reasonable value of these services on pricing that Connors Bros. Clover Leaf believes is equivalent to pricing that would be provided in an arm's-length third party transaction. The provision of the services creates an intercompany claim in favor of Connors Bros. Clover Leaf, which is settled through book entries. No cash is exchanged between the parties.

*(2) Intercompany Claims for Goods*

105.    The Debtors purchase sardines from Canada and the Debtors sell certain products to their Canadian affiliates for re-sale internationally. These transactions have historically been settled through book entries maintaining the intercompany balances and are typically settled in cash at the end of the year. On average, the Debtors incur approximately $1 to $1.5 million per month on account of the goods they purchase from their Canadian affiliates. I believe that this pricing is equivalent to pricing that would be provided in an arm's-length third party transaction.

*(3) Intercompany Claims for the Funding of Foreign Affiliates Who Primarily Support Anova Food and Bumble Bee Foods*

106.    In addition to the general support services described above, the Debtors have various Intercompany Transactions with their foreign non-Debtor affiliates (the "Foreign

Affiliates") whose operations are essential to the Debtors' domestic business operations run through Anova Food. Anova Food is an importer and distributor of seafood products—primarily as a supplier of frozen tuna to distributors, retail grocers, and restaurants.

107.    The most substantial of these Intercompany Transactions occurs between Bumble Bee Foods, Anova Food, and non-Debtor Coral Triangle Processors, LLC ("Coral Triangle"). Coral Triangle is a seafood processing and manufacturing company based in the Marshall Islands. It manages key contracts with processing facilities in Indonesia, Thailand, and Vietnam. Using specialized knowledge of the seafood industry and various quality grades, Coral Triangle procures unprepared tuna loins from third-party fishing operators. With the assistance of Non-Debtor Affiliate Anova Technical Services, LLC ("Anova Technical"), Coral Triangle manages and directs the process for cleaning, cutting, freezing, and packaging product.

108.    Bumble Bee Foods provides Coral Triangle funding to allow it to prepare finished goods on behalf of Anova Food, Coral Triangle provides finished goods to Anova Food on an exclusive and non-cash basis, and Anova Food sells the finished goods to its customers in the United States. The finished goods Anova Food obtains from Coral Triangle account for a large part of Anova Food's inventory. The revenue Anova Food receives on account of these finished goods is used to pay down the ABL Facility. All of these transactions are identified on the books of Bumble Bee Foods and its affiliates. On average, Bumble Bee Foods makes cash payments totaling approximately $4 million to $5 million per month to Coral Triangle to fund its purchase of goods and its operating disbursements.

109.    While on a smaller scale, the Debtors also fund the operations of Anova Technical, who in turn funds the operations of Non-Debtor Affiliate PT Seafood Inspection Laboratory ("PT Seafood"). Anova Technical operates primarily as a seafood procurement

company and as a provider of quality control services for Anova Food's and Bumble Bee Foods' seafood supply chain including arranging for the purchase of frozen and processed/packaged tuna products by Anova Food (from unrelated suppliers) and of unprocessed tuna on behalf of Coral Triangle.  As noted above, the product that Anova Technical sources for Coral Triangle is eventually sold to Anova Food (after processing by Coral Triangle); hence, Anova Food is an ultimate beneficiary of Anova Technical's procurement efforts.   Anova Technical receives funding from Bumble Bee Foods, Anova Food, and certain Canadian affiliates to support its operations and, in turn, funds PT Seafood and PT Asindo.  On average, Anova Technical receives approximately $250,000 per month from Bumble Bee Foods.

110.    PT Seafood is a seafood lab testing service provider and is the exclusive supplier of Neogen test kits in Indonesia.  PT Seafood has substantial involvement from the Food and Drug Administration for establishing seafood regulatory standards.  It provides laboratory testing services to Anova Technical to assist Anova Technical in its function as quality inspection agent for Anova Food.  PT Seafood also sells seafood testing kits and services to third parties.   On average, PT Seafood receives approximately $150,000 per month from Anova Technical.

