## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 12 & 68** |

**FINAL ORDER: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**"), dated November 21, 2019, of Bumble Bee Parent, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002, 4001-1, 4001-2, and 9013-1 of the Local Rules for the United States Bankruptcy Court, District of Delaware (the "**Local Rules**") seeking, among other things:

        i.      authorization for the Debtors to obtain a senior secured asset-based debtor in possession credit facility with the priority set forth in the waterfall attached hereto as **Exhibit C** (the "**Priority Waterfall**") and, as to the Term Loan DIP Facility (as defined below), the priority set forth in the Priority Waterfall and in the DIP Intercreditor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is 280 Tenth Avenue, San Diego, CA 92101.

Agreement (as defined herein) (the "**ABL DIP Facility**") consisting of up to $200,000,000 in revolving credit commitments, subject to the terms, conditions, and limitations set forth herein and in the documentation regarding the ABL DIP Facility (the commitments thereunder the "**Revolving DIP Commitments**" and the loans thereunder the "**Revolving DIP Loans**"), which shall include (a) the immediate conversion (i.e. "roll up") of all outstanding Prepetition ABL Credit Agreement Indebtedness (as defined below) into obligations under the ABL DIP Facility (the "**Prepetition ABL Roll Up**") upon entry of the Interim Order, (b) funding of those certain expenditures set forth in the Approved Budget (as defined below), and (c) an amount equal to $10,000,000 of the Revolving DIP Commitments available in the form of standby letters of credit, inclusive of all outstanding letters of credit existing under the Prepetition ABL Credit Agreement (as defined herein) converting to letters of credit under the ABL DIP Facility, provided by Wells Fargo Capital Finance, LLC ("**Wells Fargo**"), as administrative agent (in such capacity, the **"ABL DIP Agent")**, and the lenders thereunder (collectively, and together with Wells Fargo, in such capacity, the "**ABL DIP Lenders**");

ii.     authorization for the Debtors to enter into the ABL DIP Facility, and approving the terms and conditions thereof, as set forth in this Final Order (as defined herein) and the ABL DIP Documents (as defined herein) entered into, by and among Bumble Bee Foods, LLC (the "**U.S. ABL DIP Borrower**"), Connors Bros. Clover Leaf Seafoods Company as Canadian Borrower (the "**Canadian Borrower**"), Bumble Bee Foods S.À.R.L. ("**Holdings**"), certain subsidiaries of Holdings as guarantors, the ABL DIP Agent, and the ABL DIP Lenders (in the form attached hereto as **Exhibit A**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified

from time to time in accordance with the terms thereof and hereof, the "**ABL DIP Agreement**," and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**ABL DIP Documents**," including, without limitation, any fee letters executed by the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, as necessary, collectively, the "**ABL Fee Letters**");

iii.     authorization for the Debtors to execute and deliver the ABL DIP Agreement and the other ABL DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

iv.     authorization for the ABL DIP Agent to terminate the ABL DIP Agreement in accordance with the terms hereof and thereof;

v.     effective upon entry of this Final Order, authorization to grant liens to the DIP Agents and DIP Lenders on all of the proceeds or property recovered (collectively, the "**Avoidance Proceeds**") on account of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**");

vi.     allowance of the ABL DIP Superpriority Claims (as defined herein) in favor of the ABL DIP Agent and the ABL DIP Lenders;

vii.     authorization for Bumble Bee Foods, LLC (the "**Term Loan DIP Borrower**") to obtain a senior secured term loan debtor in possession credit facility with the priority set forth in the Priority Waterfall and, as to the ABL DIP Facility, the priority set forth in the Priority Waterfall and in the DIP Intercreditor Agreement (the "**Term**

**Loan DIP Facility**" together with the ABL DIP Facility, the "**DIP Facilities**") consisting of up to $80 million in term loan credit commitments (the commitments thereunder, the "**Term Loan DIP Commitments**" and, together with the ABL DIP Commitments, the "**DIP Commitments**"; the loans thereunder the "**Term DIP Loans**" and, together with the ABL DIP Loans, the "**DIP Loans**"), provided by the lenders thereunder (collectively, the "**Term Loan DIP Lenders**" and, together with the ABL DIP Lenders, the "**DIP Lenders**");

viii.       authorization for the Debtors to enter into the Term Loan DIP Facility, and approving the terms and conditions thereof, as set forth in this Final Order and the Term Loan DIP Documents (as defined herein) entered into, by and among the Term Loan DIP Borrower, Holdings and certain subsidiaries of Holdings as guarantors, Brookfield Principal Credit LLC, as administrative agent (in such capacity, the "**Term Loan DIP Agent**") (the Term Loan DIP Agent with the ABL DIP Agent, collectively, the "**DIP Agents**"), and the Term Loan DIP Lenders (in the form attached hereto as **Exhibit B**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**Term Loan DIP Agreement**" and, together with the ABL DIP Agreement, the "**DIP Agreements**") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, (collectively, the "**Term Loan DIP Documents**" and, together with the ABL DIP Documents, the "**DIP Documents**"), including, without limitation, any fee letters executed by the Debtors, the Term Loan DIP

Agent, and the Term Loan DIP Lenders, as necessary (collectively, the "**Term Loan Fee Letters**" and, together with the ABL Fee Letters, the "**Fee Letters**");

ix.      authorization for the Debtors to execute and deliver the Term Loan DIP Agreement and the other Term Loan DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

x.      approving that certain DIP Intercreditor Agreement by and between the ABL DIP Agent, the Term Loan DIP Agent, the Prepetition ABL Agent (as defined herein) and the Prepetition Term Loan Agent (as defined herein) (in the form attached hereto as **Exhibit E**, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Intercreditor Agreement**");

xi.      authorization for the Term Loan DIP Agent to terminate the Term Loan DIP Agreement in accordance with the terms thereof;

xii.      allowance of the Term Loan DIP Superpriority Claims (as defined herein) in favor of the Term Loan DIP Agent and the Term Loan DIP Lenders;

xiii.      authorization, subject to the terms and provisions hereof, for the Debtors to use, among other things, Cash Collateral (as defined herein), within the meaning of section 363(a) of the Bankruptcy Code;

xiv.      the granting of adequate protection to the (a) lenders under the Prepetition ABL Credit Agreement (as defined herein), and (b) lenders under the Prepetition Term Loan Credit Agreement (as defined herein);

xv.      entry of this Final Order providing that (a) the Debtors waive any right to surcharge against the DIP Collateral and the Prepetition Collateral (each as defined

herein), including pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the Prepetition Secured Parties (as defined herein) are not subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, and (c) subject to Paragraph 19 hereof, the Prepetition Secured Parties are not subject to the equitable doctrine of "marshaling," or any other similar doctrine with respect to the DIP Collateral;

xvi.        pursuant to Bankruptcy Rule 4001(c)(2), requesting an interim hearing on the DIP Motion be held before this Court to consider entry of an interim order (the "**Interim Order**") (A) (i) authorizing the U.S. ABL DIP Borrower, on an interim basis, to borrow under the ABL DIP Facility an amount not to exceed $200 million (the "**Interim ABL Commitment Amount**"), and (ii) authorizing the Term Loan DIP Borrower, on an interim basis, to borrow under the Term Loan DIP Facility an amount not to exceed $40 million (the "**Interim Term Loan Commitment Amount**" and together with the Interim ABL Commitment Amount, the "**Interim Order Commitment Amount**")**, where a portion of the Interim ABL Commitment Amount shall be accessed to effectuate the Prepetition ABL Roll Up, and the rest of the Interim Order Commitment Amount shall be accessed to meet the Debtors' working capital and other needs pending the final hearing and as set forth in the Approved Budget (as defined herein), (B) authorizing the Debtors' use of Cash Collateral, and (C) granting the adequate protection and other relief described therein;

xvii.        scheduling a final hearing (the "**Final Hearing**") to consider entry of a final order (the "**Final Order**") approving the DIP Motion and approving the Debtors' notice with respect thereto; and

xviii.        granting related relief.

The Court having held an interim hearing pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) on November 22, 2019 (the "**Interim Hearing**"), and the Court having entered the Interim Order on November 25, 2019 [Docket No. 68] granting the relief requested in the DIP Motion on an interim basis as set forth in the Interim Order and the Court having held the Final Hearing on December 19, 2019 to consider entry of the Final Order; and upon the record of the Interim Hearing and the Final Hearing and upon the Court's consideration of the DIP Motion and all exhibits thereto; and upon the First Day Declaration and the Winthrop Declaration; and upon due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**[2]

A.    Petition Date:  On November 21, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.  On December 3, 2019, an official committee of unsecured creditors (the "**Committee**") was appointed in the Cases pursuant to section 1102 of the Bankruptcy Code.

B.    Jurisdiction.  This Court has core jurisdiction over these Cases, this DIP Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    <u>Notice</u>.  The notice given by the Debtors of the DIP Motion, the DIP Documents, entry of the Interim Order, and the Final Hearing was proper, timely, and adequate and sufficient notice and complies with Bankruptcy Rules 4001(b) and (c).

D.    <u>Debtors' Stipulations</u>.   After consultation with their attorneys and financial advisors, and without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 34 below), the Debtors admit, stipulate and agree that:

(a)    <u>Prepetition ABL Credit Agreement and Prepetition Term Loan Credit Agreement</u>.

(i)    The U.S. ABL DIP Borrower, the Canadian Borrower, Holdings and the other Guarantors party thereto (collectively, the "**Prepetition ABL Credit Parties**"), Wells Fargo Capital Finance, LLC, as administrative agent (in such capacity, the "**Prepetition ABL Agent**"), and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**" and, together with the Prepetition ABL Agent, the "**Prepetition ABL Secured Parties**"), are party to that certain ABL Credit Agreement, dated as of August 18, 2017 (as the same has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including the Prepetition ABL Security Agreement (as defined below)), as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**Prepetition ABL Documents**").

(ii)     As of the Petition Date, the outstanding aggregate principal amount under the Prepetition ABL Credit Agreement was not less than $192,420,215 consisting of $186,817,599 in revolving loans and $5,602,616 in letters of credit (together with all other outstanding Obligations, as defined in the Prepetition ABL Credit Agreement, including interest, fees and expenses, the "**Prepetition ABL Credit Agreement Indebtedness**").

(iii)     As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Credit Parties granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, a security interest in and continuing lien on (the "**Prepetition ABL Credit Agreement Liens**") substantially all of their assets and property (with certain exceptions set out in the Prepetition ABL Documents) including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement referred to below) (which for the avoidance of doubt, includes "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**")) *other than* (x) Term Loan Priority Accounts (as defined in the Prepetition Intercreditor Agreement) and (y) Cash Collateral (in the case of each of (x) and (y), that is proceeds of Term Loan Priority Collateral (as defined in the Prepetition Intercreditor Agreement)) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition ABL Priority Collateral**"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in that certain Prepetition Intercreditor Agreement, defined below) and proceeds, products, and rents of any of the foregoing (collectively, the

"**<u>Prepetition Term Loan Priority Collateral</u>**," and together with the Prepetition ABL Priority Collateral, the "**<u>Prepetition Collateral</u>**") subject only to Permitted Prior Liens (as defined herein) and the liens of the Prepetition Term Loan Agent on the Prepetition Term Loan Priority Collateral and excluding the Excluded Assets (as defined in the Prepetition ABL Security Agreement).

