## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BUMBLE BEE PARENT, INC., *et al.*,[1] | Case No. 19-12502 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 31 & 171** |

**ORDER (A) APPROVING THE STALKING HORSE AGREEMENT; (B) APPROVING THE SALE TO THE STALKING HORSE BIDDER OF SUBSTANTIALLY ALL OF THE PURCHASED ASSETS OF THE DEBTORS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE; (D) AUTHORIZING THE DEBTORS TO CONSUMMATE TRANSACTIONS <u>RELATED TO THE ABOVE; AND (E) GRANTING OTHER RELIEF</u>**

Upon the motion, dated November 21, 2019 [Docket No. 31] (the "<u>Motion</u>")[2] of

Bumble Bee Parent, Inc. and its affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), pursuant to

sections 105, 363, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules

2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the

District of Delaware (the "<u>Local Rules</u>"), for an order (the "<u>Order</u>") authorizing and approving

the proposed sale of the Purchased Assets and the assumption and assignment of certain

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bumble Bee Parent, Inc. (5118); Bumble Bee Holdings, Inc. (1051); Bumble Bee Foods, LLC (0146); Anova Food, LLC (2140); and Bumble Bee Capital Corp. (7816).  The headquarters for the above-captioned Debtors is located at 280 Tenth Avenue, San Diego, CA 92101.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated November 21, 2019, a copy of which is attached hereto as **<u>Exhibit A</u>** (as amended from time to time, and together with the exhibits thereto, the Sellers' Disclosure Schedule, and ancillary documents executed or deliverable in connection therewith, and as may be amended, modified, or supplemented from time to time in accordance with "<u>Stalking Horse Agreement</u>").

executory contracts and unexpired leases of the Debtors in connection therewith on the terms set forth in the Stalking Horse Agreement; and the Court having taken into consideration this Court's prior order, dated December 19, 2019 [Docket No. 171] (the "Bidding Procedures Order"), approving bidding procedures for the sale of the Purchased Assets (the "Bidding Procedures") and granting certain related relief; and Tonos US LLC, Tonos 1 Operating Corp., and Melissi 4 Inc. (collectively, the "Buyer") having submitted the highest or best bid for the Purchased Assets, which was the Successful Bid (as defined in the Bidding Procedures) for the Purchased Assets at an auction conducted pursuant to the Bidding Procedures (the "Auction"); and this Court having conducted a hearing to consider the Transactions on January 23, 2020  (the "Sale Hearing"), at which all interested parties were offered an opportunity to be heard with respect to the Transactions; and this Court having reviewed and considered (i) the Motion and the exhibits thereto, (ii) the Stalking Horse Agreement, by and between the Debtors and Buyer, whereby the Debtors have agreed, among other things, to sell the Purchased Assets to Buyer, including certain executory contracts and unexpired leases of the Debtors that will be assumed and assigned to Buyer (the "Assumed Contracts"), on the terms and conditions set forth in the Stalking Horse Agreement and any ancillary or supplemental documents executed in connection therewith, (iii) the *Debtors' Omnibus Reply in Support of the Sale Motion* [Docket No. 302] (the "Reply"); (v) the McNeil Declaration,[3] (vi) the Braun Declaration,[4] (vii) the Chong-Yih

---

[3]  *Declaration of Kent McNeil in Support of Entry of Order (A) Approving the Stalking Horse Agreement; (B) Approving the Sale to the Stalking Horse Bidder of Substantially All of the Purchased Assets of the Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Authorizing the Debtors to Consummate Transactions Related to the Above; and (E) Granting Other Relief* [Docket No. 301].

[4]  *Declaration of Matthew Braun in Support of Entry of Order (A) Approving the Stalking Horse Agreement; (B) Approving the Sale to the Stalking Horse Bidder of Substantially All of the Purchased Assets of the Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired*

25932113.1

Declaration,[5] (viii) the objections and reservations of rights filed by parties in interest including those set forth on <u>Exhibit A</u> attached to the Reply (collectively, the "<u>Objections</u>"); (ix) the arguments of counsel made, and the evidence proffered and adduced, at the Sale Hearing; and due notice of the Motion and the form of this order (the "<u>Proposed Sale Order</u>") having been provided; and all objections to the Transactions and the Proposed Sale Order having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is in the best interests of the Debtors, their estates, creditors, and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these Chapter 11 Cases; and after due deliberation and sufficient cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.[6]  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction to decide the Motion and approve the Transactions pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing*

---

*Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Authorizing the Debtors to Consummate Transactions Related to the Above; and (E) Granting Other (related document(s)31) Filed by Bumble Bee Parent, Inc.* [Docket No. 300].

[5]    *Declaration of Jerry Chong-Yih in Support of Entry of Order (A) Approving the Stalking Horse Agreement; (B) Approving the Sale to the Stalking Horse Bidder of Substantially All of the Purchased Assets of the Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Authorizing the Debtors to Consummate Transactions Related to the Above; and (E) Granting Other Relief* [Docket No. 307].

[6]    The Court's jurisdiction to approve the relief set forth in this Order is coextensive with its jurisdictional reach over the assets of the Debtors' estates.

*Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order hereon under Article III of the U.S. Constitution.  Venue of these chapter 11 cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief granted herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, Local Rules 6004-1 and 6006-1.

D.    **Opportunity to Object**.  A fair and reasonable opportunity to object to, and be heard with respect to, the Motion and the Transactions has been given to all Persons entitled to notice pursuant to the Bidding Procedures Order, including, but not limited to, the following: (i) all non-Debtor parties to the Assumed Contracts, (ii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002, (iii) all applicable federal, state, and local taxing and regulatory authorities, (iv) all known plaintiffs or co-defendants in civil litigation filed against the Debtors, or their counsel; (v) all known parties holding or asserting a lien or other security interest in the Debtors' assets; and (vi) all of the Debtors' known creditors.

E.    **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

F.    **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Stalking Horse Agreement and Transactions and for entering into the Stalking Horse Agreement.  The Debtors' entry into and performance under the Stalking Horse Agreement (i) constitutes a sound and reasonable exercise of the Debtors' business judgment; (ii) provides value to and is beneficial to the Debtors' estates, and is in the best interests of the Debtors and their stakeholders; and (iii) is reasonable and

25932113.1

4

appropriate under the circumstances. Business justifications for the Transactions include, but are not limited to, the following: (a) the Stalking Horse Agreement constitutes the highest or best offer received for the Purchased Assets; (b) the Stalking Horse Agreement presents the best opportunity to maximize the value of the Purchased Assets on a going concern basis and avoid decline and devaluation of the Purchased Assets; (c) unless the Transactions are concluded expeditiously, as provided for pursuant to the Stalking Horse Agreement, certainty of consummating the Transactions will be compromised and recoveries to creditors may be materially diminished; and (d) the value of the Debtors' estates will be maximized through the sale of the Purchased Assets pursuant to the Stalking Horse Agreement.