111.    Non-Debtor Affiliate PT Asindo Minesagara ("PT Asindo") maintains Anova Food's primary Clearsmoke distribution facility.  Clearsmoke is a patented technology based on the principles of traditional wood smoking, which Anova Food uses to preserve the quality of its frozen seafood products.  PT Asindo is largely self-funded but Anova Food provides it certain supplies, including wood, spare parts, and other machinery that is used to make the Clearsmoke smoke machines.  The value of these supplies is approximately $5,000 per month.

112.    Bumble Bee Foods funds the operations of Coral Triangle and Anova Technical and its subsidiaries, and receives the benefit of those entities providing goods to Anova Food and services to Bumble Bee Foods and Anova Food on a non-cash basis.  Further, these goods and services are essential to the conduct of the operation of Anova Food and Bumble Bee Foods, and the revenues from the sale of finished goods by Anova Food, a wholly-owned subsidiary of Bumble Bee Foods, are used to pay down the obligations under the ABL Facility, thereby creating liquidity for Bumble Bee Foods and enhancing the value of Anova Food.  All of these transactions are recorded on Bumble Bee Foods' books and these entities typically settle their intercompany accounts on at least a yearly basis.

*(4) Intercompany Claims for the Funding of Foreign Affiliates Who Primarily Support Anova Food and Bumble Bee Foods*

113.    Lastly, as described above, Bumble Bee Foods is one of the two borrowers under the ABL DIP Facility.  Over the course of the Chapter 11 Cases, receipts from Bumble Bee Foods and Connors Bros. will be applied to reduce the advances under the ABL DIP Facility.  The Debtors project that over the course of the Chapter 11 Cases Connors Bros. will be a net liquidity provider to the Debtors and the Debtors will owe a balance to Connors Bros. resulting from the application of cash generated by Connors Bros. and its subsidiaries to satisfying advances made to Bumble Bee Foods as borrower under the ABL DIP Facility.

114.    I believe that the relief requested in this motion is essential to the Debtors' business operations and is in the best interests of the Debtors, their estates, and creditors. Accordingly, I believe that the relief requested in the motion should be approved.

01:25621777.4

ix.    *Vendors Motion*

**(1)    Foreign Vendors**

115.    As discussed above, while the Debtors rely on suppliers in the United States to obtain certain goods and services, the Debtors obtain the overwhelming majority of goods and services used in the operation of their businesses from foreign vendors, which are primarily located in the Asia Pacific region.  Specifically, the Debtors obtain the vast majority of their albacore tuna and "light meat" tuna, including skipjack, yellowfin, and bigeye, from FCF. The Debtors obtain smaller volumes of fresh and frozen tuna as well as oysters, sardines, and other raw and finished food products from other foreign vendors.  In addition, the Debtors rely on the foreign vendors to provide processing services, such as cleaning, de-boning, and loining fish and other raw seafood purchased by the Debtors.  The foreign vendors also provide preparation and packaging services, canning supplies, and equipment essential to the Debtors' business operations.  Each of the foreign vendors plays a critical role in the Debtors' manufacturing process and could not be easily replaced.

116.    Given the importance the foreign vendors play in the Debtors' manufacturing process, even a temporary disruption in the Debtors' supply chain would have a devastating effect on the operation of the Debtors' businesses.  Indeed, the vast majority of foreign vendors also satisfy the criteria for consideration as a critical vendor set forth in the Vendors Motion, including, as described in more detail below, FCF.  Accordingly, I believe that the Debtors need the ability to pay the foreign vendor claims on an uninterrupted basis.  Through the Vendors Motion, the Debtors seek authority to pay foreign vendor claims up to a total of $28.6 million on an interim basis and up to a total of $58.4 million on a final basis.  The Debtors believe that approximately $14 million of this amount is entitled to priority under section 503(b)(9) of the Bankruptcy Code.