(iv)    The Term Loan DIP Borrower, Holdings and the other Guarantors (collectively, the "**<u>Prepetition Term Loan Credit Parties</u>**" and, together with the Prepetition ABL Credit Parties, the "**<u>Prepetition Credit Parties</u>**"), Brookfield Principal Credit LLC, as administrative agent thereunder (the "**<u>Prepetition Term Loan Agent</u>**" and, together with the Prepetition ABL Agent, the "**<u>Prepetition Agents</u>**"), the lenders from time to time party to the Prepetition Term Loan Agreement (the "**<u>Prepetition Term Loan Lenders</u>**"; the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, together with the Prepetition ABL Secured Parties, the "**<u>Prepetition Secured Parties</u>**"), are party to that certain Term Loan Credit Agreement, dated as of August 15, 2017 (as the same has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "**<u>Prepetition Term Loan Credit Agreement</u>**" and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including the Prepetition Term Loan Security Agreement (as defined below)), as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**<u>Prepetition Term Loan Documents</u>**", and together with the Prepetition ABL Documents, the "**<u>Prepetition Credit Documents</u>**").

(v)     As of the Petition Date, the outstanding aggregate principal amount of term loans under the Prepetition Term Loan Credit Agreement was $649,233,814 and the outstanding Prepayment Premium (as defined in the Prepetition Term Loan Credit Agreement) that was due and payable was $32,461,691 (collectively with all other outstanding obligations including all accrued and unpaid interest, fees, costs, charges, any other premiums and expenses, the "**Prepetition Term Loan Credit Agreement Indebtedness**" and, together with the Prepetition ABL Credit Agreement Indebtedness, the "**Prepetition Credit Agreement Indebtedness**").

(vi)     As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Credit Parties granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, a security interest in and continuing liens on (the "**Prepetition Term Loan Credit Agreement Liens**," and, together with the Prepetition ABL Credit Agreement Liens, the "**Prepetition Liens**") substantially all of their assets and property (with certain exceptions set out in the Prepetition Term Loan Documents), including (a) a first priority security interest and continuing lien on the Prepetition Term Loan Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to Permitted Prior Liens (as defined herein) and the liens of the Prepetition ABL Administrative Agent on the Prepetition ABL Priority Collateral and excluding the Excluded Assets (as defined in the Prepetition Term Loan Security Agreement).

(vii)     The Prepetition ABL Agent and the Prepetition Term Loan Agent entered into that certain prepetition Intercreditor Agreement dated as of August 15, 2017

(as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "**Prepetition Intercreditor Agreement**") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other Prepetition Credit Parties that are not Debtors.  Each of the Prepetition Credit Parties under the Prepetition Credit Documents acknowledged and agreed to the Prepetition Intercreditor Agreement.

(b)    The Prepetition ABL Credit Agreement Indebtedness constitutes the legal, valid and binding obligations of the Prepetition ABL Credit Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition ABL Credit Agreement Indebtedness is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(c)    The Debtors acknowledge and agree that as of the Petition Date: (i) the Prepetition ABL Credit Agreement Liens on the Prepetition Collateral and the Prepetition ABL Credit Agreement Indebtedness were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties; (ii) the Prepetition ABL Credit Agreement Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Loan Priority Collateral, and (2) certain liens otherwise permitted by the Prepetition ABL Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition ABL Credit Agreement Liens as of the Petition Date, the "**Prepetition ABL Permitted Prior Liens**"); (iii) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the

Prepetition ABL Credit Agreement Liens or Prepetition ABL Credit Agreement Indebtedness exist, and no portion of the Prepetition ABL Credit Agreement Liens, Prepetition ABL Credit Agreement Indebtedness or any amounts paid to the Prepetition ABL Secured Parties or applied to the obligations owing under the Prepetition ABL Documents prior to the Petition Date is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, subordination (equitable or otherwise), recovery, attack, offset, contest, objection, reclassification, reduction or counterclaim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (iv) the Debtors and their estates have no claims, objections, challenges, defenses, setoff rights, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Credit Agreement; and (v) the Prepetition ABL Credit Agreement Indebtedness constitutes an allowed, secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code.

(d)     The Prepetition Term Loan Credit Agreement Indebtedness constitutes the legal, valid and binding obligations of the Prepetition Term Loan Credit Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Term Loan Credit Agreement Indebtedness is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(e)     The Debtors acknowledge and agree that as of the Petition Date: (i) the Prepetition Term Loan Credit Agreement Liens on the Prepetition Collateral and the Prepetition

Term Loan Credit Agreement Indebtedness were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Agent; (ii) the Prepetition Term Loan Credit Agreement Liens were senior in priority over any and all other liens in the Prepetition Term Loan Credit Agreement Collateral, subject only to (1) the Prepetition ABL Credit Agreement Liens on the Prepetition ABL Priority Collateral, and (2) certain liens otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date, the "**Prepetition Term Loan Permitted Prior Liens**" and, together with the Prepetition ABL Permitted Prior Liens, the "**Permitted Prior Liens**"); (iii) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Credit Agreement Liens or Prepetition Term Loan Credit Agreement Indebtedness exist, and no portion of the Prepetition Term Loan Credit Agreement Liens or Prepetition Term Loan Credit Agreement Indebtedness or any amounts paid to the Prepetition Term Loan Agent or applied to the obligations owing under the Prepetition Term Loan Documents prior to the Petition Date is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, subordination (equitable or otherwise), recovery, attack, offset, contest, objection, reclassification, reduction or counterclaim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (iv) the Debtors and their estates have no claims, objections, challenges, defenses, setoff rights, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Term Loan Agent, Prepetition Term Loan Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals,

officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Credit Agreement; and (v) the Prepetition Term Loan Credit Agreement Indebtedness constitutes an allowed, secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code.

(f)     Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns hereby unconditionally, irrevocably and fully, forever waives, discharges, and releases (i) any right to challenge any of the Prepetition Credit Agreement Indebtedness, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Credit Agreement Indebtedness and (ii) each of the Prepetition Agents and the other Prepetition Secured Parties, and each of their respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accounts, attorneys, affiliates, and predecessors in interest of any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights that exist on the date hereof relating to any of the Prepetition Credit Documents or the transactions contemplated under such documents, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, arising at law or in equity, including, without limitation, any so-called "lender liability," recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of state or federal law and any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or the claims of the Prepetition Secured Parties and Prepetition Agents.

25738781.1

(g)    Subject to paragraph 34 hereof, the Debtors' acknowledgements, stipulations and releases (as set forth in this paragraph) shall be binding on the Debtors and their respective representatives, successors and assigns, and on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in the Cases, whether such trustee or representative is appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

E.    <u>Prepetition Intercreditor Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Credit Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Final Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Final Order or the DIP Documents, unless expressly set forth herein or therein.

F.    <u>Findings Regarding DIP Facilities and Use of Cash Collateral</u>.

(a)    Good cause has been shown for the entry of this Final Order.

(b)    The Debtors have a critical need to obtain the DIP Facilities and to use Cash Collateral as well as other collateral to continue the operation of their businesses.  Without such funds, the Debtors will not be able to meet their payroll obligations or to pay operating and other expenses during this critical period.  The ability of the Debtors to finance their operations through the incurrence of new indebtedness is vital to the preservation and maintenance of the

going concern value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the estates.

(c)    The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

(d)    The DIP Agents and the DIP Lenders are willing to provide the DIP Facilities, and the Prepetition Secured Parties are willing to consent to the use of their Cash Collateral and other Prepetition Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Final Order, as applicable, and provided that the DIP Liens, the DIP Superpriority Claims and other protections granted by this Final Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facilities and the Cash Collateral use approved by this Final Order. The DIP Agents and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facilities approved by this Final Order and to be further evidenced by the DIP Documents, and the Prepetition Secured Parties have acted in good faith in consenting to the Debtors' use of their Cash Collateral and other Prepetition Collateral pursuant to the terms of this Final Order, and their reliance on the assurances referred to above is in good faith.

(e)    Among other things, entry of this Final Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and professional fees. The DIP Facilities and the use of Cash

25738781.1

Collateral as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Facilities and to the use of Cash Collateral is not obtained. Consummation of the DIP Facilities and the use of Cash Collateral pursuant to the terms of this Final Order therefore are in the best interests of the Debtors' estates.

(f)     The DIP Documents and the use of Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, and the Prepetition Secured Parties, among other parties, and the ABL DIP Facility, the Term Loan DIP Facility and the use of Cash Collateral reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents including, without limitation, all loans, including the Prepetition ABL Roll Up, made to, guarantees issued by, and all letters of credit issued (or deemed issued) for the account of, the Debtors pursuant to the DIP Documents, and any other obligations under the DIP Documents, including bank product and hedging obligations (individually, the "**ABL DIP Obligations**" and the "**Term Loan DIP Obligations**", and collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified on appeal.

(g)    To the extent necessary, the Prepetition Secured Parties have either consented to the DIP Facilities and the Debtors' use of the Prepetition Collateral, including Cash Collateral, or their respective interests therein are being adequately protected by, among other things, the adequate protection described by this Final Order.  This Court concludes that the adequate protection provided to the Prepetition Secured Parties hereunder for, among other things, the Debtors' incurrence of the DIP Obligations on a priming basis, as described herein, and the Debtors' use of the Prepetition Collateral, including Cash Collateral, is consistent with and authorized by sections 361, 362, 363, and 364 of the Bankruptcy Code.

G.    Based on the foregoing findings, acknowledgements, and conclusions, and upon the record made before the Court at the Interim Hearing and at the Final Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Approval of DIP Motion</u>.  The DIP Motion is granted on a final basis on the terms and conditions set forth in this Final Order and the DIP Documents; <u>provided, however</u>, that if there are any inconsistencies between the terms of this Final Order and the DIP Documents, the terms of this Final Order shall govern.  Any objections or responses to the relief requested in the DIP Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied with prejudice.  This Final Order shall become effective immediately upon its entry.

2.    <u>Authorization of DIP Facilities and DIP Documents</u>.

(a)    The ABL DIP Facility and the Term Loan DIP Facility are each hereby approved on a final basis.  The Debtors are hereby authorized to execute, issue, deliver, enter into and adopt, as the case may be, the ABL DIP Agreement, all ABL DIP Documents, the Term

Loan DIP Agreement and all Term Loan DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Approved Budget (as defined herein).  The U.S. ABL DIP Borrower is hereby authorized to borrow money under the ABL DIP Facility and the Term Loan DIP Borrower is authorized to borrow money under the Term Loan DIP Facility, on a final basis, up to an aggregate principal or face amount not to exceed $280 million.  The Debtors that are Guarantors are hereby authorized to guarantee such borrowings and the other DIP Obligations, all in accordance with the terms of this Final Order, the DIP Agreements, and all other DIP Documents.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and, without further application to the Court, to pay all fees referred to in this Final Order, the ABL DIP Agreement, the ABL DIP Documents, the Term Loan DIP Agreement and the Term Loan DIP Documents including, without limitation, the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the professionals of the DIP Agents, including Paul Hastings LLP, Blake, Cassels & Graydon LLP, Womble Bond Dickinson LLP, FTI Consulting, Weil, Gotshal & Manges LLP, Richards Layton & Finger LLP, Rothschild & Co., Goodmans LLP (subject to the same procedures, including with respect to the ability to object, provided for in paragraph 22(e) regarding payment of the fees and expenses of the Prepetition Secured Parties).