G. **Compliance with Bidding Procedures Order**. The Debtors and Buyer complied with the Bidding Procedures Order and the Bidding Procedures in all respects. Buyer was the Successful Bidder (as defined in the Bidding Procedures) for the Purchased Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

H. **Highest or Best Value**. The Debtors and their advisors, including Houlihan Lokey Capital, Inc., (i) engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process pursuant to the Bidding Procedures Order and Bidding Procedures; (ii) conducted a fair and open sale process; and (iii) the Bidding Procedures Order, the Bidding Procedures, and the process utilized pursuant thereto were designed to obtain the highest or best value for the Purchased Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result. The sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.

I.       No other Person or entity or group of Persons or entities has offered to purchase the Purchased Assets for an amount that would give an opportunity for equal or greater value to the Debtors than the value provided by the Buyer pursuant to the Stalking Horse Agreement. Execution of the Transactions is the best alternative available to the Debtors to maximize the return to their creditors and limit the losses to counterparties to the Assumed Contracts.  No alternative to the Transactions exists that would provide a greater value to the Debtors, their creditors or other parties in interest.

J.       The sale and assignment of the Purchased Assets outside of a plan of reorganization pursuant to the Stalking Horse Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of any chapter 11 plan of the Debtors.   Neither the Stalking Horse Agreement nor the Transactions contemplated thereby constitutes a *sub rosa* chapter 11 plan.

K.       **Fair Consideration**.  The consideration to be paid by Buyer under the Stalking Horse Agreement constitutes fair and reasonable consideration for the Purchased Assets.

L.       **No Successor or Other Derivative Liability**.  Buyer is not, and will not be, a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity between Buyer and the Debtors.  The Transactions do not amount to a consolidation, merger, or *de facto* merger of Buyer with or into any of the Debtors.

M.       **Good Faith**.  The Stalking Horse Agreement and each of the transactions contemplated therein were negotiated, proposed, and entered into by the Debtors and Buyer in good faith, without collusion, and from arms'-length bargaining positions.  Buyer is a "good faith Buyer" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is

entitled to all the protections afforded thereby.  Neither the Debtors nor Buyer have engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. The Stalking Horse Agreement was not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors.  Neither the Debtors nor the Buyer is entering into the Stalking Horse Agreement, or proposing to consummate the Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.

N.    The sale of the Purchased Assets is consistent with the Debtors' policies concerning the transfer of personally identifiable information, or does not seek to transfer such information (if any).  Accordingly, appointment of a consumer ombudsman pursuant to sections 363(b)(1)(A), (B) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

O.    **Notice**.  As evidenced by the affidavits of service filed with this Court: (i)  proper, timely, adequate, and sufficient notice of the Motion, the bidding process (including the deadline for submitting bids and the Auction), the Sale Hearing, the Transactions, and the Proposed Sale Order was provided by the Debtors to all interested parties; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order, Bankruptcy Code sections 102(1) and 363(b), Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, Local Rules 6004-1 and 6006-1, and the procedural due process requirements of the United States Constitution; and (iii) no other or further notice of the Motion, the Transactions, the Bidding Procedures, the Sale Hearing, or the Proposed Sale Order is required.

25932113.1

With respect to Persons whose identities are not reasonably ascertained by the Debtors, publication of the notice in *USA Today*, national edition, on December 24, 2019, was sufficient and reasonably calculated under the circumstances to reach such Persons.

P.    **Cure Notice**.  As evidenced by the certificates of service filed with this Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served notice of the potential assumption and assignment of the Assumed Contracts and of the related proposed Cure Amounts (as defined below) upon each non-Debtor party to the Assumed Contracts (the "Cure Notice").  The service of the Cure Notice was good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the proposed Cure Amounts for the assumption and assignment of the Assumed Contracts.  Subject to paragraph 28 of this Order, all non-Debtor parties to the Assumed Contracts have had a reasonable opportunity to object both to the proposed Cure Amounts listed on the Cure Notice and to the assumption and assignment of the Assumed Contracts to Buyer.  No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay the Cure Amounts or defaults that are not required to be cured.

Q.    **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Purchased Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Purchased Assets (other than any Assumed Liabilities and Permitted Liens other than Permitted Tax Liens), including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, any and all claims arising under state or federal antitrust

laws, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit

plan claims, workers' compensation claims, retiree healthcare or life insurance claims or claims

for taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability

claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or

regulation of the United States, any state, territory, or possession thereof or the District of

Columbia), whether arising prior to or subsequent to the commencement of these chapter 11

cases, whether known or unknown, and whether imposed by agreement, understanding, law,

equity or otherwise arising under or out of, in connection with, or in any way related to the

Debtors, the Debtors' interests in the Purchased Assets, the operation of the Debtors' business

before the Closing (as defined below), or the transfer of the Debtors' interests in the Purchased

Assets to Buyer, and all Excluded Liabilities (collectively, excluding any Acquired Claims,

Assumed Liabilities and/or any Permitted Liens other than Permitted Tax Liens, the "Claims"),

because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code have been satisfied.  For purposes of this Order, "Permitted Tax Liens" shall

mean Permitted Liens for Taxes, assessments or other governmental charges not yet due and

payable or the amount or validity of which is being contested in good faith by appropriate

Proceedings as set forth in subsection (i) of the defined term "Permitted Liens" in the Stalking

Horse Agreement.  Those holders of Claims who did not object (or who ultimately withdrew

their objections, if any) to the Transactions or the Motion are deemed to have consented pursuant

to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims who did object that have

an interest in the Purchased Assets fall within one or more of the other subsections of section

363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims

that constitute interests in the Purchased Assets attach solely to the proceeds of the Transactions

ultimately attributable to the property in which they have an interest, in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Transactions, subject to any rights, claims, and defenses that the Debtors' estates and/or the Debtors, as applicable, may possess with respect thereto.  All Persons having Claims of any kind or nature whatsoever against the Debtors or the Purchased Assets shall be forever prohibited, barred, and estopped from pursuing or asserting such Claims against Buyer or any of its assets, property, Affiliates (including any Person who may at any time from the Agreement Date until the Closing serve as a director, officer, manager, employee or advisor of any Seller or Transferred Subsidiary), successors, assigns, or the Purchased Assets.