117.    FCF is among the foreign vendors the Debtors seek authority to pay.  It is, by far, the most critical of the Debtors' vendors.  Albacore tuna products are the Debtors' leading product segment, representing $279 million (or 38%) of the Debtors' annual sales in the United States and $62 million (or 44%) of the Debtors' annual gross profit.  Since 2010, FCF has met between 95% to 100% of the Debtors' albacore demand and 70% to 100% of their light meat tuna demand.  This is not surprising because FCF is responsible for a large percentage of the longline-caught tuna in markets available to the Debtors, and the Debtors' specifications require them to use only longline-caught tuna in their products.  The remaining available longline-caught tuna is dispersed among one other larger participant and multiple smaller brokers and fisheries. The Debtors estimate that replacing FCF would take no less than six (6) months and as long as one (1) year.  To do so would also be capital and resource intensive and might even require the Debtors to take on the "middle-man" role that FCF currently serves by directly sourcing fish from boats in various foreign locations.  Of course, FCF is significantly advantaged in those markets because it operates in the native languages—a capability the Debtors do not currently have—and has pre-existing relationships with fishing vessels in these locations.

118.    There are three (3) important financial elements underlying the Debtors' request to provide FCF critical vendor status beyond the outright critical nature of the products that FCF supplies.  *First*, the Debtors are conditioning critical vendor status on FCF continuing to provide the ninety (90)-day payment terms that it afforded to the Debtors prior to these Chapter 11 Cases and to continue to adhere to pricing terms favorable to the Debtors.  *Second*, the Debtors' DIP Financing incorporates as a key assumption that such additional payment terms will be provided by FCF.  *Third*, and related to the prior two (2) points, FCF will be paid its pre-petition claim, which is approximately $51 million, in accordance with the agreed-upon ninety

(90)-day payment terms, rather than as a lump-sum or on an otherwise accelerated schedule.  In sum, the Debtors believe that there will be substantial financial benefits to the estates from maintaining the ninety (90)-day payment terms with FCF during the course of these Chapter 11 Cases; indeed, the Debtors' DIP financing budget is premised on the maintenance of such payment terms.

119.    The Debtors identified FCF as their most important vendor in the very early stages of planning for the Chapter 11 Cases and well before FCF emerged as a serious bidder.  In obtaining important accommodations from FCF prior to the Chapter 11 Cases, the Debtors communicated to FCF that it would be considered for foreign or critical vendor treatment and that the Debtors would seek a first day order to continue to satisfy FCF's claims—arising both pre- and post-petition—in accordance with the parties' prevailing business practices. I believe FCF's comfort that it would be paid as a foreign or critical vendor during the Chapter 11 Cases was a significant factor contributing to FCF's decision to provide the Debtors with ninety (90)-day payment terms as the Debtors underwent their financial restructuring, and this additional liquidity allowed the Debtors to conduct the robust marketing process described herein, among other things.  For these reasons, I believe that it is essential to maintain the ordinary course payment terms between the Debtors and FCF, including payment for goods received prepetition and to continue to purchase goods postpetition, all on the agreed to ninety (90)-day payment terms, in these Chapter 11 Cases.

120.    Moreover, even without critical vendor status, FCF would be entitled to payment in full of its claims in these Chapter 11 Cases in any realistic scenario.  As stated above, the FCF Supply Contract is critical to the Debtors' business and will likely need to be assumed by any acquirer of the Debtors' assets.  Assumption, of course, would require that all outstanding

amounts due under the FCF Supply Contract, including those arising prepetition, would need to be paid to cure the defaults under the FCF Supply Contract.  Therefore, affording FCF critical vendor status will merely alter the timing of FCF's statutory entitlement to payment in full of its prepetition claim under the FCF Supply Contract.  The Debtors submit that the unique circumstances described above are more than sufficient to justify granting FCF critical vendor status at this time.

### (2)    Domestic Critical Vendors

121.    In the ordinary course of business, the Debtors engage domestic critical vendors to provide various goods and services essential to the production and distribution of their products.  Among other things, the domestic critical vendors:  (i) supply seafood, meat and poultry finished products as well as other goods used in the Debtors' products; (ii) provide packaging services; and (iii) supply cans, lids, and other goods necessary to package the Debtors' products.  The Debtors' business depends on, among other things, the Debtors' ability to retain their domestic critical vendors and maintain their reputation and customer loyalty.  The Debtors need to be able to assure their customers, vendors, services providers, and employees that, notwithstanding the filing of the Chapter 11 Cases, they will continue to operate at the highest level.