(c)    Subject to the provisions contained in paragraph 40 hereof, the Debtors are hereby authorized to execute, deliver and perform one or more amendments or modifications to the ABL DIP Documents and/or Term Loan DIP Documents for the purpose of adding additional

financial institutions as ABL DIP Lenders and/or Term Loan DIP Lenders and reallocating the commitments for the ABL DIP Facility among the ABL DIP Lenders and/or the Term Loan DIP Facility among the Term Loan DIP Lenders, in each case in such form as the Debtors, the ABL DIP Agent and the ABL DIP Lenders or the Term Loan DIP Agent and the Term Loan DIP Lenders, as applicable, may agree (it being understood that no further approval of this Court shall be required for non-material amendments to the ABL DIP Documents and/or the Term Loan DIP Documents).

3.     <u>Binding Effect</u>.   Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms.   No obligation, payment, transfer or grant of a security or other interest under the DIP Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

4.     <u>ABL DIP Loans and Roll Up</u>.

(a)     All loans made or monies advanced under the ABL DIP Facility to or for the benefit of the "Loan Parties" under and as defined in the ABL DIP Agreement (the "**ABL DIP Loan Parties**") on or after the Petition Date including, without limitation, loans made or monies advanced or deemed advanced under or in connection with the ABL DIP Facility, shall: (i) be evidenced by the books and records of the ABL DIP Agent; (ii) bear interest payable at the rates set forth in the ABL DIP Agreement; (iii) be secured in the manner set forth in this Final Order and in the ABL DIP Documents; (iv) be payable in accordance with the terms of the ABL DIP

Documents; and (v) otherwise be governed by the terms set forth in this Final Order and in the ABL DIP Documents.

(b)     The Advances (as defined in the Prepetition ABL Credit Agreement) outstanding as of the Petition Date under the Prepetition ABL Credit Agreement constitute a portion of the Revolving DIP Loans outstanding under the ABL DIP Facility.  For all purposes of the ABL DIP Documents, the sum of the Pre-Petition Revolving Loans and any other Revolving DIP Loans made on the Closing Date shall constitute all of the Revolving DIP Loans outstanding on the Closing Date.  Each Pre-Petition Letter of Credit (as defined in the ABL DIP Agreement) shall constitute a "Letter of Credit" for all purposes of the ABL DIP Documents and shall be deemed issued under the ABL DIP Agreement as of the Closing Date.  All Letter of Credit Outstandings (as defined in the Prepetition ABL Credit Agreement) shall constitute Letter of Credit Outstandings for all purposes of the ABL DIP Documents.

(c)     For the avoidance of doubt, the Prepetition ABL Roll Up shall be subject to paragraph 34 of this Final Order.

5.     _Use of ABL DIP Loans_.  Subject to the terms and conditions of this Final Order and the ABL DIP Documents (including, without limitation, satisfaction of the conditions precedent to borrowing set forth therein), and other restrictions set forth in the DIP Documents, an amount not to exceed $200 million of the ABL DIP Loans shall be available on or after the Closing Date and shall be used by the U.S. ABL DIP Borrower, in each case in accordance with the Approved Budget (as defined herein) to (a) effectuate the Prepetition ABL Roll Up as set forth in the ABL DIP Agreement and paragraph 4(b) of this Final Order, (b) fund general corporate needs, including, without limitation, working capital needs, (c) pay administrative expenses of the Cases, including reasonable fees and expenses of professionals, (d) pay

Adequate Protection Provisions and (e) pay any prepetition obligations authorized to be paid pursuant to any "first day order" entered by the Court, in each case, in accordance with the Approved Budget (as defined herein).

6.      Term DIP Loans.  All loans made or monies advanced under the Term Loan DIP Facility to or for the benefit of the "Credit Parties" under and as defined in the Term Loan DIP Agreement (the "Term DIP Loan Parties" and, together with the ABL DIP Loan Parties, the "**Loan Parties**") on or after the Petition Date including, without limitation, loans made or monies advanced or deemed advanced under or in connection with the Term Loan DIP Facility, shall: (a) be evidenced by the books and records of the Term Loan DIP Agent; (b) bear interest payable at the rates set forth in the Term Loan DIP Agreement; (c) be secured in the manner set forth in this Final Order and in the Term Loan DIP Documents; (d) be payable in accordance with the terms of the Term Loan DIP Documents; and (e) otherwise be governed by the terms set forth in this Final Order and in the Term Loan DIP Documents.

7.      Use of Term DIP Loans.  Subject to the terms and conditions of this Final Order and the Term Loan DIP Agreement (including, without limitation, satisfaction of the conditions precedent to borrowing set forth therein), the proceeds of the Term DIP Loans shall be available on or after the Closing Date and shall be used by the Term Loan DIP Borrower, in each case in accordance with the Approved Budget (as defined herein) to (a) pay transaction fees and expenses, administrative expenses of the cases (including the professional fees and expenses of the Term Loan DIP Agent and/or the Term Loan DIP Lenders, to the extent the ABL DIP Facility does not provide sufficient funds to pay such needs) and to fund general corporate needs, including, without limitation, working capital needs and repayments of borrowings under the ABL DIP Facility (solely to the extent not accompanied by a corresponding reduction of

commitments under such ABL DIP Facility), and (b) pay any prepetition obligations authorized to be paid pursuant to any "first day order" entered by the Court, in each case, in accordance with the Approved Budget.

8.    <u>Payment of DIP Fees and Expenses</u>.    The Debtors are authorized to pay or otherwise incur all fees, expenses, and other amounts payable under the Fee Letters and under the terms of the ABL DIP Agreement, any other ABL DIP Documents, the Term Loan DIP Agreement and any other Term Loan DIP Documents including, without limitation, the commitment fee, the unused line fee, the servicing fee, the closing/upfront fee, the exit fee, the administrative agent fee, and any letter of credit fees (collectively, the "**<u>DIP Fees</u>**") as well as all reasonable and documented out-of-pocket costs and expenses of the DIP Agents in accordance with the terms of the DIP Agreements (collectively, the "**<u>Expenses</u>**").    The DIP Fees and Expenses approved pursuant to this paragraph shall include, without limitation, the reasonable and documented prepetition and postpetition fees and expenses of counsel and financial advisors retained by the DIP Agents associated with the arrangement, preparation, execution, delivery and administration of the DIP Documents (and any amendment or waiver with respect thereto), and the Cases and, subject to the same procedures provided in paragraph 22(e) regarding payment of the fees and expenses of the Prepetition Secured Parties, none of the DIP Fees and Expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with this Court with respect to such fees and expenses.    In addition, the Debtors are hereby authorized to indemnify the DIP Agents, the DIP Lenders, and their respective affiliates and other parties, as provided in the DIP Agreements.    All fees and expenses approved pursuant to this paragraph shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of

the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents. The Debtors are hereby authorized to pay all DIP Fees and Expenses in accordance with the DIP Documents.

9.    ABL DIP Superpriority Claims. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the ABL DIP Obligations shall constitute allowed claims against the Debtors (without the need to file any proofs of claim) including priority over any and all administrative expenses, diminution claims (including all Adequate Protection Provisions (as defined herein)), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code (the "**ABL DIP Superpriority Claims**"), which allowed claims, shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expense claims allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out and senior to the Adequate Protection 507(b) Claims (as defined herein).

10.    Term Loan DIP Superpriority Claims. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Term Loan DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proofs of claim), including priority over any and all administrative expenses, diminution claims (including all Adequate Protection Provisions (as defined herein)), and all other claims against the Debtors, now existing or hereafter arising, in these Cases or a Successor Case (as defined herein), of any kind whatsoever, including, without limitation, all administrative expenses or other claims

arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code (the "**Term Loan DIP Superpriority Claims**" and, together with the ABL DIP Superpriority Claims, the "**DIP Superpriority Claims**"), which allowed claims, shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expense claims allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out; provided, however, that the ABL DIP Superpriority Claims and Term Loan DIP Superpriority Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities as set forth herein, and shall be subject to the Carve Out and senior to the Adequate Protection 507(b) Claims (as defined herein).

11.    Carve Out.

(a)    For purposes hereof, the "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time by the Bankruptcy Court, whether by interim order, procedural order, or otherwise, unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee, pursuant to sections 328 or 1103 of the Bankruptcy Code and, with respect to Committee professionals (the "**Committee Professionals**") (solely with respect to any

25738781.1

26

Committee and the Committee Professionals strictly subject to the Approved Budget and the line items applicable to such Committee and Committee Professionals set forth therein) and the Debtor Professionals (together with the Committee Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by a Creditor Representative (defined below) of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3 million incurred after the first business day following delivery by one of the Creditor Representatives (defined below) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by e-mail (or other electronic means) by the ABL DIP Agent or the Term Loan DIP Agent (each, a "**Creditor Representative**") to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in paragraph 36), stating that the Post-Carve Out Trigger Notice Cap has been invoked and describing the alleged default that is continuing under the DIP Documents.  In addition, without duplication of any Allowed Professional Fees, and only after the funding of the Carve Out Reserves in full, an additional amount shall be funded to the Post-Carve Out Trigger Notice Reserve from the DIP Term Funding Account up to the lesser of (x) the remaining amount in the DIP Term Funding Account and (y) $8.6 million if a Sale Order has been entered by the Bankruptcy Court approving the Stalking Horse APA substantially in the form filed on the Petition Date or $10 million if the Sale Order has not been entered by the Bankruptcy Court,

which amount shall be available solely to pay any transaction, restructuring, sale or other similar fees then due and owing or that thereafter become due and owing to Houlihan Lokey Capital Inc.