     R.     Buyer would not have entered into the Stalking Horse Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, if the sale of the Purchased Assets was not free and clear of all Claims, or if Buyer would, or in the future could, be liable for any such Claims.

     S.     The total consideration to be provided under the Stalking Horse Agreement reflects Buyer's reliance on this Order to provide it with title to and possession of the Purchased Assets free and clear of all Claims.

     T.     **<u>Assumption and Assignment of Assumed Contracts</u>**.  The assumption and assignment of the Assumed Contracts is integral to the Stalking Horse Agreement, is in the best interests of the Debtors and their estates, and represents the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assumed Contracts (i) is necessary to sell the Purchased Assets to Buyer; (ii) allows the Debtors to sell their business to Buyer as a going concern; (iii) limits the losses suffered by non-Debtor parties to the Assumed Contracts; and (iv) maximizes the recoveries to other creditors of the Debtors by

limiting the number and total asserted amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Contracts.

U.      With respect to each of the Assumed Contracts, the Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code.  The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed upon or judicially resolved (the "Cure Amounts"), are deemed to be the entire cure obligation due and owing under the Assumed Contracts pursuant to or under Bankruptcy Code section 365(b) and are, except as otherwise set forth in this Order, set forth on **Exhibit B** attached hereto.  Further, Buyer has provided adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.  Accordingly, the Assumed Contracts may be assumed by the Debtors and assigned to Buyer as provided for in the Stalking Horse Agreement and herein.

V.      **Validity of Transfer**.  As of the Closing Date (as defined in the Stalking Horse Agreement) of the Transactions (the "Closing"), the transfer of the Purchased Assets to Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest Buyer with all right, title, and interest of the Debtors in respect of the Purchased Assets, free and clear of all Claims.  The consummation of the Transactions is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

W.      The Debtors (i) have full corporate power and authority to execute the Stalking Horse Agreement and all other documents contemplated thereby, and the Transactions have been duly and validly authorized by all necessary corporate action of the Debtors; (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the

Stalking Horse Agreement; and (iii) upon entry of this Order, other than any consents identified in the Stalking Horse Agreement (including with respect to antitrust or other regulatory matters), need no consent or approval from any other Person to consummate the Transactions.

        X.      The Purchased Assets of the Debtors constitute property of their estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

        Y.      The Stalking Horse Agreement is a valid and lawful contract binding upon each of the signatories thereto and shall be enforceable pursuant to its terms.  The Stalking Horse Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  This Order, the Stalking Horse Agreement, and, upon Closing, the Transactions, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Buyer, the Debtors, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

        Z.      **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.  Therefore, time is of the essence in consummating the Transactions, and the Debtors and Buyer intend to close the Transactions as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Transactions as contemplated by the Stalking Horse Agreement.  Accordingly, there is sufficient cause to lift the

stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Order.

AA.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion, the Reply, the declarations filed in support thereof, and presented at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT:**

1.    **Motion is Granted**.    The Motion and the relief requested therein is granted and approved as set forth herein.

2.    **Objections Overruled**.  Any and all objections to the Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing or by stipulation filed with this Court, including the Objections, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.

3.    **Notice.**  Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.    **Fair Purchase Price**.  The consideration provided by Buyer under the Stalking Horse Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Voidable Transactions Act; (ii) fair consideration under the Uniform Fraudulent Conveyance Act; and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

5.      **Approval of the Debtors' Entry Into Stalking Horse Agreement**.  The

Debtors' entry into the Stalking Horse Agreement, including all transactions contemplated

thereby and all of the terms and conditions thereof, is hereby authorized in its entirety.  The

failure to specifically include or reference in this Order any particular provisions of the Stalking

Horse Agreement, including any of the documents, agreements, or instruments related thereto

and executed in connection therewith, shall not diminish or impair the effectiveness of such

provisions, documents, agreements, or instruments, it being the intent of this Court that entry into

the Stalking Horse Agreement be authorized and approved in its entirety.

6.      **Approval of the Backup Bid**.[7] Brookfield Principal Credit LLC, solely in

its capacity as Term Loan Agent and DIP Term Loan Agent, Honey Blue U.S. Acquisition, L.P.,

as U.S. Buyer, Honey Blue Canada Acquisition, Inc., as Canadian Buyer, and Honey Blue

Equity Acquisition, Inc., as Equity Buyer (collectively, the "Credit Bid Backup Bidder") is

hereby approved as the Backup Bidder for the Purchased Assets, and the Bid submitted by Credit

Bid Backup Bidder is hereby approved and authorized as the Backup Bid and shall remain open

as the Backup Bid pursuant to the terms of the Bidding Procedures.  In the event that the Stalking

Horse Bidder cannot or does not consummate the Transactions in accordance with this Order, the

Debtors may designate the Backup Bidder to be the Successful Bidder and the Backup Bid to be

the Successful Bid upon the filing of a notice to such effect with the Court, in which case: (i) the

Credit Bid Backup Bidder, not the Stalking Horse Bidder, shall be deemed to be the "Buyer" for

all intents and purposes under this Order; (ii) the Credit Bid Backup Bidder's Purchase

---

[7]    Capitalized terms in this paragraph 6 but not otherwise defined in this Order shall have the meanings ascribed to
such terms in the Bidding Procedures, the *Final Order: (I) Authorizing Debtors to (A) Obtain Postpetition
Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative
Expense Claims; (III) Granting Adequate Protection; (IV) Modifying Automatic Stay; and (V) Granting Related
Relief* [Docket No. 173], or Exhibit A to the *Notice of Designation of Credit Bid Backup Bid* [Docket No. 310].

25932113.1

Agreement and related documentation, subject to execution thereof, shall be deemed to be, collectively, the "Stalking Horse Agreement" for all intents and purposes under this Order; (iii) the transactions contemplated under the Credit Bid Backup Bidder's Purchase Agreement and related documentation shall be deemed to be the "Transactions" for all intents and purposes under this Order; (iv) the Debtors shall be authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order in light of the foregoing; (v) pursuant to the Bidding Procedures and applicable law (including Bankruptcy Code sections 363(b) and 363(k)) and in accordance with the DIP Orders, the Credit Bid Backup Bidder (on behalf of the Term Agents) was authorized to and did credit bid for the Purchased Assets: (A) all of the DIP Term Loan Debt and (B) a portion of the Term Loan Debt equal to the Credit Bid Amount less than the amount of DIP Term Loan Debt, which was a valid and proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and 363(k) (the "Credit Bid"); and (vi) there is no cause to limit the amount of the Credit Bid under section 363(k) of the Bankruptcy Code.