122.    To identify the domestic critical vendors, the Debtors have reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria: (i) whether there is an alternative source for the goods or services that can be acquired within a reasonable amount of time; (ii) whether there is a unique process or special knowledge of the Debtors that the vendor has possessed over time that no one else has; (iii) whether the vendor's products been pre-approved for use in the Debtors' end product by the Debtors' customers; and (iv) whether a vendor meeting any of the

01:25621777.4

foregoing criteria is able or likely to refuse to provide goods or services to the Debtors postpetition if its prepetition balances are not paid.

123.    In many instances, the domestic critical vendors provide services or goods unique to the Debtors that could not be easily or quickly obtained from another vendor or are sole-source providers.  In addition, although certain services or goods provided by the domestic critical vendors could be obtained elsewhere, I do not believe that alternative providers could be found within a reasonable amount of time or would be acceptable to their customers.  I believe that it is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, the domestic critical vendors given the critical role that they play in the Debtors' business.  To prevent the commencement of the Chapter 11 Cases from causing an unexpected or inopportune interruption to their business operations, the Debtors are seeking to pay domestic critical vendor claims to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the domestic critical vendors.

124.    Through the Vendors Motion, the Debtors seek authority to pay domestic critical vendor claims up to a total of $4.3 million on an interim basis and up to a total of $4.4 million on a final basis.  Of this amount, the Debtors believe that approximately $3.3 million is entitled to priority under section 503(b)(9) of the Bankruptcy Code.

**(3)    Lien Claims**

125.    The Shippers and Warehousemen.  In the ordinary course of business, the Debtors necessarily depend on an extensive shipping, warehousing and distribution network to move goods to their factories and finished product to their customers.  The Debtors accordingly engage the use of reputable common carriers, dedicated carriers, freight-forwarders, ocean carriers, parcel carriers, consolidators, brokers and customs agents (collectively, the "Shippers"). The Debtors also support their distribution capabilities by contracting with certain third-party

warehousemen, distributors and logistics providers who store goods in transit on behalf of the Debtors (the "Warehousemen").

126.    If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation and storage of the Debtors' property, various statutes, tariffs, and agreements may permit the Shippers or Warehousemen, as applicable, to assert possessory liens against or otherwise exercise control over the Debtors' property in their possession.  In addition, shipments may be stopped in transit or not released if customs duties are not paid by the Debtors or their customs agents when due in the ordinary course.  The successful operation of the Debtors' business, and thus their ability to maximize the value of their assets, depends on their ability to process such goods.

127.    Other Potential Lienholders.  In addition to the Vendor Claims of Shippers and Warehousemen, the Debtors also from time to time transact business with a number of other third parties (collectively, the "Lien Claimants") who, under applicable non-bankruptcy law, may have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date.  Such Lien Claimants may have provided equipment and/or performed various services for the Debtors, including (i) providing equipment and parts necessary for the operation of the Debtors' factories and (ii) rendering essential services related to the operation of the Debtors' facilities, such as machine repair and maintenance.

128.    As of the Petition Date, certain Lien Claimants may not have been paid in full for certain prepetition goods, equipment and services, which may result in such Lien Claimants asserting, and perfecting, statutory liens against the Debtors' facilities or the Debtors' goods or equipment, notwithstanding the automatic stay under section 362 of the Bankruptcy

01:25621777.4

Code.   Furthermore, certain Lien Claimants may refuse to perform ongoing services to the Debtors, including manufacturing, installation, repair and servicing obligations, unless their claims are paid in full.

129.    I believe that if the Debtors are unable to pay the Lien Claims, they could risk losing access to critical property, which could immediately and irreparably harm the Debtors to the detriment of all stakeholders.  Through the Vendors Motion, the Debtors seek authority to pay Lien Claims up to a total of $3.6 million, all of which will be due within the first thirty (30) days of the Chapter 11 Cases.

130.    I believe that each category of claims the Debtors seek to pay under the motion is essential to prevent irreparable harm to the Debtors' business operations and that therefore the motion should be approved.

## **<u>CONCLUSION</u>**

131.    I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019          */s/ Kent McNeil*
                                   Kent McNeil
                                   Chief Financial Officer

## **EXHIBIT A**

**Corporate Organizational Chart**