(b)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by a Creditor Representative to the Debtors (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall: (i) be deemed a borrowing request and notice of borrowing by the Debtors for ABL DIP Loans under the ABL DIP Agreement, in an amount equal to (a) the maximum amount provided for in paragraph 11(a)(ii) above, plus (b) the then unpaid amounts (including the good-faith estimated Professional Fees accrued and not yet invoiced) of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans), as provided for in paragraph 11(a)(iii) above; and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account not subject to the control of the DIP Agents or any Prepetition Secured Party in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims to the fullest extent allowable under the Bankruptcy Code and applicable non-bankruptcy law.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for ABL DIP Loans under the ABL DIP Agreement (on a *pro rata* basis based on the then-outstanding ABL DIP Loans), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans).  The Debtors shall deposit and hold such amounts in a segregated account not subject to the control of the DIP Agents or any Prepetition Secured Party in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out**

**Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  On the first business day after a DIP Agent provides notice of a Carve Out Trigger Notice to the ABL DIP Lenders, notwithstanding anything in the ABL DIP Agreement or any other DIP Document, including Section 8.04(n) of the DIP Term Loan Agreement, to the contrary, including with respect to the existence of a Default (as defined in the ABL DIP Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for ABL DIP Loans under the ABL DIP Facility, any termination of the ABL DIP Loan Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the ABL DIP Agreement), each ABL DIP Lender with an outstanding ABL DIP Loan Commitment (on a *pro rata* basis based on the then-outstanding ABL DIP Loan Commitments) shall make available to the ABL DIP Agent such ABL DIP Lender's *pro rata* share with respect to such borrowing in accordance with the ABL DIP Facility; provided, however, that notwithstanding anything to the contrary in this paragraph 11, no ABL DIP Lender shall be required to make ABL DIP Loans in excess of the lesser of its ABL DIP Loan Commitment and its *pro rata* share of the Borrowing Base.   Notwithstanding anything to the contrary set forth herein or in the DIP Documents, if the amount of all the ABL DIP Loans available to the Debtors following delivery of the Carve Out Trigger Notice is insufficient to fund the full amount of the Carve Out Reserves, then the Carve Out Trigger Notice shall be deemed to be a withdrawal request for proceeds solely from the DIP Term Funding Account (as defined in the Term Loan DIP Agreement) in an amount necessary solely to fund any unfunded portion of the Carve Out Reserves outstanding after application of all the ABL DIP Loans, regardless of anything in the Term Loan DIP Agreement to the contrary, including under Section 2.13(a)(iii) thereunder or with respect to the existence of a Default (as

defined in the Term Loan DIP Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Term DIP Loans under the Term Loan DIP Facility, any termination of the Term DIP Loan Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the Term Loan DIP Agreement) up to the full amount of any proceeds.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Pre-Carve Our Trigger Notice Reserve funded by or from the ABL DIP Lenders or the DIP ABL Priority Collateral or the Term DIP Lenders or the DIP Term Loan Collateral, respectively) to: (a) the ABL DIP Agent on behalf of the ABL DIP Lenders, and (b) the Term Loan DIP Agent on behalf of the Term DIP Lenders.

(c)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Pre-Carve Our Trigger Notice Reserve funded by or from the ABL DIP Lenders or the DIP ABL Priority Collateral or the Term DIP Lenders or the DIP Term Loan Collateral, respectively) to: (a) the ABL DIP Agent on behalf of the ABL DIP Lenders, and (b) the Term Loan DIP Agent on behalf of the Term DIP Lenders.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 11, then, any excess funds in one of

the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the ABL DIP Agent or the Term Loan DIP Agent, as applicable.  Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order, following delivery of a Carve Out Trigger Notice, the ABL DIP Agent and the Term Loan DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid in accordance with this paragraph (c) and paragraphs (a) and (b) above.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Advances (as defined in the ABL DIP Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the ABL DIP Agreement or in the Term Loan DIP Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit Agreement Indebtedness. Notwithstanding anything herein, but subject to paragraph 35, no proceeds of Prepetition Collateral, the DIP Loans or the Carve Out shall be used for the purpose of: (a) investigating,

25738781.1

objecting to, challenging, or contesting in any manner, or in raising any defenses to, the amount, validity, extent, perfection, priority, enforceability, or avoidability of the Prepetition Credit Agreement Indebtedness, the Prepetition Liens or any liens or security interests with respect thereto, or any other rights or interests of any of the Prepetition Secured Parties, whether in their capacity as such or otherwise, including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the Prepetition Secured Parties (whether in their capacity as such or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(d)    No Direct Obligation to Pay Allowed Professional Fees; No Waiver of Right to Object to Fees.  The DIP Agents and the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Case (as defined herein) under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall (i) be construed to obligate the DIP Agents or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement or (ii) require any DIP Lender to make DIP Loans in excess of its DIP Commitment.  Notwithstanding any provision in this paragraph 11 to the contrary, no portion of the Carve-Out, any Cash Collateral, any DIP Collateral, or any proceeds of the DIP Facilities (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out) shall be utilized for the payment of professional fees and disbursements to the extent restricted under paragraph 35 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors,

any Committee, any other official or unofficial committee in these Cases or any Successor Case (as defined herein) or of any other person or entity, or shall affect the right of the DIP Agents or the DIP Lenders to object to the allowance and payment of any such fees and expenses.

(e)     Payment of Allowed Professional Fees Prior to Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     Payment of Carve Out On or After Termination Declaration Date. Any payment or reimbursement from the Carve-Out Reserves made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

12.     DIP Liens. As security for the ABL DIP Obligations and Term Loan DIP Obligations, effective and perfected automatically upon the date of the Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by any DIP Agent of any DIP Collateral (as defined herein), the following security interests and liens (all such liens and security interests granted to the ABL DIP Agent and Term Loan DIP Agent, for their benefit and for the benefit of the respective ABL DIP Lenders and Term Loan Lenders, pursuant to the Interim Order, this Final Order and the DIP Documents, (the "**DIP Liens**") are hereby granted to the ABL DIP Agent and Term Loan DIP Agent:

(a)      pursuant to section 364(d) of the Bankruptcy Code, perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness, regardless of whether any lien or any security interest securing or purporting to secure the Prepetition Credit Agreement Indebtedness is valid or invalid, perfected or unperfected, or avoidable or non-avoidable, subject and subordinate to all perfected non-avoidable senior pre-existing liens as of the Petition Date securing claims other than liens securing the Prepetition Credit Agreement Indebtedness;

(b)      pursuant to section 364(c)(2) of the Bankruptcy Code, perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by section 546 of the Bankruptcy Code) including the Avoidance Proceeds; and

(c)      pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests on other assets of the Debtors subject to permitted liens (excluding the Prepetition Credit Agreement Liens) on the Petition Date (the assets referenced in clauses (a)-(c) of this paragraph 12 collectively, the "**DIP Collateral**").

13.    The DIP Collateral includes all tangible and intangible prepetition and postpetition property and interests in property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, including, without limitation: (a) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, intellectual property, instruments, insurance, inventory, investment property, letter-of-credit rights, money and any supporting obligations related thereto; (b) all commercial tort claims; (c) all books and records pertaining to the DIP Collateral; (d) all property of any Prepetition Credit Party held by the ABL DIP Agent,

the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, or any Prepetition Secured Party, including all property of every description, in the custody of or in transit to the DIP Agents, the DIP Lenders or any Prepetition Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such party or as to which such party may have any right or power, including, but not limited to cash; (e) all other goods (including, but not limited to, fixtures) and personal property, whether tangible or intangible and wherever located; (f) all owned real property interests, and all proceeds of all owned and leased property (except that the DIP Liens granted to the ABL DIP Agent shall not include the DIP Collateral described in this paragraph 13(f)); (g) any Indebtedness of Holdings or any of its Subsidiaries owing to Holdings or any of its Subsidiaries; (h) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; and (i) all proceeds of the foregoing, plus all Prepetition Collateral.  The DIP Collateral shall include the Avoidance Proceeds, which includes any proceeds or property recovered, unencumbered or that is the otherwise subject of a successful Avoidance Action, whether by judgment, settlement, or otherwise.

14.     DIP Collateral that is: (a) of a type that would be ABL Priority Collateral; and (b) of a type that would be ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, shall, in each case, constitute "**DIP ABL Priority Collateral**"; provided, however, that neither the DIP Term Funding Account (as defined in the Term Loan DIP Agreement) nor any funds held therein shall constitute the DIP ABL Priority Collateral.  DIP Collateral that is: (a) of a type that would be Term Priority Collateral; (b) of a type that would be Term Priority Collateral but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (c) the DIP Term Funding Account and all funds held therein, shall, in each case, constitute

"**DIP Term Loan Priority Collateral**".    Notwithstanding anything in this paragraph 14 or paragraph 15, the priority of DIP Liens on DIP Collateral consisting of Avoidance Proceeds shall be *pari passu* as between the DIP ABL Agent and the DIP Term Loan Agent.

15.    DIP Lien Priority.  The DIP Liens securing the DIP ABL Obligations (the "**DIP ABL Liens**") and the DIP Liens securing the DIP Term Loan Obligations (the "**DIP Term Loan Liens**") are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens and the DIP Term Loan Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise have the priority set forth in the Priority Waterfall. Notwithstanding anything herein to the contrary, the DIP Liens shall be subordinate to the Carve Out.

16.    Remedies.  (a) Any automatic stay otherwise applicable to the DIP Agents and the DIP Lenders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Agents and the DIP Lenders to: (i) declare all DIP Obligations to be due and payable; (ii) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains; and/or (iii) terminate the applicable DIP Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations.

(b)    In addition to the rights and remedies described above, upon not less than five (5) business days' prior written notice to the Debtors (with a copy to counsel to each of the Prepetition Agents, the Committee and the U.S. Trustee) following the occurrence and continuance of an Event of Default (as defined herein), the DIP Agents are hereby granted relief

from the automatic stay provisions of section 362 of the Bankruptcy Code without further notice, hearing, motion, order or together action of any kind, to foreclose on, or otherwise enforce and realize on, their DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the applicable DIP Obligations, and by occupying the Debtors' premises (subject to paragraph 16(c) below) to sell or otherwise dispose of the DIP Collateral, with the exercise of remedies as among the ABL DIP Agent and Term Loan DIP Agent being subject to the DIP Intercreditor Agreement, except as expressly provided herein, in all cases subject to the Carve Out.  During the foregoing five (5) business day period objections may be raised by the Debtors or the Committee; provided, however, that during such five (5) business day period, the Debtors may only use Cash Collateral pursuant to paragraph 37 of this Order.

(c)      Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agents and the DIP Lenders contained in this Final Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon five (5) business days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Cash Collateral Termination Event has occurred and is continuing, the DIP Agents (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord, licensor, or third party owner and the DIP Agents (the terms of which shall be reasonably acceptable to the parties thereto), enter any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights,

licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a lien

of any third party and that are used by Debtors in their businesses, in the case of either

subparagraph (i) or (ii) of this paragraph 16(b) without interference from lienholders or licensors

thereunder, subject to such lienholders' or licensors' rights under applicable law; provided,

however, that the DIP Agents and DIP Lenders can only enter onto any leased premises after a

Cash Collateral Termination Event has occurred and is continuing, in accordance with (x) a

separate agreement with the landlord of the applicable leased premises; (y) upon entry of an

order of this Court after the filing of a motion and appropriate notice and an opportunity for

landlords to object and be heard; or (z) as permitted by applicable law; provided, further, that the

DIP Agents, on behalf of the DIP Lenders, shall pay only rent and additional rent, fees, royalties,

or other monetary obligations of the Debtors that first arise after the written notice referenced

above from the DIP Agents and that accrue during the period of such occupancy or use by such

DIP Agent calculated on a daily basis.  Nothing herein shall require the Debtors, the DIP Agents,

or the other DIP Lenders to assume any lease, license or other contract under Bankruptcy Code

section 365(a) as a precondition to the rights afforded to the DIP Agents and the DIP Lenders in

this paragraph 16(c).