7.      **Consummation of Transactions**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Stalking Horse Agreement and to consummate the Transactions, including by taking any and all actions as may be reasonably necessary or desirable to implement the Transactions and each of the transactions contemplated thereby or to otherwise effectuate the relief granted pursuant to this Order.

8.      The Debtors, their Affiliates, and their respective officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and

implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Agreement and to take all further actions as may be reasonably (i) requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer, or reducing to Buyer's possession, the Purchased Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Stalking Horse Agreement, all without further order of this Court.

9.      All Persons that are currently in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to Buyer as of the Closing.

10.     Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments reasonably necessary or appropriate to consummate the transactions contemplated by the Stalking Horse Agreement.

11.     Nothing in this Order or the Stalking Horse Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

12.     Without limiting the provisions of paragraph 11 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets of the Debtors sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the sale of the Purchased Assets.

25932113.1

13.     **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the applicable Purchased Assets in accordance with the terms of the Stalking Horse Agreement.   Upon the Closing, such transfer shall: (i) be valid, legal, binding, and effective; (ii) vest Buyer with all right, title, and interest of the Debtors in respect of the Purchased Assets; and (iii) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Transactions, in the same amount and order of their priority, with the same extent, validity, force and effect which they have against the Purchased Assets, and subject to any rights, claims, and defenses that the Debtors' estates and/or the Debtors, as applicable, may possess with respect thereto. For the avoidance of doubt, the applicable Purchased Assets shall be transferred in accordance with the Stalking Horse Agreement free and clear of all Permitted Tax Liens.

14.     **Injunction**.   Except as otherwise provided in the Stalking Horse Agreement, all Persons (and their respective successors and assigns) including, without limitation, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors, any holders of Claims against the Debtors arising from any state or federal antitrust laws, and any other creditors holding Claims against the Debtors, the Purchased Assets, or the Debtors' business are hereby forever prohibited, barred, and estopped from asserting or pursuing such Claims against Buyer, its Affiliates, successors, or assigns, its property, or the Purchased Assets, including, without limitation, by taking any of the following actions: (i) commencing or continuing in any manner any action or other proceeding against Buyer, its Affiliates, successors or assigns, assets, or properties; (ii) enforcing, attaching,

collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its Affiliates, successors or assigns, assets, or properties; (iii) creating, perfecting, or enforcing any Claim against Buyer, its successors or assigns, assets, or properties; (iv) asserting a Claim as a setoff or right of subrogation of any kind against any obligation due Buyer or its successors or assigns; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions approved, contemplated or taken in respect thereof.

15.     All Persons are hereby prohibited from taking any action that would interfere with or adversely affect the ability of the Debtors to transfer the Purchased Assets in accordance with the terms of the Stalking Horse Agreement and this Order.  Following the Closing, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Purchased Assets or assert any claims against the Buyer based on or related to any such Claim or based on any actions the Debtors have taken or may take, or failed to take or may fail to take, in these chapter 11 cases.  Except as set forth in the Stalking Horse Agreement, Buyer and its Affiliates, successors and assigns shall have no liability for any Claims, causes of action, obligations, demands, losses, claims, taxes, costs, and expenses of any kind, character, or nature whatsoever, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever relating to or arising from the Debtors, their estates, the Purchased Assets, or the Transactions, including with respect to: (i) any employment or labor agreements; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current

25932113.1

or former employees of any of the foregoing, including, without limitation, the Employee Benefit

Plans and any participation or other agreements related to the Employee Benefit Plans, or the

termination of any of the foregoing; (iii) the Debtors' business operations or the cessation

thereof; (iv) any litigation involving one or more of the Debtors; (v) any employee, workers'

compensation, occupational disease or unemployment or temporary disability related law,

including, without limitation, claims that might otherwise arise under or pursuant to (a) the

Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards

Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e)

the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of

1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in

Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Multiemployer Pension Plan

Amendments Act of 1980, (k) state and local discrimination laws, (l) state and local

unemployment compensation laws or any other similar state and local laws, (m) state workers'

compensation laws or (n) any other state, local or federal employee benefit laws, regulations or

rules or other state, local or federal laws, regulations or rules relating to, wages, benefits,

employment or termination of employment with any or all Debtors or any predecessors; (vi) any

antitrust laws; (vii) any product liability or similar laws, whether state or federal or otherwise;

(viii) any environmental laws, rules, or regulations, including, without limitation, under the

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601,

et seq., or similar state statutes; (ix) any bulk sales or similar laws; (x) any federal, state, or local

tax statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code

of 1986, as amended; and (xi) any statute or theory of or related to successor liability, including

the common law doctrine of *de facto* merger or successor or transferee liability, or successor-in-interest liability theory.

16.    The entry of this Order shall not effect any release of (i) any future or ongoing obligation(s) under the Stalking Horse Agreement, this Order, the Seller Documents, the Buyer Documents, or the DIP Secured Loan Facilities or (ii) any Person's rights, claims, causes of action, or remedies relating to the foregoing.

17.    **General Assignment**.  This Order (i) shall be effective as a determination that, as of the Closing, the conveyances and transfers described herein and the Stalking Horse Agreement have been effected and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the Purchased Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby authorized and directed to accept for filing any and all of the documents and instruments reasonably necessary or appropriate to consummate the transactions contemplated by the Stalking Horse Agreement.  This Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets and/or a bill of sale or assignment transferring indefeasible title and interest in the Purchased Assets, including the Assumed Contracts, to the Buyer on the terms set forth in the Stalking Horse Agreement.

18.     **Release of Interests**.  If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims, liens, interests, or encumbrances on, or claims against or interests in the Purchased Assets (including, for the avoidance of doubt, the Term Agents and ABL Agents) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the Person has with respect to the Purchased Assets, then with regard to the Purchased Assets that are purchased by Buyer pursuant to the Stalking Horse Agreement and this Order (i) the Debtors are hereby authorized to execute and file such statements, instruments, or releases on behalf of the Person with respect to the Purchased Assets and (ii) Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchased Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

19.     To the maximum extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets and, to the maximum extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Buyer as of the Closing; *provided*, *however*, that, for the avoidance of doubt, nothing in this Order or the Stalking Horse Agreement shall authorize the transfer to the

Buyer of any government-issued license, permit, or registration, or governmental authorization or approval without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfer.  To the maximum extent available under applicable law, all existing licenses or permits applicable to the Debtors' business shall remain in place until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