17.    Budget.  For purposes of this Final Order, the term "Approved Budget" means a

cash flow forecast detailing cash receipts, cash disbursements, inventory levels and accrued and

unpaid professional fees on a weekly basis for (a) the applicable 13-week period or (b) the period

until the projected closing of the 363 Sale (as defined in the Term Loan DIP Agreement and

ABL DIP Agreement), whichever is shorter, for such weekly period on a regional and

consolidated basis, in each case substantially consistent with the manner in which such

information is presented in the Budget attached hereto as **Exhibit D**, filed with the Bankruptcy

Court on or before the date of entry of this Final Order, and shall initially refer to the Approved Budget delivered by the Debtors on or before the date of entry of this Final Order and thereafter shall refer to the Approved Budget delivered by the Debtors pursuant to Schedule 5.1 to the ABL DIP Agreement and Section 7.1(f) of the Term Loan DIP Agreement on the second Wednesday following the end of each fiscal month of Holdings falling after the Petition Date (each such date, a "**Budget Delivery Date**"), in each case, in form and substance acceptable to the ABL DIP Agent and the Term Loan DIP Agent; provided, however that the Committee shall receive the Approved Budget and any other documents provided pursuant to Schedule 5.1 to the ABL DIP Agreement and Section 7.1(f) of the Term Loan DIP Agreement contemporaneously with the DIP Agents and the DIP Lenders.  On each Wednesday on or before 11:59 pm Pacific Time (the "**Reporting Date**") starting the week after the first full calendar week following the Petition Date, delivery of the following will be made to the DIP Agents, the DIP Lenders and the Committee: (a) a budget variance report covering the cumulative period commencing on the Sunday immediately following the Budget Delivery Date for the then-effective Approved Budget through the Saturday immediately preceding the Reporting Date (such period, the "**Budget Testing Period**") setting forth the variances (whether positive or negative) of actual total operating receipts and total operating expenses as compared to the Approved Budget then in effect covering the applicable Budget Testing Period, together with an explanation, in reasonable detail, for any budget variances, and additional discussion and other information related to any budget variances as the ABL DIP Agent or the Term Loan DIP Agent may reasonably request; and (b) a certification that no proceeds of the ABL Revolving Loans or the Term DIP Loans have been used for purposes other than as set forth in the Approved Budget (subject to permitted variances).

25738781.1

18.    <u>Budget Covenants</u>.

(a)    Except as otherwise provided in the DIP Agreements or approved by the DIP Agents and the requisite lenders under the applicable DIP Agreement (and regardless of whether or not a Carve Out Trigger Notice has been delivered), the Debtors and their Subsidiaries shall not, directly or indirectly (i) use any cash or the proceeds of any DIP Loans in a manner or for a purpose other than those consistent with the DIP Agreements, the Interim Order, this Final Order, and the Approved Budget (and any variances permitted thereunder), (ii) permit a disbursement causing any variance other than any variances permitted thereunder without the prior written consent of the ABL DIP Agent, the Term Loan DIP Agent, and the requisite lenders under the applicable DIP Agreement or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments set forth in the Approved Budget and authorized by the Bankruptcy Court.

(b)    Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses of Professional Persons solely to the extent that such fees and expenses are authorized to be paid under sections 328, 330, 331, and 363 of the Bankruptcy Code pursuant to an order of the Court, as the same may be due and payable.  Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice, the right of the Debtors to pay professional fees of Professional Persons outside the Carve Out shall terminate, and the Debtors shall provide immediate notice to all Professional Persons informing them that the Debtors' ability to pay such Professional Persons is subject to and limited by the Carve Out.

(c)    Following the Petition Date: (i) total operating expenses (excluding professional fees and expenses) paid by the Loan Parties and their subsidiaries shall not exceed the amounts in the then effective Approved Budget by more than (A) in the case of any Budget Testing Period with a duration of one or two week(s), 15%, and (B) in the case of any other Budget Testing Period, 12.5%, in each case, on a cumulative basis for such Budget Testing Period; and (ii) total operating receipts (excluding any borrowings or other cash receipts not constituting trade receipts) of the Loan Parties and their subsidiaries shall not be less than (A) in the case of any Budget Testing Period with a duration of one or two week(s), 85%, and (B) in the case of any other Budget Testing Period, 87.5%, in each case, on a cumulative basis for such Budget Testing Period, of the amounts in the then effective Approved Budget, and in the case of each of clause (i) and (ii),  such variances shall be tested weekly, starting the week after the first full calendar week following the Petition Date.

19.    <u>Limitation on Charging Expenses Against DIP Collateral</u>.  No expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents, and no consent shall be implied from any action, inaction or acquiescence by the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, or the Prepetition Secured Parties.  In no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy

Code or (b) the equitable doctrine of "marshaling," or any other similar doctrine with respect to the DIP Collateral; provided that the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties may only use Avoidance Proceeds to satisfy outstanding DIP Obligations and obligations under the Prepetition Term Loan Credit Agreement or Prepetition ABL Credit Agreement, as applicable, if such obligations are not otherwise indefeasibly paid in full from proceeds of DIP Collateral or Prepetition Collateral, as applicable, that are not Avoidance Proceeds.

20.    Cash Collateral.    Subject to the terms of this Final Order and the Approved Budget, and, in the case of Cash Collateral held in the DIP Term Funding Account, subject to the Term Loan DIP Agreement, the Debtors are hereby authorized to use all Cash Collateral, solely in accordance with the Carve Out and the Approved Budget, in which the Prepetition Agents or any other Prepetition Secured Party has, and in which the DIP Agents and DIP Lenders have, a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which any of the Prepetition Agents or DIP Agents have control.

21.    Use of Cash Collateral.    Cash Collateral may be used only: (a) to effectuate the Prepetition ABL Roll Up; (b) to pay the Adequate Protection Provisions, (c) to pay the DIP Obligations, including, without limitation, to pay principal, interest, reimbursement obligations on account of letters of credit, fees, costs and expenses under the DIP Facilities; (d) for working capital and other general corporate purposes of the Debtors in accordance with the Approved Budget and the DIP Documents; (e) to pay the allowed administrative costs and expenses of the Cases, including the Carve Out; (f) to pay prepetition obligations authorized pursuant to "first day orders;" and with respect to (d), (e), and (f) above, solely in accordance with the Approved

Budget, the DIP Documents, and this Final Order, or as otherwise ordered by the Court after notice and a hearing.

22.    <u>Prepetition Secured Parties' Adequate Protection</u>.  The Prepetition Secured Parties are entitled, until the indefeasible repayment in full in cash of (a) in the case of the Prepetition ABL Secured Parties, the Prepetition ABL Credit Agreement Indebtedness and (b) in the case of the Prepetition Term Loan Agent, the Prepetition Term Loan Credit Agreement Indebtedness, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral (each, a "<u>Diminution Claim</u>").  As adequate protection for and to secure payment of an amount equal to, such Diminution Claims, the Prepetition Secured Parties are granted, *nunc pro tunc* as of the Petition Date, the following adequate protection (collectively, the "<u>Adequate Protection Provisions</u>"):

(a)    <u>Adequate Protection Liens</u>.

(i)    As adequate protection of the interests of the Prepetition ABL Agent and the Prepetition ABL Lenders in the Prepetition ABL Priority Collateral for their Diminution Claims, the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted valid and perfected security interests in and liens on the DIP Collateral (the "**ABL Adequate Protection Liens**").

(ii)    As adequate protection of the interests of the Prepetition Term Loan Agent in the Prepetition Term Loan Credit Agreement Collateral for its Diminution Claims, the Prepetition Term Loan Agent, for itself and for the benefit of the Prepetition Term Loan Lenders, is hereby granted valid, binding,

continuing, enforceable and fully-perfected security interests in, and liens on, the DIP Collateral (the "**Term Loan Adequate Protection Liens**").

(b)    Adequate Protection Lien Priority

(i)    The ABL Adequate Protection Liens and Term Loan Adequate Protection Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise  have the priority set forth in the Priority Waterfall.

(c)    Section 507(b) Claim.

(i)    As adequate protection for, and to secure payment of an amount equal to, the Prepetition ABL Secured Parties' Diminution Claims, the Prepetition ABL Secured Parties are hereby granted to the extent provided by Bankruptcy Code Section 507(b) allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claim**").

(ii)    As adequate protection for, and to secure payment of an amount equal to, the Prepetition Term Loan Agent's Diminution Claim, the Prepetition Term Loan Secured Parties are hereby granted to the extent provided by Bankruptcy Code Section 507(b) allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all

administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Term Loan 507(b) Claim**" and, together with the Prepetition ABL 507(b) Claim, the "**Adequate Protection 507(b) Claims**").

(iii)    Except as set forth herein, the Adequate Protection 507(b) Claims shall have priority over all administrative expense claims, secured claims (except secured claims secured by Permitted Prior Liens), and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 114 of the Bankruptcy Code; provided, however, that the Adequate Protection 507(b) Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities set forth herein, and subject to the Carve Out as set forth in this Final Order and junior to the DIP Superpriority Claims.

(d)    Interest, Fees, Expenses, and Interest Accrual.  Without further application to this Court, the Debtors shall pay forthwith in cash (i) upon entry of the Interim Order, all accrued and unpaid interest through the Petition Date owed to the Prepetition Secured Parties under the Prepetition ABL Credit Agreement and Prepetition Term Loan Credit Agreement (including, without limitation, payment of all outstanding default interest); (ii) on the last business day of each month, a payment to the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Lenders, of the cash pay portion of interest that accrued on the loans under the Prepetition Term Loan Credit Agreement, which, for the avoidance of doubt,

shall not include the Prepayment Premium, at the non-default rate during such monthly period (or portion thereof) pursuant to Section 2.07(a)(ii) of the Prepetition Term Loan Credit Agreement; (iii) on the last business day of each month, payment in kind of all PIK Interest (as defined in the Prepetition Term Loan Credit Agreement) that accrued on the loans under the Prepetition Term Loan Credit Agreement, which, for the avoidance of doubt, shall not include the Prepayment Premium, during such monthly period (or portion thereof) (which PIK Interest shall be capitalized and added to the principal amount of the loans under the Prepetition Term Loan Credit Agreement, including for the purposes of the foregoing clause (ii)); (iv) upon entry of the Interim Order, all accrued and unpaid fees and disbursements owed to the Prepetition ABL Agent and Prepetition Term Loan Agent, respectively, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition ABL Agent and Prepetition Term Loan Agent, respectively, as provided under the Prepetition ABL Credit Agreement and Prepetition Term Loan Credit Agreement, as applicable and, in each case, whether incurred before or after the Petition Date; and (v) during the pendency of the Chapter 11 Cases, (A) interest shall accrue on the Prepayment Premium at the default rate set forth in Section 2.07(b) of the Prepetition Term Loan Credit Agreement and (B) the additional interest of 2.00% shall continue to accrue on the loans under the Prepetition Term Loan Credit Agreement pursuant to Section 2.07(b) of the Prepetition Term Loan Credit Agreement; provided, that the interest payments described in this clause (v) shall not be capitalized and added to the principal

amount of the loans under Prepetition Term Loan Credit Agreement for the purposes of calculating the interest payable to the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Lenders pursuant to this paragraph.