20.    **Sale Proceeds; Payment of Certain Indebtedness**.    Upon the consummation of the Transaction, and the application of proceeds thereof, (i)(x) all outstanding Obligations (including, without limitation, any accrued but unpaid interest, fees and expenses, any prepayment premium, the outstanding principal balance of loans made thereunder, all obligations in respect of Letters of Credit, and all Bank Product Obligations) under the DIP ABL Credit Agreement as of the Closing (the "Existing DIP ABL Obligations") and (y) to the extent not discharged prior to the consummation of the Transaction, all outstanding Obligations (including without limitation any accrued but unpaid interest, fees and expenses, any prepayment premium, the outstanding principal balance of loans made thereunder, all obligations in respect of Letters of Credit, and all Bank Product Obligations) under the Prepetition ABL Credit Agreement as of Closing (the "Existing Prepetition ABL Obligations"), in each case of clause (x) and (y), other than (1) contingent indemnification Obligations with respect to which no claim has been threatened or asserted, (2) any Bank Product Obligations (other than Hedge Obligations) that, by the terms of the applicable Bank Product Agreement are not required to be repaid or cash collateralized as a result of the repayment of other Obligations, (3) any Hedge Obligations that, by the terms of the applicable Bank Product Agreement are not required to be repaid as a result of the repayment of other Obligations, shall be paid in full in cash, or cash collateralized or

otherwise terminated in a manner satisfactory to the applicable issuing banks, as applicable, from the cash proceeds of the Transaction to the secured parties thereunder; it being understood and agreed that all capitalized terms in this clause (i) not otherwise defined in this Order shall have the meanings ascribed to them in the DIP ABL Credit Agreement and/or the Prepetition ABL Credit Agreement, as applicable, (ii)   all Obligations (as defined in the DIP Term Loan Agreement) (including any accrued but unpaid interest and fees, any prepayment premium and outstanding principal, but excluding contingent indemnification obligations for which no underlying claim has been asserted) as of the Closing (the "Existing DIP Term Loan Obligations") under the DIP Term Loan Agreement shall be paid in full in cash to the secured parties thereunder and (iii) (x) an amount equal to the Prepetition Term Loan Repayment Amount (calculated as set forth in Schedule 1 hereto) of the Obligations outstanding (including any accrued but unpaid interest and fees, any prepayment premium and outstanding principal, but excluding contingent indemnification obligations for which no underlying claim has been asserted and Obligations in respect of Bank Product Agreements to the extent such Obligations are not yet due) as of the Closing (the "Existing Prepetition Term Loan Obligations") under the Prepetition Term Loan Agreement shall be paid in cash to the secured parties thereunder ("Prepetition Term Loan Lenders") and (y) the Prepetition Term Loan Lenders shall have exchanged their right to receive repayment of an amount equal to the Term Loan Rollover Amount (calculated as set forth in Schedule 1 hereto) of the Existing Prepetition Term Loan Obligations for term loans under the term loan facility incurred by the Buyer to finance the Transaction; it being understood and agreed that all capitalized terms in this clause (iii) not otherwise defined in this Order shall have the meanings ascribed to them the Prepetition Term Loan Agreement.  Nothing in this paragraph 21 or Schedule 1 hereto shall alter the rights and

obligations of the parties to the DIP Intercreditor Agreement (as defined in the DIP ABL Credit

Agreement) thereunder with respect to ABL Priority Collateral (as defined in the DIP

Intercreditor Agreement) (or the proceeds thereof) or Term Priority Collateral (as defined in the

DIP Intercreditor Agreement) (or the proceeds thereof).

21.    **D&O Policy**.  On or before the Closing Date, the Debtors are authorized,

effective immediately upon entry of his Order, to purchase insurance policies for directors' and

officers' liability as provided for in any orders entered by the Court approving the Debtors' entry

into any postpetition debtor in possession financing facility and any budget in connection

therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection

therewith.

22.    **No Successor or Other Derivative Liability**.    By virtue of the

Transactions, Buyer shall not be deemed to: (i) be a legal successor, or otherwise be deemed a

successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all

Debtors; or (iii) be a mere continuation or substantial continuation, or be holding itself out as a

mere continuation, of any or all Debtors or their respective estates, or the enterprise or operations

of any or all Debtors.

23.    **Assumption and Assignment of Assumed Contracts**.  The Debtors are

hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume

and assign the Assumed Contracts to Buyer free and clear of all Claims, and to execute and

deliver to Buyer such documents or other instruments as may be reasonably necessary to assign

and transfer the Assumed Contracts to Buyer, as provided in the Stalking Horse Agreement.

Upon the Closing, Buyer shall succeed to the entirety of the Debtors' rights and obligations in

respect of the Assumed Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the

Debtors shall be relieved from any further liability with respect to the Assumed Contracts. Buyer acknowledges and agrees that, from and after the Closing, Buyer shall comply with the terms of each Assumed Contract in its entirety.

24.     All Cure Amounts that have not been waived shall be determined in accordance with the Bidding Procedures Order and paid in accordance with the terms of the Stalking Horse Agreement.  Payment of the Cure Amounts shall be in full satisfaction and cure of any and all defaults under the Assumed Contracts for purposes of section 365 of the Bankruptcy Code, and upon such payment such Assumed Contracts shall be deemed to be in full force and effect, free of default for such purposes.  Each non-Debtor party to an Assumed Contract is forever prohibited, barred, and estopped from asserting against the Debtors or Buyer, their Affiliates, successors, or assigns, or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

25.     The Cure Amounts set forth on Exhibit B attached to this Order are the final Cure Amounts for purposes of this Order and the Transactions.  Such Cure Amounts are and shall be deemed to be finally determined.  To the extent a non-Debtor party to an Assumed Contract failed to timely object to a proposed Cure Amount, any such non-Debtor party shall be prohibited from challenging, objecting to, or denying the validity and finality of such Cure Amount at any time.

26.     If a non-Debtor party to an Assumed Contract objects solely to the proposed Cure Amount, the Debtors may, with the consent of, or at the direction of, the Stalking Horse Bidder, pay the undisputed portion of such Cure Amount and place the disputed amount in a segregated account pending further order of the Court or mutual agreement of the parties.  So

long as such disputed amounts are held in such segregated account, the Debtors may, without delay, assume and assign such Assumed Contract.  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in such segregated account.

27.     Upon the Closing, the Debtors shall file a notice of sale closing and serve the same on all counterparties to the Assumed Contracts.  Such notice shall serve as notice that such Assumed Contracts have actually been assumed and assigned.