(e)    <u>Payment of Prepetition Secured Parties' Professional Fees and Expenses</u>. The Debtors shall pay the Prepetition Secured Parties' prepetition and postpetition Professional Fees and Expenses within ten (10) days (if no written objection is received within such ten (10) day period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses; <u>provided, however</u>, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoice to the DIP Agents, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the U.S. Trustee and the Committee.  Written objections to payment of such fees and expenses, which may only be asserted by the Debtors, the DIP Agents, the U.S. Trustee and the Committee, must contain a specific basis for the objection.  None of the fees and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file any interim or final fee application with the Court with respect thereto; <u>provided, however</u>, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of such invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

(f)      Adequate Protection Condition.  As a condition to receiving the Adequate Protection Provisions of this Order, each of the Prepetition Term Loan Lenders, Prepetition Term Loan Agent, Term Loan DIP Lenders, and Term Loan DIP Agent shall, upon or substantially concurrently with the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code and of their non-debtor affiliates, whether pursuant to section 36 of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36 or otherwise (and not, for the avoidance of doubt, upon the occurrence of the Maturity Date due to any other event), so long as the proceeds of such sale or disposition shall satisfy in full in cash the Term Loan DIP Obligations and the obligations under the Prepetition Term Loan Credit Agreement (or if such obligations are otherwise satisfied and discharged or reduced pursuant to an arrangement satisfactory to the Term Loan DIP Agent in its sole discretion; it being understood and agreed that the satisfaction and discharge or reduction of the Term Loan DIP Obligations and the Prepetition Term Loan Credit Agreement Indebtedness in connection with (1) a sale pursuant to and in accordance with the Stalking Horse APA (as defined in the Term Loan DIP Agreement), as in effect on the date hereof, without giving effect to any amendment, waiver, consent or other modification thereto that is adverse to the interests of the Term Loan DIP Lenders or the Prepetition Term Loan Lenders and not otherwise approved by the Required Lenders as defined in and under the Term Loan DIP Agreement), and (2) any sale pursuant to the Sale Order (as defined in the Term Loan DIP Agreement) pursuant to any offer that is deemed

higher or better by the Bankruptcy Court shall be satisfactory to the Term Loan DIP Agent) (any such sale, a "**Qualified Sale Closing**"), shall provide a full release of each of the RMI Subs (as defined below), Holdings and Clover Leaf Seafood S.à. r.l. ("**Luxco Parent**") from their respective Term Loan DIP Obligations and the obligations arising under the Prepetition Term Loan Documents, duly executed by each of the Prepetition Term Loan Lenders, Prepetition Term Loan Agent, Term Loan DIP Lenders, and Term Loan DIP Agent then party to the DIP Term Loan Documents and the Prepetition Term Loan Documents as of the Sale Closing in a form and substance reasonably acceptable to the Debtors.

23.    <u>Credit Bid; Application of Sale Proceeds</u>.  (a)  Subject to section 363(k) of the Bankruptcy Code, the DIP Agents and the Prepetition Secured Parties, respectively, shall have the right to credit bid all of their respective claims (subject to the provisions of paragraph 34 herein) (including, for the avoidance of doubt, all of the Prepetition Credit Agreement Indebtedness and the DIP Obligations) in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan or otherwise, unless the Court orders otherwise.  The Prepetition Term Loan Agent, the Term Loan DIP Agent, Prepetition ABL Agent and ABL DIP Agent shall each be deemed a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.  Notwithstanding anything herein and subject to paragraph 47 of this Order and the Carve Out: (i) the right of each of the DIP Agents to consent to the sale of any portion of its collateral, including, without limitation, any Assets, on terms and conditions acceptable to the DIP Agents, are hereby expressly reserved and not modified, waived or impaired and (ii) unless otherwise ordered by the Court, including without

limitation pursuant to the Sale Order (as defined in the DIP Documents), all cash proceeds generated from the sale of any assets secured by Prepetition Liens or DIP Liens shall be paid to the DIP Agents upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents in accordance with the terms and conditions of the DIP Order and the DIP Documents and thereafter, against the obligations owing by the Debtors under the Prepetition Credit Documents in accordance with the terms of this Order, the DIP Intercreditor Agreement, and the Prepetition Intercreditor Agreement, until such time as all DIP Obligations and Prepetition Credit Agreement Indebtedness has been paid in full in cash in accordance with the terms and conditions of the DIP Documents, the DIP Order and the Prepetition Credit Documents, as applicable.

(b)    Upon consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 or 1129 of the Bankruptcy Code, all amounts outstanding under the ABL DIP Documents, and, to the extent not discharged prior to Closing, under the Prepetition ABL Documents, shall be repaid in full in cash (unless the Court orders otherwise or the Prepetition ABL Secured Parties and/or ABL DIP Agent and ABL DIP Lenders, as applicable, otherwise agree). Nothing in this paragraph 23 or this Final Order shall alter the rights and obligations of the parties to the DIP Intercreditor Agreement thereunder with respect to ABL Priority Collateral (as defined in the DIP Intercreditor Agreement) (or the proceeds thereof) or Term Priority Collateral (as defined in the DIP Intercreditor Agreement) (or the proceeds thereof).

24.    <u>Milestones</u>.    The DIP Agents and the DIP Lenders are hereby entitled to performance of the milestones set forth in section 7.18 of the Term Loan DIP Agreement and Schedule 5.21 to the ABL DIP Agreement (as such Milestones may be, or may have been,

25738781.1

amended by agreement as between the DIP Agents and the Debtors, collectively, the "**Milestones**"), a schedule reflecting the Milestones is attached hereto as **Exhibit F**. For the avoidance of doubt, the failure of the Debtors to comply with any of the Milestones shall constitute an Event of Default under the DIP Agreements and this Final Order and permit the DIP Agents, subject to paragraph 16, to exercise the rights and remedies provided for in this Final Order and the DIP Documents.

25.    <u>Reservation of Rights of Prepetition Secured Parties</u>.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant hereto is without prejudice to the right of any of the Prepetition Secured Parties to seek modification of the grant of adequate protection so as to provide different or additional adequate protection.

26.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents, the DIP Lenders, or the Prepetition Agents choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, but subject in all respects to the provisions of this Final Order.

27.    <u>Secured Party Status</u>.  To the extent that any Prepetition Agent is the secured party under any account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any Prepetition Credit Document, the ABL DIP Agent, for itself and on behalf of the ABL DIP Lenders, or the Term Loan DIP Agent, for itself and on behalf of the Term Loan DIP Lenders, as applicable, is also deemed to be the secured party under such account control agreements, loss payee or additional insured under each such insurance policy, and the secured party under each such Prepetition Credit Document (in any such case with the same priority of liens and claims thereunder relative to the priority of (a) the DIP ABL Liens, (b) the DIP Term Loan Liens, and (c) the Prepetition Liens and Adequate Protection Liens, in each case, as set forth in the Priority Waterfall and this Final Order), and shall have all rights and powers in each case attendant to that position (including rights of enforcement but subject in all respects to the terms of this Final Order), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Final Order and the applicable DIP Documents.

28.    <u>Optional Recordation</u>.  A certified copy of this Final Order may, in the discretion of the DIP Agents or the Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of or in addition to such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

29.    <u>Delivery of Instruments and Documents</u>.  The Debtors shall execute and deliver to the DIP Agents or the Prepetition Agents, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agents or the Prepetition Agents may

reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

30.    <u>Preservation of Rights Granted Under this Final Order</u>.  Except with respect to (a) the Carve Out, (b) any replacement financing that indefeasibly repays in full in cash the DIP Obligations and the Diminution Claims prior to or simultaneously with the allowance of any claims or expenses in connection with such financing, or (c) as expressly provided herein or in the DIP Agreements, no claim or lien having a priority senior to or *pari passu* with those granted by this Final Order shall be granted or allowed while any portion of the DIP Obligations or the Diminution Claims, as the case may be, remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, in each case, whether in these Cases or any Successor Case (as defined herein), without the express written consent of the DIP Agents given in accordance with the DIP Documents (which consent may be withheld in each DIP Agent's sole discretion).

31.    <u>Certain Limits on Rights of Debtors</u>.  Unless all DIP Obligations and Diminution Claims shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreements and a Cash Collateral Termination Event hereunder if any of the Debtors seek, or if there is entered: (a) any stay, vacatur, rescission, or modification of this Final Order without the prior written consent of the DIP Agents and the Prepetition Secured Parties that is not reversed or vacated within five (5) days, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP

Agents or the Prepetition Secured Parties; or (b) an order converting the Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of the Cases that are not reversed or vacated within five (5) days.  If the Debtors seek an order dismissing any of the Cases under section 1112 of the Bankruptcy Code, the proposed order submitted to the Court by the Debtors shall be in a form and substance reasonably acceptable to the DIP Agents.  Notwithstanding the dismissal of any of the Cases under section 1112 of the Bankruptcy Code or otherwise (x) the DIP Superpriority Claims and other administrative claims granted under this Final Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and all Diminution Claims shall have been paid and satisfied in full (and such DIP Superpriority Claims, the other administrative claims granted under this Final Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) to the fullest extent permitted by law or ordered by this Court, this Court shall retain exclusive jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

32.    <u>Effect of Reversal, Etc.</u>  Upon any reversal or modification on appeal of this Final Order, section 364(e) of the Bankruptcy Code applies to any DIP Obligations, the Adequate Protection Provisions, the DIP Liens, the Adequate Protection Liens, and the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, and the Prepetition Secured Parties and are entitled to all of the benefits and protections afforded by section 364(e).

33.    <u>Survival of Rights</u>.  Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, and all other rights and remedies of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan

DIP Agent, Term Loan DIP Lenders, or the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, impaired, or discharged by: (a) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, or by any other act or omission; (b) the entry of an order confirming a plan of reorganization in any of the Cases; or (c) consummation of any chapter 11 plan(s). The terms and provisions of this Final Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code (each, a "**Successor Case**"), and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the DIP Superpriority Claims, and all other administrative claims granted pursuant to this Final Order and all other rights and remedies of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, the Term Loan DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, all Diminution Claims, and all allowed claims payable in cash arising from the Adequate Protection Provisions are indefeasibly paid in full in cash.