28.     Notwithstanding anything to the contrary herein, with respect to any executory contract or unexpired lease identified on a Supplemental Assumption Notice (as defined below) (each such contract or lease, a "Supplemental Contract"), such Supplemental Contract shall be deemed an Assumed Contract under this Order provided that the applicable contract counterparty does not object to the Supplemental Assumption Notice by the Supplemental Assumption Objection Deadline (as defined below), and the Cure Amount for that Supplemental Contract shall be as set forth in the Supplemental Assumption Notice unless a different amount is agreed to by the Debtors (or the Buyer, if applicable) and the affected counterparty in writing.  If an affected counterparty objects to the Supplemental Assumption Notice with respect to its Supplemental Contract by the Supplement Assumption Objection Deadline, then such Supplemental Contract shall only be treated as an Assumed Contract upon either (i) the withdrawal of the applicable objection or (ii) further order of the Court.  For purposes of this paragraph 28, "Supplemental Assumption Notice" shall mean (i) that certain notice to be filed on January 23, 2020, or (ii) any subsequent notice setting forth additional executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder, the proposed Cure Amount for any Supplemental Contract, and the applicable Supplemental Assumption Objection Deadline and shall contain a statement that the failure to timely object to

the Supplemental Assumption Notice by the Supplemental Assumption Objection Deadline shall result in the contract being assumed and assigned in accordance with this Order.  For purposes of this paragraph 28, "Supplemental Assumption Objection Deadline" shall mean 4:00 p.m. (prevailing Eastern Time) on the date that is ten (10) days after the filing and service of a Supplemental Assumption Notice (or the next business day if that date does not fall on a business day).

29.    ***Ipso Facto* Clauses Ineffective**.    The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Buyer in accordance with their respective terms, including all obligations of Buyer as the assignee of the Assumed Contracts, notwithstanding any provision in any such Assumed Contracts (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  There shall be no, and all non-Debtor parties to any Assumed Contract are forever prohibited, barred, and estopped from raising or asserting against the Debtors or Buyer any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases, or any other fees charged to Buyer or the Debtors as a result of the assumption or assignment of the Assumed Contracts.

30.    Upon the Debtors' assumption and assignment of the Assumed Contracts to Buyer, no default shall exist under any Assumed Contracts, and no non-Debtor party to any Assumed Contracts shall be permitted to declare a default by any Debtor or Buyer, or otherwise take action against Buyer, as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contracts.  Any provision in an Assumed Contract that prohibits or conditions the assignment or sublease of such Assumed Contract (including without limitation, the granting of a lien therein) or allows the non-Debtor

party thereto to terminate, recapture, impose any penalty, condition on renewal, or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely with respect to assignment of the Assumed Contracts in the Transactions. The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Contract.

31.     **Statutory Mootness**. The transactions contemplated by the Stalking Horse Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Transactions shall neither affect the validity of the Transactions nor the transfer of the Purchased Assets to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

32.     **No Avoidance of Stalking Horse Agreement**. Neither the Debtors nor Buyer has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

33.     **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Transactions and the Debtors and Buyer intend to close the Transactions as soon as practicable.

25932113.1

34.    **Binding Effect**.    The terms and provisions of the Stalking Horse Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors, Buyer and its Affiliates, successors, and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent dismissal of the chapter 11 cases or the appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, or receiver, and any such trustee, examiner or receiver shall be authorized to perform under the Stalking Horse Agreement without the need for further order of this Court.

35.    **Conflicts; Precedence**.    In the event that there is a direct conflict between the terms of this Order and the terms of (i) the Stalking Horse Agreement or (ii) any other order of this Court, the terms of this Order shall control.    Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, or any order confirming such plan, shall conflict with or derogate from the provisions of the Stalking Horse Agreement or the terms of this Order, and this Order shall control in the event of any such potential conflict.

36.    **Modification of Stalking Horse Agreement**.    The Stalking Horse Agreement, and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; *provided* that any modification, amendment, or supplement that materially changes the terms of the Stalking Horse Agreement or

any related agreements, documents, or other instruments shall be subject to further Court approval.

37.    **Bulk Sales**.  No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Transactions.  The Debtors and the Buyer waive, and hereby shall be deemed to have waived, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

38.    **Conditions Precedent**.  Notwithstanding anything to the contrary herein, none of the parties to the Stalking Horse Agreement shall have an obligation to close the Transactions until all conditions precedent in the Stalking Horse Agreement to the parties' respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Stalking Horse Agreement.

39.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Stalking Horse Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to this Order and the Stalking Horse Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

40.    **Sections 332 and 363(b)(1)(A), (B)**.  The sale pursuant to the Stalking Horse Agreement satisfies section 363(b)(1)(A) of the Bankruptcy Code and is consistent with the Debtors' policies, if any, in effect as of the date hereof prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtors.  To

the extent any such personally identifiable information exists and the transfer of such information is inconsistent with such policies, the Stalking Horse Agreement is hereby amended to provide that any such information constitutes an Excluded Asset and shall not be transferred to Buyer. Accordingly, a consumer privacy ombudsman was not required nor appointed pursuant to sections 363(b)(1)(B) or 332 of the Bankruptcy Code.

41.    **DOJ Agreement**.  "DOJ Agreement" as used in Section 1.1 of the Stalking Horse Agreement is modified to mean the following from United States of America v. Bumble Bee Foods, LLC, Case No. 17-00249 (EMC) (N.D. Cal.):  (a) the Judgment in a Criminal Case, ECF # 42, filed on August 7, 2017, (b) the Amended Plea Agreement, ECF # 32, filed on August 2, 2017 by and among the United States of America and Bumble Bee Foods, LLC, and (c) any amendments to that Judgment that may be issued with the prior written consent of the Buyer except in the event that the Buyer fails to comply with the obligations under the DOJ Agreement for which it has successor liability.  Further, Section 2.3 of the Stalking Horse Agreement is modified to provide that notwithstanding any other provision of the Stalking Horse Agreement or this Order, the Buyer has contracted to pay and explicitly agrees to pay the remaining criminal fine owed as of the date hereof (*i.e.* $17 million) by the defendant Bumble Bee Foods LLC to the United States of America pursuant to paragraph 9(a) of the Amended Plea Agreement and the Schedule of Payments set forth in the Judgement.  Furthermore, section 10.18 "Non-Recourse" of the Stalking Horse Agreement is hereby amended to exclude a release of potential liability under the DOJ Agreement of Big Catch Cayman L.P. or Bumble Bee Foods S.a.r.l., and this Order shall not affect the liability of any party that currently is obligated under the DOJ Agreement and that is not a debtor in these cases to pay the sums under the DOJ Agreement to the United States.  Moreover, the Buyer shall have successor liability for the

obligations under the DOJ Agreement pursuant and subject to the terms of sections 2.1(o) and 2.3(b) of the Stalking Horse Agreement; provided, however, that, notwithstanding the foregoing or any other provision of the Stalking Horse Agreement to the contrary, the Buyer shall not assume and shall not be deemed to have assumed, and shall have no successor liability, for any other obligations under the DOJ Agreement or to pay any amounts owed or that could be owed by Big Catch Cayman L.P. to the United States in the maximum of $81.5 million in the event of a Qualifying Transaction, as defined in Attachment A to the Amended Plea Agreement.