34.    _Effect of Stipulations on Third Parties_. The stipulations and admissions contained in paragraph D of this Final Order shall be binding on the Debtors and all parties in interest, including, without limitation, any Committee, unless, and solely to the extent that an adversary proceeding or other contested matter has been commenced by a party in interest (other than the Debtors) with the requisite standing and authority, against the Prepetition Secured Parties in connection with any matter related to the Prepetition Credit Agreements (a "**Challenge**"), by (i) in the case of such adversary proceeding or other contested matter filed by a party in interest

with required standing other than the Committee, no later than seventy-five (75) days from the date of entry of the Interim Order; or (ii) in the case of an adversary proceeding or other contested matter filed by the Committee, no later than sixty (60) days after the appointment of the Committee (the "**Challenge Deadline**"); provided, however, that if the Cases convert to Chapter 7, or if a Chapter 11 trustee is appointed, in each case prior to the Challenge Deadline, the Challenge Deadline shall be extended for the Chapter 7 or Chapter 11 trustee by the longer of 30 days or the time remaining in the Challenge Period.  If the Cases convert to Chapter 7, the Chapter 7 trustee will have standing to commence a Challenge, notwithstanding any other provision in this Order to the contrary.  The Challenge Deadline may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Credit Agreement), the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Credit Agreement), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. Notwithstanding anything to the contrary in the Interim Order or this Final Order, if, prior to the Challenge Deadline, the Committee files a motion seeking standing to file a Challenge with a draft complaint identifying and describing all such Challenge(s), the Challenge Deadline will be tolled solely with respect to the Challenges asserted in such draft complaint and solely with respect to the Committee until the earlier of (i) two (2) business days subsequent to the date of entry of an order granting the Committee standing to file any such Challenge(s) described in the complaint, and (ii) entry of an order denying such motion; provided, however, that such extension shall only apply to those Challenges asserted in the draft complaint that this Court has specifically found that the Committee has standing to assert; provided, further that the Challenge Deadline shall not be tolled for more than thirty (30) days from the filing of the Committee's

motion seeking standing to file a Challenge, but allowing for additional time as necessary to accommodate the Court's schedule. If no such adversary proceeding or contested matter is timely and properly filed by the Challenge Deadline or the Court does not rule in favor of the plaintiff in any such proceeding, then the:  (w) stipulations, admissions and releases contained in paragraph D of this Final Order shall become binding on all parties in interest, including, for the avoidance of doubt, any Committee appointed in the Cases; (x) Prepetition Credit Agreement Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case; (y) Prepetition Credit Agreement Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph D, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) Prepetition Credit Agreement Indebtedness and the Prepetition Credit Agreement Liens shall not be subject to any other or further challenge by the Debtors, any Committee, or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any such adversary proceeding or contested matter is timely and properly filed, the stipulations, admissions and releases contained in paragraph D of this Final Order shall nonetheless remain binding and preclusive on the Debtors, any Committee, and any other person or entity, except as to any such stipulations and admissions that were expressly and successfully challenged in such timely and properly filed adversary proceeding or contested matter.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee, standing

25738781.1

57

or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Credit Agreement Indebtedness or the Prepetition Credit Agreement Liens.

35.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything herein or in any other order by this Court to the contrary, without the prior written consent of the DIP Agents or the Prepetition Agents, none of the DIP Obligations, the Cash Collateral, DIP Collateral, or the Carve Out may be used for the following purposes: (a) to object to or contest the validity or enforceability of the Interim Order or this Final Order or any obligations outstanding under the DIP Documents or the Prepetition Credit Agreement; <u>provided, however</u>, that the Committee may expend up to $100,000 (the "**Investigation Budget**") for the fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions contained in paragraph D; (b) to assert or prosecute any claim or cause of action against the DIP Agents, any DIP Lender, or any Prepetition Secured Party; (c) to seek to modify any of the rights granted under the Interim Order or this Final Order to the DIP Agents, any DIP Lender or any Prepetition Secured Party; (d) to make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the covenants related to the Approved Budget (as set forth herein or in the DIP Agreements) and, with respect to the payment of any prepetition claim or non-ordinary course administrative claim, separately approved by this Court; (e) to object to, contest, delay, prevent or interfere in any way with the exercise of rights and remedies by the ABL DIP Agent, the ABL DIP Lenders, Term Loan DIP Agent, or Term Loan DIP Lenders under the DIP Documents or with respect to the DIP Collateral once an Event of Default has occurred and any applicable notice period has expired (except that, prior to the expiration of

such notice period, the rights of the Debtors and other parties in interest with respect to any such exercise of remedies are preserved); or (f) except as expressly provided or permitted under the DIP Agreements and the Budget, to make any payment or distribution to any non-Debtor affiliate, equity holder, or insider of any Debtor outside of the ordinary course of business.

36.  <u>Events of Default</u>.  Except as otherwise provided in this Final Order, unless waived by the DIP Agents in writing and in accordance with the terms of the DIP Agreements, each of the following shall constitute an event of default (each, an "**Event of Default**"): (a) failure of the Debtors to perform or comply with any of the terms, provision, conditions, covenants, or obligations under this Final Order in any material respect; or (b) the occurrence of an Event of Default as defined in either of the DIP Agreements.

37.  <u>Termination of Cash Collateral Use</u>.  In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary except the Carve Out, and after delivery (including delivery by electronic mail or facsimile) of notice of the occurrence of a Cash Collateral Termination Event by one or more of the DIP Agents, as applicable, to the Debtors, the Committee, the Prepetition Secured Parties and the U.S. Trustee, the Debtors shall no longer be authorized pursuant to this Final Order to use Cash Collateral other than with respect to the Carve Out and such Cash Collateral use shall automatically terminate the date upon which any of the following events occurs (such date being referred to herein as the "**Cash Collateral Termination Date**," and each of the following events, a "**Cash Collateral Termination Event**"); <u>provided</u> that, notwithstanding anything to the contrary herein or in the DIP Documents, during the five (5) business day period following the Cash Collateral Termination Event, the Debtors may, use Cash Collateral to pay regular payroll and other expenses critical to keep the business of the Debtors operating solely in accordance with the

Approved Budget (subject to permitted variances) in the aggregate amount not to exceed $12 million; provided, however, Cash Collateral shall not include any amounts in the DIP Term Funding Account that are not yet drawn or permitted to be drawn in accordance with the Term Loan DIP Agreement:

(a)     the appointment of a trustee or the appointment of an examiner with enlarged powers in any of the Cases unless such appointment is approved by the Prepetition Agents;

(b)     the delivery of a Carve Out Trigger Notice;

(c)     the occurrence of an Event of Default as defined in either of the DIP Agreements;

(d)     the entry of an order by this Court or any other Court having jurisdiction over these Cases granting other superpriority liens with priority over or *pari passu* with the DIP Liens;

(e)     the filing by the Debtors of a motion to approve postpetition financing without the prior written consent of the DIP Agents acting at the direction of the relevant required DIP Lenders, which consent shall not be unreasonably withheld if the postpetition financing provides for full payment in cash of the DIP Obligations;

(f)     the filing by the Debtors of a motion to approve any material sale of assets of the Debtors under section 363 of the Bankruptcy Code, whether pursuant to a chapter 11 plan or otherwise, in each case without the prior written consent of the DIP Agents acting at the direction of the relevant requisite DIP Lenders;

(g)     the entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property

of the Debtors having a value in excess of $1 million without the prior written consent of the DIP

Agents, except as permitted by the DIP Agreements;

(h)    the filing of a motion by any Debtor (or any party in interest) that is not

dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the

entry of any order permitting, recovery from any portion of the Prepetition Collateral (or from

any Prepetition Secured Party directly) any costs or expenses of preserving or disposing of the

Prepetition Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or

otherwise);

(i)    the termination of the commitments under the DIP Documents or

acceleration of the DIP Obligations; or

(j)    any of the liens securing the Prepetition Credit Agreement Indebtedness or

the Adequate Protection Liens granted to the Prepetition Secured Parties shall cease to be valid,

binding, and perfected liens with the priority and to the extent provided in this Final Order.

38.    <u>Rights of Prepetition Agents</u>.    Notwithstanding the occurrence of the Cash

Collateral Termination Date, all of the rights, remedies, benefits and protections provided to the

Prepetition Agents under this Final Order as of such Cash Collateral Termination Date shall

survive the Cash Collateral Termination Date.

39.    <u>Access to the Debtors</u>.  In accordance with the terms of the DIP Documents and

the Prepetition Credit Agreements, the DIP Agents and the Prepetition Agents, respectively, and

their respective professionals shall be afforded continued reporting as to DIP Collateral amounts

and reasonable access to the DIP Collateral and the Debtors' business premises, during normal

business hours and upon reasonable advance notice, for purposes of verifying the Debtors'

compliance with the terms of this Final Order.

40.    <u>Modifications of DIP Documents</u>.   The Debtors, the DIP Agents, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications of the respective DIP Documents without further order of this Court; <u>provided, however</u>, that notice of any material modification or amendment to the respective DIP Documents shall be filed with the Court and provide parties a five (5) business day notice period in which to object, <u>provided</u>, that after such time the modification may be approved by the Court.

41.    <u>Binding Effect; Successors and Assigns</u>.   The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors; <u>provided, however</u>, for the avoidance of doubt, that the Debtors' acknowledgements, stipulations, and releases set forth in paragraph D are subject to paragraph 34 hereof and shall inure to the benefit of the ABL DIP Agent, the ABL DIP Lenders, the Term Loan DIP Agent, Term Loan DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns, as applicable; <u>provided, however</u>, that the DIP Agents and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Agreements or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the

Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

42.    <u>Master Proof of Claim</u>.    Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Case to the contrary, none of the Prepetition Secured Parties will be required to file (a) proofs of claim for claims arising under the Prepetition Credit Documents; or (b) requests for payment of administrative expenses in any of the Cases or any Successor Case with respect to any Adequate Protection Obligations or Adequate Protection Payments, and the Debtors' stipulations, admissions, and acknowledgements and the provisions of this Final Order shall, subject to paragraph 34, be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties with regard to all claims arising under the Prepetition Credit Documents. Notwithstanding the foregoing, each of the Prepetition Agents, for the benefit of itself and its respective Prepetition Secured Parties, are authorized and entitled, in their sole discretion, but are not required, to file (and amend and/or supplement, as each sees fit), for any claim or administrative expense claim described herein: (x) a master proof of claim; (y) proofs of claim; and/or (z) requests for payment of administrative expenses, in each of the Cases or any Successor Case.  The failure to file any such proof of claim or request for payment of an administrative expense shall not affect the validity or enforceability of any of the Prepetition Credit Agreement Indebtedness or this Final Order.  The DIP Agents and the DIP Lenders shall similarly not be required to file proofs of claim to maintain their respective claims for payment of the DIP Obligations, and the evidence presented with the DIP Motion and the record established at the

Interim Hearing and at the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to such obligations and secured status.