42.    **Anova Holding USA, LLC Objection.**  The objection of Anova Holding USA, LLC [Docket No. 257] is withdrawn without prejudice and all parties' rights are reserved.

43.    **Matson Logistics, Inc. Objection.**  Notwithstanding anything to the contrary set forth on Exhibit B to this Order, the establishment of the Cure Amounts for that certain Broker Transportation Agreement Between Bumble Bee and Matson Logistics, Inc. ("Matson") dated as of February 1, 2016 (the "Matson Contract") shall be adjourned to the hearing scheduled for January 29, 2020, provided that the Debtors and Matson may agree to establishment of a Cure Amount with respect to the Matson Contract without need for further order of the Court.

44.    **Wal-Mart Stores, Inc. Objection.**  Notwithstanding anything to the contrary set forth on Exhibit B to this Order, the establishment of the Cure Amounts for Walmart Inc. f/k/a Wal-Mart Stores, Inc. and certain of its subsidiaries ("Walmart") shall be adjourned, provided that the Debtors and Walmart may agree to establishment of a Cure Amount without need for further order of the Court.

45.    **Dolgencorp, LLC Objection.**  Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, including the establishment of any Cure Amount

as $0.00, with respect to the objection of Dolgencorp, LLC [Docket No. 291] ("Dollar General" and such objection, the "DG Objection"), Dollar General shall be authorized to continue to setoff rebate amounts owed to Dollar General in accordance with the Dolgencorp Contract (as defined in the DG Objection).

46.     **SuperValu, Inc. Objection.**  Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, including the establishment of any Cure Amount as $0.00, with respect to the objection of SuperValu Inc. [Docket No. 290] ("SuperValu" and such objection the "SV Objection"), with respect to the Corporate Agreement (as defined in the SV Objection), the obligation owed under the Corporate Agreement prior to January 1, 2020, is $28,500 and such amounts shall be honored in accordance with the terms of the Corporate Agreement, and all amounts coming due under the Corporate Agreement from and after January 1, 2020 shall be honored in the ordinary course of business by the Debtors or the Buyer, as applicable, subject to all defenses, rights, terms and conditions of the Corporate Agreement; provided, however, that anything due and owing under such contracts as of the Closing shall be paid by the Debtors; provided, further, however, that any rights of setoff, including with respect to rebates, in each case whether such rights arise pre- or post-Closing, are unaffected and shall be honored by Buyer in the ordinary course of business as such rights arise under the Corporate Agreement.

47.     **NTT Data, Inc. Resolution.**  Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, the Cure Amount for the Debtors' executory contract with NTT Data, Inc. shall be established as $57,172.66, with respect to amounts accrued prior to the Petition Date, and the amount of $13,599.34, reflecting the balance of amounts owed for November 2019, shall be treated as an Assumed Liability, to the extent that such amount is

not paid prior to the Closing Date; provided, however, that anything due and owing under such contracts as of the Closing shall be paid by the Debtors.

48.  **Costco Wholesale Corporation Resolution.**  The following contracts with Costco Wholesale Corporation and its affiliates (collectively, "Costco") shall be deemed to be included as Assumed Contracts, subject to the provisions of the Stalking Horse Agreement with respect to the removal of any Assumed Contract (collectively, the following contracts, the "Costco Contracts"):

>    (a)    Item Agreement for Kirkland Signature Albacore 8-7oz Cluster Packs, Price Decline Notification, and Certificate from Steve Mavity, effective as of January 14, 2014 and as has been amended and supplemented from time to time (the "Albacore Tuna Agreements");

>    (b)    Costco Wholesale Vendor Agreement (Basic) Puerto Rico 2001, effective as of October 8, 2001;

>    (c)    U.S. Funding Supplier Contract for Snow's Chopped Claims, effective as of October 29, 2019;

>    (d)    U.S. Warehouse Endcap Agreement for Displays through January 2020, effective as of November 12, 2019;

>    (e)    U.S. Warehouse Endcap Agreement for Displays through March 2020, effective as of November 12, 2019;

>    (f)    U.S. Warehouse Endcap Agreement for Displays through July 2020, effective as of November 12, 2019;

>    (g)    Vendor Set-Up Form for Bumble Bee Albacore Tuna 6/8 pks, effective as of May 1, 2019;

>    (h)    Vendor Set-Up Form for Kirkland Signature Solid White Albacore Tuna in Water, effective as of May 1, 2019; and

>    (i)    Costco Wholesale Private Label Agreement Dual Brand Agreement, effective as of May 13, 2020.

Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, the Cure Amount for each Costco Contract shall be $0.00 as of the Petition Date, and upon assumption of any applicable Costco Contract, the Buyer shall honor any obligations under

25932113.1

that Costco Contract, subject to all defenses, rights, terms and conditions thereof, arising from and after the Petition Date that have not been performed as of the effective date of assumption, which shall be treated as Assumed Liabilities; provided, however, that anything due and owing under such contracts as of the Closing shall be paid by the Debtors.

49.    **SAP Objection.**  Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, with respect to the objection of SAP America, Inc. ("SAP") and its affiliates SAP SE ("SAP SE") and Concur Technologies, Inc. [Docket No. 296] ("Concur," and with SAP and SAP SE, the "SAP Entities" and such objection the "SAP Objection"):[8]

> (a)    The post-Petition Date amount of $576,348.64 is outstanding under the License Agreement, and such amounts shall be paid as a condition to assumption of the License Agreement;
>
> (b)    The post-Petition Date amount of $14,453.16 is outstanding under the SAP Cloud Services Agreement, and such amounts shall be paid as a condition to assumption of the SAP Cloud Services Agreement;
>
> (c)    The pre-Petition Date amount of $2,258.02 shall be established as the Cure Amount for the Concur Cloud Services Agreement;
>
> (d)    Each of the License Agreement, the SAP Cloud Services Agreement, and the Concur Cloud Services Agreement, shall be assumed and assigned as Assumed Contracts, and SAP and Concur consent to the assumption and assignment of such agreements to the Buyer, subject to the payments required for each agreement as set forth herein and execution of an assignment agreement in the form previously provided by the applicable SAP Entity to the Debtors and the Buyer;
>
> (e)    SAP and Concur consent to Buyer providing the Debtors with services under the TSA contemplated under the Stalking Horse Agreement, subject to any limitations set forth in the applicable assignment agreement; and
>
> (f)    The Blockchain Agreements between the Debtors and SAP SE may only be assumed and assigned to the Buyer with the consent of SAP SE or, if

---

[8]    Capitalized terms used in this paragraph 49 but not otherwise defined in this Order shall have the meaning ascribed to such terms in the SAP Objection.