43.     <u>Forbearance of the Prepetition Secured Parties</u>.   Prior to the occurrence of an Event of Default or a Cash Collateral Termination Event, except as expressly permitted pursuant to the terms of this Final Order or the DIP Loan Documents, the Prepetition Secured Parties shall not (a) exercise any rights or remedies with respect to any Prepetition Liens or Prepetition Collateral, (b) enforce or pursue an event of default or other breach under any Prepetition Credit Document, or (c) assert any demand for payment of any kind whatsoever, in each case with respect to (i) Holdings, Luxco Parent, Coral Triangle Processors, LLC ("**Coral Triangle**") and Anova Technical Services, LLC ("**Anova**" and, together with Coral Triangle, the "**RMI Subs**"), on account of any Prepetition Credit Agreement Indebtedness and (ii) Connors Bros. Clover Leaf Seafoods Company, Clover Leaf Holdings Company, K.C.R. Fisheries Ltd., and 6162410 Canada Limited (collectively, with the entities listed in the foregoing clause (i), the "**Non-Debtor Credit Parties**"); <u>provided</u> that such forbearance shall terminate (x) upon the delivery of a Carve-Out Trigger Notice; (y) with respect to any Non-Debtor Credit Party, if such Non-Debtor Credit Party receives any written charge, complaint, claim, demand, suit, or notice (copy of which shall immediately be provided to the DIP Agents and the Prepetition Agents) seeking payment or remedies in excess of $100,000; and (z) solely with respect to either Holdings or the Luxco Parent, upon three (3) business days' notice that, in the reasonable discretion of the ABL DIP Agent or the Term DIP Agent, Holdings or Luxco Parent (as applicable) is in breach of its obligations under the DIP Documents or the Stalking Horse APA (as defined in the DIP Documents) and such breach or alleged breach is not cured within such three (3) business days period.

44.    _Effectiveness_.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Final Order.

45.    _Preservation of Intercompany Claims_.  Notwithstanding anything to the contrary in this Final Order or the DIP Documents, or as a result of the incurrence of the DIP Obligations, the Debtors' compliance with any of the Adequate Protection Provisions, or any repayment or satisfaction of the DIP Obligations or any Prepetition Credit Agreement Indebtedness, the rights, defenses, claims, causes of action, and other legal entitlements of each Credit Party (as defined in the Term Loan DIP Agreement) and Loan Party (as defined in the ABL DIP Agreement) (collectively, the "**DIP Credit Parties**") and each Prepetition Credit Party (collectively, the "**Credit Parties**"), including any entitlement to set-off, subrogation or contribution, against any other Credit Party arising under or related to the DIP Facilities or the Prepetition Secured Debt are expressly preserved; _provided_ that any such legal entitlements with respect to the Debtors shall be subject to paragraph 47 and the Carve-Out and junior to the DIP Liens, Prepetition Liens, DIP Superpriority Claims, and Adequate Protection 507(b) Claims and, in each case, subject to the satisfaction in full of the DIP Obligations and the Prepetition Credit Agreement Indebtedness; _provided_, _further_ that any such legal entitlements of the CCAA Debtors (as defined in the Term Loan DIP Agreement) arising under the ABL DIP Facility with respect to the Debtors shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed claims against the Debtors (without the need to file any proofs of claim) including priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b),

506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code, which shall be subject to paragraph 47 and the Carve-Out and junior to the DIP Liens, Prepetition Liens, DIP Superpriority Claims, and Adequate Protection 507(b) Claims and, in each case, subject to the satisfaction in full of the DIP Obligations and the Prepetition Credit Agreement Indebtedness.

46.    <u>CCAA Initial Order</u>.  Notwithstanding anything in this Final Order, the DIP Facilities, the DIP Documents or elsewhere, no Debtor shall provide an intercompany advance to any Canadian affiliate that is not an Debtor until such time as the Ontario Superior Court of Justice (Commercial List) has issued the CCAA Initial Order (as defined in the Term Loan DIP Documents), approving, among other things, the DIP Facilities and containing a paragraph in substance substantially similar to paragraph 45 herein.

47.    <u>Closing Escrow Accounts</u>.  Notwithstanding anything to the contrary herein or in the DIP Documents and provided that no Event of Default has occurred and is continuing under any DIP Document, immediately prior to any Qualified Sale Closing (and not, for the avoidance of doubt, upon the occurrence of the Maturity Date (as defined in the ABL DIP Agreement or the Term Loan DIP Agreement, as applicable) due to any other event), the Debtors shall be entitled to submit (1) a borrowing request and notice of borrowing for ABL DIP Loans under the ABL DIP Credit Agreement and/or (2) a withdrawal request for proceeds of the DIP Term Funding Account, subject to the limitations contained in the DIP Documents, and utilize and direct the transfer of proceeds of such borrowing request and notice of borrowing and/or withdrawal request into one or more escrow accounts established by the Debtors (the "**Closing Escrow Accounts**"), in an amount equal to the lesser of (such lesser amount, the "**Permitted Funding Amount**") (x)(I) on or prior to January 31, 2020, $250,000,000 and (II) on or after February 1,

2020, $255,000,000, in each case, *less* the principal amount of (1) Advances (under and as defined in the ABL DIP Agreement and the Prepetition ABL Credit Agreement), (2) Letter of Credit Disbursements (under and as defined in the ABL DIP Agreement) not yet reimbursed, including outstanding Advances (under and as defined in the ABL DIP Agreement) made with respect to such Letter of Credit Disbursements, and (3) undrawn Letters of Credit (under and as defined in the ABL DIP Agreement) to the extent such Letters of Credit were not outstanding (or are not replacements of Letters of Credit that are outstanding on the Closing Date (as defined in the DIP Documents), in an aggregate undrawn face amount no greater than that of the Letters of Credit being replaced) on the Closing Date (as defined in the DIP Documents), in each case, on the date of the withdrawal immediately prior to giving effect to the incurrence of the Permitted Funding Amount *less* the outstanding principal amount of loans outstanding under the Term Loan DIP Agreement on the date of withdrawal immediately prior to giving effect to the incurrence of the Permitted Funding Amount and (y) the Closing Escrow Amount (as defined below).  The "**Closing Escrow Amount**" shall mean an amount equal to the sum of, without duplication, (a) the amount required to satisfy the obligations of the Debtors under the Stalking Horse APA and/or the Sale Order, in accordance with the terms of the Stalking Horse APA and/or the Sale Order, as applicable, including any amounts earned, due and payable under the line item "Utility Deposit/Other APA Schedule Items" (the "**Transaction Expense Amount**"); provided, that, to the extent that any portion of the Transaction Expense Amount is not itemized in the Approved Budget or is insufficient to satisfy the applicable liability, such portion of the Transaction Expense Amount based on a good faith estimate of the Debtors may nevertheless be withdrawn from the DIP Term Funding Account, and (b) the amount necessary to fund (i) the administration of the Cases in an amount not to exceed the Wind-Down Amount (as defined in

the Term Loan DIP Documents), (ii) all accrued and unpaid professional fees, (iii) the amounts

earned, owing, due and payable under line item "KEIP/KERP/MIP/SIP" in the Approved Budget

in an amount not to exceed the KEIP/KERP Amount (as defined in the Term Loan DIP

Documents), and (iv) any other line item amount provided in the Approved Budget, other than

under the line items (1) "Restructuring Professional Fee", (2) "KEIP/KERP/MIP/SIP", (3)

"Wind-Down Budget", and (4) "Utility Deposit/Other APA Schedule Items", that is unpaid as of

the date of such borrowing request and notice of borrowing and/or withdrawal request, up to the

aggregate amount unpaid and budgeted to be drawn upon such Qualified Sale Closing for all

such line item amounts in the Approved Budget.  The Closing Escrow Accounts and the Closing

Escrow Amounts shall not be subject to any pre- or postpetition liens or claims against the

Debtors or their assets, including any liens or claims securing the DIP Facilities or the

Prepetition Credit Agreement Indebtedness, the DIP Liens, the DIP Superpriority Claims, the

Adequate Protection Liens, or any and all other forms of adequate protection, liens, or claims

against the Debtors or the Debtors' assets arising from the DIP Facilities or the Prepetition Credit

Agreement Indebtedness; provided that the Prepetition Term Loan Credit Parties shall retain any

Adequate Protection Liens, Adequate Protection 507(b) Claims, and any liens or claims securing

any Prepetition Term Loan Credit Agreement Indebtedness in any residual amounts remaining in

the Closing Escrow Accounts after the satisfaction in full of all obligations comprising the

Closing Escrow Amounts.

48.    <u>Bank Products</u>.  Pre-Petition U.S. Bank Products (other than Hedge Agreements) under the Prepetition ABL Documents shall be deemed to constitute U.S. Bank Products under the ABL DIP Documents with the same effect as if such Pre-Petition U.S. Bank Products were provided by a Bank Product Provider at the request of the U.S. Borrower on the date of entry of this Final Order.  All Pre-Petition Canadian Bank Products (other than Hedge Agreements) under the Prepetition ABL Documents shall constitute Canadian Bank Products under the ABL DIP Documents with the same effect as if such Pre-Petition Canadian Bank Products were provided by a Bank Product Provider at the request of the Canadian Borrower on the date of entry of this Final Order.

49.    <u>Employee Credit Card Program</u>.  (a) The Debtors are authorized to continue to use the commercial card program under the WellsOne Commercial Card Agreement, dated on or around April 14, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Card Agreement"), between Bumble Bee Foods, LLC and Wells Fargo subject to the terms and conditions thereof.  Wells Fargo is authorized to make advances from time to time to Bumble Bee Foods, LLC with a maximum exposure at any time up to $25,000.  All prepetition charges and fees are authorized and required to be paid.  The indebtedness owed by Bumble Bee Foods, LLC to Wells Fargo in respect of the Card Agreement was secured by certain collateral (the "**Card Program Collateral**") pursuant to the terms of that certain Credit and Security Agreement, dated as of September 1, 2011, between Bumble Bee Foods, LLC and Wells Fargo, as such agreement may have been amended, restated, supplemented or otherwise modified from time to time.  Wells Fargo has and shall continue to have a valid and perfected, non-avoidable first-priority lien in such Card Program Collateral and any proceeds thereof.  Such lien shall not be primed by any lien granted to any post-petition lender or other person.  To satisfy the

25738781.1

requirement that Wells Fargo continue to have a valid and perfected, non-avoidable first-priority lien in such Card Program Collateral and any proceeds thereof, Debtor grants Wells Fargo a priming lien and security interest pursuant to Bankruptcy Code section 364(d)(1) with respect to such Card Program Collateral.

(b) Wells Fargo may rely on the representations of Bumble Bee Foods, LLC with respect to its use of the commercial card program pursuant to the Card Agreement, and Wells Fargo shall not have any liability to any party for relying on such representations by Bumble Bee Foods, LLC as provided for herein.

50.   <u>Chubb Reservation of Rights</u>. For the avoidance of doubt, (i) to the extent ACE American Insurance Company, Federal Insurance Company and/or any of its affiliates (collectively, and together with each of their successors, "Chubb") had a Permitted Prior Lien, such lien and/or security interest shall be senior to any liens and/or security interests granted pursuant to this Order, (ii) this Order does not grant the Debtors any right to use any property (or the proceeds thereof) held by Chubb as collateral to secure obligations under any insurance policies and related agreements; and (iii) nothing, including the DIP Documents and/or this Order, alters or modifies the terms and conditions of any insurance policies or related agreements issued by Chubb.

51.   <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Final Order.

25738781.1      **Dated: December 19th, 2019**
                **Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**