SAP SE's consent cannot be obtained, by further order of the Court upon adequate notice to SAP SE, which shall have an opportunity to respond.

50.     **Freudland/Syntax Resolution.**  Notwithstanding anything in this Order or the Stalking Horse Agreement to the contrary, the Cure Amount for the Debtors' executory contracts with Freudenberg IT LP (n/k/a Syntax Systems USA LP) (the "Syntax Contracts") shall be established as $33,379.01, with respect to amounts accrued as of the entry of this Order, and establishment of the Cure Amount shall be without prejudice to any post-Petition Date amounts that have accrued but are not yet due as of the entry of this Order, which amounts shall be paid in the ordinary course of business by the Debtors or the Buyer, as applicable, subject to all defenses, rights, terms and conditions of the Syntax Contracts; provided, however, that anything due and owing under such contracts as of the Closing shall be paid by the Debtors.

51.     **Preferred Freezer Resolution.**  Notwithstanding anything to the contrary set forth on Exhibit B to this Order, the establishment of the Cure Amounts for Preferred Freezer Services, LLC ("Preferred") shall be adjourned to the hearing scheduled for January 29, 2020, provided that the Debtors and Preferred may agree to establishment of a Cure Amount without need for further order of the Court.

52.     **Chubb Companies Resolution.**  Notwithstanding anything in this Order, the Stalking Horse Agreement, or any list or schedule of assumed contracts, assumed and assigned contracts, or cure amounts, nothing shall permit or otherwise effect a sale, an assignment or any other transfer at this time of (a) any insurance policies that have been issued by ACE American Insurance Company, Westchester Surplus Lines Insurance Company, ACE Property and Casualty Insurance Company, Illinois Union Insurance Company, Federal Insurance Company, Vigilant Insurance Company or any of their affiliates (and, together with each of their successors, the "Chubb Companies") and all agreements, documents or instruments

relating thereto (collectively, the "Chubb Insurance Contracts"), and/or (b) any rights, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts, (c) any collateral securing the Debtors' obligations under the Chubb Insurance Contracts (together with any proceeds thereof, the "Chubb Collateral"), unless and until a further order is entered by this Court, at a subsequent hearing, or as submitted under certification of counsel by agreement of the Debtors, the Buyer and the Chubb Companies, with the rights of the parties fully preserved pending entry of such further order.  Such further order, without further notice, may provide, among other things, that (i) subject to the execution of an assumption agreement by the Debtors, the Buyer and the Chubb Companies, in form and substance satisfactory to each of the parties (the "Chubb Assumption Agreement"), the Debtors are authorized to assume and assign the Chubb Insurance Contracts to the Buyer and the Buyer shall assume and shall be liable for any and all now existing or hereinafter after arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under the Chubb Insurance Contracts; (ii) the rights and interests of the Debtors in the Chubb Collateral shall be transferred and assigned to the Buyer; (iii) the Debtors are authorized to enter into the Chubb Assumption Agreement; and/or (iv) such other and further relief as may be requested by the Chubb Companies, the Debtors and/or the Buyer.

53.    **Settlement Trust Term Sheet Provisions.**  In accordance with the terms of the Settlement Trust Term Sheet [Docket No. __] (the "Settlement Term Sheet"):

(a)    nothing in this Order or the documents and transactions approved pursuant to this Order does, or may be construed to, release, waive, modify, enjoin, or otherwise impact any claims or causes of action asserted against any non-Debtor defendant now or hereafter named in *In re Packaged Seafood Products Antitrust Litigation*, MDL No. 3:15-md-02670 (S.D. Cal.) (the "MDL"), or any claims other than Claims (for purposes of this paragraph 53 only, as defined in the Stalking Horse Agreement) of the Debtors' or their respective estates arising from the facts and circumstances alleged in the MDL;

(b)    none of the Trust Assets (as defined in the Settlement Term Sheet) are Purchased Assets or Acquired Actions; provided, however, for the avoidance

of doubt, none of the Trust Assets are included in the definitions of Purchased Assets or Acquired Actions; and

        (c)     the Debtors shall not pursue the outstanding portions of the Debtors' motion seeking approval of the Annual Incentive Plan or the Key Employee Incentive Plan [Docket No. 183] related to Individuals 1-3, as referenced in the hearing on January 10, 2020.

54.     Notwithstanding anything to the contrary in this Order (including but not limited to the relief contained in paragraph 15 of this Order), the Stalking Horse Agreement, or the assumption and assignment of the Assumed Contracts to Buyer pursuant to section 365 of the Bankruptcy Code, nothing in this Order shall serve to release, waive, impair, enjoin, or otherwise affect any claims or causes of action any counterparty to an Assumed Contract may have against the Debtors or any other party, or that any non-Debtor may have against any other non-Debtor, in either instance arising from or relating to (a) the Debtors' prepetition Sherman Antitrust Act violations, and (b) any allegation contained in, arising out of, or relating to those pled in the actions consolidated in the District Court for the Southern District of California captioned *In re Packaged Seafood Antitrust Litigation,* Case No. 3:15-md-02670-JLS-MDD, irrespective of the Cure Amount(s) set forth in the *Notice of Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts* [D.I. 206], as the same may be supplemented or modified, or such counterparty's failure to object to such Cure Amount(s).

55.     **General Provisions**.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

56.     Substantially contemporaneously with the Closing, or such later time as may be appropriate in accordance with the Stalking Horse Agreement, in each case without further order of the Court, the Debtors are (a) authorized to change their legal names in

25932113.1

accordance with applicable corporate law, and file any necessary documents to effectuate such name changes and (b) file a notice of name change in these chapter 11 cases and change the caption of the chapter 11 cases for all purposes, including the electronic docket, in these chapter 11 cases.

57.     This Order shall be effective as a determination that, on the date of the Closing, all Claims of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated as to the Purchased Assets, with such Claims to attach to the proceeds of the sale.

25932113.1     **Dated: January 24th, 2020**
               **Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**